Exhibit A

**SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK**

-------------------------------------------------------------------X

CMG HOLDINGS GROUP, INC., as successor to
XA THE EXPERIENTIAL AGENCY, INC.,

                     Plaintiff,

        -against-

JOSEPH WAGNER, HUDSON GRAY LLC, DARREN
ANDERECK, JESSIE LOMMA, MICHAEL DAY, JEAN
WILSON, ESTELLE PIZZO, STUDIO AG, LLC,
REMIGIO GUDIN, and MIXED COMPANY, INC.,

                     Defendants.

-------------------------------------------------------------------X

Index No. 652894/2014

(Scarpulla, J.)

FIRST AMENDED
COMPLAINT

Plaintiff XA The Experiential Agency, Inc. ("XA") ( "XA" or "Plaintiff"), by and

through its attorneys, Eaton & Van Winkle LLP, files this first amended complaint against

Hudson Gray LLC ("Hudson Gray"), Joseph Wagner ("Wagner"), Darren Andereck

("Andereck"), Jean Wilson ("Wilson"), Jessie Lomma ("Lomma") and Remigio Gudin

("Gudin") (the "Hudson Defendants"), Studio AG LLC ("Studio AG") and Estelle Pizzo

("Pizzo") (the "Studio AG Defendants"), and Mixed Company, Inc. ("Mixed Company"), and

alleges as follows:

## PRELIMINARY STATEMENT

1.     Defendants include XA's former officers, referred to herein as the "Hudson

Defendants," and several companies they secretly established to divert business and steal

property from XA.  They did so through a pattern of mail and wire fraud crimes, through several

criminal enterprises, within the meaning of the Racketeer Influenced and Corrupt Organizations

Act, 18 U.S.C. §1961, *et. seq*. ("RICO").

2.     Defendants' misconduct is described below in terms of several schemes.

3.      The objective of the first scheme was to divert XA profits to Hudson, the Hudson Defendants and the Studio AG Defendants, and to steal XA's clients for themselves, a scheme perpetrated through a pattern of predicate mail and wire fraud crimes, within the meaning of the RICO statute (the "Profit and Client Theft Scheme").

4.      The objective of the second scheme was to steal XA's physical property, including everything from furniture (e.g., tables, chairs, pedestals, vases and office lighting fixtures) to large, extremely expensive commercial lighting equipment for high end events, and even items such as XA's computers and cell phones. These thefts were implemented through mail and wire fraud crimes by which they coordinated their improper activities (the Property Theft Scheme"). Text messages among these defendants include directions to engage in the thefts during times when they would not be seen and even discussing what specific XA property each would steal.

5.      The third scheme involved the RICO Defendants concealing the other schemes during the period 2009 to mid-2014 through other and further RICO misconduct.  They did so by, *inter alia*, concealing the fact they were diverting business to other entities they secretly controlled, coordinating their misconduct through text messaging and email communications with one another.  From January, 2014 through September, 2014, based on emails and texts recovered by XA IT professionals from XA's server, the Hudson Defendants secretly ported XA proprietary information from XA's server into temporary servers they controlled, for the benefit and ultimate use of themselves and Hudson Gray. They secretly ported XA proprietary business information on their XA telephones into temporary numbers they controlled and stole paper copies of existing XA contracts and work data.  They did so to prevent discovery by XA of what they had done and/or to impair the ability of XA to determine the details of what had occurred.

Based on information obtained from one XA telephone discovered that did not have its data erased (and still had and has intact all its emails and text messages) and the recovery by IT professionals of the information defendants attempted to permanently erase from the server, the details of many crimes engaged in by the Hudson Defendants, during this period, are established.

6.      Defendants were so confident they would not be caught as a result of the destruction of the XA server, the coordinated use of temporary phone numbers and erasures of their phone data, as well as their theft of XA hard copy data and property, that they established their competing enterprise, Hudson Gray, in direct competition with XA, in the same building in which XA was located.

7.      The three schemes are referred to collectively as the "RICO Schemes."

8.      In perpetrating the wrongdoing alleged herein, XA's former officers and employees, i.e., the Hudson Defendants, while employed by XA, abused their company's trust, exploited and stole XA's confidential and proprietary information, including customer lists and pricing information, and used this information to enrich themselves, through competing entities they secretly owned and controlled, initially through Studio AG and, later, Hudson Gray.

9.      The misconduct remained hidden from 2009 to early 2014, for reasons alleged below.  In January, 2014, XA's parent company, CMG, under new management, began to demand answers as to why XA was not more profitable, given its high gross revenues.  The Hudson Defendants refused to provide any information and CMG began aggressively attempting to get that information.

10.      The Hudson Defendants responded by secretly creating defendant Hudson Gray, through which they began to solicit major XA clients, including NBCUniversal and Bazaar Magazine. Their goal was to have these established XA relationship companies become clients

of Hudson Gray, and, upon information and belief, that is when the Concealment Scheme, went into full swing.

11.     The Hudson Defendants' conduct violated the RICO statute. Their misconduct also breached other statutes, including statutes prohibiting the destruction of computer and electronic records, and theft.  Their misconduct also violated common law duties prohibiting, *inter alia*, fiduciary breach, fraud, conversion and tortious interference.

## PARTIES

12.     XA is a corporation organized and existing under the laws of the State of Nevada which, during all times relevant to the causes alleged herein, had offices located at 333 Hudson Street, New York, New York.  XA is a wholly owned subsidiary of CMG, and was and is engaged in the event and party planning business for large companies and wealthy individuals.

13.     Upon information and belief, defendant Wagner is an individual residing at 128 Brahms Circle, Wheaton, Illinois 60189 and was, at all times relevant hereto, XA's chief executive officer.  He resigned in April, 2014.

14.     Upon information and belief, defendant Andereck is an individual residing at 360 Furman Street, Unit 1113, Brooklyn, New York, New York, 11201. He became employed by XA in or about June, 2000 and, as President/Creative Director of XA, oversaw the New York office operations and maintained client relationships.  He resigned from XA on or about May 22, 2014.

15.     Upon information and belief, Hudson Gray is a creative marketing and branding agency with offices located at 333 Hudson Street, New York, New York.  It is a Delaware limited liability company formed on March 14, 2014 and owned by defendants Wagner, Andereck, and Wilson. As alleged below, Hudson Gray was created to compete with XA.  It did and is today improperly competing with XA.

4

16.     Upon information and belief, Studio AG is an Illinois Limited Liability Company, with offices located at 1800 West Cuyler Street, Chicago, Illinois, 60613.  Studio AG is in the same business as XA and was created by Wagner, Andereck, and Wilson to steal XA's profits and clients in the ways alleged below.  Studio AG's bills, which XA was asked to pay, were for work done almost exclusively on New York-based business, including, for example, the NBCUniversal Upfront and the Characters Unite Project.

17.     Upon information and belief, defendant Lomma is an individual residing at 360 Furman Street, Unit 302, Brooklyn, New York, 11201.  Lomma became employed by XA in August, 2003 and held the title of Vice President of Production.  She oversaw event production, staff and vendors, supervised and hired production staff, created and maintained budgets and worked with clients to assure proper event executions.  She resigned from XA on June 13, 2014.

18.     Upon information and belief, defendant Michael Day is an individual residing at 10 Hanover Square Apt. 21F New York, New York, 10005.   Day held the title Executive Producer of XA. Day was directly involved with event creation and production, creating and maintaining contracts for events and working with clients to assure proper event execution.  He resigned from XA on May 20th, 2014.

19.     Upon information and belief, Wilson is an individual residing at 115 North Highland Avenue, Elmhurst, Illinois 60126, who held the title of Chief Operating Officer.  She was responsible for paying vendors, reviewing and sending out contracts and, generally, for the management of both XA's Chicago and New York offices.  Documents recovered from the XA server indicate that she was frequently in New York and attended all major New York events.  She resigned from XA on or about September 26, 2014.

20.     Upon information and belief, Pizzo is an individual residing 1636 North

Hermitage Avenue, Chicago, Illinois 60626, who was and is Studio AG's general manager.

Pizzo interfaced directly with defendants Wilson and Andereck regarding XA and Studio AG

business projects.  This included, for example, sending hundreds of thousands of dollars in

invoices, by email, for work Studio AG did in New York, on XA's New York projects.  Such

projects, included all NBCUniversal's New York projects and, the coordination of all other

Studio AG work in New York.  She worked with Wilson to cause XA to pay phony Studio AG

invoices for fictitious New York based work and coordinated XA New York-based personnel

doing Studio AG business, including having New York XA employees design Studio AG's own

website.

21.     Upon information and belief, Gudin is an individual residing at 6 Peter Cooper

Road, Apt. 11e, New York, New York, 10010 and was an employee of AG.  Gudin represented

himself to third parties, including the United States Citizenship and Immigration Service, to be

working for XA, which never employed him, contrary to his petition for non-immigrant worker

status, filed February 11, 2014, as recovered from the XA server.  On information and belief,

Gudin lied on his federal form at the direction of defendant Andereck, and sent it to the

Department of Homeland Security, in support of Gudin's petition.  Gudin was extensively

involved in the thefts and commercial bribery mentioned above and alleged in greater detail

below.

22.     Upon information and belief, Mixed Company, Inc., an Illinois corporation owned

by Wilson and a partner, fraudulently billed XA $183,705.00 over the last two years alone,

2013-2014, for services it could not provide.  Most of the bills for these services were stolen or

destroyed. On information and belief, Wilson, as she exited XA, erased XA's files from its

server, based on IT tracing of the deletions of massive amounts of electronic data from her home IT address. Mixed Company, a small, local florist in a suburb west of Chicago was billing XA for "project support," "creative support," and "production services" for numerous NBCUniversal large projects, including NBCUniversal's 2014 Upfront, its largest yearly event. Such required services were, in fact, far too large for a small florist to provide, and XA's own itemized 2014 Upfront Budget, which defendants attempted to permanently delete from XA's files, shows no participation by Mixed Company. Mixed Company sent numerous bills to XA for work it allegedly provided on the NBCUniversal Upfront projects and other New York NBCUniversal related projects.

## JURISDICTION AND VENUE

23.     This court has personal jurisdiction over each and all of the Defendants because, upon information and belief, Defendants reside in New York and/or maintain business offices in New York and/or have engaged in criminal and/or tortious conduct outside and inside New York which have had substantial effects in New York and/or because each and all of the Defendants have done substantial business in New York.

24.     Venue is proper because many of the events, transactions and occurrences occurred in the County of New York and because a substantial portion of Defendants' misconduct occurred in the County of New York and/or was directed from New York City.

## FACTS

**Business Diversion through Controlled Companies, XA Scenes and Studio AG**

25.     XA was established in August, 2000 and was in the event planning business. In April 2009, CMG, a publicly traded company, acquired XA and all its subsidiaries, including a subsidiary called XA Scenes.

26. CMG had learned XA was engaged in business lines consonant with its business goals and that XA was essentially bankrupt and wanted to be acquired. XA owed trade creditors monies but had revenues in excess of $10 million.

27. Between 2009 and 2014, XA remained marginally profitable each year or lost a relatively small amount of money but had (apparent) substantial, gross revenues and CMG hoped it would, sooner or later, generate stronger returns. CMG acquired XA's assets using a procedure in Illinois similar to a bankruptcy proceeding, through a public sale. Once CMG became an owner of XA's assets, it entered into contracts with XA's senior officers, providing them with salaries and earn-out compensation based on profitability.

28. At that time, surprisingly to CMG, the XA officers, Wagner, Andereck and Wilson did not want CMG stock. On information and belief, the reason they did not want CMG stock was because they intended to and did in fact, at or about that time, begin to abuse XA's resources to increasingly siphon XA profits and customers to themselves. Such acts were in violation of the Agreements they had just signed, and were, in addition, activities in which they had engaged over prior years, as the emails and text messages that would be recovered from the restored server would later indicate.

29. CMG acquired XA and all its subsidiaries in April, 2009. XA's belief regarding why these defendants did not want stock in CMG is based on the time frame in which Studio AG and Hudson Gray were created and the diversions their emails disclose.

30. In or about April 2009, on information and belief, Wagner, Andereck and Wilson, entered into substantively identical employment agreements ("Agreement" or "Agreements") with XA, a representative copy of which is annexed as Ex. C (the "Wagner Agreement"). XA's belief that Andereck and Wilson executed such agreements is based on statements by defendant

8

Wilson that no one worked at XA unless they signed the Handbook and statements by counsel Michael Vandetty that he understood such agreements existed and were executed and in place in XA's office, prior to the time the Hudson Defendants left for Hudson.

31.     Based on documents retrieved from the restored XA server, XA learned that the Hudson Defendants had a long history of wrongful competition and had long been diverting profits and customers from XA.

32.     Example – Studio AG.  Defendant Studio AG is a limited liability company owned by Wagner, Andereck and Wilson, a fact defendants named in  XA's first complaint acknowledged in their Third Party Complaint in this Action, at ¶ 64 (mentioning Wagner and Andereck and "another former XA employee" – in fact, it was Wilson) but not disclosed to XA or its owners prior to litigation.   Studio AG does the same work as XA, as demonstrated in its advertisements, website and emails.  From 2009 to May, 2014, the Hudson and Studio AG Defendants used Studio AG to compete with XA in violation their Agreement's non-competition prohibitions, as detailed below.  Documents called "Sale by customer summaries," recovered from XA's server, indicate defendants used Studio AG to service XA customers including, e.g., The Nine Hundred Shops, CW Television Network, NBC's Characters Unite Tour, and the UN Foundation, notwithstanding non-competition Agreement prohibitions.  The Hudson Defendants jointly directed XA employee, Natalia Tsynkevich ("Natalia"), while employed at XA, to design Studio AG's website, causing this website to advertise the same products and services XA was marketing, at that same time.

33.     Example -- XA Scenes.  XA Scenes was secretly used by Wagner, Andereck and Wilson to act as an "event manager" for Gallery 1028, a large loft event space in Chicago, owned by Calihan Catering.  Gallery 1028 held hundreds of corporate and private events

between 2009 and March, 2011.  The business XA Scenes was doing, however, could and should have been done by XA. The Hudson Defendants, managing the event space, used their control over XA Scenes to divert business to Studio AG, improperly competing with XA, in breach of their Agreements.  From 2009 through March 2011, hundreds of potential XA events were diverted to Studio AG, through XA Scenes, including, corporate events by large companies, including NBCUniversal, fund raising events, and high end weddings. In each case, profits that should have been made by XA were improperly re-directed to Studio AG, for producing the events, and XA Scenes, for renting out the event space.

34.    The history of Studio AG is particularly important as it shows a pattern of long-standing fraudulent conduct similar to that in which Hudson Gray has engaged and is engaging, under the control of the same persons, who previously diverted substantial business from XA, through Studio AG and XA Scenes, for their own benefit.

35.    Example -- Fiori XA. In August, 2004, XA purchased Fiori, Inc., which became a wholly owned XA subsidiary. Fiori purchased the assets of a company called "Alice's Gardens," which was then defendant Andereck's floral shop.  Fiori, Inc. was renamed Fiori XA and Fiori XA then engaged in the same business as did XA.  On December 12, 2009, Wagner, Andereck and Wilson formed Studio AG, a private LLC, and used it to continue the business of Fiori XA, under a different name, a private company they secretly owned.  Studio AG's creation and its use to divert XA's business was neither disclosed to CMG's Board, nor its shareholders. It was not disclosed in SEC filings, even though Fiori XA was a major XA asset.  On information and belief, the Hudson and Studio AG Defendants failed to make disclosure to XA to assure XA would not discover this was a competing enterprise.  To further assure secrecy, they put the business in the name of one of their lieutenants, defendant Pizzo, not in their own names, even

though they were its real owners.  XA was unaware of Studio AG's true ownership until it was disclosed in a libel suit filed by certain defendants herein in response to XA's initial complaint.

36.    On information and belief, Wilson, Wagner and Andereck told Fiori clients that Studio AG was the "same" company as Fiori XA, using a different name.  For example, by email dated May 22, 2009, Pizzo described to Andereck how she told Parkway Bank that Firoi was in the process of "rebranding" and would soon incorporate as Studio AG.  This is the same type of "rebranding" to which they referred in text messages that XA recovered from the XA mobile phone defendant Gudin left behind.  Specifically, by text messages dated June 3, 2014, the Hudson Defendants described what they would tell XA clients about rebranding – namely, that Hudson was the "same" company as XA, just using a different name.

37.    Email and text messaging was used extensively by all defendants to coordinate and implement their wrongdoing; there was extensive wire fraud, a RICO predicate act.

38.    Example.  By email dated 11/16/10, Studio AG's General Manager, Pizzo, asked XA COO Wilson, to transfer invoices for which Studio AG was responsible, to XA.  Wilson and/or Pizzo fraudulently altered bills to make it appear XA, not Studio AG, was responsible to pay these invoices.  Wilson caused a false invoice to be created so that vendor, Manhattan Neon Sign Corp, was paid out of XA funds, by check, sent by mail to settle a Studio AG debt owed to that vendor. In an email that Pizzo sent to Wilson, she wrote: "Hi Jean, as promised, I am forwarding the revised invoices (with XA name on bill to).  If at all possible can you pay the second invoice for $2400.00 too? They really want 50% of what we currently owe before they start the UNICEF project. If you can pay these 2 – that will meet their requirement of 50%."  XA was paying Studio AG's bills so Studio AG could order more materials to service a stolen XA job, namely, the UNICEF Project.

39.   Example.  By email dated 11/11/2010, Wilson and Andereck directed XA employee Natalya to design Studio AG's website, even though she was working for XA and Studio AG was advertising the same services as XA.  Photos nominally portraying Studio AG events were, in large part, photos of XA corporate events, improperly accessed and used without XA's permission, in breach of copyright laws.  The Hudson Defendants, specifically Wilson and Andereck, thus diverted XA business to Studio AG.

40.   Example.  By email dated 6/28/10, P.J. Acosta, a Studio AG employee, and Katie Hall, an XA employee, sent a template of a Studio AG sales script designed to sell corporate and private parties for Studio AG – that made no mention of XA.  Employee Hall took care of all contracts for XA Scenes and used her sales script to induce XA Scene's clients to use Studio AG during the time she was a salaried XA employee.  Documents recovered from XA's server indicate the Hudson Defendants paid employee Hall a commission on all the décor packages she sold for Studio AG.  None of this was disclosed to XA and all of this conduct was in breach of Hall's and Hudson Defendants' duty of undivided loyalty and good faith owed to XA.

41.   Example.  By email dated 6/03/09, among all of Andereck, Wagner and Pizzo, Pizzo stated she intended to sell a van titled to Fiori XA and to use the proceeds for "AG payables."  In other words, they were planning to sell an XA asset, without XA's owners' knowledge, and to use the sale proceeds to pay Studio AG's debts.

42.   Example.  By email dated 1/22/13, Natalia emailed Andereck several logo designs for Queens Endoscopy; this, however, was a Studio AG design job.  CMG had no idea Andereck was running a design service out of Studio AG through which he decorated the homes and offices of high income individuals and businesses.  Andereck ordered hundreds of thousands of

dollars of lighting, furniture, textiles and similar items, and provided contracting services for decorating clients, charged to XA.

43.     Example.  By email dated 11/12/10 from Natalia to Andereck, Natalia sent samples of Bridal Affair Magazine email blasts advertising Gallery 1028 and listing its vendors as XA Scenes and Studio AG, with XA employee Katie Hall listed as the contact person. No mention was made of XA, itself, even though XA could have done everything being advertised by Studio AG.  Defendants thus used XA resources to advertise their competing business.

44.     Despite high gross revenues, XA failed to obtain meaningful profit because the Hudson Defendants and Studio AG Defendants were diverting that business from XA.

45.     According to Studio AG's own year-end customer summaries, which were erased, but recovered from XA's server, XA was Studio AG's biggest customer for 2012, when it charged XA $103,148.50.  In 2013, AG charged XA $122,048.30.  However, in just the first five months of 2014, as soon as CMG management began demanding answers to questions regarding the seeming lack of profitability at XA (but prior to the Hudson Defendants actually walking out of XA for Hudson Gray), Studio AG billed XA $550,401.16. On a per month basis, this was roughly ten times what it had been billing in previous years and was a fraudulent effort to damage XA and put it out of business.  XA's internal records indicate Studio AG billed XA $142,060.80 in 2013 and $184,288.45, in 2012 – these differences between Studio AG's and XA's records are, on information and belief, due to un-deposited funds due XA that were diverted to Studio AG, and carried in accounts receivable, on a yearly basis.

46.     Example. On information and belief, the few hard copy bills the Hudson Defendants left behind in XA's Chicago office to document charges billed to XA were fraudulent.  Studio AG, for example, charged XA tens of thousands of dollars for duratrans,

13

which are large light boxes used for events.  Studio AG, however, was not in the business of

selling duratrans -- it bought duratrans from Manhattan Neon Corp, as indicated in Studio AG

emails recovered on the XA server.  The recovered documents indicate Studio AG was charging

XA for duratrans it never sold to XA.

47.     Example. Studio AG charged XA for fabricated build-outs that were in fact done

by a different company working for XA.  Studio AG charged XA for furniture, referencing

locations (without itemizations), and pretending it was renting or selling furniture – however,

Studio AG was not in the business of renting or selling furniture to XA -- or anyone else.

48.     Example.  The Hudson Defendants created fictitious invoices and falsely charged

XA for labor costs associated with the breaking down of equipment at the Javits Center.

However, on information and belief, the Javits Center exclusively handles such breaking down

through union labor contracts, not companies that employ non-union personnel, as did XA.

**April, 2009 to January 2014**

49.     From April 20, 2009 through January, 2014, CMG Board members repeatedly

made contact with Wagner regarding XA's persistently small or non-existent profit margins,

despite high gross revenues.

50.     In all instances, Wagner blamed XA's lack of profitability on CMG's lack of

financial support for XA.

51.     Board members relied on auditor's reports, and Wagner's own explanation that

XA had fixed yearly costs of $8 million, and could only be profitable if revenues exceeded fixed

costs.

52.     Because XA was a valuable asset to CMG's company profile, as a high earning, if unprofitable subsidiary, and because CMG was not in a position to provide more capital Wagner said was needed for XA to become profitable, XA's operation continued as it had since 2009.

53.     In January, 2014, however, new Board members hired Mr. Ron Burkhardt as Executive Chairman of XA and directed that he oversee its operations and attempt to improve its profitability.

**February 2014 – Wagner Quits XA**

54.     Wagner, upon learning that Burkhardt was coming in, immediately threatened that if Burkhardt was installed to oversee what he was doing, he would quit.

55.     Documents retrieved from the XA server show that Wagner was already working to establish Hudson Gray, in January, 2014, on information and belief, so it could be used as a competing enterprise, against XA.  Hudson was formally established in March, 2014.

56.     XA, in this time period, January through March, 2014, had no idea Wagner and his associates were creating Hudson Gray, nor that they were engaged not only in stealing XA's clients, but that they intended to steal all its physical resources, including furniture, tables, electronic databases and most of its files.

57.     The Hudson Defendants stripped XA of its clients, assets and intellectual property to prevent XA continuing operating an event planning business.

**Server Documents Reveal How the Hudson Defendants Systematically Destroyed XA**

58.     The Hudson Defendants' conspiracy to destroy XA was facilitated by their creation of a communication system that XA could not review and which they, on information and belief, planned to sanitize further upon their withdrawal from XA to prevent any disclosure of their misconduct.  Specifically, in furtherance of their conspiracy and schemes, defendant

Wilson, XA COO, between March 7 and March 11, 2014, bought all new I-phones, using XA credit cards, one for each of the Hudson Defendants. She then federal expressed them to XA's New York office where, on information and belief, some or all of the Hudson Defendants "ported" all the information from their existing XA mobile phones into the new I-phones, using new, temporary numbers unattached to XA's server.

59.    To effect the looting of XA's intellectual property, Wilson and Wagner issued instructions to XA's employee, Mia Blagsvedt, as to how XA's data was to be ported into newly purchased I-phones.  By email from Blagsvedt to Andereck, Day, and Loma, dated 3/11/14, she wrote: "I will need you all to let me know once you have powered on your phones… before I can begin the porting process. You will definitely want to back-up your current phone and then as you follow the prompts on the new I-phone you can pull the data from the cloud … as it requests … Once your new I-phone is activated…I can call the porting department…"

60.    Two months later and continuing through the present, these I-phones, with the XA-ported confidential information were (and still are) being used by the Hudson Defendants and their associates.  In this way, the Hudson Defendants concealed from XA what they had done with respect to XA's communications systems and computer network, in the two months prior to their leaving for Hudson, all accomplished when they were still working for XA.

61.    As a direct consequence of the Hudson Defendants' misconduct, all XA data and communications, including emails, text messages and all electronically stored contact information, on all the phones that defendants caused XA to purchase for them, were wiped out and irretrievably lost to XA, with one crucial exception.

62.    One XA phone, left un-erased, on information and belief by accident, still had its voicemail and email service intact.  This phone, used by defendant Gudin, included his recorded

conversations and messages, emails and text messages with the other Hudson Defendants

including, the following representative conversations:

- Example.  Gudin, in a text message to a temporary XA employee on June 3, 2014,

recorded [speaking of XA] -- "None of us works there anymore.  XA is gone.  We are all moving

to a new company…we are the same with a different name…".   The reason Gudin said they

were the "same" was because he and the Hudson Defendants had stolen not only XA's clients,

but XA's proprietary information, all its employees and, critically, XA's physical resources, as

well, needed to conduct its business, as detailed below.

- Example.  In a text message dated June 2, 2014, Andereck wrote to Day and

Gudin -- "Get the four duratrans [XA's highly expensive light boxes for events] out of storage

[XA's storage locker] today or tomorrow only, put them in downstairs storage [Hudson's own,

new storage locker, in the same building]."  In another text message also dated June 2, 2014,

Andereck cautioned the other Hudson Defendants to steal the equipment when no one was

around to see them – specifically, Andereck wrote "I have a meeting with them Wednesday.

Mike [Day] will call you to get light boxes.  I need to make sure no one is there."  On

information and belief, the Hudson Defendants came in on weekends and late at night when no

one was there to steal the duratrans (and other) items.  XA's belief as to the time at which they

stole the material is based on statements made to XA personnel by building security officers who

recorded the times the Hudson Defendants entered the building, as well as XA's personnel

reviewing security footage of these persons sneaking into the building, late at night.

- Example.  Between, January, 2014 and May, 2014, when Andereck quit XA, the

XA server documents show Andereck purchased, using XA funds, $56,806.16 worth of

duratrans.  None were in the XA office when XA owners entered after the Hudson Defendants

left.  None were in XA's storage locker, either.  On information and belief, first the Hudson Defendants stole what was in the locker, then ordered more items billed to XA, so they could steal them, too.  XA's belief is based on XA server documents showing purchases of duratrans right before the Hudson Defendants left XA's premises -- none were in XA's office.

•   Example.  The Hudson Defendants openly discussed what they were stealing from XA.  For example, XA employee Chelsea Tracy, by text message dated May 3, 2014, wrote to Gudin "You want one of the wooden topped round coffee tables in the storage room, right?  I'm getting my stuff today.  Just want to make sure I don't take any of yours."  Gudin responds "No. It is yours. I just want two wooden pedestals."  None of these items belonged to any of them – all belonged to XA and all were in XA's office or proprietary locker.  Andereck organized the looting, along with his conspirators, on information and belief, as their reward for helping Wagner, Andereck and Wilson destroy XA's business (all orchestrated through wire communication emails and text messages).  These defendants discussed their theft in the most cavalier fashion notwithstanding they were stealing XA property and destroying their employer's business.

•   Example.  Andereck, by text message dated 5/24/14, directed Gudin "I may need you to go pick up lights [two pendent chandeliers purchased by XA costing $3,329.40] at "Lighting by Gregory."  These chandeliers were purchased by XA but were actually installed in Hudson Gray's New York offices.  Similarly, Andereck purchased a Caravaggio pendant lamp from Lumens for $1,521.50, on 4/20/14, which the Hudson Defendants caused XA to pay for when Andereck expensed this purchase on his XA AMEX card.   On information and belief, this fixture was installed in Hudson Gray's office.  XA's belief is based on photos of these same fixtures used by Hudson in its advertising of its new offices, showing them now hanging there

since June 3, 2014.  The photos of these fixtures were sent to Andereck, from Gudin's I-phone -- the bills for them, now recovered from XA's server, show they were improperly purchased using XA funds, proving Hudson Gray's and the Hudson Defendants' thefts.

63.     Numerous other items were stolen besides duratrans, tables, chairs and other furniture, laptops and phones.  No item was apparently too big or too small for the Hudson Defendants to steal.  These resources were necessary to XA continuing its business as an event planning provider.

64.     The misconduct alleged herein was extensive, blatant and recorded.  It consists of coordinated thefts designed to put XA out of business by a cabal of faithless employees, bound by common law contractual and fiduciary duties to their employer, in violation of civil prohibitions and criminal laws, including, because of the manner by which the thefts were implemented, the RICO statute.

65.      Defendants cover-up involved destroying computer records that evidenced their misconduct, erasing information on XA's server, using temporary phone numbers to disguise wire fraud communications coordinating the thefts, and entering the XA premises, in the dead of the night, to avoid detection as they carried away property, files and confidential documents, as well as furniture, computers and other XA property.

**Gudin's Role in the RICO Schemes**

66.     Defendant Gudin is a Spanish national who is or was, on information and belief, Andereck's boyfriend.

67.     In March, 2014, Andereck represented to the Department of Homeland Security that XA would employ Gudin as XA's art director.  In fact, Gudin never worked for XA, but his work visa lists XA as his employer/sponsor.  In fact, he received a few checks from XA which

were billed out to his Spanish design company, R2, on information and belief, in an effort to cover-up the fact he was never an XA employee. XA's belief is based on statements made by XA's billing company, Paychecks, that provided checks to all XA employees, which has advised XA that Gudin never worked for XA.

68.     On information and belief, Andereck caused XA to pay thousands of dollars for Gudin's immigration-related legal bills (for his visa application and even plane tickets to Spain when he needed to return there in connection with his visa), and sent Gudin on expensive trips (e.g., to Spain, Las Vegas, Los Angeles, Houston and Chicago) having nothing to do with XA business. Andereck even had XA pay $1,550.00 to the U.S. Immigration Service to file Gudin's fraudulent petition, which had nothing to do with XA.

69.     Texts recovered from Gudin's I-phone show a pattern of deceit in disclosures made to government agencies, including the Immigration and Naturalization Service and the Department of Homeland Security, regarding his status as a purported XA "employee." Gudin's visa, for example, falsely states XA is his employer, another fraud, committed just six weeks before he and the other Hudson Defendants engaged in the wholesale looting of XA, on or about June 2, 2014. His cell phone statements establish his role in the theft of XA property which caused the destruction of XA, a company he helped plunder, for his own benefit.

70.     All this was occurring right before Wagner negotiated his "release" from liability with XA at a time when XA was wholly unaware of the ongoing misconduct alleged herein.

**Wagner's Release Agreement, Non-competition and its Limited Provisions.**

71. On or about April 22, 2014, in anticipation of his departure, Wagner and XA entered into a release and non-solicitation agreement (the "Release Agreement"). At that time, XA had no knowledge of Wagner's misconduct. The Agreement provided:

> Wagner hereby covenants and agrees that, subject to the condition set forth herein, during his employment with XA and for a period of six (6) months, following the separation of his employment (for any reason), he <u>shall not solicit or attempt to solicit any client of XA</u> who is doing business with XA at the time of such termination, or who did business with XA at any time within six (6) months prior to such termination, (Emphasis added).

72. At the time the Release Agreement was executed, Wagner, along with his co-conspirators, were already implementing the misconduct described above and below. Wagner erased his emails from XA's network which have, to date, not been fully recovered.

73. As of the time the Release Agreement was executed, Wagner had already formed Hudson Gray, on March 14, 2014, and he had already rented the office space in which Hudson Gray would operate, at 333 Hudson Street. At this time, Wagner had completed the preparations necessary for Hudson Gray to compete with XA.

74. Wagner negotiated the Release Agreement in bad faith and the Release Agreement does not protect Wagner from his then existing and then in-process criminal conduct, his common law breaches of fiduciary and contractual duties and other tortious conduct. The Release Agreement, moreover, does not cover misconduct by Studio AG, which he never advised XA was a different, then existing competing venture.

**The Hudson Defendants' Immediate Competition with XA, through Hudson Gray**

75.     As soon as Hudson Gray became operational in mid-March, 2014, it immediately

began improperly competing with XA.  On information and belief, the reason Wagner and his

conspirators established Hudson when they did was so they could have an entity ready to accept

NBCUniversal's 50% deposits for each of six approved NBCUniversal/XA jobs they intended to

and did, in fact, divert.  XA's belief is based on XA's history with NBCUniversal and the fact

that NBCUniversal would always deposit, three to four months prior to project activation, 50%

of the project's total cost.  After the Hudson Defendants left XA, XA received none of the

monies that should have come in from the already approved NBCUniversal projects.  As alleged

below, one project, in fact, began less than one week after Andereck left XA, on May 22, 2014.

76.     Other projects, including "Dig," "Satisfaction" and "Masters of Sex" activations,

occurred within the time horizon in which deposits had been historically made, but which never

arrived at XA even though all of these jobs were in the final stages of development when said

deposits would have typically been advanced.  For example, Andereck informed XA employee

non-defendant Jeff Smith by email on April 1, 2014 "We [XA] have the [DIG] job," yet no

NBCUniversal monies were wired into XA's account on this or any of the pre-approved

NBCUniversal production jobs.  NBC's diversion of over $1.5 million dollars of existing XA-

NBC projects to Hudson Gray was no common place commercial occurrence.  NBC re-directed

roughly $1.5 million dollars in already-approved  XA-NBC business fully developed at XA, to

Hudson Gray.  These near-execution-stage projects, including one executed the very week

Andereck left XA, for which XA would have, in the normal course, received  a 50% deposit

from NBCUniversal three to four months in advance, suddenly received no such deposits.

77.     The redirection of funds for these projects to Hudson Gray occurred while the Hudson defendants were still employed at XA.   On information and belief, NBCUniversal delayed contractual execution of already-developed contracts, approved by NBCUniversal, until the Hudson Defendants resigned from XA to join Hudson Gray.

78.     Hudson Gray and the Hudson Defendants, during this period, uploaded to Hudson Gray's website, photos of XA events, misrepresenting them as Hudson Gray events.  Wagner continued to compete with XA through Hudson Gray, just as he and his cronies had done *sub silentio*, through Studio AG and XA Scenes, because the Hudson Defendants could no longer steal XA business through those entities and maintain secrecy.   It is highly implausible that the Hudson Defendants would have left XA absent prior assurance that NBCUniversal was on board with transfer of business to Hudson Gray.

79.     Hudson stole not only XA's clients and deposits but its employees and physical resources to do business.

80.     Example.  The Hudson Defendants stole high end office chairs worth more than $12,000, from XA's offices and relocated them to Hudson Gray's office, leaving two chairs, but inadvertently, also, the bills for the chairs, showing they caused XA to buy twelve, not two.  On information and belief the Hudson Defendants relocated the stolen chairs to Hudson Gray's office.  XA's belief is based on photos of Hudson Gray's office which the Hudson Defendants placed on Hudson Gray's website, showing the same chairs XA purchased now adorning Hudson Gray's competing office.

81.     Example.  Thousands of dollars in lighting equipment for events, computers and even cell phones, were purchased by Andereck, Wilson and Wagner, using XA funds, all while

23

XA employed them.  The bills for these items, charged to XA but missing from XA's office, were later recovered from XA's server.

82.     On information and belief, before and after Hudson Gray was formed, Wagner, Andereck and Wilson, had solicited and thereafter employed former XA employees, including defendant Day and Lomma, as well as non-XA employee, Gudin.

**The Business Diversions – the NBCUniversal "Upfront" Event**

83.     The size of the business diversions was enormous.  The "NBC Upfront" is an event at which the networks unveil their fall lineups to advertisers and sell advertising space for the upcoming season.  It is the largest such event of the year and, generally, the most important one in that industry.  During 2015, NBCUniversal's Upfront was held at the Jacob K. Javits Convention Center in New York, on May 11, 2015.

84.     XA recovered from its server the 2015 Upfront Budget, which breaks down what XA the Hudson Defendants were charging NBCUniversal – namely, $16,530,000.00, as of February, 2015.  Subtracting costs for the venue and union labor paid for by NBCUniversal (which the Budget indicates), at a minimum, the total event cost that Hudson Gray charged for this NBC event is $14,530,000.00.   The industry standard margin for event planners is twenty percent – in other words, Hudson Gray and the Hudson Defendants will arrogate to themselves almost $3,000,000.00 profit from this one job alone.

85.     During 2014, XA handled the same NBCUniversal Upfront job, at the same venue, with essentially the same work being done.  XA recovered documents show that in 2014, XA charged NBCUniversal roughly $6,000,000.00 for the same work.   On information and belief, the Hudson Defendants diverted the actual amount NBCUniversal was charged to another entity, probably Studio AG.  XA's belief is based on the fact that XA, last year, appears to have

had the entire job for the NBC Upfront, as it does this year, and, on information and belief, no substantial changes in cost of goods or services occurred during the intervening months.

86.     XA had at least five other major NBCUniversal events that were in final stages of development and had to have been approved by NBCUniversal to have gotten as far along as they were, at the time the Hudson Defendants exited XA for Hudson Gray.

87.     Example.  The "DIG TCP Summer Press Tour" job was activated on July 31, 2014 and had a budget of in excess of $500,000.  This project was in development since February, 2014.  On April 1, 2014, Andereck in an email to XA employee non-defendant Jeff Smith stated: "We [XA] have the [DIG] job." On that same day, Jodi Arden from NBC sent an email to Andereck asking: "Is there any way to get a topline [budget] look this week" It's Colleen's [Mohan's] last week and we'd like her to be able to weigh in before she's out." Mohan, whose activation department had already contacted Andereck and Smith about the DIG job at that time, on information and belief, knew that the DIG project was developed by and belonged to XA, yet diverted the deposit monies and final payment for it to Hudson Gray.

88.     Example.  The "Satisfaction Screening" job, activated on August 5, 2014, had a budget of in excess of $300,000.  This project was in development since March, 2014.

89.     Example.  The "Characters Unite Initiative" was a job ongoing since 2008, handled exclusively by XA.  The "CB2 Pride Photo Booth Event" was part of the Characters Unite Initiative and was activated at the end of May, 2014.  Although XA serviced this event for six years, it was never paid for any Characters Unite projects after May, 2014. XA has been unable to access documents showing costs because all the physical contracts are missing and XA IT professionals have not yet been able to restore documents regarding this project.

25

90.     Although XA personnel repeatedly called NBCUniversal to discuss ongoing projects, and emailed them as well, NBCUniversal did not respond to their efforts to communicate. Those efforts started right after the July 4, 2014 weekend and were made continuously through August, 2014.  No one would respond until the new President of XA finally reached Lynn Weiss of NBCUniversal.  Ms. Weiss, however, refused to provide any information but wrote XA stating: "You should actually reach out to Colleen Mohan in the New York office whose team handles marketing and events."

91.     After many failed efforts to reach Ms. Mohan to schedule a meeting, Mohan finally agreed to meet with XA.  On September 4, 2014, in a face to face meeting with Alexis Laken, President of XA and other XA employees, Mohan asked them if they knew where Andereck was presently working after having left XA.   Mohan refused to provide any information about any NBCUniversal upcoming events, but said NBCUniversal had no projects going on at that time.  To the contrary, at that very time, all the jobs mentioned above were activated, approved by NBCUniversal, and in process of being produced by Andereck at Hudson Gray, where Mohan sent them.

92.     The Release Agreement Wagner signed on or about April 22, 2014, pursuant to ¶ 8, purported to release claims against Wagner for claims arising *prior* to April 22, 2014 – this Agreement does not bar claims thereafter.   Because the Settlement Agreement and General Release were procured by fraud, it does not bar claims, regardless of when they occurred.

93.     Wagner engaged in numerous criminal acts both before and after April 22, 2014, as alleged herein and/or facilitated, directed and/or conspired to have them committed by his co-conspirators.

**The XA Handbook**

94.     All XA employees were given an XA Employee Handbook (the "Handbook").

95.     XA's COO, Wilson, was the signatory on its Welcome page and knew the importance of each employee's compliance with its policies governing employee conduct.

96.     Accordingly, as COO, Wilson's responsibilities included assuring that XA's employees complied with Handbook policies, and especially its conduct rules. Handbook § 701 included XA's Code of Conduct and Work Rules, set forth examples of unacceptable workplace behavior – all of the following were breached by the Defendants herein:

      a.     Having a conflict of interest;

      b.     Engaging in unethical or illegal conduct;

      c.     Theft or inappropriate removal or possession of property;

      d.     Conduct that reflects adversely upon XA or employee;

      e.     Unauthorized use of telephones, mail system, or employer-owned equipment;

      f.     Unauthorized disclosure of business "secrets" or confidential, proprietary information;

97.     Wilson, Andereck and other former XA employees, although aware of XA's policy requiring that employees observe principles of fair dealing and to conduct themselves ethically, including the "scrupulous regard for the highest standards of conduct and personal integrity," *See* Handbook § 104 Business Ethics and Conduct, nevertheless violated each and all of the above rules as the facts alleged above and below indicate.

98.     XA had a policy prohibiting the conduct of business if it involved an actual or potential conflict of interest. *See* Handbook §108 Conflicts of Interest. Employees, moreover,

were specifically cautioned that "business dealings with outside firms should not result in

unusual gains for those firms," referring to: "bribes, product bonuses, special fringe benefits,

unusual price breaks, and other windfalls…" Each of the Hudson Defendants breached this

provision of the Handbook.

99.    XA's policies mandated that employees having "influence" on transactions,

purchases, and contracts, disclose the existence of any act or potential conflict.  No such conflicts

were ever reported even though Studio AG was competing with XA and the Hudson Defendants

were preparing Hudson to compete with XA while they were still employees.

100.    The Hudson Defendants, all of whom were formerly XA's officers/employees,

knew of XA's non-disclosure policy to protect its confidential business information and trade

secrets. *See* Handbook §112, Non-Disclosure.  The Handbook includes examples: customer lists

and preferences, financial information, marketing strategies, new materials research, pending

projects and proposals, and proprietary production processes – and XA employees were required

to sign a non-disclosure agreement, as a condition of employment. On information and belief,

such documentation was signed, but it was and is missing in both hard copy and/or electronic

form and has been missing since the XA office was examined, immediately after the Hudson

Defendants left it.  XA's belief is based on statements made by defendant Wilson to CMG's

principal, Glen Laken, that all XA workers received the handbook and signed agreements to

abide by it.  In any event, similar duties exist as a matter of fiduciary obligations these

employees owed to XA, their employer.

101.    XA also had a policy requiring employees to return Company property upon

termination of employment, and allows XA to take all appropriate action to recover or protect its

property. *See* §706, Return of Property.  The Hudson Defendants violated this provision.

102.    The Hudson Defendants violated XA's policies regarding computer and email use, *see* Handbook §516, Computer and E-mail Usage, which states the firm's system and software was "not to be used to solicit others for commercial ventures.… outside organizations, or other non-business matters."

103.    XA employees were reminded of the firm's software licensing agreements which prohibited illegal duplication.

104.    XA's computer and email policies warned employees they could be held personally liable for violations and that the following conduct was prohibited, including using organization time and resources for personal gain, sending or posting confidential material, trade secrets or proprietary information outside of the organization, and engaging in unauthorized transactions that may incur a cost to the organization. The Hudson defendants did each of these.

105.    Former XA COO Wilson knew the importance of accurate timekeeping records and Handbook §401, Timekeeping, advised employees of their responsibility to keep accurate records under Federal and State law.  Instead, on information and belief, the Hudson Defendants extensively falsified records and destroyed or stole other records, as alleged above and below.

106.    The Hudson Defendants violated XA's Handbook and HR policies and violated or caused to be violated federal and state law regarding pay and benefits reporting as many nominally XA employees were caused to perform services for Fiori, XA Scenes, Studio AG and Hudson Gray, while on XA's payroll.

107.    Handbook § 112, required each of the Stolen Employees to sign a non-disclosure agreement and each did so agreeing to protect XA's "confidential business information and trade secrets." Pursuant to Handbook 112, titled "Non-Disclosure":

> The protection of confidential business information and trade
> secrets is vital to the interests and the success of XA, The

29

Experiential Agency, Inc. Such confidential information includes, but is not limited to, the following examples: customer lists, customer preferences, financial information, labor relations strategies, marketing strategies, new materials research, pending projects and proposals, proprietary production processes, research and development strategies, technological data, and technological prototypes.

108.    The Hudson Defendants each violated this provision and the other provisions set forth above.

**CMG's and XA's Discovery of the Hudson Defendants' Misconduct**

109.    Immediately after departure from XA, each employee's computer at XA's New York office was examined and each was found to have had all emails deleted.  Confidential records of XA's business and contacts were missing.  XA's employees' signed non-disclosure agreements were missing.  Upon information and belief, each of these employees intentionally destroyed documents, engaged in extensive efforts to erase computer and other electronic files, and/or stole such documents as they could access before leaving XA.  XA's belief is based on its review of emails between the Hudson Defendants discussing when to erase their hard drives.

110.    Example.  On May 21, 2014, Lomma emailed Wilson and asked for former XA employee Michael Day's log on information so she could follow up "anything important."

111.    Example.  On June 4, 2014, Lomma emailed Wilson and asked her to change the computer passwords for former XA employees, Chelsea Tracy and Shetal Amin, stating they have moved to Hudson. Lomma personally quit less than two weeks later.

112.    Hudson Gray and the Hudson Defendants' efforts to conceal their misconduct were extensive, but their personal (recovered) emails and text messages show their extensive efforts to coordinate the theft and destruction of XA property. Their own words show they were

systematically violating Handbook prohibitions and suggest they thought what they erased, stole, secreted or destroyed could not be discovered by XA.

113.    XA also learned that the Hudson Defendants contacted XA clients both before leaving XA, when they had fiduciary and contractual duties to XA, and for a certain period of time, after resigning.  The damages they caused resulted in XA being forced to file a form of reorganization in Illinois, referred to as an "assignment for the benefit of creditors."

114.    Example.  As alleged, the Hudson Defendants diverted at least six ongoing NBCUniversal projects.  XA's bank records establish that, with the exception of jobs very far along in the process, XA received no income from any NBCUniversal jobs after January, 2014. On information and belief, payments from NBCUniversal jobs were diverted to Hudson Gray or delayed monies could be funneled to the Hudson Defendants and Hudson Gray. The timing as Hudson became operational was no coincidence.

115.    Hudson wrongfully acquired needed funds to operate and it became operational almost overnight.  On information and belief, the Hudson Defendants arranged, together with NBCUniversal, to receive 50% deposits on some or all of the NBCUniversal jobs for which XA failed to receive deposits, as alleged above.

116.    Recovered emails indicate one NBCUniversal job, the CB2 job, for example, was activated May 31, 2014, less than one week after almost all of the Hudson employees quit and went to Hudson Gray.  XA should have received the NBCUniversal deposit for that job at least three months earlier but records indicate no deposit received by XA.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Violations of 18 U.S.C. § 1962(c) against all the RICO Defendants)

117.    XA repeats and realleges the above paragraphs as if fully set forth herein.

118.   18 U.S.C. § 1962(c) provides, in pertinent part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity..."

119.   RICO Defendants Wagner, Andereck, Wilson, Lomma, Pizzo, Day, and Gudin are natural persons and, as such, each is a "person" within the meaning of 18 U.S.C. § 1961(3) (the "RICO Individual Defendants").

120.   Defendants Hudson Gray, Studio AG, and Mixed Company, Inc., are business entities and, as such, each a "person" within the meaning 18 U.S.C. § 1961(3).  Hudson Gray, Studio AG, and Mixed Company, Inc. are collectively referred to as the "RICO Entity Defendants."

121.   The above RICO Individual Defendants and RICO Entity Defendants are collectively referred to as the "RICO Defendants."

122.   The RICO Defendants engaged in activities affecting interstate or foreign commerce.  Among other things, XA (New York) engaged in extensive email and telephone communication with XA's Chicago office, on essentially a daily basis.  Andereck, Gudin, Lomma, and Day were located in New York and Wagner, Wilson and Pizzo were located in Chicago and, on information, all travelled between the two offices and spent substantial time and did business in New York.  Their communications were extensive, as Schedule A indicates. Studio AG, located in Chicago, did extensive business in New York, including nominally working (but actually stealing) XA's NBCUniversal work.

123.   The Hudson Defendants, along with Pizzo and Studio AG, carried out a multi-year, fraudulent scheme by which they stole monies, customers and property from XA. They

diverted, first to Studio AG, and later to Hudson Gray, XA clients and business, along with physical property, also stolen (the "Diversions") and engaged in extensive efforts to conceal their misconduct by engaging in all the concealment efforts alleged above.

124.    The Diversions and Concealment Scheme were effected by a pattern of predicate crimes, that shows a long-standing pattern of criminal misconducts ranging from grand larceny and theft, to RICO predicate crimes of mail fraud, wire fraud and commercial bribery.

125.    The Diversions were concocted, implemented and concealed by the RICO Defendants, as alleged above and below.

**The RICO Defendants' Predicate Acts**

126.    The Diversions of business, customers and property that injured XA were effected through Defendants' pattern of mail and wire fraud crimes, as orchestrated by the RICO Defendants, by and through their pattern of commercial bribery.  In addition, fraud involving misuse of visas, permits and other documents, in violation of 18 U.S.C. §1546, is also a predicate crime under 18 U.S.C. §1961.

127.    Each of the mailing set forth in Schedule A annexed hereto is an instance of racketeering activity within the meaning of 18 U.S.C. § 1961(1) because each such act was indictable under 18 U.S.C. § 1341 (mail fraud).

128.    Each email, text and/or referenced telephone call sent by wire in furtherance of the RICO Diversions and the RICO Defendants schemes to defraud XA, was racketeering activity within the meaning of the RICO statute

129.    The crimes form a pattern of criminal acts lasting from 2009 through at least mid-2014.

130.     XA's allegations of predicate crimes are established largely by the RICO

Defendants' own words, in their own emails and text messages, and in their own spreadsheets

and fake bills, that they failed to irretrievably erase from XA's server, which was restored, and

from Gudin's I-phone, the only one left behind that was not completely erased.

131.     They are, in addition, established, by Hudson Gray's own website photos which

include photos of XA high-end furniture, stolen from XA's office (the invoices for same were

recovered from XA's server).  This stolen furniture now adorns Hudson's office, a fact

inadvertently documented on their own website.

**The Three Criminal Enterprises and Enterprise Distinctness**

132.     The RICO Defendants operated and managed the affairs of four criminal

"enterprises," with different but largely overlapping members.

133.     The first criminal enterprise was and is Studio AG, a business entity enterprise

(the "Studio AG Enterprise), controlled largely but not exclusively by its owners Andereck,

Wilson, Day and Wagner.  Studio AG was and is a criminal "enterprise" within the meaning of

18 U.S.C. § 1961(4).

134.     The second criminal enterprise was and is Hudson Gray (the "Hudson Gray

Enterprise," controlled largely but not exclusively by its owners, Andereck, Wilson, Wagner,

and, also, Lomma) (the "Hudson Gray Enterprise"). Hudson was and is a criminal "enterprise"

within the meaning of 18 U.S.C. § 1961(4) through which Andereck, Wilson, Wagner (and

Lomma) and that entity continued the pattern of predicate crimes which began at Studio AG, but

adding new predicate crimes, as indicated herein.

34

135.    The third criminal enterprise was an association in fact enterprise within the meaning of 18 U.S.C. § 1962(b), comprised of Studio AG, Hudson Gray, Andereck, Wagner, Wilson, Lomma and Pizzo (the "Association Enterprise).

136.    The fourth criminal enterprise was an association in fact enterprise among the RICO Defendants to engage in the Diversions

137.    Each of the RICO Defendants is a separate and distinct "person" within the meaning of the RICO statute because each is either a natural person or business entity and, for RICO purposes, this is sufficient distinctness between the entities Studio AG and Hudson Gray, and the natural persons controlling enterprise activity, to satisfy RICO enterprise-person distinctness.

138.    Each RICO Defendant was and is a separate and distinct from the predicate crimes of mail fraud and wire fraud and commercial bribery in which they engaged, because, on information and belief, each had or has legitimate functions and activities, apart from their criminal activities chronicled in Schedule A.

**How Each of the RICO Defendants Operated and Managed Enterprise Activity**

139.    Each criminal enterprise was operated for the common purpose of diverting monies, property and clients away from XA, and concealing what was occurring, so clients which would have, in the ordinary course, continued to use XA, for a reasonable period of time going forward, would, instead, become a source of revenue for the RICO Defendants.

140.    Each of the RICO Defendants satisfies the operation and management test, each controlling a substantial part of the activity of the Enterprises, as follows.

141.    Each RICO defendant operated or managed a portion of criminal enterprise activity.

142.    Andereck managed and operated the Enterprises in at least the following ways, as alleged above and as set forth in further detail in Schedule A:

(a)       causing XA to purchase goods and materials for the benefit of private competing companies he secretly controlled with Wilson and Wagner, including, but not limited to, Studio AG and Hudson Gray and, as well, XA Scenes;

(b)        using XA employees to market and promote his own secretly owned and controlled competing companies, XA Scenes, Studio AG and Hudson Gray, through direct customer relations work, electronic communications and print marketing;

(c)       directing XA employees to steal XA's corporate property including property necessary for the operation of its business;

(d)       soliciting XA employees and clients to work with Hudson Gray, while they were affiliated with and/or employed by XA;

(e)        creating fraudulent American Express credit card statements on Excel spreadsheets (with the American Express logo fraudulently superimposed on top) to disguise actual purchases and fraudulently give the appearance that expenses on these spreadsheets were billings from a single account, when, in fact, they reflected purchases from a number of different American Express accounts, each and all of which were controlled by Andereck;

(g)       directing defendants Lomma and Day to participate in the fraudulent American Express scheme by creating their own fraudulent American Express statements;

(h)       engaging in fraud through the purchase of lighting, furniture, drapery, flooring, cabinets, rugs and other expensive decor items for use and sale to Studio AG decorating clients which had no affiliation with XA, subsidizing their own competing enterprise;

(i)        allowing employees Lomma and Day to purchase furnishings, electronic

equipment and clothing from high end retailers for Studio AG decorating clients (and their own

personal use) from merchants including, but not limited to, Brooks Brothers, Nordstrom, Best

Buy, The Container Store, The Brickell Collection, The Tie Bar, East Elm, All Modern, Zara,

Crate and Barrel, Restoration Hardware and other retailers selling goods and services, unrelated

to the operation of XA;

(j)        directing XA COO Wilson to pay for legal services associated with

defendant Gudin's fraudulent immigration application and was actively stealing property and

files from XA during the summer of 2014;

(k)        Directing XA employees to stay away from XA's own offices when

representatives of CMG, including XA's new Chairman, Ron Burkhardt, came to XA's office to

try to conceal the planned theft of XA's property and business; such efforts at concealment

where organized and carried out by email and text message;

(l)        Fraudulently re-purposing dormant XA subsidiary, XA Scenes, as a

marketing vehicle for defrauding XA via the Gallery 1028/Studio AG partnership, as alleged

above;

(m)        fraudulently "closing"  XA subsidiary Fiori XA to divert Fiori's business

to Studio AG, a secret entity owned and operated by Wilson, Wagner and Andereck to directly

compete with and steal XA's business;

(n)        Using Studio AG to vend fictitious goods and services to XA that Studio

AG could never provide, were never delivered, and/or were double billed to mimic XA's own

purchase orders as a method by which he and co- conspirators Wilson and Wagner could siphon

XA's profits into their own enterprise;

(o)        directing XA employees and executives to forge AG bills in an effort to

make it appear Studio AG bills were XA bills, so XA could subsidize Studio AG's financial

burdens, draining XA's financial resources.

143.    Wagner managed and operated the Enterprises by *inter alia*:

(a)        purchasing and/or causing others to purchase goods and materials for the

benefit of private competing enterprises he secretly controlled with Wilson and Andereck,

including but not limited to, XA Scenes, Studio AG and Hudson Gray, all using XA monies;

(b)        using XA employees to market and promote his own secretly owned and

controlled competing companies, XA Scenes, Studio AG and Hudson Gray, through direct

customer relations work, electronic communications and print marketing;

(c)        coordinating the Diversions including, on information and belief, engaging

in and/or directing others to engage in at least the following acts during the relevant time period,

(i) secretly creating Hudson Gray in March, 2014,  six weeks before resigning as XA's CEO and

signing a  settlement agreement with XA, to facilitate the theft of approximately $1.5 million

dollars of XA contract work from NBCUniversal and other longtime XA clients and (ii)

fraudulently representing to CMG board members that he was unable to draw a full salary for his

services as CEO of XA for many years because of XA's lack of profitability -- but secreting the

fact that the purported "lack of profitability" was orchestrated by himself and Andereck and

Wilson caused by their transfer of monies among their secretly owned companies;

(d)        receiving $425,568.00 from CMG by virtue of a settlement agreement at

the time of his resignation on 4/30/ 2014 predicated on fraudulent representations and omitted

material information;

(e)      erasing all his XA computer files and stealing hard copy files from XA's Chicago office, without CMG's or XA's consent, and directing XA employees leaving for Hudson to do the same, many of which erased computer files have not been fully recovered;

(f)      stealing or directing the theft of hard copy files including, e.g., files containing those American Express bills expensed to XA in 2014 and all contracts and bills related to XA's past and ongoing business.

144.   Defendant Wilson managed and operated the Enterprises in at least the following ways, as alleged above and as set forth in Schedule A:

(a)      causing XA to purchase goods and materials for the benefit of private competing enterprises she secretly controlled with Wagner and Andereck, including but not limited to, XA Scenes, Studio AG and Hudson Gray and defendant Mixed Company, a private enterprise she controlled (with an non-defendant partner);

(b)      using XA employees to market and promote her own secretly owned and controlled competing enterprises; XA Scenes, Studio AG and Hudson Gray through direct customer relations work, electronic communications and print marketing;

(c)      coordinating the Diversions including, on information and belief, engaging in at least the following misconduct during the relevant time period, reimbursing Andereck's American Express bills, based on a screen shot of the statement total, without ever seeing, in the original bill (and months later accepting) fraudulent "coded" American Express credit card statements on Excel spread-sheets from Andereck, Lomma and Day. On information and belief, these were used to create the appearance that the expenses reflected on them came from a singular account, when, in fact, they reflected purchases from a number of different American Express accounts, all controlled by Andereck, and presenting these fraudulent statements to XA

auditors. When asked by auditors for the original bills, Wilson responded -- "Not available. Darren's (Andereck) personal cc (credit card)," to conceal that the actual purchases were in furtherance of the Commercial Bribery and Property Diversions, as alleged above.

(d)     misleading new CMG CEO Glenn Laken about Wagner's relationship with XA employees in the New York Office by, *inter alia*, stating he had no relationship with them, in any capacity, after he had already used them to steal work for XA's newly created competitor, Hudson Gray;

(e)     advising Laken and new XA directors, Jeff Devlin and Ron Burkhardt, that XA had ample funds to pay a $300,000 plus contract settlement to Wagner when it did not, and, by so doing, undermined XA's ability to operate;

(f)     shielding co-conspirator Andereck from direct contact with new CMG directors, writing, for example, on 2/22/2014 "If you are coming through Chicago this week, I would suggest you stay clear of our office on Tuesday and Wednesday. Ron (Burhardt) and Jeff will be there. I can meet you at the notary whatever you need. Just let me know. We should catch up at some point. Good developments on other fronts to share";

(g)     secretly sending XA employees she knew were about to quit new I-phones in March, 2014 and sending employees of the company she owned with Andereck and Wagner - XA competitor and vendor Studio AG, new I-phones that were all paid for by XA, all of which, on information and belief, are still being used by executives and employees at Hudson Gray;

(h)     conspiring with Andereck and other Hudson defendants working for XA to transfer the contents of storage lockers located at 333 Hudson (XA's New York Office) and other locations, to new storage lockers assigned to Hudson Gray and billing XA for the cost of moving the stolen material and records to their offices and/or storage facilities;

40

(i)     concealing the existence and whereabouts of the lockers and their contents from XA owners and new XA employees – which lockers were actually located all over the country and which contain or contained XA records and material;

(j)     paying defendant Gudin's immigration lawyer and other "invoices" associated with Gudin with XA funds, knowing Gudin was working for Studio AG, an enterprise in direct competition with XA that she jointly owned with Andereck and Wagner and aware, on information and belief, that Gudin would be, along with the other defendants, engaged in the theft of XA property;

(k)     purchasing new laptops in January 2014 with XA funds, for use by Hudson Gray and its associates;

(l)     Fraudulently billing $183,705.00 to XA from 2013-2104 through defendant Mixed Company, Inc., a florist in Elmhurst that she secretly owned, on information and belief, for goods and services it could never provide, and never did provide, given the size of its operations;

(m)     On information and belief, directing, on June 11, 2014 that Pedro Faria of Farpin Solutions wipe the computers in XA's NY office of all documents, after she, Wilson herself, posing as Ron Burkhardt (XA's Chairman), erased all company records from XA's server in Chicago without Burkhardt's consent or knowledge, or that of CMG or XA. XA's belief is based on restored emails it has reviewed and the statements of Pedro Faria, XA's IT professional, who succeeding in recovering emails and text messages from XA's server.

145.    Defendant Lomma managed and operated the Enterprises by, *inter alia*:

(a)     converting XA resources for the benefit of Studio AG though fraudulent billing practices and by directing the theft of XA's  physical and intellectual property through the deletion of XA computer files;

(b)     directing the theft of XA property from XA storage lockers;

(c)     illegally transferring assets from XA storage facilities to storage facilities controlled  Hudson Gray while employed at XA;

(d)     bribing an XA freelancer, SFD, which worked for XA during the May 2014 NBC Upfront event, knowing XA would not have the resources to pay him due to the theft of business opportunities she and her co-conspirators were coordinating to "keep him on our side";

(e)     coordinating the Diversions including, on information and belief, engaging in at least the following during the relevant time period, (i)  on April 2014 directing XA employee Chelsea Tracy to transfer property belonging to XA from a collection of storage units around the country to new Hudson facilities – Lomma directed that XA funds be used to pay the movers, thus causing XA to pay for the theft of its own property; (ii) on or April 23, 2014, suggesting to Andereck via e-mail that a "donation" should be made to "Eric" from SFD (a fabricator who worked for XA ) "so we can keep him on our side." Andereck okayed a "donation of 1k" – Lomma then caused the bribe to be expensed to XA, using her fraudulent XA American Express spreadsheet.

(f)     On May 21st, 2014, one day after Day's resignation, Lomma was asking for Day's log information and was colluding with Wilson about how much longer to keep former XA employee email accounts open;

(g)     On June 4, 2014, directing Wilson to: "Have Chelsea and Shetal's inboxes changed." Chelsea Tray and Shetil Amin were XA  employees who had moved to Hudson Gray;

(h)     In May 2014, just before her resignation, charging expensive items on her XA American Express account including, but not limited to, furniture from the Brickell Collection for $3,050.00 and charges of nearly $1,000.00 at The Container Store. These thefts were of merchandise having no operational value to XA that she caused XA to pay;

(i)     Along with Andereck and Day, fraudulently creating elaborate spreadsheets, meant to mimic actual American Express bills, and using these "coded" spreadsheets to disguise the fraudulent use of XA assets, as evinced in an August 2013 e-mail where Loma discusses with Andereck where to place a charge from Jamali for Mohan's birthday. Writing "I wasn't sure how to code this – was it donated from XA…." (ie: billed on the XA Amex spreadsheet) …" or being billed to a project?" (i.e., billed by Studio AG to XA). The Jamali bill in question was "donated" by XA to Mohan's 2013 birthday party by Andereck expensing it on his June 2013 AMEX spreadsheet.

146.    Defendant Pizzo managed and operated the Enterprises by controlling Studio AG as its General Manager. Studio AG was secretly created to replace XA subsidiary Fiori XA Inc., and steal XA business. As General Manager of Studio AG, Pizzo engaged in the following acts establishing operation and management of enterprise activity:

(a)     orchestrating the diversion of millions of dollars from XA by directing the fraudulent billing of goods and services it had already purchased to XA (double billing);

(b)     creating or directing the creation of fictitious bills for goods and services that Studio AG never provided, including furniture, duratrans (large display illuminators), and fabricated display items, such as custom made aluminum frame structures and staging.

43

(c)　　　　employing Studio AG staff and sales personnel to knowingly solicit, steal and execute event jobs that she knew were XA jobs, including, for example, numerous of NBC's Bravo Events, NBC's Oxygen Channel party, numerous USA Network MOTH events, USA Network's Suits and Style Pop Up Shop activation [pictured on Studio AG's own website] and hundreds of high-end weddings and charity events;

(d)　　　　using XA employees to do Studio AG work, including creating Studio AG's website, which she knew would be used to compete with XA;

(e)　　　　manipulating bank documents to conceal what AG was doing from XA owners and directing Wilson, on numerous occasions, to pay Studio AG bills, using XA funds;

(f)　　　　concealing the real ownership of Studio AG by allowing its owners to list her as Studio AG's "principal";

(g)　　　　helping Studio AG's real owners siphon XA funds into Studio AG.  For example, by email dated 4/28/2010 titled "other $ needs," Pizzo directed Wilson to pay a Studio AG invoice associated with an event for Bravo (an NBC event stolen from XA), using XA funds to which Wilson responded: " I will work on your need, but with the Amex payment that needs to go out on Darren's (Andereck) card by 5/3 I have to balance carefully" – to which Pizzo responded: "I've been trying to get Darren paid for the (Fiori XA's) van $4K. Also need to clear a little bit more of the old Roy Houff that I have neglected. And then there is that nagging Manhattan Neon still lurking. In reality a total of 30k or 40k would be a lot better than the $20k. Sorry! let me know what you can do so I can plan and promise." This is Pizzo asking Wilson to pay bills associated in part with an NBC Bravo job that Studio AG stole from XA, using funds, also stolen from XA, in part through the sale of a van that XA owned, which they were also stealing and monetizing, with Wilson's participation.

(h)     Pizzo organized the fraudulent transfer of invoices between Studio AG and XA – for example, Wilson on 11/16/10 transferred Manhattan Neon invoices for which Studio AG was responsible to XA and, then, Wilson, at Pizzo's direction, paid this AG bill with XA funds.

(i)     Pizzo organized the creation and submission of numerous fictitious bills to XA, over a six year period, for work (fabricating) and material (furniture and duratrans from Manhattan Neon) that other vendors provided – Studio AG was not in the business of fabricating, selling furniture or making duratran sales;

(j)     Pizzo orchestrated bogus Studio AG charges to XA for work it never could have done, e.g., breaking down equipment at the Javits Center, when, on information and belief, the Javits Center handles all such breaking down through union labor.

(k)     On information and belief, Pizzo fraudulently billed XA more than $550,000.00 in the first five months of 2014, while she, along with Wilson, Wagner, Andereck Day and Lomma, created and organized Hudson Gray, diverting profits from XA's 2014 NBC Upfront event by depositing such profits into Studio AG accounts, leaving XA with nothing. XA's belief that this occurred is based a comparison of several Studio AG bills left behind in XA's office (which showed services and goods that Studio AG claimed to have supplied to XA for the 2014 NBC Upfront) and XA's own internal six page itemized 2014 Upfront budget, created by Wilson, Andereck, Wagner and Lomma, which does not list Studio AG as a vender, in any category of service.

147.    Defendant Day managed and operated the Enterprises by, *inter alia*:

(a)     re-directing NBC contract work to Hudson Gray, and purposefully delaying the contractual execution of already developed and approved NBCUniversal XA

projects he personally worked on with NBC staff, until after his resignation from XA, to join Hudson Gray. By doing so he diverted monies from other NBCUniversal jobs in development at XA since February 2014 to Hudson Gray, and XA NBCUniversal jobs about to be activated from which he prevented XA from receiving deposit monies from NBC, thereby helping to orchestrate the diversion of same to Hudson Gray, along with Andereck;

(b)     fraudulently charging tens of thousands of dollars to XA, in 2014 alone, for items intended for personal use including, but not limited to, charges from Nordstrom, Brooks Brothers, The Tie Bar, Seating Solutions, Best Buy, Banana Republic, Uniqlo and West Elm, as recorded or "coded" on his fraudulent American Express spreadsheet which indicates such charges were paid for by XA and never reimbursed.  In addition and for example, Day picked up a Samsung flat screen TV at Best Buy purchased with XA's credit card – and left the box in XA's office, after becoming a Hudson Gray employee – the box had no TV in it and there was no TV in XA's office;

(c)     helping to steal at least $32,000.00 in light boxes (duratrans) with Gudin at Andereck's direction -- as a then Hudson Gray employee, Day accompanied Gudin to XA's storage locker and stole four additional duratrans on June 3, 2014, transferring them to Hudson Gray's own storage locker.

(d)     erasing and orchestrating the erasure, through acts of others, of XA computer files and the theft of hard copy folders and budgets for XA NBC jobs in progress, including the Pride Phone Booth event activated on 5/31/14 and 6/26/14, shortly after his resignation and move to Hudson Gray, notwithstanding this was an XA event and part of a six year ongoing project XA created for NBC called "Characters Unite." Day discussed plans for the 2015 iteration of this continuing project with NBC executive Loren Hynes on May 19, one day

46

before his resignation, and Hynes sent Andereck and Day, via e-mail, NBC generated concepts for the 2015 Characters Unite activation in a "final brief" on May 22, 2014. All the Characters Unite plans set forth in the NBC brief are now being executed by Hudson Gray;

(e)    intentionally delaying the signing contracts on jobs developed and approved while he worked at XA so he could divert them to Hudson Gray.  For example, on June 2, 2014, in a text message to Gudin, Day asked: "What is the new (Hudson) office number?...Don't you know what number it is on the door?"  Gudin responds, "No. First door to the right down the hallway from the front elevator." Day responded: "Need it for a contract not directions but will ask Darren (Andereck)"  Here, Day is diverting an XA contract to Hudson Gray less than two weeks after leaving XA for Hudson, which did not, at that time, even have an operational office.

**The RICO Defendants' Pattern of Criminal Conduct**

148.    The RICO predicate payments have been made continuously since at least 2009 and Mohan has continued to receive such goods and services through at least the mid-2014, establishing pattern continuity.  None of the predicate crimes were isolated events; all were "continuous" within the meaning of RICO's pattern element.

149.    The RICO Defendants' criminal acts were "related" within the meaning of RICO's pattern element in that the same predicate crimes were used to implement the scheme (mail and wire fraud and commercial bribery), the victim was the same, XA, the perpetrators controlling the activity of each of the Enterprises were largely the same, Wilson, Andereck, Wagner, Studio AG, Hudson Gray, and Lomma, facilitating and/or concealing the schemes, as alleged above.

150.    The methodology by which the Diversions and concealments were accomplished was the same, i.e., fraudulent billing, creation and sending of fraudulent invoices and bills, coordinated thefts of XA property and concealment of the above by theft of hard copy files, destruction of XA's server, and the coordinated use of temporary telephone communications to avoid detection.

151.    Each predicate act was intended to and did have the same result, i.e., XA was wrongfully deprived of revenue which was diverted to Studio AG or other controlled entities and, beginning in the summer of 2014, to Hudson Gray, and ultimately, as with Studio AG, to the Hudson Defendants and to Mohan, in the ways discussed.

152.    Each predicate act involved the same perpetrators, the RICO Defendants, actively engaged in the same type of predicate crimes, as set forth in Schedule A (mail and wire fraud) and all of their coordinated efforts to conceal the Diversion schemes through other and further predicate crimes, as alleged above.  Each predicate act involved the same methods of commission, i.e., the Hudson Defendants abusing their access to XA's records, and stealing or trying to (and in some cases  successfully destroying same), in breach of trust as XA officers, and the creation of fictitious entities and invoices to divert XA monies and clients.

**But-for Causation, Proximate Causation and Direct Injury**

153.    The RICO Defendants' criminal and tortious misconduct was the but-for cause of XA's injuries, as detailed below.

154.    The RICO Defendants' criminal and tortious misconduct was the foreseeable, direct and proximate cause of injury to XA, in the form of stolen revenue, business, clients and physical property within the meaning of the RICO statute.

**Criminal Scienter**

155.    Each defendant acted with actual criminal scienter, as evidenced by the emails, texts and mailings quoted in the above allegations.

**Damages**

156.    XA has suffered injury to its business and property as a result of the theft of its customers, the loss of its physical property, the diversion of its business capital, first to Studio AG (and other entities under Defendants control), including XA Scenes, and, then, to Hudson Gray, in the ways alleged above.

157.    XA's business relationships are property within the meaning of New York Penal Law § 155.00(1) which defines larceny.  In wrongfully diverting such relationships, the RICO Defendants deprived XA of property within the meaning of New York Penal Law § 155.05(1).

158.    Had the RICO Defendants not interfered with XA's relationships with its clients, they would have, in the ordinary course, continued as XA clients and revenue would have continued to be received, on an ongoing basis, by XA, rather than being diverted to Studio AG, Hudson and the Defendants, controlling them.

159.    Defendants each conspired to implement, facilitate and shield from discovery their pattern of racketeering activities, knowing they were causing XA harm and intending, beginning in or about February, 2014 and through the summer of 2014, to destroy XA for the benefit of their competing enterprise, Hudson Gray.

160.    As alleged above, on information and belief, the profit on the NBC Upfront job, alone, for 2014, was roughly $3 million (20% of the cost of the project).  XA had at least six NBCUniversal jobs and Studio AG, to whom business was being diverted, had numerous NBCUniversal corporate events, and hundreds of weddings and other events.

161.    Although the criminal erasure of the XA server by defendants and the theft of its hard copy files has made calculation of damages with precision impossible, the damage Defendants' thefts and diversions they caused are believed to be, over the period, 2009 to 2015, in excess of $20 million.

**The RICO Defendants' Active Concealment of the Predicate Crimes from XA**

162.    Each of the Defendants actively concealed information from XA in all the ways alleged above and as set forth in Schedule A to impair and prevent XA from learning about the existence of, and harm being caused by, the racketeering activities described above.

163.    Concealment of RICO predicate crimes is itself a predicate crime pursuant to 18 U.S.C. § 1961.   Here, many of the RICO Defendants' acts of concealment were made by mail and wire communications, violations of 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud), and, hence instances of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).

164.    XA has suffered direct and proximately caused injury to its business and property, from 2009 through the summer of 2014, in an amount to be proven at trial and presently not calculable with precision because of defendants' willful destruction and theft of its property, but is expected to exceed $20 million dollars.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Violations of 18 U.S.C. § 1962(c))**
**(Against Wagner, Andereck, Wilson, Lomma, Studio AG and Hudson Gray)**

165.    XA repeats and realleges the above paragraphs as if fully set forth herein.

166.    Studio AG was and is a criminal business entity enterprise.

167.    Hudson Gray was and is a criminal business entity enterprise.

168.    Wagner, Andereck, Wilson, Pizzo and Lomma operated and managed Studio AG as a criminal enterprise.

169.    Wagner, Andereck, Wilson, and Lomma operated and managed Hudson Gray as a criminal enterprise.

170.    Wagner, Andereck, Wilson, Day and Lomma acted for the common purpose of engaging in criminal activity and engaged in the activities alleged above.

171.    On information and belief, Wagner, Andereck, Wilson, and Lomma largely functioned as a continuing unit from at least 2009 to the summer of 2014 and acted jointly to bring to fruition the objects of the RICO schemes, i.e., enriching them at XA's expense, through the predicate crimes they committed or orchestrated, through the Studio AG and Hudson Gray criminal enterprises.

172.    Wagner, Andereck, Wilson, and Lomma are each separate and distinct from the criminal business entity enterprises through which they acted as each was and is a separate and distinct legal person, within the meaning of the RICO statute.

173.    The entity enterprises are separate and distinct from the predicate crimes that the RICO Defendants committed because, on information and belief, the entities had legitimate operations or activities other than committing the predicate acts.

174.    From 2009 through the summer of 2014, as alleged above, Studio AG was operated and managed by Wagner, Andereck and Wilson and, from the spring or summer of 2014 to the present, these same persons operated and managed Hudson Gray as a RICO association in fact enterprise in the manner alleged above.

175.    The emails and texts alleged herein were sent by interstate mails and/or wires in furtherance of the RICO scheme and constituted an act indictable under 18 U.S.C. § 1341 (mail

fraud) and/or 18 U.S.C. § 1343 (wire fraud).   Each was and is "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B) (the "Mail and Wire Fraud Racketeering Activities").

176.    The Mail and Wire Fraud Racketeering Activities, constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

177.    Fraud involving misuse of visas, permits and other documents, in violation of 18 U.S.C. §1546, is also a predicate act under 18 U.S.C. §1961.

178.    Each of Wagner, Andereck, Wilson, Day, Pizzo and Lomma operated and managed the activity of Studio AG and Hudson Gray, orchestrating and directing the Diversions, as alleged above, including the concealment of same, through mail and wire communications sent to conceal the RICO predicate misconduct and pattern of misconduct.

179.    The Diversions were a direct, foreseeable and proximate consequence of each and all of the RICO predicate acts through which the RICO schemes were perpetrated through the Association Enterprise.

180.    The persons controlling the activity of the entity enterprises each violated 18 U.S.C. § 1962(c) and these violations were a but-for cause, as well as a proximate cause, of injury to XA's business or property, resulting in damages reasonably expected to exceed $20 million.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Violation of 18 U.S.C. §1961, et. seq.)
### (Against Andereck, Wilson and
### Wagner and Studio AG and Hudson Gray)

181.    XA repeats and realleges the above paragraphs as if fully set forth herein.

182.    From at least 2009 to the summer of 2014,  Andereck, Wilson and Wagner, operated and managed an association in fact enterprise, through a pattern of criminal acts to

undermine and destroy XA, using Studio AG and later Hudson Gray, in the manner alleged above, diverting profit away from XA and to themselves.

183.    Such Diversion were the but-for and proximate cause of injury XA suffered.

184.    XA has suffered injury over the five year period in which the scheme was perpetrated, from 2009 to the summer of 2014, in an amount to be proven at trial, but reasonably expected to exceed $20 million.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(RICO Conspiracy – Violation of 18 U.S.C. § 1962(d))**
**(Against Wilson, Wagner,**
**Andereck, Lomma, Mixed Company, Day, and Gudin)**

185.    XA repeats and realleges the paragraphs above as if fully set forth herein.

186.    18 U.S.C. § 1962(d) provides, in pertinent part, that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

187.    Studio AG, Hudson Gray, and Mixed Company, and the Hudson Defendants, agreed to act together to bring about the objects of the conspiracy, i.e., to divert business and customers to Studio AG, and other entities they secretly controlled, and, later, Hudson Gray, and to otherwise divert profits from business XA did or could have done, during this period, to themselves.

188.    Defendant Mixed Company, owned and controlled by Wilson (and a non-defendant partner), fraudulently billed XA $183,705.00 in 2013-2014 for services it did not provide.  Although most of the bills for these services were missing or, on information and belief stolen or destroyed by Wilson and/or the Hudson Defendants as she/they left XA for Hudson, documents left included bills to XA for vacuous, unspecified "project support," "creative support," "production services," for the NBCUniversal activations.

189.    On information and belief, such bills were efforts to conceal the Hudson Defendants' effort to bankrupt XA and benefit Studio AG and Hudson Gray, as well to benefit Mixed Company and, derivatively, its owner, Wilson, while eliminating XA as a potential competitor to their new company, Hudson Gray.

190.    Defendant Gudin, along with Andereck and Day, agreed to, and did, conduct criminal acts and/or acts in support of the criminal acts of those persons controlling enterprise activity to facilitate and conceal the theft of XA's commercial property, and the creation of Hudson Gray's new competing office.  Gudin, for example, stole expensive lighting equipment worth over $32,000, and other material of value from XA's storage locker, and moved it into Hudson Gray's storage area.

191.    Defendant Day, with defendants Gudin and Andereck agreed to, and did, conduct criminal acts and/or acts in support of the criminal acts of those persons controlling enterprise activity to facilitate and conceal the theft of XA's commercial property, the diversion of XA jobs to Hudson Day and the diversion of XA's revenue through the use of fraudulent American Express spreadsheets designed to mimic actual American Express bills.  Day, for example, stole duratrans and other material of value from XA's storage locker and transferred them into Hudson Gray's storage facility and expensed tens of thousands dollars of personal purchases from Brooks Brothers, the Tie Bar, and Nordstroms on his XA American Express card.

192.    Based on documents XA has recovered from its server and the one XA cell phone the Hudson Defendants failed to erase, damages are likely to exceed twenty million dollars.

## AS AND FOR A FIFTH CAUSE OF ACTION
## FOR DECLARATORY JUDGMENT
### (Against Wagner)

193.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

194.    In April 2014, Wagner and XA negotiated a settlement agreement that was signed on or about April 22, 2014 and contains a general release of all claims (the "General Release").

195.    This Court should declare the General Release unenforceable because it was procured through Wagner's fraudulent conduct.

196.    In negotiating the General Release, Wagner failed to disclose material information to XA, namely, he had, for years, with his associates, been running competing businesses, including Studio AG, and had, as recently as March 2014, incorporated Hudson Gray, so he could continue to implement his theft of XA  business, customers and property.

197.    Wagner knew XA would never have signed a General Release had it known of Wagner's participation in, among other things, the RICO Schemes, the fraudulent conduct alleged herein and the theft of property he was then coordinating with the other Hudson Defendants and he concealed this information from XA to induce it to sign the General Release.

198.    When the settlement agreement containing the General Release was signed, XA had no reason to suspect an extensive conspiracy, orchestrated by Wagner and his associates, was already underway to destroy XA.  XA reasonably, defrauded, assumed this was an ordinary corporate termination not involving any of the type of injurious misconducts alleged herein.

199.    A bona fide, justiciable and substantial controversy exists between Wagner and XA, parties with adverse legal interests regarding the General Release which Wagner has asserted, in this litigation, as a defense to liability.

200.    A declaratory judgment would serve a useful purpose in settling the legal issue of whether Wagner can use this fraudulently obtained General Release to bar XA's claims against him, and a declaration would resolve the controversy and offer certainty with respect to same.

201. This Court should enter a declaratory judgment finding that the General Release, and any other language in the April 22, 2014 settlement agreement that could preclude any of the claims made against Wagner, including XA's RICO claims, is unenforceable due to his fraud in connection with procuring the settlement agreement and release.

**AS AND FOR A SIXTH CAUSE OF ACTION
FOR BREACH OF CONTRACT
(Against the Hudson Defendants)**

202. Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

203. By executing the General Release, Wagner was contractually required to not solicit XA clients for six months after his departure from XA which obligation existed, as well, as a matter of common law duties and duties set forth in XA's Handbook and undertaken by him.

204. Wagner violated the settlement agreement, XA Handbook provisions and common law duties when he continued to solicit XA clients for Hudson Gray, starting in or about March 2014, as alleged above.

205. As alleged above, obligations to protect XA confidential information existed throughout the Hudson Defendants employment as set forth in XA's Handbook. The XA Handbook required execution of a non-disclosure agreement by all of Hudson's employees.

206. Although all executed forms were missing in the XA office, on information and belief, such documents were in fact signed, kept in the XA office and barred all the Hudson Defendants from acting, as they did, to undermine XA, in the ways alleged, for the benefit of Hudson Gray and themselves.

207. XA's belief regarding the existence of the signed agreements is based on the understanding CMG counsel who advises that it was his understanding such agreements were signed and kept at the XA office.

208.     By soliciting existing and potential XA clients and diverting existing and potential XA business to Hudson Gray, while still employed at XA, each of the Hudson Defendants breached their obligations under XA's handbook and the agreements they signed regarding compliance with its terms.

209.     As a direct result of Defendants' actions, Plaintiff has been caused damages in the amount of $20,000,000, not including interest, costs and attorney's fees.

**AS AND FOR A SEVENTH CAUSE OF ACTION
FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND
IMPOSITION OF A CONSTRUCTIVE TRUST
<u>(Against Hudson Gray, the Hudson Defendants)</u>**

210.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

211.     The Hudson Defendants have built a business using stolen XA's confidential information, trade secrets, and customers in breach of fiduciary duties.

212.     A preliminary and permanent injunction is necessary to avoid any further misappropriations and use of XA's trade secrets.

213.     Plaintiff has no adequate remedy at law and has made no prior application for the injunctive relief sought herein to this or any other Court.

214.     Without preliminary and permanent injunctive relief, Plaintiff is and will continue to be irreparably harmed by the Hudson Defendants actions.

215.     This Court should enter an injunction restraining the Hudson Defendants preventing them from using XA trade secrets, contacting or working with any customers who were former XA customers, including NBCUniversal, and a constructive trust should be imposed on the profit the Hudson Defendants have made, as a result of their wrongful conduct.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## FOR BREACH OF FIDUCIARY DUTY
## (Against the Hudson Defendants)

216.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

217.     As former XA employees, the Hudson Defendants owed fiduciary duties of

loyalty to XA including, among other things, acting solely in XA's best interests.

218.     Each of the Hudson Defendants breached that duty in numerous ways.

219.     As a proximate and direct result of the Hudson Defendants breaches of fiduciary

duty, XA has been damaged in an amount exceeding $20,000,000, exclusive of interest, costs

and attorney's fees.

## AS AND FOR A NINTH CAUSE OF ACTION
## FOR FAITHLESS SERVANT DOCTRINE
## (Against the Hudson Defendants)

220.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

221.     As XA employees, the Hudson Defendants were required to act faithfully to their

employer, XA.

222.     The Hudson Defendants placed their own interests above those of XA, faithlessly

and proximately acting to intentionally cause injury to XA.

223.     The Hudson Defendants improper activities related to the performance of their

duties and they knowingly and faithlessly breached those duties by entering into the conspiracies

allege to loot XA, steal its business (as they stole earlier business and business prospects through

other companies they controlled), as well as XA's property, as alleged herein, all needed to carry

on its business.

224.     As a result of the Hudson Employees' faithlessness and disloyalty, they should be

ordered to disgorge compensation received during the entire period of disloyalty, from at least

2009 to the present, in an amount to be determined at trial, but reasonably believed to exceed $20,000,000, independent of interest, costs and attorney's fees.

## AS AND FOR A TENTH CAUSE OF ACTION
## FOR TORTIOUS INTERFERENCE WITH A CONTRACT
### (Against Wagner and Hudson Gray)

225.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

226.     By signing the Release Agreement, Wagner contracted to not solicit XA clients for six months, beginning on approximately February 26, 2014.

227.     Hudson Gray tortuously interfered with Wagner's settlement agreement and the General Release by soliciting XA clients, starting in March, 2014.

228.     Hudson Gray was created to solicit and service XA clients, despite its knowledge of XA contracts and/or business relationships with same, but intentionally interfered with those existing contracts and/or relationships in the ways alleged above.

229.     As a direct result of Hudson's actions, XA has been damaged in an amount to be determined at trial but reasonably believed to exceed $20,000,000, exclusive of interest, costs and attorney's fees.

## AS AND FOR A ELEVENTH CAUSE OF ACTION
## FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Hudson Gray, the Hudson Defendants,
### And the Studio AG Defendants)

230.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

231.     Each of Hudson Gray and the Studio AG Defendants knowingly aided and abetted the fiduciary breaches of the Hudson Defendants in all the ways alleged herein.

232.     As a direct result of their conduct, XA has been damaged in the amount reasonably expected to exceed $20,000,000, exclusive of interest, costs and attorney's fees.

### AS AND FOR A TWELFTH CAUSE OF ACTION
### FOR MISAPPROPRIATION AND UNFAIR COMPETITION
### (Against Hudson, Hudson Defendants and the Studio AG Defendants)

233.   Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

234.   Hudson, the Hudson Defendants and the Studio AG Defendants willfully and maliciously misappropriated XA  confidential and proprietary information for their own benefit, including customer lists, contact information, contracts, invoices, bills, and correspondence,  all regarding existing clients and future client prospects.

235.   XA's client lists and contacts were developed at substantial cost to the company, over many years, and were not otherwise known or easily learned by anyone outside XA.

236.   Hudson, the Hudson Defendants and the Studio AG Defendants, acting willfully and in bad faith, used the foregoing XA information, to obtain an improper competitive advantage against XA and to solicit and misappropriate XA's client prospects, opportunities and business for themselves.

237.   As a result of their actions, XA has been damaged in the amount reasonably believed to exceed $20,000,000, not including interest, costs and attorney's fees.

### AS AND FOR AN THIRTEENTH CAUSE OF ACTION
### FOR USURPATION OF A CORPORATE OPPORTUNITY
### (Against Hudson Gray, the Hudson Defendants and Studio AG Defendants)

238.   Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

239.   As described above, upon information and belief, during their employment at XA, the Hudson Defendants lured the USA Network, an XA client, to transfer its business from XA to Hudson Gray and the Studio AG Defendants.

240.   On information and belief, the Hudson Defendants contacted other XA clients and stole business from XA, as alleged above -- opportunities that belonged to XA.

241.     As a result of the Hudson Defendants and the Studio AG Defendants' misconduct, XA has suffered damages in an amount to be proven at trial but reasonably believed to exceed $20,000,000, exclusive of interest, costs and attorney's fees.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
## FOR TORTIOUS INTERFERENCE
## WITH XA'S BUSINESS RELATIONSHIPS
## (Against the Hudson Defendants and the Studio AG Defendants)

242.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

243.     XA had a long-standing business relationship with NBCUniversal, and other companies, as alleged above.

244.     The Hudson Defendants and Studio AG Defendants, at all relevant times, knew of the existence of these relationship and their value to XA.

245.     The Hudson Defendants and Studio AG Defendants intentionally and maliciously interfered with business relationships they knew belonged to XA, having been established by XA through XA's efforts and resources, and did so, through improper means, including criminal acts of mail and wire fraud, with the objective of putting XA out of business, for their benefit, through their controlled companies, including Studio AG and Hudson Gray.

246.     As a result of these actions, Plaintiff has been damaged in an amount to be proven at trial but reasonably believed to exceed $20,000,000, exclusive of interest, costs and attorney fees.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
## FOR TORTIOUS INTERFERENCE WITH XA'S
## PROSPECTIVE ECONOMIC ADVANTAGE
## (Against the Hudson Defendants and the Studio AG Defendants)

247.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

248.     As alleged above, Hudson, the Hudson Defendants and the Studio AG Defendants willfully and maliciously interfered with XA's reasonable expectation of economic benefit and advantage from its business relationships, including NBCUniversal business that was already being worked on by XA employees.

249.     Hudson Gray, the Hudson Defendants and the Studio AG Defendants interfered with XA's prospective economic advantage in its NBCUniversal work and other projects by improperly accessing XA's confidential information concerning XA relationships and using same to steal XA potential clients, directly and indirectly, in a manner that interfered, disrupted, and precluded XA's economic benefits from such relationships, in violation of XA Handbook provisions, contractual agreements they signed, but stole, and fiduciary duties they owed their employer. The Hudson Defendants, as XA senior officers who orchestrated the thefts and interference, breached the highest levels of fiduciary duty and trust.

250.     As a result of their misconduct, Hudson  Gray and Studio AG received economic benefits they would not have obtained, as did each and all of the Studio AG and Hudson Defendants, and XA has been damaged in an amount to be determined at trial but reasonably believed to exceed $20,000,000, exclusive of interest, costs and attorney fees.

### AS AND FOR A SIXTEENTH CAUSE OF ACTION
### FOR CONVERSION OF XA'S PROPERTY
### (Against Hudson Gray and the Hudson Defendants)

251.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

252.     Hudson Gray and the Hudson Defendants improperly, in breach of fiduciary duties and with malice took property belonging to XA from its corporate offices and leased premises including but not limited to, furniture, lighting fixtures, computers, telephones and other equipment used in the conduct of XA's business, and surreptitiously moved such property to Hudson's offices.

253.     Hudson Gray, acting through these persons, knew the stolen property was valuable to XA, had been paid for by XA, and had value to XA, in the conduct of its business.

254.     Hudson Gray and the Hudson Defendants knew they were not entitled to remove XA property from XA's premises, which is why the Hudson Defendants were instructed to take such property when no one would see them, and that such conduct would damage XA.

255.     Hudson Gray and the Hudson Defendants converted property belonging to XA, and Hudson and each and all of the Hudson Defendants aided and abetted each other in this conversion of XA property, as alleged above.

256.     XA been damaged by the conversion of its property, including its property interest in its existing customers, as well, in an amount to be proven at trial but reasonably believed to be in excess of $20,000,000, exclusive of interest, costs and attorney fees.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### FOR UNJUST ENRICHMENT
### (Against the Hudson Gray, the Hudson Defendants,
### And the Studio AG Defendants)

257.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

258.     Hudson Gray and Studio AG, acting through the Hudson Defendants and Studio AG Defendants, and their employees, acquired by improper means, assets, property and things of value from Plaintiff, and there were unjustly enriched at XA's expense.

259.     Equity and good conscience require that neither Hudson Gray, the Hudson Defendants nor the Studio AG Defendants, be allowed to retain the improper benefits they arrogated to themselves as such benefits were obtained by theft and conversion, deception regarding XA's established and then existing client relationships, the looting and theft of XA of financial assets, the theft of its property and existing/prospective business relationships.

260.    Because XA's physical office was plundered by the Hudson and Studio AG

Defendants, these defendants did not have to pay for business-related equipment, including

phones, laptops, software programs, and office furniture, including tables and expensive chairs,

nor of expensive lighting equipment. The costs of same were diverted back to XA, as these

defendants used XA credit cards and/or expense accounts to charge, pay for or seek

reimbursement for the items they stole from XA's office and then put in use in Hudson Gray's

own office, to improperly compete with XA's business, which they intentionally crippled.

261.    As a direct result of Hudson actions, carried out through XA's former employees,

XA has been damaged in the amount to be proven at trial but reasonably expected to exceed

$20,000,000, exclusive of interest, costs and attorney fees.

## PUNITIVE DAMAGES

262.    Defendants' wrongful conduct was and remains aggravated and outrageous,

evidencing evil motives and/or a willful and wanton disregard for XA's rights in their efforts to

destroy what they regarded as potential competitor to their new business, Hudson Gray.

263.    Defendants' conduct was all the more outrageous because it took place in breach

of heightened duties owed to XA, by virtue of their positions within XA, because each knew and

intended their misconduct should financially injure XA and because they attempted to conceal

such misconduct through the destruction of XA's business data, on its server, their attempted

erasure of phone recordings, to secret their conspiracy, along with their emails and messages,

and the outright theft of the company's hard copy files, or their destruction of same, as well as

their theft of XA's physical office furniture, computers, phones, vases and commercial lighting

fixtures.  Punitive damages equal to five (5) times compensatory damages are sought.

WHEREFORE Plaintiff demands judgment:

(a)     awarding XA money damages in an amount to be determined at trial, including

compensatory damages;

(b)     awarding XA treble damages, attorney's fees and costs under the RICO statute;

(c)     awarding XA punitive damages of five times compensatory damages;

(d)     ordering that the Hudson Defendants and the AG Defendants to disgorge to XA

all compensation and payments improperly received by them;

(e)     ordering injunctive relief and a constructive trust imposed, as alleged;

(f)     awarding XA such other and further relief as the Court seems just and proper.

Dated:     New York, New York
           June 26, 2015

                              EATON & VAN WINKLE LLP

                              By: /s/ Lawrence Allen Steckman
                                      Lawrence Allen Steckman, Esq.
                              3 Park Avenue
                              New York, NY 10016-2078
                              Tel. (646) 821-9367