Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

XA EXPERIENTIAL AGENCY, INC.,                :        Index No. 652894/2014

               Plaintiff,               :        **THIRD-PARTY SUMMONS**

         v.                        :

JOSEPH WAGNER, HUDSON GRAY LLC,              :
JEFFREY SMITH, DARREN ANDERECK and           :
JESSIE LOMA,                                 :

            Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH WAGNER, JEFFREY SMITH, DARREN :
ANDERECK, and JESSIE LOMMA,                  :

          Third-Party Plaintiffs,      :

         v.                        :

GLENN LAKEN and ALEXIS LAKEN,                :

          Third-Party Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**TO THE ABOVE-NAMED THIRD-PARTY DEFENDANTS:**

    **YOU ARE HEREBY SUMMONED** and required to serve upon Third-Party Plaintiffs'

attorney an Answer to the Third-Party Complaint in this action within twenty (20) days after the

service of this Summons, exclusive of the day of service, or within thirty (30) days after service

is complete if this summons is not personally delivered to you within the State of New York.  In

case of your failure to answer, judgment will be taken against you by default for the relief

demanded in the Third-Party Complaint.

{11051495:5}

Dated: New York, New York
February 19, 2015

Respectfully submitted,

WINDELS MARX LANE & MITTENDORF, LLP

By: _____
Scott R. Matthews
Daniel J. Shim
156 West 56th Street
New York, NY 10019
(212) 237-1000
*Attorneys for Third-Party Plaintiffs*

To:   Glenn Laken
2130 North Lincoln Park West
Apartment 8N
Chicago, Illinois 60614

Alexis M. Laken
25 Ludlow Street
Apartment #2
New York, New York 10002

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

XA EXPERIENTIAL AGENCY, INC.,                    :       Index No. 652894/2014

                       Plaintiff,       :       **THIRD-PARTY COMPLAINT**

                     v.                :

JOSEPH WAGNER, HUDSON GRAY LLC,                  :
JEFFREY SMITH, DARREN ANDERECK and               :
JESSIE LOMA,                                     :

                   Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH WAGNER, JEFFREY SMITH, DARREN            :
ANDERECK, and JESSIE LOMMA,                       :

             Third-Party Plaintiffs,       :

                   v.                :

GLENN LAKEN and ALEXIS LAKEN,                    :

             Third-Party Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Defendants and Third-Party Plaintiffs Joseph Wagner ("Wagner"), Jeffrey Smith

("Smith"), Darren Andereck ("Andereck"), and Jessie Lomma ("Lomma"), erroneously named

Jessie Loma in the Complaint (Smith, Andereck, Lomma, and Wagner are referred to as the

"Third-Party Plaintiffs"), by their attorneys, Windels Marx Lane & Mittendorf, LLP, for their

Third-Party Complaint against Third-Party Defendants, Glenn Laken and Alexis Laken

(collectively, the "Third-Party Defendants" or the "Lakens"), respectfully allege:

## NATURE OF THIS ACTION

1.     The Third-Party Plaintiffs bring this Third-Party Complaint for libel as a result of defamatory statements made by the Lakens in public securities filings, communications made to the Third-Party Plaintiffs' business colleagues, and statements made to a major media company for the sole purpose of publication.  All of these defamatory statements were false, made while the Lakens knew or should have known that the statements were false, widely published to third-parties without privilege or authorization, made in a grossly irresponsible manner without due consideration to applicable standards, constituted defamation *per se*, and caused all Third-Party Plaintiffs damages in an amount to be determined at trial.

## THE PARTIES

2.     XA, The Experiential Agency, Inc., erroneously named as XA Experiential Agency, Inc. in the Complaint ("XA"), the plaintiff in this matter, is a marketing company that is a wholly owned subsidiary of CMG Holdings Group, Inc. ("CMG").

3.     Joseph Wagner ("Wagner") is an individual residing in the state of Illinois, and is the former CEO of XA.

4.     Wagner, Andereck, Smith, and Lomma are all employees of HudsonGray, Inc. ("HudsonGray"), a marketing and branding agency located in New York, New York.

5.     On information and belief, Glenn Laken is an individual residing in the state of Illinois, and is the CEO of CMG.

6.     On information and belief, Alexis Laken is an individual residing in the state of New York, and is the current President of XA.

7.     Smith is an individual residing in the state of New York, county of New York.

8.     Lomma is an individual residing in the state of New York, county of Kings.

9. Andereck is an individual residing in the state of Illinois.

## JURISDICTION AND VENUE

10. This Court properly has jurisdiction over the Lakens under CPLR 302(a)(1).

11. The defamatory statements made by the Lakens are false allegations exclusively concerning the prior employment of Wagner as CEO of XA, and the prior employment of the Smith, Andereck, and Lomma at XA.

12. XA has closed its Chicago office in favor of operations in its New York office, located at 333 Hudson Street, Suite 203, New York, New York 10013. Alexis Laken, President of XA, has publicly stated that XA has "decided to focus [XA's] operations out of [XA's] New York office." *See* **Exhibit A**.

13. Glenn Laken is the CEO and Chairman of the Board of Directors of CMG, the parent company of XA, and all of his defamatory comments regarding Third-Party Plaintiffs concerned Third-Party Plaintiffs' association with XA.

14. CMG maintains offices in New York at 333 Hudson Street, Suite 203, New York, New York 10013.

15. Jurisdiction over the Lakens in this Court is proper because: (a) all of the defamatory statements made by the Lakens relate to Third-Party Plaintiffs' prior employment with XA; (b) CMG and XA are and were present and conducting business in New York; and (c) the operation of XA's main headquarters is in New York,.

16. Additionally, upon information and belief, Alexis Laken is subject to the jurisdiction of this Court under CPLR 301 as a resident of the state of New York, county of New York.

17.     Venue is appropriate in this matter because the parties Smith and Alexis Laken are residents of the state of New York, county of New York.

18.     Furthermore, XA, as plaintiff, initiated the underlying lawsuit in this Court and the claims asserted herein directly relate to the claims asserted by XA therein.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

19.     XA employed Wagner as CEO pursuant to an executed employment agreement.

20.     After prior disputes regarding compensation, and XA's failure to make payments in accordance with an earlier agreement to settle, those disputes were resolved through the Settlement Agreement and Release, effective as of April 30, 2014, entered into between Wagner and XA (the "April Settlement Agreement and Release").   A copy of the April Settlement Agreement and Release is attached hereto as **Exhibit B.**

21.     The April Settlement Agreement and Release:

     a.      contains an integration clause that states that it constitutes the entire agreement between the parties and supersedes any prior agreements with respect to the matters set forth therein and supersedes all prior agreements between XA and Wagner;

     b.      contains a general release by XA of any claims against Wagner, known or unknown, that arose on or before April 30, 2014; and

     c.      finalized all matters regarding the employment and termination of Wagner as CEO of XA.

22.     Smith, Andereck, and Lomma did not enter into employment or separation agreements with XA.

23.     Following the departure of Wagner, Smith, Andereck, and Lomma from XA, the Lakens began a concerted campaign to publicize defamatory statements regarding the Third-Party Plaintiffs, which statements the Lakens knew, or should have known, to be false. These statements were purposefully disseminated by Glenn and Alexis Laken through: 1)

statements made to CMG shareholders by Glenn Laken in SEC Form 8-K and Form 10-Q/A filings in November 2014; 2) statements made by Alexis Laken to Wagner's business partner and vendor; and 3) statements made, upon information and belief, to the news publication *Crain's Chicago Business* ("*Crain's*") for the specific purpose of publication, intimidation, and damage to Third-Party Plaintiffs' reputations.

## A. Defamatory Statements by Glenn Laken Contained in SEC Filings

24. In a letter dated November 19, 2014 signed by Glenn Laken attached to the Form 8-K filed by CMG on November 20, 2014, Glenn Laken publishes a litany of defamatory comments.

25. He falsely states that a "pattern of fraud uncovered was instituted and overseen by former CEO Joe Wagner, who ran XA with little or no oversight from former CMG board members."

26. Glenn Laken implies that Wagner resigned from his position as CEO because "board members and consultants, from CMG began to question why XA . . . never made a significant profit."

27. Glenn Laken states that Wagner and Andereck, along with another non-party, "all owned privately held competing companies designed to siphon business opportunity away from XA. These private affiliations were not disclosed to the board of CMG" and these companies "defrauded" CMG "by becoming vendors to XA – charging XA nearly $650,000.00 in questionable receipts over [sic] last two years alone."

28. Glenn Laken then states that all Third-Party Plaintiffs, along with other non-parties, "conspired . . . to strip XA's business of all corporate clients, newly purchased computers, lockers filled with staging equipment around the country and ongoing projects worth

over $1,000,000.00 in revenue," and repeats allegations of "transactions between XA and parties owned by these former employees who did not disclose their interests in them."

29.    Laken's letter also asserts "numerous instances of conversion of XA assets and funds, such as personal charges on company credit cards, payments for cell phones for family members, reimbursement for personal travel and other expenses which did not relate to XA in any way," and that emails were deleted by the Third-Party Plaintiffs.

30.    The Form 10-Q/A of CMG, filed November 20, 2014 and signed by Glenn Laken, substantively repeats all of these false and defamatory statements. In addition, in it, Glenn Laken states that the Third-Party Plaintiffs formed HudsonGray, "which was soliciting XA's clients using confidential information gained from their employment with XA." Further, Glenn Laken states that CMG and XA plan to recover "emails deleted by the former employees."

31.    At the time Glenn Laken published these statements, he knew, or should have known, all of these statements to be absolutely false.

32.    Both the November 19, 2014 letter and the relevant pages of the Form 10-Q/A are attached hereto as **Exhibit C**.

**B.    Defamatory Statements by Alexis Laken to Wagner's Business Partner**

33.    To further the Lakens' efforts to spread defamatory statements against Wagner, Alexis Laken, President of XA, wrote at least one email to Wagner's business partner and vendor falsely accusing Wagner of theft.

34.    Alexis Laken stated that XA had "documentary proof that Joseph Wagner, the former CEO of XA, stole millions of dollars in business opportunity and cash receipts from the parent company that owns XA over the course of his tenure." In fact, Alexis Laken went so far

as to state that Wagner was susceptible to "criminal" charges. An email containing these statements is attached hereto as **Exhibit D.**

35. Alexis Laken used this email to intimidate and threaten Wagner's business partner, thereby harming Wagner.

36. Furthermore, Alexis Laken threatened this business partner, stating that she has "an ongoing relationship with a number of media outlets – Craig's [sic] Chicago in particular has been asking for interesting and salacious details." Upon information and belief, Alexis Laken is referring to the news publication *Crain's Chicago Business* ("*Crain's*"). This email is attached hereto as **Exhibit E.**

## C. Defamatory Statements Made to *Crain's* for Purposes of Publication

37. Upon information and belief, Alexis Laken and Glenn Laken used their relationships with *Crain's* to further spread their defamatory statements concerning all Third-Party Plaintiffs.

38. On December 16, 2014, *Crain's* published an article entitled, "Marketing and PR agency XA shutters Chicago office amid theft allegations." *See* **Exhibit A.**

39. Both the Lakens are quoted in the article.

40. Upon information and belief, the Lakens made defamatory statements about Third-Party Plaintiffs for the purpose of publication in a widely-read news source.

41. Upon information and belief, the Lakens repeated many of the defamatory statements identified above to *Crain's* for publication in the article.

42. Upon information and belief, the Lakens also provided *Crain's* with additional documents or information that contained defamatory statements not published elsewhere. Indeed, although the article reports that these statements are alleged in XA's lawsuit against

Third-Party Plaintiffs and HudsonGray, they are, in fact, not contained in XA's Complaint. On information and belief, the Lakens falsely informed *Crain's* that these statements were alleged in the Complaint so that *Crain's* would publish them, when, in fact, these statements are not included in the Complaint.[1]

43.     For example, the article states that XA alleges in its lawsuit that Wagner and Andereck operated a company called XA Scenes and Studio AG "without the knowledge of CMG executives and siphoned millions of dollars in revenue from XA." The article states that XA alleges that Andereck owns Studio AG.

44.     The article further states that XA alleges that Mixed Company, an entity owned by former XA COO Jean Wilson, was an "unauthorized vendor" to XA and received $130,000 in payments.

45.     Upon information and belief, these statements were provided by the Lakens to *Crain's* for publication for the express purpose of causing reputational and economic harm to the Third-Party Plaintiffs.

46.     At the time the Lakens provided this information, they knew or should have known that the information was false.

**D.      The Lakens Knew that the Defamatory Statements were False**

47.     All of the defamatory statements that Glenn Laken made in the SEC filings, that Alexis Laken made to Wagner's business partner, and that the Lakens, upon information and belief, made to *Crain's* for the purposes of publication are demonstrably false, and both either knew their statements were false, or should have known their falsity, at the time that they made the statements.

---

[1] XA withdrew its Complaint against Wagner following service of Wagner's Motion to Dismiss the Complaint on the basis of documentary evidence. XA then missed the January 23, 2015 deadline to serve an amended complaint. Accordingly, there is now no Complaint pending against Wagner.

### a.  XA Scenes and Studio AG Did Not Siphon Business from XA

48.  Glenn Laken's shareholder letter and Form 10-Q/A and the *Crain's* article planted by the Lakens contain statements that XA Scenes and Studio AG were competitors of XA in which Wagner and Andereck had an ownership interest that was not disclosed to CMG, and that the Third-Party Plaintiffs siphoned business from XA to these entities without the knowledge of CMG board members.

49.  This is patently false.

50.  XA Scenes was a subsidiary of XA, Inc., the predecessor entity of XA.

51.  At the time that CMG acquired the assets of XA, it also obtained all the trademarks, customer lists, and goodwill of XA Scenes.

52.  CMG board members were not only fully aware of the actions of XA Scenes, but were actively involved in XA Scenes' operations.

53.  For example, at the time that Wagner was employed by XA, XA Scenes was the leaseholder for the New York office of both XA and CMG.

54.  James Ennis ("Ennis"), the former CFO, COO, and Treasurer of CMG, was also the President, Secretary, and Treasurer of XA.

55.  In October 2009, Ennis signed a guarantee as President of CMG for rent payments to be made by XA Scenes. This agreement is attached hereto as **Exhibit F.**

56.  In fact, to assist paying corporate office lease expenses, CMG paid $10,000.00 directly to XA Scenes.

57.  Furthermore, in January 2010, Ennis executed a Certificate of Business: Fictitious Firm Name for XA to conduct business under the name of XA Scenes. A true and correct copy of this certificate is attached hereto as **Exhibit G.**

58.     Glenn Laken, as the CMG Chief Executive Officer and Chairman of the CMG board of directors, and Alexis Laken, as President of XA, knew, or should have known, any statements that XA Scenes was operating without the knowledge of CMG were false.

59.     Furthermore, even ignoring the corporate affiliation between XA Scenes and XA, the allegation that XA Scenes siphoned business away from XA is false, as the two entities were not competitors.

60.     XA is an event marketing company.

61.     XA Scenes was the venue management division of XA.

62.     Therefore, the Lakens knew or should have known that any statement that XA Scenes siphoned business away from XA was false when they made the defamatory statements.

63.     Similarly, the Lakens knew or should have known that all of their defamatory statements regarding Studio AG were false.

64.     Studio AG was formed by Wagner, Andereck, and another former XA employee because XA required floral décor and fabrication services. Previously, Fiori XA, a subsidiary of XA, Inc., provided this service. In 2009, however, CMG management decided to abandon Fiori XA's line of business.

65.     When it became clear that such services were required again, Wagner, Andereck, and another XA manager formed Studio AG to better serve XA's clients.

66.     The requirement of these types of services, and the consequential formation of Studio AG, was specifically discussed in a memorandum dated December 4, 2009 from Wagner (and a colleague) to Ennis, COO and CFO of CMG. This memorandum is attached hereto as **Exhibit H**.

67.     As an illustration of how openly this was done, Wagner also wrote a memorandum dated January 27, 2014 to Ron Burkhardt ("Burkhardt") soon after Burkhardt became Executive Chairman at XA, disclosing Wagner's ownership interest in Studio AG "to support XA." This memorandum is attached as **Exhibit I**. Burkhardt was also a board member of CMG.

68.     Further, as with XA Scenes, it is impossible for Studio AG to have siphoned business away from XA because the two entities are not competitors, and rather, Studio AG was formed specifically to support XA operations.

69.     Any statement that the CMG board was unaware of the ownership or operation of Studio AG or that Studio AG siphoned any business away from XA is false.  And the Lakens knew or should have known that any statements to that effect were false.

        **b.**      **Third-Party Plaintiffs Used Personal Monies to Fund XA**

70.     The Lakens also published the defamatory statement that all Third-Party Plaintiffs converted XA funds by charging "personal charges on company credit cards," making payments for cell phones for family members, obtaining reimbursement for personal travel, and other expenses not related to XA.

71.     At the time the Lakens made these statements, they knew that they were false.

72.     Due to the shrinking of the credit markets, Wagner, Andereck and another member of XA management used their personal credit cards to fund XA's expenses.

73.     Therefore, for the benefit of the company, Wagner and Andereck incurred significant expenses on their personal credit card accounts.

74.     For example, Wagner used his own credit card for a venue payment on December 9, 2013 in the amount of $32,076.00 on behalf of XA.  A credit card statement showing that payment is attached hereto as **Exhibit J.**

75.     Because this was Wagner's personal credit card, Wagner exposed himself to significant personal financial liability given that in the event XA was unable or unwilling to pay, Wagner would be personally responsible for these charges.

76.     Andereck similarly exposed himself to personal financial liability by using his own personal credit card for the benefit of XA.

77.     It was then XA's standard practice to reimburse Wagner and Andereck for any of these expenses related to XA's business.  From these reimbursements, XA would specifically exclude any payments Wagner and Andereck made that were personal.  For example, Wagner, for a period of a handful of months, used his personal credit card for family cell phone plans, which amounted to approximately $20 per month, and used his personal credit card for miscellaneous purchases, such as concert tickets.

78.     As a matter of course, Wagner and Andereck reimbursed XA for any credit card charges made for personal usage, even prior to any demand from XA.

79.     Furthermore, Wagner and Andereck submitted to Burkhardt five years of their personal credit card statements for review.  Burkhardt, on behalf of XA, determined that no expenses charged to XA were outside the normal and ordinary course of XA's business.

80.     The defamatory statements that Smith and Lomma in any way converted funds of XA for their own personal use have absolutely no truthful basis.

81.     Thus, all of the statements that any of the Third-Party Plaintiffs in any way used XA funds for their own personal use are completely false.

82.     Over a period of years, Third-Party Plaintiffs attempted to stop XA's reliance on their personal credit cards.

83.     In a memorandum dated December 4, 2009 to Ennis, Wagner stated that XA's management, including Wagner and Andereck, were supporting XA by use of their personal credit cards.  Wagner suggests that this had been a burden because those managers had their "personal credit compromised" due to the necessity of using their own personal credit cards for XA's needs. *See* **Exh. H**.

84.     By memorandum dated January 27, 2014, over four years later, Wagner wrote another memorandum to Burkhardt, XA's Executive Chairman and CMG's board member.  In it, Wagner states that there is "still no credit line" for XA, and that Wagner and Andereck are "using personal credit cards to support XA's need for credit." *See* **Exh. I**.

85.     Simply put, there were no XA company credit cards for anyone to even abuse. And the use of Wagner and Andereck's own personal credit cards for XA's expenses was not only something of which CMG board members were aware, it was something that Third-Party Plaintiffs were actively attempting to end.

86.     Additionally, with regard to Wagner, throughout this time period, XA failed to pay Wagner compensation according to his employment agreement, which necessitated a settlement agreement executed in February 2014 that required XA to pay Wagner over $500,000 (the "February Agreement").  When XA failed to comply with these terms, Wagner and XA signed April Settlement Agreement and Release. *See* ¶¶ 16-17, *supra*.

87.     Therefore, during the time that the Lakens claim that Wagner was converting funds, XA actually owed Wagner hundreds of thousands of dollars.

88.     Finally, as stated above, the April Settlement Agreement and Release contained a general release of all claims XA may have had against Wagner as of April 30, 2014. Thus, even if the defamatory statements of conversion were true, XA had waived any such claims when the defamatory statements were made such that the statement in Glenn Laken's letter that XA "will use every legal avenue available to claw-back the stolen profits of the past" is false and misleading. There is a pattern and practice of such duplicitous conduct.

### c.     Third-Party Plaintiffs Are Permitted to Solicit XA's Clients

89.     The Lakens also made defamatory statements that HudsonGray and Third-Party Plaintiffs improperly poached corporate clients or business opportunities from XA.

90.     The April Settlement Agreement and Release entered into between XA and Wagner does not contain a non-solicitation provision restricting Wagner's ability to solicit XA clients. *See* **Exh. B.** It does, however, contain an integration clause, stating that it constitutes the entire agreement between the parties and supersedes any prior agreements with respect to the matters set forth therein and supersedes all prior agreements between XA and Wagner. *See id.* at ¶ 11. Thus, Wagner was permitted to seek the business of any of XA's clients.

91.     In fact, when Glenn Laken was confronted with the effect of the lack of a non-solicitation provision in the April Settlement Agreement and Release, he stated that it was not a concern because of his view that Wagner no longer had any interest in the business of XA and that Wagner was going to focus on his consulting business.

92.     Alexis Laken, as President of XA, has or has access to the April Settlement Agreement and Release, thereby demonstrating that she knew or should have known that the allegations concerning improper solicitation were false.

93.     In addition, prior to XA initiating the underlying lawsuit against Wagner and others, Wagner's counsel sent XA a letter on September 18, 2014, which specifically directs XA's attention to the release provisions and integration clause of the April Settlement Agreement and Release.  This letter is attached hereto as **Exhibit K**.  Further, in response to the lawsuit, on November 7, 2014, Wagner, along with HudsonGray, filed a motion to dismiss which specifically articulated why Wagner was not subject to a non-solicitation provision, the effect of the integration clause in the April Settlement Agreement and Release, and the effect of the general waiver contained therein.

94.     Smith, Andereck, and Lomma never signed any employment manual, handbook, contract, or agreement that contained any restriction against solicitation.  The statements made by the Lakens that they had any such duty are completely false.

95.     Accordingly, at the time the Lakens made these statements, they knew them to be false.

96.     These statements were particularly egregious considering that Alexis Laken made statements to business entities implying that Wagner had engaged in criminal activity.  *See* **Exh. D**.

97.     Such statements were deliberately meant to harm the business reputation of Third-Party Plaintiffs.

**d.      Third-Party Plaintiffs Did Not Delete Email Accounts**

98.     In a transparent attempt to saddle Third-Party Plaintiffs with as many nefarious actions as possible, Glenn Laken states in the SEC filings that XA's investigations have discovered "e-mails deleted by former employees."

99.     Glenn Laken is well aware that XA's own email policy is to delete former employee email accounts 60 days after separation.

100.    At the latest, Glenn Laken was made aware of this policy on September 12, 2014, when Jean Wilson, former COO of XA, provided an email to Glenn Laken that explicitly stated this policy.

101.    Glenn Laken's defamatory statements that suggest improper deleting of emails by XA's former employees demonstrates the desperate attempts that both he and Alexis Laken went in their efforts to impugn Third-Party Plaintiffs' reputations and harm their business.

### e.     Implication of Wagner's Resignation Due to XA's Performance

102.    Glenn Laken's letter to shareholders implies that Wagner resigned his position as CEO because XA "never made a significant profit."

103.    Laken, however, is well aware that a dispute arose between XA and Wagner regarding payments owed to Wagner as a result of a certain incentive package, and in February 2014, XA and Wagner executed a contract entitling Wagner to certain payments (the "February Release").

104.    XA, however, failed to make the payments required by the February Release.

105.    To resolve Wagner's claims against XA, the parties entered into the April Settlement Agreement and Release, which also terminated Wagner's employment with XA.

106.    Thus, the implication that Glenn Laken made in his letter that Wagner resigned due to an investigation into XA's poor performance is false and is meant to disparage Wagner's business reputation.

### f.      Mixed Company Was Known to XA

107.    The *Crain's* article states that a company called Mixed Company, owned by former COO Jean Wilson, was an "unauthorized vendor" to XA and received improper payments.

108.    The Third-Party Plaintiffs comprised senior management of XA, such that they had full authority to hire vendors without first seeking or receiving any authorization from CMG, XA's corporate parent.

109.    In addition, Mixed Company had stellar qualifications in the floral design industry, including design credentials and experience, and provided myriad other benefits to XA as determined in the business judgment of Third-Party Plaintiffs.

110.    For example, because of the relationship that XA had with Mixed Company, Mixed Company was willing and able to provide services at the last minute that other entities would not have been able to provide.

111.    Furthermore, upon information and belief, the information that the Lakens provided to *Crain's* overstates the amount that was paid to Mixed Company.

112.    Thus, the statements concerning an improper relationship between XA and Mixed Company when Third-Party Plaintiffs were employed by XA are false, and the Lakens knew it to be so when they provided *Crain's* with that information.

### g.      The Lakens' Blatantly False Claims Concerning Computers and Staging Equipment

113.    The Lakens also made defamatory statements that Third-Party Plaintiffs stole newly purchased computers and lockers filled with staging equipment around the country.

114.    These statements are completely false.  There is absolutely no basis for these statements.

## COUNT I (LIBEL PER SE)

115. Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

116. The defamatory statements made by Glenn Laken in the November 19, 2014 letter to CMG shareholders attached to XA SEC Form 8-K and in the Form 10-Q/A filings constitute libel *per se*.

117. Glenn Laken knew, or should have known, that his defamatory statements, including statements of Third-Party Plaintiffs siphoning business to entities in which they had an interest without the knowledge of CMG, converting funds for personal use, improperly soliciting the business of XA's clients, improperly deleting emails, and all the other defamatory assertions, were false.

118. The defamatory statements made by Glenn Laken were: 1) false statements; 2) published to countless third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) constitute libel *per se*.

119. Glenn Laken knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner.

120. The defamatory statements were published in publicly available SEC filings, were made available to all shareholders of CMG, are currently accessible on the internet, and have been publicized in countless investment internet discussion boards. *See, e.g.,* February 12, 2015 printout from *Investors Hub*, attached hereto as **Exhibit L**.

121. By making these publications, Glenn Laken has published his defamatory statements to countless numbers of people, and has done so with the intention of injuring Third-Party Plaintiffs' business reputation and to discredit and harm them.

122.    The defamatory statements have damaged the personal and business reputation of Third-Party Plaintiffs, resulting in monetary damages in an amount to be determined at trial.

123.    The defamatory statements suggest improper performance of Third-Party Plaintiffs' duties or unprofessional conduct by Third-Party Plaintiffs.

124.    Business clients and associates of Third-Party Plaintiffs have already contacted them, raising their concerns about the defamatory statements published by Glenn Laken, resulting in monetary damages in an amount to be determined at trial.

125.    Potential clients of Third-Party Plaintiffs may have been deterred by the defamatory statements made by Glenn Laken, resulting in monetary damages in an amount to be determined at trial.

126.    The actions of Glenn Laken in making the defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT II (LIBEL PER SE)

127.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

128.    The defamatory statements made by Alexis Laken to Wagner's business partner and vendor constitute libel *per se*.

129.    Alexis Laken knew, or should have known, that her defamatory statements that XA was in possession of documentary proof that Wagner stole millions of dollars in business opportunity and cash receipts from CMG, and the implication that Wagner had engaged in criminal conduct were false.

130.   The defamatory statements made by Alexis Laken were: 1) false statements; 2) published to third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) constitute libel *per se*.

131.   Alexis Laken knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner by spreading these statements through emails in Wagner's business community.

132.   Alexis Laken further sought to intimidate these business entities, threatening embarrassing media coverage through use of her media connections.

133.   By sending these emails, Alexis Laken has published her defamatory statements to business associates of Wagner, and has done so with the intention of injuring Wagner's business reputation and to discredit and harm him.

134.   The defamatory statements have damaged the personal and business reputation of Wagner, resulting in monetary damages in an amount to be determined at trial.

135.   The defamatory statements not only suggest improper performance of Wagner's duties or unprofessional conduct by Wagner, but further suggest that Wagner conducted himself in a criminal fashion.

136.   The actions of Alexis Laken in making her defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT III (LIBEL PER SE)

137.   Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

138.   Upon information and belief, the defamatory statements made by the Lakens to the news publication *Crain's* constitute libel *per se*.

139.   The Lakens knew, or should have known, that their defamatory statements, including statements of Third-Party Plaintiffs siphoning business to entities in which they had an interest without the knowledge of CMG, converting funds for personal use, improperly soliciting the business of XA's clients, improperly deleting emails, and all the other defamatory assertions, were false.

140.   The defamatory statements made by the Lakens were: 1) false statements; 2) published to countless third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) constitute libel *per se*.

141.   Upon information and belief, by providing their statements to *Crain's*, the Lakens knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner.

142.   The defamatory statements were published in a widely circulated news periodical, with an internet-based website that boasts monthly readership of over 400,000 people.   *See* http://crainschicagoadvertising.com/stats/print/ (last accessed February 12, 2015).  Furthermore, *Crain's* is specifically targeted towards business professionals, precisely the audience with whom Third-Party Plaintiffs' good reputations are most valuable.

143.   By making these statements for the purpose of mass publication, the Lakens published their defamatory statements to countless numbers of people, and did so with the intention of injuring Third-Party Plaintiffs' business reputation and to discredit and harm them.

144.   The defamatory statements have damaged the personal and business reputations of Third-Party Plaintiffs, resulting in monetary damages in an amount to be determined at trial.

145.   The defamatory statements suggest improper performance of Third-Party Plaintiffs' duties or unprofessional conduct by Third-Party Plaintiffs.

146.   Business clients and associates of Third-Party Plaintiffs have already contacted them, raising their concerns about the defamatory statements published by the Lakens, resulting in monetary damages in an amount to be determined at trial.

147.   Potential clients of Third-Party Plaintiffs may have been deterred by the defamatory statements made by the Lakens, resulting in monetary damages in an amount to be determined at trial.

148.   The actions of the Lakens in making their defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT IV (LIBEL)

149.   Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

150.   The defamatory statements made by Glenn Laken in the November 19, 2014 letter to CMG shareholders attached to XA SEC Form 8-K and in the Form 10-Q/A filings constitute libel.

151.   Glenn Laken knew, or should have known, that his defamatory statements, including statements of Third-Party Plaintiffs siphoning business to entities in which they had an interest without the knowledge of CMG, converting funds for personal use, improperly soliciting the business of XA's clients, improperly deleting emails, and all the other defamatory assertions, were false.

152.   The defamatory statements made by Glenn Laken were: 1) false statements; 2) published to countless third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) caused specific damages.

153.   Glenn Laken knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner.

154.   The defamatory statements were published in publicly available SEC filings, were made available to all shareholders of CMG, are currently accessible on the internet, and have been publicized in countless investment internet discussion boards. *See, e.g.,* printout from *Investors Hub*, attached hereto as **Exhibit L.**

155.   By making these publications, Glenn Laken has published his defamatory statements to countless numbers of people, and has done so with the intention of injuring Third-Party Plaintiffs' business reputation and to discredit and harm them.

156.   The defamatory statements have damaged the personal and business reputation of Third-Party Plaintiffs, resulting in monetary damages in an amount to be determined at trial.

157.   The defamatory statements suggest improper performance of Third-Party Plaintiffs' duties or unprofessional conduct by Third-Party Plaintiffs.

158.   Business clients and associates of Third-Party Plaintiffs have already contacted them, raising their concerns about the defamatory statements published by Glenn Laken, resulting in monetary damages in an amount to be determined at trial.

159.   Potential clients of Third-Party Plaintiffs may have been deterred by the defamatory statements made by Glenn Laken, resulting in monetary damages in an amount to be determined at trial.

160.   The actions of Glenn Laken in making the defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT V (LIBEL)

161.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

162.    The defamatory statements made by Alexis Laken to Wagner's business partner and vendor constitute libel.

163.    Alexis Laken knew, or should have known, that her defamatory statements that XA was in possession of documentary proof that Wagner stole millions of dollars in business opportunity and cash receipts from CMG, and the implication that Wagner had engaged in criminal conduct were false.

164.    The defamatory statements made by Alexis Laken were: 1) false statements; 2) published to third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) caused specific damages.

165.    Alexis Laken knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner by spreading these statements through emails in Wagner's business community.

166.    Alexis Laken further sought to intimidate these business entities, threatening embarrassing media coverage through use of her media connections.

167.    By sending these emails, Alexis Laken has published her defamatory statements to business associates of Wagner, and has done so with the intention of injuring Wagner's business reputation and to discredit and harm him.

168.    The defamatory statements have damaged the personal and business reputation of Wagner, resulting in monetary damages in an amount to be determined at trial.

169.    The defamatory statements not only suggest improper performance of Wagner's duties or unprofessional conduct by Wagner, but further suggest that Wagner conducted himself in a criminal fashion.

170.    Business clients and associates of Wagner have already contacted Wagner, raising their concerns about the defamatory statements published by the Lakens, resulting in monetary damages in an amount to be determined at trial.

171.    The actions of Alexis Laken in making their defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT VI (LIBEL)

172.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

173.    Upon information and belief, the defamatory statements made by the Lakens to the news publication *Crain's* constitute libel.

174.    The Lakens knew, or should have known, that their defamatory statements, including statements of Third-Party Plaintiffs siphoning business to entities in which they had an interest without the knowledge of CMG, converting funds for personal use, improperly soliciting the business of XA's clients, improperly deleting emails, and all the other defamatory assertions, were false.

175.    The defamatory statements made by the Lakens were: 1) false statements; 2) published to countless third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) caused specific damages.

176.    Upon information and belief, by providing their statements to *Crain's*, the Lakens knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner.

177.    The defamatory statements were published in a widely circulated news periodical, with an internet-based website that boasts monthly readership of over 400,000 people. *See* http://crainschicagoadvertising.com/stats/print/ (last accessed February 12, 2015). Furthermore, *Crain's* is specifically targeted towards business professionals, precisely the audience with whom Third-Party Plaintiffs' good reputations are most valuable.

178.    By making these statements for the purpose of mass publication, the Lakens published their defamatory statements to countless numbers of people, and did so with the intention of injuring Third-Party Plaintiffs' business reputation and to discredit and harm them.

179.    The defamatory statements have damaged the personal and business reputation of Third-Party Plaintiffs, resulting in monetary damages in an amount to be determined at trial.

180.    The defamatory statements suggest improper performance of Third-Party Plaintiffs' duties or unprofessional conduct by Third-Party Plaintiffs.

181.    Business clients and associates of Third-Party Plaintiffs have already contacted them, raising their concerns about the defamatory statements published by the Lakens, resulting in monetary damages in an amount to be determined at trial.

182.    Potential clients of Third-Party Plaintiffs may have been deterred by the defamatory statements made by the Lakens, resulting in monetary damages in an amount to be determined at trial.

183.    The actions of the Lakens in making their defamatory statements were motived by ill-will, malice or other nefarious motive.

## PRAYER FOR RELIEF

WHEREFORE, Third-Party Plaintiffs demand judgment against Glenn Laken and Alexis Laken for:

1.      monetary damages in an amount to be determined at trial, plus interest and costs, and reimbursement of Third-Party Plaintiffs' attorneys' fees and expenses;

2.      punitive damages for the knowing publication of the defamatory statements;

3.      a mandatory and permanent injunction directing the Lakens and all employees and agents of CMG and its subsidiaries, including XA, to cease making defamatory statements concerning the Third-Party Plaintiffs; and

4.      such other relief as the Court deems to be fair and equitable.

Dated: New York, New York
        February 19, 2015

Respectfully submitted,

WINDELS MARX LANE & MITTENDORF, LLP

By: _____
        Scott R. Matthews
        Daniel J. Shim
156 West 56th Street
New York, NY 10019
(212) 237-1000
*Attorneys for Third-Party Plaintiffs*

Index No. 652894/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

XA EXPERIENTIAL AGENCY, INC.,

                                        Plaintiff,

                    v.

JOSEPH WAGNER, HUDSON GRAY LLC, JEFFREY SMITH, DARREN ANDERECK and
JESSIE LOMA,

                                        Defendants,

JOSEPH WAGNER, JEFFREY SMITH, DARREN ANDERECK, and JESSIE LOMMA,

                                        Third-Party Plaintiffs,

                    v.

GLENN LAKEN and ALEXIS LAKEN,

                                        Third-Party Defendants.

---

### THIRD-PARTY SUMMONS AND COMPLAINT

---

**WINDELS MARX LANE & MITTENDORF, LLP**
*Attorneys for Third-Party Plaintiffs*

156 WEST 56TH STREET
NEW YORK, NEW YORK 10019
212.237.1000

---

| To: | Signature (Rule 130-1.1-a) |
|---|---|
| | Printed name beneath |
| | Daniel Shin |

Attorney(s) for

Service of a copy of the within                                        is hereby admitted.

Dated,

                    Attorney(s) for

---

Please take notice
☐ **NOTICE OF ENTRY**
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within court on
☐ **NOTICE OF SETTLEMENT**
that an order                                of which the within is a true copy will be presented for
settlement to the HON                                                one of the judges
of the within court, at
on                                at                        M

Dated,

                                        Yours, etc.

To                                **WINDELS MARX LANE & MITTENDORF, LLP**
                                *Attorneys for Third-Party Plaintiffs*

Attorney(s) for
                                156 WEST 56TH STREET