UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CMG HOLDINGS GROUP, as successor to   :
XA THE EXPERIENTIAL AGENCY, INC.,   :    Civil Action No.: 15-cv-05814-JPO
  :
             Plaintiff,   :
  :
       vs.   :
  :
JOSEPH WAGNER, HUDSON GRAY LLC,   :
DARREN ANDERECK, JESSIE LOMMA,   :
MICHAEL DAY, JEAN WILSON, ESTELLE   :
PIZZO, STUDIO AG, LLC, REMIGIO GUDIN,   :
and MIXED COMPANY, INC.,   :
  :
          Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH WAGNER, JEFFREY SMITH, DARREN :
ANDERECK, and JESSIE LOMMA,                 
  :
       Third-Party Plaintiffs,   :
  :
       vs.   :
  :
GLENN LAKEN and ALEXIS LAKEN,   :
  :
       Third-Party Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION PURSUANT TO
<u>RULE 12(b)(6) TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, New York 10019
(212) 237-1000
*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

PRELIMINARY STATEMENT ............................................................................................1

PROCEDURAL HISTORY...................................................................................................4

FACTS ALLEGED IN THE AMENDED COMPLAINT .....................................................6

I.   Background ..................................................................................................................6

II.  The Schemes Alleged in the Amended Complaint ......................................................8

    A.  Studio AG Replaces Fiori XA ..............................................................................9

    B.  XA Scenes Was Part of XA ................................................................................10

    C.  HudsonGray ........................................................................................................10

    D.  Alleged Property Theft .......................................................................................12

    E.  Alleged Concealment..........................................................................................12

STANDARD........................................................................................................................13

ARGUMENT ......................................................................................................................14

POINT I ..............................................................................................................................14

THE RICO CLAIMS MUST BE DISMISSED FOR FAILURE TO
SUFFICIENTLY ALLEGE A "PATTERN" OF RACKETEERING ACTIVITY ......................14

    A.  Most of the Alleged Predicate Acts Must be Disregarded...................................16

        1.  Larceny is Not a Predicate Act ....................................................................16

        2.  Defendants Did Not Commit Any Wrongdoing With Studio AG, and Any
            Allegations Concerning Studio AG are Barred by the Statute of Limitations.............17

            a.   Studio AG's Ownership and Purpose Was Disclosed to Plaintiff........................17

            b.   All Claims Related to Studio AG's Creation and Use are Time-Barred ..............18

        3.  The Allegations Regarding XA Scenes are Incoherent ...............................19

    4. XA Does Not Sufficiently Plead Any Commercial Bribery ........................................20

    5. Defendants Did Not Engage in Any Visa Fraud.........................................................21

  B. Because the Alleged Schemes are "Inherently Terminable," There
     is no "Open-Ended" Continuity ....................................................................................21

  C. The Alleged Nine-Month Scheme is Too Short for "Close-Ended" Continuity ..............22

  D. Because XA Alleges No Racketeering, the Conspiracy Claim Must
     Also be Dismissed........................................................................................................24

POINT II ................................................................................................................................24

ALL CLAIMS MUST BE DISMISSED AS AGAINST WAGNER PURSUANT
TO THE APRIL RELEASE ..................................................................................................24

  A. The Controlling April Release Bars XA's Claims.........................................................25

    1. The April Release Includes a General Release of All Claims ....................................25

    2. XA Agreed Not to Sue Wagner .................................................................................26

    3. The April Release Does Not Contain a Non-Solicitation Provision,
       Requiring Dismissal of Tortious Interference with Contract and Breach of
       Contract Claims ......................................................................................................26

  B. Claims Against Wagner Must Also be Dismissed for Improper Venue...........................27

POINT III...............................................................................................................................28

XA'S DECLARATORY JUDGMENT CLAIM MUST BE DISMISSED.................................28

POINT IV...............................................................................................................................29

XA'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED AS AGAINST
ALL DEFENDANTS FOR FAILURE TO STATE A CLAIM ................................................29

POINT V ................................................................................................................................31

THE SEVENTH CLAIM FOR INJUNCTION AND CONSTRUCTIVE
TRUST MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR RELIEF ..........31

POINT VI ...........................................................................................................32

THE BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED
BECAUSE XA DOES NOT IDENTIFY ANY PARTICULAR BREACH ................................32

POINT VII ..........................................................................................................33

THE TENTH CLAIM FOR TORTIOUS INTERFERENCE MUST BE DISMISSED
AS AGAINST HUDSONGRAY BECAUSE THE NON-SOLICITATION PROVISION
SUPPOSEDLY INTERFERED WITH DOES NOT EXIST .........................................33

POINT VIII .........................................................................................................34

THE TWELFTH CLAIM FOR MISAPPROPRIATION AND UNFAIR
COMPETITION FAILS BECAUSE XA DOES NOT IDENTIFY ANY CONFIDENTIAL
INFORMATION ....................................................................................................34

POINT IX ...........................................................................................................34

THE THIRTEENTH CLAIM FOR USURPATION OF A CORPORATE
OPPORTUNITY MUST BE DISMISSED AGAINST HUDSONGRAY AND THE
STUDIO AG DEFENDANTS BECAUSE XA ALLEGED THAT THEY ARE
COMPETITORS .....................................................................................................34

POINT X ............................................................................................................35

XA'S CLAIM FOR PUNITIVE DAMAGES MUST BE DISMISSED .....................................35

CONCLUSION .....................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*5–Star Management, Inc. v. Rogers,*
940 F.Supp. 512 (E.D.N.Y. 1996) ..................................................................13, 17

*Ackerman v. 305 East 40th Owners Corp.,*
189 A.D.2d 665 (1st Dep't 1993) .............................................................................18

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,*
483 U.S. 143 (1987)..................................................................................................18

*Alleghany Corp. v. Kirby,*
333 F.2d 327 (2d Cir.1964).......................................................................................29

*Arista Records, LLC v. Doe 3,*
604 F.3d 110 (2d Cir.2010).......................................................................................30

*Aronis v. TLC Vision Centers, Inc.,*
49 A.D.3d 576 (2d Dep't 2008) ................................................................................35

*Ashby v. ALM Media, LLC,*
110 A.D.3d 459 (1st Dep't 2013) .............................................................................33

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,*
268 F.3d 103 (2d Cir.2001).......................................................................................14

*Barille v. Sears Roebuck & Co.,*
289 Ill. App. 3d 171 (1st Dist. 1997) .................................................................26, 27

*Bell v. Hubbert,*
2007 WL 60513 (S.D.N.Y. 2007)..............................................................................14

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,*
757 F.2d 523 (2d Cir.1985).......................................................................................29

*Buller v. Giorno,*
28 A.D.3d 258 (1st Dep't 2006) ...............................................................................27

*Caballero v. Anselmo,*
759 F.Supp. 144 (S.D.N.Y. 1991).............................................................................31

*Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.,*
76 A.D.3d 310 (1st Dep't 2010) ...............................................................................29

*Chambers v. Time Warner, Inc.,*
282 F.3d 147 (2d Cir.2002)...................................................................................7, 13

*Coles-Moultrie Elec. Co-op. v. Sullivan,*
  304 Ill. App. 3d 153 (4th Dist. 1999)........................................................................25

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.,*
  544 F. Supp.2d 178 (S.D.N.Y. 2008)........................................................................29

*Corrado v. New York State Unified Court Sys.,*
  2014 WL 4626234 (E.D.N.Y. 2014)........................................................................32

*DeFalco v. Bernas,*
  244 F.3d 286 (2d Cir.2001)........................................................................22

*Derven v. PH Consulting, Inc.,*
  427 F.Supp.2d 360 (S.D.N.Y. 2006)........................................................................34

*Desclafani v. Pave-Mark Corp.,*
  2008 WL 3914881 (S.D.N.Y. 2008)........................................................................19

*Dorset Indus., Inc. v. Unified Grocers, Inc.,*
  893 F. Supp. 2d 395 (E.D.N.Y. 2012)........................................................................34, 35

*First Capital Asset Management, Inc. v. Satinwood,*
  385 F.2d 159 (2d Cir.2004)........................................................................22, 24

*GICC Capital Corp. v. Technology Finance Group, Inc.,*
  67 F.3d 463 (2d Cir.1995)........................................................................21, 22, 23

*Global Network Communications, Inc. v. City of New York.*
  458 F.3d 150 (2d Cir.2006)........................................................................13, 17

*Goldfine v. Sichenzia,*
  118 F.Supp.2d 392 (S.D.N.Y. 2000)........................................................................14

*Guardian Mortg. Acceptance Corp. v. Bankers Trust Co. of California, N.A.,*
  259 A.D.2d 358 (1st Dep't 1999)........................................................................35

*H.J., Inc. v. Northwestern Bell Telephone Co.,*
  492 U.S. 229 (1989)........................................................................15, 16, 22, 23

*Harris v. New York State Department of Health,*
  202 F.Supp.2d 143 (S.D.N.Y. 2002)........................................................................13

*Hoag v. Chancellor, Inc.,*
  246 A.D.2d 224 (1st Dep't 1998)........................................................................27, 33

*In re Merrill Lynch Ltd. Partnerships Litigation,*
  154 F.3d 56 (2d Cir.1998)........................................................................18

*Katzman v. Victoria's Secret Catalogue,*
    167 F.R.D. 649 (S.D.N.Y. 1996) ..........................................................14

*Koret, Inc. v. Christian Dior, S.A.,*
    161 A.D.2d 156 (1st Dep't 1990) .........................................................33

*Leung v. Law,*
    385 F.supp.2d 105 (E.D.N.Y. 2005) .....................................................22

*Magnoni v. Smith & Laquercia, LLP,*
    701 F.Supp.2d 497 (S.D.N.Y. 2010).....................................................12

*McGarry v. Pallito,*
    687 F.3d 505 (2d Cir.2012)...................................................................13

*McNaughton v. City of New York,*
    234 A.D.2d 83 (1st Dep't 1996) ...........................................................33

*Morris v. 702 East Fifth Street HDFC,*
    46 A.D.3d 478 (1st Dep't 2007) .....................................................27, 29

*National Group for Communications and Computers Ltd. v. Lucent Technologies Inc.,*
    420 F.Supp.2d 253 (S.D.N.Y. 2006).....................................................19

*Old Republic Ins. Co. v. Hansa World Cargo Serv.,*
    170 F.R.D. 361 (S.D.N.Y. 1997) ..........................................................31

*Paulemon v. Tobin,*
    30 F.3d 307 (2d Cir.1994).....................................................................13

*Piechur v. Redbox Automated Retail, LLC,*
    No. 09-CV-984-JPG, 2010 WL 706047 (S.D. Ill. Feb. 24, 2010).........27

*Prince v. Madison Square Garden,*
    427 F.Supp.2d 372 (S.D.N.Y. 2006).....................................................30

*Random House, Inc. v. Rosetta Books LLC,*
    283 F.3d 490 (2d Cir.2002)...................................................................31

*Ray Larsen Associates, Inc. v. Nikko Am., Inc.,*
    1996 WL 442799 (S.D.N.Y. 1996)..................................................22, 23

*Reich v. Lopez,*
    38 F.Supp.3d 436 (S.D.N.Y. 2014)........................................................23

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.,*
    13 N.Y.3d 398 (2009) ...........................................................................25

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir.2004)...........................................................................13

*Rosenson v. Mordowitz*,
  2012 WL 3631308 (S.D.N.Y. 2012) (Oetken, J.) ..................................14

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985)........................................................................................15

*Sokolow, Dunaud, Mercadier & Carreras v. Lacher*,
  299 A.D.2d 64 (1st Dep't 2002) ...............................................................28

*Solow v. New Northern Brokerage Facilities, Inc.*,
  255 A.D.2d 198 (1st Dep't 1998) .............................................................32

*Sotheby's Inc. v. Dumba*,
  1992 WL 27043 (S.D.N.Y. 1992).................................................................29

*Sperry Int'l Trade, Inc. v. Government of Israel*,
  670 F.2d 8 (2d Cir.1982)..............................................................................31

*Spool v. World Child Intern. Adoption Agency*,
  520 F.3d 178 (2d Cir.2007)...........................................................15, 16, 22, 23

*United States v. Reifler*,
  446 F.3d 65 (2d Cir.2006)............................................................................22

*Van Brunt v. Rauschenberg*,
  799 F.Supp. 1467 (S.D.N.Y. 1992).............................................................31

*Weizmann Institute of Science v. Neschis*,
  229 F.Supp.2d 234 (S.D.N.Y. 2002)...................................................15, 16

*Williams v. Calderoni*,
  2012 WL 691832 (S.D.N.Y. 2012)..............................................................30

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*,
  328 Fed.Appx. 695 (2d Cir.2009)..............................................................18

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*,
  530 F.Supp.2d 486 (S.D.N.Y. 2007)...................................................19, 22

**STATUTES**

18 U.S.C. § 1546.........................................................................................................21

18 U.S.C. § 1961(1).................................................................................................15, 16

18 U.S.C. § 1962(a).....................................................................................................15

18 U.S.C. § 1962(b).....................................................................................................15

18 U.S.C. § 1962(c).....................................................................................................15

18 U.S.C. § 1962(d).....................................................................................................24

18 U.S.C. 1964(c)........................................................................................................35

New York Penal Law § 155.00(1)................................................................................16

New York Penal Law § 155.05(1)................................................................................16

New York Penal Law § 180.00....................................................................................20

New York Penal Law § 180.03....................................................................................20

**OTHER AUTHORITIES**

F.R.C.P. Rule 12(b)(6)................................................................................1, 6, 7, 13, 19

<u>**PRELIMINARY STATEMENT**</u>

Defendants move to dismiss portions of the First Amended Complaint (the "Amended Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

Plaintiff CMG Holdings Group, Inc., as successor to XA The Experiential Agency, Inc. ("Plaintiff" or "XA"), asserts numerous claims against certain former employees who now work for HudsonGray, Inc. ("HudsonGray"), which is an experiential and event marketing agency. Plaintiff also asserts claims against Studio AG, LLC ("Studio AG") and Mixed Company, Inc. ("Mixed Company"), previously XA's vendors, and Estelle Pizzo ("Pizzo"), an owner of Studio AG.

HudsonGray markets its clients' brand and products by creating an "experience" for potential consumers, rather than through traditional marketing. Its success or failure depends upon its creativity and execution of its vision for its clients' offerings. In doing so, HudsonGray, like XA, relies upon outside vendors to provide goods and services that it does not produce itself to assist in creating the marketing experience for its clients. In that regard, Studio AG provides floral arrangements, furniture, and scenic fabrication, and Mixed Company provides creative services, design consultation, research, onsite production, and floral fabrication. HudsonGray, again like XA, does not provide such goods and services.

The Amended Complaint is littered with knowingly false statements, allegations which contradict themselves, and confusing accusations designed to mislead the Court. Plaintiff, despite having been repeatedly provided with documents identifying the role of the defendant entities, and their ownership by certain of the individual defendants, intentionally misconstrues the relationship between them to assert its claims. Plaintiff also alleges breach of non-existent

non-solicitation and employment agreements in an attempt to go after its former employees. Most egregiously, however, is Plaintiff's attempt to transform this "garden variety" business dispute into a federal racketeering case, apparently for the purpose of selling stock.[1]  To allege violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO") and to state any claim against defendant Joseph Wagner ("Wagner"), Plaintiff makes allegations that its *knows* to be false.

First, Plaintiff alleges that certain defendants secretly formed a competing company in 2009, Studio AG, but never disclosed it prior to this litigation.  Aside from the fact that Studio AG does not compete with XA, a 2009 memorandum to Plaintiff's prior Chief Operating Officer, attached to the Third-Party Complaint in this action, demonstrates the allegation to be false. Indeed, Plaintiff's Chairman and Chief Executive Officer, Glenn Laken, admitted *in this case* that XA was notified in writing about Studio AG in 2009.[2]  This negates the allegations and renders all claims based upon alleged diversions to Studio AG barred by the statute of limitations.

Second, Plaintiff asserts that certain defendants diverted business from XA to an allegedly competing entity known as XA Scenes.  A document that XA filed with the State of Nevada and attached to the Third-Party Complaint demonstrates that this allegation as false.  XA

---

[1] Matthews Dec., Ex. I (On or about July 16, 2015, Plaintiff issued a press release advertising to sell a "new class of series A preferred shares that will have first priority payout from any litigation settlement" to attract "capital to support CMG's ongoing civil RICO (Racketeer Influenced and Corrupt Organizations) lawsuit against former employees seeking total damages of $20 million."); Ex. J (On or about July 22, 2015, after a spike in the volume of its stock trading, Plaintiff filed a Form 8-K stating: "Glenn Laken, Chairman and CEO of CMG Holdings announced today that Company management has arranged financing for all litigation costs related to CMG's civil RICO lawsuit against Hudson Gray, Studio AG, Mixed Company and the Hudson Defendants. Under the terms of this arrangement, CMG's only financial responsibilities will be out of pocket expenses, such as experts and deposition costs. In return for said funding, CMG has agreed to share any recovery costs on a 67-33 split basis.").

[2] Laken admits in the Answer to the Third-Party Complaint that, "The requirement of these types of services [that Fiori XA previously provided], and the consequential formation of Studio AG, was specifically discussed in a memorandum dated December 4, 2009 from Wagner (and a colleague) to Ennis, COO and CFO of CMG." (Matthews Dec., Exs. B and C, ¶ 66.)

Scenes is a fictitious name filed by XA in 2010 for XA's use. In other words, XA alleges that defendants diverted business from XA to XA – an obviously absurd claim.

Third, Plaintiff bases its claims against Wagner on a non-solicitation provision supposedly contained in a Settlement Agreement and Release, dated April 22, 2014 ("April Release"). *The April Release, however, does not contain a non-solicitation provision.* The Amended Complaint's block quotation of the purported provision actually draws from a prior settlement agreement between XA and Wagner, the Release Agreement and Non-Solicitation, dated February 26, 2014 (the "February Release"), that was superseded by the April Release. In its initial complaint in this action, XA relied upon the February Release's non-solicitation provision, and Wagner moved to dismiss and for sanctions based upon XA's reliance upon a void agreement and its failure to mention the operative April Release in its pleadings. XA is thus fully aware of the two agreements and their different terms. XA's false statements regarding the April Release can only have been intentional, warranting the imposition of sanctions and denial of leave to replead.

Fourth, XA makes the incredible claim that defendant Remigio Gudin ("Gudin") committed visa fraud by claiming to be an XA employee. The claim is incredible because XA issued a W-2 to Gudin in 2014, in which it acknowledged being his employer.

Disregarding Plaintiff's meritless allegations concerning Studio AG, XA Scenes, the April Release, and Gudin's employment, the alleged RICO violations boil down to the purported diversion of clients and theft of lights and office furniture over the course of seven months. Although disputed, XA's allegations, even if true, cover too short a time period to constitute a "pattern" of racketeering as a matter of law. Accordingly, all of XA's RICO claims must be dismissed.

Dismissal of the RICO claims leaves several of Plaintiff's common law claims that also must be dismissed, either in their entirety or as against certain defendants, for the reasons detailed below. Similarly, there is no basis for punitive damages, and that claim must be dismissed as a matter of law.

Because the Amended Complaint is based upon allegations that Plaintiff *knows* to be false and that were the subject of a prior motion to dismiss presented to the Supreme Court of the State of New York before this action was removed to this Court, the Court should deny Plaintiff the opportunity to replead its claims and sanction the Plaintiff for proceeding on these false allegations.

## PROCEDURAL HISTORY

XA commenced this action in the Supreme Court of the State of New York, County of New York, by a summons and complaint dated September 22, 2014 (the "Original Complaint"), interposing various common law claims against Wagner, HudsonGray, Jeffrey Smith,[3] Darren Andereck ("Andereck"), and Jessie Lomma ("Lomma"). On November 7, 2014, Wagner moved to dismiss the Original Complaint as against him, on the grounds, *inter alia*, that XA's claims were barred by the April Release, and HudsonGray moved to dismiss certain of the common law claims asserted against it. The motion also requested sanctions, on the grounds that the Original Complaint relied upon, and attached as an exhibit, the February Release, which was void upon being superseded by the April Release that XA did not reference in the Original Complaint. XA agreed to file an amended complaint on or before December 17, 2014, and Wagner and HudsonGray withdrew their motion to dismiss the Original Complaint.

Thereafter, Wagner, Smith, Andereck and Lomma filed a third-party complaint (the "Third-Party Complaint") against Glenn Laken and Alexis Laken (collectively, the "Lakens"),

---

[3] Jeffrey Smith is not named as a defendant in the Amended Complaint.

respectively, the Chairman and CEO, and President, of Plaintiff, seeking monetary damages for defamatory statements they made in SEC filings, an article in *Crain's*, and to Wagner's business partners and vendors. The Third-Party Complaint annexed as exhibits documents showing the Lakens' statements – many of which have been repeated without correction in the Amended Complaint – to be demonstrably and blatantly false. On June 26, 2015, the Lakens filed an Answer to the Third-Party Complaint, which is now pending.

After several extensions of its time to file amended pleadings, Plaintiff filed the Amended Complaint on June 26, 2015. The Amended Complaint repeats many of the falsehoods refuted by the documents annexed to the dismissal motion and the Third-Party Complaint; in some cases new falsehoods are asserted. The Amended Complaint asserts additional claims, including four based upon the RICO statute.

On July 25, 2015, Defendants filed a Notice of Removal, removing this action to this Court. Defendants now move to dismiss (1) all RICO claims as against all Defendants (claims 1-4); (2) all claims as against Wagner (claims 1-17); (3) the fifth claim for declaratory judgment; (4) the sixth claim for breach of contract as against all HudsonGray Defendants (as defined below); (5) the seventh claim for injunctive relief and the imposition of a constructive trust as against the HudsonGray Defendants; (6) the eighth and eleventh claims for breach of fiduciary duty and aiding and abetting the breach of fiduciary duty, respectively, as against all Defendants; (7) the tenth claim for tortious interference with contract as against HudsonGray; (8) the twelfth claim for misappropriation and unfair competition as against all Defendants; (9) the thirteenth claim for usurpation of a corporate opportunity as against HudsonGray and the Studio AG Defendants; and (10) the claim for punitive damages as against all Defendants.

<u>**FACTS ALLEGED IN THE AMENDED COMPLAINT**</u>

**I.      <u>Background</u>**

XA is a wholly owned subsidiary of CMG Holdings Group, Inc. ("CMG") and "is engaged in the event and party planning business for large companies and wealthy individuals." (AC, ¶ 12.)[4]  Many of the defendants are former officers or employees of XA who now work for HudsonGray, which is a marketing and branding agency located in New York, New York. (*Id.*, ¶ 15.)  Wagner is the former CEO of XA, having resigned in March 2014 and memorialized in the April Release.  Andereck, Lomma, Day, Wilson, and Gudin[5] (collectively, with Wagner and HudsonGray, the "HudsonGray Defendants") are former officers and employees of XA, having each resigned between May and September 2014. (*Id.*, ¶ 14, 17-19, 21.)

CMG acquired XA and its subsidiaries in an Illinois proceeding similar to bankruptcy in April 2009. (*Id.*, ¶ 25-27.)  "XA remained marginally profitable each year or lost a relatively small amount of money" between 2009 and 2014. (*Id.*, ¶ 27.)  XA alleges that the disappointing profits resulted from the diversion of business from XA. (*Id.*, ¶ 44.)  When members of CMG's Board of Directors questioned Wagner about the "persistently small or non-existent profits margins," Wagner consistently "blamed XA's lack of profitability on CMG's lack of financial support for XA." (*Id.*, ¶ 49-50.)  XA admits that "because CMG was not in a position to provide more capital Wagner said was needed to become profitable, XA's operation continued as it had since 2009," lending credence to Wagner's explanation. (*Id.*, ¶ 52.)

---

[4] Citations to "AC" shall refer to the Amended Complaint, which is annexed as Exhibit A to the Declaration of Scott R. Matthews.  References shall also be made to the Declaration of Joseph Wagner ("Wagner Dec."), the Declaration of Jean Wilson ("Wilson Dec."), and the Declaration of Remigio Gudin ("Gudin Dec.")

[5] XA alleges that Gudin was never an employee of XA.  (AC, ¶ 21.)  That is simply false, as evidenced by a W-2 submitted in support of this motion.  (Gudin Dec., Ex. L.)

In January 2014, CMG hired Ronald Burkhardt as XA's Executive Chairman, which XA alleges caused Wagner to threaten to resign his position as XA's CEO. (*Id.*, ¶ 53-54.) According to XA, on April 22, 2014, "in anticipation of his departure, Wagner and XA entered into a release and non-solicitation agreement." (*Id.*, ¶ 71.) The Amended Complaint then provides a block quotation from the April Release's purported non-solicitation provision, stating that Wagner "shall not solicit or attempt to solicit any client of XA" while he was employed at XA and for six months after his resignation. (*Id.*)

Contrary to XA's allegations, the April Release does *not* contain a non-solicitation provision.[6] (Matthews Dec., Ex. D.) The non-solicitation provision selectively quoted in the Amended Complaint actually appears in the February Release (*id.*, Ex. E, ¶ 4), which is not referenced in the Amended Complaint though its contents are repeatedly misattributed to the April Release. (AC, ¶ 71, 203, 226.) XA and Wagner first entered into the February Release, pursuant to which Wagner, upon receiving a $418,750 settlement payment from XA, would be prohibited from soliciting XA clients during his employment with XA and for a six-month period after his resignation. (Matthews Dec., Ex. E, ¶ 4.) Following XA's failure to make the $418,750 payment,[7] the parties entered into the April Release, pursuant to which Wagner agreed to accept $210,000 – about half of what XA had promised him just two months earlier – in exchange, *inter alia*, for a general release from XA of all claims accruing as of April 30, 2014. (*Id.*, Ex. D, ¶ 2,

---

[6] Rather than accept XA's allegations concerning the April Release as true, the Court may review the actual document, although it is not incorporated into the Amended Complaint, because XA relies upon it heavily and it is therefore "integral" to the Amended Complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

[7] The Amended Complaint asserts that Wagner received "$425,568 by virtue of a settlement agreement at the time of his resignation" (¶ 143(c)), but also contradictorily states that XA did not have "ample funds to pay a $300,000 plus contract settlement with Wagner." (*Id.*, ¶ 144(e).) Both of these allegations are wrong. The April Release provides for a $210,000 payment. (Matthews Dec., Ex. D, ¶ 4.)

8.) The April Release superseded the February Release (*id.*, ¶ 11) and contains no non-solicitation provision. (*Id., passim.*)

XA alleges, upon information and belief, that Andereck and Wilson, along with Wagner, "entered into substantively identical employment agreements" (AC, ¶ 30), and that the agreements contain non-disclosure provisions. (*Id.*, ¶ 205-07.)[8] XA's belief "regarding the existence of signed agreements is based on the understanding [of] CMG['s] counsel who advises that it was his understanding such agreements were signed and kept at the office", not a review of any actual document. (*Id.*, ¶ 207.) Actually, Andereck and Wilson never signed any employee handbook with a non-solicitation provision, or any employment, non-disclosure, or non-solicitation agreement with XA. (*See* Wilson Dec., ¶ 3.)

## II.     The Schemes Alleged in the Amended Complaint

In support of its RICO claims, XA alleges three schemes conducted by various combinations of the defendants: (1) a scheme to divert clients and profits from XA (AC, ¶ 3); (2) a scheme to steal furniture, lights, and other property from XA (*id.*, ¶ 4); and (3) a scheme to conceal the first two schemes. (*id.*, ¶ 5.) Essentially, XA's claims revolve around the departure of certain of its employees to join HudsonGray, which, according to the Amended Complaint was planned, carried out, and completed between February 2014 and the summer of 2014. (*Id.*, ¶ 159.)

---

[8] According to paragraph 30 of the Amended Complaint, a copy of Wagner's employment contract is annexed as Exhibit C. Exhibit C is not annexed to the Amended Complaint; nor is any Exhibit A or B identified or attached. The Amended Complaint also claims that "Schedule A," purportedly listing instances of mail and wire fraud, is annexed to the pleading (¶ 122, 127, 138, 152, 162), but no schedule is attached. Plaintiff's counsel provided us with a copy of Schedule A on July 21, 2015, but advised that any references to exhibits or schedules in the pleadings are "errors" that should be disregarded, and that they should not be considered part of the Amended Complaint. (Matthews Dec., ¶ 3-4).

## A. **Studio AG Replaces Fiori XA**

XA first alleges wrongdoing with respect to Studio AG, an entity created by Wagner, Andereck, and Wilson, and XA Scenes, which XA alleges was a "dormant subsidiary" purchased in April 2009 as part of its purchase of XA's assets, to do work that "could and should have been done by XA" and re-directing profits from XA to Studio AG and XA Scenes. (*Id.*, ¶ 33.) The Amended Complaint repeatedly states, without qualification, that the existence of Studio AG "was not disclosed to XA or its owners prior to litigation." (*Id.*, ¶ 32, 35.) In fact, the formation of Studio AG and its work with XA was never a secret. Fiori XA – a subsidiary of XA, Inc., the predecessor to XA, The Experiential Agency, Inc. – that closed when CMG declined to purchase its assets in 2009, provided vital floral and décor elements for XA events. When Fiori XA closed, a replacement entity that could work closely with XA was needed, *i.e.*, Studio AG. The formation, ownership, and purpose of Studio AG was disclosed to CMG in a memorandum dated December 4, 2009: "Jean, Darren, Joe to form Studio AG" due to "Fiori XA issue." (Matthews Dec., Ex F.) After Mr. Burkhardt was hired to be XA's Executive Chairman, Wagner again disclosed the ownership and purpose of Studio AG in a memorandum to him dated January 27, 2014. (*Id.*, Ex. G.)[9]

---

[9] XA's specific allegations concerning Studio AG are absurd. For instance, XA alleges, based upon its tendentious interpretation of an email dated June 3, 2009, that defendant Estelle Pizzo was going to "sell a van titled to Fiori XA and to use the proceeds for 'AG payables'" and "to pay Studio AG's debts." (AC, ¶ 41.) The email in question, however, actually suggests that the van be sold "to pay down Fiori XA payables" (Matthews Dec., Ex. K) – just another example of either recklessly sloppy drafting or an intentional falsehood. Indeed, not only is XA's allegation false, but it would have been impossible for a van sold in June 2009 to pay Studio AG's debts, because, according to XA's own allegations, Studio AG was not created until December 12, 2009. (AC, ¶ 35.) Obviously, Studio AG did not incur debts six months before it existed.

### B. **XA Scenes Was Part of XA**

Publicly filed documents also show that XA's allegations concerning XA Scenes are not just false, but absurd. Plaintiff claims that XA Scenes was a "dormant subsidiary" of XA, when, in fact, it was a fictitious name used by XA.[10] (*Id.*, Ex. H.) Thus, when XA alleges that the HudsonGray Defendants diverted business to XA Scenes, it is really alleging that they "diverted" business to XA – itself. Moreover, Plaintiff's knowledge that XA Scenes was not a competing entity to which monies could be diverted can be inferred from the fact that Plaintiff did not include XA Scenes as a defendant in this action, as it attempts to do with Studio AG and Mixed Company.

### C. **HudsonGray**

The Amended Complaint alleges that Wagner began work to establish HudsonGray in January 2014, and formed the company in March 2014, which began competing with XA upon its formation. (AC, ¶ 55, 75.) XA alleges that the HudsonGray Defendants solicited XA clients before and after they left XA. (*Id.*, ¶ 113.) XA alleges that the HudsonGray Defendants developed projects while at XA, delayed execution of the contract and deposit until after they left for HudsonGray, thus diverting projects that should have been handled by XA. (*Id.*, ¶ 75-78, 114, 147(e).) XA also merely alleges that HudsonGray began work on projects in the months after Wagner left XA. (*Id.*, ¶ 87, 88, 116.) XA also blames the "loss" of projects on the HudsonGray Defendants even where it cannot make any connection to any purported action of any defendant. For instance, it alleges that after six years of servicing the "Characters Unite Initiative," XA ceased working on the project after May 2014, but does not allege that it was diverted to

---

[10] Even if it were a "dormant subsidiary", defendants could not have wrongfully diverted monies to XA Scenes.

HudsonGray due to any nefarious actions. (*Id.*, ¶ 89.) By Plaintiff's own allegations, therefore, this alleged scheme lasted, at longest, from February 2014 until August 2014. (AC, ¶ 159.)[11]

Many of XA's own allegations, however, are inconsistent with a scheme by the HudsonGray Defendants to destroy or defraud XA. For example, although Wagner resigned from XA in March 2014 and HudsonGray was allegedly operational in mid-March (*id.*, ¶ 75), the other HudsonGray Defendants did not immediately join the new company. Rather, Andereck stayed with XA until May 22, 2014 (¶ 14), ensuring that XA's client project was completed. Day worked at XA until May 20, 2014 (¶ 18), Lomma worked at XA until June 13, 2014 (¶ 17), and Wilson stayed until September 2014. (¶ 19.) If the HudsonGray Defendants had truly intended to transfer future and existing XA business to HudsonGray, they would have resigned *en masse*, immediately after HudsonGray became operational. Indeed, most of the nefarious conduct alleged by XA – employees seeking reimbursement for expenses (*Id.*, ¶ 142(e)), payment of vendors' invoices (*Id.*, ¶ 38, 45, 46, 47, 144(l)), and gaining access to a departed colleague's work email account (*Id.*, ¶ 110, 145(f)) – are not examples of racketeering, but of running a normal business.

Finally, XA's claims of client diversion are premised on a misunderstanding, or an intentional misrepresentation, of the nature of the event marketing industry. XA alleges that, "Had the Rico Defendants not interfered with XA's relationships with its clients, they would have, in the ordinary course, continued as XA clients and revenue would have continued to be received." (*Id.*, ¶ 158.) Experiential marketing campaigns, however, are often awarded after a formal bidding process, or at the very least after a presentation is made outlining the agency's ideas for the campaign. (Wagner Dec., ¶ 3.) Projects are awarded, not inherited, and the simple fact that XA handled an event in the past does not mean it will continue to do so in perpetuity.

---

[11] Wagner did not actually form HudsonGray until March 14, 2014. (AC, ¶ 15.)

(*Id.*)  XA's clients did not award projects to competitors because anyone "stole" XA's client list – which XA publishes on its website, http://www.experientialagency.com[12] – but because after the HudsonGray Defendants switched employers – which is every person's legal right – XA had no creative personnel remaining who could book and produce a project.

### D.  **Alleged Property Theft**

In addition to "stealing" clients, XA alleges that the HudsonGray Defendants engaged in a scheme to steal lights, furniture, files, and other property from XA for use at HudsonGray. (*Id.*, ¶ 4, 38, 41-42, 46-47, 62, 80-81, 142, 144-47.)  Although false, this alleged scheme occurred between February 2014 and August 2014.  (*Id.*, ¶ 159.)

### E.  **Alleged Concealment**

The third scheme alleged by XA is that the defendants concealed the schemes to divert clients and property to HudsonGray by deleting servers, removing files, or avoiding encounters with Mr. Burkhardt, the XA executive hired in 2014. (*Id.*, ¶ 5, 58-62, 65, 144.)  According to the Amended Complaint, the scheme to conceal HudsonGray diversions and property theft took place between January 2014 and September 2014.  (*Id.*, ¶ 5.)

---

[12] The Court may take judicial notice of websites. *Magnoni v. Smith & Laquercia, LLP*, 701 F.Supp.2d 497, 501 (S.D.N.Y. 2010).

## <u>STANDARD</u>

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See McGarry v. Pallito,* 687 F.3d 505, 510 (2d Cir.2012). While a court considering a Rule 12(b)(6) motion to dismiss for failure to state a claim is limited to the facts stated in the complaint, the complaint includes any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2d Cir.1994); *Rombach v. Chang,* 355 F.3d 164, 169 (2d Cir.2004). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002). Moreover, the Court may take judicial notice of a document filed in another action, *Global Network Communications, Inc. v. City of New York.* 458 F.3d 150, 157 (2d Cir.2006), and may "take judicial notice of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action." *Harris v. New York State Department of Health,* 202 F.Supp.2d 143, 173 n. 13 (S.D.N.Y. 2002); *5–Star Management, Inc. v. Rogers,* 940 F.Supp. 512, 519 (E.D.N.Y. 1996) (finding it appropriate to consider the plaintiff's principal's admission in a prior state court action for the truth of the matter asserted).

**ARGUMENT**

**POINT I**

**THE RICO CLAIMS MUST BE DISMISSED FOR FAILURE
TO SUFFICIENTLY ALLEGE A "PATTERN" OF RACKETEERING ACTIVITY**

XA's attempt to concoct a racketeering case fails, as XA is unable to allege a "pattern" of racketeering against any of the defendants. "RICO is a broadly worded statute that 'has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce.'" *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir.2001) (quoting S. Rep. No. 91-617, at 76 (1969)). "Civil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear device." *Bell v. Hubbert*, 2007 WL 60513, at *5 (S.D.N.Y. 2007) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir.1991). "[A]ll too frequently, plaintiffs attempt to mold their claims to the RICO form even though their injuries do not fall within those intended to be addressed by the Act. Many courts have noted that the allure of treble damages, attorney's fees, and federal jurisdiction presents a powerful incentive for plaintiffs to attempt to fit 'garden variety fraud' claims within the standard of civil RICO." *Rosenson v. Mordowitz*, 2012 WL 3631308, *4 (S.D.N.Y. 2012) (Oetken, J.); *see also Goldfine v. Sichenzia,* 118 F.Supp.2d 392, 397 (S.D.N.Y. 2000) (stating that "this Court looks with particular scrutiny at Civil RICO claims to ensure that the Statute is used for the purpose intended by Congress"). "Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early state of the litigation." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (internal quotations omitted).

"To establish a RICO claim, a plaintiff must show: (1) the violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 184 (2d Cir.2007). To establish a violation of § 1962(c),[13] the plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). XA's RICO claims must be dismissed for failing to sufficiently allege any pattern of racketeering activity because, at most, it has alleged predicate acts that occurred during a short seven-month period between February 2014 and August 2014. "To establish a RICO pattern it must be shown that the predicates themselves amount to, or they otherwise constitute a threat of, *continuing* racketeering activity." *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989) (emphasis original). The RICO statute defines "racketeering activity" as the commission of certain state law crimes – for instance, murder, kidnapping, gambling, arson, robbery, bribery, extortion – and the violation of certain enumerated federal statutes. 18 U.S.C. § 1961(1). To establish that a defendant has engaged in "racketeering activity," a plaintiff must sufficiently allege an indictable commission of a "predicate act" listed in 18 U.S.C. § 1961(1). *See Weizmann Institute of Science v. Neschis*, 229 F.Supp.2d 234, 255 (S.D.N.Y. 2002).

"'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.*, 492 U.S. at 241. Significantly, "[p]redicate acts extending over a few

---

[13] XA's first two claims specifically allege a violation of 18 U.S.C. § 1962(c). The third claim, however, vaguely alleges a violation of "18 U.S.C. § 1961 *et seq.*" Because the Amended Complaint does not allege the investment of racketeering funds in interstate or foreign commerce, *see* 18 U.S.C. § 1962(a), or the use of racketeering income to acquire an interest or control of an enterprise in interstate or foreign commerce, *see* 18 U.S.C. § 1962(b), we assume the third cause of action also asserts a violation of 18 U.S.C. § 1962(c). The fourth cause of action alleges a conspiracy to violate 18 U.S.C. § 1962(c), which will be addressed in Section I(D), below.

weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated." *Id.* at 242 (emphasis original).

XA's RICO claims rely upon alleged actions that (1) do not actually constitute predicate acts under the statute, (2) did not happen, or (3) are insufficiently pled. Once those purported predicate acts are stripped away, XA's claims rely solely upon alleged mail and wire fraud that supposedly occurred over the course of a few months. Because the alleged wrongdoing occurred during such a short period of time and there is no threat that it will continue, XA has not established a "pattern" of racketeering activity. But first, we must discuss each of the alleged predicate acts in turn.

## A. Most of the Alleged Predicate Acts Must be Disregarded

### 1. Larceny is Not a Predicate Act

The gravamen of XA's claim is that the HudsonGray Defendants stole clients, business relationships, files, lighting, and office furniture while setting up the new company. XA asserts that "XA's business relationships are property within the meaning of New York Penal Law § 155.00(1) which defines larceny. In wrongfully diverting such relationships, the RICO Defendants deprived XA of property within the meaning of New York Penal Law § 155.05(1)." (AC, ¶ 157.) Larceny, however, is *not* a predicate act under RICO.[14] *Spool*, 520 F.3d at 184 ("Ordinary theft offenses and conspiracies to commit them are not among the predicate activities defined in 18 U.S.C. § 1961(1)."); *Weizmann Institute of Science*, 229 F.Supp.2d at 255. Accordingly, XA may not rely upon any alleged larceny in support of its RICO claims.

---

[14] Defendants, of course, deny engaging in larceny.

### 2. Defendants Did Not Commit Any Wrongdoing With Studio AG, and Any Allegations Concerning Studio AG are Barred by the Statute of Limitations

#### a. Studio AG's Ownership and Purpose Was Disclosed to Plaintiff

Similarly, none of XA's allegations concerning Studio AG constitute predicate acts because, contrary to the Amended Complaint's repeated assertions, its existence and purpose was disclosed to CMG in 2009. According to XA, Studio AG was created by Andereck, Wagner, and Wilson to divert business from XA, and was not disclosed to XA until this litigation. (AC, ¶ 32.) Actually, in a 2009 memorandum to the then Chief Operating Officer and Chief Financial Officer of XA's parent company, CMG, Wagner and Wilson disclosed their intended formation of Studio AG for the purpose of furthering XA's business. The memorandum states: "Fiori XA issue / Jean, Darren, Joe to form Studio AG". (Matthews Dec., Ex F.) Then, in a memorandum to the then Executive Chairman of XA, Ronald Burkhardt, dated January 27, 2014, Wagner again addresses "Jean, Darren, Joe ownership in Studio AG post CMG acquisition to support XA (Fiori XA legacy)." (*Id.*, Ex. G.) The Third-Party Complaint annexes the 2009 and 2014 memoranda (Matthews Dec., ¶ 10-11), and alleges that, "The requirement of these types of services [previously performed by Fiori XA], and the consequential formation of Studio AG, was specifically discussed in a memorandum dated December 4, 2009 from Wagner (and a colleague) to Ennis, COO and CFO of CMG." (*Id.*, Ex. B, ¶ 66.) Glenn and Alexis Laken, Plaintiff's respective Chief Executive Officer and President, did not deny the allegation in their Answer to the Third-Party Complaint. (*Id.*, Ex. C, ¶ 66.)[15] Studio AG was never a secret, and it was not created to divert business from XA – in fact, it does not even engage in the same business as XA.

---

[15] The Court may take judicial notice of the memoranda, which are incorporated into pleadings in this action, *Global Network Communications, Inc.,* 458 F.3d at 157, and the Lakens' admissions, which contradict XA's allegations in this case. *5–Star Management, Inc.,* 940 F.Supp. at 519 (finding it appropriate to consider the plaintiff's principal's admission in a prior state court action for the truth of the matter asserted).

Rather, as explained in advance of its formation, Studio AG was formed to provide services attendant to XA events because XA did not purchase Fiori XA assets in the 2009 UCC sale. Plaintiff's knowledge and acceptance of the arrangement precludes any finding of wrongdoing by any of the defendants. *See Ackerman v. 305 East 40th Owners Corp.*, 189 A.D.2d 665, 666-67 (1st Dep't 1993) (cooperative board consented to director's purchase of apartment by failing to object when intention to bid was disclosed, and was estopped from objecting after purchase).

### b. All Claims Related to Studio AG's Creation and Use are Time-Barred

In any event, Plaintiff knew, or should have known, about Studio AG on December 4, 2009, when CMG received the memorandum from Wagner and Wilson. To the extent the creation and use of Studio AG was wrongful in any manner, it cannot be used as a predicate act because it occurred prior to the four-year statute of limitations applicable to the RICO statute, *see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987) (four-year statute of limitations for RICO claim), which accrues "when the plaintiff discovers – or should have reasonably discovered – the alleged injury," and "runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 328 Fed.Appx. 695, 697 (2d Cir.2009). Although the Second Circuit recognizes a separate accrual rule for subsequent injuries, those injuries must be "new and independent" and cannot depend on injuries that are derivative of the "core injury" sustained. *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 59-60 (2d Cir.1998). Where a "scheme was fraudulent at the outset," therefore, subsequent actions in furtherance of the scheme will not create "new and independent injuries" that would trigger a new statute of limitations. *Id.* (investment scheme was fraudulent at outset such that later misrepresentations by defendant and fees paid by plaintiffs did

not create new and independent injuries); *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F.Supp.2d 486, 524-27 (S.D.N.Y. 2007), *aff'd by* 328 Fed.App. 695 (2d. Cir.2009) (statute of limitations accrued at time of first bribe, and subsequent injuries sustained as a result of the bribery scheme did not re-start statute of limitations); *National Group for Communications and Computers Ltd. v. Lucent Technologies Inc.*, 420 F.Supp.2d 253, 265-66 (S.D.N.Y. 2006) (statute of limitations accrued at time of first kickback payment).

Here, Plaintiff alleges that the Studio AG Defendants engaged in a fraudulent scheme to divert business from XA – a scheme XA admittedly had actual notice of in 2009. All injuries allegedly involving Studio AG are attributable to this scheme, which XA alleges was fraudulent at the outset, and thus all subsequent injuries are derivative of the initial injury sustained, and barred by the statute of limitations.

### 3. The Allegations Regarding XA Scenes are Incoherent

XA also alleges that defendants diverted business to XA Scenes, which XA alleges is a CMG subsidiary acquired along with XA in 2009. (AC, ¶ 25, 33, 43, 142(l).) XA's allegation that defendants wrongfully diverted business from XA *to an affiliate of XA* is simply absurd. XA's apparent lack of knowledge as to its own corporate structure renders the allegation even more ridiculous. XA Scenes was merely a d/b/a of XA, as evidenced by the Certificate of Business: Fictitious Firm Name[16] filed with the Clark County Clerk's Office and signed by James Ennis as President. (Matthews Dec., Ex. H.) The Amended Complaint alleges that defendants diverted business from XA to . . . XA. To say the allegation is frivolous is an understatement. There can be no diversion of business to oneself. The fictitious name form is

---

[16] The Court may take judicial notice of publicly filed corporate documents in assessing a Rule 12(b)(6) motion. *See Desclafani v. Pave-Mark Corp.*, 2008 WL 3914881, *6 (S.D.N.Y. 2008) (taking judicial notice of records filed with Florida Secretary of State).

annexed to the Third-Party Complaint.  Thus, even if XA did not actually know what companies were part of XA, it received a very concrete reminder prior to the Amended Complaint's filing, but chose to ignore it and plead falsely.

### 4.  XA Does Not Sufficiently Plead Any Commercial Bribery

XA's RICO claims also rely upon "Commercial Bribery" as a predicate act (AC, ¶ 124, 126, 138, 149), a term that is capitalized, though is not defined, in the Amended Complaint. (*Id.*, ¶ 144(c).)  The only specific allegation concerning a "bribe" concerns a single incident and that is too vague to state a claim for bribery.  According to the Amended Complaint, on April 23, 2014, Lomma suggested to Andereck that a "donation" be made to "Eric" from SFD, "a fabricator who worked for XA," so "we can keep him on our side." (*Id.*, ¶ 145(e).)  Andereck supposedly approved a "donation of 1k." (*Id.*)  First, the allegation does not support a claim for commercial bribery in the first degree, which requires a bribe of more than $1,000. N.Y. Penal Law § 180.03.  Second, the vague allegation does not constitute commercial bribery in the second degree, which prohibits conferring or offering to confer a benefit upon "any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." N.Y. Penal Law § 180.00.  The bribery allegation does not state if "Eric" is an employee or principal of SFD, nor what exactly the "bribe" was intended to influence Eric to do. (AC, ¶ 145(e).)  In any event, it seems that the bribe was never paid because XA did not have $1,000. (*Id.*, ¶ 145(d).)  This allegation cannot support a RICO claim.

**5. Defendants Did Not Engage in Any Visa Fraud**

Finally, XA alleges that defendants engaged in "fraud involving misuse of visas, permits and other documents, in violation of 18 U.S.C. § 1546" (AC, ¶ 126), an apparent reference to its allegations that Gudin and others misrepresented to the U.S. government that Gudin was an employee of XA. (*Id.*, ¶ 66-70.) XA bases its professed belief that Gudin was not an employee upon statements allegedly made by XA's payroll vendor. (*Id.*, ¶ 67.) In point of fact, Gudin was an employee of XA, as evidenced by the W-2 issued to him by XA. (Gudin Dec., Ex. L.) Accordingly, the statements made by Gudin and Andereck[17] that Gudin was or would be an employee of XA were true, and therefore no visa fraud occurred.

**B. Because the Alleged Schemes are "Inherently Terminable," There is no "Open-Ended" Continuity**

An "open-ended" pattern of racketeering features "past criminal conduct coupled with a threat of future criminal conduct." *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 466 (2d Cir.1995). In this case, XA alleges that the HudsonGray Defendants acted wrongfully by taking confidential and proprietary information, office furniture, and lights from XA and bringing them to their new business, HudsonGray. (AC, ¶ 3-4, 55-57, 63-63, 75-93, 142-47.) The HudsonGray Defendants also purportedly solicited XA clients during their employment with XA and upon joining HudsonGray. (*Id.*, ¶ 113.) The scheme, according to the Amended Complaint terminated in the summer of 2014 (*id*, ¶ 159, 164), and, by its very nature, could not have continued after the last HudsonGray Defendant resigned and they no longer had access to any further information or property and no longer owed any duty of loyalty to XA.

---

[17] XA alleges that Gudin "is or was, on information and belief, Andereck's boyfriend." (AC, ¶ 66.) One can only guess why XA would include an allegation about Andereck's and Gudin's private life. The allegation happens to be false (Gudin Dec., ¶ 5), but, in any event, Andereck's and Gudin's private lives are completely irrelevant to this lawsuit.

An "inherently terminable" scheme cannot constitute an "open-ended" pattern because there is no threat that it will continue. For instance, in *GICC Capital Corp.*, the plaintiff argued there was a threat of continuity by arguing that "the defendants would have continued to loot TFG if not for the fact that all available funds had already been looted." *GICC Capital Corp.*, 67 F.3d at 466. The Second Circuit rejected the argument, holding that "it defies logic" to argue there is a threat of continuity where the scheme could not continue. *Id.* In the instant case, there is simply no possible way Defendants could continue the alleged schemes – and according to Amended Complaint, all allegations of wrongdoing cease in the summer of 2014. (AC, ¶ 159, 164.)[18] *See First Capital Asset Management, Inc. v. Satinwood*, 385 F.2d 159, 181 (2d Cir.2004).

## C. The Alleged Nine-Month Scheme is Too Short for "Close-Ended" Continuity

Alternatively, a plaintiff "may demonstrate continuity over a closed period by proving a series of related predicates extending over a *substantial* period of time." *H.J., Inc.*, *supra*, 492 U.S. at 242 (emphasis added). Since *H.J., Inc.* was decided, *the Second Circuit has never found predicate acts spanning less than two years to be a close-ended pattern. See Spool*, 520 F.3d at 184 (sixteen-month period of time is insufficient to establish close-ended continuity); *see also*, *First Capital*, 385 F.3d at 182 (seven months or just over a year is insufficient); *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir.2001) (predicate acts made over a period of approximately 1½ years is insufficient for close-ended pattern); *GICC Capital Corp.*, 67 F.3d at 467-68 (eleven-month period is insufficient for close-ended pattern); *World Wrestling Entertainment, Inc.*, 530 F.Supp.2d at 514 (predicate acts over a four month period is insufficient); *Ray Larsen*

---

[18] A scheme can also be deemed "open-ended" if the very purpose of the business is criminal in nature or the alleged acts are inherently unlawful, such as murder and kidnapping. *See Leung v. Law*, 385 F.supp.2d 105, 125-26 (E.D.N.Y. 2005). In this case, however, XA alleges that HudsonGray is a "creative marketing and branding agency" (AC, ¶ 15), and not a branch of the Mafia. Therefore, the alleged schemes cannot be deemed open-ended on this basis. On the other hand, Laken, Plaintiff's Chairman and CEO, was convicted for racketeering conspiracy, wire fraud, illegal kickbacks, theft of honest services, conspiracy to commit the above substantive offenses and to commit union pension fund fraud, securities fraud, fraud by an investment advisor, conspiracy to commit securities fraud, wire fraud, and commercial bribery. *See, generally, United States v. Reifler*, 446 F.3d 65, 70 (2d Cir.2006).

*Associates, Inc. v. Nikko Am., Inc.*, 1996 WL 442799, *8 (S.D.N.Y. 1996) ("A scheme that spans seventeen months does not generally reflect the kind of long-term criminal conduct over a 'substantial period of time' contemplated by the RICO statute.").[19] In this case, XA has alleged, at most, predicate acts over the course of seven months, from February 2014 through the summer of 2014. (AC, ¶ 159.) Although the XA Scenes and Studio AG allegations begin in 2009, they were clearly included in the Amended Complaint to "mold" XA's business dispute into a RICO claim, and must be disregarded as meritless – and the Studio AG allegations are time-barred as well. *See Spool*, 520 F.3d at 184-85 (eliminating meritless alleged predicate acts in determining whether pattern exists).[20]

XA's RICO claim is essentially that the HudsonGray Defendants, over the course of a few months, started a competing company, diverted some clients to the new company, and stole office furniture. Although false, even if afforded treatment as true, this does not meet the required elements of racketeering activity. This is simply not enough to state a claim for racketeering activity under the RICO statute, and therefore, the RICO claims must all be dismissed.

---

[19] While continuity is "centrally a temporal concept", *H.J., Inc.*, 492 U.S. at 242, "close ended" continuity could be found where the predicate acts occurred over a period of less than two years if they were sufficiently complex, involved many perpetrators and victims. The schemes alleged by XA, however, are small in scope, with only one alleged victim and a handful of alleged perpetrators, mitigating against any exception to the two-year guideline. *See GICC Capital*, 67 F.3d at 468.

[20] Even if the Court deems that XA has sufficiently pleaded visa fraud as a predicate notice, those actions supposedly occurred at the same time as the alleged client diversion and property theft to HudsonGray, and thus does not expand the time period in question. (AC, ¶ 67-70.) Moreover, the visa fraud scheme is not "related" to the client diversion, and so cannot form part of the same "pattern" of racketeering. *See Reich v. Lopez*, 38 F.Supp.3d 436, 451-53 (S.D.N.Y. 2014) (Oetken, J.).

**D. Because XA Alleges No Racketeering, the Conspiracy Claim Must Also be Dismissed**

Because XA cannot state a RICO claim, the fourth cause of action alleging a RICO conspiracy in violation of 18 U.S.C. § 1962(d) must also be dismissed. *See First Capital*, 385 F.3d at 182.[21]

## POINT II

## ALL CLAIMS MUST BE DISMISSED AS AGAINST WAGNER PURSUANT TO THE APRIL RELEASE

The April Release precludes all of XA's claims against Wagner that rely upon allegations prior to April 30, 2014. To avoid this plain fact, the Amended Complaint brazenly and intentionally mischaracterizes the April Release as a "release and non-solicitation agreement" (AC, ¶ 71) – although there is no non-solicitation provision in the April Release. The Amended Complaint also claims that the April Release was procured by Wagner through fraud (*id.*, ¶ 92), but fails to mention that XA admits in the April Release that it did not rely upon any representation made by Wagner in entering into the April Release. (Matthews Dec., Ex. D, ¶ 12(iv).) The Amended Complaint even goes so far as to quote the non-solicitation provision of the February Release, which was superseded by the April Release, as if it appears in the April Release. (AC, ¶ 71.) The reason XA would misconstrue the April Release is plain – it clearly bars all claims against Wagner. It is a mystery, however, how XA believed it could dupe the Court with such transparent falsehoods in the face of documents presented on a prior motion to dismiss.

---

[21] The RICO conspiracy claim is the only cause of action asserted against Mixed Company, a florist shop that was named as a defendant in this case for the "crime" of selling flowers to XA for use in client productions.

## A. **The Controlling April Release Bars XA's Claims**

Under Illinois law[22], "[a]s a general rule, when a contract provision is unambiguous, the court must give effect to the plain language of the provision." *Coles-Moultrie Elec. Co-op. v. Sullivan*, 304 Ill. App. 3d 153, 159 (4th Dist. 1999). "In interpreting a contract, meaning and effect must be given to every part of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary." *Id.* "A contract is to be construed as a whole, giving meaning and effect to every portion thereof, if possible, and not resorting to detached portions thereof standing alone." *Id.*[23]

### 1. *The April Release Includes a General Release of All Claims*

As admitted in the Amended Complaint (¶ 194), the April Release contains a release of all claims held by XA against Wagner. Specifically, the April Release states:

> XA and CMG and all of their subsidiaries and affiliates . . . hereby waive, release and forever discharge Wagner . . . from any and all known or unknown actions, causes of action, claims or liabilities of any kind, whether based upon any federal, state, municipal, or local statute, law, ordinance or regulation, which have or could be asserted by the Releasors against Wagner ***arising out of or related to*** this Dispute, ***Wagner's relationship with and/or termination from XA and/or arising out of or related to any other occurrence up to and including the Effective Date***.

(Matthews Dec., Ex. D, ¶ 8(a), emphasis added.) The "Effective Date" is defined as April 30, 2014. (*Id.*, ¶ 2.)[24] To remove all doubt of XA's release of all claims, the April Release states, in

---

[22] The April Release provides that its interpretation "shall be construed and enforced in accordance with, and governed by, the laws of the State of Illinois, without regard to any applicable choice of law or conflicts rules." (Matthews Dec., Ex. D, ¶ 20.)

[23] New York law is in accord with Illinois law in this regard. *See, e.g., Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 403-404 (2009).

[24] The Amended Complaint inaccurately alleges that the release is for all claims prior to April 22, 2014, rather than April 30, 2014. (AC, ¶ 92.) XA's Original Complaint contained this same inaccuracy, which Wagner and HudsonGray pointed out in their motion to dismiss. Rather than correct a demonstrably incorrect fact during the year XA spent drafting the Amended Complaint, XA has re-pleaded a statement that it knows to be false.

all capital letters no less, "XA . . . FURTHER UNDERSTAND[S] THAT THIS AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS THAT HAVE ARISEN ON OR PRIOR TO THE EFFECTIVE DATE."[25] (*Id.*, ¶ 8(c).)   And since the Amended Complaint makes no specific allegation of wrongdoing against Wagner after April 30, 2014 (AC, *passim*), all of XA's claims against Wagner must all be dismissed.

2. <u>*XA Agreed Not to Sue Wagner*</u>

The April Release also contains a covenant by XA not to sue Wagner, which states: "XA . . . also agree[s] not to sue Wagner . . . or become a party to a lawsuit on the basis of ***any claim of any type whatsoever arising out of or related to his relationship with and/or termination from employment with XA***, which claims, known or unknown, arises or could have been asserted on or before the Effective Date." (Matthews Dec., Ex. D, ¶ 8(b), emphasis added.)   It is indisputable that XA's claims concern Wagner's relationship with and/or termination from employment with XA.   Thus, XA has breached the covenant not to sue contained in the April Release by initiating the current lawsuit.

3. *The April Release Does Not Contain a Non-Solicitation Provision, Requiring* <u>*Dismissal of Tortious Interference with Contract and Breach of Contract Claims*</u>

The Amended Complaint's repeated assertion that Wagner violated a non-solicitation provision in the April Release – a contractual obligation that simply does not exist (Matthews Dec., Ex. D, *passim*)[26] – forms the basis for its breach of contract and tortious interference claim

---

[25] Tellingly, the provision outlining the general release by Wagner of XA contains a specific exclusion for certain claims Wagner may have, such as unemployment and worker's compensation claims. (Matthews Dec., Ex. D, ¶ 7(b).)  The release by XA of Wagner contains no exceptions. (*Id.*, ¶ 8.)

[26] XA cannot rely upon the non-solicitation provision of the February Release or any other prior agreement, as the April Release superseded all prior agreements between the parties.  Under Illinois law, "a written agreement which is complete on its face supersedes all prior agreements on the same subject matter and bars the introduction of evidence concerning any prior term or agreement on that subject matter." *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 177 (1st Dist. 1997).  "This particularly applies when the contract . . . contains an unambiguous merger

against Wagner. (AC, ¶ 203-209, 226-229.) Both must be dismissed, because both claims require

a valid contractual obligation and a breach thereof. *Morris v. 702 East Fifth Street HDFC*, 46

A.D.3d 478, 479 (1st Dep't 2007) (stating elements of a contract claim include a valid contract

and a breach thereof);[27] *Hoag v. Chancellor, Inc.*, 246 A.D.2d 224, 228 (1st Dep't 1998)

(holding elements of tortious interference claim include existence of contract and breach

thereof).[28]

## B.  Claims Against Wagner Must Also be Dismissed for Improper Venue

Even if the April Release did not preclude XA's claims against Wagner, those claims

must still be dismissed because the agreement provides for exclusive jurisdiction in Cook

County, Illinois.  "Forum selection clauses are *prima facie* valid and enforceable unless the party

seeking to avoid enforcement establishes that enforcing the clause would be unjust or

unreasonable or that the clause is invalid for reasons such as fraud, undue influence or

overweening bargaining power." *Piechur v. Redbox Automated Retail, LLC*, No. 09-CV-984-

JPG, 2010 WL 706047, at *2 (S.D. Ill. Feb. 24, 2010) (citing *M/S Bremen v. Zapata Off-Shore

Co.*, 407 U.S. 1, 9-17 (1972)).  Here, XA and Wagner agreed to submit all disputes to a court in

---

or integration clause." *Id.*  The April Release contains an integration clause which plainly states that it constitutes the entire agreement between the parties and supersedes all prior agreements. (Matthews Dec., Ex. D, ¶ 11.) Furthermore, the recitals in the April Release specifically refer to the termination of Wagner's employment.  (*Id.*, p. 1.)  In any event, Wagner was not bound by the non-solicitation provision of the February Release due to XA's failure to make the $418,750 settlement payment. (*Id.*, Ex. E, ¶ 4.)  The Amended Complaint admits that XA did not have "ample funds to pay a $300,000 plus contract settlement to Wagner" (¶ 144(e)), thus requiring XA to negotiate the operative April Release.

[27] Even assuming that Wagner violated a non-solicitation agreement, he was released from any claims as of April 30, 2014. (Matthews Dec., Ex. D, ¶ 8.)  After that date, Wagner had no obligation to refrain from soliciting XA clients, as all of his contractual obligations to XA were superseded by the April Release. (*Id.*, ¶ 11.)

[28] Additionally, Wagner cannot be sued for tortious interference with a contract to which he is a party. *Buller v. Giorno*, 28 A.D.3d 258, 259 (1st Dep't 2006) ("We note, moreover, that plaintiff, in any event, has no tortious interference claim against defendant John Giorno since he was a party to the allegedly interfered-with agreement.") Thus, even if the April Release contained a non-solicitation provision – which it does not – this claim would have to be dismissed against Wagner.

Cook County, Illinois. (Matthews Dec., Ex. D, ¶ 21.) As such, all claims against Wagner must be dismissed and XA must pursue its claims, if any, in Cook County, Illinois.

**POINT III**

**XA'S DECLARATORY JUDGMENT CLAIM MUST BE DISMISSED**

XA admits that the claims asserted Wagner are barred by the April Release, and thus asks the Court to "declare the [April] Release unenforceable because it was procured through Wagner's fraudulent conduct." (AC, ¶ 195.) Again, the release against Wagner provides for a complaint release "from *any and all known or unknown actions*, causes of action, claims or liabilities of any kind . . ." (Matthews Dec., Ex. D, ¶ 8(a), emphasis added.) Because XA does not allege any actual fraudulent misrepresentation by Wagner, and admits in the April Release that no representations of any kind were made, the fifth claim must also be dismissed.

The Amended Complaint does not allege any "knowing misrepresentation of a material fact" by Wagner to procure the release (AC, *passim*), which would be required to base its claim upon fraudulent inducement. *Sokolow, Dunaud, Mercadier & Carreras v. Lacher*, 299 A.D.2d 64, 70 (1st Dep't 2002) ("To sustain a claim for fraudulent inducement, there must be a knowing misrepresentation of material fact, which is intended to deceive another party and to induce them to act upon it, causing injury."). In addition, XA specifically states in the April Release that "they are not relying on any representation, either oral or written, express or implied, made to them by the other Party other than as set forth in this Agreement." (Matthews Dec., Ex. D, ¶ 12(iv).)

Instead, XA asserts that Wagner fraudulently obtained the April Release by "fail[ing] to disclose material information to XA" concerning his alleged wrongdoing. (AC, ¶ 196.) Contrary to XA's argument, however, "a claim for fraud within the scope of a release can be released even

if it is unknown to the releaser, *and notwithstanding that the releasee did not make full disclosure of its wrongdoing before the release was granted.*" *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 76 A.D.3d 310, 318 (1st Dep't 2010) (emphasis added), *citing Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 527-28 (2d Cir.1985); *Sotheby's Inc. v. Dumba*, 1992 WL 27043, *7 (S.D.N.Y. 1992) ("a general release executed even without knowledge of a specific fraud effectively bars a claim or defense based on that fraud"). XA argues that its release of Wagner as to "ALL KNOWN AND UNKNOWN CLAIMS" (Matthews Dec., Ex. D, ¶ 8(c), capitals original) is void because XA purportedly did not know about some of its claims against Wagner fails as a matter of law, because the law does not require "that the defendant must come forward and confess to all his wrongful acts" as a precondition for a release. *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp.2d 178, 190 (S.D.N.Y. 2008), *citing Alleghany Corp. v. Kirby*, 333 F.2d 327, 333 (2d Cir.1964). "Moreover, [t]he policy underlying *Alleghany* and *Bellefonte* applies with equal force [to fiduciaries]. The purpose of a settlement is to end litigation, not to provide a breather before the next round." *Id.* at 191. If XA's argument were successful, no release could be "general" because a party never has perfect knowledge of the counterparties' actions. *See Centro Empresarial Cempresa S.A.,* 76 A.D.3d at 626. XA's fifth claim must also therefore be dismissed.

## POINT IV

### XA'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED
### AS AGAINST ALL DEFENDANTS FOR FAILURE TO STATE A CLAIM

Plaintiff's breach of contract claim against the HudsonGray Defendants – just like its contract claim against Wagner – relies upon the breach of non-existent contractual obligations, and so must also be dismissed. It is axiomatic that to state a claim for breach of contract, the plaintiff must allege, *inter alia*, a valid contract and a breach thereof. *Morris*, 46 A.D.3d at 479.

Plaintiff alleges, upon information and belief, that the HudsonGray Defendants[29] other than Wagner entered into signed non-disclosure agreements with XA prohibiting them from disclosing confidential information during their employment. (AC, ¶ 205-06.) Though a plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession of the defendant" or "where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir.2010), such allegations must be "'accompanied by a statement of the facts upon which the belief is founded.'" *Prince v. Madison Square Garden,* 427 F.Supp.2d 372, 385 (S.D.N.Y. 2006) (citation omitted); *see also Williams v. Calderoni,* 2012 WL 691832, at *7 (S.D.N.Y. 2012).

Plaintiff alleges that its "belief regarding the existence of the signed agreements is based on the understanding [of] CMG['s] counsel who advises that it was his understanding such agreements were signed and kept in the XA office." (AC, ¶ 207.)[30]  In other words, Plaintiff's belief as to the existence of signed contracts is based upon the speculation of an attorney who did not work for XA.  Plaintiff also fails to explain how it does not have direct knowledge of the contracts it has entered into.  Therefore, the Court is not required to accept as true XA's allegation that a signed contract exists.  In point of fact, none of the HudsonGray Defendants, other than Wagner, signed any written employment agreement with XA, and the so breach of contract claims interposed against them must also be dismissed.

---

[29] XA's breach of contract claim is yet another example of sloppy and confusing drafting.  The Amended Complaint defines "Hudson Defendants" as HudsonGray, Wagner, Andereck, Wilson, Lomma, and Gudin.  (AC, p. 1.) Obviously, HudsonGray was never employed by XA.  XA alleges (falsely) that Gudin was never an employee of XA (*id.*, ¶ 67), but nonetheless includes him in its claim for breach of employment agreements.  The Amended Complaint specifically alleges only that Andereck and Wilson (¶ 30) entered into written agreements; no specific allegation is ever made as to Lomma.  (*Id.*, *passim.*)  In any event, none of the HudsonGray Defendants, other than Wagner, whose agreement was superseded by the April Release, entered into any written agreements with XA.

[30] The Amended Complaint is filled with references to emails and documents supposedly recovered from deleted servers, but XA does not allege that it recovered copies of any contracts with Andereck or Wilson.  The reason is that such contracts never existed.

## POINT V

## THE SEVENTH CLAIM FOR INJUNCTION AND CONSTRUCTIVE TRUST
## MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR RELIEF

XA's seventh cause of action for an injunction and a constructive trust are entirely meritless and must be dismissed. To obtain a preliminary or permanent injunction, a party must establish, *inter alia*, "irreparable harm in the absence of the injunction." *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir.2002) (preliminary injunction); *Old Republic Ins. Co. v. Hansa World Cargo Serv.,* 170 F.R.D. 361, 385 (S.D.N.Y. 1997) (standard same for permanent injunction, except that plaintiff must actually succeed on the merits). To constitute irreparable harm, the potential injury "must be the kind of injury for which an award of money cannot compensate." *Sperry Int'l Trade, Inc. v. Government of Israel,* 670 F.2d 8, 12 (2d Cir.1982). XA seeks $20,000,000 in monetary damages in this lawsuit (AC, ¶ 161, 180, 184, 192, 209, 219, 225, 229, 232, 237, 241, 246, 250, 256, 261), which "is precisely the type of harm which injunctive relief is *not* designed to remedy." *Old Republic,* 170 F.R.D. at 385 (emphasis original). Therefore, the claim for injunctive relief must be dismissed.

XA's request for a constructive trust must also be dismissed. To state a claim for a constructive trust, a plaintiff must allege a transfer of property in reliance of a promise or agreement. *Van Brunt v. Rauschenberg,* 799 F.Supp. 1467, 1474 (S.D.N.Y. 1992); *Caballero v. Anselmo,* 759 F.Supp. 144, 147 (S.D.N.Y. 1991) ("plaintiff must at least show a promise and a transfer of property"). Here, no allegations are made in support of the claim.

**POINT VI**

**THE BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED
BECAUSE XA DOES NOT IDENTIFY ANY PARTICULAR BREACH**

XA's eighth claim for breach of fiduciary duty and eleventh claim for aiding and abetting breach of fiduciary must be dismissed because they both fail to identify any particular breach. *Solow v. New Northern Brokerage Facilities, Inc.*, 255 A.D.2d 198, 198 (1st Dep't 1998) (dismissing claim where no specific breaches of fiduciary duty alleged). Instead, the breach of fiduciary duty claim vaguely asserts that, "Each of the Hudson Defendants breached that duty in numerous ways" (AC, ¶ 218), and the aiding and abetting claim vaguely states that, "Each of the Hudson Gray and Studio AG Defendants knowingly aided and abetted the fiduciary breaches of the Hudson Defendants in all the ways alleged herein." (AC, ¶ 231.) To the extent that XA relies upon the over 200 paragraphs of the Amended Complaint that are repeated and realleged as part of the breach of fiduciary duty and aiding and abetting claims, XA has engaged in impermissible "shotgun pleading." *Corrado v. New York State Unified Court Sys.*, 2014 WL 4626234, at *4 (E.D.N.Y. 2014).

Plaintiff's intentionally vague pleading should not be countenanced, and the claims should be dismissed. Finally, since Plaintiff has already repleaded its claims following its first failed attempt to state a claim in State court, its failure to comply with pleading requirements again should not be excused. Leave to replead should be denied.

**POINT VII**

**THE TENTH CLAIM FOR TORTIOUS INTERFERENCE MUST BE
DISMISSED AS AGAINST HUDSON GRAY BECAUSE THE NON-SOLICITATION
<u>PROVISION SUPPOSEDLY INTERFERED WITH DOES NOT EXIST</u>**

Plaintiff's claim that HudsonGray tortiously interfered with a non-solicitation provision that does not exist must be dismissed. To state a claim for tortious interference with a contract, a plaintiff must allege, *inter alia*, the existence of a valid contract, interference by a third party, and a resulting breach. *Hoag*, *supra*, 246 A.D.2d at 228. Plaintiff does not allege any of those elements because the operative April Release contains no non-solicitation obligation. (Matthews Dec., Ex. D.) Therefore, there is no non-solicitation agreement for HudsonGray to interfere with or for Wagner to have breached.

Even if Wagner was bound by a non-solicitation agreement, the claim must be dismissed. Plaintiff alleges that "Hudson Gray tortuously [*sic*] interfered with Wagner's settlement agreement and the General Release by soliciting XA clients, starting in March, 2014." (AC, ¶ 227.) If HudsonGray solicited the clients, rather than Wagner, than there was no breach of the (non-existent) solicitation agreement by Wagner. On the other hand, if Plaintiff contends that HudsonGray so controlled and dominated Wagner that it forced Wagner to breach the contract, then HudsonGray cannot be held liable for tortious interference with contract. *See Ashby v. ALM Media, LLC*, 110 A.D.3d 459, 459 (1st Dep't 2013) (dismissing tortious interference claim against executive of breaching party); *McNaughton v. City of New York*, 234 A.D.2d 83, 84 (1st Dep't 1996) (dismissing claim against employees of breaching party); *Koret, Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156, 157 (1st Dep't 1990) (dismissing claim against parent corporation of breaching party). Thus, under any theory, the tortious interference with contract claim must be dismissed in its entirety.

## POINT VIII

### THE TWELFTH CLAIM FOR MISAPPROPRIATION AND UNFAIR COMPETITION FAILS BECAUSE XA DOES NOT IDENTIFY ANY CONFIDENTIAL INFORMATION

XA's claim that the HudsonGray Defendants and the Studio AG Defendants "willfully and maliciously misappropriated XA confidential and proprietary information for their own benefit" (AC, ¶ 234) fails because XA fails to specifically identify any confidential information, instead listing types of documents, such as contracts, invoices, and bills. The only specific allegation made by XA – that its "client lists and contacts were developed at substantial cost to the company, over many years, and were not otherwise known or easily learned by anyone outside XA" (AC, ¶ 235) – is absolutely false, as anyone who visited XA's website, http://www.experientialagency.com, would have access to its client list. Under New York law, the most important factor in determining whether information is an actionable "trade secret" is "whether or not the information is in fact secret." *Derven v. PH Consulting, Inc.*, 427 F.Supp.2d 360, 371 (S.D.N.Y. 2006). XA cannot hold Defendants liable for using information posted on XA's own website, and has failed to allege any particular piece of secret information that was improperly used by any Defendant. Accordingly, the claim must be dismissed.

## POINT IX

### THE THIRTEENTH CLAIM FOR USURPATION OF A CORPORATE OPPORTUNITY MUST BE DISMISSED AGAINST HUDSONGRAY AND THE STUDIO AG DEFENDANTS BECAUSE XA ALLEGED THAT THEY ARE COMPETITORS

Plaintiff fails to state a claim against HudsonGray or the Studio AG Defendants for a usurpation of a corporate opportunity. "The doctrine of 'corporate opportunity' is 'based on a duty of loyalty to an employer' and provides that 'corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation.'" *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395,

413 (E.D.N.Y. 2012) (quoting *Design Strategies, Inc. v. Davis,* 384 F. Supp. 2d 649, 672 (S.D.N.Y. 2005)).  As such, "this cause of action is applicable to fiduciaries and employees within the same corporate entity." *Id.*  HudsonGray and Studio AG are alleged to be competitors of XA. (AC, ¶ 15, 32.)  Competitors owe no duty of loyalty or obligation to provide XA with any benefit whatsoever, and XA fails to plead otherwise. *Dorset Indus., Inc.*, 893 F. Supp. 2d at 413.  As such, this claim must be dismissed.

## POINT X

### XA'S CLAIM FOR PUNITIVE DAMAGES MUST BE DISMISSED

Plaintiff's request for punitive damages "equal to five (5) times compensatory damages" must be dismissed as meritless. (AC, ¶ 262-63.)  Under New York law, punitive damages are permitted only when the alleged tort is particularly evil and reprehensible and aimed at the public. *See Guardian Mortg. Acceptance Corp. v. Bankers Trust Co. of California, N.A.*, 259 A.D.2d 358, 358 (1st Dep't 1999) ("Punitive damages, although available for breach of fiduciary duty, are available only in instances where the fiduciary duty is shown to have entailed an outrageous public wrong."); *Aronis v. TLC Vision Centers, Inc.*, 49 A.D.3d 576, 577 (2d Dep't 2008) ("punitive damages are available for the purpose of vindicating a public right only where the actions of the alleged tort-feasor constitute gross recklessness or intentional, wanton, or malicious conduct aimed at the public generally or are activated by evil or reprehensible motives.").  Even if the XA's RICO claims are deemed viable at this stage of the litigation, a prevailing civil RICO claim entitles the plaintiff to attorneys' fees, treble damages, and costs, but not punitive damages. 18 U.S.C. 1964(c).

XA does not allege any wrong aimed at the public; rather, the Amended Complaint alleges wrongdoing directed at one company, XA.  Further, Plaintiff has, at best, alleged a

"garden variety" business dispute, and not anything "evil" or reprehensible. Accordingly, the allegations do no support a basis for the award of punitive damages, and the demand should therefore be dismissed.

## CONCLUSION

For the reasons set forth above, and in the accompanying declarations, and the exhibits annexed thereto, Defendants request that the Court grant Defendants' Motion to Dismiss Plaintiff's First Amended Complaint with prejudice, sanction Plaintiff for filing a frivolous pleading based upon knowingly false allegations, and grant Defendants such other and further relief as the Court deems just and proper.

Dated: New York, New York
      August 7, 2015

                    Respectfully submitted,

                    **WINDELS MARX LANE & MITTENDORF, LLP**

                    By _____/s_____
                          Scott R. Matthews
                          James Tracy
                    156 West 56th Street
                    New York, New York 10019
                    (212) 237-1000
                    smatthews@windelsmarx.com
                    jtracy@windelsmarx.com
                    *Attorneys for Defendants*