**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

CMG HOLDINGS GROUP, INC. as assignee of
XA THE EXPERIENTIAL AGENCY, INC.,                              Civil Action No.: 15-cv-
                                                              05814- JPO
                                    Plaintiff,
                                                              (Oetken, J.)
               -against-

JOSEPH WAGNER, HUDSONGRAY LLC, DARREN                         SECOND AMENDED AND
ANDERECK, JESSIE LOMMA, MICHAEL DAY, JEAN                     REVISED COMPLAINT
WILSON, ESTELLE PIZZO, STUDIO AG, LLC,
REMIGIO GUDIN, and MIXED COMPANY, INC.,


                                    Defendants.
-------------------------------------------------------------------X

        CMG Holdings, Inc., as assignee, and XA The Experiential Agency, Inc. (collectively

"XA" or "Plaintiff"), by and through its attorneys, Eaton & Van Winkle LLP, files this Second

Amended and Revised Complaint against Joseph Wagner ("Wagner"), Darren Andereck

("Andereck"), Jean Wilson ("Wilson"), Jessie Lomma ("Lomma"), Michael Day ("Day") and

Remigio Gudin ("Gudin") (collectively the "Individual Hudson Defendants"), and HudsonGray

LLC a/k/a HudsonGray, Inc. ("HudsonGray") (collectively with the Hudson Individual

Defendants, the "Hudson Defendants"), Studio AG LLC ("Studio AG") and Estelle Pizzo

("Pizzo") (the "Studio AG Defendants"), and Mixed Company, Inc. ("Mixed Company")

(collectively the "Defendants"), alleging as follows.

## THE FRAUDULENT SCHEME

        1.      Plaintiff XA was not a profitable business but it should have been. From 2009

through 2014, XA had numerous high-profile clients and well-paying entertainment industry

jobs.  Defendants and their co-conspirators, however, were engaged in a pattern of criminal

conduct by which they systematically removed profits from XA, for themselves, eventually

1

stealing virtually all XA's assets.  Several defendants controlled companies, some related to XA, like Fiori XA, and some companies separate from it, like Studio AG, the control of which allowed Defendants to engage in a shell game, moving money between companies, at will, often leaving XA with the expenses and assuring companies, like Studio AG, seized any income.

2.      The result of their shell game was that XA barely broke even, while Defendants' other companies made millions, that should have gone to XA.  Their scheme remained hidden as defendants created fake invoices, lied to XA's owners and to XA customers to facilitate their diversions of XA funds and resources.  When XA's owner, CMG Holdings Group Inc. started asking hard questions, Defendants quickly moved all XA's assets, including intellectual property, such as customer lists and contracts, and physical property, such as computers and the office furniture, to a new company, HudsonGray, that they created and tried to permanently destroy XA's servers, to conceal their crimes.

3.      Essentially, XA was left as an empty shell while Defendants, using XA monies, customers and property, built their own profitable company entirely from assets they stole from their former employer. Their schemes were facilitated by a series of mail and wire frauds, all are actionable torts in themselves, and together, forming a pattern of predicate crimes within the meaning of the RICO statute.  The damage was enormous. XA lost years of profits – millions of dollars – and was then stripped of its ability to even do business in the future by the outright theft of its physical resources.

4.      Defendants include certain of XA's former officers and a company they established, HudsonGray, and several companies they established and/or controlled for the purpose of diverting XA business and stealing valuable XA property.  They did so through a

pattern of mail and wire fraud crimes, through several criminal enterprises, within the meaning

of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et. seq.* ("RICO").

## PRELIMINARY STATEMENT

5.      Exhibit A is a spreadsheet, chronologically organized, identifying the type of

RICO predicate crime involved, the date on which the crime occurred, and the parties involved

in the crime.  Where the predicate act was mail or wire fraud, the spreadsheet alleges the general

content of the communication and how it furthered the RICO scheme involved, satisfying

particularity requirements as applied to predicate crimes in alleged RICO schemes.

6.      Exhibit B is a partial list of property defendants stole, along with its value, as

retrieved, so far, from the XA server the RICO Defendants attempted, unsuccessfully, to

permanently erase, as they left for their competing venture, HudsonGray.

7.      Exhibit C includes pages of XA's Handbook detailing responsibilities of all XA

employees, many of which obligations overlap traditional fiduciary duties owed between

employees and employers.

8.      Defendants' misconduct is described below in terms of three fraudulent schemes.

9.      The objective of the first scheme was to secretly divert XA profits to the Hudson

Defendants and the Studio AG Defendants, and to steal XA's clients for themselves, a scheme

perpetrated through a pattern of predicate mail and wire fraud crimes, as alleged in detail below

and as chronicled and specified in additional detail, in Exhibit A, within the meaning of the

RICO statute (the "Profit and Client Theft Scheme").

10.     The objective of the second scheme was to steal XA's physical property,

including everything from furniture (e.g., tables, chairs, pedestals, vases and office lighting

fixtures) to large, extremely expensive commercial lighting equipment for high end events

(called "duratrans"), and items such as XA computers and cell phones. These criminal thefts

were coordinated through mail and wire fraud crimes (the "Property Theft Scheme"), as alleged

in detail below and as organized, with pricing, in Exhibit B. Text messages among these

defendants include directions to engage in the thefts during times when they would not be seen

and even discussing what specific XA property each would steal.  *See infra* and Exhibit A.

11.     The objective of the third scheme was to conceal misconduct during the period

2009 to mid-2014 through other and further RICO misconduct (the "Concealment Scheme").

They did so by, *inter alia*, concealing the fact they were diverting business to other entities they

controlled, coordinating their misconduct through text messaging and email communications

with one another, including messages directing, *inter alia*, that they come into the premises,

when no one would be at the office, and messages directing that they attempt to avoid personnel

sent by the owners, who were attempting to determine what was really going on at XA.

12.     From January, 2014 through September, 2014, based on the emails and texts

recovered by XA IT professionals from XA's erased server, the Hudson Defendants secretly

"ported" XA proprietary information from XA's server into temporary servers that they

controlled, for their own benefit and use by HudsonGray. They stole paper copies of existing XA

contracts and work data to prevent XA from discovering what they had done and/or to impair

XA's ability to determine what had occurred.

13.     Based on information obtained from one recovered XA telephone that did not

have its data erased (and still had and has intact all its emails and text messages) and, as well, the

recovery by IT professionals of some of the information defendants attempted to permanently

erase from XA's server, the details of many of the crimes in which the Hudson Defendants and

their co-conspirators engaged, during this period, are established, in their own words.

14.     Defendants were so confident they would not be caught as a result of the destruction of the XA server, the coordinated use of temporary phone numbers and erasures of their phone data, as well as their theft of XA hard copy data and property, that they established their competing enterprise, HudsonGray, in direct competition with XA, in the same building in which XA was located.

15.     The schemes mentioned above and described below, are referred to collectively as the "RICO Schemes."  In perpetrating the wrongdoing alleged herein, XA's former officers and employees, i.e., the Hudson Defendants, while employed by XA, abused their company's trust, exploited and stole XA's confidential and proprietary information, including customer lists and pricing information, and used this information to enrich themselves, through competing entities they owned and controlled, initially through Studio AG and, later, HudsonGray.

16.     The misconduct remained hidden from 2009 to early 2014, for reasons alleged below.  In January, 2014, XA's parent company, CMG, under new management, began to demand answers as to why XA was not more profitable than XA management was representing, given its high gross revenues.  The Hudson Defendants refused to provide any information and CMG began aggressively attempting to get that information.

17.     The Hudson Defendants responded by secretly creating defendant HudsonGray, through which they began to solicit major XA clients, including NBCUniversal and Bazaar Magazine. Their goal was to have these established XA relationship companies become clients of HudsonGray. Upon information and belief, that is when the erasure of the XA server was begun and when the use of cell phones that were unconnected to XA server took place.  That is also when the Hudson Defendants began entering into the XA premises, when no one was

present, to effect the Property Theft Scheme, as disclosed in the recovered emails and text messages.

18.     The Hudson Defendants' conduct violated not only the RICO statute, but other statutes, as well, including statutes prohibiting the destruction of computer and electronic records, criminal statutes prohibiting larceny and theft and, as well, common law duties prohibiting, *inter alia*, fiduciary breach, fiduciary fraud, conversion and tortious interference with existing and prospective business relations, unfair competition and acting as a faithless servant to the injury of one's employer.

## **PARTIES**

19.     XA is a corporation organized and existing under the laws of the State of Nevada which, during all times relevant to the causes alleged herein, had offices located at 333 Hudson Street, New York, New York 10013.  XA is a wholly owned subsidiary of CMG Holdings Group, Inc. which has been assigned XA's assets, including this lawsuit. XA was and is engaged in the event and party planning business for large companies and wealthy individuals.

20.     Upon information and belief, defendant Wagner is an individual residing at 128 Brahms Circle, Wheaton, Illinois 60189 and was, at all times relevant hereto, XA's chief executive officer.  He resigned in April, 2014.

21.     Upon information and belief, Wilson is an individual residing at 115 North Highland Avenue, Elmhurst, Illinois 60126, who held the title of Chief Operating Officer.  She was responsible for paying vendors, reviewing and sending out contracts and, generally, for the management of both XA's Chicago and New York offices.  Documents recovered from the XA server indicate that she was frequently in New York and attended all major New York events. She resigned from XA on or about September 26, 2014.

6

22.      Upon information and belief, defendant Andereck is an individual residing at 360 Furman Street, Unit 1113, Brooklyn, New York 11201. He became employed by XA in or about June, 2000 and, as President/Creative Director of XA, oversaw the New York office operations and maintained client relationships.  He resigned from XA on or about May 22, 2014.

23.      Upon information and belief, HudsonGray is a marketing and branding agency with offices located at 333 Hudson Street, New York, New York 10013.  It is a Delaware limited liability company formed on March 14, 2014 and owned by defendants Wagner, Andereck, and Wilson.  HudsonGray was established to compete with XA and to service clients improperly taken from XA by its former employees.  HudsonGray began competing with XA when the Individual Hudson Defendants were still working for XA.

24.      Upon information and belief, Studio AG is an Illinois Limited Liability Company, with offices located at 1800 West Cuyler Street, Chicago, Illinois 60613. Studio AG was established on or about December 12, 2009, following CMG's acquisition of XA in April, 2009. Studio AG is in the same business as XA, as detailed below, and was established by Wagner, Andereck, and Wilson to steal XA profits and clients.  Studio AG's bills, which they caused XA to pay, were for work done almost exclusively on New York-based business, including, e.g., the NBCUniversal Upfront and the Characters Unite Project.  Studio AG's website shows it provides largely the same services as XA provided from 2009 to the summer of 2014.

25.      Upon information and belief, defendant Lomma is an individual residing at 360 Furman Street, Unit 302, Brooklyn, New York 11201.  Lomma became employed by XA in August, 2003 and held the title of Vice President of Production.  She oversaw event production, staff and vendors, supervised and hired production staff, created and maintained budgets and worked with clients to assure proper event executions.  She resigned from XA on June 13, 2014.

26.     Upon information and belief, defendant Michael Day is an individual residing at 10 Hanover Square Apt-21F, New York, New York 10005.  Day held the title Executive Producer of XA and was directly involved with event creation and production, creating and maintaining contracts for events and working with clients to assure proper event execution.  He resigned from XA on May 20, 2014.

27.     Upon information and belief, Pizzo is an individual residing 1636 North Hermitage Avenue, Chicago, Illinois 60626, who was and is listed as Studio AG's general manager.  Pizzo interfaced directly with defendants Wilson and Andereck regarding XA and Studio AG business projects, including sending hundreds of thousands of dollars in invoices, by email, for work Studio AG did in New York, on XA's New York projects.  Such projects, included all NBCUniversal's New York projects and, the coordination of all other Studio AG work in New York.  She worked with Wilson to cause XA to pay phony Studio AG invoices for fictitious New York based work and coordinated XA New York-based personnel doing Studio AG business, including having New York XA employees design Studio AG's own website.

28.     Upon information and belief, Gudin is an individual residing at 6 Peter Cooper Road, Apt-11E, New York, New York 10010 and was and/or is also a an employee of  Studio AG and HudsonGray.  Gudin was extensively involved in the thefts mentioned above.

29.     Upon information and belief, Mixed Company, Inc., an Illinois corporation owned by Wilson and a partner, fraudulently billed XA $183,705.00 over the last two years alone,  for services it could not provide.  Most of the bills for these services were stolen or destroyed by the Individual Hudson Defendants. On information and belief, Wilson, as she exited XA, erased XA's files from its server, based on IT tracing of the deletions of massive amounts of electronic data from her home IT address.  Mixed Company, a small, local florist in a suburb west of

Chicago was billing XA for "project support," "creative support," and "production services" for numerous NBCUniversal projects, including NBCUniversal's 2014 Upfront, its largest yearly event. Such services were far too large for a small florist to provide, and XA's own itemized 2014 Upfront Budget, which defendants attempted to permanently delete from XA's files, but which XA IT professionals recovered, show no participation by Mixed Company, which sent numerous bills to XA for work allegedly provided on the NBCUniversal Upfront projects and other New York NBCUniversal related projects.

## JURISDICTION AND VENUE

30.     This court has personal jurisdiction over each and all of the Defendants because, upon information and belief, Defendants reside in New York and/or maintain business offices in New York and/or have engaged in criminal and/or tortious conduct outside and inside New York which have had substantial effects in New York and/or because each and all of the Defendants have done substantial business in New York.

31.     Venue is proper because many of the events, transactions and occurrences occurred in the County of New York and because a substantial portion of Defendants' misconduct occurred in the County of New York and/or was directed from New York City.

## JURY DEMAND

32.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

## FACTS

**Business Diversion through Controlled Companies, XA Scenes and Studio AG**

33.     XA was established in August 2000 and was in the event planning business.

34.     In April, 2009, CMG, a publicly traded company, acquired XA and all its subsidiaries, including a subsidiary called XA Scenes.

35.     CMG had learned XA was engaged in business lines consonant with its business

goals and that XA was essentially bankrupt and wanted to be acquired.  XA owed trade creditors

monies but had revenues in excess of $10 million.

36.     Between 2009 and 2014, XA remained marginally profitable each year or lost a

relatively small amount of money but had (apparent) substantial, gross revenues and CMG hoped

it would, sooner or later, generate stronger returns.  CMG acquired XA's assets using a

procedure in Illinois similar to a bankruptcy proceeding, through a public sale.

37.     Once CMG became an owner of XA's assets, it entered into employment

contracts with XA's senior officers, providing them with salaries and earn-out compensation

based on profitability.

38.     At that time, surprisingly to CMG and its principals, the XA officers, Wagner,

Andereck and Wilson, did not want CMG stock.  On information and belief, the reason they did

not want CMG stock was because they intended to and did in fact, at or about that time, begin to

abuse XA's resources, siphoning XA profits and customers to themselves and entities they

controlled, in violation of obligations they owed their employer.

39.     CMG acquired XA and all its subsidiaries in April, 2009. XA's belief regarding

why these defendants did not want stock in CMG is based on the time frame in which Studio AG

and HudsonGray were created, i.e., respectively, when CMG purchased XA and its subsidiaries

and when Wagner was leaving XA.

40.     In or about April 2009, Wagner entered into an employment agreement

("Employment Agreement") with XA, a copy of which is annexed as Ex. D (the "Wagner

Agreement") which contains non-competition and non-solicitation injunctions.

41.     Based on documents retrieved from the restored XA server, XA learned that the Hudson Defendants had a long history of wrongful competition and had long been diverting profits and customers from XA from the time that CMG acquired XA and its supposedly dormant subsidiary, XA Scenes, through their controlled entities.

42.     Example:  Studio AG.  Defendant Studio AG is a limited liability company owned by Wagner, Andereck and Wilson, a fact defendants named in  XA's first complaint acknowledged in their Third Party Complaint in this Action, at ¶ 64 (mentioning Wagner and Andereck and "another former XA employee" – in fact, it was Wilson).   Studio AG is engaged in the same business as XA, as demonstrated in its own advertisements, website and emails. From 2009 to May, 2014, the Hudson Defendants and Studio AG Defendants used Studio AG to compete with XA in violation of applicable non-competition prohibitions, as detailed below, and in violation of common law duties owed to XA.  In fact, documents called "Sale by customer summaries," recovered from XA's server, indicate defendants used Studio AG to service XA customers including, e.g., The Nine Hundred Shops, CW Television Network, NBC's Characters Unite Tour, and the UN Foundation.  The Hudson Defendants even directed XA employee, Natalia Tsynkevich ("Natalia"), while employed at XA, to design Studio AG's website, causing this website to advertise the same products and services XA was marketing, at that same time.

43.     Example -- XA Scenes.  XA Scenes was secretly used by Wagner, Andereck and Wilson to act as an "event manager" for Gallery 1028, a large loft event space in Chicago, owned by a company called Calihan Catering.  Gallery 1028 held hundreds of corporate and private events between 2009 and March, 2011.  Beginning around 10/01/08, when XA Scenes signed a consulting agreement with Calihan Catering for Gallery 1028's exclusive management, and lasting through in or about March, 2011, when Calihan Catering cancelled this agreement,

XA Scenes promoted Studio AG, not XA, as the recommended event provider for Gallery 1028 clients.  During the three years this contract was in place, XA did not produce one single event at this venue – but documents recovered from XA's server indicate Studio AG produced hundreds of high-end weddings, corporate parties and charity events there.  The business XA Scenes was doing, managing events for Studio AG, could and should have been events done by XA. This included corporate events, by large companies, including NBCUniversal.  Profits that should have been made by XA were improperly re-directed to Studio AG, through XA Scenes, which managed the Gallery 1028 event space.

44.     Server emails show the Hudson Defendants caused XA employees to support Studio AG, to the detriment of XA.  For Example, XA employee Katie Hall was directed to create a sales script for XA Scenes which promoted Studio AG services, to Galley 1028 clients, including a June 28, 2010 email.  XA was then paying Hall a $45,000 salary. The Hudson Defendants were, at the same time, paying her commissions for selling Studio AG décor and lighting packages to Gallery 1028 clients, as recovered emails show.  Advertising and email blasts created by XA employee Natalia for Bridal Affair Magazine and Michigan Ave. Magazine, touted Studio AG, Gallery 1028 and XA Scenes – but made no mention of XA.  XA Scenes was secretly re-purposed by the Hudson Defendants to benefit themselves and their then-competing entity, Studio AG.

45.     The Hudson Defendants made sure that what they were doing at XA Scenes was concealed from XA, which was told it was a dormant (unused) subsidiary.  Recovered server documents show the Hudson Defendants directed XA employees to sign separate confidentiality agreements for "affiliate" XA Scenes, established a separate bank account for XA Scenes

through which checks made out to XA Scenes for the rental of Gallery 1028's loft space were processed, concealing how the Hudson Defendants were using XA Scenes to benefit themselves.

46.    The history of Studio AG is particularly important as it shows a pattern of long-standing fraudulent conduct similar to that in which HudsonGray has engaged and is engaging, under the control of the same persons, who previously diverted substantial business from XA, through Studio AG , for their own benefit, as alleged in detail below.

47.    Example -- Fiori XA. In August, 2004, XA purchased Fiori, Inc., which became a wholly owned XA subsidiary.  Fiori had purchased the assets of a company called "Alice's Gardens," then defendant Andereck's floral shop.  Fiori, Inc. was renamed Fiori XA and Fiori XA then engaged in the same business as did XA.  Specifically, Fiori XA was in the event management business and entered into "event management" agreements with companies, including Calihan Catering, to manage Gallery 1028.  Fiori XA was retained to provide event planning services by numerous companies including Precision Meetings & Events, Inc., on June 26, 2009, as "the décor Production Company for the Live Canada Event," a multi-city activation with promotional parties in Washington DC, New York, Chicago, Minneapolis, Dallas and San Francisco.  Contracted services for the event included "audio/video, lighting and game show materials." This $122,510.00 event produced by Fiori XA should have produced by XA.

48.    Fiori XA also produced high-end weddings that XA could have produced.  For example, by email dated 01/28/08, Alexandra Shapiro, USA Network's Senior Vice President for Brand Marketing, thanked Andereck for a "supremely beautiful wedding weekend." PJ Acosta from Fiori XA was the "design lead" for the Shapiro wedding.  Fiori XA's own spreadsheets show Fiori XA serviced numerous USA Network events. USA Network, a cable affiliate of NBC Universal, was an XA client. In a 05/06/09 email chain recovered from XA's server, Beth

Gammonley from Chicago Social Brides Magazine confirmed with Andereck that "Fiori XA is running a ½ page horizontal ad in the June 2009 issue," in competition with XA.  Fiori XA's Amex September 17th – October 18th spread sheets, recovered from XA's server, shows Fiori XA's business model was identical to its successor, Studio AG's model, as detailed below, e.g., stealing events from XA like the "WC Premier" and the "WC Press Stunt," while vending services to XA that XA could have provided to itself, from XA vendors including, e.g., Sign Expo, Jamali Gardens, Empire Cut Flowers and COGS Equipment.

49.     Fiori XA was not a florist, as certain of the Hudson Defendants represented to XA.  Recovered server documents show it ordered flowers for events from the same wholesalers XA used.  Similarly, it was not a fabricator, either, but relied on wholesale fabrication companies, e.g., Manhattan Neon and Sign Expo for staging, signage and props. It did not supply XA with furnishings, though charges for same were expensed to XA through Andereck's Fiori XA American Express card.  These charges were all fraudulent.

50.     Example:  Studio AG.  On December 12, 2009, Wagner, Andereck and Wilson formed Studio AG, a private LLC, and used it to continue the business of Fiori XA, under a different name, a private company they secretly owned.  Studio AG's real purpose was neither disclosed to CMG's Board, nor its shareholders.  It was not disclosed in SEC filings, even though Fiori XA was a major XA asset.  On information and belief, the Hudson and Studio AG Defendants made extensive efforts to secret the fact that they were using Studio AG to improperly compete with XA.  To assure secrecy, they put the business (Studio AG) in the name of one of their lieutenants, defendant Pizzo, not in their own names, even though they were unquestionably its real owners. Studio AG's ownership was first disclosed in a libel suit filed by certain defendants herein in response to XA's initial complaint.

51.     No email communication to CMG from any of the Individual Hudson Defendants ever mentioned that Studio AG was wrongly competing with XA.  To the contrary, "Studio AG" was mentioned only in passing in communications that never disclosed its real purpose was to divert and steal XA business.   A 12/04/09 memorandum, for example, simply states, under the heading: "Lack of Holding Company support for critical legal issues" – "Jean, Darren, Joe to form Studio AG" –it makes no mention of the fact that Studio AG's real purpose was theft and does not state that it was to supposedly to provide XA support.  A memorandum dated 01/27/14 mentions the name Studio AG, but just states it is owned by "Jean, Darren and Joe," and states its purpose is supposedly to "support XA."

52.     On information and belief, Wilson, Wagner and Andereck told Fiori clients that Studio AG was the "same" company as Fiori XA, using a different name.  For example, by email dated 05/22/09, Pizzo described to Andereck how she told Parkway Bank that Fiori was in the process of "rebranding" and would soon incorporate as Studio AG.  This is the same type of "rebranding" to which they referred in text messages that XA recovered from the XA mobile phone defendant Gudin left behind (and failed to erase).  Specifically, by text messages dated 06/03/14, the Hudson Defendants described what they would tell XA clients about rebranding – namely, that Hudson was the "same" company as XA, just using a different name.

53.     Email and text messaging was used extensively by all defendants to coordinate and implement their wrongdoing; there was extensive wire fraud, a RICO predicate act, as chronicled in Exhibit A.

54.     Example:  By email dated 11/16/10, Studio AG's General Manager, Pizzo, asked XA's COO Wilson, to transfer invoices for which Studio AG was responsible, to XA.  Wilson and/or Pizzo fraudulently altered bills to make it appear XA, not Studio AG, was responsible to

pay these invoices.  Wilson caused a false invoice to be created so that vendor, Manhattan Neon Sign Corp, was paid out of XA funds, by check, sent by mail to settle a Studio AG debt owed to that vendor. In an email that Pizzo sent to Wilson, she wrote: "Hi Jean, as promised, I am forwarding the revised invoices (with XA name on bill to).  If at all possible can you pay the second invoice for $2400.00 too? They really want 50% of what we currently owe before they start the UNICEF project. If you can pay these 2 – that will meet their requirement of 50%."  XA was paying Studio AG's bills so Studio AG could order more materials to service a stolen XA job, namely, the UNICEF Project.

55.  Example:  By email dated 11/11/10, Wilson and Andereck directed XA employee Natalya to design Studio AG's website, even though she was working for XA and Studio AG was advertising the same services as XA.  Photos nominally portraying Studio AG events were, in large part, photos of XA corporate events, improperly accessed and used without XA's permission, in breach of copyright laws.  The Hudson Defendants, specifically Wilson and Andereck, thus diverted XA business to Studio AG.

56.  Example:  By email dated 06/28/10, P.J. Acosta, a Studio AG employee, and Katie Hall, an XA employee, sent a template of a Studio AG sales script designed to sell corporate and private parties for Studio AG – that made no mention of XA.  Employee Hall took care of all contracts for XA Scenes and used her sales script to induce XA Scene's clients to use Studio AG during the time she was a salaried XA employee.  Documents recovered from XA's server indicate the Individual Hudson Defendants paid employee Hall a commission on all décor packages she sold for Studio AG.  None of this was disclosed to XA. All this conduct was in breach of Hall's and Hudson Defendants' duty of undivided loyalty and good faith owed to XA.

57.     Example:  By email dated 06/03/09, among all of Andereck, Wagner and Pizzo, Pizzo stated she intended to sell a van titled to Fiori XA and to use the proceeds for "AG payables."  In other words, they were planning to sell an XA asset, without XA's owners' knowledge, and to use the sale proceeds to pay Studio AG's debts.  Recovered emails indicate that Defendants referred to Fiori XA and Studio AG interchangeably throughout 2009 during their so called "rebranding" process to banks, as indicated in emails dated 02/27/09, 04/06/09, 05/22/09, to insurance providers, vendors and clients.   A recovered 06/02/09 email between Pizzo, Andereck and Wilson discusses the use of proceeds from the sale of Fiori XA's van for Fiori payables or the purchase of a new van, for Studio AG, all of which follows their pattern of referencing Studio AG as the same company as Fiori XA, but with a different name.  On 02/27/09, defendants set up a Fiori XA account at North Community Bank.  That account was established to accept Studio AG checks, even though Studio AG was not legally incorporated until 12/28/09.  This allowed the sale of a Fiori XA asset for the benefit of Studio AG, in June, 2009, by defendants depositing proceeds from the sale in the North Community bank account that Fiori XA shared with Studio AG.

58.     Example:  By email dated 01/22/13, Natalia emailed Andereck several logo designs for Queens Endoscopy; this, however, was a Studio AG design job.  CMG had no idea Andereck was running a design service out of Studio AG through which he decorated the homes and offices of businesses and high income individuals, one of whom, Colleen Mohan, executive vice president of Brand Marketing at NBCUniversal, represented XA's most important corporate client—which XA would lose when Andereck moved to HudsonGray.  Andereck ordered hundreds of thousands of dollars of lighting, furniture, textiles and similar items and provided

17

contracting services for these Studio AG decorating clients, charging many of these products and services to XA.

59.     Example:  By email dated 11/12/10 from Natalia to Andereck, Natalia sent samples of Bridal Affair Magazine email blasts advertising Gallery 1028 and listing its vendors as XA Scenes and Studio AG, with XA employee Katie Hall listed as the contact person. No mention was made of XA, even though XA could have done everything being advertised by Studio AG.  Defendants used XA resources to advertise their competing business.

60.     Despite high gross revenues, XA failed to obtain meaningful profit. The reason was that the Hudson Defendants and Studio AG Defendants were diverting business from XA to their own entities.

61.     According to Studio AG's own year-end customer summaries, which were erased, but recovered from XA's server, XA was Studio AG's biggest customer for 2012, when it charged XA $103,148.50.  In 2013, AG charged XA $122,048.30.  However, in just the first five months of 2014, as soon as CMG management began demanding answers to questions regarding the seeming lack of profitability at XA (but prior to the Hudson Defendants actually walking out of XA for HudsonGray), Studio AG billed XA $550,401.16. On a per month basis, this was roughly ten times what it had been billing in previous years and was a fraudulent effort to damage XA and put it out of business.  XA's internal records indicate Studio AG billed XA $142,060.80 in 2013 and $184,288.45, in 2012 – these differences between Studio AG's and XA's records are, on information and belief, due to un-deposited funds due XA that were diverted to Studio AG, and carried in accounts receivable, on a yearly basis.

62.  Example: On information and belief, the few hard copy bills the Hudson Defendants left behind in XA's Chicago office to document charges billed to XA were

fraudulent.  Studio AG, for example, charged XA tens of thousands of dollars for duratrans, which are large light boxes used for events.  Studio AG, however, was not in the business of selling duratrans -- it bought duratrans from Manhattan Neon Corp, as indicated in Studio AG emails recovered on the XA server.  The recovered documents indicate Studio AG was charging XA for duratrans it never sold to XA.

63.     Example: Studio AG charged XA for fabricated build-outs that were in fact done by different companies working for XA.  Studio AG charged XA for furniture XA had already rented from legitimate furniture rental companies like Taylor Creative and Cort Rentals, referencing locations (without itemizations), and pretending it was renting or selling furniture – however, Studio AG was not in the business of renting or selling furniture to XA - or anyone else.

64.     Example:  The Hudson Defendants created fictitious invoices and falsely charged XA for labor costs associated with the breaking down of equipment at the Javits Center. However, on information and belief, the Javits Center exclusively handles such breaking down through union labor contracts, not companies that employ non-union personnel, as did XA.

65.     Studio AG's website homepage states: "we are a boutique design and production firm providing expertise in corporate and social event design" and that it "understands how to conquer the challenges of producing an event."  XA's website states " XA is an award winning public relations, social media and event production company"  Studio AG's website advertises identical capabilities for event planning, e.g., production of high-end weddings and corporate events as XA.  Corporate events pictured on Studio AG's website include, for example, USA Network's "Suits and Style Pop Up Shop," an event for Vanity Fair Magazine and a screening for the CW Network, all events XA could have been produced.  Studio AG's "Suits and Style"

event was, in fact, part of XA's ongoing "Suits" promotion for USA Network, and is prominently featured on XA's own website.  XA's website states " we build unforgettable global experiential platforms that help brands thrive…"

66.     In a January 4, 2014 letter to Homeland Security for defendant Gudin's O-1 Visa Petition, defendant Pizzo, Studio AG's "principal" wrote: "Studio AG [is] a Chicago-based event design and production company" "specializing in corporate and social event design" working for such notable luxury brands as  "The Four Seasons, Ritz Carlton, Starwood, Van Cleef & Arpels, Swarovski and Michael Kors." In this letter, Pizzo noted Gudin's contribution to Studio AG's "Grand Opening Event for the W Hotel in Chicago" - an event XA should have produced. As the "retained design firm for W Hotels," Studio AG also sent the W Hotel chain direct advertisements and inserts promoting its "Same Sex Wedding Service."

67.     In emails recovered from XA's server, other Studio AG production events included Studio AG's Oxygen Event (for NBC's Oxygen Channel), multiple of Bravo's Top Chef Events, an event for "the Wrigley team," and a party for Google. Binders from Gallery 1028 from 2009-2011 and Studio AG's own end of year statements, 2010-2012, memorialize a multitude of high end weddings, corporate parties and fund raising events all of which could have been produced by XA, but were produced, instead, by Studio AG.

68.     XA, upon restoring its server, discovered that Studio AG was competing with XA for high-end wedding and corporate events through its own website.  Examples would include a Pinterest site, videos created by XA employee Jeff Smith, a 14 page booklet created by XA employee Natalia for the purpose of promoting AG's services to "Oakbrook" [Mall] and the 'JW Hotel," numerous advertisements in publications such as Michigan Avenue Magazine, and Bridal Affair Magazine, created by XA employees - and direct advertising through site venues at

Gallery 1028 and the W Hotel created and promoted by members of XA's staff.  Studio AG even arranged for Studio AG employee PJ Acosta to steal potential new XA business by having him appear as an "Influential Notable" on "event logistics" at XA's Real Simple Magazine event, on March 11th, 2010.  Studio AG stole XA's 900 Shops job outright, shortly after producing a wedding for Sarah Burrows, the PR & Communications Director of the 900 Shops vertical mall on Michigan Ave. "at cost or very little profit." Recovered Parkway Bank records show when Lauren Edelman assumed Burrows role as PR & Communications Director of the 900 Shops, the Hudson Defendants began paying her to work as an "account coordinator" for XA. This conflict of interest was established, on information and belief, to insure Edelman continued to award XA's 900 Shops account to Studio AG.

    69.    Studio AG was not and is not a "florist."  Like XA, Studio AG orders flowers and vases for specific booked events from wholesale florists and vase suppliers, including Vasesource and Jamali Gardens, often charging XA for these Studio AG floral supplies.  Studio AG was and is not a fabricator. Like XA, Studio AG relies on wholesale fabricating firms to create staging, signage and props. These firms include, e.g., Manhattan Neon, Site Fabrication and SFD Fabrication, often charging XA for same.

    70.    Though XA employee Katie Hall was commissioned for all the décor and lighting packages she sold to clients booking Studio AG events at Gallery 1028, the large loft facility managed by XA Scenes, XA's server shows no indication Studio AG ever supplied XA with décor or lighting but, rather, that XA supplied Studio AG with furnishings, lighting and décor for its interior design service and party rental service.  Though Studio AG has pretended, on occasion, to have been created to "support" XA, there is no evidence Studio AG ever paid XA anything or "supported" it in connection with anything.

71.     Only Studio AG benefitted from its relationship to XA. It benefitted by virtue of the Individual Hudson Defendants directing and/or using XA's employees, contacts and capital resources for their own enrichment, billing XA hundreds of thousands of dollars for services XA could have supplied to customers, but for the diversions of same to Studio AG and its owners, the Individual Hudson Defendants.

**April, 2009 to January 2014**

72.     From April 20, 2009 through January, 2014, CMG Board members repeatedly made contact with Wagner regarding XA's persistently small or non-existent profit margins, despite high gross revenues.  In all instances, Wagner blamed XA's lack of profitability on CMG's lack of financial support for XA.  Board members relied on auditor's reports, and Wagner's own explanation that XA had fixed yearly costs of $8 million, and could only be profitable if revenues exceeded fixed costs.

73.     Because XA was a valuable asset to CMG's company profile, as a high earning, if unprofitable subsidiary, and because CMG was not in a position to provide the additional capital Wagner said was needed for XA to become profitable, XA's operation continued as it had since 2009.

74.     In January, 2014, however, new Board members hired Mr. Ron Burkhardt as Executive Chairman of XA and directed that he oversee its operations, find out why the company was so severely under-performing and to improve its profitability.

**February 2014 – Wagner Quits XA**

75.     Wagner, upon learning that Burkhardt was coming in, immediately threatened that if Burkhardt was installed to oversee what he was doing, he would quit.

76.     Although Hudson was established in March, 2014, on information and belief, in January, 2014, the Individual Hudson Defendants had already acquired office space and were installing computers in same, as retrieved Server documents show.

77.     XA, during the time period January through March, 2014 had no idea Wagner and his associates were establishing HudsonGray, nor that they were engaged not only in stealing XA's clients, but intended to steal furniture, tables, electronic databases, along with most of its files and were planning, in the near future, to erase XA's server and to eliminate all physical signs of what they had done and were doing to establish their competing enterprise.

78.     In fact, in late 2013, the Hudson Defendants were already in the process of stripping XA of its clients, assets and intellectual property by porting XA IT data into their own temporary server, to prevent XA operating its event planning business.

**Server Documents Reveal How the Hudson Defendants Systematically Destroyed XA**

79.     The Hudson Defendants' conspiracy to destroy XA was facilitated by their creation of a communication system that XA could not review and which they, on information and belief, planned to sanitize further upon their withdrawal from XA to prevent any disclosure of their misconduct.  Defendant Wilson, XA's COO, between March 7 and March 11, 2014, bought all new iPhones, using XA credit cards, one for each of the Hudson Defendants and other XA employees they would steal.  She then federal expressed them to XA's New York office where, on information and belief, some or all of the Hudson Defendants "ported" all information from their existing XA mobile phones into the new iPhones, using new, temporary numbers, unattached to XA's server.

80.     To effect the planned looting of XA's intellectual property, Wilson and Wagner issued instructions to XA's employee, Mia Blagsvedt, as to how XA's data was to be ported into

newly purchased iPhones.  By email from Blagsvedt to Andereck, Day, and Loma, dated 03/11/14, she wrote: "I will need you all to let me know once you have powered on your phones… before I can begin the porting process. You will definitely want to back-up your current phone and then as you follow the prompts on the new iPhone you can pull the data from the cloud … as it requests … Once your new iPhone is activated…I can call the porting department…"  These iPhones, with the XA-ported confidential information were used by the Hudson Defendants and their associates to conceal from XA what they had done with respect to XA's communications systems and computer network, prior to their leaving for Hudson, all done when they were still working for XA, in breach of their duty of loyalty to XA.

81.     Between 12/20/13 and 05/21/14,  David Tuma, an IT specialist who had signed a confidentiality and non-disclosure agreement with XA, secretly redirected 1,789,382 items of proprietary and intellectual information from XA's servers into a "generic east and west exch029" account, controlled by the Individual Hudson Defendants.  During this five-month period, Tuma continually emailed "migration" updates to defendants Wilson and Wagner, as he systematically emptied sixty-six digital mailboxes, depriving XA information pertaining to ongoing contractual business, account and employee information.  Tuma also advised Wilson and Wagner, via email, on the mechanics of transferring XA's proprietary telephone data to HudsonGray controlled devices between 03/07/14 and 03/11/14, when defendants secretly ported XA's proprietary data and IP information onto new iPhones controlled by HudsonGray.

82.     As a direct consequence of the Hudson Defendants' misconduct, all XA data and communications, including emails, text messages and all electronically stored contact information that were on the phones defendants caused XA to purchase for them, were wiped out and irretrievably lost to XA -- with one crucial exception.

83.    One XA phone, left un-erased, on information and belief by accident, still had its voicemail and email service intact.  This phone, used by defendant Gudin, included his recorded conversations and messages, emails and text messages with the other Hudson Defendants including, the following representative conversations:

•    Example:  Gudin, in a text message to a temporary XA employee on June 3, 2014, recorded [speaking of XA] -- "None of us works there anymore.  XA is gone.  We are all moving to a new company…we are the same with a different name…"   The reason Gudin said they were the "same" was because he and the Individual Hudson Defendants had stolen not only XA's clients, but XA's proprietary information, all its employees and, critically, XA's physical resources, as well, everything needed to conduct its business, as further detailed below.

•    Example:  In a text message dated 06/02/14, Andereck wrote to Day and Gudin -- "Get the four duratrans [XA's highly expensive light boxes for events] out of storage [XA's storage locker] today or tomorrow only, put them in downstairs storage [Hudson's own, new storage locker, in the same building]."

•    Example: In another text message dated 06/02/14, Andereck cautioned the other Hudson Defendants to steal the equipment when no one was around to see them – specifically, Andereck wrote "I have a meeting with them Wednesday. Mike [Day] will call you to get light boxes.  *I need to make sure no one is there*." (Emphasis added).  On information and belief, the Hudson Defendants came in on weekends and late at night when no one was there to steal the duratrans (and other) items.  XA's belief as to the time at which they stole the material is based on statements made to XA personnel by building security officers who recorded the times the Hudson Defendants entered the building, as well as XA's personnel reviewing security footage of these persons sneaking into the building, late at night.

- Example:  Between, January, 2014 and May, 2014, when Andereck quit XA, the XA server documents show Andereck purchased, using XA funds, $56,806.16 worth of duratrans.  None were in the XA office when XA owners entered after the Hudson Defendants left.  None were in XA's storage locker, either.  On information and belief, first the Hudson Defendants stole what was in the locker, then ordered more items billed to XA, so they could steal them, too.  XA's belief is based on XA server documents showing purchases of duratrans right before the Hudson Defendants left XA's premises -- none were in XA's office.

- Example:  The Hudson Defendants openly discussed what they were stealing from XA.  For example, XA employee Chelsea Tracy, by text message dated 05/03/14, wrote to Gudin "You want one of the wooden topped round coffee tables in the storage room, right?  I'm getting my stuff today.  Just want to make sure I don't take any of yours."  Gudin responds "No. It is yours. I just want two wooden pedestals."  None of these items belonged to any of them – all belonged to XA and all were in XA's office or proprietary locker.  Andereck organized the looting, along with his conspirators, on information and belief, as their reward for helping Wagner, Andereck and Wilson destroy XA's business (all orchestrated through wire communication emails and text messages).  These defendants discussed their theft in the most cavalier fashion notwithstanding they were stealing XA property and destroying their employer's business.

- Example:  Andereck, by text message dated 05/24/14, directed Gudin "I may need you to go pick up lights [two pendent chandeliers purchased by XA costing $3,329.40] at "Lighting by Gregory." These chandeliers were purchased by XA but were actually installed in HudsonGray's New York offices.  Similarly, Andereck purchased a Caravaggio pendant lamp from Lumens for $1,521.50, on April 20, 2014, which the Hudson Defendants caused XA to pay

for when Andereck expensed this purchase on his XA AMEX card.   On information and belief, this fixture was installed in HudsonGray's office.  XA's belief that these items are now in HudsonGray's offices is based on photos of these same fixtures used by HudsonGray in its advertising of its new offices, showing these items now hanging there, since June 3, 2014.  The photos of these fixtures were also sent to Andereck, from Gudin's iPhone -- the bills for them, now recovered from XA's server, show they were improperly purchased using XA funds, proving HudsonGray's and the Hudson Defendants' thefts.

84.     Numerous other items were stolen besides duratrans, tables, chairs and other furniture, laptops and phones.  No item was apparently too big or too small for the Hudson Defendants to steal.  These resources were necessary to XA continuing its business as an event planning provider.  The misconduct alleged herein was extensive, blatant and recorded.  It consists of coordinated thefts designed to put XA out of business by a cabal of faithless employees, bound by common law contractual and fiduciary duties to their employer, in violation of civil prohibitions and criminal laws, including, because of the manner by which the thefts were implemented, the RICO statute.

85.     Defendants cover-up involved destroying computer records that evidenced their misconduct, erasing information on XA's server, using temporary phone numbers to disguise wire fraud communications coordinating the thefts, and entering the XA premises, in the dead of the night, to avoid detection as they carried away property, files and confidential documents, as well as furniture, computers and other XA property.  *See* Exhibit A chronicling the coordinated thefts, Exhibit B, detailing what was stolen and its value, at least for items recovered from the XA server, and Exhibit C, showing the obligations that XA set forth in its Handbook that all

27

employees were required to have signed, all of which copies, as to the Individual Hudson

Defendants, were missing from the XA Office.

**Gudin's Role in the RICO Schemes**

86.     Defendant Gudin is a Spanish national. On information and belief, Andereck

caused XA to pay thousands of dollars for Gudin's immigration-related legal bills (for his visa

application and even plane tickets to Spain when he needed to return there in connection with his

visa), and sent Gudin on expensive trips (e.g., to Spain, Las Vegas, Los Angeles, Houston and

Chicago) having nothing to do with XA business. Andereck even had XA pay $1,550.00 to the

U.S. Immigration Service to file Gudin's petition, which had nothing to do with XA.

87.     Gudin, however, was about to be instrumental in helping the Hudson Defendants

loot XA.  Text messages recovered from Gudin's iPhone show a pattern of deceit.  He and the

other Hudson Defendants did, in fact, engage in the wholesale looting of XA, beginning on or

about June 2, 2014.  The one cell phone that was not erased was Gudin's phone.  His cell phone

statements establish his role in the theft of XA property which caused the destruction of XA, a

company he helped plunder, for his own benefit.

88.     During the six weeks Gudin "worked" for XA, he participated in and orchestrated

numerous acts of grand larceny and helped oversee the build-out of HudsonGray's new office.

The payroll checks Gudin collected from XA from 04/15/14 - 05/31/14 paled in value to the XA

checks he collected in 2013 and 2014 for unspecified services.  Records from XA's account at

Parkway Bank show Gudin collected checks for tens of thousands of dollars from XA before he

was a "legal" employee, with no tax deductions or notation what they were for.

89.     All this was occurring right before Wagner negotiated his purported "release" from liability with XA at a time when XA was wholly unaware of his ongoing, fraudulent misconduct.

**Wagner's Employment Agreement and Non-Competition**

90.     On or about April 1, 2009, Wagner entered into an employment contract, a copy of which is annexed as Exhibit D (the "Employment Contract") which contained a detailed non-competition clause in paragraph 6.

91.     On February 26, 2014, in anticipation of his departure from XA, Wagner and XA executed a document titled RELEASE AGREEMENT AND NON-SOLICIATION ("The First Release Agreement").

92.     The purpose of the First Release Agreement, as stated therein, was to resolve a dispute as to the amount of cash and stock that Wagner was owed, at the time, from XA, under his employment agreement – it was not an effort to resolve any issue regarding any fraud, as XA had no idea that it had been defrauded by Wagner and his co-conspirators.

93.     At the time the Release Agreement was executed, unknown to XA or its owners, Wagner, along with his co-conspirators, had been implementing the misconduct described above (and below) and Wagner was planning to immediately erase all  his emails from XA's network which, to date, have not been fully recovered.  Because the First Release Agreement was induced by fraud, it is void and does not supersede the Employment Agreement.

94.     On April 22, 2014, the parties entered into another agreement (the "Second Release Agreement), as the above-quoted section of the First Release Agreement contemplated.

95.     As of the time the Second Release Agreement was executed, Wagner had already formed HudsonGray, on March 14, 2014, and had already rented the office space in which

HudsonGray would operate, at 333 Hudson Street, back in January, 2014. Wagner had already completed the preparations necessary for HudsonGray to compete with XA and to cover his tracks through the erasure of the XA server and cell phones, as well as the planned thefts of hard copy documents in XA's office.

96.     Nothing in the Second Release Agreement sets forth any purpose regarding the resolution of any type of fraud claim regarding any issue involving Wagner – indeed, at that time, neither XA nor CMG had any idea Wagner had been and was then engaged in any type of fraud, let alone the extensive fraud that XA would later discover.

97.     The Second Release Agreement was not an effort to settle any fraud claim and was negotiated by Wagner in bad faith. Induced by fraud, the Second Release Agreement cannot protect Wagner from his then existing common law obligation to not engage in any wrongful solicitation of business as well as the provisions of his employment agreement, which continued, in effect.

98.     Because the Second Release Agreement was induced by fraud, as was the First Release Agreement, the Employment Agreement remains in effect. Although the Employment Agreement identifies an Illinois venue, by filing his third party claims, which effectively seeks adjudication of the very issues on his purported defamation claim as XA seeks to litigate on its main claim, Wagner has waived any right to demand an Illinois venue.

**The Hudson Defendants' Immediate Competition with XA, through HudsonGray**

99.     As soon as HudsonGray became operational in mid-March, 2014, it immediately

began improperly competing with XA.  On information and belief, the reason Wagner and his

co-conspirators established Hudson when they did was so they would have an entity ready to

accept NBCUniversal's 50% deposits for each of six approved NBCUniversal/XA jobs that they

intended to and did, in fact, divert.  XA's belief is based on XA's history with NBCUniversal

and the fact that NBCUniversal would always deposit, three to four months prior to project

activation, 50% of the project's total cost.

100.    After the Hudson Defendants left XA, XA received none of the monies that

should have come in from the already approved NBCUniversal projects.  As alleged below, one

project, in fact, began less than one week after Andereck left XA, on May 22, 2014.

101.    Other projects, including "Dig," "Satisfaction" and "Masters of Sex" activations,

occurred within the time horizon in which deposits had been historically made, but which never

arrived at XA even though all of these jobs were in the final stages of development when said

deposits would have typically been advanced.  For example, Andereck informed XA employee

non-defendant Jeff Smith by email on April 1, 2014 "We [XA] have the [DIG] job," yet no

NBCUniversal monies were wired into XA's account on this or any of the pre-approved

NBCUniversal production jobs.  NBC's diversion of over $1.5 million dollars of existing XA-

NBC projects to HudsonGray was no common place commercial occurrence.  NBC re-directed

roughly $1.5 million dollars in already-approved XA-NBC business fully developed at XA, to

HudsonGray.  These near-execution-stage projects, including one executed the very week

Andereck left XA, for which XA would have, in the normal course, received a 50% deposit from NBCUniversal three to four months in advance, suddenly received no such deposits.

102.    The redirection of funds for these projects to HudsonGray occurred while the Individual Hudson Defendants were still employed at XA.  On information and belief, NBCUniversal delayed execution of some already-developed contracts, approved by NBCUniversal, until the Hudson Defendants resigned from XA to join HudsonGray.

103.    HudsonGray and the Hudson Defendants, during this period, uploaded to HudsonGray's website, photos of XA events, misrepresenting them as HudsonGray events. Wagner continued to compete with XA through HudsonGray, just as he and his cronies had done *sub silentio*, through XA Scenes and Studio AG, because the Individual Hudson Defendants could no longer steal XA business through that entity and maintain secrecy.   It is implausible that the Hudson Defendants would have left XA absent prior assurance that NBCUniversal was on board with transfer of business to HudsonGray and the timing of events strongly suggests that they obtained such comfort at the time they were still XA employees.

104.    Hudson stole not only XA's clients and deposits but its employees and physical resources to do business.  *See* Exhibit B.

105.    Example:  The Hudson Defendants stole high end office chairs worth more than $12,000, from XA's offices and relocated them to HudsonGray's office, leaving two chairs, but inadvertently, also, the bills for the chairs, showing they caused XA to buy twelve, not two.  On information and belief the Hudson Defendants relocated the stolen chairs to HudsonGray's office.  XA's belief is based on photos of HudsonGray's office which the Hudson Defendants placed on HudsonGray's website, showing the same chairs XA purchased now adorning HudsonGray's competing office.

32

106.    Example:  Thousands of dollars in lighting equipment for events, computers and even cell phones, were purchased by Andereck, Wilson and Wagner, using XA funds, all while XA employed them.  The bills for these items, charged to XA but missing from XA's office, were later recovered from XA's server.  Exhibit B lists furniture and other physical items stolen from XA's offices, for use at HudsonGray and Studio AG, including prices.

107.    On information and belief, before and after HudsonGray was formed, Wagner, Andereck and Wilson, had solicited and thereafter employed former XA employees, including defendants Day and Lomma, as well as Gudin.

**The Business Diversions – the NBCUniversal "Upfront" Event**

108.    The size of the business diversions was enormous.  The "NBC Upfront" is an event at which the networks unveil their fall lineups to advertisers and sell advertising space for the upcoming season.  It is the largest such event of the year and, generally, the most important one in that industry.  NBCUniversal's Upfront was held at the Jacob K. Javits Convention Center in New York, on May 11, 2015.

109.    XA recovered from its server the 2015 Upfront Budget, which breaks down what the Hudson Defendants were charging NBCUniversal for the NBC Upfront event – namely, $16,530,000.00, as of February, 2015.  Subtracting costs for the venue and union labor paid for by NBCUniversal (which the Budget indicates), at a minimum, the total cost HudsonGray charged for this NBC event is $14,530,000.00.   The industry standard margin for event planners is twenty percent – in other words, HudsonGray and the Hudson Defendants will arrogate to themselves almost $3,000,000.00 profit from this one job alone.

110.    During 2014, XA handled the same NBCUniversal Upfront job, at the same venue, with essentially the same work being done.  XA recovered documents show that in 2014,

33

XA charged NBCUniversal roughly $6,000,000.00 for the same work.   On information and belief, the Hudson Defendants diverted the actual amount NBCUniversal was charged to another entity, probably Studio AG.  XA's belief is based on the fact that XA, last year, appears to have had the entire job for the NBC Upfront, as HudsonGray does this year, and, on information and belief, no substantial changes in cost of goods or services occurred during the intervening months.

111.    XA had at least five other major NBCUniversal events that were in final stages of development and had to have been approved by NBCUniversal to have gotten as far along as they were, at the time the Hudson Defendants exited XA for HudsonGray.

112.    Example:  The "DIG TCP Summer Press Tour" job was activated on July 31, 2014 and had a budget of in excess of $500,000.  This project was in development at XA since February, 2014.  On April 1, 2014, Andereck in an email to XA employee non-defendant Jeff Smith stated: "We [XA] have the [DIG] job." On that same day, Jodi Arden from NBC sent an email to Andereck asking: "Is there any way to get a topline [budget] look this week" It's Colleen's [Mohan's] last week and we'd like her to be able to weigh in before she's out." Mohan, whose activation department had already contacted Andereck and Smith about the DIG job at that time, on information and belief, knew that the DIG project was developed by and belonged to XA, yet diverted the deposit monies and final payment for it to HudsonGray.

113.    Example:  The "Satisfaction Screening" job, activated on August 5, 2014, had a budget of in excess of $300,000.  This project was in development at XA since March, 2014.

114.    Example:  The "Characters Unite Initiative" was a job ongoing since 2008, handled exclusively by XA.  The "CB2 Pride Photo Booth Event" was part of the Characters Unite Initiative and was activated at the end of May, 2014.  Although XA serviced this event for

34

six years, it was never paid for any Characters Unite projects after May, 2014. XA has been unable to access documents showing costs because all the physical contracts are missing and XA IT professionals have not yet been able to restore documents regarding this project.

115.    Although XA personnel repeatedly called NBCUniversal to discuss ongoing projects, and emailed them as well, NBCUniversal did not respond to their efforts to communicate. Those efforts started right after the July 4, 2014 weekend and were made continuously through August, 2014.  No one would respond until the new President of XA finally reached Lynn Weiss of NBCUniversal.  Ms. Weiss, however, refused to provide any information but wrote XA stating: "You should actually reach out to Colleen Mohan in the New York office whose team handles marketing and events."

116.    After many failed efforts to reach Ms. Mohan to schedule a meeting, Mohan finally agreed to meet with XA.  On September 4, 2014, in a face to face meeting with Alexis Laken, President of XA and other XA employees, Mohan asked them if they knew where Andereck was presently working after having left XA.   Mohan refused to provide any information about any NBCUniversal upcoming events, but said NBCUniversal had no projects going on at that time.  To the contrary, at that very time, all the jobs mentioned above were activated, approved by NBCUniversal, and in process of being produced by Andereck at HudsonGray, where Mohan sent them.

117.    The Release Agreement Wagner signed on or about April 22, 2014, pursuant to ¶ 8, purported to release claims against Wagner for claims arising *prior* to April 22, 2014 – this Agreement, even if it were not unenforceable for fraud, does not bar claims thereafter.   Wagner engaged in numerous criminal acts both before and after April 22, 2014, as alleged herein and/or

facilitated, directed and/or conspired to have them committed by his co-conspirators none of which criminal acts have been or could be released even if the release were valid.

**The XA Handbook**

118.   On information and belief, as detailed below, all XA employees, including the individual Hudson Defendants were given an XA Employee Handbook (the "Handbook"). They were required to sign a Non-Disclosure Agreement, as indicated at paragraph 3, which requires employees to promptly deliver on termination of employment all memoranda, notes, records, reports and other documents and electronic data (and all copies thereof) relating to the Company or the business of the Company obtained while employed by XA, in their possession or under their control relating to Confidential Information.

119.   Joseph Wagner, CEO, is listed as required to sign the "Employee Non-Disclosure Agreement."

120.   XA's belief that the XA Employee Handbook was used at XA and signed by each of the Individual Hudson Defendants is based on the following.

121.   First, although almost no hard copy records of the Handbook were found in XA's office, one full copy of the Handbook and two Employee Handbook Acknowledgment forms, signed in 2014 by XA employees Aisha Chaudhry and Nikki Ellis, were (apparently) accidentally left behind at the bottom of a box located in a closet.  The Handbook, at the back, includes the Handbook Acknowledgment Form, by which receipt of XA's employee handbook is to be memorialized and the promise to comply with its provisions, executed.

122.   Second, the Hudson Defendants left behind, in a different box, one complete employee event production binder belonging to one XA employee Gina Stephani.  All pertinent information was intact under each of the tabs identifying the documents under them -- except for

36

one -- the employee handbook, the only missing document.  On information and belief, it was taken out of the binder to hide its contents, but the tab under which it was placed was still in the binder.

123.    Third, CMG management discovered binders filled with hundreds of confidentiality and non-disclosure agreements dating back to 2003 between XA and vendors, temporary employees, venue management companies and independent contractors, making clear that the Individual Hudson Defendants were concerned with confidentiality and non-disclosure issues.  Numerous confidentiality agreements between XA and vendors, e.g., Empire Chauffeured Transportation, Hall's Party Rentals, The Chicago Mass Choir, Arlen Music Consultants, Ford Models, and Live Nation demonstrate the Individual Hudson Defendants placed a premium on the protection of XA's proprietary information.

124.    Fourth, Wilson personally told new XA President Alexis Laken it was XA's policy to "make sure all new employees sign an employee handbook" and she made similar statements, as well, to other CMG personnel.

125.    Fifth, in an undated email to new employees by XA producer, Kate Stevens, she wrote "Also, please turn in your signed Non-Disclosure form by end of day."  On information and belief, XA's practice of having all temporary workers, vendors and property management companies sign non-disclosure/non-compete agreements spanned over a decade.  XA's belief is based, first, on its finding hundreds of identical, signed non-disclosure forms dating back to 2003, but none for the Individual Hudson Defendants, and an extensive non-disclosure draft form, for Wagner, with his hand-written comment – "ADMIN" – the form provides for confidentiality not only for XA, but, specifically, two other business entities, Fiori XA and XA Scenes, along with an express, jurisdictional consent for either Chicago, Ill. or New York City.

On information and belief, this form was signed by Wagner, but stolen, along with the rest of the agreements.

126.     XA's COO, Wilson, was the signatory on its Welcome page and knew the importance of each employee's compliance with its policies governing employee conduct.

127.     Accordingly, as COO, Wilson's responsibilities included assuring that XA's employees complied with Handbook policies, and especially its conduct rules.

128.     Handbook § 701 included XA's Code of Conduct and Work Rules. It set forth examples of unacceptable workplace behavior – all of the following were breached by the Individual Hudson Defendants herein:

  a.     Having a conflict of interest;

  b.     Engaging in unethical or illegal conduct;

  c.     Theft or inappropriate removal or possession of property;

  d.     Conduct that reflects adversely upon XA or employee;

  e.     Unauthorized use of telephones, mail system, or employer-owned equipment;

  f.     Unauthorized disclosure of business "secrets" or confidential, proprietary information;

129.     Wilson, Andereck and other former XA employees, although aware of XA's policy requiring that employees observe principles of fair dealing and to conduct themselves ethically, including the "scrupulous regard for the highest standards of conduct and personal integrity," *See* Handbook § 104 Business Ethics and Conduct, nevertheless violated each and all of the above rules as the facts alleged above and below indicate.

130.    XA had a policy prohibiting the conduct of business if it involved an actual or potential conflict of interest. *See* Handbook §108 Conflicts of Interest. Employees, moreover, were specifically cautioned that "business dealings with outside firms should not result in unusual gains for those firms.  On information and belief, each of the Hudson Defendants breached this provision of the Handbook.

131.    XA's policies mandated that employees having "influence" on transactions, purchases, and contracts, disclose the existence of any act or potential conflict of interest.  No such conflicts were ever reported even though Studio AG was competing with XA and the Hudson Defendants were preparing Hudson to compete with XA while they were still employees.

132.    The individual Hudson Defendants, all of whom were formerly XA's officers/employees, knew of XA's non-disclosure policy to protect its confidential business information and trade secrets. *See* Handbook §112, Non-Disclosure.  The Handbook includes examples: customer lists and preferences, financial information, marketing strategies, new materials research, pending projects and proposals, and proprietary production processes – and XA employees were required to sign a non-disclosure agreement, as a condition of employment.

133.    XA also had a policy requiring employees to return Company property upon termination of employment, and allows XA to take all appropriate action to recover or protect its property. *See* §706, Return of Property.  The Hudson Defendants violated this provision.

134.    The Hudson Defendants violated XA's policies regarding computer and email use, *see* Handbook §516, Computer and Email Usage, which states the firm's system and software was "not to be used to solicit others for commercial ventures…. outside organizations,

or other non-business matters."  XA employees were reminded of the firm's software licensing agreements which prohibited illegal duplication.

135.    XA's computer and email policies warned employees they could be held personally liable for violations and that the following conduct was prohibited, including using organization time and resources for personal gain, sending or posting confidential material, trade secrets or proprietary information outside of the organization, and engaging in unauthorized transactions that may incur a cost to the organization. The Hudson defendants did each of these.

136.    XA's former COO Wilson knew the importance of accurate timekeeping records and Handbook §401, Timekeeping, advised employees of their responsibility to keep accurate records under Federal and State law.  Instead, on information and belief, the Hudson Defendants extensively falsified records and destroyed or stole other records, as alleged above and below.

137.    The Hudson Defendants violated XA's Handbook, HR policies and caused to be violated federal and state law regarding pay and benefits reporting as many nominally XA employees were caused to perform services for Fiori XA, XA Scenes (which was being caused to divert business to Studio AG), Studio AG and HudsonGray, all while on XA's payroll.

138.    Handbook § 112, required each of the Stolen Employees to sign a non-disclosure agreement and each did so agreeing to protect XA's "confidential business information and trade secrets." Pursuant to Handbook 112, titled "Non-Disclosure":

> The protection of confidential business information and trade secrets is vital to the interests and the success of XA, The Experiential Agency, Inc. Such confidential information includes, but is not limited to, the following examples: customer lists, customer preferences, financial information, labor relations strategies, marketing strategies, new materials research, pending projects and proposals, proprietary production processes, research and development strategies, technological data, and technological prototypes.

139.    On information and belief, as alleged above, the individual Hudson Defendants stole the employee handbook receipt forms in an attempt to insulate themselves from liability.

**CMG's and XA's Discovery of the Hudson Defendants' Misconduct**

140.    Immediately after departure from XA, each employee's computer at XA's New York office was examined and each was found to have had all emails deleted.

141.    Confidential records of XA's business and contracts were missing.  Upon information and belief, each of these employees intentionally destroyed documents, engaged in extensive efforts to erase computer and other electronic files, and/or stole such documents as they could access before leaving XA, to hide what they had done and to avoid liability for same. XA's belief is based on its review of emails between the Hudson Defendants discussing when to erase their hard drives and for the reasons further stated above.

142.    Example:  On May 21, 2014, Lomma emailed Wilson and asked for former XA employee Michael Day's log on information so she could follow up "anything important."

143.    Example:  On June 4, 2014, Lomma emailed Wilson and asked her to change the computer passwords for former XA employees, Chelsea Tracy and Shetal Amin, stating they had moved to Hudson.  Lomma personally quit less than two weeks later.

144.    The Hudson Defendants' efforts to conceal their misconduct were extensive, but their personal (recovered) emails and text messages show their extensive efforts to coordinate the theft and destruction of XA property. Their own words show they thought what they erased, stole, secreted or destroyed could not be discovered by XA.

145.    XA also learned that the Hudson Defendants contacted XA clients both before leaving XA, when they had fiduciary and contractual duties to XA, and for a certain period of

time, after resigning.  The damages they caused resulted in XA being forced to file a form of reorganization in Illinois, referred to as an "assignment for the benefit of creditors."

146.    Example:  As alleged, the Hudson Defendants diverted at least six ongoing NBCUniversal projects.  XA's bank records establish that, with the exception of jobs very far along in the process, XA received no income from any NBCUniversal jobs after January, 2014. On information and belief, payments from NBCUniversal jobs were diverted to HudsonGray or monies due were delayed and funneled to the Hudson Defendants. The timing as to when HudsonGray became operational was no coincidence.

147.    Hudson wrongfully acquired needed funds to operate and it became operational almost overnight.  On information and belief, the Hudson Defendants arranged, together with NBCUniversal, to receive 50% deposits on some or all of the NBCUniversal jobs for which XA failed to receive deposits, as alleged above.

148.    Recovered emails indicate one NBCUniversal job, the CB2 job, for example, was activated May 31, 2014, less than one week after almost all of the Hudson employees quit and went to HudsonGray.  XA should have received the NBCUniversal deposit for that job at least three months earlier but records indicate no deposit received by XA.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**(Violations of 18 U.S.C. § 1962(c))**
**(Against All RICO Defendants)**

149.    XA repeats and realleges the above paragraphs as if fully set forth herein.

150.    18 U.S.C. § 1962(c) provides, in pertinent part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity..."

151.    RICO Defendants Wagner, Andereck, Wilson, Lomma, Pizzo, Day, and Gudin are natural persons and, as such, each is a "person" within the meaning of 18 U.S.C. § 1961(3) (the "RICO Individual Defendants").

152.    Defendants HudsonGray, Studio AG, and Mixed Company, Inc., are business entities and, as such, each a "person" within the meaning 18 U.S.C. § 1961(3).

153.    HudsonGray, Studio AG, and Mixed Company, Inc. are collectively referred to as the "RICO Entity Defendants."

154.    The above RICO Individual Defendants and RICO Entity Defendants are collectively referred to as the "RICO Defendants."

155.    The RICO Defendants engaged in activities affecting interstate or foreign commerce.  Among other things, XA (New York) engaged in extensive email and telephone communication with XA's Chicago office, on essentially a daily basis.  Andereck, Gudin, Lomma, and Day were located in New York and Wagner, Wilson and Pizzo were located in Chicago and, on information, all travelled between the two offices and spent substantial time and did business in New York.  Their communications were extensive, as Exhibit A indicates. Studio AG, in Chicago, did extensive business in New York, including nominally working (but actually stealing) XA's NBCUniversal work.

156.    The Hudson Defendants, along with Pizzo and Studio AG, carried out a multi-year, fraudulent scheme by which they stole monies, customers and property from XA. They diverted, first to Studio AG, and later to HudsonGray, XA clients and business, along with physical property, also stolen (the "Diversions") and engaged in extensive efforts to conceal their misconduct by engaging in the Concealment Scheme.

43

157.    The RICO Schemes were effected by a long-standing pattern of RICO predicate misconduct (Exhibit A, particularizing wire and mail fraud allegations), non-RICO criminal misconducts (Exhibit B, ranging from grand larceny to theft), all of which, foreseeably and directly, caused injury to XA's business and property within the meaning of RICO statute, and numerous common law breaches, as alleged below which, as well, directly injured XA.

158.    The Diversions were concocted, implemented and concealed by the RICO Defendants, as alleged above and below.

**The RICO Defendants' Predicate Acts**

159.    The Diversions/thefts of business, customers and property that injured XA were effected through Defendants' pattern of mail and wire fraud crimes, by the RICO Defendants.

160.    Each of the emails/mailings set forth in Exhibit A is an instance of racketeering activity within the meaning of 18 U.S.C. § 1961(1) because each such act was indictable under 18 U.S.C. § 1341 (mail fraud).

161.    Each email, text and/or referenced telephone call sent by wire in furtherance of the RICO Diversions and the RICO schemes to defraud XA was integral to achieving the object of the RICO Schemes in that these frauds were used to obtain money and/or property from XA, in violation of law, and each is racketeering activity within the meaning of the RICO statute.

162.    Each RICO Defendant committed wire fraud by participating in the fraudulent schemes which were furthered by the use of interstate transmission facilities.

163.    The crimes particularized in Exhibit A form a pattern of criminal acts lasting from late 2009 through at least mid-2014.  XA's allegations of predicate crimes are established largely by the RICO Defendants' own words, in their own emails and text messages, and in their own spreadsheets and fake bills, that they failed to irretrievably erase from XA's server, which was

44

restored with great effort, and from Gudin's iPhone, the only one the Individual Hudson Defendants left behind, but failed to erase.

164.    They are, in addition, established, by HudsonGray's own website photos which include photos of XA high-end furniture, stolen from XA's office (the invoices for same were recovered from XA's server).  This stolen furniture now adorns Hudson's office, a fact inadvertently documented on their own website.

**The Three Criminal Enterprises, Enterprise Distinctness and Continuity**

165.    The RICO Defendants operated and managed the affairs of three criminal "enterprises," with different but largely overlapping members.

166.    The first criminal enterprise was and is Studio AG, a business entity enterprise (the "Studio AG Enterprise), the activity of which was controlled largely but not exclusively by its owners Andereck, Wilson, and Wagner.  Studio AG was and is a criminal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4).

167.    The second criminal enterprise was and is HudsonGray (the "HudsonGray Enterprise," controlled largely but not exclusively by its owners, Andereck, Wilson, and Wagner (the "HudsonGray Enterprise").  Hudson was and is a criminal "enterprise" within the meaning of 18 U.S.C. § 1961(4) through which Andereck, Wilson, and Wagner by and through that entity continued the pattern of predicate crimes which they had begun at Studio AG, adding new predicate crimes, as indicated herein and in Exhibit A.

168.    The third criminal enterprise was an association in fact enterprise within the meaning of 18 U.S.C. § 1962(b), comprised of Studio AG, HudsonGray, Andereck, Wagner, Wilson, Lomma, Day, Pizzo, Gudin and Mixed Company (the "Association Enterprise).  The

45

Association Enterprise was operated and managed by each of its members in all the ways detailed below in separate allegations regarding the operation/management of enterprise activity.

169.    The Studio AG enterprise has existed from December, 2009 to the present time. On information and belief, each was engaged in siphoning business, under the direction of its secret owners, Wilson, Andereck and Wagner, in the ways alleged above, including through their control of XA Scenes, through which they diverted XA business to Studio AG.  Each of these defendants controlled the activity of each enterprise, i.e., diversion of XA business, as further explained in allegations showing why each of these defendants satisfies the operation and management test of RICO liability.

170.    HudsonGray, created in 2014, provided a vehicle to continue the Diversions that had been ongoing at Studio AG, through the Studio AG enterprise

171.    The association in fact enterprise lasted from at least December, 2009, when Studio AG was created, to the summer or fall of 2014, during which time enterprise activity was controlled essentially by the same people, all with the aim and objective of effecting the continued diversions of business and property to the Entity RICO Defendants and, derivatively, the individual RICO defendants, which owned them.

172.    RICO Defendants Wilson, Wagner and Andereck, acted as a continuing unit for the common purpose of obtaining business and property for themselves and stood at the top of hierarchy of XA employees, who they directed to engage in acts which furthered their own schemes to divert business to their controlled enterprise, Studio AG.

173.    The Individual Hudson Defendants' common interest in Studio AG and HudsonGray is manifest not only in their ownership of same but when they acted to form these

business entities, specifically, times when they all still owed fiduciary duties to their employer, XA, and, thus, were not permitted to steal its business or resources for their own, personal gain.

174.     An employee who conducts the affairs of a business entity through illegal acts is separate from that entity within the meaning of RICO's distinctness requirement.

175.     Each of the RICO Defendants is a separate and distinct "person" within the meaning of RICO. Sufficient distinctness exists as between the entities Studio AG, HudsonGray and Mixed Company, and the natural persons owning and controlling their activity, to satisfy RICO enterprise-person distinctness, because they are all separate, distinct legal entities.

176.     Each RICO Defendant was and is separate and distinct from the predicate crimes of mail fraud and wire fraud in which they engaged, because, on information and belief, each had or has legitimate functions and activities, apart from their criminal activities chronicled in Exhibit A.

**How Each of the RICO Defendants Operated and Managed Enterprise Activity**

177.     Each criminal enterprise was operated for the common purpose of diverting monies, property and clients away from XA, and concealing what was occurring, so clients which would have, in the ordinary course, continued to use XA, for a reasonable period of time going forward, would, instead, become a source of revenue for the RICO Defendants. Each of the RICO Defendants satisfies the operation and management test, each controlling a substantial part of the activity of the Enterprises, as follows.

178.     Andereck managed and operated the Enterprises in at least the following ways, as alleged above and as set forth in further detail in Exhibit A:

(a)      Causing XA to purchase goods and materials for the benefit of private competing companies he secretly controlled with Wilson and Wagner, including, but not limited to, Studio AG and HudsonGray and, as well, XA Scenes;

(b)      Using XA employees to market and promote competing companies, XA Scenes, Studio AG and HudsonGray, through direct customer relations work, electronic communications and print marketing;

(c)      Directing XA employees to steal XA's corporate property including property necessary for the operation of its business;

(d)      Soliciting XA employees and clients to work with HudsonGray, while they were affiliated with and/or employed by XA;

(e)      Creating fraudulent American Express credit card statements on Excel spreadsheets (with the American Express logo fraudulently superimposed on top) to disguise actual purchases and fraudulently give the appearance that expenses on these spreadsheets were billings from a single account, when, in fact, they reflected purchases from a number of different credit cards, including American Express and Visa accounts, each and all of which Andereck controlled;

(f)      Directing defendants Lomma and Day to participate in the fraudulent American Express scheme by creating their own fraudulent American Express statements--  for example, in an email dated 03/01/10, recovered from XA's server, Lomma asks Andereck, "Do you usually pay Manhattan Neon (a fabricator) through Fiori XA?  That's the way the invoice came to me…so let me know if I need to revise." Andereck used his Fiori XA American Express card through 2014, incorporating charges from his Fiori XA Amex with those from his personal

Amex and Visa accounts, on the fraudulent American Express spreadsheets he submitted to XA for re-imbursement.

(g)       Engaging in fraud through the purchase of lighting, furniture, drapery, flooring, cabinets, rugs and other expensive decor items for use and sale to Studio AG decorating clients which had no affiliation with XA, subsidizing his own competing enterprise;

(h)       Allowing employees Lomma and Day to purchase furnishings, electronic equipment and clothing from high end retailers for Studio AG decorating clients (and their own personal use) from merchants including, but not limited to, Brooks Brothers, Nordstrom, Best Buy, The Container Store, The Brickell Collection, The Tie Bar, East Elm, All Modern, Zara, Crate and Barrel, Restoration Hardware and other retailers selling goods and services, unrelated to the operation of XA;

(i)       Directing XA's COO Wilson to pay for legal services associated with defendant Gudin's fraudulent immigration application, while he was actively stealing property and files from XA during the first five months of 2014;

(j)       Directing XA employees to stay away from XA's own offices when representatives of CMG, including XA's new Chairman, Ron Burkhardt, came to XA's office to try to conceal the planned theft of XA's property and business; such efforts at concealment where organized and carried out by email and text message;

(k)       Fraudulently re-purposing dormant XA subsidiary, XA Scenes, as a marketing vehicle for defrauding XA via the Gallery 1028/Studio AG partnership, as alleged above;

(l)        Fraudulently "closing"  XA subsidiary Fiori XA to divert Fiori's business to Studio AG, operated by Wilson, Wagner and Andereck to directly compete with and steal XA's business;

(m)        Using Studio AG to vend fictitious goods and services to XA that Studio AG could never provide, were never delivered, and/or were double billed to mimic XA's own purchase orders as a method by which he and co- conspirators Wilson and Wagner could siphon XA's profits into their own enterprise;

(n)        Directing XA employees and executives to forge AG bills in an effort to make it appear Studio AG bills were XA bills, so XA could subsidize Studio AG's financial burdens, draining XA's financial resources.

179.    Wagner managed and operated the Enterprises by *inter alia*:

(a)        Purchasing and/or causing others to purchase goods and materials for the benefit of private competing enterprises he secretly controlled with Wilson and Andereck, including but not limited to, XA Scenes, Studio AG and HudsonGray, all using XA monies;

(b)        Using XA employees to market and promote his own secretly owned and controlled competing companies, including Studio AG and HudsonGray, through direct customer relations work, electronic communications and print marketing;

(c)        Coordinating the Diversions including, on information and belief, engaging in and/or directing others to engage in at least the following acts during the relevant time period, (i) secretly creating HudsonGray in March, 2014,  six weeks before resigning as XA's CEO and signing a  settlement agreement with XA, to facilitate the theft of approximately $1.5 million dollars of XA contract work from NBCUniversal and other longtime XA clients and (ii) fraudulently representing to CMG board members that he was unable to draw a full salary for

his services as CEO of XA for many years because of XA's lack of profitability -- but secreting the fact that the purported "lack of profitability" was orchestrated by himself and Andereck and Wilson caused by their transfer of monies among their secretly owned companies;

(d)      Receiving $210,0000 from CMG by virtue of a settlement agreement at the time of his resignation on April 30, 2014 predicated on fraudulent representations and omitted material information;

(e)      Erasing all his XA computer files and stealing hard copy files from XA's Chicago office, without CMG's or XA's consent, and directing XA employees leaving for Hudson to do the same, many of which erased computer files have not been fully recovered;

(f)      Stealing or directing the theft of hard copy files including, e.g., files containing those American Express bills expensed to XA in 2014 and all contracts and bills related to XA's past and ongoing business.

180.      Defendant Wilson managed and operated the Enterprises in at least the following ways, as alleged above and as set forth in Exhibit A:

(a)      Causing XA to purchase goods and materials for the benefit of private competing enterprises she secretly controlled with Wagner and Andereck, including but not limited to, XA Scenes, Studio AG and HudsonGray and defendant Mixed Company, a private enterprise she controlled (with an non-defendant partner);

(b)      Using XA employees to market and promote competing enterprises; XA Scenes, Studio AG and HudsonGray through direct customer relations work, electronic communications and print marketing;

(c)      Coordinating the Diversions including, on information and belief, engaging in at least the following misconduct during the relevant time period, reimbursing

Andereck's American Express bills, based on a screen shot of the statement total, without ever seeing the original bill (and months later accepting) fraudulent "coded" American Express credit card statements on Excel spread-sheets from Andereck, Lomma and Day. On information and belief, these were used to create the appearance that the expenses reflected on them came from a singular account, when, in fact, they reflected purchases from a number of different credit card accounts, including American Express and Visa accounts, all controlled by Andereck, and presenting these fraudulent statements to XA auditors. When asked by auditors for the original bills, Wilson responded - "Not available. Darren's (Andereck) personal cc (credit card)," to conceal that the actual purchases were in furtherance of the Diversions, as alleged above.

(d)     Misleading XA owners about Wagner's relationship with XA employees in the New York Office by, *inter alia*, stating he had no relationship with them, in any capacity, after he had already used them to steal work for XA's newly created competitor, HudsonGray;

(e)     Advising CMG and new XA directors, Jeff Devlin and Ron Burkhardt, that XA had ample funds to pay a $300,000 plus contract settlement to Wagner when it did not, and, by so doing, undermined XA's ability to operate;

(f)     Shielding co-conspirator Andereck from direct contact with new CMG directors, writing, for example, on February 22, 2014, "If you are coming through Chicago this week, I would suggest you stay clear of our office on Tuesday and Wednesday. Ron (Burkhardt) and Jeff will be there. I can meet you at the notary whatever you need. Just let me know. We should catch up at some point. Good developments on other fronts to share";

(g)     Secretly sending XA employees she knew were about to quit new iPhones in March, 2014 and sending employees of the company she owned with Andereck and Wagner - XA competitor and vendor Studio AG, new iPhones that were paid for by XA, which, on

information and belief, are still being used by executives and employees at HudsonGray and Studio AG;

(h)      Conspiring with Andereck and other Hudson defendants working for XA to transfer the contents of storage lockers located at 333 Hudson (XA's New York Office) and other locations, to new storage lockers assigned to HudsonGray and billing XA for the cost of moving the stolen material and records to HudsonGray's  offices and/or storage facilities;

(i)      Concealing the existence and whereabouts of XA's lockers and their contents from XA owners and new XA employees – which lockers were actually located all over the country and which contain or contained XA records and material;

(j)      Paying defendant Gudin's immigration lawyer and other "invoices" associated with Gudin with XA funds, knowing Gudin was working for Studio AG, an enterprise in direct competition with XA, that she jointly owned with Andereck and Wagner and aware, on information and belief, that Gudin would be, along with the other defendants, imminently engaged in the theft of XA property;

(k)      Purchasing new laptops in January, 2014 with XA funds, for use by HudsonGray and its associates;

(l)      Fraudulently billing $183,705.00 to XA from 2013-2104 through defendant Mixed Company, Inc., a florist in Elmhurst that she secretly owned, on information and belief, for goods and services it could never provide, and never did provide, given the size of its operations;

(m)      On information and belief, directing, on June 11, 2014 that Pedro Faria of Farpin Solutions wipe the computers in XA's NY office of all documents, after she, Wilson herself, posing as Ron Burkhardt (XA's Chairman), erased all company records from XA's

server in Chicago without Burkhardt's consent or knowledge, or that of CMG or XA. XA's belief is based on restored emails it has reviewed and the statements of Pedro Faria, XA's IT professional, who succeeded in recovering some of the erased emails and text messages from XA's server.

181.   Defendant Lomma managed and operated the Enterprises by, *inter alia*:

(a)   Converting XA resources for the benefit of Studio AG though fraudulent billing practices;

(b)   Directing the theft of XA's  physical and intellectual property through the deletion of XA computer files;

(c)   Directing the theft of XA property from XA storage lockers;

(d)   Illegally transferring assets from XA storage facilities to storage facilities controlled by HudsonGray while employed at XA;

(e)   Coordinating the Diversions including, on information and belief, engaging in at least the following during the relevant time period: (i)  in April, 2014, directing XA employee, Chelsea Tracy, to transfer property belonging to XA from a collection of storage units around the country to new HudsonGray facilities – Lomma directed that XA funds be used to pay the movers, causing XA to pay for the theft of its own property; (ii) on April 23, 2014, suggesting to Andereck via email that a "donation" should be made to "Eric" from SFD (a fabricator who worked for XA ) "so we can keep him on our side." Andereck approved a "donation of 1k" – Lomma then caused the "donation" to be expensed to XA, using her fraudulent XA American Express spreadsheet.

(f)     On May 21, 2014, one day after Day's resignation, Lomma was asking for Day's login information and was colluding with Wilson about how much longer to keep former XA employee email accounts open;

(g)     On June 4, 2014, directing Wilson to: "Have Chelsea and Shetal's inboxes changed." Chelsea Tray and Shetil Amin were XA  employees who had moved to HudsonGray;

(h)     In May, 2014, just before her resignation, charging expensive items on her XA American Express account including, but not limited to, furniture from the Brickell Collection for $3,050.00 and charges of nearly $1,000.00 at The Container Store. These thefts were of merchandise having no operational value to XA that she caused XA to pay for;

(i)     Along with Andereck and Day, fraudulently creating elaborate spreadsheets, meant to mimic actual American Express bills, and using these "coded" spreadsheets to disguise the fraudulent use of XA assets, as evinced in an August 2013 email where Loma discusses with Andereck where to place a charge from Jamali Flowers for Mohan's birthday. Writing "I wasn't sure how to code this – was it donated from XA…." (ie: billed on the XA Amex spreadsheet) …" or being billed to a project?" (e.g., billed by Studio AG to XA). The Jamali bill in question was "donated" by XA to Mohan's 2013 birthday party by Andereck expensing it on his June 2013 AMEX spreadsheet.

182.    Defendant Pizzo managed and operated the Enterprises by controlling Studio AG as its General Manager. Studio AG was secretly created to replace XA subsidiary Fiori XA Inc., and steal XA business. As General Manager of Studio AG, Pizzo engaged in the following acts establishing operation and management of enterprise activity:

(a)      Orchestrating the diversion of millions of dollars from XA to Studio AG by directing that XA pay Studio AG for goods and services that XA had already purchased from other sources (double billing);

(b)      Creating or directing the creation of fictitious bills for goods and services that Studio AG never provided, including furniture, duratrans (large display illuminators), and fabricated display items, such as custom made aluminum frame structures and staging.

(c)      Employing Studio AG staff and sales personnel to knowingly solicit, steal and execute event jobs that she knew were XA jobs, including, e.g., numerous of NBC's Bravo Events,  NBC's Oxygen Channel party, numerous USA Network MOTH events, USA Network's Suits and Style Pop Up Shop activation [pictured on Studio AG's own website] and hundreds of high-end weddings and charity events;

(d)      Using XA employees to do Studio AG work, including creating Studio AG's website, which she knew would be used to compete with XA;

(e)      Manipulating bank documents to conceal what AG was doing from XA owners and directing Wilson, on numerous occasions, to pay Studio AG bills, using XA funds;

(f)      Concealing the real ownership of Studio AG by allowing its owners to list her as Studio AG's "principal";

(g)      Helping Studio AG's real owners siphon XA funds into Studio AG.  For example, by email dated 04/28/10 titled "other $ needs," Pizzo directed Wilson to pay a Studio AG invoice associated with an event for Bravo (an NBC event stolen from XA), using XA funds to which Wilson responded: " I will work on your need, but with the Amex payment that needs to go out on Darren's (Andereck) card by 5/3 I have to balance carefully" – to which Pizzo responded: "I've been trying to get Darren paid for the (Fiori XA) van $4K. Also need to clear a

little bit more of the old Roy Houff [bill] that I have neglected. And then there is that nagging

Manhattan Neon still lurking. In reality a total of 30k or 40k would be a lot better than the $20k.

Sorry! Let me know what you can do so I can plan and promise." This is Pizzo asking Wilson to

pay bills associated in part with an NBC Bravo job that Studio AG stole from XA, using funds,

also stolen from XA, in part through the sale of a van XA owned, which they were also stealing,

and monetizing, with Wilson's participation.

      (h)     Pizzo organized the fraudulent transfer of invoices between Studio AG

and XA – for example, Wilson on 11/16/10 transferred Manhattan Neon invoices for which

Studio AG was responsible to XA and, then, Wilson, at Pizzo's direction, paid this AG bill with

XA funds.

      (i)     Pizzo organized the creation and submission of numerous fictitious bills to

XA, over a six year period for work (fabricating) and material (furniture and duratrans from

Manhattan Neon) that other vendors provided – Studio AG was not in the business of fabricating,

selling furniture or making duratran sales;

      (j)     Pizzo orchestrated bogus Studio AG charges to XA for work it never

could have done, e.g., breaking down equipment at the Javits Center, when, on information and

belief, the Javits Center handles all such breaking down through union labor.

      (k)     On information and belief, Pizzo fraudulently billed XA more than

$550,000.00 in the first five months of 2014, while she, along with Wilson, Wagner, Andereck

Day and Lomma, created and organized HudsonGray, diverting profits from XA's 2014 NBC

Upfront event by depositing such profits into Studio AG accounts, leaving XA with nothing.

XA's belief that this occurred is based a comparison of several Studio AG bills left behind in

XA's office (which showed services and goods that Studio AG claimed to have supplied to XA

for the 2014 NBC Upfront) and XA's own internal six page itemized 2014 Upfront budget, created by Wilson, Andereck, Wagner, Gudin and Lomma, which does not list Studio AG as a vender, in any category of service.

183.    Defendant Day managed and operated the Enterprises by, *inter alia*:

(a)    Re-directing NBC contract work to HudsonGray, and purposefully delaying the contractual execution of already developed and approved NBCUniversal XA projects he personally worked on with NBC staff,  until after his resignation from XA, to join HudsonGray.  By doing so he diverted monies from other NBCUniversal jobs in development at XA since February 2014, to HudsonGray, as well as XA NBCUniversal jobs about to be activated from which he prevented XA from receiving deposit monies from NBC, thereby helping to orchestrate the diversion of same to HudsonGray, along with Andereck;

(b)    Fraudulently charging tens of thousands of dollars to XA, in 2014 alone, for items intended for personal use including, but not limited to, charges from Nordstrom, Brooks Brothers, The Tie Bar, Seating Solutions, Best Buy, Banana Republic, Uniqlo and West Elm, as recorded or "coded" on his fraudulent American Express spreadsheet which indicates such charges were paid for by XA and never reimbursed.  In addition and for example, Day picked up a Samsung flat screen TV at Best Buy purchased with XA's credit card – and left the box in XA's office, after becoming a HudsonGray employee – the box had no TV in it and there was no TV in XA's office;

(c)    Helping to steal at least $32,000.00 in light boxes (duratrans) with Gudin at Andereck's direction -- as a then HudsonGray employee, Day accompanied Gudin to XA's storage locker and stole four additional duratrans on June 3, 2014, transferring them to HudsonGray's own storage locker.

58

(d)      Erasing and orchestrating the erasure, through acts of others, of XA computer files and the theft of hard copy folders and budgets for XA NBC jobs in progress, including the Pride Phone Booth event activated on 05/31/14 and 06/26/14, shortly after his resignation and move to HudsonGray, notwithstanding this was an XA event and part of a six year ongoing project XA created for NBC called "Characters Unite." Day discussed plans for the 2015 iteration of this continuing project with NBC executive Loren Hynes on May 19, one day before his resignation, and Hynes sent Andereck and Day, via email, NBC generated concepts for the 2015 Characters Unite activation in a "final brief" on May 22, 2014. All the Characters Unite plans set forth in the NBC brief are now being executed by HudsonGray;

(e)      Intentionally delaying the signing of contracts on jobs developed and approved while he worked at XA so he could divert them to HudsonGray.  For example, on June 2, 2014, in a text message to Gudin, Day asked: "What is the new (Hudson) office number?...Don't you know what number it is on the door?"  Gudin responds, "No. First door to the right down the hallway from the front elevator." Day responded: "Need it for a contract not directions but will ask Darren (Andereck)"  Here, Day is diverting an XA contract to HudsonGray less than two weeks after leaving XA for Hudson, which did not, at that time, even have an operational office.

**The RICO Defendants' Pattern of Criminal Conduct**

184.    The RICO predicate misconduct and diversions of payments and business to Studio AG were made continuously between 2009 and the summer or fall of 2014, establishing pattern continuity, a period generally in excess of two years of predicate crimes.  No statement by any of the RICO Defendants, nor any document ever provided to XA or CMG, disclosed that

the real purpose and business of Studio AG was the diversion of business from XA and its

owners, to Studio AG's owners, Wilson, Wagner and Andereck.

185.    The discovery of the RICO Defendants' criminal misconduct did not occur until

CMG entered into XA's offices and immediately identified the thefts and destruction of files and

the unauthorized removal of furniture and light fixtures.

186.    The extent of damage the RICO Defendants caused was discovered, shortly

thereafter, when XA succeeded in having its server partly restored by IT professionals. This

coincided with XA's discovery of Gudin's cell phone which, unlike the rest of the phones the

RICO Defendants left behind, had not been erased.

187.    There were no storm-warnings of any fraud or any reason to suspect any sort of

criminal misconduct was ongoing, prior to the summer of 2014.

188.    None of the Exhibit A predicate crimes were isolated events; all were

"continuous" within the meaning of RICO's pattern element and part of the scheme to defraud

XA.

189.    The RICO Defendants' criminal acts were "related" within the meaning of

RICO's pattern element in that the same predicate crimes were used to implement the subject

schemes (mail and wire fraud), for the same purpose (to improperly seize XA business for

themselves in breach of criminal and common law obligations), causing the same result

(deprivation of XA of its customers and business projects that should have been a source of

revenue to XA), as well as the loss of ongoing business projects.

190.    The perpetrators controlling the activity of each of the Enterprises were the same,

Wilson, Andereck, and Wagner, controlling Studio AG and HudsonGray, as well as non-

defendant XA Scenes, along with defendants Lomma, Day and Gudin, each implementing,

facilitating and/or concealing the schemes and damage being done, as detailed in allegations regarding the operation and management of enterprise activity.

191.    The victim was the same, XA (and derivatively its corporate owner and public shareholders).

192.    The instances of misconduct were not isolated events.  Specifically, the methodology by which the Diversions and concealments were accomplished was the same, e.g., fraudulent billing, creation and sending of fraudulent invoices and bills, coordinated thefts of XA physical property and concealment of the above by, *inter alia*, theft of hard copy files, the attempted permanent erasure of XA's server, the coordinated use of temporary telephone communications to avoid detection, and subsequent erasure of all temporary phones that Wilson purchased, using XA funds (other than Gudin's phone), and the purposeful theft/elimination of employee handbooks, including from an employee binder the Hudson Individual Defendants left behind at the bottom of one box, in a storage closet, as well as, on information and belief, as alleged above, signed employment agreements all containing, as does Wagner's, the same anti-solicitation and competition provisions.

193.    Each predicate act was intended to and did have the same result, i.e., XA was wrongfully deprived of revenue which was diverted to Studio AG or other controlled entities from the inception of the acquisition of XA by CMG and the RICO individual defendants creation of Studio AG, in 2009, to the  summer of 2014, when  HudsonGray was established.

194.    Each predicate act involved the same perpetrators, six individuals and three business entity RICO Defendants, all actively engaged in the same types of predicate crimes, Exhibit A (mail and wire fraud), as well as other non-RICO crimes, larceny and theft, and all

their coordinated efforts, as alleged above, to conceal the RICO Schemes through other and further crimes and acts of fraudulent concealment.

195.     Vertical relatedness is satisfied because each of the predicate acts was related to the enterprise and its activity, i.e., stealing business from XA, through companies the individual RICO Defendants secretly controlled, including XA Scenes, to divert business, customers and projects to Studio AG, since 2009, and, thereafter, beginning in or about the summer of 2014, to HudsonGray, as well as Studio AG.

196.     The RICO defendants were able to commit the predicate crimes solely by virtue of their senior positions within XA, which enabled them to direct business where they chose and, as well, through their control of enterprise activity, as detailed in the operation and management allegations above (and as amplified in Exhibit A). Both were crucial to the racketeering which was the pattern of activity of each enterprise.  The predicate crimes furthered, implemented and/or concealed enterprise affairs - and it was solely the RICO Defendants which benefitted.

197.     Horizontal relatedness is satisfied because each predicate crime was related to the other predicate crimes in that each and all of these crimes had the same object, i.e., implementing enterprise activity and schemes, including the theft of XA monies, projects and customers, concealing not only their RICO-violating fraudulent conduct, but their non-RICO thefts and larceny of XA's physical resources and, as well, implementing and concealing all their breaches of common law fiduciary duties as XA employees and officers.

**But-for Causation, Proximate Causation and Direct Injury**

198.     The RICO Defendants' criminal and tortious misconduct was the but-for cause of XA's injuries, as detailed above and below.

199.    The RICO Defendants' criminal and tortious misconduct was the foreseeable, direct and proximate cause of injury to XA, in the form of stolen revenue, business projects, clients and physical property of XA, within the meaning of the RICO statute.

**Criminal Scienter**

200.    Each defendant acted with actual criminal scienter, as evidenced by the emails, texts and mailings quoted in the above allegations, which cannot be plausibly construed as anything other than documentation of an intentional and highly coordinated plan to engage in the thefts alleged herein.

**Damages**

201.    XA has suffered injury to its business and property as a result of the theft of its customers (specific customers are alleged above, which are only a subset of those stolen), the loss of its physical property (detailed in Exhibit B, which are those which have been confirmed through the partly restored server), as well as the diversion of its business and revenues, first to Studio AG (through their control of other entities, including XA Scenes, beginning in or about 2009), and, then, starting in 2014, to HudsonGray, as well as specific lost opportunities, including NBCUniversal business, as well as other business, in all the ways alleged.

202.    The physical property stolen from XA's office had a value of more than $200,000. *See* Exhibit B.  The misconduct is larceny within the meaning of New York Penal Law § 155.00(1).  Theft of XA's business relationships is, within the meaning of RICO, the theft of business or property and compensable in RICO damages.

203.    Had the RICO Defendants not interfered with XA's relationships with its clients, they would have, in the ordinary course, continued as XA clients and revenue would have continued to be received, on an ongoing basis, for the period such relationships are maintained in

that industry, by XA, rather than being diverted to Studio AG, HudsonGray and the individual RICO Defendants, controlling them.

204.     Defendants each conspired to implement, facilitate and shield from discovery their pattern of racketeering activities, knowing they were causing XA harm and intending, beginning, with respect to HudsonGray, in or about December, 2013 and through the summer of 2014, to destroy XA for the benefit of their competing enterprise, continuing the damage they had effected, through, Studio AG.

205.     As alleged above, on information and belief, the profit on the NBC Upfront job, alone, for 2014, was roughly $3 million (20% of the cost of the project).

206.     XA had at least six NBCUniversal jobs and Studio AG, to whom business was being diverted, had numerous NBCUniversal corporate events, and hundreds of weddings and other events.

**The RICO Defendants' Active Concealment of the Predicate Crimes from XA**

207.     Each of the Defendants actively concealed information from XA in all the ways alleged above and as set forth in Exhibit A to impair and prevent XA from learning about the existence of, and harm being caused by, the racketeering activities described above.

208.     Concealment of RICO predicate crimes is itself a predicate crime pursuant to 18 U.S.C. § 1961.   Here, many of the RICO Defendants' acts of concealment were orchestrated and directed through mail and wire communications, violations of 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud), and, hence instances of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B), as well as through theft and destruction of documents and files, which as of concealment are, as well, predicate crimes.

209.     XA has suffered direct and proximately caused injury to its business and property, from 2009 through the summer of 2014, in an amount to be proven at trial and presently not calculable with precision because of defendants' willful destruction and theft of its property, but is expected to exceed $20 million dollars.

## SECOND CLAIM FOR RELIEF
### (RICO Conspiracy – Violation of 18 U.S.C. § 1962(d))
### (Against Wilson, Wagner, Andereck, Lomma, Mixed Company, Day, and Gudin)

210.     XA repeats and realleges the paragraphs above as if fully set forth herein.

211.     18 U.S.C. § 1962(d) provides, in pertinent part, that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

212.     The Studio AG Defendants, the Hudson Defendants and Mixed Company agreed to act together to bring about the objects of the conspiracy, i.e., to divert business and customers from XA to Studio AG, and other entities they controlled, as well as XA Scenes, through the activity of the enterprise, as described herein and, later, through HudsonGray, and to otherwise divert profits from business XA did or could have done, during roughly a four year period during which the predicate criminal pattern existed, to themselves.

213.     Each of the RICO Defendants agreed to join in one or more of the three pleaded enterprises with knowledge that predicate acts would be committed by some enterprise members, as shown in the allegations regarding the operation and management activities of each of them, including specific, intentional, overt acts in which they engaged in furtherance of the objectives of the conspiracy alleged.

214.     Defendant Mixed Company, owned and controlled by Wilson (and a non-defendant partner), fraudulently billed XA $183,705.00 in 2013-2014 for services it did not provide.  Although most of the bills for these services were missing or, on information and belief

stolen or destroyed by Wilson and/or the Hudson Defendants as she/they left XA for Hudson, documents left included bills to XA for vacuous, unspecified "project support," "creative support," and "production services," for the NBCUniversal activations.

215.    In 2013 and 2014, almost every week, Wilson wrote checks to Mixed Company, in rounded off amounts, e.g., $4,200, $5000, $5,200, aggregating more than $180,000 during the only two years for which records have been recovered.

216.    On information and belief, such bills were efforts to conceal the Hudson Defendants' effort to bankrupt XA and benefit Studio AG and HudsonGray, as well to benefit Mixed Company and, derivatively, its owner, Wilson, while eliminating XA as a potential competitor to their new company, HudsonGray.

217.    Defendant Gudin, along with Andereck and Day, agreed to, and did, conduct criminal acts and/or acts in support of the criminal activity, acting to facilitate and conceal the theft of XA's commercial property, and the creation of HudsonGray's new competing office. Gudin, for example, stole expensive lighting equipment worth over $32,000, and other material of value from XA's storage locker, and moved it into HudsonGray's storage area and office.

218.    Defendant Day, with defendants Gudin and Andereck agreed to, and did, conduct criminal acts and/or acts in support of the criminal acts of those persons controlling enterprise activity to facilitate and conceal the theft of XA's commercial property, the diversion of XA jobs to Hudson Day and the diversion of XA's revenue through the use of fraudulent American Express spreadsheets designed to mimic actual American Express bills.

219.    Day, for example, stole duratrans and other material of value from XA's storage locker and transferred them into HudsonGray's storage facility and expensed tens of thousands

dollars of personal purchases from Brooks Brothers, the Tie Bar, and Nordstrom on his XA American Express card.  The RICO Defendants substantive violations are set forth in Exhibit A.

220.    Based on documents XA has recovered from its server and the one XA cell phone the Hudson Defendants failed to erase, damages are likely to exceed twenty million dollars.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract)**
**<u>(Against the Individual Hudson Defendants)</u>**

221.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

222.    On information and belief, each and all the Individual Hudson Defendants had identical contracts.  Although no signed employment contracts were found for any of the Individual Hudson Defendants, other than Wagner, on information and belief, all signed such contracts.  XA's belief is based, *inter alia*, on its discovery, at the bottom of one box left behind by the Hudson Defendants, draft employment contracts for Andereck and Wilson, as well as Wagner, all dated April 2009, with hand-written markups for the Andereck and Wilson contracts.

223.    The non-competition and non-solicitation clauses of the XA employment agreements precluded Andereck, Wilson and Wagner from soliciting XA clients and stealing confidential information and trade secrets. All breached their employment agreements.

224.    On information and belief, all the Hudson Defendants also breached XA Handbook provisions and attempted to conceal same by stealing the acknowledgement pages, and the books themselves. XA's belief is based on the fact that it discovered a copy of the Handbook, and several signed acknowledgments of receipt, by XA employees, signed in 2014, in a discarded box at the bottom of a storage closet.

225.    By soliciting existing and potential XA clients and diverting existing and potential XA business to HudsonGray, while still employed at XA, and engaging in the thefts and

destruction of XA property, as alleged above, each of the individual Hudson Defendants breach of their obligations under XA's handbook and, as well, breach of signed employment contracts.

226.    As a direct result of the individual Hudson Defendants' actions, Plaintiff has been caused damages in the amount of $20,000,000, not including interest, costs and attorney's fees.

**FOURTH CLAIM FOR RELIEF**
**(For Injunctive Relief and Constructive Trust)**
**(Against HudsonGray and the Hudson Defendants)**

227.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

228.    The individual Hudson Defendants, as XA officers/employees, at all times relevant herein were fiduciaries of XA and built a competing business using XA's confidential information and trade secrets, in breach of fiduciary duties, and, as well, through the theft of XA's physical resources, the erasure and/or the destruction of XA electronic files and information and the theft/destruction of documents, including, XA handbooks.

229.    A permanent injunction is necessary to avoid any further exploitation of XA's trade secrets.  Plaintiff has no adequate remedy at law and has made no prior application for the injunctive relief sought herein to this or any other Court. Without permanent injunctive relief, Plaintiff is and will continue to be irreparably harmed by the Hudson Defendants actions.

230.    This Court should enter an injunction restraining the Hudson Defendants preventing them from using XA trade secrets, contacting or working with any customers who were former XA customers, including NBCUniversal, and a constructive trust should be imposed on the profit the Hudson Defendants have made, as a result of their wrongful conduct.

231.    The Individual Hudson Defendants were XA fiduciaries, and as alleged above, expressly and impliedly promised to keep XA's proprietary information confidential.

232.    In reliance on their express and implied promises of loyalty, XA transferred into the possession and control of the Individual Hudson Defendants, all the physical resources of XA's office which the defendants subsequently stole and/or abused for their own unjust enrichment.

233.    Each of the Individual Hudson Defendants should be deemed to be holding XA's former physical resources and proprietary/confidential information in a constructive trust.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty**
**(Against the Hudson Defendants)**

234.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

235.    As former XA employees and/or officers, the Individual Hudson Defendants owed fiduciary duties of undivided loyalty and honesty to XA including, *inter alia*, acting solely in XA's best interests and not engaging in the diversion of business opportunities and customers, including existing customers and business projects, in process, as particularized above, and erasing XA's computer files, and stealing XA's hard copy data, files and physical resources.

236.    Each of the Individual Hudson Defendants breached that duty in the numerous ways summarized above, including in the paragraphs describing how each of these defendants operated and managed enterprise activity for purposes of the above RICO allegations, showing substantial, conscious conduct engaged in to bring about the RICO schemes' objectives.

237.    As a proximate and direct result of the Hudson Defendants breaches of fiduciary duty, XA has been damaged in an amount exceeding $20,000,000, exclusive of interest, costs and attorney's fees.

## SIXTH CLAIM FOR RELIEF
### (Breach of the Faithless Servant Doctrine)
### (Against the Individual Hudson Defendants)

238.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

239.    As XA employees, the Individual Hudson Defendants were required to act faithfully to their employer, XA. They placed their own interests above those of XA, consciously, faithlessly and proximately acting to cause injury to XA business and property.

240.    The Individual Hudson Defendants improper activities related to the performance of their duties and they knowingly and faithlessly breached those duties by engaging in the misconduct above and looting XA, stealing its business (as they stole earlier business and business prospects through other companies they controlled), as well as XA's physical property, all of which was necessary to XA carrying on its business.

241.    As a result of the Hudson Employees' faithlessness and disloyalty, they should be ordered to disgorge compensation received during the entire period of disloyalty, from at least 2009 to the present, in an amount to be determined at trial, but reasonably believed to exceed $20,000,000, independent of interest, costs and attorney's fees.

## SEVENTH CLAIM FOR RELIEF
### (Tortious Interference with Contractual Relations)
### (Against Wilson, Wagner, Andereck, Studio AG and HudsonGray)

242.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

243.    Wilson, Wagner, Andereck and HudsonGray tortuously interfered with XA's relationships with companies to which it provided event planning services by all the improper means alleged above.

244.    Studio AG and later HudsonGray interfered by providing the competing entities that would service clients the individual Hudson Defendants were diverting to them.

70

245.    As a foreseeable and direct result of Wilson's, Wagner's, Andereck's, Studio AG's and HudsonGray's interference with XA's contractual relations with its customers, XA was injured.

246.    XA has been damaged in an amount to be determined at trial but reasonably believed to exceed $20,000,000, exclusive of interest, costs and attorney's fees.

### EIGHTH CLAIM FOR RELIEF
#### (Aiding and Abetting Breach of Fiduciary Duty)
#### (Against the Hudson Defendants and the Studio AG Defendants)

247.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

248.    Each of HudsonGray and the Studio AG Defendants knowingly aided and abetted the fiduciary breaches of each of the Hudson Defendants.

249.    Each of these defendants substantially assistrf one another, in all the ways alleged above, aware that doing so would aid in the breach of applicable fiduciary  duties.

250.    Each of these defendants consciously acted to achieve the RICO schemes' objectives, as set forth, *inter alia*, in paragraphs above describing how each of them operated and managed the activity of the RICO enterprises.

251.    As a direct result of their conduct, XA has been damaged in the amount reasonably expected to exceed $20,000,000, exclusive of interest, costs and attorney's fees.

### NINTH CLAIM FOR RELIEF
#### (Misappropriation and Unfair Competition
#### (Against the Hudson Defendants and the Studio AG Defendants)

252.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

253.    The Hudson Defendants and the Studio AG Defendants willfully and maliciously misappropriated XA  confidential and proprietary information for their own benefit, including customer lists, contact information, contracts, invoices, bills, and correspondence,  all regarding

existing clients and future client prospects, along with pricing information relevant to business generation strategies.

254.    Information regarding Statement of Work orders for upcoming events, contracts and budgets for scheduled events and ongoing client development information was not available on the XA website, nor was information regarding the names and contact numbers for individuals and departments representing each of XA's event clients, including XA clients stolen by Studio AG. XA learned this information was stolen (ported to the defendants' servers) when the information erased from its server was partially recovered, as alleged above.

255.    XA's client lists and contacts were developed at substantial cost to the company, over many years, and were not otherwise known or easily learned by anyone outside XA.

256.    The Hudson Defendants' and the Studio AG Defendants' acts were independently wrongful, not only under their employment contracts and XA Handbook prohibitions, but, as well, under the criminal law (RICO and non-RICO) and the common law, with respect to fraud, fiduciary breach and conversion.

257.    These defendants knew their acts were wrongful, as evidenced by the efforts they made to hide the ownership and true purpose of Studio AG, their false assertions to XA that XA Scenes was a dormant (unused) subsidiary, and their secreting the creation of HudsonGray and its purpose, to substantially assist them in achieving an improper competitive advantage against XA.

258.    As a result of their actions, XA has been damaged in the amount reasonably believed to exceed $20,000,000, not including interest, costs and attorney's fees.

**TENTH CLAIM FOR RELIEF**
**(Theft of Corporate Opportunities and Aiding and Abetting the Theft of Opportunities)**
**(Against the Hudson Defendants and Studio AG Defendants)**

259.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

72

260.    As described above, upon information and belief, during their employment at XA, the Hudson Defendants lured the USA Network, an XA client, to transfer its business from XA to HudsonGray and the Studio AG Defendants.

261.    On information and belief, the Hudson Defendants contacted other XA clients and stole business from XA, as alleged above -- opportunities that belonged to XA, including, but not limited to The 900 Shops, CW Network, NBC, and Bazaar Magazine.

262.    Such diversion of corporate opportunities began in or about late 2009, with the creation of Studio AG, and was aided and abetted by each of the Studio AG defendants and the individual Hudson Defendants, on an ongoing basis, with the misconduct continuing through the diversions of corporate opportunities to HudsonGray.

263.    While competitors normally owe other competitors no duties to forgo opportunities, here, Studio AG and HudsonGray, owned and controlled by Wagner, Wilson and Andereck, and operated when they were XA officers, could not lawfully steal and/or aid and abet the theft of XA opportunities, customers and XA physical resources, for their personal benefit and to the detriment of XA.

264.    As a result of the Hudson Defendants and the Studio AG Defendants' misconduct, XA has suffered damages in an amount to be proven at trial but reasonably believed to exceed $20,000,000, exclusive of interest, costs and attorney's fees.

### ELVENTH CLAIM FOR RELIEF
### (Tortious Interference with Business Relationships)
### (Against the Hudson Defendants and the Studio AG Defendants)

265.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

266.    XA had a long-standing business relationship with NBCUniversal, and other companies, as alleged above.

267.    The HudsonGray and the Individual Hudson Defendants and the Studio AG Defendants knew of the existence of these XA relationships and of their value to XA.

268.    The HudsonGray, the Individual Hudson Defendants and Studio AG Defendants intentionally and maliciously interfered with XA's business relationships, having been established by XA and through XA's efforts and resources, and they did so, through improper means including criminal acts of racketeering, including mail and wire fraud, non-RICO criminal acts, including larceny and theft, destruction of computer information, and all the breaches of fiduciary duty, alleged above, including those in the form of frauds.

269.    All the alleged misconduct was undertaken with the objective of defendants enriching themselves at XA's expense and, during the spring and summer of 2014, putting XA out of business, completely, for their own benefit, and for the benefit of their controlled companies, including Studio AG and HudsonGray.

270.    Plaintiff has been damaged in an amount to be proven at trial but reasonably believed to exceed $20,000,000, exclusive of interest, costs and attorney fees.

## TWELTH CLAIM FOR RELIEF
### (Tortious Interference with Prospective Advantage)
### (Against the Hudson Defendants and the Studio AG Defendants)

271.    Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

272.    As alleged above, HudsonGray, the Hudson Defendants and the Studio AG Defendants willfully and maliciously interfered with XA's reasonable expectation of economic benefit and advantage from its business relationships, including NBCUniversal business that was already being worked on by XA employees, that was transferred to HudsonGray.

273.    The Hudson Defendants and the Studio AG Defendants interfered with XA's prospective economic advantage in its existing NBCUniversal work, and numerous other

ongoing projects, by improperly accessing XA's confidential information concerning XA relationships and using same to steal potential XA clients, directly and indirectly, in a manner that was intended to interfere, disrupt, and preclude XA from experiencing the economic benefits it was deriving and would in the foreseeable future have derived from such relationships.

274.     Defendants' misconduct violated XA Handbook provisions and employment agreements which, on information and belief, as alleged above, they signed (but stole before leaving), and common law fiduciary duties they owed their employer, XA.

275.     The Hudson Defendants, as XA senior officers who orchestrated the thefts and interference, breached the highest levels of fiduciary duty and trust.

276.     As a result of their misconduct, HudsonGray and Studio AG received economic benefits they would not have otherwise obtained, as did Studio AG and Hudson Defendants.

277.     XA has been damaged in an amount to be determined at trial but reasonably believed to exceed $20,000,000, exclusive of interest, costs and attorney fees.

**THIRTEENTH CLAIM FOR RELIEF**
**(Conversion of XA Property**
**(Against HudsonGray and the Hudson Defendants)**

278.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

279.     HudsonGray and the Hudson Defendants improperly, in breach of fiduciary duties and with malice stole property belonging to XA from its corporate offices and leased premises including but not limited to, furniture, lighting fixtures, computers, telephones and other equipment used in the conduct of XA's business, *see* Exhibit B, and surreptitiously moved such property to Hudson's offices.

280.     HudsonGray, acting through the individual Hudson Defendants, knew the stolen property was valuable to XA, had been paid for by XA, and had value to XA, in the conduct of its business.

281.     The Hudson Defendants knew they were not entitled to remove XA property from XA's premises, which is why the Individual Hudson Defendants agreed to take such property when no one would be at the office to see what they were doing, as well as to avoid CMG personnel, trying to find out what was occurring at the XA office, under the control of the Individual Hudson Defendants.

282.     The Individual Hudson Defendants converted property belonging to XA, and HudsonGray and each and all of the Individual Hudson Defendants aided and abetted each other in this conversion of XA's physical property, as alleged above.

283.     XA been damaged by the conversion of its physical property (worth at least $200,000, *see* Exhibit B), as well as  its interest in its existing customers and sources of revenues,  in an amount to be proven at trial but reasonably believed to be in excess of $20,000,000, exclusive of interest, costs and attorney fees.

**FOURTEENTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**
**(Against the Hudson Defendants and the Studio AG Defendants)**

284.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

285.     HudsonGray and Studio AG, acting through the Hudson Defendants and Studio AG Defendants, and their employees, acquired by improper means, including acts of racketeering, mail and wire fraud, non-racketeering criminal acts of larceny and theft, as well as multiple frauds and fraudulent concealments, as well as destruction of computer files, assets, property and things of value from XA, which purchased them.

286.     The Hudson Defendants and the Studio AG Defendants were and are unjustly enriched at XA's expense.

287.    Equity and good conscience require that neither HudsonGray, the Hudson Defendants nor the Studio AG Defendants, be allowed to retain the improper benefits they arrogated to themselves by virtue of their theft and conversion of XA's established and then existing client relationships, the looting and theft of XA of financial assets, the theft of its property and impairment of its existing/prospective business relationships.

288.    Because XA's physical office was plundered by the Hudson and Studio AG Defendants, these defendants did not have to pay for business-related equipment, including phones, laptops, software programs, and office furniture, including tables and expensive chairs, nor for expensive lighting equipment. *See* Exhibit B.

289.    The costs of same were diverted back to HudsonGray, as these defendants used XA credit cards and/or expense accounts to charge, pay for or seek reimbursement for the items they stole from XA's office and then put into use in HudsonGray's office, to improperly compete with XA's business, intentionally crippling XA from engaging in the event planning business.

290.    As a direct result of Hudson Defendants' and Studio AG Defendants' actions, carried out under the direction of XA's former employees, XA has been damaged in the amount to be proven at trial but reasonably expected to exceed $20,000,000.

## PUNITIVE DAMAGES

291.    XA seeks RICO treble damages for damages arising from defendants' RICO predicate acts, and punitive damages for injury caused by each defendant's non-RICO misconduct, including crimes of theft and larceny, and tortious conducts, ranging from fiduciary fraud and tortious interference, to unfair competition, as well as fraudulent concealment and the destruction and/or theft of XA's confidential business records and trade secrets, as well as its computer system, in the amount of ten times compensatory injury.

77

292.    Defendants' wrongful conduct was and remains aggravated and outrageous, evidencing evil motives and/or a willful and wanton disregard for XA's rights in their efforts to destroy what they regarded as a competitor to their new business, HudsonGray.  That misconduct took place in breach of heightened duties owed to XA, by virtue of their senior XA positions.

293.    Defendants all knew and intended that their misconduct would financially injure XA.  All attempted to conceal their individual and collective misconduct through the theft and destruction of XA's business data on  XA's server, their attempted permanent erasure of same, and their erasure of XA phones, purchased for the singular purpose of and used, in fact, to secret their conspiracy and its implementation, their criminal and tortious misconduct, including the theft of the company's hard copy files, and/or their destruction of same, and their theft of XA's physical office furniture, computers, phones, vases and commercial lighting fixtures, as well.

294.    Because the defendant's RICO-violating, non-RICO criminal, and fraudulent and tortious misconduct is actionable independent of the existence of any contract, allegation and proof of misconduct directed toward the public, generally, is not required.

295.    XA seeks a punitive award in the amount of then times compensatory damages for injury caused by all of defendants' non-RICO misconducts.

WHEREFORE Plaintiff demands judgment:

(a)    Awarding XA money damages in an amount to be determined at trial, including compensatory damages;

(b)    Awarding XA treble damages, attorney's fees and costs under the RICO statute;

(c)    Awarding XA punitive damages of ten times compensatory damages;

(d)    Ordering that the Hudson Defendants and the AG Defendants to disgorge to XA all compensation and payments improperly received by them;

(e)     Ordering permanent injunctive relief and a constructive trust imposed, as alleged;

(f)     Awarding XA such other and further relief as the Court seems just and proper.

Dated:      New York, New York
            August 28, 2015

                                    EATON & VAN WINKLE LLP

                                    By: /s/ Lawrence Allen Steckman
                                            Lawrence Allen Steckman, Esq.
                                    3 Park Avenue
                                    New York, NY 10016-2078
                                    Tel. (646) 821-9367