UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

CMG HOLDINGS GROUP, as successor to
XA THE EXPERIENTIAL AGENCY, INC.,     :

                 Plaintiff,     :

         vs.     :

JOSEPH WAGNER, HUDSON GRAY LLC,
DARREN ANDERECK, JESSIE LOMMA,
MICHAEL DAY, JEAN WILSON, ESTELLE
PIZZO, STUDIO AG, LLC, REMIGIO GUDIN,
and MIXED COMPANY, INC.,     :

              Defendants.     :

Civil Action No.: 15-cv-05814-JPO

------------------------------------- x

JOSEPH WAGNER, JEFFREY SMITH, DARREN : 
ANDERECK, and JESSIE LOMMA,     :

        Third-Party Plaintiffs,     :

         vs.     :

GLENN LAKEN and ALEXIS LAKEN,     :

        Third-Party Defendants. :

------------------------------------- x

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION PURSUANT TO
## RULE 12(b)(6) TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, New York 10019
(212) 237-1000
*Attorneys for Defendants*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

PROCEDURAL HISTORY ...................................................................................................4

FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT ...................................6

    I.    Background...................................................................................................6

    II.    The Schemes Alleged in the Second Amended Complaint ...........................9

        A.    Alleged Diversions to Fiori XA, Studio AG, and XA Scenes.................10

            (i)    Fiori XA..........................................................................................11

            (ii)    Studio AG ......................................................................................12

            (iii)    XA Scenes......................................................................................14

        B.    Alleged Diversion to HudsonGray .........................................................15

        C.    Alleged Property Theft ............................................................................16

        D.    Alleged Concealment...............................................................................17

STANDARD..........................................................................................................................17

ARGUMENT .......................................................................................................................18

    POINT I ........................................................................................................................18

    THE RICO CLAIMS MUST BE DISMISSED FOR FAILURE TO
    SUFFICIENTLY ALLEGE A PREDICATE ACT OR A "PATTERN" OF
    RACKETEERING ACTIVITY .....................................................................................18

        A.    XA Fails to Allege Any Predicate Acts..................................................19

            1.    XA Fails to Allege Any Mail or Wire Fraud Against Any Defendants ........20

            2.    Defendants Did Not Commit Any Wrongdoing With Studio AG, and
                Any Allegations Concerning Studio AG are Barred by the Statute of
                Limitations....................................................................................21

                a.    Studio AG's Ownership and Purpose Was Disclosed to Plaintiff.............21

                b.    All Claims Related to Studio AG's Creation and Use are Time-
                    Barred ...................................................................................22

                c.    XA Makes No Plausible Allegations Concerning Studio AG ..................24

            3.    The Allegations Regarding XA Scenes and Fiori XA are Incoherent...........24

            4.    Concealment is Not a Predicate Act .............................................................25

B.    XA Has Not Alleged Any "Pattern" of Racketeering Activity ............................25

    1.    Because the Alleged Schemes are "Inherently Terminable,"  There is no "Open-Ended" Continuity.........................................................................26

    2.    The Alleged Nine-Month Scheme is Too Short for "Close-Ended" Continuity ................................................................................................27

C.    Because XA Alleges No Racketeering, the Conspiracy Claim Must Also be Dismissed...........................................................................................................29

POINT II........................................................................................................................29

ALL CLAIMS MUST BE DISMISSED  AS AGAINST WAGNER PURSUANT TO THE APRIL RELEASE .....................................................................................29

A.    The April Release is Operative, and Supersedes All Prior Agreements...............30

B.    The April Release Includes a General Release of All Claims .............................31

C.    XA Agreed Not to Sue Wagner ...........................................................................32

D.    The April Release Does Not Contain a Non-Solicitation Provision, and the Employment Agreement's Non-Competition Provision Was Not Triggered, Requiring Dismissal of Breach of Contract Claim .................................................33

E.    Claims Against Wagner Must Also be Dismissed for Improper Venue................34

POINT III ......................................................................................................................34

XA'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED AS AGAINST ALL DEFENDANTS FOR FAILURE TO STATE A CLAIM ............................................34

POINT IV .......................................................................................................................38

THE FOURTH CLAIM FOR INJUNCTION AND CONSTRUCTIVE TRUST MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR RELIEF ...............38

POINT V.........................................................................................................................39

THE BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED BECAUSE XA DOES NOT IDENTIFY ANY PARTICULAR BREACH ........................39

POINT VI .......................................................................................................................40

THE SEVENTH, ELEVENTH, AND TWELFTH CLAIMS FOR TORTIOUS INTERFERENCE MUST BE DISMISSED ........................................................................40

POINT VII ...................................................................................................41

    THE TWELFTH CLAIM FOR MISAPPROPRIATION AND UNFAIR
    COMPETITION FAILS BECAUSE XA DOES NOT IDENTIFY ANY
    CONFIDENTIAL INFORMATION ...........................................................41

POINT VIII .................................................................................................42

    THE THIRTEENTH CLAIM FOR USURPATION OF A CORPORATE
    OPPORTUNITY MUST BE DISMISSED AGAINST HUDSONGRAY AND THE
    STUDIO AG DEFENDANTS BECAUSE XA ALLEGED THAT THEY ARE
    COMPETITORS .......................................................................................42

POINT IX ....................................................................................................43

    XA'S CLAIM FOR PUNITIVE DAMAGES MUST BE DISMISSED .............43

CONCLUSION ............................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*23-25 Bldg. Partnership v. Testa Produce, Inc.,*
    381 Ill.App.3d 751 (1st Dist. 2008) ....................................................................................31

*5–Star Management, Inc. v. Rogers,*
    940 F.Supp. 512 (E.D.N.Y. 1996) ..............................................................................18, 22

*Ackerman v. 305 East 40th Owners Corp.,*
    189 A.D.2d 665 (1st Dep't 1993) ........................................................................................22

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,*
    483 U.S. 143 (1987) ...............................................................................................22, 23

*Arista Records, LLC v. Doe 3,*
    604 F.3d 110 (2d Cir.2010) ...............................................................................................35

*Arnon Ltd. v. Beierwaltes,*
    125 A.D.3d 453 (1st Dep't 2015) ......................................................................................41

*Aronis v. TLC Vision Centers, Inc.,*
    49 A.D.3d 576 (2d Dep't 2008) .........................................................................................43

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,*
    268 F.3d 103 (2d Cir.2001) ...............................................................................................18

*Barille v. Sears Roebuck & Co.,*
    289 Ill. App. 3d 171 (1st Dist. 1997) .................................................................................30

*Bell v. Hubbert,*
    2007 WL 60513 (S.D.N.Y. 2007) ......................................................................................18

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC,*
    69 F. Supp.3d 342 (S.D.N.Y. 2014) (Oetken, J.) ..............................................................20

*Carvel Corp. v. Noonan,*
    3 N.Y.3d 182 (2004) ..........................................................................................................41

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir.2002) ..........................................................................................17, 30

*Corrado v. New York State Unified Court Sys.,*
    2014 WL 4626234 (E.D.N.Y. 2014) ..................................................................................40

*Crawford v. Franklin Credit Mgmt. Corp.,*
    758 F.3d 473 (2d. Cir.2014) ............................................................................ 20

*DeFalco v. Bernas,*
    244 F.3d 286 (2d Cir.2001) ............................................................................ 27

*Derven v. PH Consulting, Inc.,*
    427 F.Supp.2d 360 (S.D.N.Y. 2006) ............................................................ 42

*Desclafani v. Pave-Mark Corp.,*
    2008 WL 3914881 (S.D.N.Y. 2008) ...................................................... 24, 43

*Design Strategies, Inc. v. Davis,*
    384 F. Supp. 2d 649 (S.D.N.Y. 2005) ........................................................ 42

*Dorset Indus., Inc. v. Unified Grocers, Inc.,*
    893 F. Supp. 2d 395 (E.D.N.Y. 2012) ........................................................ 42

*Emergency Enclosures, Inc. v. National Fire Adjustment Co., Inc.,*
    68 A.D.3d 1658 (4th Dep't 2009) .......................................................... 40, 41

*First Capital Asset Management, Inc. v. Satinwood,*
    385 F.2d 159 (2d Cir.2004) ...................................................................... 27, 29

*GICC Capital Corp. v. Technology Finance Group, Inc.,*
    67 F.3d 463 (2d Cir.1995) ................................................................ 26, 27, 28

*Global Network Communications, Inc. v. City of New York,*
    458 F.3d 150 (2d Cir.2006) ...................................................................... 17, 22

*Goldfine v. Sichenzia,*
    118 F.Supp.2d 392 (S.D.N.Y. 2000) ............................................................ 19

*Guardian Mortg. Acceptance Corp. v. Bankers Trust Co. of California, N.A.,*
    259 A.D.2d 358 (1st Dep't 1999) ................................................................ 43

*H.J., Inc. v. Northwestern Bell Telephone Co.,*
    492 U.S. 229 (1989) ................................................................................ 26, 27

*Harris v. New York State Department of Health,*
    202 F.Supp.2d 143 (S.D.N.Y. 2002) ...................................................... 17, 18

*Katzman v. Victoria's Secret Catalogue,*
    167 F.R.D. 649 (S.D.N.Y. 1996) .................................................................. 19

*Leung v. Law,*
    385 F.supp.2d 105 (E.D.N.Y. 2005) ............................................................ 27

*Lobosco v. New York Telephone Company/Nynex,*
  96 N.Y.2d 312 (N.Y. 2001) ........................................................................................... 37

*Magnoni v. Smith & Laquercia, LLP,*
  701 F.Supp.2d 497 (S.D.N.Y. 2010) ............................................................................. 16

*McGarry v. Pallito,*
  687 F.3d 505 (2d Cir.2012) ........................................................................................... 17

*In re Merrill Lynch Ltd. Partnerships Litigation,*
  154 F.3d 56 (2d Cir.1998) .............................................................................................. 23

*Miranda v. Ponce Fed. Bank,*
  948 F.2d 41 (1st Cir.1991) ............................................................................................. 18

*Morris v. 702 East Fifth Street HDFC,*
  46 A.D.3d 478 (1st Dep't 2007) .................................................................................... 33

*M/S Bremen v. Zapata Off-Shore Co.,*
  407 U.S. 1 (1972) ............................................................................................................ 34

*National Group for Communications and Computers Ltd. v. Lucent Technologies*
*Inc.,*
  420 F.Supp.2d 253 (S.D.N.Y. 2006) ............................................................................. 23

*Old Republic Ins. Co. v. Hansa World Cargo Serv.,*
  170 F.R.D. 361 (S.D.N.Y. 1997) ................................................................................... 38

*Osborne v. Tooker,*
  36 A.D.3d 778 (2d Dep't 2007) ..................................................................................... 39

*Paulemon v. Tobin,*
  30 F.3d 307 (2d Cir.1994) .............................................................................................. 17

*Piechur v. Redbox Automated Retail, LLC,*
  No. 09-CV-984-JPG, 2010 WL 706047 (S.D. Ill. Feb. 24, 2010) ............................. 34

*Plasticware, LLC v. Flint Hills Resources, LP,*
  852 F.Supp.2d 398 (S.D.N.Y. 2012) ............................................................................. 40

*Prince v. Madison Square Garden,*
  427 F.Supp.2d 372 (S.D.N.Y. 2006) ............................................................................. 35

*Random House, Inc. v. Rosetta Books LLC,*
  283 F.3d 490 (2d Cir.2002) ........................................................................................... 38

*Ray Larsen Associates, Inc. v. Nikko Am., Inc.,*
  1996 WL 442799 (S.D.N.Y. 1996) ................................................................................ 28

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir.2004) ........................................................................................17

*Rosenson v. Mordowitz,*
   2012 WL 3631308 (S.D.N.Y. 2012) (Oetken, J.) ......................................................19

*Sedima, S.P.R.L. v. Imrex Co., Inc.,*
   473 U.S. 479 (1985) ...................................................................................................19

*Sokolow, Dunaud, Mercadier & Carreras v. Lacher,*
   299 A.D.2d 64 (1st Dep't 2002) ................................................................................31

*Solow v. New Northern Brokerage Facilities, Inc.,*
   255 A.D.2d 198 (1st Dep't 1998) ..............................................................................39

*Sperry Int'l Trade, Inc. v. Government of Israel,*
   670 F.2d 8 (2d Cir.1982) ...........................................................................................38

*Spool v. World Child Intern. Adoption Agency,*
   520 F.3d 178 (2d Cir.2007) .............................................................................19, 20, 28

*Thome v. Alexander & Louisa Calder Foundation,*
   70 A.D.3d 88 (1st Dep't 2009) ..................................................................................40

*United States v. Altman,*
   48 F.3d 96 (2d Cir.1995) ...........................................................................................20

*United States v. Autuori,*
   212 F.3d 105 (2d Cir.2000) ........................................................................................20

*United States v. Reifler,*
   446 F.3d 65 (2d Cir.2006) ..........................................................................................27

*Weizmann Institute of Science v. Neschis,*
   229 F.Supp.2d 234 (S.D.N.Y. 2002) ................................................................19, 20, 25

*Williams v. Calderoni,*
   2012 WL 691832 (S.D.N.Y. 2012) .............................................................................35

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,*
   328 Fed.Appx. 695 (2d Cir.2009) ..............................................................................23

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,*
   530 F.Supp.2d 486 (S.D.N.Y. 2007) ....................................................................23, 28

**Statutes**

18 U.S.C. § 1961(1)......................................................................................................19, 25

18 U.S.C. § 1962..............................................................................................................19

18 U.S.C. § 1962(d)..........................................................................................................29

18 U.S.C. 1964(c).............................................................................................................43

**Other Authorities**

Federal Rules of Civil Procedure Rule 12(b)(6)........................................................1, 17, 24, 33

## PRELIMINARY STATEMENT

Defendants move to dismiss portions of the Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

As plaintiff CMG Holdings Group, Inc., as successor to XA The Experiential Agency, Inc. ("Plaintiff" or "XA"), has filed complaint after complaint in this action, it has become clear that it is just making things up as it goes along.  XA's established pattern is to make a series of demonstrably false and contradictory allegations; when those deficiencies are pointed out in a motion to dismiss, to re-plead; and in the amended pleading to assert new and repeated falsehoods.  In each successive pleading, XA has increased the stakes: its original complaint asserted a series of faulty common law claims; the first amended complaint added deficient RICO claims; and the Second Amended Complaint has increased its improper claim for punitive damages from five to ten times the compensatory damages awarded.  To say that XA has made a mountain out of a molehill is inaccurate, however, because there is not even a molehill here.

The Second Amended Complaint asserts numerous claims against certain former employees who now work for HudsonGray, Inc. ("HudsonGray"), an experiential and event marketing agency.  Plaintiff also asserts claims against Studio AG, LLC ("Studio AG") and Mixed Company, Inc. ("Mixed Company"), previously XA's vendors, and Estelle Pizzo ("Pizzo"), an owner of Studio AG.  HudsonGray markets its clients' brands and products by creating an "experience" for potential consumers, rather than through traditional marketing.  Its success or failure depends upon its creativity and execution of its vision for its clients' offerings.  In doing so, HudsonGray, like XA, relies upon outside vendors to provide goods and services that it does not itself produce to assist in creating the marketing experience for its clients.  In that regard, Studio AG provides floral arrangements, furniture, and scenic fabrication, and Mixed

Company provides creative services, design consultation, research, and floral fabrication. HudsonGray, again like XA, does not provide such goods and services.

Essentially, XA claims that its former employees stole XA clients and XA's office furniture for the benefit of HudsonGray to compete with XA; that is, a commercial dispute that often arises when employees leave one company for another. The Second Amended Complaint, however, attempts to transform this "garden variety" business dispute into a federal racketeering case, apparently for the purpose of selling its penny stock.[1] XA's fabricated RICO claim fails for two reasons. First, XA has, according to its own characterization, alleged a series of thefts of clients and property. Larceny is not a predicate act under the RICO statute, and merely re-labeling the acts as "mail fraud" does not make it so. Second, the alleged scheme to divert clients and property to HudsonGray covers only eight months, which is insufficient to constitute a "pattern" of racketeering. XA's attempt to evade this pitfall by manufacturing claims that defendants diverted business to Studio AG, Fiori XA, and XA Scenes between 2009 and 2014 does not withstand scrutiny.

First, Plaintiff was expressly notified of Studio AG's dealings with XA upon its creation in 2009. XA did not object to the arrangement in 2009, and so cannot claim fraud now. In addition, XA's claims related to Studio AG are barred by the four-year statute of limitations. Further, XA's allegations concerning Studio AG describe nothing more than a legitimate vendor-

---

[1] Matthews Dec., Ex. J (On or about July 16, 2015, Plaintiff issued a press release advertising to sell a "new class of series A preferred shares that will have first priority payout from any litigation settlement" to attract "capital to support CMG's ongoing civil RICO (Racketeer Influenced and Corrupt Organizations) lawsuit against former employees seeking total damages of $20 million."); Ex. K (On or about July 22, 2015, after a spike in the volume of its stock trading, Plaintiff filed a Form 8-K stating: "Glenn Laken, Chairman and CEO of CMG Holdings announced today that Company management has arranged financing for all litigation costs related to CMG's civil RICO lawsuit against Hudson Gray, Studio AG, Mixed Company and the Hudson Defendants. Under the terms of this arrangement, CMG's only financial responsibilities will be out of pocket expenses, such as experts and deposition costs. In return for said funding, CMG has agreed to share any recovery costs on a 67-33 split basis.").

vendee relationship, and XA articulates no legitimate basis on which to suggest that the invoices paid by XA are illegitimate.  Second, the claim that diversions were made to Fiori XA, a wholly owned subsidiary of XA's predecessor, and XA Scenes, which XA operated as a fictitious d/b/a affiliate, are spurious because one cannot improperly "divert" business to oneself.  Because these claims are not viable, XA cannot demonstrate a "pattern" of racketeering, which is fatal to its RICO claim.

XA's common law claims are no better.  All of Plaintiff's claims against Wagner are barred by the Settlement Agreement and Release, dated April 22, 2014 ("April Release"), which supersedes all prior agreements between the parties, contains a release of all claims against Wagner for actions prior to April 30, 2014, does not include a non-solicitation provision, and requires any suit against Wagner to be brought in Cook County, Illinois.  To avoid the April Release's clear terms, XA asserts, without alleging any specific misrepresentation, that the April Release  and its predecessor, the Release Agreement and Non-Solicitation, dated February 256, 2014 ("February Release"), are both void due to fraud, leaving Wagner's employment contract from 2009 still operative.  The argument is undermined by XA's prior pleadings in this case and admissions from XA's former Executive Chairman, Ronald Burkhardt.  In its original complaint, XA sued upon the *February Release*, rather than the operative April Release.   In its First Amended Complaint, XA sued upon the *April Release*, presenting a block quotation of the February Release's non-solicitation provision as part of the April Release – a blatantly false allegation that could only have been deliberate.  XA now asserts that the two agreements upon which it previously sued were obtained by fraud.  XA's willingness to repeatedly change the facts in an effort to state a contract claim is staggering and, because the employment agreement's non-solicitation provision was never triggered by the payment of the necessary severance

package, XA still cannot present a viable claim.  XA's former Executive Chairman, moreover, expressly acknowledges that Plaintiff was aware that the April Release did not contain a restriction against solicitation.

XA's contract claims against the remaining individual HudsonGray defendants also fail, as none of them ever signed an employment contract with XA.  Again, XA's former Executive Chairman admits that he has never seen such documents.  XA cannot simply wish contracts containing non-solicitation provisions into existence.  Various other common law claims, as set forth below, must also be dismissed.

XA first filed this lawsuit on September 22, 2014.  It has evaded scrutiny of its allegations for one year.  This charade should not continue any longer.

## PROCEDURAL HISTORY

XA commenced this action in the Supreme Court of the State of New York, County of New York, by a summons and complaint dated September 22, 2014 (the "Original Complaint"), interposing various claims against Wagner, HudsonGray, Jeffrey Smith,[2] Darren Andereck ("Andereck"), and Jessie Lomma ("Lomma").  On November 7, 2014, Wagner moved to dismiss the Original Complaint as against him, on the grounds, *inter alia*, that XA's claims were barred by the April Release, and HudsonGray moved to dismiss certain of the claims asserted against it. The motion also requested sanctions, on the grounds that the Original Complaint relied upon, and attached as an exhibit, the February Release, which was void upon being superseded by the April Release, which XA did not rely upon in the Original Complaint.  XA agreed to file an amended complaint on or before December 17, 2014, and Wagner and HudsonGray withdrew their motion to dismiss the Original Complaint.

---

[2] Jeffrey Smith is not named as a defendant in the First Amended Complaint or the Second Amended Complaint.

Thereafter, Wagner, Smith, Andereck and Lomma filed a third-party complaint (the "Third-Party Complaint") against Glenn Laken and Alexis Laken (collectively, the "Lakens"), respectively, the Chairman and CEO, and President, of Plaintiff, seeking monetary damages for defamatory statements they made in SEC filings, an article in *Crain's*, and to Wagner's business partners and vendors. The Third-Party Complaint annexed as exhibits documents showing the Lakens' statements to be demonstrably and blatantly false. On June 26, 2015, the Lakens filed an Answer to the Third-Party Complaint, which is now pending.

After several extensions of its time to file amended pleadings, Plaintiff filed the First Amended Complaint on June 26, 2015. The First Amended Complaint repeated many of the falsehoods refuted by the documents annexed to the initial dismissal motion and the Third-Party Complaint. XA also asserted new falsehoods; for example, XA presented a block quotation of a non-solicitation provision it alleged was part of the operative April Release, but was actually from the previous, superseded February Release.

On July 25, 2015, Defendants removed this action to this Court, and thereafter moved to dismiss portions of the First Amended Complaint, including all four RICO claims. Rather than defend the First Amended Complaint, Plaintiff again chose to re-plead. The Second Amended Complaint, however, repeats most of the same factual misrepresentations. Many of the amendments only increase the level of incoherence to Plaintiff's claims – for instance, in this third pleading, Plaintiff asserts a breach of contract claim on a third different contract, asserting that the contracts sued upon in the prior pleadings are both void.

Defendants now move to dismiss from the Second Amended Complaint (1) all RICO claims against all Defendants (claims 1-2); (2) all claims against Wagner (claims 1-14); (3) the third claim for breach of contract against the Individual HudsonGray Defendants; (4) the fourth

{11126926:4}                                   5

claim for injunctive relief and the imposition of a constructive trust against the HudsonGray Defendants; (5) the fifth and eighth claims for breach of fiduciary duty and aiding and abetting the breach of fiduciary duty, respectively, against all Defendants; (6) the seventh, eleventh, and twelfth claim for tortious interference with contract and business relationships against the HudsonGray Defendants and Studio AG Defendants; (7) the ninth claim for misappropriation and unfair competition against all Defendants; (8) the tenth claim for theft of a corporate opportunity against HudsonGray and the Studio AG Defendants; and (9) the claim for punitive damages against all Defendants. The only claims not challenged at this stage are the sixth claim for breach of the faithless servant doctrine, the thirteenth claim for conversion, and the fourteenth claim for unjust enrichment.

## FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT

### I.   Background

XA is a wholly owned subsidiary of CMG Holdings Group, Inc. ("CMG") and "was and is engaged in the event and party planning business for large companies and wealthy individuals."[3] (SAC, ¶ 19.)[4]  Many of the defendants are former officers or employees of XA who now work for HudsonGray, which is a marketing and branding agency located in New York, New York. (*Id.*, ¶ 23.)  Wagner is XA's former CEO, having resigned in March 2014, as

---

[3] XA alleges both that defendants' purported actions "stripped" XA "of its ability even to do business in the future" (SAC, ¶ 3) and that it is currently engaged in the event and party planning business. (*Id.*, ¶ 19.) Even as to a simple factual statement that is obviously within XA's knowledge – whether XA currently operates – XA makes two contradictory allegations.  Thus, from the start, XA's pleadings are characterized by hyperbole, contradiction, and falsehood.

[4] Citations to "SAC" shall refer to the Second Amended Complaint, which is annexed as Exhibit A to the Declaration of Scott R. Matthews. Citations to "FAC" shall refer to the First Amended Complaint, which is annexed as Exhibit B to the Matthews Declaration.  References shall also be made to the Declaration of Joseph Wagner ("Wagner Dec."), the Declaration of Jean Wilson ("Wilson Dec."), and the Declaration of Remigio Gudin ("Gudin Dec.")

memorialized in the April Release.  Andereck, Lomma, Day, Wilson, and Gudin[5] (collectively, with Wagner the "Individual HudsonGray Defendants," and with HudsonGray, the "HudsonGray Defendants") are former officers and employees of XA, each having resigned at various times between May and September 2014. (*Id.*, ¶ 21-22, 25, 26, 28.)

In April 2009, CMG acquired the assets of XA, Inc., the predecessor to XA, and of its subsidiaries in an Illinois proceeding similar to bankruptcy. (*Id.*, ¶ 34-36.)  According to the Second Amended Complaint, "XA remained marginally profitable each year or lost a relatively small amount of money" between 2009 and 2014. (*Id.*, ¶ 36.)  XA alleges that the disappointing profits resulted from the diversion of business from XA. (*Id.*, ¶ 60.)  When members of CMG's Board of Directors questioned Wagner about the "persistently small or non-existent profits margins," Wagner consistently "blamed XA's lack of profitability on CMG's lack of financial support for XA." (*Id.*, ¶ 72-73.)  XA admits that "because CMG was not in a position to provide more capital Wagner said was needed to become profitable, XA's operation continued as it had since 2009," lending credence to Wagner's explanation. (*Id.*, ¶ 73.)

In January 2014, CMG hired Ronald Burkhardt as XA's Executive Chairman, which XA alleges caused Wagner to threaten to resign his position as XA's CEO. (*Id.*, ¶ 74-75.)  According to XA, on February 26, 2014, "in anticipation of his departure, Wagner and XA executed [February Release]." (*Id.*, ¶ 91.)  According to XA, the purpose of the February Release "was to resolve a dispute as to the amount of cash and stock that Wagner was owed" pursuant to the severance terms of his employment contract, dated April 1, 2009 (the "Employment Contract").

---

[5] In the First Amended Complaint, XA alleged that Gudin was never an employee of XA. (FAC, ¶ 21.)  Upon being presented with a W-2 issued by XA to Gudin, XA now admits that it employed Gudin.  (SAC, ¶ 88.)  Sadly, what stands out about XA's allegations concerning Gudin's employment is not that the First Amended Complaint contained a factual error, but that XA corrected the error in the Second Amended Complaint.

(*Id.*, ¶ 92.)  The February Release contains a non-solicitation provision, a release, and provides that XA will make a payment to Wagner in the amount of $418,750. (Matthews Dec., Ex. F, ¶ 4.)

The parties then entered into the April Release, which by its terms superseded and terminated the Employment Contract and February Release. (SAC, ¶ 94; Matthews Dec., Ex. E, ¶ 6, 11.)  The April Release also provided for a yet lower payment of $210,000 to Wagner, a more extensive release to Wagner, and does not include a non-solicitation provision. (*Id.*, ¶ 2, 8.) Burkhardt admits that Laken knowingly agreed to remove the non-solicitation provision, stating that "it was not a concern because of his opinion that Wagner no longer had any interest in the business of XA and that Wagner was going to focus on consulting." (Burkhardt Aff., ¶ 8.)  XA alleges that the April Release was "contemplated" by "the above-quoted section of the [February Release]" (SAC, ¶ 94), although the Second Amended Complaint does not quote the February Release at all and no such provision exists. (*Id.*, *passim*; Matthews Dec., Ex. F, *passim*.)  The actual reason why the parties entered into a second settlement agreement was that XA could not pay even the reduced severance package it promised in the February Release.[6]  As will be shown below, the April Release remains in effect and bars this suit against Wagner.[7]

XA alleges, upon information and belief, that "each and all of the Individual Hudson Defendants [Wagner, Wilson, Andereck, Day, Lomma, and Gudin] had *identical* contracts" (SAC, ¶ 222, emphasis added), and annexes a copy of Wagner's Employment Agreement to the

---

[6] The Second Amended Complaint alludes to this fact by alleging that Wilson "advis[ed] CMG and new XA directors, Jeff Devlin and Ron Burkhardt, that XA had ample funds to pay a $300,000 plus contract settlement to Wagner when it did not." (SAC, ¶ 180(e).)

[7] In its three different pleadings, XA has taken three very different positions regarding its agreements with Wagner. In the Original Complaint, XA sought to enforce the February Release, without mentioning the existence of the April Release; in the First Amended Complaint, XA sued upon the April Release, pretending that it contained the February Release's non-solicitation provision (FAC ¶ 71, 202-09); in the Second Amended Complaint, XA claims that the February Release and April Release – which they previously sought to enforce – are void due to fraud, and now sues upon the superseded Employment Agreement. (SAC, ¶ 90-98, 221-26.)

Second Amended Complaint, which contains a non-solicitation agreement that was never activated due to XA's failure to make the required severance payments. (*Id.*, Ex. D.) XA admits that it does not have any signed employment agreement for any defendant other than Wagner, but bases its belief that such agreements exist upon the alleged discovery of draft agreements for Wilson and Andereck from 2009. (*Id.*, ¶ 222.) XA also alleges that "all the Hudson Defendants also breached XA Handbook provisions" prohibiting the solicitation and diversion of XA clients, and bases its belief that the Individual HudsonGray Defendants signed the XA handbook upon the discovery of signed acknowledgement pages from other XA employees. (*Id.*, ¶ 224-225.) Actually, Andereck, Wilson, Day, Lomma, and Gudin never signed any employment, non-disclosure, or non-solicitation agreement with XA (Wilson Dec., ¶ 3; Andereck Dec., ¶ 3; Day Dec., ¶ 3; Lomma Dec., ¶ 3; Gudin Dec., ¶ 3), a fact that is confirmed by Mr. Burkhardt. (Burkhardt Aff., ¶ 8.)

## II.   The Schemes Alleged in the Second Amended Complaint

To concoct RICO claims, XA alleges three schemes conducted by various combinations of the defendants: (1) a scheme to divert clients and profits from XA (SAC, ¶ 9); (2) a scheme to steal furniture, lights, and other property from XA (*id.*, ¶ 10); and (3) a scheme to conceal the first two schemes. (*Id.*, ¶ 11.) Essentially, XA's claims revolve around the departure of certain of its employees to join HudsonGray, which, according to the Second Amended Complaint was planned, carried out, and completed between January 2014, when Wagner allegedly started forming HudsonGray (*id.*, ¶ 76), and August 2014. (*Id.*, ¶ 204.) Because XA's claims against defendants are so limited in time, however, XA also manufactured schemes involving the diversion of money to Fiori XA, Studio AG, and XA Scenes from 2009 to 2014 in a desperate attempt to articulate a valid RICO claim.

## A. <u>Alleged Diversions to Fiori XA, Studio AG, and XA Scenes</u>

While all of XA's claims are meritless, its allegations in regards to Fiori XA, Studio AG, and XA Scenes contradict admissions made by XA in this litigation, publicly filed documents, and basic common sense. At no point does XA provide any basis for its allegations that these standard business relationships were fraudulent.

Before examining Plaintiff's specific allegations, it is useful to review the nature of XA's business. Like most businesses, XA did not itself create all of the goods and perform all of the services that it used in an experiential marketing campaign. Instead, very much like a general contractor that subcontracts with a plumber, an electrician, and a roofer to most efficiently and profitably construct a building, XA engaged third-parties to provide certain products, such as lighting fixtures or furniture, and certain services, such as design and floral arrangements, that were incorporated into XA's marketing plans. After providing its goods or services, the third-party would present an invoice to XA for the materials and work performed. XA would pay the third-party for the goods and services with part of the money it received from the customer.

These third-parties are necessarily part of the "event planning industry," in the same way that a general contractor and all of its subcontractors are part of the construction industry. The use of a subcontractor that "engages in the same business" as the general contractor is not a diversion of business, but a profitable and commonly used business strategy. The Second Amended Complaint describes exactly such an arrangement between XA and Studio AG, but insists – without any basis – that it was really a fraudulent diversion of business away from XA. The allegations concerning Fiori XA and XA Scenes are even more divorced from reality, as those entities were, respectively, a wholly owned subsidiary and an affiliate of XA operating as a d/b/a.

{11126926:4}                                          10

### (i)   Fiori XA

XA alleges that, "In August 2004, XA purchased Fiori, Inc.,"[8] which had "purchased the assets of a company called 'Alice's Gardens,' then defendant Andereck's floral shop." (SAC, ¶ 47.) Fiori, Inc. "became a wholly owned subsidiary" of XA, Inc. and "was renamed Fiori XA and Fiori XA then engaged in the same business as did XA." (Id.) According to XA, Fiori XA managed a loft event space called Gallery 1028, provided event planning services, and produced high-end weddings. (Id., ¶ 47-48.) Fiori XA also "vended" services to XA. (Id., ¶ 48.) Among Fiori XA's clients was the USA Network, which is affiliated with NBC, an XA client. (Id., ¶ 48.)

Fiori XA's activities as described by XA are precisely what one would expect of a wholly owned subsidiary: providing services to the parent company; servicing the parent company's clients; and branching out into related but distinct fields, i.e., from event marketing to weddings. XA, however, asserts that these activities are fraudulent, alleging that events and weddings produced by Fiori XA "should have been produced" by XA, that ads run by Fiori XA were "in competition with XA," and presents Fiori XA's work for the USA Network as improper. (Id., 47-48.) Presumably to show that Fiori XA was a competitor, rather than a specialized subsidiary, XA states that Fiori XA was not a florist – because it purchased flowers wholesale.[9] (Id., ¶ 49.) XA also alleges that Fiori XA's billing of expenses incurred on XA events to XA

---

[8] Actually, XA, Inc., XA's predecessor, purchased Fiori XA. XA was not created until CMG purchased some of XA, Inc.'s assets in 2009. (SAC, ¶ 33-35.) However, CMG did not purchase Fiori XA's assets. Thus, not only is the Second Amended Complaint's discussion on Fiori XA incoherent, it is unnecessary. CMG never owned XA during Fiori XA's existence, and so could not have been harmed by it.

[9] It should go without saying that purchasing flowers wholesale, and then arranging the flowers, is exactly what a florist does. XA's apparent belief that all florists grow flowers is incorrect. Moreover, it contradicts XA's allegation in paragraph 47 that Fiori XA was a floral shop.

(*id.*) is an example of fraud, rather than how goods and services are exchanged in a market economy.  Even if Fiori XA "engaged in the same business as did XA," as falsely alleged by XA, Fiori XA's revenue or activities could not have harmed XA, as it was a wholly owned subsidiary of XA, Inc. that CMG did not purchase. (*See*, fn. 9.)  Other than conclusory labels, XA provides absolutely no basis for its allegations that any of these actions could have been fraudulent.

   (ii)   **Studio AG**

   XA's allegations concerning Studio AG, a company that provides floral arrangements, furniture, and scenic fabrication, are similarly incoherent.  According to XA, Studio AG – like Fiori XA before it – "is engaged in the same business as XA," and that defendants used Studio AG to service several XA clients.  (*Id.*, ¶ 42.)  The Second Amended Complaint describes a normal business relationship between XA and Studio AG, but improperly characterizes it as fraudulent.  For instance, XA alleges that Studio AG "charged XA tens of thousands of dollars" for lighting equipment called duratrans, which XA concludes is fraudulent because Studio AG "was not in the business of selling duratrans – it bought duratrans from Manhattan Neon Corp." (*Id.*, ¶ 62.)  This is not evidence of fraud; rather, Studio AG charged XA for expenses it incurred for work on an XA project.  Studio AG's charges for furniture, flowers, staging, signage, and props are similarly innocent. (*Id.*, ¶ 63, 69.)  Studio AG's bills are no more improper than a plumber's invoice charging for parts and labor, and the mere labeling of the arrangement by XA as "fraudulent" does not make it so, or even plausible.

   Many of XA's allegations are not just implausible, but impossible.  For instance, XA alleges, citing an email dated June 3, 2009, that defendant Estelle Pizzo was going to "sell a van titled to Fiori XA and to use the proceeds for 'AG payables'" and "to pay Studio AG's debts."

(*Id.*, ¶ 57.)  The email in question, however, actually states that the van be sold "to pay down Fiori XA payables."  Indeed, not only is XA's allegation false, but it would have been impossible for a van sold in June 2009 to pay Studio AG's debts, because, according to XA's own allegations, Studio AG was not created until December 12, 2009. (SAC, ¶ 50.)  Obviously, Studio AG did not incur debts six months before it existed.[10]

Even if Studio AG's relationship with XA was improper – and it was not – CMG was notified of the nature of the relationship at its inception.  Studio AG was formed on December 12, 2009 (SAC, ¶ 50) to perform the same support services that Fiori XA had performed prior to CMG's decision not to purchase that subsidiary's assets along with the rest of XA, Inc.  Contrary to XA's allegations (*id.*), the formation, ownership, and purpose of Studio AG were disclosed to CMG in a memorandum dated December 4, 2009: "Jean, Darren, Joe to form Studio AG" due to "Fiori XA issue." (Matthews Dec., Ex. G.)  After Mr. Burkhardt was hired to be XA's Executive Chairman, Wagner again disclosed the ownership and purpose of Studio AG in a memorandum to him dated January 27, 2014. (*Id.*, Ex. H; Burkhardt Aff., ¶ 7.)  In his Answer to the Third-Party Complaint, Plaintiff's principals admitted that, "The requirement of these types of services [that Fiori XA previously provided], and the consequential formation of Studio AG, was specifically discussed in a memorandum dated December 4, 2009 from Wagner (and a colleague) to Ennis, COO and CFO of CMG." (Matthews Dec., Exs. C and D, ¶ 66.)  These memoranda are also (selectively) quoted in the Second Amended Complaint – just one paragraph after XA

---

[10] In its last motion to dismiss, defendants pointed out that the email states "Fiori XA payables," rather than "AG payables," as quoted in XA's pleadings.  The misquotation is repeated in the Second Amended Complaint, which XA tries to rationalize by stating that defendants purportedly used Fiori XA and Studio AG interchangeably. (SAC, ¶ 57.)  Even if that is true – and there is no basis to believe it is – it does not change the fact that (1) the email actually says "Fiori XA payables" and (2) Studio AG could not have incurred debt six months before it existed.  XA's explanation, though incoherent, demonstrates that the misquotation was not a typing error, but a knowing decision to repeat a false allegation.

{11126926:4}                                      13

claims it received no disclosure about Studio AG. (SAC, ¶ 50-51.)  It is simply impossible for XA to claim that it did not know of Studio AG's ownership by Wagner, Andereck, and Wilson and the role it served in XA's business.

**(iii)   XA Scenes**

Perhaps most absurd of all are XA's diversion allegations are those involving XA Scenes. Plaintiff claims that, "XA Scenes was secretly used by Wagner, Andereck, and Wilson to act as an 'event manager' for Gallery 1028" from October 2008 to March 2011. (SAC, ¶ 43.) According to XA, Studio AG produced events at Gallery 1028, which XA Scenes, as the event manager, promoted. (*Id.*, ¶ 44.)  XA Scenes also advertised for Gallery 1028, which advertisements listed Studio AG as a vendor (*id.*, ¶ 59), as one would expect from a manager of an event space.

XA alleges that the "diversions" began "from the time that CMG acquired XA and it's supposedly dormant subsidiary, XA Scenes" (*Id.*, ¶ 41), and that the HudsonGray Defendants falsely advised that "XA Scenes was a dormant (unused) subsidiary." (*Id.*, ¶ 257.)  In fact, XA Scenes was not a subsidiary but merely a d/b/a used by XA, as evidenced by a public filing from January 2010 and signed by Jim Ennis as President. (*Id.*, Ex. I.)  Thus, when XA alleges that the HudsonGray Defendants diverted business to XA Scenes, it is really alleging that they "diverted" business from XA to XA – itself.[11]

---

[11] The fact that XA Scenes was not a "dormant subsidiary," but a fictitious name used by XA, was pointed out on defendants' last motion to dismiss.  (Dkt. No. 16, p. 19 of 45.)  In an apparent response, XA now claims that it believed it was a dormant subsidiary when it was acquired.  (SAC, ¶ 41.)  It is simply impossible that CMG could have created XA in 2009 upon purchasing XA, Inc.'s assets and *not* know XA's corporate structure.  In any event, the public filing from January 2010 demonstrates that Plaintiff knew of XA Scene's status.  (Matthews Dec., Ex. I.) Ultimately, it does not matter, as "diverting" business to a wholly owned subsidiary would not be any more improper that "diverting" business to a d/b/a.  But the repeated false pleading, on a topic – its own corporate structure – that Plaintiff obviously knows, after the error has been pointed out and demonstrated with corporate filings, only to assert something obviously incoherent as a diversion of business to oneself, is, unfortunately, representative of the entire Second Amended Complaint.

**B. Alleged Diversion to HudsonGray**

The Second Amended Complaint alleges that Wagner began work to establish HudsonGray in January 2014, and formed the company in March 2014, which began competing with XA upon its formation. (SAC, ¶ 76-77.)   XA alleges that the Individual HudsonGray Defendants solicited XA clients before and after they left XA (*id.*, ¶ 17, 178(d), 223, 225), and delayed execution of the contract and deposit of XA projects until after they left for HudsonGray, thus diverting projects that should have been handled by XA. (*Id.*, ¶ 99.)  However, the first project XA identifies as having been diverted began in late May 2014, months after Wagner left XA. (*Id.*, ¶ 100.)   XA also blames the "loss" of projects on the HudsonGray Defendants even where it cannot make any connection to any purported action of any defendant. For instance, it alleges that after six years of servicing the "Characters Unite Initiative," XA ceased working on the project after May 2014, but does not allege that it was diverted to HudsonGray due to any nefarious actions. (*Id.*, ¶ 114.)  By Plaintiff's own allegations, therefore, this alleged scheme lasted, at the longest, from January 2014 until August 2014.  (*Id.*, ¶ 76, 204.)[12]

Many of XA's own allegations, however, are inconsistent with a scheme by the HudsonGray Defendants to destroy or defraud XA.  For example, although Wagner resigned from XA in March 2014 and HudsonGray was allegedly operational in mid-March (*id.*, ¶ 99), the other Individual HudsonGray Defendants did not immediately join the new company.  Rather, Andereck resigned from XA on May 22, 2014. (*Id.*, ¶ 22)  Day worked at XA until May 20, 2014

---

[12] According to the Second Amended Complaint, the "pattern of racketeering" involving HudsonGray began in about December 2013.  (SAC, ¶ 204.)  However, the first specific allegations involving HudsonGray begin in January 2014.  (*Id.*, 76.)

(¶ 26), Lomma worked at XA until June 13, 2014 (¶ 25), and Wilson stayed until September 2014. (¶ 21.)  If the HudsonGray Defendants had truly intended to transfer future and existing XA business to HudsonGray, they would have resigned *en masse*, immediately after HudsonGray became operational. Indeed, most of the nefarious conduct alleged by XA – employees seeking reimbursement for expenses (*id.*, ¶¶ 178(e)-(f), 180(c), 181(h)-(i), 183(b)),[13] payment of vendors' invoices (*id.*, ¶¶ 54, 62-63), and gaining access to a departed colleague's work email account (*id.*, ¶ 142) – are not examples of racketeering, but of running a normal business.

Finally, like its allegations concerning Fiori XA, Studio AG, and XA Scenes, XA's claims of client diversion to HudsonGray cannot form the basis of its claims.  XA publishes the identities of its clients on its website, http://www.experientialagency.com.[14] Without any legitimate restriction against solicitation, the Individual HudsonGray Defendants were free to work with these clients after switching employers.  In any event, once these individuals left XA, XA had no creative personnel remaining who could book and produce a project.

### C. Alleged Property Theft

In addition to "stealing" clients, XA alleges that the HudsonGray Defendants engaged in a scheme to steal lights, furniture, files, and other property from XA for use at HudsonGray. (*Id.*,

---

[13] XA's allegations that Wagner and Andereck submitted fraudulent credit card bills are entirely fabricated.  Mr. Burkhardt, XA's former Executive Chairman, states XA did not have a corporate credit card, forcing Wagner and Andereck to use personal credit cards to fund expenses, which XA reimbursed whenever it had sufficient funds. (Burkhardt Aff., ¶ 6.)  Mr. Burkhardt further attests that he reviewed three years of credit card statements submitted by Wagner and Andereck, and that he determined that no charges were made outside the ordinary course of business. (*Id.*)

[14] The Court may take judicial notice of websites. *Magnoni v. Smith & Laquercia, LLP*, 701 F.Supp.2d 497, 501 (S.D.N.Y. 2010).

¶ 2-3, 10, 83-84, 88, 104-06, 178(c), 181, 278-83.)  Although false, this alleged scheme occurred between January 2014 and August 2014.  (*Id.*, ¶ 76, 204.)

### D. **Alleged Concealment**

The third scheme alleged by XA is that the defendants concealed the schemes to divert clients and property to HudsonGray by deleting servers, removing files, or avoiding encounters with Mr. Burkhardt, who was hired by XA in 2014. (*Id.*, ¶ 11, 79-82, 85, 140-141.)  According to the Second Amended Complaint, the scheme to conceal HudsonGray diversions and property theft again took place between January 2014 and August 2014.  (*Id.*, ¶ 76, 204.)

## STANDARD

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *McGarry v. Pallito,* 687 F.3d 505, 510 (2d Cir.2012).  Although the Court is limited to the facts stated in the complaint, the complaint includes any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2d Cir.1994); *Rombach v. Chang,* 355 F.3d 164, 169 (2d Cir.2004).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).  Moreover, the Court may take judicial notice of a document filed in another action, *Global Network Communications, Inc. v. City of New York.* 458 F.3d 150, 157 (2d Cir.2006), and may "take judicial notice of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action." *Harris v. New York State Department of Health,* 202

F.Supp.2d 143, 173 n. 13 (S.D.N.Y. 2002); *5–Star Management, Inc. v. Rogers,* 940 F.Supp.

512, 519 (E.D.N.Y. 1996) (finding it appropriate to consider the plaintiff's principal's admission

in a prior state court action for the truth of the matter asserted).

## ARGUMENT

### POINT I

### THE RICO CLAIMS MUST BE DISMISSED FOR FAILURE TO SUFFICIENTLY ALLEGE A PREDICATE ACT OR A "PATTERN" OF RACKETEERING ACTIVITY

XA's attempt to concoct a racketeering case fails because XA is unable to allege any

predicate act or any "pattern" of racketeering against any of the defendants.   The Second

Amended Complaint improperly seeks to mold garden variety common law claims into a RICO

lawsuit by trying to transform alleged client diversion and property theft into mail and wire

fraud, and making non-sensical allegations concerning Studio AG, XA Scenes, and Fiori XA in

order to create a lengthy enough scheme to constitute a pattern of racketeering.

"RICO is a broadly worded statute that 'has as its purpose the elimination of the

infiltration of organized crime and racketeering into legitimate organizations operating in

interstate commerce.'" *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,*

268 F.3d 103, 107 (2d Cir.2001) (quoting S. Rep. No. 91-617, at 76 (1969)).  "Civil RICO is an

unusually potent weapon – the litigation equivalent of a thermonuclear device." *Bell v. Hubbert,*

2007 WL 60513, at *5 (S.D.N.Y. 2007) (quoting *Miranda v. Ponce Fed. Bank,* 948 F.2d 41, 44

(1st Cir.1991).  "[A]ll too frequently, plaintiffs attempt to mold their claims to the RICO form

even though their injuries do not fall within those intended to be addressed by the Act. Many

courts have noted that the allure of treble damages, attorney's fees, and federal jurisdiction

presents a powerful incentive for plaintiffs to attempt to fit 'garden variety fraud' claims within

the standard of civil RICO." *Rosenson v. Mordowitz*, 2012 WL 3631308, *4 (S.D.N.Y. 2012) (Oetken, J.); *see also Goldfine v. Sichenzia*, 118 F.Supp.2d 392, 397 (S.D.N.Y. 2000) (stating that "this Court looks with particular scrutiny at Civil RICO claims to ensure that the Statute is used for the purpose intended by Congress"). "Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early state of the litigation." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (internal quotations omitted).

"To establish a RICO claim, a plaintiff must show: (1) the violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 184 (2d Cir.2007). To establish a violation of § 1962(c), the plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). XA's RICO claims must be dismissed for (1) failing to allege a predicate act under 18 U.S.C. § 1961; and (2) failing to sufficiently allege any pattern of racketeering activity because, at most, it has alleged predicate acts that occurred during a short eight-month period between January 2014, when Wagner allegedly started forming HudsonGray (SAC, ¶ 76), and August 2014. (*Id.*, ¶ 204.)

## A.    XA Fails to Allege Any Predicate Acts

The RICO statute defines "racketeering activity" as the commission of certain state law crimes – for instance, murder, kidnapping, gambling, arson, robbery, bribery, extortion – and the violation of certain enumerated federal statutes. 18 U.S.C. § 1961(1). To establish that a defendant has engaged in "racketeering activity," a plaintiff must sufficiently allege an indictable commission of a "predicate act" listed in 18 U.S.C. § 1961(1). *See Weizmann Institute of Science*

{11126926:4}                                                           19

*v. Neschis*, 229 F.Supp.2d 234, 255 (S.D.N.Y. 2002).  XA's RICO claim relies upon two alleged predicate acts: (1) mail and wire fraud, which is based upon meritless allegations, and (2) "concealment," which is not an enumerated predicate act.  Accordingly, XA has not alleged any racketeering activity, and its RICO claims must be dismissed.

### 1.  XA Fails to Allege Any Mail or Wire Fraud Against Any Defendants

"The Second Circuit has instructed that 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp.3d 342, (S.D.N.Y. 2014) (Oetken, J.), *citing Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d. Cir.2014).  "The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir.2000).  A scheme to defraud has been interpreted to include "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *United States v. Altman*, 48 F.3d 96, 101 (2d Cir.1995).

XA's claim of mail and wire fraud fails to allege any scheme to defraud, instead asserting only a claim of theft.  In *BWP Media USA Inc.*, *supra*, plaintiff asserted a mail and wire fraud RICO claim against a network of websites that posted stolen celebrity photographs.  69 F.Supp.3d at 348-49.  The Court held that no scheme to defraud was alleged; rather, plaintiffs alleged defendants participated in theft, which is not a predicate act under the statute.  *Id.* at 363, citing *Spool*, 520 F.3d at 184 ("Ordinary theft offenses and conspiracies to commit them are not among the predicate activities defined in 18 U.S.C. § 1961(1).").  XA itself specifically describes defendants' alleged acts as larceny: "[The alleged theft of physical property] is larceny within the

meaning of New York Penal Law § 155.00(1).  Theft of XA's business relationships is, within the meaning of RICO, the theft of business or property and compensable in RICO damages." (SAC, ¶ 202.)  Thus, even under XA's own characterization of its claim, no mail or wire fraud has been alleged.

### 2.  Defendants Did Not Commit Any Wrongdoing With Studio AG, and Any Allegations Concerning Studio AG are Barred by the Statute of Limitations

#### a.  Studio AG's Ownership and Purpose Was Disclosed to Plaintiff

Even if XA adequately pleaded mail fraud in regards to the alleged diversions to HudsonGray, its allegations concerning Studio AG must all be disregarded because Studio AG's existence and purpose was disclosed to CMG in 2009.  In a 2009 memorandum to the then Chief Operating Officer and Chief Financial Officer of XA's parent company, CMG, Wagner and Wilson disclosed their intended formation of Studio AG for the purpose of furthering XA's business.  The memorandum states: "Fiori XA issue / Jean, Darren, Joe to form Studio AG". (Matthews Dec., Ex. G.)  Then, in a memorandum to the then Executive Chairman of XA, Ronald Burkhardt, dated January 27, 2014, Wagner again addresses "Jean, Darren, Joe ownership in Studio AG post CMG acquisition to support XA (Fiori XA legacy)." (*Id.*, Ex. H; Burkhardt Aff., ¶ 7.)  The Third-Party Complaint annexes the 2009 and 2014 memoranda (Matthews Dec., ¶ 9-10), and alleges that, "The requirement of these types of services [previously performed by Fiori XA], and the consequential formation of Studio AG, was specifically discussed in a memorandum dated December 4, 2009 from Wagner (and a colleague) to Ennis, COO and CFO of CMG." (*Id.*, Ex. C, ¶ 66.)  Glenn and Alexis Laken, Plaintiff's respective Chief Executive Officer and President, did not deny the allegation in their Answer to

the Third-Party Complaint. (*Id.*, Ex. D, ¶ 66.)[15]   The Second Amended Complaint, although

claiming XA never received notice of Studio AG, also actually references the memoranda, but

claims they were vague. (SAC, ¶ 51.)   This new argument[16] is refuted by the documents

themselves and by the Lakens' and Burkhardt's admissions.

Studio AG was never a secret, and it was not created to divert business from XA – in fact,

it does not even engage in the same business as XA.   Rather, as explained in advance of its

formation, Studio AG was formed to provide services attendant to XA events because CMG did

not purchase Fiori XA assets in 2009.   Like any other third-party vendor, Studio AG was paid for

its services.   Plaintiff's knowledge and acceptance of the arrangement precludes any finding of

wrongdoing by any of the defendants. *See Ackerman v. 305 East 40th Owners Corp.*, 189 A.D.2d

665, 666-67 (1st Dep't 1993) (cooperative board consented to director's purchase of apartment

by failing to object when intention to bid was disclosed, and was estopped from objecting after

purchase).

**b.  All Claims Related to Studio AG's Creation and Use are Time-Barred**

In any event, Plaintiff knew, or should have known, about Studio AG on December 4,

2009, when CMG received the memorandum from Wagner and Wilson.   To the extent the

creation and use of Studio AG was wrongful in any manner, it cannot be used as a predicate act

because it occurred prior to the four-year statute of limitations applicable to the RICO statute,

*see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987) (four-year

---

[15] The Court may take judicial notice of the memoranda, which are incorporated into pleadings in this action, *Global Network Communications, Inc.*, 458 F.3d at 157, and the Lakens' admissions, which contradict XA's allegations in this case. *5–Star Management, Inc.*, *supra*, 940 F.Supp. at 519 (finding it appropriate to consider the plaintiff's principal's admission in a prior state court action for the truth of the matter asserted).

[16] The First Amended Complaint did not even mention the existence of the memoranda, although XA obviously knew of their existence because XA received the memoranda in 2009 and 2014, and the documents were annexed to the Third-Party Complaint.

{11126926:4}                                                              22

statute of limitations for RICO claim), which accrues "when the plaintiff discovers – or should have reasonably discovered – the alleged injury," and "runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 328 Fed.Appx. 695, 697 (2d Cir.2009).   Although the Second Circuit recognizes a separate accrual rule for subsequent injuries, those injuries must be "new and independent" and cannot depend on injuries that are derivative of the "core injury" sustained. *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 59-60 (2d Cir.1998).   Where a "scheme was fraudulent at the outset," therefore, subsequent actions in furtherance of the scheme will not create "new and independent injuries" that would trigger a new statute of limitations. *Id.* (investment scheme was fraudulent at outset such that later misrepresentations by defendant and fees paid by plaintiffs did not create new and independent injuries); *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F.Supp.2d 486, 524-27 (S.D.N.Y. 2007), *aff'd by* 328 Fed.App. 695 (2d. Cir.2009) (statute of limitations accrued at time of first bribe, and subsequent injuries sustained as a result of the bribery scheme did not re-start statute of limitations); *National Group for Communications and Computers Ltd. v. Lucent Technologies Inc.*, 420 F.Supp.2d 253, 265-66 (S.D.N.Y. 2006) (statute of limitations accrued at time of first kickback payment).

Here, Plaintiff alleges that the Studio AG Defendants engaged in a fraudulent scheme to divert business from XA – a scheme XA admittedly had actual notice of in 2009.   All injuries allegedly involving Studio AG are attributable to this scheme, which XA alleges was fraudulent at the outset, and thus all subsequent injuries are derivative of the initial injury sustained, and barred by the statute of limitations.

### c. XA Makes No Plausible Allegations Concerning Studio AG

Even if one ignores the fact that XA knew about Studio AG at its creation, XA has made no plausible allegation that Studio AG or the Individual HudsonGray Defendants engaged in any wrongdoing.  XA asserts that it has found invoices from Studio AG, and declares that the invoices are fraudulent. (SAC, ¶ 62-63, 69.)  The reasons given for suspecting foul play are risible – for example, that part of Studio AG's invoice is for lights, and that Studio AG does not manufacture lights. (*Id.*, ¶ 62.)  Obviously, the invoice does not claim that Studio AG manufactured the lights, but rather that it purchased the lights for use in an XA managed event, and charged XA for their use.  XA's other breathless allegations concerning furniture, staging, signs, and props are similarly specious. (SAC, ¶ 63, 69.)  If XA has stated a claim, then any business could dig out any invoice, declare it "fraudulent," and bring suit.  A plaintiff must be able to articulate some rational belief for its claim, and XA simply has not done so.

### 3. <u>The Allegations Regarding XA Scenes and Fiori XA are Incoherent</u>

XA's allegations of business diversion are most ridiculous when applied to Fiori XA, a former subsidiary that Plaintiff never owned, and XA Scenes, which is merely XA by another name.  XA was not a "dormant subsidiary," as claimed by XA (SAC, ¶ 41, 257), but was a d/b/a of XA, as evidenced by the Certificate of Business: Fictitious Firm Name[17] filed with the Clark County Clerk's Office and signed by James Ennis as President in January 2010. (Matthews Dec.,

---

[17] The Court may take judicial notice of publicly filed corporate documents in assessing a Rule 12(b)(6) motion. *See Desclafani v. Pave-Mark Corp.*, 2008 WL 3914881, *6 (S.D.N.Y. 2008) (taking judicial notice of records filed with Florida Secretary of State).

Ex. I.)  The Second Amended Complaint therefore alleges that defendants diverted business from XA to . . . XA.[18]

XA's allegations concerning business diversion to Fiori XA, formerly a wholly owned subsidiary of XA, Inc. that CMG did *not* purchase in 2009, are similarly incoherent.  XA's claim that Fiori XA performed work that "should" have been performed by XA (SAC, ¶ 47-48) must be disregarded because (1) as a wholly owned subsidiary, XA, Inc. would have profited through Fiori XA's work (*id.*, ¶ 47); and (2) Plaintiff did not own XA, Inc. while Fiori XA operated between 2004 and 2009 (*id.*, ¶ 33-35), and so could not have suffered any damages from these actions.

### 4.   Concealment is Not a Predicate Act

XA's claim that defendants' alleged concealment of its other predicate acts is itself a predicate act (SAC, ¶ 208) fails because (1) defendants, as shown above, have not committed any underlying predicate act, and (2) "concealment" is not a predicate act.  All "predicate acts" are listed in 18 U.S.C. § 1961(1), *see Weizmann Institute of Science, supra,* 229 F.Supp.2d at 255, and the statute does not include "concealment" as a "racketeering activity.  18 U.S.C. § 1961(1) (*passim*).  The claim must be dismissed as a matter of law.

### B.   XA Has Not Alleged Any "Pattern" of Racketeering Activity

XA's claims, which focus on a scheme that purportedly took place over the course of eight months and terminated in August 2014, cannot constitute a "pattern" of racketeering.  "To establish a RICO pattern it must be shown that the predicates themselves amount to, or they

---

[18] It does not profit XA to allege that XA Scenes was a "dormant subsidiary" – after all, one cannot "divert" business to a wholly owned subsidiary – but XA nonetheless has knowingly pleaded that falsehood *twice*.  As evidenced by the Nevada corporate filing, Plaintiff knew that XA Scenes was a fictitious name for XA in January 2010. (Matthews Dec., Ex. I.)  That document was annexed to the Third-Party Complaint and to the prior motion to dismiss, so XA certainly was reminded of this fact prior to drafting the Second Amended Complaint, but nonetheless continued its inaccurate pleading.

otherwise constitute a threat of, continuing racketeering activity." *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989) (emphasis original).  "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.*, 492 U.S. at 241.  Significantly, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.  Often a RICO action will be brought before continuity can be established in this way.  In such cases, liability depends on whether the threat of continuity is demonstrated." *Id.* at 242 (emphasis original).  XA cannot demonstrate either closed- or open- ended continuity, and therefore has not alleged a "pattern" of racketeering.

### 1. Because the Alleged Schemes are "Inherently Terminable," There is no "Open-Ended" Continuity

An "open-ended" pattern of racketeering features "past criminal conduct coupled with a threat of future criminal conduct." *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 466 (2d Cir.1995).  In this case, XA alleges that the Individual HudsonGray Defendants acted wrongfully by taking confidential and proprietary information, office furniture, and lights from XA and bringing them to their new business, HudsonGray. (SAC, ¶ 2-3, 10, 83-84, 88, 104-06, 178(c), 181, 278-83.)  The Individual HudsonGray Defendants also purportedly solicited XA clients during their employment with XA and upon joining HudsonGray. (*Id.*, ¶ 17, 178(d), 223, 225.)  The scheme terminated in August of 2014 (*id*, ¶ 204), and, by its very nature, could not have continued after the last HudsonGray Defendant resigned and no longer had access to any XA information or property and no longer owed any duty of loyalty to XA.

An "inherently terminable" scheme cannot constitute an "open-ended" pattern because there is no threat that it will continue.  In *GICC Capital Corp.*, the plaintiff argued there was a threat of continuity by arguing that "the defendants would have continued to loot TFG if not for the fact that all available funds had already been looted." *GICC Capital Corp.*, 67 F.3d at 466. The Second Circuit rejected the argument, holding that "it defies logic" to argue there is a threat of continuity where the scheme could not continue. *Id.*  Here, there is simply no possible way Defendants could continue the alleged schemes – and according to Second Amended Complaint, all allegations of wrongdoing necessarily ceased in August 2014. (SAC, ¶ 204.)[19] *See First Capital Asset Management, Inc. v. Satinwood*, 385 F.2d 159, 181 (2d Cir.2004).

## 2. <u>The Alleged Nine-Month Scheme is Too Short for "Close-Ended" Continuity</u>

Alternatively, a plaintiff "may demonstrate continuity over a closed period by proving a series of related predicates extending over a *substantial* period of time." *H.J., Inc.*, *supra*, 492 U.S. at 242 (emphasis added).  Since *H.J., Inc.* was decided, *the Second Circuit has never found predicate acts spanning less than two years to be a close-ended pattern.  See Spool*, 520 F.3d at 184 (sixteen-month period of time is insufficient to establish close-ended continuity); *see also, First Capital*, 385 F.3d at 182 (seven months or just over a year is insufficient); *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir.2001) (predicate acts made over a period of approximately 1½ years is insufficient for close-ended pattern); *GICC Capital Corp.*, 67 F.3d at 467-68 (eleven-

---

[19] A scheme can also be deemed "open-ended" if the very purpose of the business is criminal in nature or the alleged acts are inherently unlawful, such as murder and kidnapping.  *See Leung v. Law*, 385 F.supp.2d 105, 125-26 (E.D.N.Y. 2005).  In this case, however, XA alleges that HudsonGray is a "creative marketing and branding agency" (SAC, ¶ 23), and not a branch of the Mafia.  Therefore, the alleged schemes cannot be deemed open-ended on this basis.  On the other hand, Laken, Plaintiff's Chairman and CEO, was convicted for racketeering conspiracy, wire fraud, illegal kickbacks, theft of honest services, conspiracy to commit the above substantive offenses and to commit union pension fund fraud, securities fraud, fraud by an investment advisor, conspiracy to commit securities fraud, wire fraud, and commercial bribery.  *See, generally, United States v. Reifler*, 446 F.3d 65, 70 (2d Cir.2006).

month period is insufficient for close-ended pattern); *World Wrestling Entertainment, Inc.*, 530 F.Supp.2d at 514 (predicate acts over a four month period is insufficient); *Ray Larsen Associates, Inc. v. Nikko Am., Inc.*, 1996 WL 442799, *8 (S.D.N.Y. 1996) ("A scheme that spans seventeen months does not generally reflect the kind of long-term criminal conduct over a 'substantial period of time' contemplated by the RICO statute.").[20] Here, XA has alleged, at most, predicate acts over the course of eight months, from January 2014 through the summer of 2014. (SAC, ¶ 76, 204.) Although the XA Scenes, Fiori XA, and Studio AG allegations begin in 2009,[21] they were clearly included in the Second Amended Complaint to "mold" XA's business dispute into a RICO claim, and must be disregarded as meritless – and the Studio AG allegations are time-barred as well. *See Spool*, 520 F.3d at 184-85 (eliminating meritless alleged predicate acts in determining whether pattern exists).

XA's RICO claim is essentially that the HudsonGray Defendants, over the course of a few months, started a competing company, diverted some clients to the new company, and stole office furniture. Although false, even if afforded treatment as true, this does not meet the required elements of racketeering activity under the RICO statute, and, therefore, the RICO claims must all be dismissed.

---

[20] While continuity is "centrally a temporal concept", *H.J., Inc.*, 492 U.S. at 242, "close ended" continuity could be found where the predicate acts occurred over a period of less than two years if they were sufficiently complex, involved many perpetrators and victims. The schemes alleged by XA, however, are small in scope, with only one alleged victim and a handful of alleged perpetrators, mitigating against any exception to the two-year guideline. *See GICC Capital*, 67 F.3d at 468.

[21] Actually, Exhibit A to the Second Amended Complaint lists purported instances of mail and wire fraud dating back to 2004 – *five years* before CMG purchased XA, Inc.'s assets. The emails and phone calls listed on the schedule, moreover, do not described any fraud, but the normal administration of a business, baselessly twisted by XA into a fictional scheme.

**C.     Because   XA   Alleges   No   Racketeering,   the   Conspiracy   Claim Must Also be Dismissed**

Because XA cannot state a RICO claim, the second claim alleging a RICO conspiracy in violation of 18 U.S.C. § 1962(d) must also be dismissed. *See First Capital*, 385 F.3d at 182.[22]

## POINT II

### ALL CLAIMS MUST BE DISMISSED AS AGAINST WAGNER PURSUANT TO THE APRIL RELEASE

All claims against Wagner must be dismissed from this action. By the April Release – the operative agreement between the parties – XA released Wagner from all claims accruing prior to April 30, 2014. Because the April Release contains no non-solicitation provision, a fact admitted by XA's former Executive Chairman (Burkhardt Aff., ¶ 8), XA cannot articulate any breach of such a provision after April 30, 2014. Therefore, between the release provision and the lack of any non-solicitation provision, the April Release bars all of claims asserted against Wagner in this action. In an attempt to avoid the indisputable effect of the April Release, XA asserts that it is void and, therefore, the Employment Agreement is still in force. Even if the April Release and the February Release were both void (in contrast to XA's claim in its prior pleadings) and the Employment Agreement were operative, the claims against Wagner must still be dismissed. First, the Employment Agreement's non-compete clause is void because XA never paid Wagner the required severance payments. Second, the Employment Agreement – like the February Release and April Release – contains a valid forum selection provision requiring that any lawsuit against Wagner be brought in Illinois. Thus, even according to XA's latest revised position, the claims against Wagner must be dismissed from this action.

---

[22] The RICO conspiracy claim is the only claim asserted against Mixed Company, a florist shop that was named as a defendant in this case for the "crime" of selling flowers to XA for use in client productions.

{11126926:4}                                                29

### A. **The April Release is Operative, and Supersedes All Prior Agreements**

Under Illinois law,[23] "a written agreement which is complete on its face supersedes all prior agreements on the same subject matter and bars the introduction of evidence concerning any prior term or agreement on that subject matter." *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 177 (1st Dist. 1997). "This particularly applies when the contract . . . contains an unambiguous merger or integration clause." *Id.* Here, the April Release[24] – entered into after the Employment Agreement and the February Release – contains an integration clause which plainly states: "**Entire Agreement.** This Agreement constitutes the *entire agreement* between the Parties and *supersedes any prior* negotiations, *agreements*, arrangements and undertakings with respect to the matters set forth in this Agreement." (Matthews Dec., Ex. E, ¶ 11, emphasis added.) As such, all prior agreements between the parties concerning the same subject matters as the April Release are superseded.[25]

Recognizing that the April Release bars any claims against Wagner, XA asserts that the agreement is void because it was "[i]nduced by fraud," and "the Employment Agreement remains in effect." (SAC, ¶ 97-98.) XA, however, does not allege any "knowing misrepresentation of a material fact" by Wagner to induce XA to enter into the April Release

---

[23] The April Release provides that its interpretation "shall be construed and enforced in accordance with, and governed by, the laws of the State of Illinois, without regard to any applicable choice of law or conflicts rules." (Matthews Dec., Ex. E, ¶ 20.)

[24] Rather than accept XA's allegations concerning the April Release and the February Release as true, the Court may review the actual document, although it is not incorporated into the Second Amended Complaint, because XA relies upon them heavily and they are therefore "integral" to the Second Amended Complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

[25] By contrast, the terminated February Release explicitly stated that that the Employment Agreement "remains in full force and effect and Wagner is not waiving any other rights or claims he may have thereunder." (Matthews Dec., Ex. F, ¶ 5.) The April Release contains no such language for the prior February Release or Employment Agreement. (*Id.*, Ex. E, *passim.*)

(SAC, *passim*), which would be required to base its claim upon fraudulent inducement. *Sokolow, Dunaud, Mercadier & Carreras v. Lacher*, 299 A.D.2d 64, 70 (1st Dep't 2002) ("To sustain a claim for fraudulent inducement, there must be a knowing misrepresentation of material fact, which is intended to deceive another party and to induce them to act upon it, causing injury.").[26] In addition, XA specifically acknowledges in the April Release that it is "not relying on any representation, either oral or written, express or implied, made to them by the other Party other than as set forth in this Agreement." (Matthews Dec., Ex. E, ¶ 12(iv).)  Because the April Release, by its terms, supersedes the February Release and the Employment Agreement, and because XA cannot articulate any misrepresentation made by Wagner to induce XA to enter into the agreement, the April Release is operative.

## B.  **The April Release Includes a General Release of All Claims**

The April Release contains a release of all claims held by XA against Wagner. Specifically, the April Release states:

> XA and CMG and all of their subsidiaries and affiliates . . . hereby waive, release and forever discharge Wagner . . . from any and all known or unknown actions, causes of action, claims or liabilities of any kind, whether based upon any federal, state, municipal, or local statute, law, ordinance or regulation, which have or could be asserted by the Releasors against Wagner *arising out of or related to* this Dispute, *Wagner's relationship with and/or termination from XA and/or arising out of or related to any other occurrence up to and including the Effective Date.*

---

[26] Illinois law is in accord with New York on this point: "To establish an equitable claim for rescission on the basis of fraud and misrepresentation, defendants must prove: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intended to induce the other party to act; (4) acted upon  by the other party in reliance on the truth of the representation; and (5) resulting damage."  *23-25 Bldg. Partnership v. Testa Produce, Inc.*, 381 Ill.App.3d 751, 758 (1st Dist. 2008).

(Matthews Dec., Ex. E, ¶ 8(a), emphasis added.)  The "Effective Date" is defined as April 30, 2014. (*Id.*, ¶ 2.)[27]  To remove all doubt of XA's release of all claims, the April Release states, in all capital letters no less, "XA . . . FURTHER UNDERSTAND[S] THAT THIS AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS THAT HAVE ARISEN ON OR PRIOR TO THE EFFECTIVE DATE."[28] (*Id.*, ¶ 8(c).)  Thus, all claims relying upon allegations against Wagner prior to April 30, 2014 must be dismissed.

### C. <u>XA Agreed Not to Sue Wagner</u>

The April Release also contains a covenant by XA not to sue Wagner, which states: "XA . . . also agree[s] not to sue Wagner . . . or become a party to a lawsuit on the basis of any claim of any type whatsoever arising out of or related to his relationship with and/or termination from employment with XA, which claims, known or unknown, arises or could have been asserted on or before the Effective Date." (Matthews Dec., Ex. E, ¶ 8(b).)  It is indisputable that XA's claims concern Wagner's relationship with and/or termination from employment with XA. Thus, XA has breached the covenant not to sue contained in the April Release by initiating the current lawsuit.

---

[27] The Second Amended Complaint inaccurately alleges that the release is for all claims prior to April 22, 2014, rather than April 30, 2014. (SAC, ¶ 117.)  XA's Original Complaint and the First Amended Complaint both contained this same inaccuracy, which defendants pointed out in both motions to dismiss.  Despite being given two opportunities to correct the mistake, XA has again re-pleaded a statement that it knows to be false.

[28] Tellingly, the provision outlining the general release by Wagner of XA contains a specific exclusion for certain claims Wagner may have, such as unemployment and worker's compensation claims. (Matthews Dec., Ex. E, ¶ 7(b).)  The release by XA of Wagner contains no exceptions. (*Id.*, ¶ 8.)

**D. The April Release Does Not Contain a Non-Solicitation Provision, and the Employment Agreement's Non-Competition Provision Was Not Triggered, <u>Requiring Dismissal of Breach of Contract Claim</u>**

This is the third breach of contract claim XA has asserted against Wagner, and each has alleged a breach of a different contract. XA first sued on the February Release (Dkt. No. 1-2, ¶ 11-12, 28-33),[29] then on the April Release (FAC, 71-74, 203-209), and now on the Employment Agreement. (SAC, ¶ 98, 221-226.) The third time is not a charm for XA – this breach of contract claim must be dismissed as well.

It is axiomatic that to state a breach of contract claim, the plaintiff must allege, *inter alia*, a valid contractual obligation and a breach thereof. *Morris v. 702 East Fifth Street HDFC*, 46 A.D.3d 478, 479 (1st Dep't 2007). The Second Amended Complaint's breach of contract claim must be dismissed because the April Release does not contain any non-solicitation provision (Matthews Dec., Ex. E, *passim*),[30] and the provision in the Employment Agreement relied upon by XA never became effective because the required severance payment was never made. (Wagner Dec., ¶ 4-5.) Paragraph 6 of the Employment Agreement prohibits Wagner from competing with XA "for a period commencing on the Effective Date and ending nine (9) months following termination as provided in Section 11(a) or 11(c), and *if and only if*, [XA] has paid in immediately available funds to [Wagner] within two (2) business days of such Termination all earned base compensation, Signing Bonus, Incentive Compensation and severance payments owed to [Wagner] under this Agreement and made all business expense reimbursement to [Wagner]." (SAC, Ex. D, ¶ 6, emphasis added.) XA's failed to make these

---

[29] The Court may take judicial notice of the pleadings on a Rule 12(b)(6) motion.

[30] Even assuming that Wagner violated a non-solicitation agreement, he was released from any claims as of April 30, 2014. (Matthews Dec., Ex. E, ¶ 8.) After that date, Wagner had no obligation to refrain from soliciting XA clients, as all of his contractual obligations to XA were superseded by the April Release. (*Id.*, ¶ 11.)

payments, requiring the parties to enter into the February Release (Matthews Dec., Ex. F), and XA's subsequent failure to make the payments required under the February Release necessitated the April Release. (*Id.*, Ex. E.) XA now seeks the benefit of a non-solicitation provision for which it did not pay, and which it then bargained away in the April Release. No matter which agreement between the parties is determined to govern, Wagner was *not* subject to a non-compete or non-solicit provision.

### E.  Claims Against Wagner Must Also be Dismissed for Improper Venue

Even if the April Release did not preclude XA's claims against Wagner, and even if XA's claims against Wagner did not fail for lack a valid non-solicitation provision claimed to be breached, all claims against Wagner must still be dismissed from this action because both the April Release (Matthews Dec., Ex. E, ¶ 21) and the Employment Agreement (SAC, Ex. D, ¶ 9(a)) provides for exclusive jurisdiction over all disputes in Cook County, Illinois. "Forum selection clauses are *prima facie* valid and enforceable unless the party seeking to avoid enforcement establishes that enforcing the clause would be unjust or unreasonable or that the clause is invalid for reasons such as fraud, undue influence or overweening bargaining power." *Piechur v. Redbox Automated Retail, LLC*, No. 09-CV-984-JPG, 2010 WL 706047, at *2 (S.D. Ill. Feb. 24, 2010) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9-17 (1972)). Accordingly, all claims against Wagner must be dismissed.

### POINT III

### XA'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED AS AGAINST ALL DEFENDANTS FOR FAILURE TO STATE A CLAIM

Plaintiff's breach of contract claim against the HudsonGray Defendants – just like its contract claim against Wagner – relies upon the alleged breach of non-existent contractual

obligations, and so must also be dismissed.  Plaintiff alleges, upon information and belief, that "each and all of the Individual Hudson Defendants had identical contracts." (SAC, ¶ 222.)  In fact, none of the Individual HudsonGray Defendants, other than Wagner, signed employment agreements with XA (Andereck Dec., ¶ 3; Wilson Dec., ¶ 3; Gudin Dec., ¶ 3; Day Dec., ¶ 3; Lomma Dec., ¶ 3), which Mr. Burkhardt admits in his affidavit. (Burkhardt Aff., ¶ 8.)  Though a plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession of the defendant" or "where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir.2010), such allegations must be "'accompanied by a statement of the facts upon which the belief is founded.'" *Prince v. Madison Square Garden,* 427 F.Supp.2d 372, 385 (S.D.N.Y. 2006) (citation omitted); *see also Williams v. Calderoni,* 2012 WL 691832, at *7 (S.D.N.Y. 2012).  Here, XA fails to explain why it does not have personal knowledge of which employment agreements it entered into, and fails to identify any factual information that makes their allegation anything more than speculation.

Instead, XA bases its allegation that all Individual HudsonGray Defendants signed *identical* contracts upon "its discovery, at the bottom of one box left behind by the Hudson Defendants, draft employment contracts for Andereck and Wilson, as well as Wagner, all dated April 2009, with hand-written markup for the Andereck and Wilson contracts." (SAC, ¶ 222.)[31] The discovery of draft contracts for some employees provides absolutely no basis for XA's stated belief that signed contracts for all employees exist; in fact, the only logical inference is

---

[31] In the First Amended Complaint, Plaintiff alleged that its "belief regarding the existence of the signed agreements is based on the understanding [of] CMG['s] counsel who advises that it was his understanding such agreements were signed and kept in the XA office" (FAC, ¶ 207) – in other words, the speculation of an attorney who did not work for XA.

that no signed agreements exist.  First, the fact that XA possesses a signed agreement with Wagner (SAC, Ex. D) but not with Andereck or Wilson, although the contracts were supposedly drafted at the same time, indicates that Andereck and Wilson never signed an employment agreement; otherwise, XA would have those agreements as well as Wagner's. [32]

Second, the fact that Andereck's and Wilson's agreements were marked up demonstrates that the contracts were not "boiler plate," and so there is no basis to believe the contracts were "identical."  Indeed, it is not plausible to allege that a company entered into "identical" agreements with its CEO and other employees.[33]  XA's allegations regarding the terms of these imagined agreements are not only sheer speculation, but implausible speculation.  Without knowing the terms of the contract allegedly breached, XA cannot state a claim for breach of contract.

Third, the allegation that draft employment agreements were prepared for Wilson and Andereck has absolutely nothing to do with the other Individual HudsonGray Defendants: Lomma, Day, and Gudin.  Indeed, XA's breach of contract claim against Gudin definitively demonstrates that XA has absolutely no factual basis to allege that the Individual HudsonGray Defendants signed employment agreements.  XA alleged in its First Amended Complaint that, "In fact, Gudin never worked for XA." (FAC, ¶ 67.)  In the most recent dismissal motion, defendants presented XA with an IRS Form W-2 that XA issued to Gudin, establishing his employment. (Dkt. No. 15-1.)  XA's Second Amended Complaint now asserts that Gudin

---

[32] The Second Amended Complaint is filled with references to emails and documents supposedly recovered from deleted servers, but XA does not allege that it recovered copies of any contracts with Andereck or Wilson.  The reason is that such contracts never existed.  (Wilson Dec., ¶ 3; Andereck Dec., ¶ 3; Day Dec., ¶ 3; Gudin Dec., ¶ 3; Lomma Dec., ¶ 3.)

[33] Presumably, for example, all of the Individual HudsonGray Defendants did not have the same compensation terms as the company's Chief Executive Officer.

worked for XA for six weeks in April and May of 2014.  (SAC, ¶ 88.)  Thus, Plaintiff has gone from asserting that Gudin never worked for XA to asserting that Gudin signed the same employment agreement as Wagner, the CEO.  The alleged existence of draft agreements for Wilson and Andereck in 2009 certainly has no bearing on whether Gudin signed an employment agreement in 2014.  Clearly, XA is just making up these allegations as it goes along.

Plaintiff's allegations regarding the employee handbooks are just as deficient.  XA alleges, upon information and belief, that the Individual HudsonGray Defendants signed employee handbooks, and bases the belief upon the fact that it discovered a box containing a handbook and signed acknowledgment receipts from other XA employees. (SAC, ¶ 224.)  The only possible inference from this information, however, is that the Individual HudsonGray Defendants did *not* sign any acknowledgement form; otherwise, their forms would be in the box.  Also, XA's employee handbook does not include a restriction against solicitation. (SAC, Ex. C, *passim*.)  In any event, under New York law, an employee handbook is not a contract when it contains a disclaimer stating that it is not a contract.  *See Lobosco v. New York Telephone Company/Nynex*, 96 N.Y.2d 312, 317 (N.Y. 2001).  In *Lobosco*, an employee handbook stated that the employer would not allow reprisals against employees who reported violations of the handbook, but also provided a general disclaimer stating that: "This code of conduct is not a contract of employment and does not create any contractual rights of any kind." *Id.* at 315.  An employee brought suit, claiming he was fired in violation of the reprisal provision of the handbook.  *Id.* at 314-15.  The New York Court of Appeals dismissed the breach of contract claim, holding that the "disclaimer prevents the creation of a contract." *Id.* at 317.  Here, the employee handbook relied upon by XA states in the Introductory Statement that: "These policies are not a legal document or an employment contract." (SAC, Ex. C, p. 4 of 13.)  Accordingly,

even if the defendants all signed handbooks – which XA has no basis to allege – they would not constitute contracts as a matter of law.

To state a claim for breach of contract, there must be a contract. XA has absolutely no direct or personal knowledge of contracts it claims that it entered into. Its belief as to their existence is based entirely on speculation, and its speculation upon these imagined contracts' terms is not even plausible. In fact, XA's former Executive Chairman has specifically denied ever seeing any signed employment contracts or handbooks, other than Wagner's Employment Contract. (Burkhardt Aff., ¶ 8.) The contract claim must be dismissed.

**POINT IV**

**THE FOURTH CLAIM FOR INJUNCTION AND CONSTRUCTIVE TRUST**
**MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR RELIEF**

XA's fourth claim for an injunction and a constructive trust (SAC, ¶ 227-233) is entirely meritless and must be dismissed. To obtain a preliminary or permanent injunction, a party must establish, *inter alia*, "irreparable harm in the absence of the injunction." *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir.2002) (preliminary injunction); *Old Republic Ins. Co. v. Hansa World Cargo Serv.*, 170 F.R.D. 361, 385 (S.D.N.Y. 1997) (standard same for permanent injunction, except that plaintiff must actually succeed on the merits). To constitute irreparable harm, the potential injury "must be the kind of injury for which an award of money cannot compensate." *Sperry Int'l Trade, Inc. v. Government of Israel*, 670 F.2d 8, 12 (2d Cir.1982). XA seeks $20,000,000 in monetary damages, plus punitive damages (SAC, ¶ 209, 220, 226, 237, 241, 246, 251, 258, 264, 270, 277, 283, 290, 295), which "is precisely the type of harm which injunctive relief is *not* designed to remedy." *Old Republic*, 170 F.R.D. at 385 (emphasis in original). Therefore, the claim for injunctive relief must be dismissed.

XA's request for a constructive trust over unspecified office furniture must also be dismissed. A constructive trust may be imposed "when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest" and its elements include a confidential or fiduciary relationship, a promise, a transfer in reliance thereon, and unjust enrichment. *Osborne v. Tooker*, 36 A.D.3d 778, 779 (2d Dep't 2007). Here, XA claims that, in "reliance upon their express and implied promises of loyalty, XA transferred the possession and control" of "all the physical resources of XA's office" to the HudsonGray Defendants. (SAC, ¶ 232.) XA's claim for a constructive trust must fail, however, because there is no allegation that XA transferred *title* to the office furniture to any of the HudsonGray Defendants; rather, XA alleges – falsely – that the HudsonGray Defendants converted it.[34]

## POINT V

### THE BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED BECAUSE XA DOES NOT IDENTIFY ANY PARTICULAR BREACH

XA's fifth claim for breach of fiduciary duty and eleventh claim for aiding and abetting breach of fiduciary must be dismissed because they both fail to identify any particular breach. *Solow v. New Northern Brokerage Facilities, Inc.*, 255 A.D.2d 198, 198 (1st Dep't 1998) (dismissing claim where no specific breaches of fiduciary duty alleged). Instead, the breach of fiduciary duty claim vaguely asserts that, "Each of the Hudson Defendants breached that duty in the numerous ways summarized above" (SAC, ¶ 236), and the aiding and abetting claim vaguely states that, "Each of these defendants substantially assistrf [*sic*] on another, in all the ways alleged above, aware that doing so would aid in the breach of applicable fiduciary duties."

---

[34] XA's conversion claim is equally meritless, but unfortunately is not susceptible to dismissal at this stage.

(SAC, ¶ 249.)   To the extent that XA relies upon the over 200 paragraphs of the Second Amended Complaint that are repeated and realleged as part of the breach of fiduciary duty and aiding and abetting claims, XA has engaged in impermissible "shotgun pleading." *Corrado v. New York State Unified Court Sys.*, 2014 WL 4626234, at *4 (E.D.N.Y. 2014).

Plaintiff's intentionally vague pleading should not be countenanced, and the claims should be dismissed with prejudice.

## POINT VI

### THE SEVENTH, ELEVENTH, AND TWELFTH CLAIMS FOR TORTIOUS INTERFERENCE MUST BE DISMISSED

Plaintiff's claim that Wilson, Wagner, Andereck, Studio AG, and HudsonGray tortiously interfered with XA's relationships with unspecified companies must be dismissed.   To state a claim for tortious interference with a contract, a plaintiff must allege, *inter alia*, the existence of a specific valid contract with a third-party breached as a result of the defendant's international interference.   *Plasticware, LLC v. Flint Hills Resources, LP*, 852 F.Supp.2d 398, 404-05 (S.D.N.Y. 2012).   Here, XA fails to identify any specific contract with which defendants supposedly interfered; rather, XA merely alleges that defendants "tortuously [*sic*] interfered with XA's relationships with companies to which it provided event planning services".   (SAC, ¶ 243.) This is now the third attempt by XA to interpose a tortious interference with contract claim, and still it cannot identify a *single* contract.   The claim must be dismissed.

To state a claim for tortious interference with its business relations[35] with NBC, Plaintiff must allege, *inter alia*, that the "interference was accomplished by wrongful means or with

---

[35] Under New York law, a claim for tortious interference with business relations and for tortious interference with prospective advantage are the same cause of action.   *See Thome v. Alexander & Louisa Calder Foundation*, 70 A.D.3d 88, 108 (1st Dep't 2009) (tortious interference with prospective business advantage); *Emergency*

malicious intent." *Arnon Ltd. v. Beierwaltes*, 125 A.D.3d 453, 453 (1st Dep't 2015). "Wrongful means include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *Id.* However, "conduct constituting tortious interference with business relations is, by definition, conduct directed not at plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Id.* at 454, *quoting Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004). Here, XA does not allege that directed any wrongful conduct towards NBC. XA, moreover, cannot demonstrate that defendants acted with "malicious intent," because, as economic competitors, defendants' alleged acts were motivated by "legitimate economic self-interest." *Carvel Corp.*, 3 N.Y.3d at 191.

The claims must be dismissed with prejudice.

## POINT VII

### THE TWELFTH CLAIM FOR MISAPPROPRIATION AND UNFAIR COMPETITION FAILS BECAUSE XA DOES NOT IDENTIFY ANY CONFIDENTIAL INFORMATION

XA's claim that the HudsonGray Defendants and the Studio AG Defendants "willfully and maliciously misappropriated XA confidential and proprietary information for their own benefit" (SAC, ¶ 253) fails because XA fails to specifically identify any confidential information, instead listing types of documents, such as contracts, invoices, and bills. The only specific allegation made by XA – that its "client lists and contacts were developed at substantial cost to the company, over many years, and were not otherwise known or easily learned by anyone outside XA" (*id.*, ¶ 255) – is absolutely false, as anyone who visited XA's website, http://www.experientialagency.com, would have access to its client list. Under New York law,

---

*Enclosures, Inc. v. National Fire Adjustment Co., Inc.*, 68 A.D.3d 1658, (4th Dep't 2009) (interference with prospective business opportunity or prospective contractual relationships). Therefore, XA's twelfth and thirteenth claims are identical, and do not have to be dealt with separately.

the most important factor in determining whether information is an actionable "trade secret" is "whether or not the information is in fact secret." *Derven v. PH Consulting, Inc.*, 427 F.Supp.2d 360, 371 (S.D.N.Y. 2006).  XA cannot hold Defendants liable for using information posted on XA's own website, and has failed to allege any particular piece of secret information that was improperly used by any Defendant.  Accordingly, the claim must be dismissed.

## POINT VIII

### THE THIRTEENTH CLAIM FOR USURPATION OF A CORPORATE OPPORTUNITY MUST BE DISMISSED AGAINST HUDSONGRAY AND THE STUDIO AG DEFENDANTS BECAUSE XA ALLEGED THAT THEY ARE COMPETITORS

Plaintiff fails to state a claim against HudsonGray or the Studio AG Defendants for a usurpation of a corporate opportunity.  "The doctrine of 'corporate opportunity' is 'based on a duty of loyalty to an employer' and provides that 'corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation.'" *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 413 (E.D.N.Y. 2012) (quoting *Design Strategies, Inc. v. Davis,* 384 F. Supp. 2d 649, 672 (S.D.N.Y. 2005)).  As such, "this cause of action is applicable to fiduciaries and employees within the same corporate entity." *Id.*  HudsonGray and Studio AG are alleged to be competitors of XA. (SAC, ¶ 23, 42.)  Competitors owe no duty of loyalty or obligation to provide XA with any benefit whatsoever, and XA fails to plead otherwise. *Dorset Indus., Inc.*, 893 F. Supp. 2d at 413.  As such, this claim must be dismissed.

## POINT IX

## XA'S CLAIM FOR PUNITIVE DAMAGES MUST BE DISMISSED

Plaintiff's request for punitive damages "in the amount of ten times compensatory injury" (SAC, ¶ 291) must be dismissed as meritless.[36]   Under New York law, punitive damages are permitted only when the alleged tort is particularly evil and reprehensible and aimed at the public. *See Guardian Mortg. Acceptance Corp. v. Bankers Trust Co. of California, N.A.*, 259 A.D.2d 358, 358 (1st Dep't 1999) ("Punitive damages, although available for breach of fiduciary duty, are available only in instances where the fiduciary duty is shown to have entailed an outrageous public wrong."); *Aronis v. TLC Vision Centers, Inc.*, 49 A.D.3d 576, 577 (2d Dep't 2008) ("punitive damages are available for the purpose of vindicating a public right only where the actions of the alleged tort-feasor constitute gross recklessness or intentional, wanton, or malicious conduct aimed at the public generally or are activated by evil or reprehensible motives.").   Even if the XA's RICO claims are deemed viable at this stage of the litigation, a prevailing civil RICO claim entitles the plaintiff to attorneys' fees, treble damages, and costs, but not punitive damages. 18 U.S.C. 1964(c).

XA does not allege any wrong aimed at the public; rather, the Second Amended Complaint alleges wrongdoing directed at one company, XA.   Further, Plaintiff has, at best, alleged a "garden variety" business dispute, and not anything "evil" or reprehensible. Accordingly, the allegations do no support a basis for the award of punitive damages, and the demand should therefore be dismissed.

---

[36] In contrast, the First Amended Complaint sought punitive damages of "five (5) times compensatory damages." (FAC, ¶ 262-63.)  Defendants' behavior obviously did not become twice as evil in between the time the First and Second Amended Complaints were drafted.  Neither request has any basis in fact or law.  Rather, like most of XA's pleadings, the requests for punitive damages is a stunt with the details molded as XA sees fit.

## CONCLUSION

For the reasons set forth above, and in the accompanying declarations, and the exhibits annexed thereto, Defendants request that the Court grant Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint with prejudice, sanction Plaintiff for filing a frivolous pleading based upon knowingly false allegations, and grant Defendants such other and further relief as the Court deems just and proper.

Dated: New York, New York
      September 18, 2015

Respectfully submitted,

**WINDELS MARX LANE & MITTENDORF, LLP**

By    /s Scott R. Matthews
      Scott R. Matthews
      James Tracy
156 West 56th Street
New York, New York 10019
(212) 237-1000
smatthews@windelsmarx.com
jtracy@windelsmarx.com
*Attorneys for Defendants*