UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**CMG HOLDINGS GROUP, INC. as assignee of XA THE EXPERIENTIAL AGENCY, INC.,**

                              Plaintiffs,

          -against-                                    Civil Action No.: 15-cv-05814- JPO

**JOSEPH WAGNER, HUDSONGRAY LLC,**                     (Oetken, J.)
**DARREN ANDERECK, JESSIE LOMMA,**
**MICHAEL DAY, JEAN WILSON, ESTELLE**
**PIZZO, STUDIO AG, LLC, REMIGIO GUDIN,**
**and MIXED COMPANY, INC.,**

                              Defendants.

---

## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS SECOND AMENDED AND REVISED COMPLAINT

Eaton & Van Winkle LLP
3 Park Avenue, 16th Floor
New York, NY 10016

On the brief:

          Lawrence Allen Steckman
          Robert Rickner

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION ..............................................................................................1

THE COMPLAINT'S ACTUAL ALLEGATIONS ..................................................2

   1.  CMG Purchases XA...................................................................................2

   2.  The Fraud Begins With Fiori XA ...............................................................5

   3.  Studio AG is Incorporated and Continues Defendants' Fraud ..................5

   4.  XA Scenes Assists Studio AG ...................................................................7

   5.  CMG Starts Asking Questions and Wagner Creates HudsonGray ............7

STANDARD ON MOTION TO DISMISS................................................................9

ARGUMENT .....................................................................................................9

      Point I   XA Has Stated a RICO Claim Against All Defendants............................9

        A.  XA Has Properly Pleaded Predicate Acts of Mail and Wire Fraud..............10

          i)       The Law Regarding RICO Schemes and
                    Pleading Mail and Wire Fraud.........................................................10

          ii)      Defendants' Argument that XA Has Only
                    Pleaded Theft and Larceny Fails.....................................................13

          iii)     XA Has Properly Pleased a Pattern Within
                    the Meaning of RICO........................................................................17

          iv)     Defendants' Statute of Limitations Argument Fails .........................21

          v)      Defendant Wagner's Contractual Release Argument Fails ..............22

          vi)     Defendant Wagner's Contractual Venue
                    Argument Should be Rejected .........................................................23

          vii)    XA Has Properly Pleaded RICO Conspiracy
                    Against All Defendants.....................................................................25

Point II      Wagner's Argument Based on the April Release Fails ...........................26

Point III     XA Has Stated A claim for Breach of Contract .....................................26

Point IV      XA Has Stated a Claim for Injunction and Constructive Trust..............30

    A.  XA Has Stated a Claim for a Permanent Injunction .....................................30

    B.  XA Has Stated a Claim for a Constructive Trust...........................................32

Point V       XA Has Stated a Claim for Breach of Fiduciary Duty ...........................34

Point VI      XA Has Stated a Claim for Tortious Interference...................................36

Point VII     XA Has stated a Claim for Misappropriation
              & Unfair Competition ...............................................................................37

Point VIII    XA Has Stated a Claim for Usurpation of Corporate
              Opportunity Against the Hudson Individual
              Defendants and Pizzo..................................................................................41

Point IX      XA Has Stated a Claim for Punitive Damages .......................................41

CONCLUSION............................................................................................................44

# TABLE OF AUTHORITIES

*Cases*

*A. Brod, Inc. v. SK & I Co., L.L.C.,*
  998 F.Supp. 314 (S.D.N.Y.1998) .................................................................. 32

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.,*
  722 F.2d 988 (2d Cir.1983) ........................................................................... 33

*Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp.,*
  135 A.D.2d 889, 522 N.Y.S.2d 287 (1987) ................................................... 38

*Allen ex rel. Allen v. Devine,*
  726 F. Supp. 2d 240 (E.D.N.Y. 2010) ........................................................... 20

*Anacomp, Inc. v. Shell Knob Servs., Inc.,*
  93-Civ. 4003 (PKL), 1994 WL 9681 (S.D.N.Y. Jan. 10, 1994) ................ 30, 35

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................ 9

*Atlantic Marine Construction Company v. United States District Court for
  Western District of Texas,*
  134  S.Ct. 508 (Dec. 3, 2013) ........................................................................ 24

*Bankers Trust Co. v. Rhoades,*
  859 F.2d 1096 (2d Cir. 1988) ........................................................................ 21

*Barbagallo v. Marcum LLP,*
  820 F. Supp. 2d 429 (E.D.N.Y. 2011) ........................................................... 41

*Bausch & Lomb Inc. v. Alcon Labs., Inc.,*
  64 F. Supp. 2d 233 (W.D.N.Y. 1999) ............................................................ 32

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544, 570 (2007) ................................................................................ 9

*Berman v. Sugo LLC,*
  580 F.Supp.2d 191 (S.D.N.Y.2008) .............................................................. 41

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
  369 F.3d 212 (2d Cir.2004) ........................................................................... 27

*Bridge v. Phoenix Bond & Indemnity Co.,*
  128 S.Ct. 2131 (2008) .................................................................................... 13

*Calabrese v. CSC Holdings, Inc.*,
    No. 2:02-CV-05171-JS-ARL, 2003 WL 22052824 (E.D.N.Y. Aug. 13, 2003) ...................... 11

*Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*,
    808 F.Supp. 213, 228 (S.D.N.Y.1992) ........................................................................ 10

*Cyril v. Neighborhood P'ship II Housing Dev. Fund, Inc.*,
    124 F. App'x 26 (2d Cir. 2005) ................................................................................... 27

*Diamond v. Oreamuno*,
    24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969) ...................................... 33

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir.1993) ........................................................................................... 21

*Don Buchwald & Assoc., Inc. v. Rich*,
    281 A.D.2d 329, 723 N.Y.S.2d 8 (1st Dep't 2001) .................................................... 43

*Durland v. U.S.*,
    161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709 (1896) ............................................ 15

*Ecolab Inc. v. Paolo*,
    753 F.Supp. 1100 (E.D.N.Y.1991) ............................................................................. 38

*Fertitta III v. Knoedler Gallery, LLC*,
    2015 WL 374968, *6 (S.D.N.Y. Jan. 29, 2015) ........................................................ 10

*Fertitta v. Knoedler Gallery, LLC*,
    No. 14-CV-2259 JPO, 2015 WL 374968 (S.D.N.Y. Jan. 29, 2015) .................... 9, 25

*Fitzgerald v. Chrysler Corp.*,
    116 F.3d 225 (7th Cir. 1997) ............................................................................... 19, 20

*Getty Petroleum Corp. v. Island Transp. Corp.*,
    878 F.2d 650 (2d Cir. 1989) ........................................................................................ 43

*Holmes v. Parade Place, LLC*,
    No. 12 CIV. 6299 GBD DF, 2013 WL 5405541 (S.D.N.Y. Sept. 26, 2013) ............ 21

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d Cir. 1998) .......................................................................................... 21

*In re Sumimoto Copper Litig.*,
    995 F.Supp. 451 (S.D.N.Y. 1998) .............................................................................. 11

*Irving Trust Co. v. Deutsch,*
  73 F.2d 121 (2d Cir.1934) ...................................................................................... 26

*Lamdin v. Broadway Surface Advertising Corp.,*
  272 N.Y. 133, 5 N.E.2d 66 (1936) ......................................................................... 36

*Lapin v. Goldman Sachs Grp., Inc.,*
  506 F.Supp.2d 221 (S.D.N.Y.2006) ....................................................................... 21

*Lentell v. Merrill Lynch & Co.,*
  396 F.3d 161 (2d Cir.2005) ...................................................................................... 21

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.,*
  879 F. Supp. 2d 243 (E.D.N.Y. 2012) ................................................................... 20

*Mariani v. Summers,*
  3 Misc.2d 534, 52 N.Y.S.2d 750 (Sup. Ct. N.Y. Co. 1944) ................................. 34

*McCracken v. Verisma Sys., Inc.,*
  No. 6:14-CV-06248 MAT, 2015 WL 5510367 (W.D.N.Y. Sept. 16, 2015) ........... 27

*McNally v. United States,*
  483 U.S. 350 (1987) ................................................................................................. 10

*Milton Abeles, Inc. v. Farmers Pride, Inc.,*
  603 F.Supp.2d 500 (E.D.N.Y.2009) ....................................................................... 41

*Nielsen v. Rabin,*
  746 F.3d 58 (2d Cir. 2014) ........................................................................................ 9

*Nirvana, Inc. v. Nestle Waters N. Am. Inc.,*
  No. 6:14-CV-01181 MAD, 2015 WL 4726502 (N.D.N.Y. Aug. 10, 2015) ........... 40

*Nutronics Imaging, Inc. v. Danan,*
  No. CV 96–2950, 1998 WL 426570 (E.D.N.Y. June 10, 1998) ............................. 32

*Pathmark Graphics Inc. v. J.M. Fields, Inc.,*
  53 A.D.2d 531, 384 N.Y.S.2d 177 (1st Dep't 1976) .............................................. 32

*Paz Sys., Inc. v. Dakota Grp. Corp.,*
  514 F. Supp. 2d 402 (E.D.N.Y. 2007) ............................................................ passim

*Pereira v. U.S.,*
  347 U.S. 1 (1954) ..................................................................................................... 10

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*
    813 F. Supp.2d 489 (S.D.N.Y. 2011) ............................................................... 31, 43

*Republic of Philippines v. Marcos,*
    806 F.2d 344 (2d Cir. 1986) ................................................................................. 32

*Schine v. Schine,*
    250 F.Supp. 822 (S.D.N.Y. 1966) ....................................................................... 26

*Schmuck v. United States,*
    489 U.S. 705 (1989) ............................................................................................. 10

*Schneidman v. Tollman,*
    190 A.D.2d 524, 593 N.Y.S.2d 23 (1st Dep't 1993) ............................................ 34

*Simonds v. Simonds,*
    58 A.D.2d 305, 396 N.Y.S.2d 547 ...................................................................... 33

*Staehr v. Hartford Fin. Servs. Group, Inc.,*
    547 F.3d 406 (2d Cir.2008) .................................................................................. 21

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.,*
    380 F.Supp.2d 250 (S.D.N.Y.2005) ..................................................................... 43

*Transaero, Inc. v. Chappell,*
    No. 13-CV-5752 JFB GRB, 2014 WL 1783732, at *12 (E.D.N.Y. May 6, 2014) ................... 40

*U.S. v. Altman,*
    48 F.3d 96 (2d Cir. 1995) .................................................................................... 15

*U.S. v. Salvagno,*
    306 F. Supp. 2d 258 (N.D.N.Y. 2004) ................................................................. 20

*U.S. v. Utley,*
    No. 98 CR. 1111 (TPG), 2000 WL 620218 (S.D.N.Y. May 12, 2000) .................... 10

*United States v. Reed,*
    601 F.Supp. 685 (S.D.N.Y.) ................................................................................. 33

*Wachtel v. National R.R. Passenger Corp.,*
    No. 11–CV–613, 2012 WL 292352 (S.D.N.Y. Jan. 30, 2012) ............................... 27

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.,*
    328 F. App'x 695 (2d Cir.2009) ........................................................................... 21

*Wrap–N–Pack, Inc. v Kaye,*
    528 F.Supp.2d 119 (E.D.N.Y. 2007).................................................................. 41, 43

*York Grp., Inc. v. Pontone*,
    No. CIV.A. 10-1078, 2014 WL 896632 (W.D. Pa. Mar. 6, 2014)........................................... 31

### Statutes

18 U.S.C. § 1341 ............................................................................................................. 10

18 U.S.C. § 1346 ............................................................................................................. 10

18 U.S.C. § 1961 ............................................................................................................. 9

28 U.S.C. § 1404 ............................................................................................................. 24

### Rules

Federal Rule 12(b)(6)............................................................................................. passim

CMG Holdings, Inc. ("CMG"), as assignee of XA The Experiential Agency, Inc. (collectively "XA" or "Plaintiff") submits this memorandum in opposition to the motion to dismiss filed by defendants Joseph Wagner ("Wagner"), Darren Andereck ("Andereck"), Jean Wilson ("Wilson"), Jessie Lomma ("Lomma"), Michael Day ("Day") and Remegio Gudin ("Gudin") (the "Individual Hudson Defendants"), and HudsonGray LLC a/k/a HudsonGray, Inc. ("HudsonGray") (collectively with the Individual Hudson Defendants, the "Hudson Defendants"), Studio AG LLC ("Studio AG") and Estelle Pizzo ("Pizzo") (the "Studio AG Defendants"), and Mixed Company, Inc. ("Mixed Company") (collectively the "Defendants"). Defendants concede XA has stated a claim for breach of the faithless servant doctrine (sixth claim), conversion (thirteenth claim), and unjust enrichment (fourteenth claim) and move to dismiss XA's other claims. For the reasons stated herein, their application should be denied.[1]

## INTRODUCTION

Defendants' effort to dismiss XA's claims is based largely on their own mischaracterizations of the pleading.  The straw-men they invent bear little resemblance to the allegations interposed.  They disregard allegations undermining their arguments. The theories upon which the claims are premised remain unaddressed or distorted.  The factual allegations and theories upon which the pleading is based are not vulnerable to Defendants' arguments.[2]

---

[1]      References to the Second Amended Complaint are notated "SAC," complaint paragraphs are referenced as "SAC ¶ __," Complaint Exhibit A predicate act numbers are referenced "Ex. A # __."

[2]      Defendants' memorandum contains many *ad homonym* attacks against XA, as well as counsel. Such attacks should be disregarded.  Similarly, Defendants' memorandum is filled with platitudes about "garden variety frauds," "incoherence" and "making things up," which should also be disregarded.   Defendants improperly submit factual affidavits in support of their Rule 12 motion arguments which XA requests be stricken.  Even if the Court considers them, which it should not do, they would merely raise factual issues inappropriate for Rule 12 motion resolution, particularly in light of Defendants' theft and attempted destruction of nearly all of XA's physical and electronic files, as disclosed largely in their own words, in their recovered emails and cell phone recordations.  Defendants' memorandum in support of their motion to dismiss is referenced as "MIS at __."

The SAC allegations are of multi-year wrongdoing, accompanied by extensive, detailed facts, largely based on Defendants' own email communications, regarding their destruction and theft of XA hard copy files, their use of fabricated invoices and spreadsheets to conceal, self-dealing transactions and payments, their exploitation of secretly controlled companies and, critically, their attempted, permanent erasure of XA's entire computer systems and electronic files (restored, in part, by XA IT professionals) and erasure of all of XA's phones (except for one, memorializing the Individual Hudson Defendants' efforts to destroy XA, the content of which is quoted extensively in the SAC, showing the wrongdoing, here, is anything but "garden variety." The facts are fully set forth in the SAC, to which the Court is respectfully directed. The Court is also respectfully directed to SAC Exhibit A which sets forth the RICO predicate crimes upon which XA's allegations are based, in chronological order, explaining how each of the predicate crimes furthered the fraudulent scheme at the heart of XA's allegations. The following fact summary is set forth for the Court's convenience.[3]

## THE COMPLAINT'S ACTUAL ALLEGATIONS

1. *CMG Purchases XA*

XA is an event planning business that produces high-end parties and promotional events for wealthy individuals, large charitable organizations and major corporations, including: The UN Foundation, Bazaar Magazine, NBCUniversal, and NBC cable affiliates USA Network, Bravo, E! and the Oxygen Channel, SAC ¶ 19. From 2009 through 2014, despite high gross revenues and increasingly larger and more lucrative contracts, XA appeared to be unprofitable, though it should have been, SAC ¶¶ 1-2. XA's persistent lack of profitability was a direct consequence of a scheme developed by the Individual Hudson Defendants to secretly siphon

---

[3]     Defendants disregard almost all of the referenced predicate crimes, inviting the Court, implicitly, to do so, as well.  The predicate crimes overwhelming implemented the RICO schemes at issue herein and even if a few such alleged predicates, ultimately, cannot be sustained, the pattern of misconduct is supported by all the rest.

profits from XA, to themselves, by re-directing XA's income to companies they owned and controlled, including defendants Mixed Company, SAC ¶¶ 214, 215, and Studio AG.  Between 2009 and the summer of 2014, when they left XA for defendant HudsonGray, the Individual Hudson Defendants continued to assert that XA was not profitable because CMG, its parent, was not investing enough money in the company. SAC ¶¶ 24, 72-73.

When XA's new management began to investigate XA's lack of profitability, the Individual Hudson Defendants immediately established a new secret company, HudsonGray, to steal XA's remaining clients, personnel, proprietary information and property.  The comprehensive nature of the destruction the Individual Hudson Defendants accomplished was captured in recorded declarations, like this text message, sent by Defendant Gudin to a temporary XA employee:   "XA is gone. We are all moving to a new company...We are the same with a different name."  SAC ¶ 83 Bullet 1.

HudsonGray was incorporated and already renting office space in early 2014, while the Individual Hudson Defendants were still working for and being paid by XA, SAC ¶ 76, and they immediately began to function as "the same" company "with a different name," as Gudin stated, transferring all XA's ongoing contract work, clients and proprietary information to itself over a five month period before most of the Individual Hudson Defendants resigned. This extraordinary theft was accomplished through the use of cell phones purchased with XA funds, used to port XA's proprietary information to temporary numbers unattached to XA's server and, thus, inaccessible to CMG review. SAC ¶¶ 79-80.  Approximately 1.8 million pieces of digital information were migrated out of 66 mailboxes from XA's server, onto a server Defendants controlled, SAC ¶¶ 81-82.  In fact, Defendants, on this motion, attach

3

copies of stolen documents in support of dismissal – confidential documents none of them should have retained, but which were stolen from XA's server. *Id*.

Once they secretly established a communication network XA could not access, the Individual Hudson Defendants solicited XA clients and stole everything XA had, including ongoing projects developed by XA for NBC Universal, SAC ¶¶ 111-114,  props, lighting equipment, contracts, contact lists, televisions, cell phones, computers and furniture. SAC ¶¶ 77, 83; *see also* Ex. B.  These thefts and diversions occurred over a five month period, from January 2014 through May 2014, after which nearly all the Individual Hudson Defendants left XA, and secretly began working for HudsonGray.

One remaining Defendant, Wilson, stayed at XA until September 2014. Although still employed in her capacity as XA's COO, she worked to conceal the whereabouts of her co-conspirators, SAC ¶ 180 (d), and misled CMG management about the location and existence of assets, SAC ¶ 180 (e)(h)(i) even as she helped siphon XA's remaining profits to defendants Mixed Company and Studio AG, SAC ¶ 180 (a) (l).  She attempted to erase the last remaining digital information from XA's server and telephones, SAC ¶180 (m), to permanently prevent XA's owners from learning what Defendants had done. SAC ¶¶ 2-4.

By sheer happenstance, one phone was accidentally left un-erased – that phone and the files XA IT professionals managed to recover from the server, disclosed the enormity of the misconduct, and it was on that basis that XA filed suit, SAC ¶ 83.

XA started its business in 2000 and was acquired by CMG in April 2009, SAC ¶¶ 33-34. XA had debts, but more than $10 million per year in revenue, SAC ¶¶ 35. After buying XA, CMG  entered into employment agreements with XA's officers, including non-compete clauses, SAC ¶¶ 37-40.  Oddly, XA's officers all said they did not want CMG stock. SAC ¶¶ 37-40.

Their immediate diversion of XA's business to Fiori XA suggests their scheme to use CMG's assets to fund their own competing enterprises was then in place. SAC ¶¶ 47-48.

2.   *The Fraud Begins with Fiori XA.*

When CMG acquired XA, it acquired all its subsidiaries, including Fiori XA, SAC ¶¶ 36-39.  Just two months after CMG bought XA, the Individual Hudson Defendants began to divert business away from XA, specifically to Fiori XA, which they used to produce, for example, a $122,000 multi-city event  for Live Canada, on June 26, 2009, SAC ¶ 47, as well as numerous high-end weddings and events for the WC  and  Bravo Networks,  SAC ¶ 48. The Individual Hudson Defendant's used Fiori XA as a vehicle to create Studio AG, as evidenced by their adding Studio AG to Fiori XA's bank account on February 27, 2009,  two months before CMG's ownership of XA was complete, SAC ¶¶ 48-50, 57.

3.   *Studio AG is Incorporated and Continues Defendants' Fraud*

In December 2009, defendants Wagner, Wilson and Andereck incorporated Studio AG, a separate company independent and facially distinct from CMG or XA, which Defendants admit "engages in the same business" as  XA, MIS at 10, listing defendant Pizzo as its "principal" to disguise ownership, SAC ¶¶ 24, 50.   CMG's former management team had no idea they intended to build Studio AG into a competing business that would steal high-end weddings, and produce events for XA's own clients like NBC's Oxygen Channel, Bravo and the USA Network SAC ¶¶ 42, 67-68.   CMG's new management team had no idea defendants had been suing Studio AG, from 2009 to 2014, to steal XA profits and clients. XA and its owners, however, were not just losing business to Studio AG. Defendants were using XA's funds to finance Studio AG's operation, and, as well, to pay its bills, SAC ¶¶ 54-59.

From 2010 through 2014, the scheme largely followed the same pattern -- expenses went to XA, while income went to Studio AG.  For example, in an email dated November 16, 2010, Studio AG's general manager, Pizzo, directed XA's COO Wilson to fraudulently alter invoices sent to Studio AG, to look like they were actually sent to XA.  SAC ¶ 54. In November 2010, Wilson and Andereck directed an XA employee to build Studio AG's website. SAC ¶ 55. In June 2011, Studio AG used XA to pay its vendor by falsely submitting a Studio AG Visa charge as a XA American Express charge instead, as explained in an email from Pizzo to Andereck recovered from XA's erased server: "We discussed this before...I thought this was paid on your [XA] Amex." SAC, Ex. A # 50. Studio AG even had XA pay its  rent. SAC, Ex. A # 40. And when it was too much trouble to quibble with vendors over disputed bills, Studio AG simply compensated itself by passing them along to XA, as illustrated in a November 14, 2013 email in which defendant Pizzo asked defendant Andereck if he would call "Brian" at Empire about $200.00 in disputed charges, to which Andereck responds, "I really don't have the time. Just bill XA back for $250.00," SAC, Ex. A # 57.

Often, Studio AG simply billed XA directly for work and material  XA could have supplied to itself from XA's own venders, totaling hundreds of thousands of dollars. SAC ¶¶ 61-63. Sometimes Studio AG fraudulently charged XA for work and materials XA already paid for, SAC ¶¶ 61-63, and fraudulently charged XA for services, materials, furniture and lighting sold or gifted to  Studio AG's interior decorating customers, many of whom managed XA's clients, SAC ¶¶ 63, 101, 111.  From 2009 through  2014, Wagner, Wilson and Andereck sent XA fraudulent spreadsheets on a monthly basis,  created to look like American Express bills,  in an effort to disguise Studio AG expenses billed to XA, in addition to other fraudulent financial transactions, SAC ¶¶ 16, 64, 85, 183 (b), as illustrated in a June 2011 email from Pizzo to

Andereck, discussing how they will submit a Studio AG Visa bill as an XA Am. Ex. charge –

"We discussed this before…I thought this was paid on your [XA] Amex." SAC, Ex. A, # 50.

While XA was paying Studio AG's bills, Wagner, Wilson and Andereck instructed XA

employees to encourage XA's customers and potential customers to use Studio AG's event

planning  services, instead of XA's services. Through personal promotion at event sites that

the Individual Hudson Defendants managed and controlled, and through creation and

dissemination of advertising material including websites, magazine ads, email blasts, videos

and booklets, created by XA staff to benefit Studio AG (and paid for by XA and its owners),

they diverted profits to themselves, through controlled entities.  SAC ¶¶ 44, 55-56, 68.

4.  *XA Scenes Assists Studio AG*

Studio AG was not the only company defendants used to loot XA. Like Fiori XA, XA

Scenes was an XA subsidiary with its own separate bank account – but it was secretly

re-purposed and controlled by defendants between 2009 and 2011 who used it to compete with

XA, in this case, as an "event manager" for Gallery 1028, a large loft space in Chicago rented

out for parties and events,  SAC ¶¶ 43-45.  From 2009 to 2011, XA Scenes and Studio AG

produced hundreds of high-end weddings, charity parties and corporate events, many for XA's

own clients, like Bravo and NBC, but XA did not share in any of the profits because they were

being diverted by Wagner, Wilson and Andereck. SAC ¶¶ 70, 71.

5.  *CMG Starts Asking Questions and Wagner Creates HudsonGray*

In January 2014, CMG hired an Executive Chairman to supervise XA, and to try to

figure out why XA's profits were so low, SAC ¶ 74.  CMG did so even though, Wagner, XA's

then CEO,  threatened to quit if anyone were brought in to monitor what he was doing.

SAC ¶ 75. On February 26, 2014, SAC ¶ 91, and April 22, 2014, SAC ¶ 94, when Wagner

purported to enter into settlement agreements with XA, CMG believed he was just an unhappy senior employee, not the owner of a new company, Hudson Gray, and was, along with other Individual Hudson Defendants, already systematically dismantling XA, from within, leaving XA without its own proprietary IT data, employees, contracts or clients,  SAC ¶¶ 79, 76-77. Neither XA nor CMG had any idea that its office being pillaged, in the dead of night – "when no one is there," SAC ¶ 83 Bullet 3, by XA employees who snuck into its office and storage lockers to split up the spoils and steal what little XA had left, before leaving for HudsonGray, as memorialized in a May 8, 2014 text message where XA employee Chelsea Tracy writes to defendant Gudin: "You want one of the wooden topped coffee tables in the storage room, right? I'm getting my stuff today. Just want to make sure I don't take any of yours." SAC ¶¶ 83 Bullet 5, 85, 103-105.  None of the "stuff" belonged to them – they were stealing it.

HudsonGray stole all XA's accounts.  By June 20, 2014, XA was severely damaged and, as Gudin had suggested, was illicitly "rebrand" by the Individual Hudson Defendants as HudsonGray, which remains in possession of (and continues to profit from) all XA's business and assets, including its trade secrets, profits, employees, hard copy and electronic files, intellectual property, office equipment and even furniture, SAC ¶¶ 103-106.  Today, XA's old clients, now clients of HudsonGray, will not even return XA's phone calls, even though many, like NBC, were XA clients for nearly a decade, SAC ¶¶ 115-116, and the existence of such clients was a material basis of CMG's purchase of XA, in the first instance.  XA's business has been injured by the extensive fiduciary and criminal misconduct.

## STANDARD ON MOTION TO DISMISS

The standard governing Rule 12 dismissal motion practice has been summarized in

*Fertitta v. Knoedler Gallery, LLC*, No. 14-CV-2259 JPO, 2015 WL 374968, at *5 (S.D.N.Y. Jan.

29, 2015) (Oetken, J.):

> To survive a motion to dismiss under Federal Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The standard of "facial plausibility" is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility is distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Nielsen v. Rabin*, 746 F .3d 58, 62 (2d Cir.2014)…

XA has alleged facts setting forth a plausible factual narrative supporting its claims.

## ARGUMENT

## POINT I

## <u>XA HAS STATED A RICO CLAIM AGAINST ALL DEFENDANTS</u>

The elements of a claim under the Racketeer Influenced and Corrupt Organizations Act,

18 U.S.C. §1961, *et. seq*.  ("RICO") are well known.  *See Fertitta*, 2015 WL 374968, *5  (listing

elements and providing citations, denying defendant's claim that he did not commit predicate

acts, refusing to dismiss RICO claim).  Here, Defendants attack only two elements of XA's

RICO claim, XA's pleading of predicate acts and a RICO pattern.  Because Defendants do not

challenge XA's pleading of RICO's other elements (and to save space), we address only the

elements they attack.[4]

---

[4]       XA's pleading of RICO elements can be found as follows: predicate acts, SAC ¶¶ 159-164 and SAC Ex. A (chart of predicate acts in chronological order); enterprise element, SAC ¶¶ 165-176; operation and management test, SAC ¶¶ 177-183;  pattern element, SAC ¶¶ 184-197 and SAC Ex. A; transaction, loss causation and direct injury requirements, SAC ¶¶ 198-199;  scienter, SAC ¶ 200; damages, SAC ¶¶ 201-206.

A.  *XA Has Properly Pleaded Predicate Acts of Mail and Wire Fraud*

i)      The Law Regarding RICO Schemes and Pleading Mail and Wire Fraud

In a mail or wire fraud-based RICO case, the mailings or wirings themselves need not contain false or misleading statements, as long as the communications further an underlying scheme that itself has a fraudulent, deceptive purpose.  *See Schmuck v. United States,* 489 U.S. 705, 715 (1989) (upholding mail fraud conviction in which the routine mailing of title documents furthered fraudulent scheme to purchase used cars, roll back their odometers, and resell them at artificially inflated prices).  Even so-called "innocent" mailings may "satisfy the mailing element under the mail fraud statute where the mailing is part of the execution of the scheme." *Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.,* 808 F.Supp. 213, 228 (S.D.N.Y. 1992) (citing *Schmuck,* 489 U.S. at 715), *aff'd,* 99 F.3d 401 (2d Cir. 1995); *Fertitta III v. Knoedler Gallery, LLC*, 2015 WL 374968, *6 (S.D.N.Y. Jan. 29, 2015) (Second Circuit has squarely held defendant commits wire fraud where he is one participant in a fraudulent scheme "furthered by the use of interstate transmission facilities.").

To satisfy the element of mail fraud requiring the use of the mails in furtherance of a scheme to defraud, *see* 18 U.S.C. § 1341, the mailings need not be an essential part of the scheme as long as they are "incident to an essential part of the scheme," *Pereira v. U.S.,* 347 U.S. 1, 8 (1954); *accord Schmuck,* 489 U.S. at 715. The same rule applies to the wire fraud statute. *See, e.g., U.S. v. Utley,* No. 98 CR. 1111 (TPG), 2000 WL 620218, at *1 (S.D.N.Y. May 12, 2000). The phrase "scheme to defraud" has been interpreted as a "plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *McNally v. United States,* 483 U.S. 350, 358 (1987) (quotations omitted), *superseded by statute on other grounds,* 18 U.S.C. § 1346. This is what the SAC pleads, here.  *See*, *e.g*., SAC ¶¶ 47-49 (Fiori XA scheme to defraud),

SAC ¶¶ 50-71 (Studio AG scheme to defraud), SAC ¶¶ 79-83 (detailing theft of electronic information and attempted permanent erasure of XA server to conceal fraudulent misconduct (including quoting the content of Defendants' communications among themselves regarding their thefts)), SAC ¶¶ 99-103 (detailing the theft of NBCUniversal projects already at XA), SAC ¶¶ 109-111 (discussing the detail of budgets for NBCUniversal events).

To survive a motion to dismiss where a scheme to defraud is alleged, the complaint need not identify false statements contained in the mailings or wire transmissions themselves – and where the mailings or wire transmissions themselves are not false or misleading, Rule 9(b)'s particularity requirements do not apply to the description of the mailings or wire transmissions. *See Calabrese v. CSC Holdings, Inc.,* No. 2:02-CV-05171-JS-ARL, 2003 WL 22052824, at *6 (E.D.N.Y. Aug. 13, 2003) (where a plaintiff alleges that mail and wire fraud were in furtherance of a larger scheme to defraud, "Rule 9(b) only requires the plaintiff to delineate, with adequate particularity, the specific circumstances constituting the overall fraudulent scheme"); *In re Sumimoto Copper Litig.,* 995 F.Supp. 451, 456 (S.D.N.Y. 1998) (where scheme in furtherance of master plan to defraud, communications need not have contained false or misleading information; detailed description of underlying scheme and connection of mail/wire communication sufficient).

Here, the overall scheme to defraud is described in great detail. The complaint explains the relationship between the mailings or wire communications and the scheme to defraud in the SAC allegations, *see*, *e.g.*, SAC ¶¶ 9-18 (summarizing schemes), and SAC Ex. A (identifying the type of predicate, who sent it and to whom, and when, all in chronological order, along with the general content of the communication and how it furthered the scheme to defraud XA of "something of value" by "trick, deceit, chicane or overreaching.").  That "something of value"

was XA's then present and potential clients, its ongoing business relationships, its then capital and physical resources, including its hard copy files and, also, electronic files Defendants erased in an effort to destroy XA's ability to continue in business.  SAC ¶¶ 42-43, 83, 85, 99.

Here, Defendants' mail and wire communication were "integral" to their fraud, as these communications were used to implement the thefts mentioned.  *See*, *e.g.*, SAC ¶ 80, Ex. A ## 122 and 126 (Defendants emailing directions as to how to "port" XA confidential and proprietary data onto temporary HudsonGray phones, allowing the theft of same), SAC ¶ 81, Ex. A #62 (multiple email updates regarding "migration" of XA data onto HudsonGray servers over a five month period), SAC ¶ 54, Ex. A ## 27, 37, (emailing directions to convert Studio AG bills into XA bills), SAC ¶ 83 Bullet 3 (text directives to "get the four duratrans out of [XA's] storage [locker] and steal XA property when "no one is there"), SAC ¶ 181(e) (emailing directions to transfer XA's property out of storage lockers into Hudson Gray storage lockers, using XA funds to pay movers to steal its own property), SAC ¶ 181(i) and Ex. A ## 16, 38, 50, 53, 57, 63, 68, 77, 85, 97, 108, 111 (fraudulent AMEX coded spreadsheets being used to disguise fraudulent use of XA funds to pay Studio AG liabilities and Defendant's own personal expenses, emailed over a five year period) and SAC ¶ 181(c), Ex. A ## 74, 108 (emailed snapshots of personal AMEX bill totals, with no itemized statements, reimbursed with XA funds).

Defendants, in their communications with the third party clients and potential clients of XA held themselves out as being lawfully capable of engaging in the transactions that are the subject of XA's claims, inducing the third parties to participate in transactions that were prohibited. *See*, *e.g.*, SAC ¶ 56 (Studio AG uses XA employee to promote Studio AG's party planning service and decor packages to Gallery 1028 clients), SAC ¶ 47 (Fiori XA signs agreement with Calihan Catering to Manage Gallery 1028, signs contract to produce the Live

Canada Event, produced by Fiori XA, rather than XA, which could have provided same service), SAC ¶ 67 (Studio AG produces events for NBC's Oxygen Channel, Bravo's Top Chef, Google, and the Wrigley Team – Studio AG's year end 2010-2012 statements detail numerous high-end weddings, corporate events and charity parties, all of which XA could have produced and financially benefitted from, but which were diverted to Studio AG) and SAC ¶ 68 (Studio AG uses XA-produced websites, booklets, videos, email blasts and magazine advertisements to steal wedding, corporate and charity event business from XA and redirecting profits to Defendants).

Doing so violated fiduciary and employment laws, *see infra*, as well as XA Handbook provisions, *see*, *e.g.*, SAC ¶ 128 (setting forth examples of unacceptable workplace behavior, including, *inter alia* conflicts of interest, illegal conduct, theft or removal of property), SAC ¶ 130 (prohibiting outside business dealings that result in unusual gains for those firms), SAC ¶ 138 (addressing non-disclosure  of trade secrets and business information), as well as contract prohibitions on solicitation, as discussed below.  Reliance by third parties on mail and wire fraud communications satisfies mail or wire fraud reliance requirements, in the context of RICO allegations.  *See Bridge v. Phoenix Bond & Indemnity Co.*, 128 S.Ct. 2131 (2008) (plaintiffs asserting RICO claim predicated on mail fraud need not prove they personally relied on the defendant's alleged misrepresentations so long as third parties rely).

ii)     <u>Defendants' Argument that XA has only Pleaded Theft and Larceny Fails</u>

Defendants argue that XA has not properly pleaded mail or wire fraud because, they say, all the instances of mail/wire fraud prior to January, 2014 should be viewed as "larceny" and "theft," which are not RICO predicate crimes, and thus not RICO-actionable – they say this is really a case about stolen office "furniture," MIS at 2.  Certainly this case involves property theft, *see* SAC, Ex. B (listing the items known to have been stolen, based on files reconstructed

13

to the date the pleading was filed, and the value of same), but the gravamen of this case is

Defendants' scheme to obtain money and property through a pattern of mail and wire fraud. It

includes Defendants' preparation and exploitation of fraudulent invoices and spreadsheets (to

deceive XA as to what was being spent on XA's business), fraudulent communications to XA

clients intended to deceive those clients into believing the Hudson Defendants could properly

direct what should have been XA business to Studio AG, a secret competing entity, at the time

they remained XA employees, being paid by XA.

Defendants used emails and mailings to achieve their criminal objective, i.e., to defraud

XA (as well as XA customers) by concealing what the Individual Hudson Defendants were really

doing, namely, stealing clients from XA, *see*, *e.g.*, SAC ¶ 45 (Hudson Defendants require XA

employees to sign separate confidentiality agreements for XA Scenes and establish separate bank

accounts for XA Scenes), SAC ¶ 52 (Hudson Defendants tell Parkway Bank Fiori XA is

"rebranding" as Studio AG and telling XA clients that HudsonGray is the "same" company as

XA, just using a different name, when this was false), SAC ¶ 50 (forming Studio AG LLC,

naming Pizzo "principal," to disguise its true ownership by Wagner, Andereck and Wilson), SAC

¶ 57 (establishing a separate Fiori XA bank account at Parkway Bank that will accept Studio AG

checks), SAC ¶ 178(j), Ex. A ## 83, 94, (emails directing XA employees to stay away from new

XA Chairman, Ron Burkhardt, sent by CMG to determine what was going on at XA and why its

profitability was so poor) SAC ¶ 80, Ex. A ## 90, 91, 95, 96 (directing XA employees to port

XA data into temporary phones, to disguise the Individual Hudson Defendants thefts of XA

electronic data), SAC ¶ 143, Ex. A ## 122, 126 (directing the changing of computer passwords

of former XA employees, working for HudsonGray), SAC ¶ 181 (e), Ex. A # 110 (directing the

transfer of XA's hardcopy files and property out of XA storage lockers into HudsonGray storage

lockers) and SAC ¶ 81, Ex. A, #62 (directing David Tuma, XA's IT specialist, to migrate

1,789,382 items of XA's proprietary information out of 66 mailboxes, into a HudsonGray

controlled server). The scheme to conceal was taking place even as these defendants used XA's

own financial and business resources to benefit themselves. *See*, *e.g.*, SAC ¶ 58, Ex. A ## 53,

63, 111, 101 (using XA funds to pay for furniture, lighting, hardware, fabrication and appliances

for Studio AG decorating clients ), SAC ¶ 110 (under-representing the true cost of XA's 2014

NBC Upfront event to divert profits ), SAC ¶ 180(a) (fraudulently billing XA $183,705.00

through Wilson's florist, Mixed Company, SAC ¶ 29), ¶ 181(e), Ex. A ## 16, 27, 37-38, 50, 53,

57, 63, 68, 77, 85, 108, 111 (converting XA resources for the benefit of Studio AG through the

use of fraudulent AMEX spreadsheets and fictitious Studio AG bills), SAC ¶ 182 (g), Ex. A #16

(using XA funds to pay for Studio AG jobs, servicing stolen XA clients, through that company)

and SAC ¶ 182 (k) (Studio AG billing XA $550,000.00 for the NBC Upfront when XA's own

budget for this event does not list Studio AG as a vendor).

  Where a scheme to defraud is alleged, the test of whether the communication may

function as a predicate crime is whether that communication furthered the fraud. The phrase

"scheme to defraud" has been broadly construed. A scheme to defraud has been interpreted to

include "everything designed to defraud by representations as to the past or present, or

suggestions and promises as to the future." *U.S. v. Altman,* 48 F.3d 96, 101 (2d Cir.1995)

(quoting *Durland v. U.S.,* 161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709 (1896)) (internal

quotation marks omitted).  Here, XA has pleaded a broad scheme, which can be analytically

broken out as three separate schemes in which the Individual Hudson Defendants secretly

engaged in a competing business, syphoning clients to Studio AG, stole business resources from

their employer, including everything from furniture to computers, and concealed what they were doing. As a direct result, they obtaining money and property belonging to XA, not Studio AG.

XA alleges Defendants intended to obtain money and property through their racketeering scheme, that they obtained money, clients and physical property as a direct result of their RICO misconduct and that they managed to hide the fact they were competing with XA, through Studio AG, in the same market, with Defendants' gain directly related to Plaintiffs' loss.  SAC ¶¶ 42-43, 67.   This wide-ranging, multi-year scheme to defraud was implemented and coordinated through mail and wire communications which allowed Defendants to steal XA's business and property, first, through Studio AG (and several other controlled entities) and, then, starting in or around January, 2014, when CMG's new management advised it would be increasing its monitoring of activity at XA, SAC ¶¶ 16-17, using both Studio AG and secretly establishing HudsonGray to achieve and further those same unlawful ends. SAC ¶¶ 169-173 and 161-162.

The fact that wire and mail fraud crimes were the vehicle through which Defendants' thefts were accomplished does not prevent these same communications from serving as RICO predicate crimes; rather, the reason these communications are predicate crimes in the first place is because they were the criminal means by which Defendants' fraud and other misconduct was being perpetrated.  That scheme to defraud included secreting that Defendants were stealing XA clients, projects and financial resources, on a systematic basis, from 2009 to 2014, largely through Studio AG, SAC ¶¶ 169, and, after establishing HudsonGray, continuing that very same type of misconduct, though both Studio AG and HudsonGray, SAC ¶¶ 170-173.

Theft of XA's physical resources, as well as its financial resources and clients, SAC ¶¶ 192-194,  in the ways the SAC alleges, was not – contrary to Defendants' spin – a "new" or "separate" scheme, but the continuation of a criminal scheme, already in progress, that pre-dated

CMG's new management's efforts to find out what was going on at XA by placing someone directly into the company to try to find out what was going on, SAC ¶ 16, which effort is what triggered the Hudson Defendants forming HudsonGray, while employed at XA, and leaving XA only after they had taken whatever they could steal from their employer. SAC ¶¶ 17-18.

    *iii)*    *XA Has Properly Pleaded a Pattern Within the Meaning of RICO*

Defendants argue that even if the mail and wire communications described in the SAC are predicate crimes, no RICO "pattern" exists because the pattern did not extend for more than two years and so failed RICO pattern element continuity requirement. They assert that XA does not properly allege any predicate crimes for the period 2009 to the summer 2014 because all the mailings and wire communications should be deemed non-RICO actionable "theft" or "larceny" and that the only possible RICO misconduct in this case could have started in January 2014, running through the time the Individual Hudson Defendants left XA, too short a period to evidence RICO pattern continuity.  This is not what the SAC alleges.

Defendants' scheme to steal XA's business began, as pleaded, in 2009 when CMG bought XA, SAC¶ 37, a time, when Wagner, Andereck and Wilson all refused to take CMG stock, SAC ¶ 38, but, instead, secretly and immediately formed Studio AG, SAC ¶ 39, through which they would, over the next several years, syphon business away from XA, to themselves. SAC ¶ 50.[5]  That scheme, i.e., to divert XA customers away from XA and to steal its financial resources, continued, after January, 2014, SAC ¶ 99, when diversions of clients to HudsonGray began (as the Individual Hudson Defendants were already doing through Studio AG).  *Id.* The scheme involved multiple company and individual defendants, SAC ¶¶ 47-48, 68, 103,

---

[5]    Defendants argue that XA has alleged a few predicate crimes dating prior to 2009, MIS at note 21, prior to CMG's purchase of XA.  Although the predicate chart cites a few early mailings which were included to make its allegations of RICO misconduct clearer, the SAC is clear -- the misconduct for which it seeks relief is that misconduct which began in 2009 with the purchase by CMG of XA.

coordinating their efforts, SAC ¶¶ 56, 192, through hundreds of mail and wire communications helping them implement their thefts, *see* SAC Ex. A, as well multiple non-RICO predicate crimes of theft and larceny, SAC Ex. B, all showing criminal acts were the "regular way" the Individual Hudson Defendants secretly operated and managed XA, SAC ¶¶ 178-184, 188-194, posing a threat of ongoing, continued criminality,  SAC ¶ 192, i.e., open/closed-end continuity.

Defendants' argument is based on a pretense that HudsonGray is alleged to have been involved a "different scheme" than the one in which XA alleges Studio AG was involved – but XA's actual allegations identify the very same sort of wrongdoing by both entities, i.e., clients continuously being diverted to Studio AG (from 2009 to the present time) and after January, 2014, XA clients and business also being diverted to HudsonGray, as well as Studio AG.  SAC ¶¶ 189-197.   Although Defendants engaged in additional non-RICO criminal wrongdoing, i.e., theft, larceny and conversion of XA physical resources, as listed and quantified in SAC Ex. B, after HudsonGray was formed, SAC ¶ 85, Defendants continued their wrongdoing, through HudsonGray, with the benefit of the physical items stolen from XA's office, SAC Ex. B.

Defendants present no compelling justification for bi-secting their crimes into two periods, 2009 to January 2014 and, then, from January, 2014 to the present.  Such bi-section would be particularly inappropriate given XA has alleged the same types of diversions involved (the diversion/theft of XA clients – *cf*.  SAC ¶¶ 42-48, 67 (theft of XA resources prior to January, 2014) with SAC ¶¶ 99-102, 109-110 (theft of XA resources after January, 20 14). The victim during both time periods was the same, XA (and its owners)).  Defendants' methodology was the same, i.e., diversions of business projects effected through controlled entities, facilitated by mail and wire communications, only a subset of which are set forth in SAC Ex. A, which suggests this was business as usual for Defendants, posing a continuing threat from 2009 to the present).

The diversion of XA capital resources (implemented through fabricated credit card spread-sheets and, e.g., falsification of the responsible parties of fraudulent invoices), pre-dated January 2014. SAC ¶¶ 54, 63, 178 (e)-(f), 180(c), Ex. A ## 16, 27, 37, 38, 50, 53, 57, 63, 68, 77, 85, 108, 111.[6] Defendants emails, coordinating and proving the out-and-out theft (including emails directing that Defendants enter the premises when no one was there to see what they were doing, and how they were going to divvy up XA's property that they were stealing among themselves, SAC ¶ 83 Bullet 3, and expressly advising one another to avoid the person that CMG put in place to try to find out what was occurring, Mr. Burkhardt, SAC ¶¶ 178(j), 180(f), Ex. A, # 83, show the misconduct in which they were engaged was intentional.

To be clear, this is not a case in which efforts are made to try to "mold" a case of ordinary theft or fraud into a RICO case, as Defendants pretend. The prototypical RICO case has been described in a leading Seventh Circuit decision by Judge Posner, *Fitzgerald v. Chrysler Corp.,* 116 F.3d 225, 227 (7th Cir.1997) as follows:

> The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetuate more, and less easily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise that he has taken over.

---

[6]     On February 27, 2009, defendant Pizzo created a new bank account for Fiori XA that would accept Studio AG checks, even though Studio AG was not incorporated until December 28, 2009, SAC Ex. A ## 3-5, making sale of Fiori's Van an asset for Studio AG to potentially use for the purchase of it's own van possible, as discussed in an email between defendants Pizzo, Andereck and Wilson on June 3, 2009. *See* SAC ¶ 57. Defendants, MIS at 10, argue Fiori XA, as "*a wholly owned subsidiary,*" could not divert business from its parent, XA, yet claim, on MIS at 11, that Fiori XA was not purchased by XA in 2009 - therefore, they suggest it was *not* a subsidiary that *could have* harmed XA, as a competitor.  Emails cited, SAC ¶¶ 47-48, allege Fiori XA functioned as a competitor to XA after CMG acquired it, from April, 2009 until December 28, 2009, when Fiori XA was "rebranded" as Studio AG. Whether a subsidiary or not, Fiori XA did in fact act as a competitor to XA, controlled by Defendants, which never compensated XA for the business and assets they stole.  At a minimum, factual issues not properly resolved on a Rule 12 motion are raised with respect to single predicate act regarding the van.

*Accord Allen ex rel. Allen v. Devine*, 726 F. Supp. 2d 240, 251 (E.D.N.Y. 2010) (quoting and applying *Fitzgerald* on question of family resemblance and prototypical RICO case).  Here, XA alleges extensive criminal activity within what, prior to CMG's acquisition of XA, appeared to be a legitimate firm.  Post-acquisition, Defendants began using XA's own resources, contacts, facilities and its appearance of legitimacy to perpetrate (and perpetuate) criminal acts of larceny and theft, as well as RICO-actionable crimes of mail and wire fraud, hiding all of these crimes within the company's legitimate operations, so they could more effectively engage in even more criminality – indeed, to a far greater extent than could be accomplished if they were acting, individually.  In other words, they could only accomplish their criminal ends by channeling their activities through their criminal enterprises, SAC ¶¶ 41-49, over which they exercised operational and managerial control, SAC ¶¶ 54-64, 70-71, 100-103 and especially SAC ¶¶ 177-183 (summarizing same, for each Hudson Individual Defendant).

Defendants engaged in misconduct bearing a close family resemblance to "prototypical" RICO misconduct – infiltration of a legitimate business by criminals who then subvert the operation of the business for their .own benefit.  *See Fitzgerald, supra*.  The Individual Hudson Defendants began their criminality, inside XA, right after CMG acquired it, syphoning XA business to Studio AG and continuing to do so, over several years, hiding their tracks and thefts, implemented and concealed by mail/wire communications, as well as fraudulent spreadsheets and invoices. When XA demanded answers, they secretly formed HudsonGray to continue their misconduct, including even more extensive thefts.[7]

---

[7]      Where mail and wire fraud is used to implement a RICO scheme and is integral to perpetration and/or concealment of the subject scheme, a RICO claim is stated.  *See U.S. v. Salvagno,* 306 F. Supp. 2d 258, 267 (N.D.N.Y. 2004) (concealment of money laundering and involving mail and wire fraud, RICO claim stated); *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.,* 879 F. Supp. 2d 243, 276 (E.D.N.Y. 2012) (insurers sufficiently alleged mail fraud under RICO where complaint alleged detailed fraudulent scheme in which owners and managers knowingly concealed facts to prevent discovery of fraud owners and managers knew of and predicate acts of mail fraud were provider's regular method of operating -- intricate planning undertaken to conceal fraud).

iv)      *Defendants Statute of Limitations Argument Fails*

Defendants assert that XA's civil RICO claim is time barred.  RICO claims must be

brought within four years of the date plaintiff "discovered or should have discovered the injury."

*Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir. 1988); *see also World Wrestling*

*Entm't, Inc. v. Jakks Pac., Inc.,* 328 F. App'x 695, 697 (2d Cir. 2009). RICO's limitations period

begins to run when plaintiff has actual or inquiry notice of the injury. *See In re Merrill Lynch*

*Ltd. P'ships Litig.,* 154 F.3d 56, 60 (2d Cir.1998).  Inquiry notice with respect to civil RICO

claims is "notice such that a 'reasonable investor of ordinary intelligence would have discovered

the existence of the fraud." *Id.* (quoting *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir.

1993)).

The information that gives rise to inquiry notice can come in the form of "storm

warnings," which are "circumstances [that] would suggest to the reasonable investor of ordinary

intelligence the probability that she has been defrauded." *Lentell v. Merrill Lynch & Co.,* 396

F.3d 161, 168 (2d Cir. 2005); *Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 412–16

(2d Cir. 2008) (summarizing Second Circuit storm warnings case law).  "[O]n a motion to

dismiss, unless [d]efendants can produce uncontroverted evidence that irrefutably demonstrates

when [the] plaintiff discovered or should have discovered the fraudulent scheme, they cannot

satisfy the heavy burden of establishing inquiry notice as a matter of law." *Lapin v. Goldman*

*Sachs Grp., Inc.,* 506 F.Supp.2d 221, 234 (S.D.N.Y. 2006) (quotes and citations omitted).

Where inquiry notice is not established, efforts to dismiss RICO have failed.  *See*, *e.g.*,

*Holmes v. Parade Place, LLC*, No. 12 CIV. 6299 GBD DF, 2013 WL 5405541, at *11 (S.D.N.Y.

Sept. 26, 2013).  Here, Defendants say XA's RICO claims are time barred because XA was

"notified" of the existence and ownership of Studio AG.  MIS at 2.  They cite two documents

that reference Studio AG – neither of which disclosed any facts relevant to the fraud in which they were engaged.  Rather, in cursory terms, they mention in a few words that Studio AG was formed and that certain defendants own it.  No information therein should have triggered any suspicion on XA's part that wrongdoing by defendants of the type alleged in the SAC was occurring and, thus, neither documents should not have raised a duty of inquiry.  SAC ¶ 51.[8]

No "storm warnings" were evident from other sources, moreover, because Defendants undertook extensive concealment efforts, *see*, *e.g.*, SAC ¶¶ 50, 85 and 95.  Defendants' fraud only came to light when CMG entered XA's offices, expecting to find a fully operational office. Instead, it found its hard copy files stolen, its computers erased and all its phones erased, except for one, which is how XA learned what had happened.  SAC ¶ 87.

> *v)*     *Defendant Wagner's Contractual Release Argument Fails*

Wagner makes several contractual arguments to avoid RICO liability.

First, they argue XA cannot sue Wagner because of a contractual release of liability exists in a settlement agreement dated April 22, 2014.  MIS at 29-34.   Defendants disregard XA's allegations that settlement efforts were only undertaken because XA had no idea of Wagner's pre-existing fraudulent conduct and planned, immediate and continuing future fraudulent conduct.  SAC ¶¶ 92-98.  Nothing in the April 22 agreement suggests the agreement was an effort to resolve a fraud dispute, SAC ¶¶ 97-98, and Defendants do not set forth any basis as to why XA should have suspected a fraud was underway.   Because the settlement efforts and agreements were the product of Wagner's fraud – specifically, his material omission regarding

---

[8]      At MIS page 21, Defendants assert Glenn Laken and Alexis Laken did not deny in their third party answer that they saw either of the two memoranda mentioning Studio AG that Wagner sent to Burkhardt or Ennis. They did not do so because ¶ 66 did not ask whether they saw them (which they did not), but merely characterized what these documents "discussed," and the Lakens responded the content of these documents' speaks for themselves.

his prior fraudulent diversions, SAC ¶¶ 92-98, 169-170, fabricated invoices and spreadsheets, SAC ¶¶ 54, 63, 178(e)-(f), and his immediately planned future misconduct for HudsonGray's and his associates' benefit, SAC ¶¶ 99-116, and no agreement attempted to resolve any assertion of any fraud, the releases therein are unenforceable. *See* authorities *supra*.

Second, Wagner argues that no specific misrepresentation or fraud has been alleged as a basis for rendering the settlement agreements unenforceable. MIS at 3. Wagner disregards the following SAC allegations, among many others, SAC ¶¶ 42-78, 95, 109-111, setting forth the misrepresentations upon which the pleading is based, including material, fraudulent omissions which have, *inter alia*, rendered the settlement "agreements" void and unenforceable.

Third, Wagner argues that monies were owed him and because he was not paid whatever monies he claimed were owing, he could solicit XA clients. Wagner was engaged in fraud from the time CMG purchased XA, in 2009, stealing XA clients and property as soon as Studio AG was established. SAC ¶¶ 42-43, 67. Per the SAC, any inability on XA's part to pay Wagner any monies he claimed he was owed was the result of Wagner's thefts of XA business and property, starting from the time CMG purchased XA. SAC ¶ 179(a)-(f).

Finally, Wagner's theft of XA's confidential property continued after the settlement agreements were signed, so even if these agreements were valid, they would still not release Wagner from the conduct detailed in the SAC.

The precise amount of financial damage Wagner caused will be a matter for trial and expert testimony. Defendants' argument that that he was permitted to solicit XA clients, however, relies fundamentally on the claim that he could do so because he was not properly paid. That argument rests on factual contentions that contradict the pleading and which are not properly resolved on a Rule 12 motion.

23

*vi)*  *Defendant Wagner's Contractual Venue Argument Should be Rejected*

Wagner argues a venue provision in his settlement agreements prevents his having to answer, here, for his misconduct.  His arguments fail for several reasons.

First, an assertion that venue is misplaced cannot be pursued in a motion to dismiss, but only in motion to transfer pursuant to 28 U.S.C. § 1404.  *See Atlantic Marine Construction Company v. United States District Court for Western District of Texas,* 134  S.Ct. 508 (Dec. 3, 2013) (rejecting attempt to enforce forum selection clause through challenge to venue,  holding (i) a valid forum selection clause does not defeat venue, (ii) that 28 U.S.C. § 1404(a) is the exclusive means of enforcing a forum selection clause in favor of another federal forum, (iii) that private interest factors should be disregarded and only consideration of public interest factors considered, including the interest of having localized controversies decided at home). Here, Wagner moves solely (and erroneously) to dismiss the SAC under Rule 12(b)(6).  His venue motion is procedurally improper and should be denied. *Id.*

Second, this Court has a strong interest in adjudicating a local controversy at home, in New York.  Both XA and HudsonGray are New York entities.   The business that the Individual Hudson Defendants, under Wagner's leadership, stole was largely New York business, including NBCUniversal business.  It was the New York XA office that, under the direction of Wagner, was victimized in all the ways the SAC indicates including the thefts of XA property for the benefit of the Individual Hudson Defendants and HudsonGray's New York office.  There are, in addition, no unusual claims or theories that militate strongly in favor of an Illinois forum.

Third, Wagner has already filed a third-party claim against XA's principals in New York in which he makes claims that replicate the factual arguments he now raises on dismissal motion. He states, at paragraph 18 of his third party complaint that: "XA, as plaintiff, initiated the

underlying lawsuit in this Court and the claims asserted herein [third-party action] directly relate

to the claims asserted by XA therein."  Wagner did not object on venue grounds in his third party

complaint and XA has already answered Wagner's third-party action claims, here in New York.

Fourth, a transfer to Illinois would result in the same claims being litigated in two fora, a

waste of judicial resources and posing the possibility of inconsistent outcomes, even though all

the same issues are already being litigated, in New York.[9]  Although Wagner may have changed

his mind as to where he wants to resolve XA's claims that he engaged in theft, larceny and

racketeering while employed by XA, as well as numerous violations of his employment

agreement, SAC Ex. D, at ¶ 4 (Confidential Information), ¶ 5 (ownership of Intellectual

Property), SAC Ex. D, at ¶ 6 (non-competition), it was his decision to interpose a pleading, here.

*vii)*       *XA Has Properly Pleaded RICO Conspiracy Against All Defendants*

Defendants argue no RICO conspiracy can exist because, they say, XA has not properly

pleaded a RICO violation for lack of proper pleading of predicate crimes or a RICO pattern.

The SAC properly pleads numerous RICO violations and their attack on XA's RICO

conspiracy claim fails.[10]  *See Fertitta v. Knoedler Gallery, LLC*, 2015 WL 374968, *6 (rejecting

argument that RICO conspiracy claim failed for lack of a properly pleaded RICO claim, noting a

---

[9]       Defendants have submitted an affidavit dated September 16, 2015 from XA's former Chairman, Ronald Burkhardt, who swears he never saw signed employment agreements.  Mr. Burkhardt is currently involved in litigation with XA and its managers challenging XA's termination of his employment contract for cause, rendering his testimony suspect. See *Burkhardt, Ronald v. XA, The Experimental Agency*, Index No. 653173/2014.  Even if he did not see signed contracts at XA, however, this has nothing to do with whether the Individual Hudson Defendants signed such agreements in 2009, agreements undeniably drafted, undeniably reviewed by Defendants Andereck and Wilson, and undeniably marked-up by them, in their own handwriting.  Although Defendants now deny such agreements were signed, their conduct complied with the terms of such agreements, including having new XA employees, hired to replace the Hudson Defendants, sign Employee Handbook Acknowledgement forms, payroll "on the first and fifteenth of the month," (HandBook 403) employee "Time off Forms" signed by Wilson for PTO (paid time off) (HandBook 307), itemized expense reports for travel expenses, (Handbook 512) timed invoices for "NonExempt Workers."  It is a reasonable inference such agreements were signed, but destroyed or stolen by the Individual Hudson Defendants, just as they stole the rest of XA's hard copy files and erased all the data on XA's server, a business run for roughly a decade (and more than a half decade when the company was owned by CMG).

[10]       Defendants state at MIS note 1 that the SAC were used to raise money for CMG as mentioned in a press release.  Although irrelevant herein, XA management rejected the suggestion and no such monies were raised.

conspiracy defendant need not be alleged to have committed predicate crimes).  XA's point

headings, hereafter, will, for convenience, mirror those set forth in Defendants' memorandum.

## POINT II
### <u>WAGNER'S ARGUMENT BASED ON THE APRIL RELEASE FAILS</u>

XA has addressed the April Release issue above.  Where it is clear the parties did not

intend to settle fraud claims by the settlement agreement in issue, courts have long refused to

permit such agreement to bar a fraud claim.  *See, e.g., Irving Trust Co. v. Deutsch,* 73 F.2d 121,

126 (2d Cir.1934) (general release executed in settlement of contract claims did not bar suit for

unrelated, unknown fraud claim where no semblance of fraud surfaced before settlement), *cert.*

*denied,* 294 U.S. 708, 55 S.Ct. 405 (1935); *Schine v. Schine,* 250 F.Supp. 822, 826 (S.D.N.Y.

1966) (release did not bar a suit for fraudulent inducement of the contract).  Here, the SAC

alleges that no fraud was contemplated at the time the settlement agreements were negotiated and

signed, SAC ¶¶ 93-98 and that the settlement agreements that were signed were not attempts to

resolve any extant dispute concerning any possible fraud.  No mention of any fraud appears in

any settlement agreement.  For these reasons, the fraud that caused the execution of the

settlement agreements renders them invalid.

## POINT III
### <u>XA HAS STATED A CLAIM FOR BREACH OF CONTRACT</u>

Defendants argue XA's contract claims against the Individual Hudson Defendants, other

than Wagner, should be dismissed because XA has not located physical, hard copy signed

contracts for them.  Their arguments should be rejected for several reasons.

First and preliminarily, Defendants improperly submit factual affidavits asserting they

never signed written contracts.  Efforts to contradict a pleading on a Rule 12 motion by

submission of factual affidavits is improper. *See McCracken v. Verisma Sys., Inc.*, No. 6:14-CV-06248 MAT, 2015 WL 5510367, at *11 (W.D.N.Y. Sept. 16, 2015):

> As it is generally improper to consider factual averments on a Rule 12(b)(6) motion, the Court will not consider the Barnard affidavit for the purposes of resolving the Healthcare Defendants' motion to dismiss.[11]

Given the Individual Hudson Defendants' theft of virtually all the hard copy files of XA's business and attempted permanent erasure of XA's server and phones, as their emails show, *see* SAC ¶¶ 79-82 and Ex. A ## 62, 90-91, and 96, it is no surprise documents that would subject Defendants to liability for misconduct are missing, too.   Their affidavits should be stricken.

Second, Defendants state XA has not submitted *any* factual information that makes its allegation regarding the existence of such contracts anything more than "speculation." Companies do not go to the trouble of having contracts drafted for employees, for them not to be signed, and employees do not take time to review contracts and mark them up with hand written comments, to not sign them.  XA alleges Wilson told several CMG employees that everyone who worked at XA was required to sign handbooks and non-disclosure forms, SAC ¶¶ 124-125. In light of the erasure and theft of XA's computer system (ported to temporary servers by the Individual Hudson Defendants, SAC ¶¶ 81-82, Ex. A #62), the theft of virtually all of XA's hard copy files, SAC ¶ 85 (and listed and quantified in SAC, Ex. B) and Wilson's statements to several members of CMG management that everyone at XA had signed agreements, XA has

---

[11]   *See, e.g., Wachtel v. National R.R. Passenger Corp.,* No. 11–CV–613, 2012 WL 292352, at *2 (S.D.N.Y. Jan. 30, 2012) ("While Plaintiff attached an affidavit to his opposition brief in an attempt to support his argument, the Court cannot consider affidavits in ruling on a motion to dismiss.") (citing *Cyril v. Neighborhood P'ship II Housing Dev. Fund, Inc.,* 124 F. App'x 26, 27 n. 2 (2d Cir.2005) (unpublished opn.) (stating that in ruling on motion to dismiss, it "would have been improper" for district court to consider affidavits presented by defendant) (citing *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (review of motion to dismiss "is generally limited to the facts and allegations that are contained in the complaint and in any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits") (citations omitted)).")

alleged a reasonable basis to believe discovery may disclose the existence of these contracts and it should be given the opportunity to confront Defendants regarding them.

Third, Defendants argue that because only draft contracts were located for Wilson and Andereck, the "only logical inference" is that there were never signed contracts. Defendants' theft of XA's hard copy files and erasure of its server, however, suggest an even more "logical" inference – these documents were signed, but stolen and/or destroyed, by Defendants just as they endeavored to disable XA from learning what they had done (and were in fact doing) and to prevent XA from continuing its business, in competition with their new entity, HudsonGray.[12]

Fourth, Defendants argue that because the draft contracts were marked up, they cannot be "identical" to the document Wagner signed. The draft contracts were "identical" to the signed Wagner contract with respect to Sections 4 (Confidential Information), 5 (Ownership of Intellectual Property), and 6 (Non-competition). Defendants' modifications were not substantive. The question whether the contracts were "identical" or "substantially similar" is a quibble.

Fifth, with respect to Individual Hudson Defendants Lomma, Day and Gudin, XA's belief that they, too, signed written employment agreements is based on the fact that Wilson represented to CMG that everyone working at XA had signed agreements. At the pleading stage

---

[12]     Defendants argue, MIS at 35, that XA has provided no reason why it lacks copies of any of the written contracts XA officers/employees signed. XA has located hundreds of non-compete agreements, SAC ¶ 123 (providing representative names of companies), signed by XA's temporary employees many of whom went on to become full time employees of XA (and HudsonGray), and at least two XA Handbook Acknowledgement pages, signed in 2014, by permanent employees working at the Chicago office, which was, at all times, under the direct supervision of Wagner and Wilson. The existence of hundreds of noncompete agreements from 2003 to 2014, the emailed directive by XA producer, Kate Stevens, to new XA employees to "turn in your *signed* nondisclosure form by the end of the day," SAC ¶ 125, and the unexplainable absence of the few contracts and noncompete agreements that directly pertain to the Individual Hudson Defendants (and the XA employees who they solicited to work at HudsonGray), provides a factual basis for XA's belief that the Individual Hudson Defendants stole these agreements, just as they have XA's other property, SAC Exs. A and B, while they were still employed as XA officers and that discovery will uncover the truth about what occurred.

and in light of XA's allegations of massive theft, extensive spoliation and erasure of files and text messages, in addition to Wagner's signed contract and the marked up drafts of the Andereck and Wilson contracts, discovery is warranted.

Regarding the XA Handbook, Defendants make similar arguments.

First, Defendants argue that because only two signed acknowledgement pages for XA's Handbook were found, there is only one "possible inference" – Defendants did not sign such forms or they would be in the box where the two pages were found.  XA suggests finding the acknowledgement forms of two employees, at the bottom of one of the few boxes left in XA's office, suggests these forms were signed by Defendants, but they stole them, along with the rest of XA's hard copy files, thinking all traces of their misconduct were thus eliminated.

Second, Defendants submit the Burkhardt affidavit which says he never saw signed contracts for Defendants but, as stated, the Court may take judicial notice that Mr. Burkhardt is in litigation with XA, rendering his statements suspect.  Nevertheless, even if he did not see the agreements, this does not make more likely the proposition that they did not exist. Nor has Burkhardt "admitted" there were no such agreements, as stated at MIS at 35.  Defendants do not proffer any reason why Mr. Burkhardt would have been looking for such agreements, at all.

Third, Defendants argue that because XA's handbook has a preface which says the policies expressed in the handbook are not a "contract of employment," a breach of contract claim cannot be based on a violation of their provisions.  The Handbook explains the obligations of XA employees and, on its signature page, i.e., its "ACKNOWLEDGEMENT OF RECEIPT" form states "I understand that it is my responsibility to read and comply with the policies contained in this handbook."  Defendants now argue they did not have to comply with these policies because they contend they did not sign the Handbook.

The Handbook provisions largely replicate ordinary common law fiduciary duties which prohibit corporate officers from engaging in the same misconduct detailed in XA's handbook and the SAC and the absence of a signed agreement or handbook does not shield such misconduct. *See Paz Sys., Inc. v. Dakota Grp. Corp.,* 514 F. Supp. 2d 402, 408-11 (E.D.N.Y. 2007) ("absence of an employment agreement does not entitle a present or former employee to misappropriate his employer's protected information. Even in the absence of an express provision prohibiting the disclosure of such information, an employee privy to confidential information has a common law duty of good faith and fair dealing to his or her employer preventing disclosure to third parties"); *Anacomp, Inc. v. Shell Knob Servs., Inc.,* 93-Civ. 4003 (PKL), 1994 WL 9681, at *12 (S.D.N.Y. Jan. 10, 1994) (even absent evidence of agreement with employer, employees owe an implicit obligation of good faith and fair dealing to their employer).  Discovery will be needed to determine if the XA Handbooks were signed by the Individual Hudson Defendants.

## POINT IV
## XA HAS STATED A CLAIM FOR INJUNCTION AND CONSTRUCTIVE TRUST

### A.  *XA Has Stated a Claim for a Permanent Injunction*

Defendants argue XA has not properly pleaded its action for an injunction because it has not alleged irreparable injury.  To the contrary, XA has alleged the Individual Hudson Defendants stole confidential information and trade secrets. Defendants were warned, in XA's Handbook that they were required to sign (but which they now claim they did not sign) that improper use of such information could subject them to personal liability.  Their use of the trade secrets and other proprietary information they stole, as well as the theft of the physical resources of XA, cannot be quantified for several reasons, including the theft of all of XA's files and the use of Studio AG to syphon off monies and business, whose records XA has yet to access.  The damage to XA, as of this point, is actually and practically irreparable.

The SAC, at ¶ 132, describes XA's Handbook description of confidential information in terms of trade secrets, including customer lists and preferences, financial information, marketing strategies, new materials research, pending projects and proposals, and proprietary production processes – all of which were erased from XA's computer system.  The SAC, at ¶ 135, describes Handbook provisions notifying XA employees that disclosure or use of trade secrets for personal gain could result in personal liability.  The SAC, at ¶ 138, quotes XA's Handbook defining trade secrets, as including customer lists and preferences, financial information, labor relations strategies, marketing strategies, new material research, pending projects and proposals, proprietary production processes, research and development strategies, technological data and technological prototypes – information which would, ordinarily, be expected to be part of XA's business files and computer records, all missing from CMG's office.

Similarly Wagner's employment agreement sets forth the information XA deemed confidential and proprietary, SAC Ex. D, at §4 (Confidential Information) and §5 (Ownership of Intellectual Property). Defendants say XA has not detailed their wrongdoing. To the contrary, *see* SAC ¶ 228, and especially ¶¶ 177-183 (referencing paragraphs and detailing how each RICO defendant operated and managed RICO enterprise activity), as well as SAC Ex. A (further detailing how each instance of Defendants' RICO misconduct furthered the alleged RICO schemes, coordinating their thefts).[13]

---

[13]    *See generally Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,* 813 F. Supp. 2d 489, 517 (S.D.N.Y. 2011) ("In determining whether matter is protectable as a trade secret, courts frequently examine the method by which defendant acquired it, e.g., such as by stealing or copying… [E]ven if this information did not independently rise to the level of a trade secret, the defendants' wrongful retention of the customer information would justify treating it as a trade secret." *quoting Paz Sys., Inc. v. Dakota Grp. Corp.,* 514 F.Supp.2d 402, 408 (E.D.N.Y.2007); *York Grp., Inc. v. Pontone,* No. CIV.A. 10-1078, 2014 WL 896632, at *22 (W.D. Pa. Mar. 6, 2014) (unfair competition claim can arise from "misappropriation of client lists, internal company documents, and business strategies even if the information contained therein does not include trade secrets… where record contains evidence giving rise to an inference that confidential business information was wrongfully appropriated, a reasonable trier of fact could conclude Batesville engaged in unfair competition, citing *Paz Systems,* 514 F.Supp.2d at 409 and holding that "The evidence suggesting that customers were transitioned to Batesville could support a

*B.   XA Has Stated a Claim for a Constructive Trust*

New York generally requires that a person establish four elements before a court will impose a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject res made in reliance on that promise; and (4) unjust enrichment. *See Bausch & Lomb Inc. v. Alcon Labs., Inc.,* 64 F. Supp. 2d 233, 252 (W.D.N.Y. 1999).  Defendants argue XA has not properly pleaded its claim for a constructive trust, characterizing its claim as seeking a trust over "unspecified furniture," MIS at 39, and argue dismissal is mandated because XA does not allege it transferred "title" to the furniture to Defendants. *Id.*  This characterization bears virtually no relation to XA's actual pleading, *see* SAC ¶¶ 227–233 and, in any event, transfer, under the case law, is properly alleged.[14]

Defendants argue XA fails to allege any "transfer" of property in reliance on a "promise."  In *Bausch & Lomb Inc.,* 64 F. Supp. 2d at 253, the "transfer" element was held satisfied by evidence that access to confidential research, development and commercial information was granted in reliance on a promise that disclosure of that information would not be made to others.  Plaintiff, there, argued the transfer element could not be satisfied because the owner of the information admitted it never "transferred title or a property interest to" one Dr. Minno, whose employment contract with Alcon stated all confidential information made known

---

finding that plaintiff suffered special damages), *reconsideration denied*, No. CIV.A. 10-1078, 2014 WL 4955309 (W.D. Pa. Oct. 1, 2014).

[14]        Defendants Wagner, Andereck and Wilson were senior XA officers, not merely employees, and thus stood in a confidential and fiduciary relationship to XA to not steal or use XA confidential information, satisfying the first constructive trust element. *See Nutronics Imaging, Inc. v. Danan,* No. CV 96–2950, 1998 WL 426570 *2 (E.D.N.Y. June 10, 1998) (employee has a fiduciary duty not to use or confidential knowledge); *Pathmark Graphics Inc. v. J.M. Fields, Inc.,* 53 A.D.2d 531, 532, 384 N.Y.S.2d 177 (1st Dep't 1976) (claim for compensation paid to former employee during period in which he was abusing fiduciary relationship with employer).  *See generally A. Brod, Inc. v. SK & I Co., L.L.C.,* 998 F.Supp. 314, 327 (S.D.N.Y.1998) (existence of a confidential relationship is a question of fact); *Republic of Philippines v. Marcos,* 806 F.2d 344, 355 (2d Cir.1986) (constructive trust is a remedy to prevent unjust enrichment and may or may not involve a fiduciary relationship), *cert. denied,* 480 U.S. 942, 107 S.Ct. 1597 (1987). Regarding the second element of a "promise," Defendants implicitly promised not to use XA confidential and proprietary information for their own benefit).

to Dr. Minno during his employment would be treated as Alcon's property.  Chief Judge

Larimer, rejecting the "transfer" argument, held, *Bausch & Lomb Inc.,* 64 F. Supp. 2d at 254:

> The case at bar involves an intangible: confidential information. The case law indicates that imposition of a constructive trust is viewed as an appropriate remedy when a party has wrongly used confidential information belonging to another.  In *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988 (2d Cir.1983), the Second Circuit stated that "a constructive trust on the 'fruits' of ABKCO's [wrongful] acquisition [of defendant/counterclaimant's music rights] was a proper remedy." In support of that holding, the court cited Restatement of Restitution § 200 for the proposition that where a fiduciary in violation of his duty to the beneficiary acquires property through the use of confidential information, he holds the property so acquired in constructive trust through the beneficiary. *Id. See also United States v. Reed,* 601 F.Supp. 685, 700 (S.D.N.Y.) ("A person who receives confidential information from another and misappropriates it for personal benefit is deemed to hold the proceeds of the misappropriation in a constructive trust for the benefit of the entrusting party"), *rev'd on other grounds,* 773 F.2d 477 (2d Cir.1985); *Diamond v. Oreamuno,* 24 N.Y.2d 494, 501, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969) (profits made by agent in stock transactions undertaken because of his "inside" information "are held in constructive trust for the principal") (quoting Restatement of Agency 2d § 388, Comment (c)).[15]

A constructive trust may be ordered if equity finds unconscionable a party continuing to

hold property in light of the claim of another. A fiduciary who profits from his or her position by

making an improper gain, e.g., entering an engagement in circumstances of conflicting interests

and thereby deriving a benefit, may be held to be constructive trustee of the improper gain or

benefit. For example, profits wrongfully diverted from a joint venture have been held subject to

imposition of a constructive trust, and a "faithless fiduciary" is, by that mechanism, forced to

---

[15]     A constructive trust is an equitable remedy, remedial in nature, imposed by equity to preclude retention of beneficial ownership of property where such retention is contrary to equitable principles and requires a person who claims title to such property subject to an equitable duty to convey it to another to avoid unjust enrichment. *See Simonds v. Simonds,* 58 A.D.2d 305, 308-09, 396 N.Y.S.2d 547, 550-51 (defendant may be compelled to convey property where the court determines an equitable duty to convey it exists – "When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee" (citations omitted), noting the equitable remedy of constructive trust may be imposed on property transferred by mistake or even in a case in which it has been received by an innocent donee, if the done is unjustly enriched"), *aff'd* 45 N.Y.2d 233, 408 N.Y.S.2d 359 (1978).

account for same.  *See Mariani v. Summers,* 3 Misc.2d 534, 52 N.Y.S.2d 750, 756 (Sup. Ct. N.Y.

Co. 1944) (citing cases), *aff'd* 269 App.Div. 840, 56 N.Y.S.2d 537 (1st Dep't 1945).

Here, XA seeks a constructive trust over both the profit that the Individual Hudson

Defendants have made by virtue of their theft not only of XA's clients, SAC ¶¶ 99-103, and the

information they stole, including pricing data for events and ancillary equipment, and the

physical resources of the XA office, SAC ¶¶ 77-83, but all the items described in SAC, Ex. B, as

of the filing date, not just "furniture."  SAC ¶¶ 77-83, 104-107.  A constructive trust is available

in such circumstances.  *See, e.g.,  Schneidman v. Tollman*, 190 A.D.2d 524, 525, 593 N.Y.S.2d

23, 24 (1st Dep't 1993) (constructive trust an appropriate remedy for breach of fiduciary duties

to limited partners in hotel venture by transferring partnership's purchase rights in properties,

without consideration, to another partnership entity formed for that purpose and from which

limited partners were excluded – constructive trust remedy intended to prevent unjust enrichment

and could be used to preserve limited partners' interest in properties).

## POINT V

## XA HAS STATED A CLAIM FOR BREACH OF FIDUCIARY DUTY

Defendants assert that XA has not pointed to any specific breach of fiduciary duty by any

of the defendants in its fifth claim for relief and its eleventh claim for aiding and abetting.  In

fact, the allegations detail extensive wrongdoing. *See especially* SAC ¶¶ 178-183 and, with

respect to each of the individual defendants, as follows: Andereck SAC ¶¶ 178 (a)–(n); Wagner

SAC ¶ 179 (a)-(f); Wilson SAC ¶ 180 (a)–(m); Lomma SAC ¶ 181 (a)–(i) and Day SAC ¶ 183

(a)-(e).  These allegations summarize the misconduct in issue which allegations are

supplemented by a chronology of the RICO wrongdoing, mail and wire fraud, *see* SAC Ex. A, all

of which provide additional detail as to how their individual misconducts furthered the fraud. This is the antithesis of "shotgun pleading," contrary to Defendants' assertions.

Largely quoted from the Individual Hudson Defendants' own documents, especially their emails and text messages, the SAC delineates how each defendant aided and abetted one other and how they provided conscious, substantial assistance to each other in the process of violating their own individual and collective fiduciary duties to XA.  See allegations showing how each defendant managed and operated the RICO enterprise.  XA's allegations show how the Individual Hudson Defendants (and the other defendants) played a substantial role in bringing about the criminal, global objectives of the RICO and other fraudulent schemes in which they engaged.

In similar cases, defendants have been liable for fiduciary breach.  *See*, *e.g.*,  *Paz Sys., Inc. v. Dakota Grp. Corp.*, 514 F. Supp. 2d 402 (E.D.N.Y. 2007) (where employee had the discretion to run all plaintiff's operations and had access to all company's confidential information, he owed a fiduciary duty to act for the benefit of the company and to not to exploit its confidential information for the benefit of himself and others – doing so  breached his fiduciary duty to the company, subjecting him and his competing company to damages for breach, including an amount for diverted and lost sales occasioned by misappropriated data).

In *Paz*, plaintiff alleged employee Owsinski breached his fiduciary duty to his employer by misappropriating Paz data and, also, that Dakota Systems induced and/or benefited from that breach.  The court explained that under New York law, an employee has a common law duty of good faith and fair dealing to the employer not to exploit its confidential information for the benefit of himself and others, citing *Anacomp, Inc.,* 1994 WL 9681, at *12 (employees with access to employer's confidential information have been held to owe an implicit obligation of

good faith and fair dealing to their employer) and *Lamdin v. Broadway Surface Advertising Corp.,* 272 N.Y. 133, 138, 5 N.E.2d 66 (1936) (employee must account to his principal for secret profits and he also forfeits his right to compensation for services rendered by him if he proves disloyal).  Defendants have breached their fiduciary duties to XA and have been disloyal.

**POINT VI**

**XA HAS STATED A CLAIM FOR TORTIOUS INTERFERENCE**

Defendants argue XA's seventh, eleventh and twelfth tortious interference claims should be dismissed because (1) XA has not identified "any specific contract" interfered with; (2) XA has not alleged any wrongful conduct directed toward NBC;  and (3), XA cannot demonstrate wrongful intent because the Individual Hudson Defendants are "competitors" motivated by their own legitimate self-interest.  All three arguments are specious.

First, throughout the SAC, XA has identified specific contracts and transactions with which Defendants interfered.  These contracts and transactions have been identified, SAC ¶¶ 47, 67-68, 109-114, among other paragraphs.

Second, contrary to Defendants' assertions, XA has alleged wrongful conduct directed toward NBC.  Specifically, by directing NBC business away from XA and to Studio AG, SAC ¶¶ 42, 67, 109-114, NBC personnel were defrauded and were led to believe that providing business to Studio AG, as directed by the Individual Hudson Defendants, was permissible and, implicitly, that they were not facilitating the theft of business XA could (and should have been doing), if defendants were not breaching fiduciary duties to their employer, XA – the means used to direct such business away from XA was the Individual Hudson Defendants' material omissions regarding the illegality of what they were doing.

Third, Defendants argue they are XA's competitors, motivated by "legitimate interests." During the period 2009 to January, 2014, however, they were not XA competitors, but XA senior officers and employees owing fiduciary duties to their employer not engage in competition against XA, not to fabricate spreadsheets to misappropriate XA's financial resources, and not to falsify invoices, to their employer's detriment, by manipulating credit cards, all alleged.

While still employed by XA, the Individual Hudson Defendants established HudsonGray and engaged in all the fraudulent and criminal conduct the SAC chronicles, including the misconduct set forth and described in SAC Exs. A and B.  That misconduct was undertaken while Defendants were still XA employees, not when they became "competitors," at HudsonGray.  Their post-hoc status as "competitors" is no defense to their fiduciary misconduct during the time they were XA officers, when XA was paying them, particularly given their misconduct has (and continues to provide) them with an unfair competitive advantage.

They are using that advantage today to the detriment of their former employer, which has replaced them with new employees, to stay in business.  There is no need for XA to allege "malicious intent" – as if the Individual Hudson Defendants were competitors because, at the time of their misconduct at XA, they were not competitors, but employees owing fiduciary duties to XA and XA has alleged "malice" throughout its allegations, in any event.

**POINT VII**

**XA HAS STATED A CLAIM FOR MISAPPROPRIATION & UNFAIR COMPETITION**

Defendants argue XA's ninth claim for misappropriation and unfair competition should be dismissed because XA has identified *types* of documents, not particular documents.

The law regarding application of misappropriation and unfair competition is set forth in *Paz Sys., Inc. v. Dakota Grp. Corp.,* 514 F. Supp. 2d 402, 408-11 (E.D.N.Y. 2007), which held that the solicitation of an employer's customer by a former employee is unfair and actionable

37

where wrongful conduct by the employee, such as physically taking or copying the employer's

files, is employed, or confidential information is used).[16]

Defendants' arguments should be rejected.

First, contrary to Defendants' arguments, XA has alleged numerous specific instances of

misappropriation.  *See*, *e.g.*, SAC ¶¶ 79-82.  More are addressed in the pleading and even more

would probably have been identified but for Defendants theft of all XA's hard copy files and

global erasure of all its electronic files.   Defendants implicitly seek to be rewarded for their

thefts by asking this Court to impose an unrealistic pleading burden on XA, in the absence of

access to its files, occasioned by Defendants' misconduct.  They should not be rewarded.

Second, Defendants argue anyone who visited XA's website would learn who XA's

clients are.  Although XA's website identified a small number of its clients for advertising

purposes, XA provided services to many dozens of clients not mentioned on the site.  The

identity of the few customers mentioned, moreover, is not the issue.   Information not on XA's

website, which the Handbook identifies as confidential and in need of protection, includes:

customer preferences, financial information, marketing strategies, new materials research,

pending projects and proposals, proprietary production processes, research and development

strategies, technological data and technological prototypes. *See* SAC at ¶¶ 132, 138 (quoting

Handbook, identifying information XA was protecting from disclosure (and annexing Handbook

sections as SAC Ex. D)).  Such information is critical in a competitive market and it is this

---

[16]     *Accord Ecolab Inc. v. Paolo,* 753 F.Supp. 1100, 1111 (E.D.N.Y.1991) ("even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee for use in his future business or employment is to be enjoined as unfair competition."); *Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp.,* 135 A.D.2d 889, 891, 522 N.Y.S.2d 287, 290 (1987)(employee's illegal physical taking or copying of an employer's files or confidential information is actionable unfair competition).

information that Defendants stole and are using, today, to compete, unfairly, with XA.  SAC ¶¶ 109-114.

Third, binders accidentally left behind by the Individual Hudson Defendants contain hundreds of confidentiality agreements between XA and persons in almost every capacity who dealt with XA between 2009 and 2014, SAC ¶¶ 122-123, including, vendors, prospective clients, temporary employees, venue management companies and independent contractors. *Id*.  The Individual Hudson Defendants assiduously protected XA confidential information when it suited their purposes, but documents they were required to sign, and on information and belief (based on Wilson's statements to CMG managers and emailed instructions to new XA employees from Kate Stevens, an XA producer, SAC ¶¶ 124-125, did sign, are all missing). XA Handbooks were placed in individual employee binders – although several of these binders were located, one document was missing from each of them, the Handbook.  Each Notebook contains a divider tab marked "Employee Handbook" indicating the former presence (and, on information and belief, intentional removal) of the Handbooks XA employees were required to sign.

This case involves the Defendants' erasure of an entire computer system covering a business operating for more than a decade – and under the ownership of CMG for a half decade.

Over the years, XA undertook many multi-million dollar and other expensive projects.

Wagner fraudulently conducted XA business without any traceable oversight for nearly a month after forming HudsonGray and renting office space for same. SAC ¶¶ 79-80.  For nearly three months after the formation of HudsonGray, Lomma, Andereck, Day and Gudin communicated with XA's clients using phone calls, emails and text messages on HudsonGray controlled devices, all for the purpose of secretly re-directing XA's clients to HudsonGray even though they were still working for and being paid by XA, as demonstrated by Gudin's un-erased

XA phone text to a colleague, stating: "XA is gone. We are all moving to a new company…we are all the same with a different name." SAC ¶¶ 80-83; 83 Bullet 1; SAC ¶¶ 145-146.  Wilson continued to work as XA's COO for four additional months after Lomma, Day, Andereck and Gudin secretly joined Wagner at HudsonGray.  She used a Hudson controlled phone for nearly six months, before attempting to erase the last bits of data left on XA's server and, then, left for HudsonGray, after her efforts to mislead XA about its clients, employees, vendors and computer data were exhausted. SAC ¶ 180(b)(g)(m).

The defense that some of XA's clients' identities could have been discerned from its website, MIS at 41, is not a serious response to the extensive and detailed allegations of wrongdoing and evidentiary citations set forth in the pleading.  *See Nirvana, Inc. v. Nestle Waters N. Am. Inc.,* No. 6:14-CV-01181 MAD, 2015 WL 4726502, at *17 (N.D.N.Y. Aug. 10, 2015) ("Where a relationship of trust is abused by the misappropriation and exploitation of confidential information for commercial business, the courts have found this to be unfair competition even if the confidential information would not alone rise to the level of a trade secret," noting that the financial data at issue was allegedly obtained pursuant to a non-disclosure agreement and unlawfully disclosed for its commercial benefit, plausibly stating an unfair competition claim);  *Transaero, Inc. v. Chappell*, No. 13-CV-5752 JFB GRB, 2014 WL 1783732, at *12 (E.D.N.Y. May 6, 2014) (where complaint alleges defendant retained confidential, technical, financial and client information including, but not limited to, client histories and sales data, quotations and financial reports and that such information was being used to solicit plaintiff's customers and suppliers and plaintiff pointed to specific examples where defendant did so and plaintiff alleged that, by misappropriating the confidential and proprietary information of his employer, defendant breached a duty independent of his duties under a Letter

Agreement, court held he breached a common law duty of good faith and fair dealing owed his

employer not to exploit confidential information for his own benefit, citing *Wrap–N–Pack, Inc.*

528 F.Supp.2d at 126 (quoting *Paz Sys., Inc.,* 514 F.Supp.2d at 409–10) and holding that

defendant's duty to refrain from misappropriating employer's confidential information existed

independently of Letter Agreement – pleading stated a plausible misappropriation claim).[17]

## POINT VIII

### XA HAS STATED A CLAIM FOR USURPATION OF CORPORATE OPPORTUNITY AGAINST THE INDIVIDUAL HUDSON DEFENDANTS AND PIZZO

Defendants seek to dismiss XA's tenth claim for usurpation of corporate opportunity

against HudsonGray.  The pleading should have been interposed against the "Individual Hudson

Defendants," rather than the "Hudson Defendants," i.e., not against the entity, HudsonGray, and,

as well, the owners of Studio AG (Wagner, Wilson and Andereck) and Pizzo, not the entity.

## POINT IX

### XA HAS STATED A CLAIM FOR PUNITIVE DAMAGES

Defendants seek dismissal of XA's punitive damage claim on the ground that the

complaint (1) does not allege conduct sufficiently reprehensible to merit punitive damages,

(2) because the conduct was not aimed at the public, and (3) because RICO does not permit

punitive damages, over and above its own remedies.  Defendants ignore XA's pleading.

---

[17]       Where theft of file or fraudulent tactics have been alleged, courts have not hesitated to find unfair competition.  *See, e.g., Berman v. Sugo LLC,* 580 F.Supp.2d 191, 209 (S.D.N.Y.2008) (unfair competition claim may be based on the misappropriation of client lists, internal company documents, and business strategies -- "solicitation of an employer's customer by a former employee is ... actionable [where] ... there was wrongful conduct by the employee, such as physically taking or copying the employer's files or using confidential information," quoting  *Paz Systems, Inc.,* 514 F.Supp.2d at 409); *Barbagallo v. Marcum LLP,* 820 F. Supp. 2d 429, 447 (E.D.N.Y. 2011) (unfair competition claim may be based on misappropriation of client lists, internal company documents, and business strategies "if wrongful or fraudulent tactics [are] employed." *Milton Abeles, Inc. v. Farmers Pride, Inc.,* 603 F.Supp.2d 500, 503 (E.D.N.Y.2009). Here, Defendants submission to this court of XA memoranda from back in 2009 and one in 2014, MIS at 21-22 and note 16, therein, mentioning Studio AG, further confirm Defendants have improperly taken internal XA company documents, in breach of fiduciary duty, to sue to unfairly compete with XA.

First, the misconduct that occurred is not only reprehensible, but criminal.  Aside from the theft of their customers, SAC ¶¶ 42-43, 47-48, 66-67,  and 99-101, the falsification of spreadsheets and invoices to use to obtain money fraudulently from XA, SAC ¶¶ 54, 63, 178(e) and (f), 180( e), Ex. A, ## 16, 27, 37-38, 50, 53, 57, 63, 68, 77, 85, 108 and 111, the theft of virtually all the hard copy files of XA and attempted permanent erasure of its entire computer systems (and theft of all the electronic data through the porting process just before they left XA), SAC ¶¶ 79-82, the extraordinarily cavalier manner in which Defendants spoke of their thefts of XA physical property and how it should be divided between them, SAC ¶ 83 Bullets 5-6, and their recorded (and now recovered) communications regarding their plans and efforts to avoid CMG oversight, SAC ¶¶ 178(j), 180(f),  XA has more than satisfied any requirement of "outrageous" misconduct.  *See also* SAC ¶¶ 44, 83, and 109-110.

Second, Defendants cite the general public harm requirement imposed in cases involving solely contractual breach, but the public harm requirement does not apply where misconduct violates non-contractual, independent duties, e.g., duties imposed by employment/fiduciary law, as well as New York criminal law.  Punitive damages have been awarded in numerous cases where allegations very similar to those here have been made. In *Paz Sys., Inc. v. Dakota Grp. Corp.,* 514 F. Supp. 2d 402, 408-11 (E.D.N.Y. 2007),  for example, a corporate employee misappropriated his employer's business data, including customer and vendor lists, and used it to divert sales to a company in which he had an ownership interest. The employer sued for misappropriation of trade secrets, unfair competition and breach of fiduciary duty.  After trial, the court found defendant liable on all three counts, stating: "Under New York law, an employee has a common law duty of good faith and fair dealing to the employer not to exploit confidential information for the benefit of himself and others." *Id.* at 409–10.  The misappropriation of Paz's

trade secrets, the court found, was "particularly egregious, in the apparently calculated nature of the misappropriation and the lengths to which Owsinski went to hide his acts, including destroying evidence during this action." It awarded punitive damages, even though plaintiff did not allege a pattern of conduct directed at the public in general.  It is hard to imagine a more calculated stream of thefts than those alleged herein.

In *Wrap-N-Pack, Inc. v. Kaye*, 528 F. Supp. 2d 119, 124-27 (E.D.N.Y. 2007), the court awarded punitive damages against a former employee where the employer alleged fiduciary breach of good faith and loyalty, diversion of corporate opportunity, misappropriation of confidential information and trade secrets, unfair competition, and tortious interference with prospective economic advantage – the court held the public harm requirement need not be satisfied because the claims were not dependent on the existence of employment agreement and the duties violated were, in any event, "independent" of contract duties.  The same is true, here.[18]

XA distinguishes contract and tort cases, *see* SAC ¶¶ 291-294, but Defendants rely on a specious statement of the law. *See* authorities *supra*; *Topps Co., Inc. v. Cadbury Stani S.A.I.C.,* 380 F.Supp.2d 250, 266–68 (S.D.N.Y.2005). XA distinguishes conduct subject to RICO remedies, for which punitive damages are *not* sought, from misconduct that is not RICO-actionable, for which punitive damages are sought.  *See* SAC ¶¶ 291-295. Again Defendants disregard the pleading and the law to attack a strawman.

---

[18]        *See generally Don Buchwald & Assoc., Inc. v. Rich,* 281 A.D.2d 329, 330, 723 N.Y.S.2d 8 (1st Dep't 2001) (punitive damages permissible against disloyal employees rejecting public harm requirement argument holding direction toward general public applies only in breach of contract cases, not tort cases and diversion of assets to a secretly created competitive organization was a fiduciary breach); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 526 (S.D.N.Y. 2011); *Getty Petroleum Corp. v. Island Transp. Corp.,* 878 F.2d 650, 657 (2d Cir.1989) (same).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated:        New York, New York
              October 19, 2015

                                    EATON & VAN WINKLE LLP
                                    By: /s/ Lawrence Allen Steckman

                                    Counsel for Plaintiff
                                    Eaton & Van Winkle LLP
                                    3 Park Avenue
                                    New York, NY 10016-2078
                                    (646) 821-9367

44