UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
CMG HOLDINGS GROUP, INC. as assignee of :
XA, THE EXPERIENTIAL AGENCY, INC., : Civil Action No.: 15-cv-05814-JPO
:
Plaintiff, :
:
vs. :
:
JOSEPH WAGNER, HUDSON GRAY LLC, :
DARREN ANDERECK, JESSIE LOMMA, :
MICHAEL DAY, JEAN WILSON, ESTELLE :
PIZZO, STUDIO AG, LLC, REMIGIO GUDIN, :
and MIXED COMPANY, INC., :
:
Defendants. :
---------------------------------------x
JOSEPH WAGNER, JEFFREY SMITH, DARREN :
ANDERECK, and JESSIE LOMMA, :
:
Third-Party Plaintiffs, :
:
vs. :
:
GLENN LAKEN and ALEXIS LAKEN, :
:
Third-Party Defendants. :
---------------------------------------x

**REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF DEFENDANTS' MOTION PURSUANT TO
RULE 12(b)(6) TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, New York 10019
(212) 237-1000
*Attorneys for Defendants*

{11143517:1}

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

POINT I ........................................................................................................................................ 2

XA'S RICO CLAIMS MUST BE DISMISSED FOR FAILURE TO PLAUSIBLY
ALLEGE ANY TIMELY PREDICATE ACT OR ANY PATTERN OF RACKETEERING ....... 2

    A.    All Allegations Regarding Fiori XA, XA Scenes, and Studio AG
          are Implausible ................................................................................................ 3

    B.    All Claims Based Upon Fiori XA, XA Scenes, and Studio AG Are
          Barred by the Statute of Limitations ............................................................... 4

    C.    XA Fails to Plausibly Allege How Any of the Communications
          Described in Exhibit A Support a Scheme to Defraud ................................... 5

    D.    Because XA Alleges, At Most, Predicate Acts Occurring Over
          a Mere Five-Month Period, No Pattern of Racketeering is Alleged ............... 7

POINT II ...................................................................................................................................... 8

ALL CLAIMS AGAINST WAGNER MUST BE DISMISSED ................................................ 8

POINT III ................................................................................................................................... 10

THE CONTRACT CLAIMS AGAINST THE REMAINING INDIVIDUAL
HUDSONGRAY DEFENDANTS MUST BE DISMISSED BECAUSE XA HAS NO
BASIS TO ALLEGE THAT SUCH CONTRACTS EXIST .................................................... 10

POINT IV ................................................................................................................................... 11

THE TORTIOUS INTERFERENCE CLAIMS MUST BE DISMISSED
BECAUSE OF THE LACK OF A CONTRACT AND ANY INTERFERENCE .................... 11

POINT V .................................................................................................................................... 12

XA'S INJUNCTION CLAIM MUST BE DISMISSED BECAUSE XA DOES
NOT ALLEGE IRREPARABLE INJURY ............................................................................... 12

POINT VI ........................................................................................................................13

XA'S BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED
FOR "SHOTGUN" PLEADING ........................................................................................13

POINT VII .......................................................................................................................13

XA'S CLAIM FOR MISAPPROPRIATION AND UNFAIR COMPETITION
MUST BE DISMISSED FOR FAILURE TO IDENTIFY ANY MISAPPROPRIATED
DOCUMENTS .................................................................................................................13

POINT VIII ......................................................................................................................14

XA'S CLAIM FOR USURPATION OF A CORPORATE OPPORTUNITY
MUST ALSO BE DISMISSED AS AGAINST PIZZO .....................................................14

POINT IX .........................................................................................................................14

XA'S CLAIM FOR PUNITIVE DAMAGES MUST BE DISMISSED ............................14

CONCLUSION .................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All Business Solutions, Inc. v. NationsLine, Inc.*,
   629 F.Supp.2d 553 (W.D.Va. 2009) ................................................................................. 13

*Alleghany Corp. v. Kirby*,
   333 F.2d 327 (2d Cir.1964) ............................................................................................ 8, 9

*Arnon Ltd. v. Beierwaltes*,
   125 A.D.3d 453 (1st Dep't 2015) ...................................................................................... 11

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
   268 F.3d 103 (2d Cir.2001) ................................................................................................ 2

*Barbagallo v. Marcum LLP*,
   820 F.Supp.2d 429 (E.D.N.Y. 2011) (Weinstein, J.) ......................................................... 15

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 554 (2007) ........................................................................................................ 2, 6

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
   757 F.2d 523 (2d Cir.1985) ............................................................................................ 8, 9

*Carvel Corp. v. Noonan*,
   3 N.Y.3d 182 (2004) ......................................................................................................... 12

*Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*,
   17 N.Y.3d 269 (N.Y. 2011) ............................................................................................ 8, 9

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*,
   544 F. Supp.2d 178 (S.D.N.Y. 2008) .................................................................................. 9

*Dorset Indus., Inc. v. Unified Grocers, Inc.*,
   893 F.Supp.2d 395 (E.D.N.Y. 2012) ................................................................................ 14

*Faively Transport Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir.2009) .............................................................................................. 12

*First Capital Asset Management, Inc. v. Satinwood*,
   385 F.2d 159 (2d Cir.2004) ............................................................................................ 7, 8

*Fitzgerald v. Chrysler Corp.*,
   116 F.3d 225 (7th Cir.1997) ............................................................................................... 3

*GICC Capital Corp. v. Technology Finance Group, Inc.*,
  67 F.3d 463 (2d Cir.1995) ............................................................................................... 7

*H.J., Inc. v. Northwestern Bell Telephone Co.*,
  492 U.S. 229 (1989) ........................................................................................................ 7

*Halebian v. Berv*,
  590 F.3d 195 (2d Cir.2009) ............................................................................................. 2

*Plasticware, LLC v. Flint Hills Resources, LP*,
  852 F.Supp.2d 398 (S.D.N.Y. 2012) ............................................................................. 11

*Poller v. Bioscrip, Inc.*,
  974 F.Supp.2d 204 (S.D.N.Y. 2013) ....................................................................... 14, 15

*Spool v. World Child Intern. Adoption Agency*,
  520 F.3d 178 (2d Cir.2007) ............................................................................................. 7

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*,
  328 Fed.Appx. 695 (2d Cir.2009) ................................................................................... 5

# PRELIMINARY STATEMENT[1]

Defendants identified numerous deficiencies in XA's Second Amended Complaint, in part, by annexing publicly filed documents and pleading admissions directly contradicting key allegations made by XA. In opposition, XA largely ignores these facts, sometimes only engaging them by issuing a blanket and implausible denial.

Defendants demonstrated the incoherent nature of XA's allegations concerning Fiori XA, XA Scenes and Studio AG, and the fact that XA had actual knowledge of what it now deems fraud in 2009, thus rendering the claims time-barred. In response, XA does not articulate – because it cannot – how the use of a subsidiary, fictitious d/b/a entity or subcontractor is improper, and merely states, as to the statute of limitations argument, and in the face of documentary evidence and its own admissions, that it had no hint of the activities now claimed to be fraudulent. This is crucial, because without the allegations concerning Fiori XA, XA Scenes and Studio AG, XA's RICO claim consists only of a five-month long scheme, which is too short, as a matter of law, to constitute a "pattern of racketeering." The RICO claims must be dismissed.

XA also fails to rescue its contract and common law claims. XA released all claims – whether known or unknown – against Wagner, so XA's argument that it's release of Wagner is void because it had no knowledge of Wagner's alleged fraud is not just implausible, but irrelevant. XA's contract claim against the other Individual HudsonGray Defendants fails because XA only speculates about non-existent contracts with these defendants. Without a contract, there can be no claim for breach. Similarly, XA's claim for tortious interference with contract also fails because XA has not identified any third party contracts or any interference

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in Defendants' moving papers.

therewith, and its claim for tortious interference with business relations fails because XA alleges no "wrongful means" used against a third party. XA is not entitled to injunctive relief because it has no irreparable injury, while its remaining claims are all deficient for failure to identify any purported trade secret stolen by Defendants. Finally, because this is a standard business dispute and nothing more, there is no basis for punitive damages whatsoever.

Defendants' motion should be granted.

## POINT I

### XA'S RICO CLAIMS MUST BE DISMISSED FOR FAILURE TO PLAUSIBLY ALLEGE ANY TIMELY PREDICATE ACT OR ANY PATTERN OF RACKETEERING

In its opposition papers, XA asserts that its claim against Defendants is a "prototypical RICO case". (XA Memo, p. 19.) In fact, when stripped of hyperbole, exaggeration, and fabricated claims, XA alleges – at worst – a dispute between a company and its former employees who now compete. This is a standard business dispute, and has nothing to do with the organized crime racketeering that the RICO statute was meant to combat. *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir.2001) (quoting S. Rep. No. 91-617, at 76 (1969)). Most of the allegations that form the basis of XA's RICO claims are implausible or barred by the statute of limitations; the remaining allegations cover a short five-month period too short, as a matter of law, to constitute a "pattern of racketeering," requiring the dismissal of both RICO claims. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 547 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."). The complaint must allege "enough facts to state a claim to relief that is plausible on its own face." *Id.* at 545. In reviewing these allegations, the Court may "draw on its judicial experience and common sense." *Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir.2009).

{11143517:1} 2

### A. All Allegations Regarding Fiori XA, XA Scenes, and Studio AG are Implausible

XA's factual allegations are not plausible. XA erroneously claims that it purchased Fiori XA in 2009 and then the Individual HudsonGray Defendants diverted monies to Fiori XA to produce events that XA supposedly could have produced itself. (SAC, ¶ 47-48.) First, XA is factually wrong, in that XA did not purchase Fiori XA in 2009[2], which is why Studio AG was formed. (Dkt. 23-20.) Even so, the allegation itself is implausible. That is, if XA purchased Fiori XA, then any monies directed to Fiori XA would benefit XA, as its parent company, rendering the allegation meaningless.

Second, XA claims that the Individual HudsonGray Defendants directed monies to XA Scenes to produce events at Gallery 1028, instead of having XA produce the events, thereby causing harm to XA. (SAC, ¶ 43.) Again, the allegation is implausible because XA Scenes was a fictitious name for XA.[3] Thus, all monies paid to XA Scenes were, in effect, paid to XA.

Third, XA alleges that the Individual HudsonGray Defendants and Studio AG committed mail and wire fraud against XA by making payments to Studio AG. (SAC, ¶ 42.) The theory falls apart because the use of a subcontractor like Studio AG is not a diversion of business away from XA. Companies routinely use subcontractors to accomplish tasks more efficiently than they could in-house; in other words, using subcontractors is a profitable strategy, not a fraudulent one. As Judge Posner stated in *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir.1997)

---

[2] XA feigns confusion (XA Memo, fn. 6) regarding Defendants' statement that Fiori XA was a wholly owned subsidiary of XA, Inc. – XA's predecessor – that was not purchased by CMG, and therefore discontinued, in 2009. Thus, prior to 2009, Fiori XA could not harm XA, Inc. because it was its wholly owned subsidiary, and could not harm XA (in its current incarnation) because CMG had not yet created it. After 2009, it could not harm the newly created XA because Fiori XA ceased to exist.

[3] XA maintains that XA Scenes was a subsidiary (XA Memo, p. 7) despite the publicly filed document – and thus properly reviewed on a dismissal motion – annexed to Defendants' moving papers showing that XA Scenes was a d/b/a of XA. (Dkt. 23-22.) Indeed, XA does not even acknowledge the document. Whether XA Scenes was a subsidiary or a d/b/a does not matter, as neither could divert business from XA, but it is important to note that XA either is stunningly ignorant of its own business, or pretends to be in order to assert this faulty RICO claim.

(cited by XA Memo, p. 19), "We have never heard it suggested that RICO was intended to encourage vertical integration." Other than a conclusory assertion, there is nothing in the Second Amended Complaint that suggests that the use of Studio AG – whose ownership and use was specifically disclosed to XA in 2009 (Dkt. 23-20) – is improper or harmful to XA.

### B. All Claims Based Upon Fiori XA, XA Scenes, and Studio AG Are Barred by the Statute of Limitations

In addition to being implausible, the statute of limitations bars all of these claims. XA asserts that it was improper for XA's former officers to subcontract any work to Studio AG that XA could have performed itself (SAC, ¶ 42), for Fiori XA to manage any event or wedding that XA could have managed (*id.*, ¶ 47-48), and for XA Scenes to allow Studio AG to produce events at Gallery 1028 that XA could have produced (*id.*, ¶ 43). All of these actions – essentially XA's business model – would have been immediately obvious to auditors hired by XA to audit XA's books and records for each year from 2009 through 2014.[4] (*Id.*, ¶ 72.) And one did not need to be an auditor to notice what XA now labels fraud. According to XA, in 2009 Fiori XA paid for a ½ page advertisement in Chicago Social Brides Magazine "in competition with XA" – hardly a good way to keep improper diversions secret from XA, which, according to the pleadings, was in the Chicago wedding business. (*Id.*, ¶ 48.) Further, as admitted by CMG's management in this litigation, Wagner and Wilson specifically advised CMG of Studio AG's purpose and ownership in 2009, writing, under the heading of "Former Corporate entities": "Fiori XA issue / Jean [Wilson], Darren [Andereck], Joe [Wagner] to form Studio AG." (Dkt. 23-20.) If using a subcontractor or a subsidiary is fraudulent, CMG had "storm warnings" of the fraud as soon as it purchased the XA assets and began operations. Contrary to the argument advanced now – that it

---

[4] The auditors, of course, found nothing untoward in XA's documents. Neither did XA's Executive Chairman, Ronald Burkhardt (Dkt. 30, ¶ 6, 9), who XA supposedly hired to oversee Wagner and determine the reason for XA's supposed lack of profitability. (SAC, ¶ 74.)

{11143517:1}                                                4

did not discover this fraud due to "extensive concealment efforts" (XA Memo, p. 22) – XA's own records – audited and then admittedly reviewed – disclosed this supposed illicit activity. Under the "storm warning" doctrine, after learning in 2009 about the "fraudulent" use of Studio AG as a subcontractor, Fiori XA's production of events and weddings, and XA Scenes management of a venue, XA had the duty to investigate further and uncover the other "frauds" XA now alleges. *See World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 328 Fed.Appx. 695, 697 (2d Cir.2009). And, to the extent that XA insists that all of the alleged schemes are indivisible (XA Memo, p. 16-17), they are all time-barred.

### C. XA Fails To Plausibly Allege *How* Any of the Communications Described in Exhibit A Support a Scheme to Defraud

XA concedes that, to allege a mail or wire fraud predicate act, it must allege a scheme to defraud, and how the particular communications further such fraud. This XA fails to do. As set forth above, many of XA's allegations concern legitimate business practices, such as a subsidiary or affiliate managing an event hall (SAC, ¶ 47, 56), a subcontractor submitting invoices for work performed and expenses incurred on a project (*id.*, ¶ 58, 67, 180(a)),[5] or the opening of a bank account for a d/b/a (*id.*, ¶ 45). These actions are common and proper business strategies, not schemes to defraud, and XA has not plausibly alleged how they are false.

XA's allegations concerning the communications furthering this "fraud" are just as misguided. For instance, XA's own description of an email dated June 4, 2014 is "Wilson changing Chelsea and Shetal's email passwords upon request of Lomma." (SAC, Ex. A, #126.) Changing the password to a business email account following an employee's departure is standard operating practice, allowing the company access to the account should it need to follow

---

[5] XA's allegation that Mixed Company fraudulently billed $183,705.00 to XA (SAC, ¶ 29, 180(a)) is based upon *nothing* but the speculation that "such services were far too large for a small florist to provide." In view of XA's stated belief that florists must *grow* their own flowers (*id.*, ¶ 49), and its demonstrated ignorance of its own business operations, one may conclude that XA has no basis to allege *anything* about Mixed Company.

up on any work left undone by the employee and barring the former employee's use of the email. XA, however, describes this email – with no basis – to mean, "Concealing and deleting the computer files of former XA employees." (*Id.*) Similarly, XA describes an email as "Updating storage detail," which XA interprets, without any justification, as "Preparation to move crates from XA's storage locker to help the establishment of Hudson Gray using stolen XA equipment . . .". (*Id.*, Ex. A, #110.)

XA also imagines sinister motives in emails concerning the reimbursement of officers' personal credit cards used for XA business expenses. (SAC, ¶ 181(i), Ex. A, #16, 38, 50, 53, 57, 63, 69, 77, 85, 97, 108, 111.) The emails do not evidence fraud, and XA fails to explain how any of them are fraudulent, other than by conclusory assertions, which do not satisfy the pleading requirements. *Twombly*, *supra*, 550 U.S. at 547 (the complaint must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action"). Rather, to address XA's lack of credit, XA officers (*i.e.*, Wagner and Andereck) voluntarily financed the company's operations by charging project expenses to their own personal credit card accounts, and then, after XA received payment for the project, XA reimbursed them. Wilson and Wagner opened their 2009 memorandum to CMG management with the follow bullet points: "Supporting business with personal credit cards – Amex billing / Operating in crisis mode since April / Expenses outstanding / Personal credit compromised." (Dkt. 23-20.) Again, in his 2014 memorandum to Mr. Burkhardt, Wagner states that there was still "No Operating Credit Line for XA" and that "Management team (Joe [Wagner] and Darren [Andereck]) using personal credit cards to support XA's need for credit – personal liability with no ownership in XA." (Dkt. 23-21.) XA now claims that these transactions were fraudulent. This is implausible, as those committing fraud do not repeatedly alert their supervisors to the

existence of the fraud. Moreover, by XA's admission, XA auditors reviewed XA's books each year (SAC, ¶ 72) – but there is no allegation of the auditors' reporting any improper reimbursement, much less widespread fraud. (*Id., passim.*) Similarly, Mr. Burkhardt reviewed three years of credit card statements, but did not find any improper expense. (Dkt. 30, ¶ 6.) In light of these admissions, this Court should deem implausible XA's unsupported allegation that Defendants submitted fraudulent expense statements.

### D. Because XA Alleges, At Most, Predicate Acts Occurring Over a Mere Five-Month Period, No Pattern of Racketeering is Alleged

XA specifies that the alleged theft of furniture, files, and clients occurred over just five (5) months, from January 2014 to May 2014. (XA Memo, p. 4.) Because the alleged scheme has ended, and by its nature cannot continue (none of the Defendants are employed by XA), XA has alleged a "close-ended" scheme. *First Capital Asset Management, Inc. v. Satinwood*, 385 F.2d 159, 181 (2d Cir.2004); *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 466 (2d Cir.1995). To constitute a "pattern of racketeering" necessary to sustain a RICO claim, a "close-ended" scheme typically must last at least two years. *Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 184 (2d Cir.2007).

XA's claims involving Fiori XA, XA Scenes and Studio AG were obviously included to stretch the "pattern" to six years. As shown above, however, XA does not even attempt to articulate how work by a subsidiary or subcontractor is fraudulent. In any event, the claims are time-barred, and XA is left with an alleged scheme to divert clients, files, and property to HudsonGray that, according to XA, occurred over no more than five (5) months. Even if XA's allegations are true – and, since they are implausible, this Court is not required to deem them true – they do not constitute the "long-term criminal conduct" targeted by the RICO statute. *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989). Thus, at most, XA alleges acts

over a mere five-month period, which is patently insufficient to establish a "pattern of racketeering," requiring the dismissal of the RICO claim.[6]

## POINT II

## ALL CLAIMS AGAINST WAGNER MUST BE DISMISSED

Defendants demonstrated in their moving papers that *all* claims against Wagner must be dismissed pursuant to the April Release. XA argues that the April Release is void because XA purportedly did not know of these claims at the time the April Release was executed. The argument fails for several reasons.

First, XA's current position contradicts its prior admission in its Original Complaint[7] that the April Release released all claims against Wagner prior to its effective date.[8] (Dkt. No. 1-2, ¶ 15.) Second, in arguing that it could not have released Wagner from unknown claims, XA ignores the April Release's terms: "XA . . . FURTHER UNDERSTAND[S] THAT THIS AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS THAT HAVE ARISEN ON OR PRIOR TO THE EFFECTIVE DATE." (Dkt. 23-18, ¶ 8(c), capitalization in original.) Third, XA's argument is contrary to law, as "a release may encompass unknown claims, including unknown fraud claims." *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (N.Y. 2011), citing *Alleghany Corp. v. Kirby*, 333 F.2d 327, 333 (2d Cir.1964); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 527-28 (2d Cir.1985). The law does not require "that the defendant must come forward and

---

[6] As no RICO claim is stated, the conspiracy claim must also be dismissed. *First Capital*, 385 F.3d at 182.

[7] XA cannot argue that it did not know about Wagner's alleged fraud at the time the Original Complaint was filed on September 22, 2014, as XA alleges that it discovered the "RICO Defendants' criminal misconduct" in the summer of 2014. (SAC, ¶¶ 185-87.) The facts have not changed since the Original Complaint was filed, only XA's desire to avoid the April Release's clear terms.

[8] XA points out in its opposition papers that the April Release does not release Wagner of any claims that accrued *after* the April Release's effective date. XA, however, cannot cite to any allegation in the Second Amended Complaint of any wrongful action by Wagner after April 30, 2014. (XA Memo, p. 23, *passim*.)

confess to all his wrongful acts" as a precondition for a release. *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp.2d 178, 190 (S.D.N.Y. 2008). "Moreover, [t]he policy underlying *Alleghany* and *Bellefonte* applies with equal force [to fiduciaries]. The purpose of a settlement is to end litigation, not to provide a breather before the next round." *Id.* at 191. Thus, whether or not XA claims it did not know of Wagner's alleged misconduct until after the April Release was signed, XA released him of all claims anyway. Further, "a party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud claim from the subject of the release." *Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 276. Here, XA cannot identify any "separate fraud" or misrepresentation – indeed, XA acknowledges in the April Release it relied upon no representations of any kind (Dkt. 23-18, ¶ 12(iv)) – and instead relies solely upon the underlying fraud allegations subject to the release. (XA Memo, p. 23.)

Finally, even if the April Release were void, XA's claims against Wagner for breach of the non-compete provision must still be dismissed, as the non-compete clause in Wagner's Employment Agreement only activated upon payment of certain monies (SAC, Ex. D, ¶ 6(d))[9] – and XA admittedly failed to make such payments. (*Id.*, ¶ 179(d).) XA's claim that such monies were not available due to Wagner's fraud (XA Memo, p. 23) is not only false, but is not supported by any allegation made in the Second Amended Complaint or by anyone with personal knowledge, and must therefore be disregarded. The obligation is not owed.

---

[9] The Second Amended Complaint (¶ 38) and XA's Memo (p. 4) express surprise that Wagner and other XA officers declined to take compensation in stock after CMG purchased XA in 2009, which XA interprets as evidence that defendants were diverting money from XA. Not only is XA's inference unsound – it is not insidious that officers would prefer cash over stock in a company that was just effectively rescued from bankruptcy – but it is also false. Wagner's bonus was, in part, to be paid in stock – a fact that XA would have "learned" by reviewing the exhibits to its own pleadings. (SAC, Ex. D, Dkt. 19-4, p. 10 of 12.) This is just another false allegation that XA knowingly made to support its meritless claims.

# POINT III

## THE CONTRACT CLAIM AGAINST THE REMAINING INDIVIDUAL HUDSONGRAY DEFENDANTS MUST BE DISMISSED BECAUSE XA HAS NO BASIS TO ALLEGE THAT SUCH CONTRACTS EXIST

XA inaccurately states that Defendants seek to dismiss XA's contract claim against the remaining Individual HudsonGray Defendants on the grounds that XA cannot produce hard copies of the agreements. (XA Memo, p. 26.) Actually, Defendants argue the claim must be dismissed because XA does not have a good faith basis to assert that such contracts ever existed. (*Id.*, p. 35.) A company necessarily knows when it has entered into employment agreements with its top officers, and could not function otherwise. XA's admitted lack of personal knowledge as to the existence of the employment agreements speaks volumes. For instance, Wagner's Employment Agreement provided for stock options as part of his bonus. (SAC, Ex. D, p. 10 of 12.) If XA had agreed to "identical" or "substantially similar" contracts with its other officers, as XA alleges (XA Memo, p. 28), it would have had to know, and track, those stock options.[10] A corporate officer's employment agreement cannot be completed without management's knowledge. It is not a minor detail, with a single copy placed in a cardboard box and forgotten, but an important agreement that is known about and memorialized.

XA's reliance upon the XA Handbook is even more misplaced. Not only is XA unable to allege with personal knowledge that Defendants signed an XA Handbook, but XA concedes that, pursuant to its own terms, *the XA Handbook is not a contract.* (SAC, Ex. C, p. 4 of 13; XA Memo, p. 29.) XA contends that employees were still required to follow the Handbook's rules and that its terms duplicate common law duties, but that does not mean that the Handbook

---

[10] XA claims, however, that no officer wanted stock. (SAC, ¶ 38.) It is simply implausible that CMG offered stock options to compensate each of its officers, but retained no independent records of the potential transaction.

creates any contractual obligations – it does not. If XA wishes to interpose a claim for breach of a common law duty, it may do so;[11] but it may not claim breach of contract absent a contract.

## POINT IV

### THE TORTIOUS INTERFERENCE CLAIMS MUST BE DISMISSED BECAUSE OF THE LACK OF A CONTRACT AND ANY INTERFERENCE

XA's claim for tortious interference with contract must fail because XA is unable to identify any contract between XA and a third party, which the third party breached, as a result of any interference by a defendant. *Plasticware, LLC v. Flint Hills Resources, LP*, 852 F.Supp.2d 398, 404-05 (S.D.N.Y. 2012). The allegations cited by XA in support of this claim (XA Memo, p. 36) are all off point: (1) events managed by Studio AG or Fiori XA, which were never managed by XA, and no alleged breach by a third party (SAC, ¶ 47, 67-68); (2) contracts that XA performed without any alleged breach by a third party (*id.*, ¶ 109-110); and (3) contracts that XA assumed it would be awarded, but were not. (*Id.*, ¶ 111-14.) None of these allegations satisfies the elements for tortious interference with contract, requiring dismissal of the claim.

Similarly, XA's claim for tortious interference with business relations must fail because XA cannot identify any "wrongful means" used by Defendants in dealing with NBC. *See Arnon Ltd. v. Beierwaltes*, 125 A.D.3d 453, 453 (1st Dep't 2015). XA attempts to salvage the claim by asserting that Defendants "implicitly" represented to NBC that using Studio AG as a subcontractor was "permissible" and that NBC was "not facilitating the theft of business XA could (and should have been doing)." (XA Memo, p. 36.) The argument fails for several reasons. First, there is no allegation in the Second Amended Complaint that Defendants made any type of representation to NBC, implicit or otherwise. (SAC, *passim*.) Second, there would have been no reason for anyone to even remark upon Studio AG's – or any other subcontractor's

---

[11] XA's sixth claim is for breach of the faithless servant doctrine (SAC, ¶ 238-241), which, although meritless, is not subject to Defendants' dismissal motion.

{11143517;1} 11

– existence, let alone make any representation regarding its relationship to XA. Third, XA cannot explain how NBC was harmed as a result of XA's use of Studio AG as a subcontractor. As the Court of Appeals made clear in *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004), offering services to customers at attractive prices, as done here, does not constitute "wrongful means" that can support a tortious interference with business claim. Therefore, XA's seventh, eleventh, and twelfth claims must all be dismissed.

## POINT V

### XA'S INJUNCTION CLAIM MUST BE DISMISSED BECAUSE XA DOES NOT ALLEGE IRREPARABLE INJURY

XA argues that its injunction claim should be sustained because the value of the property and trade secrets allegedly stolen "cannot be quantified" and therefore the damage is "actually and practically irreparable" (XA Memo, p. 30) – ignoring the fact that the Second Amended Complaint itself values such property at $20 million. (SAC, ¶ 209.) Notably, XA cites no case law in support of the argument. In the Second Circuit, the alleged theft and use of trade secrets does not create any presumption of irreparable injury, only the *dissemination* of trade secrets does so. *Faively Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir.2009). Indeed, where trade secrets are misappropriated to be used for profit, as XA alleges here, the misappropriator has an incentive to maintain the secrets' confidentiality, and the only possible damages are for lost sales, which can be remedied by money damages. *Id.* Thus, there can be no claim of irreparable injury upon which to base the claim for an injunction.

## POINT VI

## XA'S BREACH OF FIDUCIARY DUTY CLAIMS
## MUST BE DISMISSED FOR "SHOTGUN" PLEADING

Defendants' moving papers demonstrated that XA's breach of fiduciary duty claims were deficient due to "shotgun" pleading (Memo, p. 39-40) – XA repeated and realleged hundreds of paragraphs of allegations, but failed to specify which allegations were relied upon in support of the claim. (SAC, ¶ 234-37, 247-251.) XA attempts to remedy this error by belatedly citing specific allegations in its opposition papers that purportedly support the claims. (XA Memo, p. 34.) XA may not amend its pleadings (for the third time), so the claim as actually pleaded in the Second Amended Complaint remains fatally deficient. The fifth and eleventh claims, therefore, must be dismissed.

## POINT VII

## XA'S CLAIMS FOR MISAPPROPRIATION, UNFAIR COMPETITION,
## AND CONSTRUCTIVE TRUST MUST BE DISMISSED FOR FAILURE
## TO IDENTIFY ANY MISAPPROPRIATED DOCUMENTS

XA asserts that the HudsonGray Defendants "willfully and maliciously misappropriated XA confidential and proprietary information" (SAC, ¶ 253), but fails to allege the specific type of information supposedly stolen, how the information qualifies as a trade secret, or how that information would be useful to HudsonGray. (*Id., passim.*) The conclusory assertion that a trade secret has been stolen is not sufficient to state a misappropriation claim. *See e.g., All Business Solutions, Inc. v. NationsLine, Inc.*, 629 F.Supp.2d 553, 558 (W.D.Va. 2009).

XA's claim for a constructive trust over the supposedly stolen confidential information fails for the same reason – XA cannot identify any such information.

## POINT VIII

## XA'S CLAIM FOR USURPATION OF A CORPORATE OPPORTUNITY MUST ALSO BE DISMISSED AS AGAINST PIZZO

XA concedes that, as a competitor of XA, no claim for usurpation of a corporate opportunity may be asserted against HudsonGray and Studio AG, requiring dismissal of the claim against them. XA, however, maintains that the claim should be asserted against Pizzo. (XA Memo, p. 41.) XA alleges that Pizzo is Studio AG's general manager (SAC, ¶ 27), but makes no allegation that Pizzo was an officer or employee of XA. (*Id., passim.*) Thus, Pizzo owed no duty of loyalty to XA and cannot be liable to XA for usurpation of a corporate opportunity. *See Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F.Supp.2d 395, 413 (E.D.N.Y. 2012).

## POINT IX

## XA'S CLAIM FOR PUNITIVE DAMAGES MUST BE DISMISSED

XA's claim for punitive damages of ten times[12] any compensatory award must be dismissed, as XA merely alleges a business tort that could be remedied through compensatory damages. Essentially, XA claims that Defendants diverted business to HudsonGray and Studio AG, misappropriated proprietary information, stole office furniture, and destroyed records. (XA Memo, p. 42.) Such allegations do not justify the award of punitive damages.

For instance, in *Poller v. Bioscrip, Inc.*, 974 F.Supp.2d 204, 210-213 (S.D.N.Y. 2013) (Oetken, J.), the employer alleged that, in violation of her employment agreement and common law duties, its former employee (1) stole proprietary information just prior to her resignation, (2) "cleaned" her company computer, thus "deleting tens of thousands of files," (3) took a position at a rival company, and (4) diverted clients using the stolen proprietary information. In *Poller*,

---

[12] Oddly, the Original Complaint did not seek punitive damages, and the First Amended Complaint sought punitive damages of five times the compensatory damages award.

this Court dismissed the claim for punitive damages, holding that the former employee's "conduct may have been questionable and harmful to Bioscrip's business," but that "punitive damages are limited to the most egregious of cases. And here, at most, Bioscrip has suffered the ill effects of several business torts, which can be remedied by compensatory damages." *Id.* at 239-40. Similarly, in *Barbagallo v. Marcum LLP*, 820 F.Supp.2d 429, 437-440 (E.D.N.Y. 2011) (Weinstein, J.), the employer asserted breach of contract and fiduciary duty claims against its former employee who allegedly transferred confidential information and a client list to his own personal email account and to his new employer, and then used that confidential information to divert clients to his new employer. The Court dismissed the claim for punitive damages, holding that the alleged conduct was not "outrageous." *Id.* at 449.

XA has made virtually identical allegations as those made in *Poller* and *Barbagallo*. The result should be the same – dismissal of the punitive damages claim because the conduct alleged is not "evil," "reprehensible," or "wanton" and can be remedied through compensatory damages.

## CONCLUSION

For the reasons herein, Defendants' motion should be granted.

Dated: New York, New York
November 2, 2015

                            Respectfully submitted,

                            **WINDELS MARX LANE & MITTENDORF, LLP**

                            By   /s Scott R. Matthews
                                Scott R. Matthews
                                James Tracy
                                156 West 56th Street
                                New York, New York 10019
                                (212) 237-1000
                                smatthews@windelsmarx.com
                                jtracy@windelsmarx.com
                                *Attorneys for Defendants*