UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                   :
CMG HOLDINGS GROUP,                                :
                              Plaintiff,           :          15-CV-5814 (JPO)
                                                   :
              -v-                                  :          OPINION AND ORDER
                                                   :
JOSEPH WAGNER, *et al*,                            :
                              Defendants.  :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

Plaintiff CMG Holdings Group ("CMG"), as successor to XA The Experiential Agency, Inc. ("XA"), initiated this action in the Supreme Court of the State of New York, County of New York. Defendants Joseph Wagner, HudsonGray, Inc. ("HudsonGray"), Darren Andereck, Jessie Lomma, Michael Day, Jean Wilson, Estelle Pizzo, Studio AG, LLC ("Studio AG"), Mixed Company Inc. ("Mixed Company"), and Remegio Gudin (collectively the "Defendants") removed the action to this Court on July 24, 2015.

On August 31, 2015, CMG filed its Second Amended Complaint against Defendants asserting two claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, twelve assorted state law claims, and a plea for punitive damages. Defendants moved to dismiss all but three of Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted in part and denied in part.[1]

---

[1]        Defendants filed a letter motion seeking oral argument on the motion to dismiss, which this Court denies as moot. (Dkt. No. 37.)

1

## I.      Background

The following facts are taken from the Second Amended Complaint and are presumed true for the purposes of this motion.

This dispute arises from actions taken by several employees of XA—an event planning agency acquired by CMG in 2009—and involves several other companies with which they were associated.  (Dkt. No. 19 ("Compl.").)  Simply put, CMG alleges that Defendants engaged in a "shell game" to divert profits and property away from XA to their own companies and pockets by defrauding XA and its clients and by taking XA's physical property.  (Compl. ¶¶ 2-3.)  The details of the alleged scheme are somewhat more complicated.

Due to the sprawling number of defendants (ten) and claims (fifteen), some ground-clearing is in order.  CMG asserts claims against seven individual defendants and three corporate defendants.  Of the seven individual defendants, five were executive employees at XA:  Wagner as Chief Executive Officer; Wilson as Chief Operating Officer; Andereck as President/Creative Director; Lomma as Vice President of Production; and Day as Executive Producer.  (Compl. ¶¶ 20, 21, 22, 25, 26.)  The three corporate defendants—HudsonGray, Studio AG, and Mixed Company—are in the same industry as XA and are owned by some of the former-XA individual defendants: HudsonGray and Studio AG were both established by Wagner, Andereck, and Wilson; Mixed Company was established by Wilson and an outside partner.  (*Id.* ¶¶ 23, 24, 29.) The remaining two individual defendants, Pizzo and Gudin, are employees of Studio AG, and Gudin is also an employee of HudsonGray.[2]  (*Id.* ¶¶ 27, 28.)

---

[2]          Gudin also worked for XA, but only for six weeks.  (Compl. ¶ 88.)

For further clarity, the "HudsonGray Defendants" will refer to Wagner, Andereck, Wilson, Lomma, Day, Gudin, and HudsonGray, and the "Studio AG Defendants" will refer to Pizzo and Studio AG.

CMG acquired XA in 2009 through an Illinois procedure similar to a bankruptcy sale. (*Id.* ¶¶ 34, 36.)  From 2009 to 2014, XA hovered around break-even profitability despite significant gross revenues.  (*Id.* ¶ 36.)

CMG alleges that XA's lack of profitability resulted from Defendants' behind-the-scenes activity between 2009 and 2014.  Specifically, CMG alleges that the Defendants were engaged in a scheme to divert clients and profits from XA to HudsonGray, Studio AG, and Mixed Company (separate companies owned and operated by Defendants) and to steal XA's physical property. (*Id.* ¶¶ 9-11.)  Defendants did so, CMG claims, by misrepresenting to clients of XA that Defendants' own businesses were the same as XA.  (*E.g.*, *id.* ¶ 52.)  Defendants allegedly charged XA for costs incurred by their own businesses and claimed revenues for their own businesses that should have gone to XA.  (*E.g.*, *id.* ¶ 54.)  In addition, CMG claims that Defendants dispossessed XA of a significant amount of physical property—including furniture, lighting, and business records—and also absconded with a substantial proportion of XA's data. (*Id.* ¶¶ 80-82; Dkt. No. 19-2.)  The particularities of this alleged scheme will be described in further detail below, as necessary.

CMG brings suit against various configurations of the Defendants alleging two claims under RICO, twelve state law claims, and a claim for punitive damages.  Those claims are for: (1) RICO and (2) RICO conspiracy against all Defendants; (3) breach of contract against the individual HudsonGray Defendants; (4) injunctive relief and the imposition of a constructive trust against the HudsonGray Defendants; (5) breach of fiduciary duty against the HudsonGray

Defendants; (6) breach of the faithless servant doctrine against the Individual Hudson Gray

defendants; (7) tortious interference with contract against Wilson, Wagner, Andereck, Studio AG

and HudsonGray; (8) aiding and abetting breach of fiduciary duty against all Defendants except

Mixed Company; (9) misappropriation against all Defendants except Mixed Company; (10) theft

of corporate opportunities and aiding and abetting the theft of opportunities against all

Defendants except Mixed Company; (11) tortious interference with business relationships

against all Defendants except Mixed Company; (12) tortious interference with prospective

advantage against all Defendants except Mixed Company; (13) conversion against the

HudsonGray Defendants; (14) unjust enrichment against all Defendants except Mixed Company;

and (15) punitive damages.  (Compl. ¶¶ 149-295.)

Defendants move to dismiss all but three of these claims for failure to state a claim, and

all claims against Defendant Wagner on the basis of a release provision in his employment

agreement with XA.  (Dkt. No. 31.)  Defendants do not (at this stage) challenge Claim 6 (breach

of the faithless servant doctrine), Claim 13 (conversion), or Claim 14 (unjust enrichment).  (*Id.* at

6.)

## II.    Discussion

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to

state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss, courts

must accept as true all "factual allegations contained in the complaint," *Twombly*, 550 U.S. at

572, and must draw "all inferences in the light most favorable to the non-moving party[ ]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (Sotomayor, J.) (citation omitted).

**A.      Claim 1 and Claim 2: RICO and RICO Conspiracy**

RICO was enacted to "eradicate[e] . . . organized crime in the United States." *Am. Fed. Of State, Cnty. And Mun. Emps. Dist. Council 37 v. Bristol-Myers Squibb Co.*, No. 12 Civ. 2238, 2013 WL 2391999, at *3 (S.D.N.Y. Jun. 3, 2013) (quoting Pub. L. No. 91–452 (1970) (internal quotation marks omitted)).  RICO creates a private right of action and provides for treble damages where a plaintiff can show: "(1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's business or property; and (3) that such injury was by reason of the substantive RICO violation." *Curtis v. Law Offices of David M. Bushman, Esq.*, 443 Fed. App'x 582, 584 (2d Cir. 2011) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)).

A substantive RICO violation occurs where "any person employed [by] or associated with any enterprise . . . conduct[s] or participate[s], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  A "pattern" of racketeering activity requires "at least two predicate acts of racketeering activity."  *Id.* § 1961(5).

To establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO violation.  *Id.* § 1962(d).

In their motion to dismiss, Defendants argue that the RICO and RICO conspiracy claims should be dismissed because: (1) CMG fails to allege RICO predicate acts; and (2) CMG fails to allege a "pattern" of racketeering activity.  (Dkt. No. 31 at 18-29.)  Defendants do not dispute RICO's injury and causation elements.  *See Curtis*, 443 Fed. App'x at 584.

1.       **RICO Predicate Acts**

In order to assert a claim under RICO, a plaintiff must allege at least two predicate acts of racketeering activity.  18 U.S.C. § 1961(5).  "Racketeering activity" is defined as any of a long list of state and federal crimes, *id.* § 1961, including mail fraud, *id.* § 1341, and wire fraud, *id.* § 1343.

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires."  *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (citing *United States v. Zagari*, 111 F.3d 307, 327 (2d Cir. 1997)).  To assert a scheme to defraud, a plaintiff must show: "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (citations omitted).  For a claim of mail fraud, "[t]he gravamen of the offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element." *Curtis*, 443 F. App'x at 584 (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008)) (internal quotation marks omitted).  Similarly, for wire fraud, a defendant need only be "one of the participants in a fraudulent scheme which was furthered by the use of interstate transmission facilities."  *Id.* (quoting *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 446 (2d Cir. 2008)).

Allegations of fraud—including allegations of fraudulent acts as RICO predicates—must satisfy a heightened pleading requirement.  *See* Fed. R. Civ. P. 9(b); *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013).  "To satisfy this requirement, a complaint must 'specify the time, place, speaker, and content of the alleged misrepresentations,' 'explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference

that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" *Cohen*, 711 F.3d at 359 (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (alteration in original)).

In considering CMG's claims, the Court is attentive to balancing both the Supreme Court's reminder that "the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes," *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citation omitted) (internal quotation marks omitted), and the Second Circuit's instruction that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it," *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 362 (S.D.N.Y. 2014) (quoting *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (internal quotation marks omitted)).  Federal courts must guard against granting jurisdiction to garden-variety state-law disputes shoehorned into a RICO pattern; but if the shoe fits, the Court must wear it.  *See Phoenix Bond & Indem. Co.*, 553 U.S. at 660 ("We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe.").

CMG sufficiently alleges RICO predicate acts.  As to each Defendant, CMG asserts at least two fraudulent predicate acts that support a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.

In an exhibit appended to the Second Amended Complaint, CMG enumerates 134 discrete alleged RICO predicate acts of mail or wire fraud.  (Dkt. No. 19-1.)  For each act, CMG provides the date of the act, the type of act, the participants, the content of the communication, and the role of the act in furthering the fraud.  Additionally, the Complaint itself sprawls to

nearly 300 paragraphs, describing the underlying schemes in deep detail and the role that particular communications played in those schemes.  This level of specificity satisfies the heightened pleading requirement of Rule 9(b).  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (requiring a complaint alleging fraud to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (internal quotation marks omitted)); *see also Rothstein v. GMAC Mortgage, LLC*, No. 12 Civ. 3412, 2013 WL 5437648, at *16 (S.D.N.Y. 2013), *rev'd on other grounds*, 794 F.3d 256 (2d Cir. 2015) ("[I]n complex RICO cases 'a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b).'" (quoting *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998)).

*Studio AG.*  Some of these predicate acts involve Studio AG—a separate company in the event-planning business formed in late 2009 by Wagner, Andereck, and Wilson.  These alleged predicate acts include: emails among Wilson, Wagner, and Andereck in May of 2009 falsely informing a bank and the clients of an XA subsidiary that Studio AG was part of XA (Compl. ¶ 52; *id.* Ex. A ¶ 5); emails among Wilson, Pizzo, Andereck, and others in November 2010 describing plans to doctor invoices to make it appear that XA, rather than Studio AG, was responsible for Studio AG's debts (*id.*  ¶ 54; *id.* Ex. A ¶ 27); and Pizzo's creating fake bills for goods and services that Studio AG never provided (*id.* ¶ 182).

Defendants argue that the Studio AG allegations must be disregarded because the existence of Studio AG was disclosed to CMG.  (Dkt. No. 31 at 21-22.)  But the mere fact of this

disclosure does not negate these and other allegations of mail or wire fraud absent indication that CMG was or should have been aware of the fraud itself.

For the same reason, Defendants' argument that the allegations regarding Studio AG are time-barred does not merit dismissal. (*Id.* at 22-23.) Defendants correctly assert that the four-year statute of limitations applicable to RICO claims "runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." *World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.* 328 Fed. App'x 695, 697 (2d Cir. 2009) (quoting *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008)). However, such "storm warnings" trigger an obligation to inquire only where "a person of ordinary intelligence would consider it 'probable' that fraud had occurred." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 n.3 (2d Cir. 2012) (quoting *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011)). While Defendants allege that XA had notice of Studio AG's existence, they do not provide any basis on which XA should have found it probable that fraud had occurred, especially given that many of XA's key employees were themselves involved in perpetrating the alleged fraud.

*Mixed Company.* Other predicate acts involve Mixed Company, a florist owned by Wilson and a partner. CMG alleges that Mixed Company "fraudulently billed XA over $183,705.00," which was paid through a series of checks written in 2013 and 2014, despite XA records showing no participation by Mixed Company in the underlying projects. (Compl. ¶ 214; *id.* Ex. 1 ¶ 133.) CMG also alleges that Wilson subsequently lied about the Mixed Company bills to XA auditors. (*Id.* Ex. 1 ¶ 107.)

*HudsonGray.* A final set of RICO predicate acts, occurring in 2014, involves HudsonGray—a competitor to XA founded and run by XA employees while they were still

employed by XA.  (Compl. ¶ 23.)  Notably, Defendants do not directly challenge the allegations of mail fraud and wire fraud regarding the activities of HudsonGray.  (Dkt. No. 31 at 21.)  XA alleges that the very formation of HudsonGray was a scheme to defraud the clients and affiliates of XA in order to obtain money and physical property for HudsonGray.  Emails and text messages were consistently used to plan and execute the HudsonGray scheme.  (Compl. Ex. 1.)

Among the predicate acts that strongly support the inference that the actions of the HudsonGray Defendants—HudsonGray, Wagner, Andereck, Lomma, Day, Wilson, and Gudin—were part of a scheme to defraud are: text messages describing how the HudsonGray Defendants would tell XA clients that HudsonGray was the same company as XA, just using a different name (*id*. ¶ 52); a text message from Gudin to a temporary XA employee informing them that HudsonGray is "the same [as XA] with a different name" (*id*. ¶ 83); the porting of proprietary XA data and information to new iPhones possessed by the HudsonGray Defendants and unattached to XA's server (*id*. ¶¶ 80-82); and HudsonGray's receiving payment for a project developed by and belonging to XA (*id*. ¶ 112).

Between the predicate acts involving Studio AG, Mixed Company and HudsonGray, CMG has sufficiently alleged at least two RICO predicate acts against each Defendant.  In its lengthy complaint, CMG also alleges numerous acts that do not rise to the level of RICO predicate acts.  At this stage of the litigation, the Court need not decide whether each individual act constitutes a RICO predicate act, only that at least two such acts have been properly alleged.

In finding that CMG's allegations satisfy the heightened pleading requirements of Rule 9(b), the Court is also mindful of allegations that Defendants took aggressive steps to conceal their actions, making it difficult for CMG to marshal the facts its claims require.  (*Id.* ¶ 11.)  In certain circumstances, courts are permitted to apply "some leniency when confronted with the

strictures of Rule 9(b)," such as "when 'the facts are peculiarly within the knowledge of the defendants.'" *Boritzer v. Calloway*, No. 10 Civ. 6264, 2013 WL 311013, at *8 (S.D.N.Y. Jan. 24, 2013) (quoting *Am. Buying Ins. Serv., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 249 (S.D.N.Y.1996)).  Leniency is likewise justified where defendants intentionally deprive plaintiffs of access to facts supporting a claim.

Here, CMG alleges that Defendants absconded with much of XA's digital and hard-copy information and erased data from XA's servers.  (Compl. ¶ 12.)  As a result, the Complaint relies on information obtained from "one recovered XA telephone that did not have its data erased" and data recovered by IT professionals.  (*Id.* ¶ 13.)  At times, the holes in the record are apparent.  (*E.g.*, *id.* ¶ 114 ("XA has been unable to access documents showing costs because all the physical contracts are missing and XA IT professionals have not yet been able to restore documents regarding this project.").)  Given these allegations, some leniency is justified in determining whether CMG has satisfied Rule 9(b)'s heightened pleading standard.

## 2. RICO Pattern

To bring a claim under RICO, a plaintiff must allege a "pattern of racketeering activity." 18 U.S.C. § 1962(c).  A "pattern" of racketeering activity requires "at least two acts of racketeering activity."  *Id.* § 1961(5).  While two acts of racketeering activity are necessary for a RICO claim, merely alleging two acts is not alone sufficient to establish a "pattern."  Rather, "the acts must be related and 'amount to or pose a threat of continued criminal activity.'"  *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010) (quoting *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992)).

To satisfy the "relatedness requirement . . . [t]he racketeering acts must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical'

relatedness)." *Rosenson v. Mordowitz*, No. 11 Civ. 6145, 2012 WL 3631308 (S.D.N.Y. Aug. 23, 2012) (quoting *Minicone*, 960 F.2d at 1106).  "[B]oth the vertical and horizontal relationships are generally satisfied by linking each predicate act to the enterprise." *Burden*, 600 F.3d at 216 (quoting *United States v. Daidone*, 471 F.3d 371, 376 (2d Cir. 2006) (per curiam)).

As for continuity, RICO requires a plaintiff to allege either closed-ended continuity or open-ended continuity. *Id.* at 217.  Closed-ended continuity requires "a series of related predicate acts extending over a substantial period of time." *Spool v. World Child Int'l. Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  Open-ended continuity requires "activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Id.*  But "[w]hether closed-ended or open-ended, continuity is 'centrally a temporal concept.'" *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 99 (2d Cir. 2008) (quoting *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 242 (1989)).

Defendants argue that CMG has failed to adequately allege a "pattern" of racketeering activity.  (Dkt. No. 31 at 25.)  Defendants do not challenge the relatedness requirement.  Rather, they contend that the allegations are insufficient to show continuity.  Defendants argue that the schemes lack closed-ended continuity because they took place over too short a time period, focusing only on the HudsonGray activities to argue that CMG has alleged acts occurring over the course of just eight months beginning in January 2014.  (*Id.* at 27-28.)  CMG, however, argues that the schemes took place over a much longer time horizon, beginning in 2009 with the Studio AG activity.  (Dkt. No. 34 at 17-18.)

The Court concludes that CMG has plausibly alleged closed-ended continuity.[3] Defendants correctly assert that short-term activity is generally insufficient to show closed-ended continuity. *Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*, No. 14 Civ. 7349, 2016 WL 1298987, at *10 (S.D.N.Y. Mar. 31, 2016) ("The Second Circuit has never found a period of less than two years to be 'substantial.'" (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)). But Defendants fail to explain why the earlier actions involving Studio AG and Mixed Company, for which CMG has plausibly alleged RICO predicate acts that took place as early as 2009, should not be considered in establishing the relevant timeframe. *See Spool*, 520 F.3d at 184 ("The relevant period . . . is the time during which RICO predicate activity occurred."). Defendants' argument against continuity starts from the premise that their earlier acts were not RICO predicate acts, and then assumes that their later acts were of insufficient duration. However, given this Court's conclusion that CMG has plausibly alleged predicate acts occurring as early as 2009 and as late as 2014, Defendants' actions over this five-year period—throughout which Defendants engaged in diverse activities in furtherance of the alleged schemes involving multiple companies and multiple defrauded counterparties—satisfy the requirement of close-ended continuity. *See GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (2d Cir. 1995) ("[C]ourts have attempted to measure whether closed-ended continuity exists by weighing a variety of non-dispositive factors, including, *inter alia*, the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence

---

[3]      Defendants also contend that because the schemes are "inherently terminable," they lack open-ended continuity. (Dkt. No. 31 at 26-27.) Because the Court concludes that CMG has alleged closed-ended continuity, it need not address whether open-ended continuity has also been adequately pleaded. *See Burden*, 600 F.3d at 217.

of separate schemes."); *see also Fresh Meadow*, 282 F. App'x at 99-100 (finding that "[w]here the racketeering acts span nearly three and one-half years," other factors of continuity were "less critical").

CMG thus plausibly alleges a claim under RICO sufficient to survive Defendants' motion to dismiss.

Defendants contend that the non-HudsonGray allegations were "clearly included in the Second Amended Complaint to 'mold' XA's business dispute into a RICO claim."  (Dkt. No. 31 at 28 (quoting *Spool*, 520 F.3d at 184-85).)  Indeed, "there is no question that RICO's private right of action, in conjunction with the statute's inclusion of mail and wire fraud (for which there is no independent private right of action) as racketeering acts, creates federal treble damage actions out of business disputes that would otherwise never be in federal court.  However, the Supreme Court long ago observed that 'this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress.'"  *Fresh Meadow*, 282 F. App'x at 100 (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).

### 3.    RICO Conspiracy

CMG asserts a RICO conspiracy in violation of 18 U.S.C. § 1962(d) against Wilson, Wagner, Andereck, Lomma, Mixed Company, Day, and Gudin.  Defendants argue that because the RICO claim fails, the RICO conspiracy claim must also be dismissed.  (Dkt. No. 31 at 29.)

Because the Court has concluded above that the RICO claim is sufficient to survive the motion to dismiss, the only element remaining to be pleaded in support RICO conspiracy is the existence of an agreement.  18 U.S.C. § 1962(d); *see Rothstein*, No. 12 Civ. 3412, 2013 WL 5437648, at *19.  The allegations described above plausibly allege such an agreement and document the existence of the agreement by describing numerous communications about the

alleged scheme among all of the Defendants.  (*See* Compl. Ex. 1.)  The RICO Conspiracy claim

thus survives the motion to dismiss.

      **B.**      **Claims Against Wagner**

      As a defense to all claims against Wagner, Defendants argue that the Second Release

Agreement—a contract executed on April 22, 2014, in anticipation of Wagner's departure from

XA—is operative and releases Wagner from all claims by CMG.  (Dkt. No. 31 at 29-34.)  The

Second Release Agreement, they contend, supersedes the First Release Agreement, executed on

February 26, 2014, which superseded Wagner's original Employment Contract from 2009.

(Compl. ¶ 90-93.)  Defendants also argue that all claims against Wagner must be dismissed for

improper venue due to the forum selection clause in the Second Release Agreement.  (*Id.* at 34.)

In response, CMG claims that both the Second Release Agreement and the First Release

Agreement are invalid as they were only obtained as a result of Wagner's fraud.  (Dkt. No. 34 at

23.)

      While valid release agreements are enforced according to their terms, "[c]ourts will not

enforce a release that is the product of fraud."  *Becher v. Tyco Intern. Ltd.*, 27 Fed. App'x 48, 51

(2d Cir. 2001) (citing *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).

"[E]ven an explicit waiver will not be given effect[,] 'when the facts are peculiarly within the

knowledge of the party invoking the disclaimer.'"  *Aetna Cas. & Sur. Co. v. Aniero Concrete*

*Co.*, 404 F.3d 566, 576 (2d Cir. 2005) (quoting *Banque Arabe Et Internationale v. Md. Nat.*

*Bank*, 57 F.3d 146, 155 (2d Cir. 1995)).

      As discussed above, CMG pleads pervasive and particularized allegations of fraudulent

behavior by Wagner (namely that, unknown to CMG, Wagner engaged in a pattern of fraud over

a period of five years designed to siphon clients and profits away from XA and to other

businesses owned or controlled by him and his associates).  The scope and magnitude of those actions strongly support an inference that if CMG knew about Wagner's actions it would not have entered into the two Release Agreements.  *See* Fed. R. Civ. P. 9(b).  Put another way, CMG has sufficiently alleged that Wagner's calculated nondisclosures induced it to enter into the Release Agreements.  *See Sokolow, Dunaud, Mercadier & Carreras v. Lacher*, 299 A.D.2d 64, 70 (N.Y. App. Div. 1st Dep't 2002) (enumerating the elements of fraudulent inducement under New York law: a material misrepresentation or omission intended to induce another party to rely upon it to their detriment); *accord 23-25 Bldg. P'ship v. Testa Produce, Inc.* 886 N.E.2d 1156, 1164 (Ill. Ct. App. 2008) (Illinois law).  Because CMG has adequately alleged that the releases in the Release Agreements were the products of fraudulent inducement, those releases do not bar claims against Wagner at this stage.

Defendants also argue that the claims against Wagner must be dismissed for improper venue, given the forum-selection clauses in the agreements between the parties providing for exclusive jurisdiction in Cook County, Illinois.  (Dkt. No. 31 at 34.)  However, a party may "enforce a forum-selection clause by seeking dismissal of the suit . . . only when venue is 'wrong' or 'improper.'"  *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, -- U.S. --, 134 S. Ct. 568, 577 (2013).  Defendants do not argue that venue in this Court is wrong or improper, only that the forum-selection clauses warrant dismissal.  That this Court cannot do.

## C.    State Law Claims

In addition to the RICO claims, CMG alleges a dozen state-law claims against mixed-and-matched groups of Defendants, seeking punitive damages.  Defendants challenge all but three of these claims.

1.       **Claim 3: Breach of Contract**

CMG alleges breach of contract against all individual HudsonGray Defendants, claiming

that Wagner, Andereck, and Wilson breached the non-competition and non-solicitation clauses

of their employment agreements and that all individual HudsonGray Defendants breached

provisions of the XA Employee Handbook.  (Compl. ¶¶ 221-226.)  Defendants argue that these

claims must be dismissed due to the absence of breach in Wagner's case and the non-existence of

the alleged contractual obligations in the other Defendants' cases.  (Dkt. No. 31 at 34-35.)

Defendants argue that XA's own failure to comply with Wagner's contract—in particular, XA's

failure to pay Wagner compensation to which he was entitled upon termination—estops them

from alleging its breach.  (Dkt. No. 38 at 9.)  As to the remaining Defendants, Defendants argue

that only Wagner signed an employment agreement and that the Handbooks do not constitute

contracts given a disclaimer contained therein.  (Dkt. No. 31 at 34-37.)

 "To state a claim in federal court for breach of contract under New York law, a

complaint need only allege (1) the existence of an agreement, (2) adequate performance of the

contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *19

Recordings Ltd. v. Sony Music Entm't*, 97 F. Supp. 3d 433, 438 (S.D.N.Y. 2015) (quoting *Harsco

Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

As regards Wagner, Defendants argue that CMG has failed the second prong of this

inquiry by failing to perform on its own obligations under the contract.  Wagner's employment

contract[4] includes a robust non-competition provision, prohibiting him from engaging in "the

---

[4]       For reasons discussed above, CMG has adequately pleaded that the First Release
Agreement and the Second Release Agreement were the products of fraudulent inducement.  Due
to their presumptive invalidity, only Wagner's original employment contract is at issue here.
(Compl. ¶¶ 90-98.)

same, or a substantially similar, type of business as that in which [XA] engages" for nine months following his termination.  (Compl. Ex. D ¶ 6.)  However, the contract also provides that the non-competition clause is operative "if and only if" XA paid certain required compensation to Wagner "within two (2) business days" of his termination.  (*Id.*)  Defendants claim that XA failed to make this required payment.  (Dkt. No. 31 at 33.)  CMG does not dispute this claim. Rather, it argues that "any inability on XA's part to pay Wagner any monies he claimed he was owed was the result of Wagner's thefts of XA business and property."  (Dkt. No. 34 at 23.) Because CMG does not allege that it adequately performed its obligations under the operative employment agreement, it cannot sustain its breach of contract claim against Wagner.  *See Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077 (1984) ("[A] contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned.").

As regards the breach of contract claims against Andereck and Wilson, Defendants dispute CMG's pleading of the first prong of the standard for breach of contract: "the existence of an agreement."  *19 Recordings Ltd.*, 97 F. Supp. 3d at 438.  Defendants contend that Andereck and Wilson did not sign employment agreements.  (Dkt. No. 31 at 35.)  CMG does not produce the employment contracts.  Rather, it alleges on information and belief that Andereck and Wilson signed contracts that were identical to Wagner's contract, based in part on its discovery (at the bottom of an abandoned box) of draft employment contracts for Andereck and Wilson.  (Compl. ¶¶ 222-223.)  On this basis, CMG alleges that Andereck and Wilson were in breach of non-competition and non-solicitation agreements identical to that in Wagner's employment contract. (*Id.*)

But this Court need not determine whether the alleged contracts existed.  Even assuming their existence, CMG's claim for breach is unavailing given CMG's failure to allege its own adequate performance under the contracts.  If Andereck's and Wilson's contracts were identical to Wagner's—as CMG argues—then its claim for breach of contract against them must fail for the same reason that the analogous claim against Wagner fails.

As regards the remaining HudsonGray defendants Lomma, Day, and Gudin, CMG makes no specific allegations about the existence or contents of their employment contracts in its complaint.  (*See* Compl. ¶¶ 221-226.)  Only in its opposition to Defendants' motion to dismiss does CMG claim that its "belief that [Lomma, Day, and Gudin], too, signed written employment agreements is based on the fact that Wilson represented to CMG that everyone working at XA had signed agreements."  (Dkt. No. 34 at 28.)  These generalized claims are insufficient to state a claim for breach of contract.

CMG also argues that all Defendants breached provisions of the XA Employee Handbook.  But Defendants correctly assert that the Handbooks do not constitute binding employment contracts, given the express disclaimer therein.  (*See* Compl. Ex. C ("These policies are not a legal document or an employment contract.").)  Under New York law, "[r]outinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements. . . . especially in light of conspicuous disclaiming language. An employee seeking to rely on a provision arguably creating a promise must also be held to reliance on the disclaimer."  *Lobosco v. New York Tel. Co./NYNEX*, 96 N.Y.2d 312, 317 (N.Y. Ct. App. 2001).  In response, CMG claims that the provisions in the Handbook "largely replicate ordinary common law fiduciary duties . . . and the absence of a signed agreement or handbook

does not shield such misconduct." (Dkt. No. 34 at 30.) If this is the case, CMG should seek relief for breach of fiduciary duty—as indeed it has—not breach of contract.

The Court thus grants the motion to dismiss as to the claim for breach of contract.

## 2.      Claim 4: Injunctive Relief and Constructive Trust

CMG seeks injunctive relief and the imposition of a constructive trust against the HudsonGray Defendants. (Compl. ¶¶ 227-233.) CMG requests that the Court "enter an injunction preventing [the HudsonGray Defendants] from using XA trade secrets, contacting or working with any customers who were former XA customers," impose "a constructive trust . . . on the profit [these] Defendants have made," and find that "[e]ach of the Individual [HudsonGray Defendants is] deemed to be holding XA's former physical resources and proprietary/confidential information in a constructive trust." (*Id.* ¶¶ 230, 233.) Defendants argue that the request for injunctive relief should be dismissed because CMG has failed to allege irreparable harm and that the request for a constructive trust should be dismissed because there is no allegation that XA transferred the property in question to Defendants. (Dkt. No. 31 at 38-39.) Defendants further argue that the claim for injunctive relief and constructive trust must be dismissed given the request for monetary damages and the adequacy of money damages to compensate CMG for its loss. (*Id.*)

Injunctions and constructive trusts are both equitable remedies. As such, they should not be invoked absent indication that remedies at law are insufficient to compensate a plaintiff for its injuries. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) ("If a less drastic remedy . . . was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted."); *In re First Central Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004) ("New York courts have clarified that '[a]s an equitable remedy, a

constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate.'" (quoting *Bertoni v. Catucci*, 498 N.Y.S.2d 902, 905 (N.Y. App. Div. 1986)); *see generally* 27A Am. Jur. 2d Equity § 21 (2016) ("[T]he absence of an adequate remedy at law is a precondition to any type of equitable relief. . . . Thus, the plaintiff must affirmatively show a lack of an adequate remedy at law on the face of the pleading . . . .").

Here CMG seeks twenty million dollars in compensatory damages, along with treble damages for injuries arising from its RICO claims, and punitive damages for the non-RICO conduct in the amount of ten times compensatory injury.  (Compl. ¶¶ 290-291.)  CMG does not allege that these remedies at law will be insufficient to compensate it for its loss.

As a result, the Court dismisses CMG's pleas for equitable relief.

### 3.    Claim 5 and Claim 8: Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty

CMG alleges a breach of fiduciary duty against the individual HudsonGray Defendants and aiding and abetting breach of fiduciary duty against the HudsonGray Defendants and the Studio AG Defendants.  (Compl. ¶¶ 234-237, 247-251.)

Under New York law, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom."  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 64 A.D.3d 736 (2d Dep't 2009)).  "A claim for aiding and abetting a breach of fiduciary duty [under New York law] requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."  *Id.* at 142 (quoting *Kaufman v. Cohen*, 307 A.D.2d 113 (N.Y. App. Div. 2003)) (alteration in original).

CMG has adequately pleaded breach of fiduciary duty against Wagner, Wilson, Andereck, Lomma, and Day.[5]  Each of these individuals was an executive officer of XA, which is alone sufficient to plausibly allege the existence of a fiduciary relationship.  *See United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013).  For reasons discussed at length above, CMG has adequately alleged that these Defendants knowingly breached their fiduciary duties to XA's detriment by diverting XA's profits and clients to their own businesses.  (*See, e.g.*, Compl ¶¶ 178-183.)  With respect to the remaining Defendants, CMG has adequately pleaded aiding and abetting breach of fiduciary duty, given the extensive allegations of Defendants' knowing participation in the breach of fiduciary duties owed to XA by Wagner, Wilson, Andereck, Lomma, and Day.

### 4.      Claim 7: Tortious Interference with Contract

CMG alleges tortious interference with contract against Wilson, Wagner, Andereck, Studio AG, and HudsonGray.  (Compl. ¶¶ 242-246.)  Defendants argue that this claim must be dismissed because CMG fails to identify any specific valid contract with a third party that was breached as result of Defendants' interference.  (Dkt. No. 31 at 40; Dkt. No. 38 at 11.)

"Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom."  *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 404

---

[5]      CMG also alleges breach of fiduciary duty against Gudin.  (Compl. ¶¶ 234-237; *id.* at 1.)  However, CMG nowhere alleges that Gudin owed a fiduciary duty to XA.  (Dkt. No. 34 at 34-36.)  The breach of fiduciary duty against Gudin is therefore dismissed.

(S.D.N.Y. 2012) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (internal quotation marks omitted)).

CMG has described the existence of multiple specific contracts—such as those between XA and NBCUniversal—and has alleged that HudsonGray and Studio AG were compensated for XA's work on these projects, in breach of the contractual arrangement, as a result of Defendants' knowing actions.  (*See* Compl. ¶¶ 109-116.)  These facts, especially considered in the context of the alleged scheme described above, are sufficient to plausibly assert a claim for tortious interference with contract.

**5.      Claim 9: Misappropriation and Unfair Competition**

CMG alleges misappropriation and unfair competition against the HudsonGray Defendants and the Studio AG Defendants, claiming that they "willfully and maliciously misappropriated XA confidential and proprietary information for their own benefit."  (Compl. ¶ 253.)  Defendants argue that this claim should be dismissed due to CMG's failure to "allege any particular piece of secret information that was improperly used by any Defendant," noting that XA's client list was publicly available on its website and thus not secret for the purposes of alleging misappropriation.  (Dkt. No. 31 at 42.)

"The tort of unfair competition (via misappropriation) under New York law specifically requires proof that the defendant took something in which the plaintiff enjoyed a property right." *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 429 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) (citing *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)). Additionally, a plaintiff must show that the "defendant's use of the information constitutes free-riding on the plaintiff's efforts."  *Id.* (quoting *National Basketball Ass'n v. Motorola, Inc.*, 105

23

F.3d 841, 845 (2d Cir. 1997)).  "New York courts have noted the 'incalculable variety' of illegal

practice falling within the unfair competition rubric . . . calling it a 'broad and flexible doctrine.'"

*Id.* (quoting *Roy Export*, 672 F.2d at 1105 (internal citations omitted)).

Here, CMG has adequately alleged facts that fit its claim within the reach of this broad

and flexible cause of action.  As described in detail above, CMG alleges that Defendants

absconded with a significant amount of digital and physical information belonging to XA

describing the operations of its business and the private details of its client relationships, and

then used that information to establish a firm the directly competed with XA.  (*E.g.*, Compl.

¶¶ 79-82.)  CMG further asserts that even more instances of misappropriation would have been

alleged "but for Defendants theft of all XA's hard copy files and global erasure of all its

electronic files."  (Dkt. No. 34 at 38.)  These allegations plausibly support CMG's claim of

misappropriation and unfair competition.

### 6.      Claim 10: Theft of Corporate Opportunities

CMG alleges theft of corporate opportunities against all individual Defendants.[6]

Defendants argue that this claim must be dismissed as against Pizzo because he was not an

officer or employee of XA.  (Dkt. No. 38 at 14.)  Defendants do not argue that this claim should

be dismissed against the other individual Defendants.

"The doctrine of 'corporate opportunity' is 'based on a duty of loyalty to an employer'

and provides that 'corporate fiduciaries and employees cannot, without consent, divert and

exploit for their own benefit any opportunity that should be deemed an asset of the corporation.'"

---

[6]      In its complaint, CMG asserted this claim against all Defendants except Mixed
Company.  (Compl. ¶¶ 259-264.)  However, in its brief opposing the motion to dismiss, it
corrected the allegation to only cover the individual Defendants, excluding HudsonGray and
Studio AG.  (Dkt. No. 34 at 41.)

*Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 413 (E.D.N.Y. 2012) (quoting

*Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 672 (S.D.N.Y. 2005)).

Pizzo was general manager of Studio AG.  (Compl. ¶ 27.)  CMG does not allege that

Pizzo was an employee or corporate fiduciary of XA.  CMG also does not explain why this claim

should not be dismissed as against Pizzo.  (Dkt. No. 34 at 41.)  As a result, the claim for theft of

corporate opportunities must be dismissed against him.

### 7.    Claim 11 and Claim 12: Tortious Interference with Business Relationships and with Prospective Advantage

CMG alleges tortious interference with business relationships and tortious interference

with prospective advantage against all Defendants except Mixed Company.  Defendants argue

that these claims should be dismissed because CMG fails to allege that the interference was

accomplished through "wrongful means," claiming that their actions amount only to "offering

services to customers at attractive prices."  (Dkt. No. 38 at 11-12; *see* Dkt. No. 31 at 40-41.)

Under New York law, "[a] claim for tortious interference with prospective business

advantage must allege that: (a) the plaintiff had business relations with a third party; (b) the

defendant interfered with those business relations; (c) the defendant acted . . . by using unlawful

means; and (d) there was resulting injury to the business relationship."  *Thome v. Alexander &*

*Louisa Calder Found.*, 70 A.D.3d 88, 108 (N.Y. App. Div. 2009) (citing *Carvel Corp. v Noonan*,

3 N.Y.3d 182 (N.Y. Ct. App. 2004)).

As described in detail above, CMG has plausibly alleged that Defendants communicated

with XA clients in an attempt to divert business from XA to Studio AG and HudsonGray by

fraudulently representing the relationship between those companies and XA, with the result that

Defendants' own companies were paid for XA's work.  (Compl. ¶¶ 52, 112.)  Defendants'

actions were directed at parties with which CMG had business relationships, *see Carvel Corp.*, 3

N.Y.3d at 192, and were accomplished by fraudulent means, *see id.* at 191.  CMG does not

allege that Defendants' activities were mere competition; rather, CMG argues that Defendants'

active and fraudulent solicitation of XA clients resulted in XA's loss of business revenue.

(Compl. ¶¶ 42, 67, 109-114.)  These claims survive Defendants' motion to dismiss.

### 8.    Punitive Damages

Finally, CMG seeks punitive damages for injury caused by Defendants' non-RICO

misconduct[7] in the amount of ten times compensatory damages.  (Compl. ¶ 291.)  Defendants

argue that "Plaintiff has, at best, alleged a 'garden variety' business dispute, and not anything

'evil' or reprehensible" so as to justify punitive damages.  (Dkt. No. 31 at 43.)

Punitive damages are available only in the "most egregious" of cases.  *Poller v. BioScrip,*

*Inc.*, 974 F. Supp. 2d 204, 239 (S.D.N.Y. 2013).  To obtain punitive damages in ordinary tort

actions, a plaintiff "must show that the defendant committed a tort under 'circumstances of

aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive . . . or such a

conscious and deliberate disregard of the interests of others that the conduct may be called wilful

or wanton.'"  *Barbagallo v. Marcum LLP*, 820 F.Supp.2d 429, 448 (E.D.N.Y.2011) (quoting

*Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479 (N.Y. Ct. App. 1993)).  In order

to justify punitive damages, such conduct need not necessarily be directed at the public.  *See*

*Poller*, 974 F. Supp. 2d at 239.

Based on CMG's allegations, this case may present a rare occasion where punitive

damages may potentially be justified.  CMG alleges that Defendants engaged in a comprehensive

scheme over the course of five years to deprive XA of its profits and clients by working as

---

[7]    CMG seeks treble damages for injuries arising from Defendants' RICO misconduct.  *See* 18 U.S.C. § 1964(c).

executive officers for XA while simultaneously running separate businesses that fraudulently competed with XA.  CMG has alleged that Defendants: defrauded XA customers into paying Defendants for work performed by XA; misrepresented the relationship between XA and their own businesses; absconded with data and confidential information from XA's servers; and dispossessed XA of its physical property worth more than $300,000, including everything from business records to coffee tables.  CMG even claims that Defendants took XA's lighting fixtures and installed them in HudsonGray's office, going so far as to include pictures of the fixtures in HudsonGray advertising materials.  (Compl. ¶ 83.)  Given the chutzpah with which Defendants allegedly executed their schemes, the Court finds that the request for punitive damages is sufficient to survive the motion to dismiss.

## III.   Conclusion

For the foregoing reasons, the Defendants' motion is GRANTED IN PART AND DENIED IN PART.  Defendants shall file their answer to the surviving claims by September 30, 2016.

The Clerk of Court is directed to close the motions at Docket Numbers 22 and 37.


SO ORDERED.


Dated: September 7, 2016
New York, New York

_____
J. PAUL OETKEN
United States District Judge