```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   CMG HOLDINGS GROUP, as
     successor to XA The
 4   Experimental Agency, Inc.,

 5                  Plaintiff,

 6          v.                              15 Civ. 5814 (JPO)

 7   JOSEPH WAGNER, et al.,
                                            Conference
 8                  Defendants.

 9   ------------------------------x
                                            New York, N.Y.
10                                          April 12, 2018
                                            11:40 a.m.
11
     Before:
12
                          HON. J. PAUL OETKEN,
13
                                            District Judge
14

15                          APPEARANCES

16   EDWARDS POTTINGER LLC
             Attorneys for Plaintiff
17   BY:  SETH M. LEHRMAN

18   WINDELS MARX LANE & MITTENDORF LLP
             Attorneys for Defendants
19   BY:  SCOTT R. MATTHEWS

20

21

22

23

24

25
```

1              (Case called)

2              MR. LEHRMAN:  Good morning, your Honor, Seth Lehrman

3    appearing for the plaintiff and third-party defendants.

4              THE COURT:  Good morning.

5              MR. MATTHEWS:  Good morning, your Honor, Scott

6    Matthews for all defendants and third-party plaintiffs.

7              THE COURT:  Good morning.  You can be seated.

8              We are here to discuss a series of discovery disputes

9    reflected in the letters I received basically in March of this

10   year.

11             Mr. Lehrman, are you at Farmer Jaffe or Edwards

12   Pottinger?

13             MR. LEHRMAN:  I'm at the Edwards Pottinger firm.  I

14   formerly practiced with Farmer Jaffe.  That firm is dissolving.

15   Mr. Edwards and I, my cocounsel, are now partners at this new

16   firm.

17             THE COURT:  You can all remain seated.  Pull the mics

18   right in front of your face.

19             I've extended discovery in this case.  Depositions

20   will be completed June 29.  All fact discovery also completed

21   June 29.  Expert discovery to be completed October 8 of this

22   year.

23             You all haven't had any settlement discussions.  Do

24   you still have a mediation scheduled in May?

25             MR. MATTHEWS:  Your Honor, the Court's order requires

1    that we conduct private mediation in the middle of May.

2    Counsel and I have been discussing settlement informally, and

3    we would like to have the case referred to a magistrate judge

4    to conduct a settlement conference.  We think that would be

5    more useful than a private mediation.

6         THE COURT:  Do you agree?

7         MR. LEHRMAN:  I do agree.

8         THE COURT:  I can do that.  I'll have to get a

9    magistrate judge designated.  I am not sure.  It will probably

10   be one of the new magistrate judges because Judge Ellis, who

11   was originally designated, has retired.  It might be Judge

12   Aaron or one of the other ones.  I'll go ahead and do that.

13        Defense counsel, Mr. Matthews, you've raised a number

14   of issues with regard to plaintiff's production and then

15   plaintiff has raised some issues with regard to defendants'

16   production.

17        Let's start with defendants' letter which came first.

18   What would you like to discuss first?

19        MR. MATTHEWS:  Thank you, your Honor.  We have been

20   seeking to obtain documents from the plaintiff and plaintiff's

21   principal, Glenn Laken and his daughter, Alex Laken, the

22   president of the company, for years, only to be met with

23   refusals and statements that are demonstrably false.  We are

24   seeking communications regarding XA's finances, communications

25   made during this purported investigation of my client's actions

1   following their resignation from XA, submissions of coded

2   American Express charges made by Mr. Laken and Ms. Laken, and

3   records of Mr. Laken's trading activity in the CMGO stock.

4         We want these documents so we could prove that the

5   plaintiff at all times knew of defendants' lawful actions, that

6   there is no basis for the allegations in the complaint, that

7   Mr. Laken and Ms. Laken themselves acted in the same way in

8   which defendants did with respect to business expenses, and

9   that Mr. Laken is using this lawsuit as a means to prop up the

10  price of the CMGO stock.

11        The Court heard argument on this on May 3, 2017.  The

12  Court granted our motion to compel Mr. Laken to produce

13  documents that support our unclean hands defense, and he has

14  failed and refused to do so.  He has produced certain trading

15  records of the CMGO stock, but he stops producing records after

16  2014.  It's simply inconceivable that Mr. Laken, who became

17  chairman and CEO of this company as a result of amassing enough

18  stock to throw out the prior board, suddenly stops trading

19  stock in the company and doesn't have access to those records.

20  What he did was he produced records from four or five different

21  trading houses.  They all stop in 2014 and now he claims that

22  he doesn't have possession, custody or control of additional

23  records.  The suggestion is preposterous on its face.

24        In addition, he has not produced e-mail records

25  concerning this investigation.  The defendants resigned their

1  employment.  Mr. Laken's wife, Barbara Laken, conducted an

2  investigation with the aid of an IT professional.  She didn't

3  produce any documents in response to a subpoena that was issued

4  to her, instead stating that those documents have already been

5  produced by CMG.  When we subpoenaed Mr. Faria, the IT

6  professional who supposedly conducted this investigation, he

7  produced hundreds of e-mails.

8         THE COURT:  But you now have them and plaintiff's

9  counsel has admitted that the statements were not entirely

10 accurate.  You now have those e-mails, right?

11        MR. MATTHEWS:  We have e-mails from Mr. Faria and then

12 thereafter Mr. Laken, and the plaintiff supplemented their

13 production.

14        THE COURT:  What are you now missing as to Mr. Faria?

15        MR. MATTHEWS:  I don't believe we are missing

16 anything.  I don't know what we are missing.  I think we are

17 missing -- I have a suspicion that we are missing internal

18 communications between Mr. Laken and his wife and his daughter

19 via e-mail concerning this investigation, but I don't know that

20 at the moment, your Honor.

21        The reason why I have a suspicion, your Honor, is

22 because the plaintiff subpoenaed its former attorney, Darren

23 Ofsink's records because they didn't have their own financial

24 records or corporate governance documents.  Mr. Ofsink produced

25 documents that the plaintiff produced to us.  In those

1    documents are e-mails from his firm to Mr. Laken.  Those

2    e-mails have never been produced to us.

3              THE COURT:  Were they privileged?

4              MR. MATTHEWS:  No.  There are four different directors

5    on the e-mail and they just haven't been produced.  I don't

6    know why they haven't been produced.  Each time we have to go

7    behind the curtain to get documents from a nonparty suggests to

8    me that Mr. Laken is withholding other documents.

9              In addition, for some reason they haven't produced

10   financial statements after 2014.  This is a publicly traded

11   corporation that they state has ongoing business dealings yet

12   they don't have documents from '15, '16, '17, and now '18.

13   They are claiming that they have lost millions of dollars as a

14   result of my client's efforts but have no way to substantiate

15   that without providing their financial records.

16             They also continue to produce only documents that they

17   get through subpoenas to their auditors.  The suggestion that a

18   publicly traded corporation doesn't maintain its own records is

19   pretty unusual.

20             THE COURT:  This is a public company?

21             MR. MATTHEWS:  Yes, your Honor.  It's a petty stock

22   traded on the over-the-counter exchange, but it's a publicly

23   traded company.

24             THE COURT:  Does it have offices or anything, or is it

25   just in Mr. Laken's house?

1          MR. MATTHEWS:  It's in Mr. Laken's house and

2    Ms. Laken, his daughter, her house or apartment in Brooklyn.

3    They claim to be performing services.  I don't know.

4          The situation, though, your Honor, is that each time

5    we seek documents -- the plaintiff has produced 14 different

6    productions.  They produced hundreds of thousands of documents.

7          In fact, they produce all the documents that they

8    claim my clients deleted.  They don't produce the documents

9    that my client has never had access to.  They only do so after

10   we file motion after motion and we have meet and confer after

11   meet and confer.

12         Counsel and I get along well.  We work earnestly in an

13   attempt to resolve these disputes.  Unfortunately, we are

14   unable to do so.  My clients have been prejudiced in that

15   persons who were working on this matter are no longer employed

16   by the company for which they were previously employed.  We

17   didn't have notice of it until years later.  We have to file

18   subpoenas and conduct depositions without getting documents.

19   And they are spending thousands of dollars to review documents,

20   reams of documents that don't have the requested information in

21   them.

22         We have asked the Court to strike the allegations.  In

23   October I asked this Court for sanctions.  The Court

24   understandably denied the request and directed that Mr. Laken

25   and plaintiff produce all documents within 30 days.  That

1   didn't happen.  I now ask the Court again to strike the

2   allegations in the complaint concerning data deletion, American

3   Express coded statements, and anything with regard to this

4   purported investigation.

5        Should the Court not grant that, I ask that the Court

6   sanction the plaintiff and reimburse my client for its legal

7   fees in connection with these letter motions and the meet and

8   confers and review of documents.

9        THE COURT:  Mr. Lehrman.

10       MR. LEHRMAN:  Thank you, your Honor.

11       I agree with opposing counsel's assessment and

12   characterization that he and I professionally get along well.

13       I've understood, since I appeared in the case in late

14   July of last year, what defendants' discovery plan was and

15   strategy was, and we have, we being plaintiff counsel, along

16   with our clients, have worked diligently since then to attempt

17   to ensure our client's compliance with this Court's discovery

18   order and also to work diligently to confer with defendants'

19   counsel repeatedly and to address and cure any alleged

20   deficiencies with respect to plaintiff's production.

21       That's why there has been this series of productions

22   that have occurred.  Not including the first production that

23   was made by plaintiff's prior counsel that consisted of more

24   than 590,000 documents, there have been an additional 13

25   productions since then that myself and my cocounsel have made.

1          In terms of the IT investigation, granted Mr. Faria

2    produced the e-mail late, but he has produced the e-mail in

3    response to defendants' subpoena.  He testified concerning the

4    documents generally.  He was examined on some of those

5    documents.  He was examined on some documents that defense

6    counsel had confronted him with.

7          Since his deposition we, plaintiff, produced

8    additional e-mail communications.  On March 20, as part of

9    production 11, we produced an additional 46 documents that were

10   responsive to request 62 seeking communications reflecting

11   plaintiff's investigation of the alleged data deletion.

12         And we have gone through in our most recent responsive

13   letter and the declaration that we filed on behalf of Glenn

14   Laken to try to address each of the areas raised in defendants'

15   letter motion.

16         Since that last filing by plaintiff, which is docket

17   entry 79 that was filed on March 16, there is additional

18   production that's occurred, some of which defense counsel has

19   referenced.

20         I just want to make sure the record is clear as far as

21   what has been produced and when.  On April 6, plaintiff

22   produces as part of production set 14 the documents in total

23   that Darren Ofsink produced to plaintiff in response to a

24   subpoena that we had issued.

25         It's worth noting that I had had repeated e-mail

1    communications and had left repeated phone messages for

2    Mr. Ofsink going back many months requesting these documents

3    but was unsuccessful in obtaining any documents from

4    Mr. Ofsink.

5             THE COURT:  Was he an employee?  He was counsel to XA?

6             MR. LEHRMAN:  He was outside counsel to CMG.

7             THE COURT:  Was he at a firm or an employee of some

8    company?

9             MR. LEHRMAN:  He was not an employee of CMG or XA, as

10   I understand.  He maintained his own private law practice, and

11   I believe he was engaged as outside counsel by CMG.

12             Mr. Ofsink accepted service of subpoena.  He produced

13   the documents.  There were 720 pages of documents he produced.

14   We ingested them through our IT e-discovery people, Bates

15   stamped them, and produced all of the documents, withheld none

16   of them, to defendant on April 6.

17             Likewise, American Express statements for cards that

18   were issued to Glenn Laken and Alexis Laken was something that

19   the defendant had been requesting and seeking and was the

20   subject of letter motions.  Mr. Laken himself, and he addressed

21   this in his declaration, he personally requested and obtained

22   the statements from American Express recently.  He turned them

23   over to my firm and we produced those American Express

24   statements as part of production No. 13, 125 pages of

25   documents, 10 separate statements from March through December

2014.  And I understand from Mr. Laken that that is the

entirety of American Express statements that he says exist

responsive to these requests.

        Defense counsel references with respect to the unclean

hands production that was sought brokerage statements.  Again,

just to be clear, on March 22, as part of plaintiff's

production No. 12, plaintiff and Glenn Laken produced brokerage

statements maintained by Infinite Alpha, Incorporated.  Barbara

Laken subsequently testified that that's a corporation that she

owns and that she had allowed her husband to trade in

securities through those accounts maintained by Infinite Alpha,

Inc.  Again, I believe that Mr. Laken, through his declaration

and our letter response, indicated that we be making that

production and we did.

        THE COURT:  Just in general, CMG brings this case

alleging this massive fraud RICO conspiracy and it's been like

pulling teeth to get the documents for defense counsel.  Why

shouldn't I order, at the very least, the fees incurred by

having to bring all these letter motions?

        MR. LEHRMAN:  Thank you, your Honor.

        THE COURT:  I'm not blaming you.  I think it's your

clients haven't been the easiest in terms of the organization

of files and things like that, is my guess.

        MR. LEHRMAN:  I appreciate that, your Honor.

        CMG, as you indicated, and we indicated in our

 1   response to the letter motion, CMG's offices are in Glenn and

 2   Barbara Laken's Chicago apartment residence.  XA's offices are

 3   maintained in Alexis Laken's Brooklyn residence, in a room in

 4   that residence.

 5           In part the difficulty in discovery, I believe, has

 6   been because of the nature of the claims, because of the

 7   allegations that plaintiff has made about not only what

 8   defendants did in defecting from XA, but to a rival new company

 9   that they formed, but also in the allegations that they had

10   taken things, deleted data and left things essentially in

11   shambles as they head out the door.

12           That, combined with XA then moving from its Manhattan

13   offices all the way to Alexis Laken's Brooklyn residence and

14   likewise CMG moving from wherever it was into the Laken's

15   Chicago residence, again, between the nature of the claims and

16   what's been alleged and the organization of CMG and XA, I think

17   that accounts for it, and there have been discovery issues and

18   issues of alleged nonproduction on both sides.  Although we are

19   focused now on the claims by defendant of plaintiff's

20   nonproduction, there really have been things on both sides.  I

21   don't know why this happened, but there was a significant

22   period of time between requests for production being made and

23   initial production occurring.  Again, that occurred before I

24   had appeared in the case.

25           I think that there should not be any sanction and that

1    it would not be reasonable to enter a sanction of fees or any

2    other sanction against plaintiff or third-party defendants.

3          I don't think there has been prejudice suffered by

4    defendants.  There was a delay certainly with respect to the

5    production of Faria's e-mail, but defendants have the

6    opportunity to continue their examination of Mr. Faria.  I have

7    offered as counsel to pay the cost of the court reporter

8    transcription and appearance fee.  There is, I don't think,

9    additional time because they haven't examined Mr. Faria yet on

10   those documents.  I don't think there is a matter of

11   duplicative work being done in that instance.

12         THE COURT:  He is going to come back for another

13   deposition.

14         MR. LEHRMAN:  He could.

15         THE COURT:  You don't control him, I guess.  He's not

16   an employee of CMG.

17         MR. LEHRMAN:  He's not.

18         THE COURT:  He's a third party.

19         MR. LEHRMAN:  He is.

20         THE COURT:  Is he still with that Radiant Group, or

21   whatever it is called?

22         MR. LEHRMAN:  Your Honor, he is not.  He maintains his

23   own business.  I believe it's Far Pin Solutions.  He testified

24   he is providing ongoing IT support to plaintiff CMG and XA on

25   an outside basis.  He has been a cooperative witness.  I fully

1    expect that he would agree to appear for further testimony.

2              THE COURT:  Let's deal with these one at a time at a

3    more granular level.

4              The first issue is IT and Mr. Faria.  I gather

5    defendant now has the e-mails, except the one remaining issue

6    out there is whether there are e-mails between and among the

7    Lakens or otherwise within CMG personnel/principals/directors

8    about the investigation.

9              Is there anything you can tell me, Mr. Lehrman, about

10   whether there is additional documents out there that would be

11   in that category?

12             MR. LEHRMAN:  Your Honor, so I can say, first, there

13   was a collection of e-mail obtained from Alexis Laken, Glenn

14   Laken, and the one other XA employee whose name escapes me at

15   the moment.  There were e-mail collected from those three

16   custodians that were searched for responsiveness or inclusion

17   of certain key words.  And the e-mail that were responsive to

18   those searches were produced to defendants.

19             THE COURT:  And those responsiveness search terms

20   included things related to the IT investigation of what is

21   alleged in the complaint?

22             MR. LEHRMAN:  I don't believe they did.  I don't

23   believe that the searches that were previously performed

24   included such search terms.

25             So what I would propose now, and I have spent some

1    time now going back and digging through the methodology that

2    was employed, what I would propose to do would be to now

3    further review the search method that was performed, propose a

4    new revised search methodology to capture or identify e-mail

5    that are appropriately responsive about the investigation of

6    deletion and restoration.

7              THE COURT:  Why don't do you that.  Why don't you

8    confer on search terms within a week and get any production

9    within a month.  Does that work?  Is that doable?

10             MR. LEHRMAN:  It is doable for plaintiff, yes, sir.

11             THE COURT:  And defendants.

12             MR. MATTHEWS:  The timing should be acceptable, your

13   Honor.  It's the concern whether that really does remedy the

14   harm that has already occurred.

15             THE COURT:  I am going to reserve on that, and I am

16   going to reserve on any sanctions or spoliation issues or

17   whatever else you want to raise for now because discovery is

18   still open, you have until the end of June to do depositions.

19   If you need to call someone back, you can call them back.  If

20   you can establish prejudice in any form, I will consider it,

21   but I am not sure what the prejudice is other than attorney

22   costs, which is what it is.

23             MR. MATTHEWS:  It's expensive is what it is.

24             THE COURT:  I know.  Who is paying for fees?

25             MR. MATTHEWS:  My clients.

 1          THE COURT:  When you say your clients, I guess that

 2    includes Hudson -- what is it, Hudson?

 3          MR. MATTHEWS:  Hudson Gray is the entity.

 4          THE COURT:  Hudson Gray, which is the place that

 5    supposedly, the individuals from XA decamped to, right?

 6          MR. MATTHEWS:  It's a company that one of the

 7    employees resigned, formed, and ended up employing the other

 8    employees.

 9          THE COURT:  That new entity is operating and making

10    money?

11          MR. MATTHEWS:  It's operating, yeah.  It earns money,

12    sure.

13          THE COURT:  They are paying your fees.  It's not

14    insurance or anything.

15          MR. MATTHEWS:  It's not insurance.

16          THE COURT:  They are paying your fees.

17          Next category is corporate governance documents.  What

18    are you still missing in that category, Mr. Matthews?

19          MR. MATTHEWS:  On the corporate governance documents,

20    your Honor, we have been provided just within the last week or

21    so with Mr. Ofsink's file, which includes board resolutions and

22    certain actions with respect to that.  We have not yet been

23    provided with documents in response to request No. 34, which

24    concerns Glenn Laken's election or appointment to the CMG board

25    or any position that he has held has not been provided with the

 1    consulting agreement.

 2            THE COURT:  Hold there.  Do you know, Mr. Lehrman, if

 3    those documents exist?

 4            MR. LEHRMAN:  I had thought, and I have not had a full

 5    chance to fully review the production from Mr. Ofsink, but I

 6    had thought that production would include documents responsive

 7    to request 34 that Mr. Matthews --

 8            THE COURT:  Have you been able to look, Mr. Matthews,

 9    to figure out if they are actually missing from the latest

10    production?

11            MR. MATTHEWS:  They are not in the production, your

12    Honor.

13            THE COURT:  Do one other follow-up in the next week,

14    Mr. Lehrman, and see if it exists.  If you represent they don't

15    exist, then the case will go forward as if they don't exist.

16            MR. LEHRMAN:  Yes, your Honor.

17            THE COURT:  Any other corporate governance documents?

18            MR. MATTHEWS:  Any meeting minutes, resolutions

19    concerning this litigation, which is request No. 41.  This is

20    articulated on page 3 of my letter of March 13, 2018.

21            THE COURT:  Mr. Lehrman, anything more about that that

22    you know?  Would that also be in counsel's files, supposedly?

23            MR. LEHRMAN:  Again, similarly, I would expect that it

24    would be, from my understanding of what would be included in

25    Mr. Ofsink's production.  So I think generally with respect to

1    those requests I need to fully review the production made by

2    Mr. Ofsink so I can comment on whether we contend something is

3    included or not included in that production.

4          MR. MATTHEWS:  Your Honor, I reviewed Mr. Ofsink's

5    production with my clients, and I know that it's not complete

6    because Mr. Ofsink was responsible for negotiating the February

7    release agreement whereby CMG released Joe Wagner in exchange

8    for valid consideration and none of that or communications with

9    respect to that is in the production.

10          Again, the issue is that they are just trying to get

11   documents from their former attorney who now may no longer

12   practice law, for all I know, rather than searching their files

13   and making a full production.  Considering that Mr. Ofsink has

14   produced e-mails to Mr. Laken at his Gmail address that

15   Mr. Laken has not produced, it seems to me he hasn't yet

16   reviewed his own e-mail.

17          THE COURT:  I think you are going to have to do

18   another sweep that includes that as well.

19          MR. LEHRMAN:  Your Honor, as part of the additional

20   e-mail production that we discussed earlier I will make sure

21   that we include and can first confer with Mr. Matthews about

22   the methodology for collecting and reviewing e-mail from Glenn

23   Laken that would be responsive to the specific request

24   concerning e-mail between Mr. Laken and Darren Ofsink and these

25   particular issues.

1          THE COURT:  That's right.  I do want you to do that.

2     But not just e-mails.  I want you to check to see if he has the

3     files in any form that would cover these corporate governance

4     issues that haven't yet been produced.

5          MR. LEHRMAN:  Yes, your Honor.  I will discuss that

6     again with Mr. Laken certainly and address that with

7     Mr. Matthews.

8          THE COURT:  Mr. Matthews, what about the CMG financial

9     and oversight documents?  Have you gotten more of those?

10          MR. MATTHEWS:  We have gotten some of those, your

11     Honor.  We still haven't gotten documents from 2015, '16, and

12     '17.  Counsel has told me in the past that they were attempting

13     to get documents from CMG's auditors.  I don't know what the

14     final resolution of the attempts to get the documents from

15     Anderson and Bradshaw are.  I do know that we have not yet

16     received communications or actual records concerning their

17     financial documents.  My clients provided to a CMG

18     representative, when they were employed by XA, on a quarterly

19     basis, XA financial statements.  That was presented to CMG's

20     auditors.  Those documents haven't been produced in full.  I

21     don't know why they haven't.

22          Those documents go to the very heart of the

23     allegations in this case.  They claim that my clients were

24     committing a fraud and that they were siphoning money off to

25     different entities.  We contend and can establish that we

1   produced to a CMG board of directors member each and every

2   quarter the actual financial statements for XA that were used

3   to produce CMG's financial statements that were published in

4   the form of 10-Qs periodically.

5          Now, CMG, under Mr. Laken, no longer actually

6   publishes its financial statements, but those prior documents

7   should be in their files and should be produced.

8          THE COURT:  Mr. Lehrman, do you want to respond to

9   that?

10         MR. LEHRMAN:  With respect to production, that

11  plaintiff has sought, plaintiff has served a subpoena on

12  Anderson Bradshaw, one of CMG's prior auditors.  Anderson

13  Bradshaw has objected.  I've had extensive meetings and

14  conferrals with Anderson Bradshaw's counsel in Salt Lake City,

15  Utah.  We have not reached any agreement.  There has been no

16  production made by Anderson Bradshaw received by plaintiff.

17         THE COURT:  Anderson Bradshaw was what again?

18         MR. LEHRMAN:  They were an auditor.  They audited

19  CMG's 2014 financial statements.

20         THE COURT:  You are trying to get them from them.

21         MR. LEHRMAN:  Correct.

22         THE COURT:  The plaintiff and principals of plaintiff

23  do not have these, is that correct?

24         MR. LEHRMAN:  That is.  Plaintiff had previously

25  produced the audited financial statements and work papers of

1    another auditor, Malone Bailey.

2              THE COURT:  Then it switched for the later years.

3              MR. LEHRMAN:  Yes, your Honor.

4              THE COURT:  Where do things stand?

5              MR. LEHRMAN:  We attempted to serve a subpoena on

6    another auditor, John Scrudato.  We were not able to effect

7    service on Mr. Scrudato on what's published as his business

8    address, former business address.  We have not obtained any

9    production from Mr. Scrudato.

10             As Mr. Matthews indicates, CMG stopped publishing

11   financial statements.  Mr. Laken, through his declarations, is

12   attempting to address kind of the extent of his efforts and his

13   ability to obtain and produce documents in his possession,

14   custody, and control.  So we don't have possession or custody

15   of other financial statements other than what's been produced.

16             THE COURT:  Mr. Matthews, what is your ask from me?

17             MR. MATTHEWS:  I think that the allegations in the

18   complaint should be stricken.  If they have no ability to

19   produce the financial records that my clients themselves gave

20   to CMG while they were employed there, they shouldn't be able

21   to impugn my clients with allegations that they were siphoning

22   monies off to themselves and to other entities and to their

23   subsidiaries if we cannot cross-examine them on this.

24             THE COURT:  What allegations are you asking to be

25   stricken?

1              MR. MATTHEWS:  I want to ask that all the allegations

2    with respect to payments to the defendants themselves, payments

3    to Studio AG, payments to Nick's company be stricken from the

4    complaint because, your Honor, if we had an opportunity to

5    review the XA financial statements, they would show, for

6    example, payments to Studio AG in the ordinary course of

7    business because Studio AG was a vendor, and there are some

8    documents that show that the defendants luckily have in their

9    own possession, but for some reason the plaintiffs don't have

10   them, even though they were the repository of them.

11             MR. LEHRMAN:  Your Honor, it touches on an interesting

12   issue.  Defendants, who all resigned from their employment with

13   XA and then most of whom became employed by Hudson Gray,

14   somehow or another retained possession of various documents and

15   data belonging to XA.  We know this in part because it was

16   produced back to us by defendants in the course of this

17   litigation.

18             Those documents include documents that would be

19   responsive to some of these requests for financial information

20   or financial statements.  We know that bank statements from XA

21   have been produced.  They were Parkway Bank statements,

22   including copies of checks, including reconciliations, which

23   are a type of financial statement that were maintained by XA.

24             THE COURT:  From before they left.

25             MR. LEHRMAN:  Correct.  From before they left.

1          THE COURT:  Did XA continue to operate at all after

2     they left?

3          MR. LEHRMAN:  XA is continuing to operate and is

4     operating now but is not, as I understand it, producing the

5     significant events that it once did during defendants' tenure.

6     For example, the NBC upfront events, big event, multimillion

7     dollar job performed year after year, that's not something that

8     XA has performed since defendants' departure.

9          MR. MATTHEWS:  I'd like to note for the record, your

10    Honor, that the Parkway Bank documents have been produced

11    because we issued a subpoena to Parkway Bank and received two

12    disks of documents, and I provided those to prior counsel.

13          There are certain documents that defendants retained,

14    again, luckily, when they left and certain of those were backup

15    e-mails that the defendants, whose job it was to run this

16    business, had in their possession.  And within one month of one

17    employee resigning, the first lawsuit was filed against the

18    defendant, so they needed these documents to disprove the

19    allegations.  I just want the record to be clear as to the

20    reason for that.

21          THE COURT:  Your argument, Mr. Matthews, is that none

22    of the financial documents are still in the possession of

23    plaintiffs, so I should strike all these allegations in the

24    complaint.

25          MR. MATTHEWS:  My argument is that they willfully

1  refused to produce documents that are contrary to their claims.

2  That's my argument.

3       THE COURT:  Are you saying they have them and won't

4  produce them or that they destroyed them?

5       MR. MATTHEWS:  I don't know what they did with them.

6  I know they were produced to them between the years 2009 and

7  2014 and now they say that they don't have them.  In 2016, they

8  stated in response to discovery requests that they will produce

9  documents, subject to that waiver of objections, that they will

10 produce responsive, nonprivileged documents in their

11 possession.

12      THE COURT:  Which financial documents have you not

13 received?

14      MR. MATTHEWS:  We don't have anything from 2015

15 forward.  We only have some of the documents while my clients

16 were employed there, which is, for these purposes, 2009 to

17 2014.  The 2015 forward documents would demonstrate what

18 damages, if any, plaintiff would be entitled to if they can

19 establish liability.  The 2009 to 2014 documents will

20 demonstrate that they actually had them in their possession

21 because my clients provided it to them, which is not the way

22 one commits a fraud.

23      THE COURT:  But you have some of the '09 to '14

24 documents.

25      MR. MATTHEWS:  Yes.

1          THE COURT:  I just don't have a clear enough record, I

2     don't think, to strike allegations at this point.  You'll have

3     to be a little more detailed about what was requested and what

4     was not produced and how it's relevant for me to actually

5     strike allegations.

6          MR. MATTHEWS:  Will we have an opportunity to make a

7     motion with a full briefing record on that, your Honor?

8          THE COURT:  Sure.

9          Mr. Lehrman, I guess, while you are shaking the trees

10    for any other documents, you should cover that as well.

11         MR. LEHRMAN:  Yes, your Honor.

12         THE COURT:  Let's go off the record for a second.

13         (Discussion off the record)

14         THE COURT:  We were just discussing the relationship

15    between the discovery deadlines and settlement conference

16    timing.  The current fact discovery deadline, including

17    depositions, is June 29.

18         I am now going to have the parties go forward with

19    paper discovery but I'm extending the deposition deadline to

20    the end of July with the expectation and hope that the parties

21    will be able to have a settlement conference next month, May.

22    And by giving a little more time for depositions the parties

23    can, to some extent, limit the attorney's fees between now and

24    the settlement conference.  However, the parties will go

25    forward with supplementing discovery, as we have been

1    discussing.

2            Now we will go back to the issues on discovery,

3    Mr. Matthews.

4            MR. MATTHEWS:  Thank you, your Honor.

5            Our request No. 13 sought all American Express coded

6    statements for charges incurred by Jeff Devlin, Ronald

7    Burkhardt, Alexis Laken and Glenn Laken submitted to XA for

8    payment or reimbursement.

9            In December 2016, plaintiff objected to the production

10   of documents with respect to Ms. Laken and Mr. Laken and agreed

11   to produce these coded statements for Mr. Devlin and

12   Mr. Burkhardt.

13           These are not American Express statements that one

14   receives in the mail or via electronic delivery identifying all

15   of their charges.  Those statements that were modified and

16   submitted to XA for payment and/or reimbursement to the

17   individual and a job code was put on the document so that the

18   company's accounting office could determine, all right, this

19   charge should be allocated to project 1, this charge should be

20   allocated to project 2, and client 3, etc.

21           THE COURT:  Whose American Express accounts are you

22   talking about?

23           MR. MATTHEWS:  When my clients were employed by XA,

24   the company didn't have corporate credit cards.

25           THE COURT:  You are talking about Mr. Lehrman's

 1    complaint about your production.

 2              MR. MATTHEWS:  No.  I'm actually talking about -- I

 3    apologize, your Honor.  I was trying to show how it is.

 4              When my clients were employed by XA, they used their

 5    own personal credit cards and coded them and the company paid

 6    these monies to American Express.  When Mr. Laken,

 7    Mr. Burkhardt, Mr. Devlin, and Ms. Laken became involved in the

 8    business, they did the same and they also had corporate cards.

 9              Mr. Lehrman and plaintiff just made a production of

10    American Express statements for this period of time March to

11    December 2014.  That's not what we are looking for.  We are not

12    looking for the entirety of their American Express statements.

13    We are looking --

14              THE COURT:  The equivalent of what you produced, your

15    people produced?

16              MR. MATTHEWS:  Right.  To show that this was the

17    established practice in the office and that what we did was not

18    fraudulent.  We still haven't gotten those coded statements,

19    sir.

20              THE COURT:  Mr. Lehrman, do you have an update on

21    that?

22              MR. LEHRMAN:  Thank you, your Honor.

23              So as part of the initial 590,000-page production

24    there were 26 documents that were responsive to that request.

25    As part of production of set 5 that was made on November 22,

1    2017, there were five documents responsive to request 13.  And

2    then on February 15, 2018, in production 8, there were 53

3    documents responsive to this request No. 13.

4         There were a total of 84 documents that plaintiff has

5    produced that were identified as being responsive to that

6    request.  I believe that several dozen of those documents were

7    coded statements, as Mr. Matthews has described, meaning that

8    they are not actual credit card statements.  They are

9    essentially a spreadsheet identifying certain charges from a

10   certain billing period.

11        MR. MATTHEWS:  If Mr. Lehrman can provide us with the

12   Bates numbers.  Since the keys that have been represented to be

13   included in the production to identify the document request to

14   which the documents are responsive do not work, the Bates

15   numbers would be very helpful.

16        THE COURT:  Could you do that.

17        MR. LEHRMAN:  I would be -- yeah, absolutely, I can do

18   that.

19        To clarify, perhaps not in the first production set,

20   but in the subsequent production sets that my firm has made, we

21   have provided a load file, which is a data file that identifies

22   for each document being produced one or more document requests

23   to which the document responds.

24        So I understand from counsel there might be a

25   technical issue that they are experiencing being unable to read

1  that code and have the benefit of the use of that code, we have

2  in the past had at least one, if not more conferrals between

3  plaintiff's e-discovery provider and defendants.  Certainly, we

4  are happy to continue those discussions, but in the interim I

5  will provide Bates references to the previously produced coded

6  statements.

7          MR. MATTHEWS:  Thank you.

8          The last issue that is addressed in general, your

9  Honor, is with respect to the unclean hands defense.

10 Mr. Lehrman accurately recited what has been produced to date,

11 these Infinite Alpha trading records, but they stopped at the

12 end of 2014.  I don't know why Mr. Laken hasn't produced either

13 Infinite Alpha trading records through 2018, because we allege

14 that those are relevant to our defenses, or some other vehicle

15 through which he made trades concerning the CMGO stock and the

16 other companies that are identified in the request for

17 production.

18         MR. LEHRMAN:  Your Honor, Mr. Laken in his

19 declaration, dated March 16, 2018, that's docket entry 79-1,

20 addresses on an unclean hands defense portion of his

21 declaration these Infinite Alpha brokerage statements that he

22 obtained from his wife, that he had her produce them and that

23 he does not have possession or custody of additional documents

24 responsive to these requests.

25         I believe also that Barbara Laken during her

1    deposition, recent deposition testimony, I believe that she

2    offered some testimony about why there were not additional

3    brokerage statements available to her.  We've produced what

4    plaintiffs have in their possession and custody.  They don't

5    believe they have control of other statements because they are

6    unable to access the brokerage accounts.

7         THE COURT:  Why would they not be able to access their

8    brokerage account?

9         MR. LEHRMAN:  For accounts that were closed.  Some of

10   these brokerage accounts have since been closed.  So they no

11   longer have online access to those accounts.

12        THE COURT:  Mr. Matthews.

13        MR. MATTHEWS:  What is missing from Mr. Laken's

14   declaration is a statement that he no longer trades in the

15   account of CMGO or that he stopped trading in the account of

16   CMGO -- in the stock of CMGO, rather, at the end of 2014.  This

17   is a professional stock trader.  That's what he did for a

18   livelihood.  He amassed a position of CMGO's stock such that he

19   could take over the board of directors.

20        Again, the suggestion that he suddenly stopped trading

21   it when he became the CEO and became the chairman of the board

22   is incredible, and now, all of a sudden, he closes his trading

23   accounts and doesn't have access to those --

24        THE COURT:  I don't buy it.  He is ordered to produce

25   all documents reflecting any trading in CMGO, documents

1    involving his trading or trading of entities or persons he

2    controlled within one month.

3            MR. LEHRMAN:  Your Honor, may I ask for clarification.

4    All trading of any securities or all trading of CMG stock?

5            THE COURT:  CMG stock.  That's what you are asking

6    for, right, Mr. Matthews?

7            MR. MATTHEWS:  That's correct, your Honor.  We asked

8    for the CMG stock.  We also asked for companies under different

9    stock tickers, RGIN and others that are in our request for

10    production.

11            THE COURT:  What is RGIN?

12            MR. MATTHEWS:  It was a biotechnology company.

13            THE COURT:  How is it related?

14            MR. MATTHEWS:  According to Darren Ofsink's letter,

15    Mr. Laken was trading stocks under the name of Sol Mlot, under

16    an account controlled by Sol Mlot, and he was sharing in the

17    proceeds, profits, or losses of those trades, one of which was

18    CMGO, and he was doing this at a time when he was supposedly a

19    consultant to the corporation to restructure it.

20            It is akin to the posts that Mr. Laken has admittedly

21    made on the CMGO investor hub website under a pseudonym where

22    he claims not to be Mr. Laken himself and yet is disclosing and

23    making statements to the Internet that people should hold onto

24    the stock because they are going to receive $20 million as a

25    result of this lawsuit.  We think it's part and parcel of his

1   scheme to use this lawsuit as a means to prop up the stock of

2   CMGO.

3          The other stocks that we sought are at No. 33:  RGIN,

4   MDNT, SIBE, AEYE, and TNIB.  It's request No. 33 of our

5   production for production, your Honor.

6          MR. LEHRMAN:  Your Honor, there was a previous

7   production that Mr. Laken made with respect to those requests,

8   and I think Mr. Matthews' response was essentially that he

9   didn't believe that that was the complete production that

10  Mr. Laken had possession, custody, and control over.

11         I think that with respect to that document request and

12  the further production that the Court has ordered, certainly we

13  will address that, but I anticipate that it's likely that there

14  is going to be just a more detailed declaration from Mr. Laken

15  that, in part, is going to be provided in response because I've

16  had extensive conversations with Mr. Laken about collecting

17  documents and complying with the Court's order satisfying the

18  document request.  It's going to be surprising to me if there

19  is some substantial additional documents that exist and have

20  not been produced.

21         THE COURT:  He traded, say, in 2016 in one of these

22  stocks.  The fact that the brokerage account is closed doesn't

23  mean he doesn't have control over it.  He can get the documents

24  showing his trading, right?

25         MR. LEHRMAN:  Yes, your Honor.

1          THE COURT:  So he has to do that.

2          MR. LEHRMAN:  Understood.

3          THE COURT:  What else?

4          MR. MATTHEWS:  I believe that addresses all the issues

5  that we have raised in our letters, your Honor.

6          THE COURT:  What about anything else from you,

7  Mr. Lehrman?

8          MR. LEHRMAN:  Thank you, your Honor.

9          We had filed a letter motion that was docket entry 80,

10  which I understand had been denied by the Court without

11  prejudice.

12          THE COURT:  Sorry.  Which one was this?

13          MR. LEHRMAN:  Docket entry 80, which was plaintiff's

14  letter motion addressing issues of nonproduction or deficient

15  production on the defendants' side.

16          I'm just raising that I saw that the Court had, I

17  think, denied the letter motion without prejudice and to be

18  renewed.  We had not renewed it.  I, frankly, was waiting for

19  the e-mail production from defendants that's I believe

20  forthcoming so that I could renew the motion along with any

21  issues related to defendants' e-mail.  For purposes of judicial

22  economy I'm happy to wait to do that or to address it now.

23          THE COURT:  That's fine.  We can wait to do that.  I

24  think that makes sense, if that's all right with everybody.

25          I'll do two orders.  One will be a referral to the

1    magistrate judge for a settlement conference.  The second will

2    be an order just confirming that the fact deposition deadline

3    is extended to July 31.

4              MR. MATTHEWS:  Thank you, your Honor.

5              THE COURT:  Anything else for today?

6              MR. LEHRMAN:  No, your Honor.

7              THE COURT:  Thank you very much.  We are adjourned.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25