Exhibit A

I4CMCMGC                                                              1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CMG HOLDINGS GROUP, as
    successor to XA The
4   Experimental Agency, Inc.,

5              Plaintiff,

6         v.                              15 Civ. 5814 (JPO)

7   JOSEPH WAGNER, et al.,
                                          Conference
8              Defendants.

9   ------------------------------x
                                          New York, N.Y.
10                                        April 12, 2018
                                          11:40 a.m.
11
    Before:
12
                     HON. J. PAUL OETKEN,
13
                                          District Judge
14

15                       APPEARANCES

16  EDWARDS POTTINGER LLC
         Attorneys for Plaintiff
17  BY:  SETH M. LEHRMAN

18  WINDELS MARX LANE & MITTENDORF LLP
         Attorneys for Defendants
19  BY:  SCOTT R. MATTHEWS

20

21

22

23

24

25

I4CMCMGC                                                                    2

1              (Case called)

2              MR. LEHRMAN:  Good morning, your Honor, Seth Lehrman

3    appearing for the plaintiff and third-party defendants.

4              THE COURT:  Good morning.

5              MR. MATTHEWS:  Good morning, your Honor, Scott

6    Matthews for all defendants and third-party plaintiffs.

7              THE COURT:  Good morning.  You can be seated.

8         We are here to discuss a series of discovery disputes

9    reflected in the letters I received basically in March of this

10   year.

11             Mr. Lehrman, are you at Farmer Jaffe or Edwards

12   Pottinger?

13             MR. LEHRMAN:  I'm at the Edwards Pottinger firm.  I

14   formerly practiced with Farmer Jaffe.  That firm is dissolving.

15   Mr. Edwards and I, my cocounsel, are now partners at this new

16   firm.

17             THE COURT:  You can all remain seated.  Pull the mics

18   right in front of your face.

19             I've extended discovery in this case.  Depositions

20   will be completed June 29.  All fact discovery also completed

21   June 29.  Expert discovery to be completed October 8 of this

22   year.

23             You all haven't had any settlement discussions.  Do

24   you still have a mediation scheduled in May?

25             MR. MATTHEWS:  Your Honor, the Court's order requires

I4CMCMGC                                                               3

1    that we conduct private mediation in the middle of May.

2    Counsel and I have been discussing settlement informally, and

3    we would like to have the case referred to a magistrate judge

4    to conduct a settlement conference.  We think that would be

5    more useful than a private mediation.

6              THE COURT:  Do you agree?

7              MR. LEHRMAN:  I do agree.

8              THE COURT:  I can do that.  I'll have to get a

9    magistrate judge designated.  I am not sure.  It will probably

10   be one of the new magistrate judges because Judge Ellis, who

11   was originally designated, has retired.  It might be Judge

12   Aaron or one of the other ones.  I'll go ahead and do that.

13             Defense counsel, Mr. Matthews, you've raised a number

14   of issues with regard to plaintiff's production and then

15   plaintiff has raised some issues with regard to defendants'

16   production.

17             Let's start with defendants' letter which came first.

18   What would you like to discuss first?

19             MR. MATTHEWS:  Thank you, your Honor.  We have been

20   seeking to obtain documents from the plaintiff and plaintiff's

21   principal, Glenn Laken and his daughter, Alex Laken, the

22   president of the company, for years, only to be met with

23   refusals and statements that are demonstrably false.  We are

24   seeking communications regarding XA's finances, communications

25   made during this purported investigation of my client's actions

I4CMCMGC                                                           4

1   following their resignation from XA, submissions of coded

2   American Express charges made by Mr. Laken and Ms. Laken, and

3   records of Mr. Laken's trading activity in the CMGO stock.

4        We want these documents so we could prove that the

5   plaintiff at all times knew of defendants' lawful actions, that

6   there is no basis for the allegations in the complaint, that

7   Mr. Laken and Ms. Laken themselves acted in the same way in

8   which defendants did with respect to business expenses, and

9   that Mr. Laken is using this lawsuit as a means to prop up the

10  price of the CMGO stock.

11       The Court heard argument on this on May 3, 2017.  The

12  Court granted our motion to compel Mr. Laken to produce

13  documents that support our unclean hands defense, and he has

14  failed and refused to do so.  He has produced certain trading

15  records of the CMGO stock, but he stops producing records after

16  2014.  It's simply inconceivable that Mr. Laken, who became

17  chairman and CEO of this company as a result of amassing enough

18  stock to throw out the prior board, suddenly stops trading

19  stock in the company and doesn't have access to those records.

20  What he did was he produced records from four or five different

21  trading houses.  They all stop in 2014 and now he claims that

22  he doesn't have possession, custody or control of additional

23  records.  The suggestion is preposterous on its face.

24       In addition, he has not produced e-mail records

25  concerning this investigation.  The defendants resigned their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    employment.  Mr. Laken's wife, Barbara Laken, conducted an

2    investigation with the aid of an IT professional.  She didn't

3    produce any documents in response to a subpoena that was issued

4    to her, instead stating that those documents have already been

5    produced by CMG.  When we subpoenaed Mr. Faria, the IT

6    professional who supposedly conducted this investigation, he

7    produced hundreds of e-mails.

8           THE COURT:  But you now have them and plaintiff's

9    counsel has admitted that the statements were not entirely

10   accurate.  You now have those e-mails, right?

11          MR. MATTHEWS:  We have e-mails from Mr. Faria and then

12   thereafter Mr. Laken, and the plaintiff supplemented their

13   production.

14          THE COURT:  What are you now missing as to Mr. Faria?

15          MR. MATTHEWS:  I don't believe we are missing

16   anything.  I don't know what we are missing.  I think we are

17   missing -- I have a suspicion that we are missing internal

18   communications between Mr. Laken and his wife and his daughter

19   via e-mail concerning this investigation, but I don't know that

20   at the moment, your Honor.

21          The reason why I have a suspicion, your Honor, is

22   because the plaintiff subpoenaed its former attorney, Darren

23   Ofsink's records because they didn't have their own financial

24   records or corporate governance documents.  Mr. Ofsink produced

25   documents that the plaintiff produced to us.  In those

1   documents are e-mails from his firm to Mr. Laken.  Those

2   e-mails have never been produced to us.

3           THE COURT:  Were they privileged?

4           MR. MATTHEWS:  No.  There are four different directors

5   on the e-mail and they just haven't been produced.  I don't

6   know why they haven't been produced.  Each time we have to go

7   behind the curtain to get documents from a nonparty suggests to

8   me that Mr. Laken is withholding other documents.

9           In addition, for some reason they haven't produced

10  financial statements after 2014.  This is a publicly traded

11  corporation that they state has ongoing business dealings yet

12  they don't have documents from '15, '16, '17, and now '18.

13  They are claiming that they have lost millions of dollars as a

14  result of my client's efforts but have no way to substantiate

15  that without providing their financial records.

16          They also continue to produce only documents that they

17  get through subpoenas to their auditors.  The suggestion that a

18  publicly traded corporation doesn't maintain its own records is

19  pretty unusual.

20          THE COURT:  This is a public company?

21          MR. MATTHEWS:  Yes, your Honor.  It's a petty stock

22  traded on the over-the-counter exchange, but it's a publicly

23  traded company.

24          THE COURT:  Does it have offices or anything, or is it

25  just in Mr. Laken's house?

I4CMCMGC                                                                    7

1            MR. MATTHEWS:  It's in Mr. Laken's house and

2    Ms. Laken, his daughter, her house or apartment in Brooklyn.

3    They claim to be performing services.  I don't know.

4            The situation, though, your Honor, is that each time

5    we seek documents -- the plaintiff has produced 14 different

6    productions.  They produced hundreds of thousands of documents.

7            In fact, they produce all the documents that they

8    claim my clients deleted.  They don't produce the documents

9    that my client has never had access to.  They only do so after

10   we file motion after motion and we have meet and confer after

11   meet and confer.

12           Counsel and I get along well.  We work earnestly in an

13   attempt to resolve these disputes.  Unfortunately, we are

14   unable to do so.  My clients have been prejudiced in that

15   persons who were working on this matter are no longer employed

16   by the company for which they were previously employed.  We

17   didn't have notice of it until years later.  We have to file

18   subpoenas and conduct depositions without getting documents.

19   And they are spending thousands of dollars to review documents,

20   reams of documents that don't have the requested information in

21   them.

22           We have asked the Court to strike the allegations.  In

23   October I asked this Court for sanctions.  The Court

24   understandably denied the request and directed that Mr. Laken

25   and plaintiff produce all documents within 30 days.  That

1    didn't happen.  I now ask the Court again to strike the

2    allegations in the complaint concerning data deletion, American

3    Express coded statements, and anything with regard to this

4    purported investigation.

5            Should the Court not grant that, I ask that the Court

6    sanction the plaintiff and reimburse my client for its legal

7    fees in connection with these letter motions and the meet and

8    confers and review of documents.

9            THE COURT:  Mr. Lehrman.

10           MR. LEHRMAN:  Thank you, your Honor.

11           I agree with opposing counsel's assessment and

12   characterization that he and I professionally get along well.

13           I've understood, since I appeared in the case in late

14   July of last year, what defendants' discovery plan was and

15   strategy was, and we have, we being plaintiff counsel, along

16   with our clients, have worked diligently since then to attempt

17   to ensure our client's compliance with this Court's discovery

18   order and also to work diligently to confer with defendants'

19   counsel repeatedly and to address and cure any alleged

20   deficiencies with respect to plaintiff's production.

21           That's why there has been this series of productions

22   that have occurred.  Not including the first production that

23   was made by plaintiff's prior counsel that consisted of more

24   than 590,000 documents, there have been an additional 13

25   productions since then that myself and my cocounsel have made.

I4CMCMGC                                                                    9

 1          In terms of the IT investigation, granted Mr. Faria

 2     produced the e-mail late, but he has produced the e-mail in

 3     response to defendants' subpoena.  He testified concerning the

 4     documents generally.  He was examined on some of those

 5     documents.  He was examined on some documents that defense

 6     counsel had confronted him with.

 7          Since his deposition we, plaintiff, produced

 8     additional e-mail communications.  On March 20, as part of

 9     production 11, we produced an additional 46 documents that were

10     responsive to request 62 seeking communications reflecting

11     plaintiff's investigation of the alleged data deletion.

12          And we have gone through in our most recent responsive

13     letter and the declaration that we filed on behalf of Glenn

14     Laken to try to address each of the areas raised in defendants'

15     letter motion.

16          Since that last filing by plaintiff, which is docket

17     entry 79 that was filed on March 16, there is additional

18     production that's occurred, some of which defense counsel has

19     referenced.

20          I just want to make sure the record is clear as far as

21     what has been produced and when.  On April 6, plaintiff

22     produces as part of production set 14 the documents in total

23     that Darren Ofsink produced to plaintiff in response to a

24     subpoena that we had issued.

25          It's worth noting that I had had repeated e-mail

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4CMCMGC                                                                    10

1   communications and had left repeated phone messages for

2   Mr. Ofsink going back many months requesting these documents

3   but was unsuccessful in obtaining any documents from

4   Mr. Ofsink.

5          THE COURT:  Was he an employee?  He was counsel to XA?

6          MR. LEHRMAN:  He was outside counsel to CMG.

7          THE COURT:  Was he at a firm or an employee of some

8   company?

9          MR. LEHRMAN:  He was not an employee of CMG or XA, as

10  I understand.  He maintained his own private law practice, and

11  I believe he was engaged as outside counsel by CMG.

12         Mr. Ofsink accepted service of subpoena.  He produced

13  the documents.  There were 720 pages of documents he produced.

14  We ingested them through our IT e-discovery people, Bates

15  stamped them, and produced all of the documents, withheld none

16  of them, to defendant on April 6.

17         Likewise, American Express statements for cards that

18  were issued to Glenn Laken and Alexis Laken was something that

19  the defendant had been requesting and seeking and was the

20  subject of letter motions.  Mr. Laken himself, and he addressed

21  this in his declaration, he personally requested and obtained

22  the statements from American Express recently.  He turned them

23  over to my firm and we produced those American Express

24  statements as part of production No. 13, 125 pages of

25  documents, 10 separate statements from March through December

1    2014.  And I understand from Mr. Laken that that is the

2    entirety of American Express statements that he says exist

3    responsive to these requests.

4              Defense counsel references with respect to the unclean

5    hands production that was sought brokerage statements.  Again,

6    just to be clear, on March 22, as part of plaintiff's

7    production No. 12, plaintiff and Glenn Laken produced brokerage

8    statements maintained by Infinite Alpha, Incorporated.  Barbara

9    Laken subsequently testified that that's a corporation that she

10   owns and that she had allowed her husband to trade in

11   securities through those accounts maintained by Infinite Alpha,

12   Inc.  Again, I believe that Mr. Laken, through his declaration

13   and our letter response, indicated that we be making that

14   production and we did.

15             THE COURT:  Just in general, CMG brings this case

16   alleging this massive fraud RICO conspiracy and it's been like

17   pulling teeth to get the documents for defense counsel.  Why

18   shouldn't I order, at the very least, the fees incurred by

19   having to bring all these letter motions?

20             MR. LEHRMAN:  Thank you, your Honor.

21             THE COURT:  I'm not blaming you.  I think it's your

22   clients haven't been the easiest in terms of the organization

23   of files and things like that, is my guess.

24             MR. LEHRMAN:  I appreciate that, your Honor.

25             CMG, as you indicated, and we indicated in our

1   response to the letter motion, CMG's offices are in Glenn and

2   Barbara Laken's Chicago apartment residence.  XA's offices are

3   maintained in Alexis Laken's Brooklyn residence, in a room in

4   that residence.

5          In part the difficulty in discovery, I believe, has

6   been because of the nature of the claims, because of the

7   allegations that plaintiff has made about not only what

8   defendants did in defecting from XA, but to a rival new company

9   that they formed, but also in the allegations that they had

10  taken things, deleted data and left things essentially in

11  shambles as they head out the door.

12         That, combined with XA then moving from its Manhattan

13  offices all the way to Alexis Laken's Brooklyn residence and

14  likewise CMG moving from wherever it was into the Laken's

15  Chicago residence, again, between the nature of the claims and

16  what's been alleged and the organization of CMG and XA, I think

17  that accounts for it, and there have been discovery issues and

18  issues of alleged nonproduction on both sides.  Although we are

19  focused now on the claims by defendant of plaintiff's

20  nonproduction, there really have been things on both sides.  I

21  don't know why this happened, but there was a significant

22  period of time between requests for production being made and

23  initial production occurring.  Again, that occurred before I

24  had appeared in the case.

25         I think that there should not be any sanction and that

1   it would not be reasonable to enter a sanction of fees or any

2   other sanction against plaintiff or third-party defendants.

3           I don't think there has been prejudice suffered by

4   defendants.  There was a delay certainly with respect to the

5   production of Faria's e-mail, but defendants have the

6   opportunity to continue their examination of Mr. Faria.  I have

7   offered as counsel to pay the cost of the court reporter

8   transcription and appearance fee.  There is, I don't think,

9   additional time because they haven't examined Mr. Faria yet on

10  those documents.  I don't think there is a matter of

11  duplicative work being done in that instance.

12          THE COURT:  He is going to come back for another

13  deposition.

14          MR. LEHRMAN:  He could.

15          THE COURT:  You don't control him, I guess.  He's not

16  an employee of CMG.

17          MR. LEHRMAN:  He's not.

18          THE COURT:  He's a third party.

19          MR. LEHRMAN:  He is.

20          THE COURT:  Is he still with that Radiant Group, or

21  whatever it is called?

22          MR. LEHRMAN:  Your Honor, he is not.  He maintains his

23  own business.  I believe it's Far Pin Solutions.  He testified

24  he is providing ongoing IT support to plaintiff CMG and XA on

25  an outside basis.  He has been a cooperative witness.  I fully

 1   expect that he would agree to appear for further testimony.

 2            THE COURT:   Let's deal with these one at a time at a

 3   more granular level.

 4            The first issue is IT and Mr. Faria.   I gather

 5   defendant now has the e-mails, except the one remaining issue

 6   out there is whether there are e-mails between and among the

 7   Lakens or otherwise within CMG personnel/principals/directors

 8   about the investigation.

 9            Is there anything you can tell me, Mr. Lehrman, about

10   whether there is additional documents out there that would be

11   in that category?

12            MR. LEHRMAN:   Your Honor, so I can say, first, there

13   was a collection of e-mail obtained from Alexis Laken, Glenn

14   Laken, and the one other XA employee whose name escapes me at

15   the moment.   There were e-mail collected from those three

16   custodians that were searched for responsiveness or inclusion

17   of certain key words.   And the e-mail that were responsive to

18   those searches were produced to defendants.

19            THE COURT:   And those responsiveness search terms

20   included things related to the IT investigation of what is

21   alleged in the complaint?

22            MR. LEHRMAN:   I don't believe they did.   I don't

23   believe that the searches that were previously performed

24   included such search terms.

25            So what I would propose now, and I have spent some

I4CMCMGC                                                        15

1   time now going back and digging through the methodology that

2   was employed, what I would propose to do would be to now

3   further review the search method that was performed, propose a

4   new revised search methodology to capture or identify e-mail

5   that are appropriately responsive about the investigation of

6   deletion and restoration.

7            THE COURT:  Why don't do you that.  Why don't you

8   confer on search terms within a week and get any production

9   within a month.  Does that work?  Is that doable?

10           MR. LEHRMAN:  It is doable for plaintiff, yes, sir.

11           THE COURT:  And defendants.

12           MR. MATTHEWS:  The timing should be acceptable, your

13  Honor.  It's the concern whether that really does remedy the

14  harm that has already occurred.

15           THE COURT:  I am going to reserve on that, and I am

16  going to reserve on any sanctions or spoliation issues or

17  whatever else you want to raise for now because discovery is

18  still open, you have until the end of June to do depositions.

19  If you need to call someone back, you can call them back.  If

20  you can establish prejudice in any form, I will consider it,

21  but I am not sure what the prejudice is other than attorney

22  costs, which is what it is.

23           MR. MATTHEWS:  It's expensive is what it is.

24           THE COURT:  I know.  Who is paying for fees?

25           MR. MATTHEWS:  My clients.

1          THE COURT:  When you say your clients, I guess that

2     includes Hudson -- what is it, Hudson?

3          MR. MATTHEWS:  Hudson Gray is the entity.

4          THE COURT:  Hudson Gray, which is the place that

5     supposedly, the individuals from XA decamped to, right?

6          MR. MATTHEWS:  It's a company that one of the

7     employees resigned, formed, and ended up employing the other

8     employees.

9          THE COURT:  That new entity is operating and making

10    money?

11         MR. MATTHEWS:  It's operating, yeah.  It earns money,

12    sure.

13         THE COURT:  They are paying your fees.  It's not

14    insurance or anything.

15         MR. MATTHEWS:  It's not insurance.

16         THE COURT:  They are paying your fees.

17         Next category is corporate governance documents.  What

18    are you still missing in that category, Mr. Matthews?

19         MR. MATTHEWS:  On the corporate governance documents,

20    your Honor, we have been provided just within the last week or

21    so with Mr. Ofsink's file, which includes board resolutions and

22    certain actions with respect to that.  We have not yet been

23    provided with documents in response to request No. 34, which

24    concerns Glenn Laken's election or appointment to the CMG board

25    or any position that he has held has not been provided with the

I4CMCMGC                                                                17

1    consulting agreement.

2              THE COURT:  Hold there.  Do you know, Mr. Lehrman, if

3    those documents exist?

4              MR. LEHRMAN:  I had thought, and I have not had a full

5    chance to fully review the production from Mr. Ofsink, but I

6    had thought that production would include documents responsive

7    to request 34 that Mr. Matthews --

8              THE COURT:  Have you been able to look, Mr. Matthews,

9    to figure out if they are actually missing from the latest

10   production?

11             MR. MATTHEWS:  They are not in the production, your

12   Honor.

13             THE COURT:  Do one other follow-up in the next week,

14   Mr. Lehrman, and see if it exists.  If you represent they don't

15   exist, then the case will go forward as if they don't exist.

16             MR. LEHRMAN:  Yes, your Honor.

17             THE COURT:  Any other corporate governance documents?

18             MR. MATTHEWS:  Any meeting minutes, resolutions

19   concerning this litigation, which is request No. 41.  This is

20   articulated on page 3 of my letter of March 13, 2018.

21             THE COURT:  Mr. Lehrman, anything more about that that

22   you know?  Would that also be in counsel's files, supposedly?

23             MR. LEHRMAN:  Again, similarly, I would expect that it

24   would be, from my understanding of what would be included in

25   Mr. Ofsink's production.  So I think generally with respect to

I4CMCMGC                                                              18

1     those requests I need to fully review the production made by

2     Mr. Ofsink so I can comment on whether we contend something is

3     included or not included in that production.

4           MR. MATTHEWS:  Your Honor, I reviewed Mr. Ofsink's

5     production with my clients, and I know that it's not complete

6     because Mr. Ofsink was responsible for negotiating the February

7     release agreement whereby CMG released Joe Wagner in exchange

8     for valid consideration and none of that or communications with

9     respect to that is in the production.

10          Again, the issue is that they are just trying to get

11    documents from their former attorney who now may no longer

12    practice law, for all I know, rather than searching their files

13    and making a full production.  Considering that Mr. Ofsink has

14    produced e-mails to Mr. Laken at his Gmail address that

15    Mr. Laken has not produced, it seems to me he hasn't yet

16    reviewed his own e-mail.

17          THE COURT:  I think you are going to have to do

18    another sweep that includes that as well.

19          MR. LEHRMAN:  Your Honor, as part of the additional

20    e-mail production that we discussed earlier I will make sure

21    that we include and can first confer with Mr. Matthews about

22    the methodology for collecting and reviewing e-mail from Glenn

23    Laken that would be responsive to the specific request

24    concerning e-mail between Mr. Laken and Darren Ofsink and these

25    particular issues.

1          THE COURT:  That's right.  I do want you to do that.

2    But not just e-mails.  I want you to check to see if he has the

3    files in any form that would cover these corporate governance

4    issues that haven't yet been produced.

5          MR. LEHRMAN:  Yes, your Honor.  I will discuss that

6    again with Mr. Laken certainly and address that with

7    Mr. Matthews.

8          THE COURT:  Mr. Matthews, what about the CMG financial

9    and oversight documents?  Have you gotten more of those?

10         MR. MATTHEWS:  We have gotten some of those, your

11   Honor.  We still haven't gotten documents from 2015, '16, and

12   '17.  Counsel has told me in the past that they were attempting

13   to get documents from CMG's auditors.  I don't know what the

14   final resolution of the attempts to get the documents from

15   Anderson and Bradshaw are.  I do know that we have not yet

16   received communications or actual records concerning their

17   financial documents.  My clients provided to a CMG

18   representative, when they were employed by XA, on a quarterly

19   basis, XA financial statements.  That was presented to CMG's

20   auditors.  Those documents haven't been produced in full.  I

21   don't know why they haven't.

22         Those documents go to the very heart of the

23   allegations in this case.  They claim that my clients were

24   committing a fraud and that they were siphoning money off to

25   different entities.  We contend and can establish that we

1     produced to a CMG board of directors member each and every

2     quarter the actual financial statements for XA that were used

3     to produce CMG's financial statements that were published in

4     the form of 10-Qs periodically.

5                  Now, CMG, under Mr. Laken, no longer actually

6     publishes its financial statements, but those prior documents

7     should be in their files and should be produced.

8                  THE COURT:  Mr. Lehrman, do you want to respond to

9     that?

10                 MR. LEHRMAN:  With respect to production, that

11    plaintiff has sought, plaintiff has served a subpoena on

12    Anderson Bradshaw, one of CMG's prior auditors.  Anderson

13    Bradshaw has objected.  I've had extensive meetings and

14    conferrals with Anderson Bradshaw's counsel in Salt Lake City,

15    Utah.  We have not reached any agreement.  There has been no

16    production made by Anderson Bradshaw received by plaintiff.

17                 THE COURT:  Anderson Bradshaw was what again?

18                 MR. LEHRMAN:  They were an auditor.  They audited

19    CMG's 2014 financial statements.

20                 THE COURT:  You are trying to get them from them.

21                 MR. LEHRMAN:  Correct.

22                 THE COURT:  The plaintiff and principals of plaintiff

23    do not have these, is that correct?

24                 MR. LEHRMAN:  That is.  Plaintiff had previously

25    produced the audited financial statements and work papers of

I4CMCMGC                                                              21

1   another auditor, Malone Bailey.

2           THE COURT:  Then it switched for the later years.

3           MR. LEHRMAN:  Yes, your Honor.

4           THE COURT:  Where do things stand?

5           MR. LEHRMAN:  We attempted to serve a subpoena on

6   another auditor, John Scrudato.  We were not able to effect

7   service on Mr. Scrudato on what's published as his business

8   address, former business address.  We have not obtained any

9   production from Mr. Scrudato.

10          As Mr. Matthews indicates, CMG stopped publishing

11  financial statements.  Mr. Laken, through his declarations, is

12  attempting to address kind of the extent of his efforts and his

13  ability to obtain and produce documents in his possession,

14  custody, and control.  So we don't have possession or custody

15  of other financial statements other than what's been produced.

16          THE COURT:  Mr. Matthews, what is your ask from me?

17          MR. MATTHEWS:  I think that the allegations in the

18  complaint should be stricken.  If they have no ability to

19  produce the financial records that my clients themselves gave

20  to CMG while they were employed there, they shouldn't be able

21  to impugn my clients with allegations that they were siphoning

22  monies off to themselves and to other entities and to their

23  subsidiaries if we cannot cross-examine them on this.

24          THE COURT:  What allegations are you asking to be

25  stricken?

```
 1              MR. MATTHEWS:  I want to ask that all the allegations

 2    with respect to payments to the defendants themselves, payments

 3    to Studio AG, payments to Nick's company be stricken from the

 4    complaint because, your Honor, if we had an opportunity to

 5    review the XA financial statements, they would show, for

 6    example, payments to Studio AG in the ordinary course of

 7    business because Studio AG was a vendor, and there are some

 8    documents that show that the defendants luckily have in their

 9    own possession, but for some reason the plaintiffs don't have

10    them, even though they were the repository of them.

11              MR. LEHRMAN:  Your Honor, it touches on an interesting

12    issue.  Defendants, who all resigned from their employment with

13    XA and then most of whom became employed by Hudson Gray,

14    somehow or another retained possession of various documents and

15    data belonging to XA.  We know this in part because it was

16    produced back to us by defendants in the course of this

17    litigation.

18              Those documents include documents that would be

19    responsive to some of these requests for financial information

20    or financial statements.  We know that bank statements from XA

21    have been produced.  They were Parkway Bank statements,

22    including copies of checks, including reconciliations, which

23    are a type of financial statement that were maintained by XA.

24              THE COURT:  From before they left.

25              MR. LEHRMAN:  Correct.  From before they left.
```

1          THE COURT:  Did XA continue to operate at all after

2   they left?

3          MR. LEHRMAN:  XA is continuing to operate and is

4   operating now but is not, as I understand it, producing the

5   significant events that it once did during defendants' tenure.

6   For example, the NBC upfront events, big event, multimillion

7   dollar job performed year after year, that's not something that

8   XA has performed since defendants' departure.

9          MR. MATTHEWS:  I'd like to note for the record, your

10  Honor, that the Parkway Bank documents have been produced

11  because we issued a subpoena to Parkway Bank and received two

12  disks of documents, and I provided those to prior counsel.

13         There are certain documents that defendants retained,

14  again, luckily, when they left and certain of those were backup

15  e-mails that the defendants, whose job it was to run this

16  business, had in their possession.  And within one month of one

17  employee resigning, the first lawsuit was filed against the

18  defendant, so they needed these documents to disprove the

19  allegations.  I just want the record to be clear as to the

20  reason for that.

21         THE COURT:  Your argument, Mr. Matthews, is that none

22  of the financial documents are still in the possession of

23  plaintiffs, so I should strike all these allegations in the

24  complaint.

25         MR. MATTHEWS:  My argument is that they willfully

1    refused to produce documents that are contrary to their claims.

2    That's my argument.

3           THE COURT:  Are you saying they have them and won't

4    produce them or that they destroyed them?

5           MR. MATTHEWS:  I don't know what they did with them.

6    I know they were produced to them between the years 2009 and

7    2014 and now they say that they don't have them.  In 2016, they

8    stated in response to discovery requests that they will produce

9    documents, subject to that waiver of objections, that they will

10   produce responsive, nonprivileged documents in their

11   possession.

12          THE COURT:  Which financial documents have you not

13   received?

14          MR. MATTHEWS:  We don't have anything from 2015

15   forward.  We only have some of the documents while my clients

16   were employed there, which is, for these purposes, 2009 to

17   2014.  The 2015 forward documents would demonstrate what

18   damages, if any, plaintiff would be entitled to if they can

19   establish liability.  The 2009 to 2014 documents will

20   demonstrate that they actually had them in their possession

21   because my clients provided it to them, which is not the way

22   one commits a fraud.

23          THE COURT:  But you have some of the '09 to '14

24   documents.

25          MR. MATTHEWS:  Yes.

1              THE COURT:  I just don't have a clear enough record, I

2    don't think, to strike allegations at this point.  You'll have

3    to be a little more detailed about what was requested and what

4    was not produced and how it's relevant for me to actually

5    strike allegations.

6              MR. MATTHEWS:  Will we have an opportunity to make a

7    motion with a full briefing record on that, your Honor?

8              THE COURT:  Sure.

9              Mr. Lehrman, I guess, while you are shaking the trees

10   for any other documents, you should cover that as well.

11             MR. LEHRMAN:  Yes, your Honor.

12             THE COURT:  Let's go off the record for a second.

13             (Discussion off the record)

14             THE COURT:  We were just discussing the relationship

15   between the discovery deadlines and settlement conference

16   timing.  The current fact discovery deadline, including

17   depositions, is June 29.

18             I am now going to have the parties go forward with

19   paper discovery but I'm extending the deposition deadline to

20   the end of July with the expectation and hope that the parties

21   will be able to have a settlement conference next month, May.

22   And by giving a little more time for depositions the parties

23   can, to some extent, limit the attorney's fees between now and

24   the settlement conference.  However, the parties will go

25   forward with supplementing discovery, as we have been

1    discussing.

2           Now we will go back to the issues on discovery,

3    Mr. Matthews.

4           MR. MATTHEWS:  Thank you, your Honor.

5           Our request No. 13 sought all American Express coded

6    statements for charges incurred by Jeff Devlin, Ronald

7    Burkhardt, Alexis Laken and Glenn Laken submitted to XA for

8    payment or reimbursement.

9           In December 2016, plaintiff objected to the production

10   of documents with respect to Ms. Laken and Mr. Laken and agreed

11   to produce these coded statements for Mr. Devlin and

12   Mr. Burkhardt.

13          These are not American Express statements that one

14   receives in the mail or via electronic delivery identifying all

15   of their charges.  Those statements that were modified and

16   submitted to XA for payment and/or reimbursement to the

17   individual and a job code was put on the document so that the

18   company's accounting office could determine, all right, this

19   charge should be allocated to project 1, this charge should be

20   allocated to project 2, and client 3, etc.

21          THE COURT:  Whose American Express accounts are you

22   talking about?

23          MR. MATTHEWS:  When my clients were employed by XA,

24   the company didn't have corporate credit cards.

25          THE COURT:  You are talking about Mr. Lehrman's

1   complaint about your production.

2           MR. MATTHEWS:   No.   I'm actually talking about -- I

3   apologize, your Honor.   I was trying to show how it is.

4           When my clients were employed by XA, they used their

5   own personal credit cards and coded them and the company paid

6   these monies to American Express.   When Mr. Laken,

7   Mr. Burkhardt, Mr. Devlin, and Ms. Laken became involved in the

8   business, they did the same and they also had corporate cards.

9           Mr. Lehrman and plaintiff just made a production of

10  American Express statements for this period of time March to

11  December 2014.   That's not what we are looking for.   We are not

12  looking for the entirety of their American Express statements.

13  We are looking --

14          THE COURT:   The equivalent of what you produced, your

15  people produced?

16          MR. MATTHEWS:   Right.   To show that this was the

17  established practice in the office and that what we did was not

18  fraudulent.   We still haven't gotten those coded statements,

19  sir.

20          THE COURT:   Mr. Lehrman, do you have an update on

21  that?

22          MR. LEHRMAN:   Thank you, your Honor.

23          So as part of the initial 590,000-page production

24  there were 26 documents that were responsive to that request.

25  As part of production of set 5 that was made on November 22,

1   2017, there were five documents responsive to request 13.  And

2   then on February 15, 2018, in production 8, there were 53

3   documents responsive to this request No. 13.

4         There were a total of 84 documents that plaintiff has

5   produced that were identified as being responsive to that

6   request.  I believe that several dozen of those documents were

7   coded statements, as Mr. Matthews has described, meaning that

8   they are not actual credit card statements.  They are

9   essentially a spreadsheet identifying certain charges from a

10  certain billing period.

11        MR. MATTHEWS:  If Mr. Lehrman can provide us with the

12  Bates numbers.  Since the keys that have been represented to be

13  included in the production to identify the document request to

14  which the documents are responsive do not work, the Bates

15  numbers would be very helpful.

16        THE COURT:  Could you do that.

17        MR. LEHRMAN:  I would be -- yeah, absolutely, I can do

18  that.

19        To clarify, perhaps not in the first production set,

20  but in the subsequent production sets that my firm has made, we

21  have provided a load file, which is a data file that identifies

22  for each document being produced one or more document requests

23  to which the document responds.

24        So I understand from counsel there might be a

25  technical issue that they are experiencing being unable to read

1   that code and have the benefit of the use of that code, we have

2   in the past had at least one, if not more conferrals between

3   plaintiff's e-discovery provider and defendants.  Certainly, we

4   are happy to continue those discussions, but in the interim I

5   will provide Bates references to the previously produced coded

6   statements.

7           MR. MATTHEWS:  Thank you.

8           The last issue that is addressed in general, your

9   Honor, is with respect to the unclean hands defense.

10  Mr. Lehrman accurately recited what has been produced to date,

11  these Infinite Alpha trading records, but they stopped at the

12  end of 2014.  I don't know why Mr. Laken hasn't produced either

13  Infinite Alpha trading records through 2018, because we allege

14  that those are relevant to our defenses, or some other vehicle

15  through which he made trades concerning the CMGO stock and the

16  other companies that are identified in the request for

17  production.

18          MR. LEHRMAN:  Your Honor, Mr. Laken in his

19  declaration, dated March 16, 2018, that's docket entry 79-1,

20  addresses on an unclean hands defense portion of his

21  declaration these Infinite Alpha brokerage statements that he

22  obtained from his wife, that he had her produce them and that

23  he does not have possession or custody of additional documents

24  responsive to these requests.

25          I believe also that Barbara Laken during her

1    deposition, recent deposition testimony, I believe that she

2    offered some testimony about why there were not additional

3    brokerage statements available to her.  We've produced what

4    plaintiffs have in their possession and custody.  They don't

5    believe they have control of other statements because they are

6    unable to access the brokerage accounts.

7           THE COURT:  Why would they not be able to access their

8    brokerage account?

9           MR. LEHRMAN:  For accounts that were closed.  Some of

10   these brokerage accounts have since been closed.  So they no

11   longer have online access to those accounts.

12          THE COURT:  Mr. Matthews.

13          MR. MATTHEWS:  What is missing from Mr. Laken's

14   declaration is a statement that he no longer trades in the

15   account of CMGO or that he stopped trading in the account of

16   CMGO -- in the stock of CMGO, rather, at the end of 2014.  This

17   is a professional stock trader.  That's what he did for a

18   livelihood.  He amassed a position of CMGO's stock such that he

19   could take over the board of directors.

20          Again, the suggestion that he suddenly stopped trading

21   it when he became the CEO and became the chairman of the board

22   is incredible, and now, all of a sudden, he closes his trading

23   accounts and doesn't have access to those --

24          THE COURT:  I don't buy it.  He is ordered to produce

25   all documents reflecting any trading in CMGO, documents

1    involving his trading or trading of entities or persons he

2    controlled within one month.

3         MR. LEHRMAN:  Your Honor, may I ask for clarification.

4    All trading of any securities or all trading of CMG stock?

5         THE COURT:  CMG stock.  That's what you are asking

6    for, right, Mr. Matthews?

7         MR. MATTHEWS:  That's correct, your Honor.  We asked

8    for the CMG stock.  We also asked for companies under different

9    stock tickers, RGIN and others that are in our request for

10   production.

11        THE COURT:  What is RGIN?

12        MR. MATTHEWS:  It was a biotechnology company.

13        THE COURT:  How is it related?

14        MR. MATTHEWS:  According to Darren Ofsink's letter,

15   Mr. Laken was trading stocks under the name of Sol Mlot, under

16   an account controlled by Sol Mlot, and he was sharing in the

17   proceeds, profits, or losses of those trades, one of which was

18   CMGO, and he was doing this at a time when he was supposedly a

19   consultant to the corporation to restructure it.

20        It is akin to the posts that Mr. Laken has admittedly

21   made on the CMGO investor hub website under a pseudonym where

22   he claims not to be Mr. Laken himself and yet is disclosing and

23   making statements to the Internet that people should hold onto

24   the stock because they are going to receive $20 million as a

25   result of this lawsuit.  We think it's part and parcel of his

1  scheme to use this lawsuit as a means to prop up the stock of

2  CMGO.

3          The other stocks that we sought are at No. 33:  RGIN,

4  MDNT, SIBE, AEYE, and TNIB.  It's request No. 33 of our

5  production for production, your Honor.

6          MR. LEHRMAN:  Your Honor, there was a previous

7  production that Mr. Laken made with respect to those requests,

8  and I think Mr. Matthews' response was essentially that he

9  didn't believe that that was the complete production that

10 Mr. Laken had possession, custody, and control over.

11         I think that with respect to that document request and

12 the further production that the Court has ordered, certainly we

13 will address that, but I anticipate that it's likely that there

14 is going to be just a more detailed declaration from Mr. Laken

15 that, in part, is going to be provided in response because I've

16 had extensive conversations with Mr. Laken about collecting

17 documents and complying with the Court's order satisfying the

18 document request.  It's going to be surprising to me if there

19 is some substantial additional documents that exist and have

20 not been produced.

21         THE COURT:  He traded, say, in 2016 in one of these

22 stocks.  The fact that the brokerage account is closed doesn't

23 mean he doesn't have control over it.  He can get the documents

24 showing his trading, right?

25         MR. LEHRMAN:  Yes, your Honor.

1              THE COURT:  So he has to do that.

2              MR. LEHRMAN:  Understood.

3              THE COURT:  What else?

4              MR. MATTHEWS:  I believe that addresses all the issues

5    that we have raised in our letters, your Honor.

6              THE COURT:  What about anything else from you,

7    Mr. Lehrman?

8              MR. LEHRMAN:  Thank you, your Honor.

9              We had filed a letter motion that was docket entry 80,

10   which I understand had been denied by the Court without

11   prejudice.

12             THE COURT:  Sorry.  Which one was this?

13             MR. LEHRMAN:  Docket entry 80, which was plaintiff's

14   letter motion addressing issues of nonproduction or deficient

15   production on the defendants' side.

16             I'm just raising that I saw that the Court had, I

17   think, denied the letter motion without prejudice and to be

18   renewed.  We had not renewed it.  I, frankly, was waiting for

19   the e-mail production from defendants that's I believe

20   forthcoming so that I could renew the motion along with any

21   issues related to defendants' e-mail.  For purposes of judicial

22   economy I'm happy to wait to do that or to address it now.

23             THE COURT:  That's fine.  We can wait to do that.  I

24   think that makes sense, if that's all right with everybody.

25             I'll do two orders.  One will be a referral to the

1   magistrate judge for a settlement conference.   The second will

2   be an order just confirming that the fact deposition deadline

3   is extended to July 31.

4              MR. MATTHEWS:   Thank you, your Honor.

5              THE COURT:   Anything else for today?

6              MR. LEHRMAN:   No, your Honor.

7              THE COURT:   Thank you very much.   We are adjourned.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25