# EXHIBIT B

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
CMG HOLDINGS GROUP, INC. as
assignee of XA THE
EXPERIENTIAL AGENCY, INC.,
                      Plaintiff,


          -against-                    Civil Action No.:
                                       15-CV-05815-JPO
JOSEPH WAGNER, HUDSON GRAY
LLC, DARREN ANDERECK, JESSIE
LOMMA, MICHAEL DAY, JEAN
WILSON, ESTELLE PIZZO ,STUDIO
AG, LLC, REMIGIO GUDIN, and
MIXED COMPANY INC.,
                      Defendants.
--------------------------------x
JOSEPH WAGNER, JEFFREY SMITH,
DARREN ANDERECK, and JESSIE
LOMMA,
          Third-Party Plaintiffs,
        -against-
GLENN LAKEN and ALEXIS LAKEN,
          Third-Party Defendants.
--------------------------------x

                    March 1, 2018
                    10:25 a.m.



     Deposition of PEDRO FARIA, a Non-Party Witness,
taken by Defendants and Third-Party Plaintiffs,
pursuant to Subpoena, held at the law offices of
Windels Marx Lane & Mittendorf, LLP, 156 West 56th
Street, New York, New York, before Judith Castore, a
Certified Livenote Reporter and Notary Public of the
State of New York.



Job No. 53856

2

```
1
2        A P P E A R A N C E S
3
4    ON BEHALF OF PLAINTIFF and THIRD-PARTY
5    DEFENDANTS:
6        EDWARDS POTTINGER, LLC
7        425 N. Andrews Avenue, Suite 2
8        Fort Lauderdale, Florida 33301
9        954-524-2820
10       BY:  SETH LEHRMAN, ESQ.
11           seth@epllc.com
12
13   ON BEHALF OF DEFENDANTS and THIRD-PARTY
14   PLAINTIFFS:
15       WINDELS MARX LANE & MITTENDORF, LLP
16       156 West 56th Street
17       New York, New York 10019
18       212-237-1025
19       BY:  SCOTT R. MATTHEWS, ESQ.
20           smatthews@windelsmarx.com
21
22
23
24
25
```

3

```
1
2        IT IS HEREBY STIPULATED AND AGREED, by and
3    among counsel for the respective parties hereto,
4    that the filing, sealing and certification of the
5    within deposition shall be and the same are hereby
6    waived.
7        IT IS FURTHER STIPULATED AND AGREED that all
8    objections, except to the form of the question,
9    shall be reserved to the time of trial;
10       IT IS FURTHER STIPULATED AND AGREED that the
11   within deposition may be signed before any Notary
12   Public with the same force and effect as if signed
13   and sworn to before the court.
14                    * * * *
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1
2    P-E-D-R-O  F-A-R-I-A,
3    Having been duly sworn by a Notary Public
4    within and for the State of New York,
5    stated an address as 431 Erico Avenue,
6    Apartment 2-R, Elizabeth, New Jersey 07202,
7    was examined and testified as follows:
8    EXAMINATION BY MR. MATTHEWS:
9        Q    Good morning, Mr. Faria.  My
10   name is Scott Matthews, I'm an attorney
11   with the law firm of Windels Marx Lane
12   & Mittendorf.  I represent the
13   defendants in a lawsuit pending in the
14   United States District Court Southern
15   District of New York.
16       Thank you for coming this
17   morning.  I sent a subpoena to you to
18   compel your appearance at this
19   deposition.
20       Before we start I am just
21   going to go over some of what attorneys
22   like to refer to as the ground rules so
23   that you can understand that.
24       A    Okay.
25       Q    The first set of guidelines
```

5

```
1        FARIA
2    is, I'm going to ask questions.  The
3    court reporter is transcribing all of
4    my questions, as well as your answers.
5    So I would ask that you wait for me to
6    finish before you answer, and I will,
7    in turn, wait for you to finish
8    answering the question before I ask
9    another question.
10       Is that acceptable?
11       A    Sure.
12       Q    If at any time I speak over
13   you, please stop me and tell me that
14   you haven't furnished and I'll
15   certainly accommodate you.
16       Is that okay?
17       A    Um-hum.
18       Q    Another guideline that we
19   have is that when you answer questions
20   the court reporter cannot take down any
21   nonverbal responses such as nodding of
22   the head or a hand gesture, so I'll ask
23   that you answer audibly.
24       Is that okay?
25       A    Sure.
```

18

FARIA

1
2  the IT consulting business?
3      A   Sixteen years.
4      Q   Sixteen?
5      A   Yes.
6      Q   Did you originally work for
7  another company or have you always --
8  strike that.
9      A   No, I've been --
10     Q   I'm sorry.  When I say strike
11  that it means ignore my question.
12     A   Okay.
13     Q   When did you first perform IT
14  consulting services?
15     A   Four years ago when I started
16  working for myself.
17     Q   And prior to that, what were
18  you doing?
19     A   I was a senior systems
20  administrator at an engineering
21  consulting firm.
22     Q   What does a senior systems
23  engineering administrator do?
24     A   A senior systems
25  administrator is in charge of the IT

19

FARIA

1
2  infrastructure of the company.
3      Q   Okay.
4          And for how long did you do
5  that?
6      A   Ten years.
7      Q   Which company was that?
8      A   BMK Group and Birdsall
9  Services Group.
10     Q   Are those companies
11  affiliated with Radiant Resources?
12     A   No.
13     Q   Are they affiliated with XA?
14     A   No.
15     Q   Are they affiliated with CMG?
16     A   No.
17     Q   Are they affiliated with the
18  Lakens?
19     A   No.
20     Q   Have you ever been a party to
21  a lawsuit?
22     A   No.
23     Q   Have you ever been deposed
24  before?
25     A   No.

20

FARIA

1
2      Q   Do you know whether or not
3  Radiant Resources entered into a
4  contract with XA to perform IT
5  services?
6      A   I'm not sure what -- I'm not
7  sure what happens on the Radiant side.
8  I was contacted by one of the -- my
9  contacts at Radiant that asked me to
10  engage with XA through them.
11     Q   Is that contact Gary?
12     A   Yes, sir.
13     Q   What is his last name?
14     A   Ciliberto.
15     Q   What did he ask you to do?
16     A   He asked me that -- he had
17  been contacted and he -- the XA in
18  New York needed to have a -- some work
19  done in their Hudson Street office.
20     Q   Do you know why he didn't --
21  strike that.
22         You performed those services
23  and then were paid by Radiant; is that
24  correct?
25     A   Yes, sir.

21

FARIA

1
2      Q   And Radiant charged XA for
3  their --
4      A   I don't know how they got
5  paid.
6      Q   So were you paid on an hourly
7  basis or on a project basis?
8      A   Time and materials.  Hourly,
9  time and materials.
10     Q   Who did you initially work
11  with when you performed services for
12  XA?
13     A   My first visit to the XA
14  office, Jean Wilson was there, David
15  Tuma was there, and another associate
16  of David Tuma was there, and Gary for
17  the initial meeting.
18     Q   What was requested of you?
19     A   To set up a server, copier,
20  verify SonicWall, Firewall rules back
21  to the Chicago office.
22     Q   What do you mean by that, to
23  verify Firewall rules back to the
24  Chicago office?
25     A   There was a VPN in place from

6  (Pages 18 to 21)

22

FARIA

1
2 the New York office to the Chicago
3 office in order to maintain the windows
4 active directory domain and
5 communication between the New York
6 office servers and the Chicago office
7 servers.
8    Q   And what does VPN stand for?
9    A   Virtual private network.
10    Q   So this is how people in the
11 New York office could communicate with
12 people in the Chicago office and keep
13 the communications --
14    A   Exchange files.
15    Q   So that they could exchange
16 files?
17    A   Yes.  I don't know what
18 other -- I don't know what other
19 services there were that they were
20 using, the VPN particularly.
21    Q   What other potential services
22 could it be used for?
23    A   Phones.  Anything that can --
24 needed to travel through an IT based
25 network.

23

FARIA

1
2    Q   Who is David Tuma?
3    A   David Tuma, from what I
4 understand, is from Tuma & Associates.
5 There are e-mails in my -- in what I
6 sent to you.  He was, from what I
7 understand, the main IT person for Jean
8 Wilson and XA Chicago.
9    Q   He was based out of Illinois,
10 correct?
11    A   From what I understand, yes.
12    Q   Did he appear knowledgeable
13 in IT matters?
14    A   Yes, sir.
15    Q   Did Jean Wilson appear
16 knowledgeable in IT matters?
17    A   Somewhat.
18    Q   How would you amplify that,
19 explain that?
20    A   I didn't have many
21 interactions with her.  She seemed like
22 she knew some terms and some things,
23 but she deferred to David to, you know,
24 properly instruct me on the matters.
25 She kind of linked us up and then went

24

FARIA

1
2 on to do other things while David and I
3 worked together.
4    Q   Did you ever meet with Joseph
5 Wagner?
6    A   No.
7    Q   Did you ever speak with
8 Joseph Wagner?
9    A   Yes.
10    Q   Did you ever meet with Darren
11 Andereck?
12    A   Yes.  I believe the first
13 time I went to the New York office that
14 he was there.  I don't know -- it might
15 have been just in passing or I saw them
16 there.  I didn't really have much
17 interaction in my first visit with
18 employees.
19    Q   Have you ever had any other
20 interaction was Darren Andereck?
21    A   Not that I am aware of.
22    Q   Have you had any interaction
23 with Jessie Lomma?
24    A   Again, these are employees
25 that were there.  I went -- in the

25

FARIA

1
2 first visit I don't believe so, I
3 believe in the second visit she was
4 still there.  And Jean had asked me to
5 do some stuff on Jessie's computer.
6    Q   Did you have any other
7 interaction with her afterwards?
8    A   No.
9    Q   I have the same question for
10 Mike Day, D-A-Y?
11    A   Everything -- it's the same
12 interaction with all employees.
13    Q   Of XA?
14    A   Yes.
15    Q   Have you ever met or spoken
16 with Estelle Pizzo?
17    A   That name is not familiar to
18 me.
19    Q   Okay.
20        Have you ever met or spoken
21 with Remigio, R-E-M-I-G-I-O, Gudin,
22 G-U-D-I-N.  He goes by Remy?
23    A   Yes.  I believe the first
24 time I was there he was in the furthest
25 office from the door.  There was a dog

7 (Pages 22 to 25)

**30**

FARIA

flow easier for the New York employees
and have a copy of files that they
needed.

Q   Is there a voicemail server?

A   I am not familiar with their
phone system.

Q   Did XA have backup systems in
place for their data?

A   The New York office had a
disk backup system that was
incorporated during the initial set-up.

Q   What is that?

A   It had a drive and a slot and
it had cartridges.  And I installed
that setup and backup program.

Q   Prior to your going there, do
you know whether there was any backup
system in place?

A   I am not aware of any
information prior to me.

Q   When you got there you didn't
observe any backup?

A   The server was new to that
location in New York, the one that I

**31**

FARIA

set up.  There was nothing there that I
am that aware of prior to that.

Q   Who managed XAs network
configuration at that time?

A   I'm not entirely sure who had
that responsibility.  It was never
revealed to me.

Q   After you set-up the server,
do you know who had that
responsibility?

A   I don't know who was
maintaining them on the day-to-day
basis.  I don't know if XA had an IT
staff or if they were had contracting
David Tuma to perform those tasks.  I
am not privy to that information.

Q   Did you ever deal with an IT
staff other than David Tuma?

A   I did not deal with any other
people in terms of IT except Jean
Wilson and David Tuma.

Q   Are you aware that in some
time in 2014, XA migrated its e-mail to
the cloud?

**32**

FARIA

A   Afterwards during my first
interaction, I believe, with the Lakens
I became aware of that.

Q   What does that mean when
someone -- when a company migrates its
e-mail to the cloud?

A   It means that they had
on-premises servers and that for
whatever reason it was no longer
feasible to maintain that service, so
for typically better availability they
migrate their service to a cloud
provider such as Office 365 or Gmail.

Q   What were they using?

A   WindStream.

Q   Which is similar to Office
365 or Gmail?

A   Yes.  It's an exchange based
product so more in comparison to Office
365.

Q   When you have e-mail stored
on WindStream, are you able to delete
it?

A   As in that you need -- no,

**33**

FARIA

you need to -- more detail.

Q   Okay.
    Explain to me how one would
delete e-mail that's stored in the
cloud?

MR. LEHRMAN:  Form.  Vague.

A   You need more detail.

Q   Is there a process by which
one can delete e-mail stored in the
cloud on Windstream?

A   Any -- so a user has access
to whatever accounts he has access to.
That user can delete e-mail through
that access.  An administrator has
almost root access to the server, that
administrator can delete mailboxes.

Q   When you delete a mailbox,
what happens?

A   It's deleted.

Q   It's deleted completely?

A   Yes.

Q   Forever?

A   Depending -- again, so
because it's an on cloud service even

DAVID FELDMAN WORLDWIDE, INC. - A VERITEXT COMPANY
330 Old Country Road - Ste. 300, Mineola, NY 11501  1.800.727.4396

34

FARIA

1
2 an administrator of that service never
3 has full control of the servers.
4 You're getting a tenant-based control.
5 So when an e-mail is deleted -- when a
6 mailbox is deleted, depending on
7 what -- the backup that was setup and
8 configured is the recovery points that
9 are available.  So if the e-mail box is
10 deleted and no recovery points are
11 available; then, yes, it is deleted.
12     Q   And if that e-mail had
13 previously been backed up, then it's
14 available to be recovered?
15     A   From the point of time of the
16 recovery, yes.  If -- from the point of
17 time of the recovery, yes, it can be
18 recovered.  If the user deleted e-mails
19 prior to that point in time, those
20 e-mails that were deleted prior are not
21 recoverable -- from that point in time
22 of recovery.
23     Q   You said from the point in
24 time of recovery.  I'm not as well
25 versed at all as you are, but it would

35

FARIA

1
2 strike me -- did you mean to say from
3 the point of time of the back up?
4     A   Yes.
5     Q   Okay.  Thank you.
6         Someone who doesn't have
7 administrator privileges cannot delete
8 e-mail that's in the cloud; is that
9 correct?
10     A   No.
11     Q   It's wrong?
12     A   Yes.  They cannot delete
13 mailboxes.  They can delete e-mail from
14 whichever account they have access to.
15 So you as Scott can go into your
16 mailbox -- into your Outlook or
17 whatever client you use and delete and
18 manage e-mails there.  Depending upon
19 what the retention policies that your
20 company has is a different story.  So
21 you can delete -- you have access --
22 this sheet is your mailbox, you have
23 access to anything inside your mailbox.
24 Because you're not an administrator,
25 you cannot just delete the whole

36

FARIA

1
2 mailbox.
3     Q   I see.
4         And so do you know whether XA
5 had retention policies that would
6 prevent individual users who do not
7 have administrator privileges to delete
8 e-mail?
9     A   From my understanding of
10 Windstream and how it was configured,
11 users had full access to their
12 mailboxes as it is instructed, and an
13 administrator has full access to the
14 system.  There were backups that were
15 set-up.  But that's -- so there's
16 administrator access and there's user
17 access.  So I don't know who initially
18 had administrator access.  You can
19 assume that all employees had -- that
20 had a mailbox had user access.
21     Q   But not all employees had
22 administrator access?
23     A   Correct.
24     Q   Who had administrator access?
25     A   From what I recall, David

37

FARIA

1
2 Tuma had administrator access and Jean
3 Wilson had administrator access and
4 there was an ambiguous administrator
5 account.
6     Q   What does that mean?
7     A   It's just called
8 administrator.
9     Q   So you don't know who?
10     A   It's basically the God of the
11 system, right?  So whoever -- there's
12 no real accountability in terms of
13 who -- which individual logged in as
14 that person -- as that user.
15     Q   Did you conduct an
16 investigation to determine who had that
17 user privilege?
18     A   So we're fast forwarding to
19 later on in 2014 when the Lakens
20 contacted me and said, why are you not
21 responding to our requests for
22 assistance.  And I said I have not
23 received any requests until right now.
24 And at that point I assisted them in --
25 to regaining administrator access to

38

FARIA

their Windstream service.  And then in there you -- in there I was able to run some portion of an investigation that somebody logged in as an administrator created a Ron Burkhardt account, gave Ron Burkhardt administrative access, then logged off, logged back in under the Ron Burkhardt account and preceded to delete mailboxes from the system. The IP from which the administrator account was logged in from created the Ron Burkhardt account, logged out, logged back in as Ron Burkhardt and preceded to delete the mailboxes from the server was the same originating IP, a T-Mobile based IP 3G from the Illinois area.

MR. MATTHEWS:  I would like to mark this as Exhibit 2, please.

(Document, Bates-stamped XA0629524 through 532; 534 through 539, was marked Defendant's Exhibit 2, for identification, as of this date.)

39

FARIA

Q  Sir, I would like you to take a look at what's been marked as Defendant's Exhibit 2, which I'll represent -- state for the record is a series of documents produced by XA bearing the Bates Number legend at the bottom XA0629524 through 532, and then 534 through 539.  And this has been designated as confidential pursuant to a court order.  Let the record reflect that.

Have you seen this before?

A  No, sir.

Q  Did you -- you see the handwritten notes on the first page?

A  Okay.

Q  Is that your handwriting?

A  No, sir.

Q  Is this a document that you printed out?

A  No, sir.

Q  Do you know what this represents?

A  Looks like logs of some sort.

40

FARIA

Q  If you look at the first page it says 9/25/2014.  Log in Jean@XTAGENCY.com.

Do you see that?

A  Yes.

Q  Is that, to your knowledge, Jean Wilson's log in?

A  Yes, sir.

Q  And how do you know that?

A  Because I have had e-mail interactions with Jean before under Radiant.

Q  That was her e-mail address?

A  Yes, sir.

Q  And then if you go down you see on September 17, 2014, it says Windstream admin?

A  Yes, sir.

Q  Is that the administrator account that you were referring to?

A  Yes, sir.

Q  How do you know that?

A  It could be the administrator account or a Windstream maintenance

41

FARIA

person.  I am not sure if it's one other the other.

Q  Look at the next page, please.  At the top it's September 16, 2014.  And there's a -- looks like a log in of Aowens@CreativeITconsulting.com.

Do you see that?

A  Yes, sir.

Q  Do you know what CreativeconsultingIT -- CreativeITconsulting.com is?

A  That, from what I understand, is David Tuma's company.

Q  Do you know someone that has the first initial A and the last name Owens?

A  I believe that's the associate I met in New York with Mr. David Tuma.

Q  Is that a male or female?

A  Male.

Q  Do you know what his name is?

A  I don't recall.

DAVID FELDMAN WORLDWIDE, INC. - A VERITEXT COMPANY
330 Old Country Road - Ste. 300, Mineola, NY 11501  1.800.727.4396

46

FARIA

1
2   contact your IT administrator, your IT
3   administrator goes to your active
4   directory user account to reset your
5   password. And when he tells you what
6   this password and you are able to log
7   in again, that's that service that ties
8   around active directory.
9       Q   And is any of the information
10  that's in the active directory stored
11  in the cloud?
12      A   Yes. That's where he deleted
13  this from. So there's an on-premise
14  active directory server, and there's
15  some sort of sink agent to the cloud
16  service. So either by deleting the
17  account in the cloud directory -- so by
18  deleting the account in the cloud
19  directory, the sink service would then
20  delete the account from the on-premises
21  directory.
22      Q   Okay.
23          As you go through these
24  numbered pages there are a number of
25  similar entries, correct?

47

FARIA

1
2       A   Yes.
3       Q   For example, if you look at
4   page -- this is the bottom right,
5   XA0629527.
6           Do you see that page?
7       A   Um-hum.
8       Q   If you look at the top?
9       A   Um-hum.
10      Q   Mike at XPHC.com. And I'll
11  represent that I believe that that is
12  Mike Day?
13      A   Okay.
14      Q   Do you know whether or not
15  Mr. Day was still employed by XA on
16  September 10, 2014?
17      A   I do not know.
18      Q   Do you know whether -- at the
19  bottom here Jeff@EXPagency.com, do you
20  know whether Mr. Jeff Smith was still
21  employed by XA on that date?
22      A   I don't have any information
23  for employees whether or not they
24  worked or when their last day workday
25  at XA Agency is.

48

FARIA

1
2       Q   Can you go to Page -- I think
3   it's two pages down, XA0629529.
4           Can you tell me what the top
5   entry refers to?
6       A   The top entry seems to refer
7   that the user, Jean@EXPagency.com
8   logged in from -- at 9:15 in the
9   morning of September 9th, 2014, and
10  deleted a weekly back up of Remigio
11  Gudin's mailbox.
12      Q   How do you know that's a
13  weekly backup?
14      A   It says weekly user and a
15  date .PST.
16      Q   How do you know that's a
17  backup as opposed to a file that's
18  simply entitled Weekly Remigio Gudin
19  8/30/14?
20      A   It is a file in the
21  Windstream servers that is a backup of
22  that mailbox on August 30th, 2014, as a
23  part of their weekly backup process.
24  It is a -- it is a industry standard
25  naming convention.

49

FARIA

1
2       Q   So I may have files that
3   refer to what I do in a particular week
4   that I date weekly Scott Matthew's
5   files; that's something different,
6   correct?
7       A   Yes. This is a PST file. A
8   PST file is an offline version of an
9   Outlook or exchange mailbox.
10      Q   So does that suggest to you
11  that XA had a policy at this time to
12  backup user files on a weekly basis?
13          MR. LEHRMAN: Form.
14      A   User mailboxes on a weekly
15  basis, yes.
16      Q   Is that consistent with your
17  understanding of XA's policy?
18      A   I do not know what XA's
19  policies are. This is a reflection of
20  whatever -- however the Windstream
21  service was originally configured.
22      Q   Can you go to Page 0629536.
23          This page has a record of
24  transactions occurring on September 9,
25  2014, correct?

13  (Pages 46 to 49)

50

```
1              FARIA
2      A    September 10.
3      Q    I apologize.  September 10,
4  2014.
5      A    Okay.
6      Q    What is meant by the notation
7  at the top under the source effected
8  column where it says --
9      A    One second.
10     Q    Yes.
11     A    There's a discrepancy in the
12  dates.
13     Q    Where is the discrepancy?
14     A    Well, you have -- Page 28 has
15  September 10th, Page 29 has
16  September 9th.  Page 30 has
17  September 9th.  Page 31 has
18  September 9th.  Page 32 has
19  September 9th.  And then Page 34, which
20  is two pages after 32, goes back to
21  September 10th  so there's a
22  discrepancy in the pages and in the
23  timestamps of the -- it just seems
24  weird why it's out of order.
25          What's your question about
```

51

```
1              FARIA
2  Page 36?
3      Q    On Page 36 under the column
4  source effected, it says hosting dot
5  public dot data dot contacts dot
6  contactIDinfo.
7          Do you see that?
8      A    Um-hum.
9      Q    What does what refer to?
10     A    Again, you need to go further
11  down to see where it starts.  So you
12  are looking at 2:21 p.m. and 58
13  seconds.  When you go further down you
14  see that at 2:21 and 4 seconds
15  administrator logged in from that IP
16  address.  Okay.  That's weird.
17  Administrators were logging in from
18  different IP addresses.  And Jean
19  Wilson's account was logging in from
20  similar IP addresses.  Okay.  Very
21  confusing.  Nonetheless there was a
22  process of many log ins and
23  modifications.  So let's go back to --
24  this looks about right.
25          So if we go back to Page 37.
```

52

```
1              FARIA
2  Jean Wilson logs in at 1:29.  Jean
3  Wilson logs in again at 1:32, Jean
4  Wilson from one IP address, 74 dot 93
5  dot 94 dot 169.  That is one location
6  where she's logging in from those two
7  times.
8      Q    That's when -- when the
9  account user Jean@EXPagency.com is
10  logging in, correct?
11     A    Yes.  Correct.
12          So then at 2:11.19 she logged
13  in from 172 dot 56 dot 13 dot 153.
14     Q    Well, Mr. Faria, I just want
15  to ask you a question.
16     A    It's --
17     Q    Well, just give me one
18  second.
19          You don't know, as you sit
20  here today, whether or not Jean Wilson
21  actually logged in.  You know that a
22  user with the user account name
23  Jean@EXPagency.com logged in, correct?
24     A    Yes.  The user account was
25  logged in, I don't know who's sitting
```

53

```
1              FARIA
2  behind the keyboard.
3      Q    Thank you.
4      A    So at 2:11 they logged in
5  from the 172 IP address.  Two minutes
6  later the same account logs in from the
7  64 IP address, and at that time they
8  create an account called admin.  Then
9  administrator logs in roughly 50
10  seconds later from the same IP address
11  and makes changes on that contact.
12  Administrator makes more changes to its
13  own account.  Then at 2:14.24
14  administrator logs in from the same IP
15  address as the first Jean Wilson user
16  account was logged in from.  Then
17  administrator logs in from the same IP
18  address that the second Jean Wilson
19  user account was logged in from.  That
20  time at 2:21 and 4 seconds a Ron B
21  account is created.  Then 53 seconds
22  later that Ron B account is logged in,
23  it's given access to the administrator
24  aspect of things, then we go -- that
25  the Ron B account at 2:22 p.m. is then
```

14  (Pages 50 to 53)

54

FARIA

1
2  logged in from the IP address of the
3  first Jean Wilson user account. At
4  that point in time the Ron B account
5  that was logged in from the second IP
6  address location of the -- that Jean
7  Wilson and the administrator account
8  was created or administrator from
9  proceeds to delete settings and then
10  mailboxes and then users from the
11  Windstream server.
12      Q   Is that what you were
13  referring to earlier this morning?
14      A   Yes.
15      Q   When we were talking about a
16  user creating a Ron B account and then
17  deleting --
18      A   Yes.
19      Q   -- profiles?
20      A   Yes. The 172 IP address is
21  a T-Mobile public IP address. I don't
22  recall what the 64 IP address is.
23      Q   What does T-Mobile public IT
24  address mean?
25      A   Meaning that the person has a

55

FARIA

1
2  T-Mobile cellular service or hot spot
3  and they're using it to access the
4  internet. And that IP address is based
5  out of Chicago -- Illinois. I don't
6  know if Chicago was the actual
7  geographic area.
8      Q   That could be any person
9  using their hot spot?
10      A   That could be any person with
11  a device with T-Mobile service.
12      Q   Do you know when Ron
13  Burkhardt was terminated by XA?
14      A   I do not know when Ron
15  Burkardt was terminated. My second
16  interaction with XA in the Hudson
17  Street office, Ron Burkhardt and
18  another person were there under -- Jean
19  Wilson mentioned that -- Jean Wilson
20  was there. So I met Jean Wilson and
21  she said that the New York office and
22  the Chicago office are splitting up.
23  Ron is going to be spearheading the
24  New York office. There was another
25  lady there that was his administrative

56

FARIA

1
2  assistant. It seemed the computers
3  were there but there was a lot less
4  people in the office, and I believe
5  Jessie was there that day.
6      Q   Do you know why Ron Burkhardt
7  was terminated?
8      A   I have no information as to
9  why or when he was terminated from XA.
10      Q   Let's talk about when you
11  went to the New York office on your
12  second time.
13      A   Okay.
14      Q   When approximately was that?
15      A   We would have to go back to
16  the e-mails that I sent you today to
17  know exactly what the time and date was
18  for that. I don't recall.
19      Q   But you said that there were
20  computers in the office space, correct?
21      A   Yeah. There -- it looked
22  like they were -- yeah, there were
23  still computers -- empty desks and
24  computers at those desks.
25      Q   And there were chairs there,

57

FARIA

1
2  correct?
3      A   Yes.
4      Q   And there was office
5  furniture there, correct?
6      A   Yes, there was office
7  furniture.
8      Q   Just fewer employees?
9      A   By the look -- by my initial
10  assessment, yeah, it was just emptier
11  than -- a lot less hustle and bustle
12  than the original time I was there.
13      Q   It wasn't a crowded busy
14  office space?
15      A   Not anymore.
16      Q   But there were desktop
17  computers?
18      A   Yes.
19      Q   The Macs were there?
20      A   Some were there. I don't
21  know. I did not take an original
22  inventory of my first trip to the XA
23  office, so I don't know whether or not
24  everything that was there when I
25  originally went there was there when I

15  (Pages 54 to 57)

58

FARIA

1 
2 went there for the second time.
3    **Q   Did it appear to you at the**
4 **time that things were missing?**
5    A   Not to me.
6    **Q   Is it a common practice to**
7 **delete user profiles when people are no**
8 **longer employed?**
9    A   Not without first taking a
10 backup of them, from my own personal
11 experience.
12    **Q   Do you know whether or not**
13 **backups were created with XA?**
14    A   I don't know if --
15    MR. LEHRMAN: Form.  Vague.
16    **Q   Do you know whether or not**
17 **backups were created prior to e-mail**
18 **profiles being deleted?**
19    A   You are talking about two
20 different things.  Are we talking about
21 desktops or e-mails or desk top
22 profiles?
23    Q   Okay.
24       **Have you heard of -- heard**
25 **that -- strike that.**

59

FARIA

1 
2    **Did Jean Wilson ever ask you**
3 **to wipe all the computers of**
4 **information at XA's New York office?**
5    A   Yes.
6    **Q   What did she say to you?**
7    A   She asked me -- that was the
8 second interaction I had with XA at
9 Hudson Street.  And I basically went in
10 and she presented the premise that Ron
11 Burkhardt was going to be in charge of
12 the New York office, as I stated
13 previously.  And that XA New York and
14 XA Chicago were going their separate
15 ways.  And under that agreement that
16 everything that was there would
17 physically stay.  She asked me to go
18 into each and every desktop machine in
19 the office and clear out any user
20 accounts except for XA guest account.
21    **Q   What's an XA guest account?**
22    A   It's just a generic active
23 directory account that could be used to
24 log in.  You know, companies typically
25 have user one or, you know, the name of

60

FARIA

1 
2 your firm dot one or Windows marks.
3 There's a guest -- just an account that
4 exists -- an active directory that's
5 typically if anybody that is not from
6 within the enterprise or if somebody
7 just needs to have quick access to
8 something, like a publicly known user
9 name and password for access to the
10 infrastructure.
11    **Q   And what was your response to**
12 **her when she asked you this?**
13    A   I said okay.  Is there
14 anything that we should watch out for
15 during this deletion?  And she said,
16 let me know when you have any questions
17 about any files that are being deleted
18 and I will answer you as to what the --
19 you know, how to proceed.
20    **Q   Did you delete files?**
21    A   I was instructed that was the
22 premise of my being there, to clean up
23 and delete all the user profiles from
24 the desktop machines that were not XA
25 guest.

61

FARIA

1 
2    **Q   Did you do that?**
3    A   I did do that.  And
4 through -- as I was going through some
5 of the profiles I noticed that there --
6 some had either large profiles or files
7 that, from experience, by the naming
8 structure and/or their size seemed
9 important to keep.  And at any time
10 that I came to this juncture and I
11 asked Jean, what about this file or
12 what about this folder, she proceeded
13 to instruct me to continue on with the
14 deletion of those files and folders
15 from the user profiles.
16    MR. MATTHEWS:  Would you mark
17 this as Exhibit 3.
18    (E-mail string between
19 Alexis@EXPagency.com to
20 PFaria@FarPinsolutions.com, was
21 marked Defendant's Exhibit 3, for
22 identification, as of this date.)
23    **Q   This is an e-mail that you**
24 **provided this morning at approximately**
25 **1:55 a.m.**

DAVID FELDMAN WORLDWIDE, INC. - A VERITEXT COMPANY
330 Old Country Road - Ste. 300, Mineola, NY 11501  1.800.727.4396

62

FARIA

1
2      A   Um-hum.
3      Q   That is two e-mails,
4  actually.  Originally it's from
5  Alexis@EXPagency.com to
6  PFaria@FarPinsolutions.com.
7      Is that your e-mail address?
8      A   That is my e-mail address.
9      Q   Do you know what the e-mail
10 address of Alexis@EXPagency.com is?
11     A   Yes.
12     Q   Who is that?
13     A   Alexis Laken.
14     Q   Okay.
15     She asked Pedro on what day
16 did you come to the office and wipe all
17 of the computers of all information at
18 Jean's insistence?  I just need it for
19 my timeline.  Thank you, Alexis Laken.
20     Do you see that?
21     A   Yes, sir.
22     Q   Did you respond June 11,
23 2014?
24     A   That's what it looks like.
25     Q   Does that refresh your

63

FARIA

1
2  recollection of when you came to the
3  office a second time?
4      A   I would -- like I mentioned
5  before, I would have to go and review
6  my e-mails.  And if that's the date
7  that I responded to her that I went to
8  the office, then that's the date I went
9  to -- my second visit to Hudson Street
10 in New York to clean up the computers
11 was on June 11, 2014.
12     MR. MATTHEWS:  Mark this.
13     (E-mail string between
14     Gary@Radiantresources.com to
15     PFaria@FarPinsolutions.com, was
16     marked Defendant's Exhibit 4, for
17     identification, as of this date.)
18     Q   Sir, just take a look at this
19 document that's been marked Defendant's
20 Exhibit 4.
21     And this is also amongst the
22 materials that you produced to us.
23     A   Okay.
24     Q   It's a five-page e-mail
25 string.

64

FARIA

1
2      A   Okay.
3      Q   Between
4  Gary@Radiantresources.com.
5      Do you know who that is?
6      A   Yes, sir.
7      Q   Who is that?
8      A   That's Gary Ciliberto, my
9  contact at Radiant.
10     Q   And it's between he and
11 yourself; is that correct?
12     A   The last of the thread, yes.
13     Q   Right.
14     The beginning of the thread
15 is between Jean Wilson, which is
16 Jean@EXPagency.com, correct?
17     A   Yes.
18     Q   And Gary?
19     A   Yes, that's what it looks
20 like.
21     Q   Do you see on Page 2 what
22 Jean asks him or states as the purpose
23 of this IT visit?
24     A   Yes.
25     Q   Okay.

65

FARIA

1
2      I'm just going to read this
3  into the record.  It says, Gary, thanks
4  so much, 11:00 a.m. on Wednesday would
5  be great.  We will be going to each
6  desktop and removing existing profiles
7  and creating new ones for new team
8  members and then making sure that they
9  are able to print, et cetera.  There
10 are about ten Dells and four Macs.  Not
11 all will need a new profile, but all
12 need to have existing profile removed.
13 And I think there may be one new Mac in
14 the box to set-up.  We will set a
15 priority list for Wednesday, and then
16 if there's a follow-up visit needed we
17 can schedule accordingly.  I want to
18 take advantage of me being on-site
19 since it is only for the day.  We would
20 also like to make sure that all
21 machines can be logged into using the
22 XA guest credentials and can print.
23 And then the e-mail goes on with
24 respect to that.
25     Is that what she told you to

17 (Pages 62 to 65)

70

FARIA

1 are user accounts.
2     **Q  Can you give me an example of**
3 **a service account?**
4     A  Back-up exec is one.
5     **Q  Where is that?**
6     A  B.
7     **Q  On the third page?**
8     A  On the section page of the
9 e-mail on the first page of the Excel,
10 back-up exec.
11     **Q  That's a service account?**
12     A  Yeah.  Back-up exec is a
13 backup utility from Symantec.  And
14 that -- I assume that they created that
15 had account because they wanted to
16 receive e-mail alerts of backup jobs as
17 they occurred.  So that's an example of
18 a service account.  You have others;
19 feedback, inquiries, iPad.  Anything
20 that doesn't have a typical first name
21 last name could be considered a service
22 account and/or a distribution list like
23 Neighbors, VIP XAPR, XARSVP.  Those are
24 all service accounts.

71

FARIA

1     **Q  And in this time in**
2 **December 2014, Jean Wilson, Jeff Smith,**
3 **Jessie Lomma, Darren Andereck; they**
4 **were all no longer affiliated with XA,**
5 **correct?**
6     A  Yes.  And these accounts --
7 and you see these mailboxes here
8 because they were recovered --
9 requested to be recovered by Glenn
10 Laken from Windstream from Windstream's
11 back-ups.
12     **Q  Did you recover them?**
13     A  I did not recover them.
14 Windstream recovered them.
15     **Q  So by December 4, 2014, they**
16 **were recovered?**
17     A  They were recovered from a
18 point in time.
19     **Q  Right.**
20     A  Right.
21     **Q  Was any further recovery ever**
22 **done with respect to those accounts?**
23     A  No, not from Windstream.
24     **Q  Did you ever do any recovery**

72

FARIA

1 **with respect to those e-mail accounts?**
2     A  On Windstream servers, no.
3     **Q  What about on other -- in any**
4 **other fashion?**
5     A  There were -- at some point
6 the Lakens regained access to all of
7 the hardware in the Chicago and in the
8 New York office.
9     **Q  What do you mean by "regained**
10 **access"?**
11     A  They physically had access to
12 whatever was left behind in those
13 spaces.
14     **Q  Did they -- I think you said**
15 **regained?**
16     A  Or gained access or gained
17 possession.  So XA changed the guard
18 three times, right.  So there was the
19 time that I went there the first time
20 under the direction of Jean Wilson.
21 There was the second time that Jean
22 Wilson said that Ron Burkhardt was now
23 the person in charge of XA New York.
24 And then the third time, which was when

73

FARIA

1 they contacted me to assist them and
2 when I became their IT person.
3     **Q  Under the Lakens Management?**
4     A  Under the Lakens Management.
5 So they had access to these spaces and
6 access to whatever hardware was left
7 behind.  And they requested my input
8 and expertise on what should they do
9 with what was left behind.  I said the
10 desktops aren't really necessary, what
11 is most critically important is to keep
12 all the hard drives from any and all
13 equipment.  So they kept the hard
14 drives.  They sent them to me where we,
15 in different points in time, did
16 different methods of recovery.  So from
17 the profiles and things that I had
18 originally deleted.
19     **Q  Let's back up a little bit.**
20 **You said that they recovered**
21 **these e-mails from Windstream.  I'm**
22 **going to show you a document.**
23     MR. MATTHEWS:  Please mark it
24 as Exhibit 6.

19  (Pages 70 to 73)

74

FARIA
1
2        (E-mail from
3    PFaria@FarPinsolutions.com dated
4    9/30/14 to Alexis Laken, was
5    marked Defendant's Exhibit 6, for
6    identification, as of this date.)
7        **Q    This is an e-mail that you**
8  **provided, sir.**
9      A   Um-hum.
10       **Q    That is an e-mail from you**
11 **apparently to Alexis Laken; is that**
12 **correct?**
13     A   Yes.
14       **Q    Dated September 30, 2014.**
15       **Do you see that?**
16     A   Yes.
17       **Q    Entitled EXP agency e-mail**
18 **recovery access.**
19       **Do you see that?**
20     A   Yes, sir.
21       **Q    And it says, Hi, Alexis, all**
22 **five email accounts have been**
23 **recovered.  Jessie, Jeff, Darren,**
24 **Natalia, Mike.**
25       **Do you see that?**

75

FARIA
1
2      A   Um-hum.
3        **Q    Does that indicate that by**
4  **September 30th, 2014, all five of those**
5  **e-mail accounts had been recovered?**
6      A   Yes.  Recovered from the
7  point in time recovery as we discussed
8  from the attachment from the
9  December 4th e-mail.
10       **Q    Right.**
11       **And this was done by**
12 **September 30th?**
13     A   Right.  Because -- and this
14 was done by Windstream at the request
15 of Glenn Laken.
16       **Q    And the record that I showed**
17 **you earlier seemed to suggest that**
18 **these e-mail accounts were deleted on**
19 **or about September 10th, correct?**
20     A   That's correct.
21       **Q    So there's about a 20 day**
22 **period when they were deleted?**
23     A   I don't recall the date of
24 which the e-mail accounts were
25 recovered from.  This is the time in

76

FARIA
1
2  which they had been all recovered by.
3        **Q    But you don't know how far**
4  **back they -- they were backed up?**
5      A   The backups -- so
6  Windstream -- because the backups from
7  the tenant portal had already all been
8  removed as stated in the logs of
9  Exhibit 2, when the Lakens regained
10 access -- with my assistance we were
11 able to regain access into the
12 administrator tenant profile of
13 Windstream.  So because all of those
14 recovered points had been removed from
15 that tenant access, we had to contact
16 and elevate a ticket with Windstream
17 for Windstream technical support as to
18 information as to if they had backups
19 and if things could be recovered from
20 those backups.  And the manner in which
21 that those -- it worked was you had to
22 pay per instance per point in time
23 recovery that you wanted to go back to.
24 The Lakens agreed to only one point in
25 time recovery to go back to.  I don't

77

FARIA
1
2  recall the date of that point in time
3  recovery that was agreed upon.  And
4  that recovery of that point in time to
5  be determined had occurred by
6  September 30th, 2014.
7        **Q    All right.**
8        **And when you looked at**
9  **Exhibit 2 we only saw that one week of**
10 **backups had been deleted, according to**
11 **Exhibit 2, correct?**
12     A   According to Exhibit 2.
13       **Q    Okay.**
14     A   Well, not necessarily -- hold
15 on.  No, more than that.  Because all
16 the -- many recovery points dated
17 August 30th from Page 29, Page 30, Page
18 31, then Page 31 talks about
19 September 6th.
20       **Q    Where does it say that?**
21     A   Page 31?
22       **Q    Yes.**
23     A   The weekly files have a
24 September 6th date.
25       **Q    Okay.**

90

FARIA

1
2    A   I went back to the New York
3 office because John Wilken, Sarah
4 Alexis, they were the ones currently
5 running and operating XA.  And to help
6 and assist them with their Macs and
7 e-mail access; yes, I did go back.  I
8 don't recall the date exactly, I would
9 have to go back to my log.
10   Q   Was there office furniture in
11 the office then?
12   A   Yeah.  Everything looked as
13 normal as it had the last time.  Again,
14 I took no inventory of both of my
15 initial visits to the XA Hudson Street
16 office, so upon my return back things
17 looked like everything was.  But I do
18 not know for sure since inventory was
19 not taken and accounted for.
20   Q   Thank you.
21     Do you know when XA first
22 filed this lawsuit?
23   A   I don't know dates of
24 lawsuits filed.
25   Q   Do you know whether it was

91

FARIA

1
2 filed before October 1, 2014?
3   A   I -- I don't know dates of
4 when lawsuits were filed.
5   Q   When did Glenn Laken first
6 tell you that there was a lawsuit
7 involving XA and some of its former
8 employees?
9   A   I don't recall the date of
10 that conversation.
11   Q   Do you know whether it was
12 before this e-mail?
13   A   At this point, from memory,
14 they knew that something fishy had
15 happened and they were looking to get
16 to the bottom of it. I don't recall
17 them telling me when the date of a
18 lawsuit was filed.
19   Q   Have you ever spoken with
20 Richard Roth regarding this matter?
21   A   Richard Roth?  Who is Richard
22 Roth?
23   Q   I said, have you ever spoken
24 with him?
25   A   That name is not familiar to

92

FARIA

1
2 me.
3   Q   You have not recollection of
4 ever speaking with him?
5   A   That's correct.
6   Q   Have you ever spoken or
7 communicated with Lawrence Steckman
8 regarding this lawsuit?
9   A   Yes, that is the lawyer --
10 the EVW lawyers, I believe, under the
11 Ron Burkhardt litigation process.
12 Prior to Mr. Seth they were the Lakens
13 counsel.
14   Q   Have you ever spoken with
15 Robert Rickner?
16   A   Yes.
17   Q   He falls within the EVW
18 lawyers?
19   A   Yes.  There were four or five
20 EVW lawyers.  I have e-mails from --
21 threads.
22   Q   Was Paul Leiberman one of
23 them?
24   A   Sounds familiar, yes.
25   Q   Have you ever spoken with

93

FARIA

1
2 David Boies regarding this lawsuit?
3   A   David Boies does not sound
4 like a familiar name.
5   Q   Anyone at the Boies law firm?
6   A   That does not sound familiar.
7   Q   Have you been retained as an
8 expert in this lawsuit?
9   A   No.  No contract or any
10 information has been offered or
11 provided.  They have, I guess, some
12 sort of deposition, just like what
13 we're doing today, asking information
14 and timeline and processes done.
15   Q   Is XA paying for your time
16 today?
17   A   No.  I have a check for $55
18 that came with the subpoena, but it's
19 still not cashed.  I don't know where
20 that check came from.  I am not being
21 paid for my time.
22   Q   The check was the witness
23 fee, correct?
24   A   I don't know.  I never did a
25 subpoena before.  So I don't know how

24  (Pages 90 to 93)

94

FARIA

1
2 you want me to answer.  I -- this is my
3 first time.  There's a check.  I'm not
4 going to cash a check unless I know
5 exactly who it's from and what the
6 purpose is of it because then it may
7 legally bind me in agreement to
8 something I may not necessarily agree.
9 So the check is right here, I could
10 show you if you'd like.
11    **Q  Why don't you.**
12    A  This document is as I
13 received it.  Left in my office by the
14 server that he could not locate.
15    **Q  This is a check under Federal**
16 **Law that you are entitled to these fees**
17 **as -- for travel and for witness fees**
18 **at a deposition.**
19    A  It barely covers travel.
20    **Q  This is what the statutes**
21 **allow for.  I just want to make sure**
22 **that you understand that it is -- no**
23 **way connotes any agreement to testify**
24 **in any certain way or on behalf of any**
25 **party.**

95

FARIA

1
2    A  Okay.  Thank you.
3    **Q  Starting from the time that**
4 **Mr. Laken contacted you, asked you to**
5 **conduct an investigation on behalf of**
6 **XA, what did you do as part of that**
7 **investigation?**
8    A  So initially we started with
9 the Windstream e-mail recovery.  Then
10 as-needed and when they had questions
11 they would contact me.  So at one
12 point -- I don't recall exactly the
13 timeline, I would have to go back to
14 e-mails, but -- and it may be off.  So
15 at one point the New York Hudson Street
16 office gets closed.  And if my memory
17 serves me correctly Alexis moved
18 anything that they desired to keep to a
19 storage unit somewhere in Newark.  Then
20 I get a call from Barbara that they
21 have to vacate the Chicago office for
22 whatever terms, that the landlord
23 spaces, monies, they couldn't --
24 whatever the reason, they have to
25 vacate the Chicago office.  So along

96

FARIA

1
2 with Barbara and her assistant remotely
3 and over the phone and with eventually
4 remote access to the remaining servers
5 in the Chicago office, under my
6 instruction I -- they said, do we need
7 to keep all the computers?  No, we only
8 need the hard drives.  And in order to
9 save money to only have the data and
10 not have to move the complete physical
11 servers out of the Chicago office, I
12 instructed them to buy a couple of USB
13 drives.  We plugged them into the
14 servers that were functioning in
15 Chicago and proceeded to copy any data
16 off of those servers into said USB
17 drives.  Then --
18    **Q  One second.**
19       **Did you do that personally?**
20    A  I did that myself.
21    **Q  You went to Chicago?**
22    A  I remotely accessed Chicago
23 through the internet and Barbara's
24 laptop.
25    **Q  And they physically plugged**

97

FARIA

1
2 the USB drive into the server?
3    A  They physically plugged the
4 USB drivers or -- I don't recall --
5 there must have been internet.  I don't
6 recall exactly the intermediate steps
7 of the process.  I recall that I
8 remoted into servers and I copied files
9 from the servers into USB drives.
10    **Q  Okay.**
11       **Sorry.  Go ahead.**
12    A  Then there were a series of
13 hard drives that were -- or a server
14 that would not turn on for whatever
15 reason, hardware failure.  So I
16 instructed them to remove those hard
17 drives and label those hard drives
18 appropriately because I, in my
19 possession, had a server of the exact
20 same hardware configuration, and that I
21 would be able to insert those hard
22 drives into said server and bring that
23 server up in order to gain access to
24 whatever data was inside of it.
25       So they proceeded to -- I

DAVID FELDMAN WORLDWIDE, INC. - A VERITEXT COMPANY
330 Old Country Road - Ste. 300, Mineola, NY 11501  1.800.727.4396

98

FARIA

1
2  guess -- it must have happened in this
3  fashion that Barbara sent a package to
4  Alexis, and then Alexis sent a package
5  to my office. I ended up receiving in
6  my office the server that I had set-up
7  new in the first visit to XA New York,
8  and a variety of hard drives from
9  computers from Chicago and New York.
10     Q   Was the package opened by
11  Alexis?
12     A   Well, I don't know what
13  Alexis did or didn't. I'm stating that
14  I received in one package in my office
15  both Chicago and New Jersey. I mean,
16  Chicago and New York hardware in my
17  office. I don't know what happened
18  from the time it left Chicago to the
19  time that it arrived in my office.
20     Q   Is it still in your office
21  today?
22     A   No, sir, it is not.
23     Q   Where is it now?
24     A   Currently right now I believe
25  it's in a -- I believe you have an

99

FARIA

1
2  e-mail in there about a company. Oh,
3  it's in the Midwest.
4     Q   United Lex?
5     A   Sounds like that. United Lex
6  sounds like the company that the
7  hardware is all currently at, as far as
8  I know.
9     Q   When was it provided to a
10  company that sounds like United Lex?
11     A   I would have to look at my
12  e-mails and see when I provided
13  Mr. Laken with the tracking number for
14  the package that went to United Lex.
15     Q   You sent it to the Midwest
16  company?
17     A   I did.
18     Q   Do you know -- what was the
19  purpose of sending it?
20     A   Discovery and recovery of
21  information of the devices.
22     Q   What was the recovery
23  portion?
24     A   The recovery portion comes
25  from the fact that unless a hard drive

100

FARIA

1
2  is overwritten with data, when you
3  delete files off of a hard drive you're
4  literally just deleting the index
5  thereof. So a deep scan of the hard
6  drive therefore has a high likelihood
7  of the ability of data to be recovered.
8     Q   Did you perform a deep scan?
9     A   I performed a scan. Then for
10  the litigation and custody process the
11  company was contracted to do one in a
12  manner which is deemed appropriate for
13  the litigation and the cases.
14     Q   Is the scan that you did not
15  deemed appropriate for litigation?
16     A   Well, I had -- I never wrote
17  any files to the hard drives. I just
18  plugged them in and I ran applications
19  that I have to run the deep scan.
20  There was -- however, the process
21  wasn't entirely up to the best
22  practices so they deemed it necessary
23  to send it out to a company that has
24  more experience in recovery, cataloging
25  and indexing of electronic data in

101

FARIA

1
2  order to assist the Lakens with the
3  litigious process.
4     Q   Do you know whether or not
5  the scan that you performed impacted
6  any of the data on the hard drive?
7     A   From experience and what I
8  know, the scan that I performed did not
9  impact any data on the hard drive.
10     Q   Take a break.
11        (Whereupon, a brief recess
12  was taken.)
13     Q   Did you review -- as part of
14  your investigation, did you review
15  individual XA employees' e-mails?
16     A   No. I provided access and --
17  provided access as requested.
18     Q   What was requested?
19     A   Well, for the Ron
20  Burkhardt -- for the Ron Burkhardt
21  discovery, in order to save the Lakens
22  money with the lawyers I created a
23  sandbox exchange server and uploaded to
24  the server the PST files that I had
25  access to from the Windstream back-up

26  (Pages 98 to 101)

102

FARIA

1
2 that I made upon gaining access. So
3 for the Ron Burkhardt discovery, to
4 make my life easier and to assist the
5 Lakens in their -- in maintaining their
6 costs low, I searched for terms
7 provided by Robert Rickner and his team
8 against the exchange server that I
9 setup to only provide them with valid
10 or -- you know, it was a ridiculous
11 amount of e-mails in terms of size and
12 numbers, so to provide them with a
13 smaller data source in relation to the
14 terms requested.
15        I'm sorry. I did not go
16 through each mailbox and review
17 e-mails. I imported the e-mails -- the
18 PSTs into the exchange server, waited
19 for the exchange server to index, and
20 upon it being ready for index I ran the
21 searches based on terms provided by
22 Robert Rickner and team. And then
23 provided to them to results of the
24 searches. I did not review or
25 investigate any of the employees'

103

FARIA

1
2 e-mails.
3    Q   So you didn't search for
4 e-mails that would suggest that a
5 certain employee was taking an XA
6 business opportunity?
7    A   I did not search e-mails. I
8 provided access to Alexis, and John
9 Winkler and Barbara Laken to anything
10 that they requested in terms of e-mails
11 and things of that nature. I did not
12 search -- and the only search that I
13 did was within the confounds of what I
14 uploaded to the exchange server that I
15 created based on the terms requested
16 during the Ron Burkhardt litigation.
17    Q   You didn't review the content
18 of the e-mail?
19    A   I did not review the contents
20 of the e-mails.
21    Q   Thank you.
22        Did you perform a mirror
23 image of any servers when you were
24 doing your investigation?
25    A   No, I did not.

104

FARIA

1
2    Q   And that's customary to
3 perform a mirror imagine so that you
4 don't lose any data?
5        MR. LEHRMAN:  Form.
6    A   I had not had any experience
7 with recovery and the need requirements
8 of chain custody of -- during the
9 litigious process.
10        I copied active files from
11 the Chicago servers to a USB drive. I
12 did not make any mirror images of any
13 data. I believe that's why everything
14 was sent to United Lex in Kansas City,
15 I think they are, to provide the
16 proper -- the discovery and the
17 recovery under their expertise and
18 ability to comply with the case.
19    Q   Did you review any text
20 messages?
21    A   Review text messages? More
22 detail.
23    Q   Did you gain access to any
24 text messages that were stored on the
25 XA servers or XA company property and

105

FARIA

1
2 deliver that as part of your
3 investigation?
4    A   I don't recall dealing with
5 anything ever related to text messages.
6    Q   Did you find any -- did you
7 do any review of documents or data
8 regarding credit card bills?
9    A   No. I don't recall. I
10 gave -- like I said, I gave access to
11 the -- so when the servers came -- when
12 the box came with the New York and the
13 Chicago information, I turned on the
14 New York server. The hard drives that
15 were brought from Chicago for the
16 server that didn't turn on I inserted
17 into a physical server that I had in
18 good hardware condition. And that's --
19 we were able to boot up from the hard
20 drives from Chicago and gain access to
21 that box. At that point I installed
22 Team Viewer on both of those servers
23 and provided Barbara Laken access to
24 the servers. And to those servers I
25 plugged in the USB drives from Chicago,

27 (Pages 102 to 105)

142

FARIA

1
2     A   Yes.  I exported and
3   downloaded a PST file.
4     Q   And the PST file is the
5   collection of offline e-mail files that
6   you described earlier?
7     A   It's the whole mailbox in
8   offline form.
9     Q   So the whole mailbox includes
10  the e-mails in the mailbox and any
11  attachments to the e-mails?
12    A   E-mails, attachments,
13  contacts, calendar, notes, anything
14  that's -- exists within the mailbox.
15    Q   Other than what you've just
16  described -- and you backed up all of
17  that, correct?
18    A   Yes.  I exported them out of
19  Windstream and then proceeded to delete
20  them from Windstream.
21    Q   And what you just described
22  in terms of what you did in that
23  instance to back-up the user file,
24  which includes the mailbox in the form
25  of a PST file and then to delete the

143

FARIA

1
2   user file, does that accurately reflect
3   what you customarily do in deleting
4   user files?
5     A   Yes.
6     Q   Okay.
7         And, again, just to confirm,
8   in your personal practice, in your IT
9   experience, is it your practice to back
10  up user files in the way you've
11  described before deleting them?
12    A   Yes.
13    Q   Again, go back to your
14  earlier testimony, what you described
15  as, I think it's your second visit to
16  XA's offices in New York, right?
17    A   Yes.
18    Q   And that's the time where
19  your testimony was that Jean Wilson
20  instructed you to delete the user
21  accounts, correct?
22    A   The user profiles from the
23  desktops.
24    Q   And you understood that
25  instruction to require you to delete

144

FARIA

1
2   the user profile, including the mailbox
3   and the PST files; is that correct?
4     A   So the computer keeps a local
5   copy of the PST file.  So you set-up a
6   Outlook, you connect it to the server,
7   it keeps a local file called OST.  And
8   that OST file is the local copy for
9   Outlook which is a similar copy to that
10  on the server.  When you delete the
11  local profile you're only deleting all
12  the local content on that machine.  The
13  online server is a separate entity.
14  And so the second visit to XA I deleted
15  all the local profiles from the
16  desktops.  That transaction on
17  Exhibit 16 is me cleaning up the
18  Windstream online exchange server of
19  user of -- user mailboxes that were no
20  longer needed in order to keep the
21  costs down, the monthly overhead
22  expense cost down.
23    Q   And before you -- during your
24  second visit to XA's New York offices
25  after Jean Wilson instructed you to

145

FARIA

1
2   delete the user profiles, you did
3   delete the user profiles from the local
4   copy as you explained, right?
5     A   Yes.
6     Q   You indicated earlier that
7   you did not first make a backup of
8   those user profiles, correct?
9     A   Right.  I was -- I did not
10  make a backup.  I was not instructed to
11  make a backup.
12    Q   I think you indicated there
13  was some conversation that you had with
14  Jean Wilson after she first instructed
15  you and before you actually deleted the
16  user profile, correct?
17    A   Yes.  I have a habit that
18  before I delete I kind of do -- either
19  search for a number of files or search
20  of size and then look to see what is.
21  So if a profile is only ten megabytes,
22  there's really a very low likelihood of
23  having anything important.  When the
24  profile is two gigs there's a much
25  higher likelihood of having documents

37 (Pages 142 to 145)

146

FARIA

2 or information on there that is needed
3 to be preserved.  Whenever it went on
4 my personal side, that raised the red
5 flag.  And on those occasions I would
6 ask Ms. Jean Wilson, is there anything
7 here that you would like to keep.  I
8 found these files, they're larger than
9 the normal stuff.  It looks to be like
10 the user used this desktop to actually
11 produce work, not to just browse the
12 internet.  And she instructed me to
13 proceed with the deletion of the files.
14     Q   I just want to breakdown this
15 process and the series of
16 communications in a more kind of
17 one-by-one way.
18     A   Okay.
19     Q   So after Ms. Wilson
20 instructed you to delete user profiles,
21 you proceeded to review each user
22 profile one-by-one?
23     A   On each computer, yes.
24     Q   On each computer.
25         And as you reviewed each user

147

FARIA

2 profile on each computer, you were
3 assessing the volume of files
4 associated with that user profile; is
5 that right?
6     A   Yes.
7     Q   And if the volume of files
8 associated with the user profile
9 exceeded a certain amount, that would
10 prompt you to go and confirm with
11 Ms. Wilson whether or not she wanted
12 you to backup any of those files; is
13 that right?
14         MR. MATTHEWS:  Objection.  Go
15 ahead.
16     A   If she wanted to keep a copy
17 before deletion on the server, that's
18 correct.
19     Q   And was there -- and was
20 there one time or more than one time
21 that you went to Ms. Wilson and --
22 strike that.
23         You had indicated that there
24 were, in multiple instances, where you
25 were reviewing individual user profiles

148

FARIA

2 on machines where the volume was
3 significant enough that prompted you to
4 go see Ms. Wilson, right?
5     A   Yes.
6     Q   And on any of those occasions
7 did Ms. Wilson instruct you to save a
8 local copy on that machine before
9 deleting that user profile?
10     A   No.
11     Q   And, again, that practice of
12 not backing up a user profile that had
13 that volume of files associated with it
14 was inconsistent with your personal
15 practice in your line of work; is that
16 right?
17     A   Yes, that's correct.
18     Q   Again, I apologize if I'm
19 repeating something, but in your
20 initial visit to XA's offices in
21 New York, you indicated that you set
22 the server, copier, SonicWall, Firewall
23 rules that would -- that were related
24 to transmission of files between the
25 Chicago and New York office; is that

149

FARIA

2 right?
3     A   Yes.
4     Q   At that time was there a
5 backup system in the New York offices?
6     A   The new server included, as
7 stated, that there was -- a part of the
8 hardware configuration was a cartridge
9 drive, and I installed and set-up the
10 software to run local backups of the
11 New York server into said cartridge.
12 The maintenance and the removal and
13 replacement of cartridges was not a
14 part of my duty, and I don't know under
15 whose control it is.
16     Q   That's what I want to
17 understand.  And I appreciate you
18 clarifying that.
19         So, in other words, the
20 server that you set-up, that was what
21 you then later indicated -- identified
22 as a file server?
23     A   Yes.
24     Q   Right.
25         And the file server had the

38  (Pages 146 to 149)

154

```
1              FARIA
2    understand, what is the -- what you've
3    identified now as the tenant console
4    that you've testified about?
5        A   So Windstream is a service
6    provider that provides exchanges in the
7    cloud such as an Office 365 type of
8    service. So they are basically the
9    landlord. They have the servers, they
10   own the back end, they have everything
11   set up and configured. When you
12   inquire in Windstream about hosting
13   your e-mail server, you have now become
14   a tenant so you only have access to
15   your sandbox, your mailboxes, your
16   whatever it is that you have -- are
17   under contractual obligation with
18   them. Windstream has a landlord style
19   access to all the tenants -- to all the
20   tenants' contents.
21       Q   So this Windstream console,
22   the tenant system that you've
23   described, this was something that you
24   used to access the XA user -- strike
25   that.
```

155

```
1              FARIA
2        When you talked about
3    accessing XA e-mail, it was done in
4    part by -- through the Windstream
5    console you've described; is that
6    right?
7        A   Yes.
8        MR. MATTHEWS: Objection.
9        Q   And when you're using the
10   Windstream console, are you accessing
11   e-mail that exists on a local computer
12   on an e-mail server in the cloud or
13   somewhere else?
14       A   E-mail server in the cloud,
15   the off location wherever Windstream
16   holds their hardware. It's an internet
17   connection to the Windstream
18   infrastructure, if you will, and only
19   having access to your tenant. And any
20   action would produce a log of similar
21   fashion as Exhibit 2.
22       Q   So all the instances in which
23   you personally -- there were instances
24   where you logged in through the
25   Windstream console, correct?
```

156

```
1              FARIA
2        A   Yes.
3        Q   And there would be a log
4    that's -- that could be accessed to
5    identify those occasions where you
6    logged in; is that right?
7        A   Yes.
8        Q   And there would likewise be a
9    log identifying occasions where anyone
10   logged in; is that right?
11       A   That's correct.
12       Q   Another kind of category of
13   work that you did in connection with
14   this was you indicated that you had
15   remotely gotten access to an XA server
16   that was in Chicago, correct?
17       A   Yes.
18       Q   And that Barbara Laken had
19   plugged in USB drives into servers and
20   other computers in Chicago, correct?
21       A   Just servers.
22       MR. MATTHEWS: Objection.
23       Q   Just servers?
24       A   Just servers. The computers,
25   I instructed them to remove the hard
```

157

```
1              FARIA
2    drives.
3        Q   Okay.
4        A   And chuck the hardware and
5    keep the hard drives for recovery.
6        Q   So that's what I want to ask
7    you about.
8        So you had assisted with the
9    remote copying of data from one XA
10   server in Chicago; is that right?
11       A   I believe it was two or three
12   servers, I don't remember exactly.
13       Q   So you had remotely assisted
14   with the copying of data from two or
15   three servers of XA's in Chicago; is
16   that right?
17       A   To the USB drives, that's
18   correct.
19       Q   To the USB drives.
20       And then those USB drives
21   that you had assisted in copying server
22   data onto, were those USB drives
23   included with what you sent to
24   UnitedLex?
25       A   Yes. The copies were done
```

40 (Pages 154 to 157)

174

```
1              FARIA
2      more in response to counsel's
3      questions about being asked if you
4      know if Alexis Laken or Barbara
5      Laken had accessed or searched
6      various e-mail.
7  EXAMINATION BY MR. LEHRMAN:
8      Q   Let's go one-by-one.
9          Did Barbara Laken ever tell
10 you that she had, you know, reviewed
11 files on the USB drives?
12     A   Only after they arrived to me
13 and I set them up and gave them remote
14 access and they indexed on the Windows
15 server, to my knowledge.
16     Q   Did Barbara Laken ever tell
17 you that when the USB drive was in her
18 possession that she was viewing files
19 on the USB drive?
20     A   No.  My understanding was
21 that she packaged it and sent it ASAP.
22     Q   Likewise, did Alexis Laken
23 ever tell you or communicate to you
24 that she had viewed files directly from
25 the USB drives?
```

175

```
1              FARIA
2      A   No, sir.
3      Q   Did Barbara Laken ever
4  express to you that she had viewed any
5  files in any of the hard drives that
6  had been packaged up?
7      A   No, sir.
8      Q   Likewise, had Alexis Laken
9  ever communicated to you that she had
10 reviewed files on any of the hard
11 drives directly from the hard drivers?
12     A   No, sir.
13     Q   Thank you, sir.
14     A   Thank you.
15         (Time noted: 2:10 p.m.)
16
17
18
19
20
21
22
23
24
25
```

176

```
1
2  STATE OF _____ )
3                           ) :ss
4  COUNTY OF _____ )
5
6
7      I, PEDRO FARIA, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10 do hereby certify it to be a true and
11 correct transcript, subject to the
12 corrections, if any, shown on the attached
13 page.
14
15     _____
16         PEDRO FARIA
17
18
19
20 Sworn and subscribed to before
21 me, this        day of
22          , 2018.
23
24     _____
25     Notary Public
```

177

```
1
2       C E R T I F I C A T I O N
3
   STATE OF NEW YORK )
4                    ) ss.:
   COUNTY OF NEW YORK )
5
6      I, JUDITH CASTORE, Shorthand Reporter
7  and Notary Public within and for the State
8  of New York, do hereby certify:
9      That PEDRO FARIA, the witness whose
10 deposition is hereinbefore set forth, was
11 duly sworn by me and that this transcript
12 of such examination is a true record of
13 the testimony given by such witness.
14     I further certify that I am not
15 related to any of the parties to this
16 action by blood or marriage and that I am
17 in no way interested in the outcome of
18 this matter.
19     IN WITNESS WHEREOF, I have hereunto
20 set my hand this 13th day of March, 2018.
21
22
23     - - - - - - - - - - -
       JUDITH CASTORE
24
25
```

45  (Pages 174 to 177)