# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CMG HOLDINGS GROUP, INC. as assignee of     :
XA, THE EXPERIENTIAL AGENCY, INC.,        :     Civil Action No.: 15-cv-05814-JPO
                                         :
                Plaintiff,         :
                                           :
           vs.                  :     **ANSWER TO SECOND AMENDED**
                                         :     <u>**AND REVISED COMPLAINT**</u>
JOSEPH WAGNER, HUDSON GRAY LLC,      :
DARREN ANDERECK, JESSIE LOMMA,       :
MICHAEL DAY, JEAN WILSON, ESTELLE     :
PIZZO, STUDIO AG, LLC, REMIGIO GUDIN,   :
and MIXED COMPANY, INC.,             :
                                         :
               Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH WAGNER, JEFFREY SMITH, DARREN :
ANDERECK, and JESSIE LOMMA,          :
                                         :
              Third-Party Plaintiffs,    :
                                         :
           vs.                  :
                                         :
GLENN LAKEN and ALEXIS LAKEN,       :
                                         :
              Third-Party Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Defendants Joseph Wagner ("Wagner"), HudsonGray, Inc., incorrectly sued herein as

Hudson Gray LLC ("HudsonGray"), Darren Andereck ("Andereck"), Jessie Lomma

("Lomma"), Michael Day ("Day"), Jean Wilson ("Wilson"), Estelle Pizzo ("Pizzo"), Studio AG,

LLC ("Studio AG"), Remigio Gudin ("Gudin"), and Mixed Company, Inc. ("Mixed Company")

(collectively, the "Defendants"), by and through their attorneys, Windels Marx Lane &

Mittendorf, LLP, as and for their Answer to the Second Amended and Revised Complaint (the

"Second Amended Complaint") asserted by Plaintiff CMG Holdings Group, Inc., as assignee of

XA, the Experiential Agency, Inc. ("Plaintiff", "XA", or "CMG" as appropriate), states as follows:

## GENERAL DENIAL OF ALLEGED FRAUDULENT CONDUCT

Defendants categorically deny committing any fraud, or criminal or other unlawful conduct.  Defendants at all times acted in compliance with the law.  Defendants repeatedly disclosed the existence and relationship with their vendors (which Plaintiff terms co-conspirators), personally financed XA's operations, and regularly reported all revenue from operations to Plaintiff.  These allegations, to the extent they can even be understood, have no basis in fact, and this lawsuit is, upon information belief, part of CMG's continuing effort to boost its stock price to enrich its owners at the expense of the public.

## THE ALLEGED FRAUDULENT SCHEME

1.      Defendants deny the allegations in paragraph 1, except admit that from 2009 through 2014, XA had certain high-profile clients and well-paying entertainment industry jobs.

2.      Defendants deny the allegations in paragraph 2.

3.      Defendants deny the allegations in paragraph 3, and respectfully refer all questions of law to the Court.

4.      Defendants deny the allegations in paragraph 4, except admit that some of the Defendants are former employees of XA (not CMG) and current employees of HudsonGray and that some of the Defendants have ownership interests in Studio AG and Mixed Company, and respectfully refer all questions of law to the Court.

## PRELIMINARY STATEMENT

5.      Defendants deny the allegations in paragraph 5, and respectfully refer all questions of law to the Court.

{11250130:6}                                    2

6.       Defendants deny the allegations in paragraph 6.

7.       Defendants deny the allegations in paragraph 7, respectfully refer to the Court to the exhibit referenced in paragraph 7 for the contents thereof, and respectfully refer all questions of law to the Court.

8.       Defendants deny the allegations in paragraph 8.

9.       Defendants deny the allegations in paragraph 9, and respectfully refer all questions of law to the Court.

10.     Defendants deny the allegations in paragraph 10, and respectfully refer all questions of law to the Court.

11.     Defendants deny the allegations in paragraph 11, and respectfully refer all questions of law to the Court.

12.     Defendants deny the allegations in paragraph 12.

13.     Defendants deny the allegations in paragraph 13.

14.     Defendants deny the allegations in paragraph 14, except admit that HudsonGray has offices in the same building as XA did.

15.     Defendants deny the allegations in paragraph 15.

16.     Defendants deny the allegations in paragraph 16.

17.     Defendants deny the allegations in paragraph 17, and assert that HudsonGray was not created in secret and that Defendants did not solicit any XA client while employed by XA.

18.     Defendants deny the allegations in paragraph 18, and respectfully refer all questions of law to the Court.

**PARTIES**

19.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19, except admit that XA previously existed as a Nevada corporation with offices located at 333 Hudson Street, New York, New York 10013.

20.     Defendants deny the allegations in paragraph 20, except admit that Wagner was formerly XA's chief executive officer.

21.     Defendants admit the allegations in paragraph 21.

22.     Defendants deny the allegations in paragraph 22, except admit that Andereck resides at the address stated in the paragraph and resigned from XA on or about May 22, 2014.

23.     Defendants deny the allegations in paragraph 23, except admit that HudsonGray is a marketing agency with offices located 333 Hudson Street, New York, New York 10013, and that HudsonGray was formed on March 14, 2014 and registered to do business in New York on April 23, 2014.

24.     Defendants deny the allegations in paragraph 24, except admit that Studio AG is an Illinois limited liability company with offices at 1800 W. Cuyler Avenue, Chicago, Illinois 60613, and assert that it was formed on December 28, 2009.

25.     Defendants deny the allegations in paragraph 25, except admit that Lomma resides at the address stated in the paragraph and resigned from XA on or about June 13, 2014.

26.     Defendants deny the allegations in paragraph 26, except admit Day resigned from XA on May 20, 2014.

27.     Defendants deny the allegations in paragraph 27, except admit that Pizzo resides at the address stated in the paragraph and is listed as Studio AG's general manager.

28.     Defendants deny the allegations in paragraph 28, except admit that Gudin that resides at the address stated in the paragraph and was an employee of Studio AG and XA.

29.     Defendants deny the allegations in paragraph 29.

## JURISDICTION AND VENUE

30.     Defendants deny the allegations in paragraph 30, and respectfully refer all questions of law to the Court.

31.     Defendants deny the allegations in paragraph 31, and respectfully refer all questions of law to the Court.

## JURY DEMAND

32.     Defendants deny the allegations in paragraph 32, and respectfully refer all questions of law to the Court.

## ALLEGED FACTS

33.     Defendants deny the allegations in paragraph 33, and assert that XA, Inc., the predecessor to XA, was established in August 2000 and was in the experiential marketing business.

34.     Defendants deny the allegations in paragraph 34, and assert that CMG acquired some of the assets and subsidiaries of XA, Inc., which CMG transferred to XA.

35.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35, except deny that XA owed trade creditors monies but had revenues in excess of $10 million, and assert that XA, Inc., the predecessor to XA, owed trade creditors monies and in 2009 had revenues of approximately $5 million.

36.     Defendants deny the allegations in paragraph 36, except deny knowledge or information sufficient to form a belief as to the truth of the allegation that CMG hoped XA

would generate stronger returns, admit that between 2009 and 2014 XA experienced small profits or losses on larger gross revenues, and assert that CMG acquired XA, Inc.'s assets in a procedure in Illinois similar to a bankruptcy sale.

37.     Defendants deny the allegations in paragraph 37.

38.     Defendants deny the allegations in paragraph 38.

39.     Defendants deny the allegations in paragraph 39.

40.     Defendants deny the allegations in paragraph 40, respectfully refer the Court to the employment agreement referenced in paragraph 40 for the terms thereof, and admit that Wagner entered into an employment agreement with XA in or about April 2009 that has since been terminated.

41.     Defendants deny the allegations in paragraph 41.

42.     Defendants deny the allegations in paragraph 42, except admit that Studio AG is a limited liability company owned by Wagner, Andereck, Wilson, and Pizzo, admit that XA paid Studio AG for services rendered in connection with various XA projects, admit that certain defendants acknowledged ownership of Studio AG in their Third-Party Complaint in this action, and respectfully refer the Court to the documents referenced in paragraph 42 for the contents thereof.

43.     Defendants deny the allegations in paragraph 43, except admit that XA Scenes was the event manager for Gallery 1028, a large loft event space in Chicago, between 2009 and 2011, admit that Studio AG performed work for events that took place in Gallery 1028, and admit that, as event manager for Gallery 1028, XA Scenes promoted work performed by Studio AG for events taking place there for which XA Scenes, and therefore XA, received payment because XA Scenes was a d/b/a of XA established by CMG.

44.     Defendants deny the allegations in paragraph 44, except admit that XA employees worked to promote events held at Gallery 1028, which XA managed under the name XA Scenes, and that Studio AG performed services for some events held at Gallery 1028 that were promoted and advertised by XA to generate revenue for XA.  Defendants assert that advertisements touting XA Scenes necessarily supported XA, as XA Scenes was a d/b/a of XA established by CMG.

45.     Defendants deny the allegations in paragraph 45, except admit that XA Scenes had a bank account that contained revenues that rolled up to XA due to XA Scenes being a d/b/a of XA, and assert that CMG and XA knew that XA Scenes was a d/b/a of XA, rather than a "dormant (unused) subsidiary," based upon corporate filings made by XA and the fact that CMG created XA's corporate structure upon acquiring most of XA, Inc.'s assets in 2009 and CMG officers signed documents guaranteeing XA Scenes' contractual obligations, such as XA's Scenes' lease.

46.     Defendants deny the allegations in paragraph 46.

47.     Defendants deny the allegations in paragraph 47, and assert that XA, Inc., the predecessor to XA, purchased Fiori, Inc. in 2004, which became Fiori XA, a wholly owned subsidiary of XA, Inc.  Defendants further assert that CMG did not purchase Fiori XA in 2009, at which time Fiori XA became defunct.  Defendants further assert that Fiori XA, a florist, décor and fabrication company, did not engage in the same business as XA, an experiential marketing agency.

48.     Defendants deny the allegations in paragraph 48, respectfully refer to the emails and spreadsheets referenced in paragraph 48 for the contents thereof, and assert that the allegations in this paragraph all precede XA's existence, and are, as such, irrelevant and immaterial to XA's the claims in this action.  In addition, Defendants assert that Fiori XA,

following its purchase by XA, Inc., was a wholly owned subsidiary of XA, Inc. and often

provided services for XA, Inc.'s client projects, which Defendants expressly advised CMG in

2009 as a reason for the establishment of Studio AG.

49.     Defendants deny the allegations in paragraph 49, except admit that Fiori XA

ordered flowers for events from wholesalers, as florists typically do, rather than grow the flowers

themselves, and assert that Fiori XA often incurred expenses on XA, Inc. projects that were

ultimately billed to the client for whom the services were rendered.

50.     Defendants deny the allegations in paragraph 50, except admit that Wagner,

Andereck, and Wilson formed Studio AG as a limited liability company in 2009, which provided

services similar to those previously provided by Fiori XA.  Defendants assert that CMG refused

to purchase Fiori XA in 2009 when it purchased other assets owned by XA, Inc., the predecessor

to XA, that Wagner, Andereck, and Wilson informed CMG and XA that the services provided by

Fiori XA would be necessary to XA projects, and that, upon CMG's refusal to purchase Fiori XA

or make other arrangements, Wagner, Andereck, and Wilson informed CMG and XA, orally and

in writing, that they were creating Studio AG as an independent company with which XA would

contract to provide the services that Fiori XA formerly provided to XA, Inc.  Defendants further

assert that Pizzo is also an owner of Studio AG, and Defendants have never attempted to conceal

anyone's ownership interest in the company from CMG and, rather, routinely reported to CMG

the monies paid by XA to Studio AG in XA financial statements and numerous emails and

correspondence.

51.     Defendants deny the allegations in paragraph 51, respectfully refer the Court to

the memoranda referenced in paragraph 51 for the contents thereof, and assert that the existence

and purpose of Studio AG was disclosed in writing and orally at the time of, and subsequent to,

its creation.  Defendants further assert that XA's legitimate business relationship with Studio AG was not secret, and was documented in numerous invoices, emails, and other financial documents provided to XA (CMG) periodically for public reporting purposes.

52.     Defendants deny the allegations in paragraph 52, and respectfully refer the Court to the alleged text messages and emails referenced in paragraph 52 for the contents thereof.

53.     Defendants deny the allegations in paragraph 53, and respectfully refer all questions of law to the Court.

54.     Defendants deny the allegations in paragraph 54, respectfully refer the Court to the emails referenced in paragraph 54 for the contents thereof, and assert that Studio AG periodically submitted invoices to XA for services performed at the request of XA, including costs and expenses, and periodically requested payment of those invoices – as would any vendor.

55.     Defendants deny the allegations in paragraph 55, except admit that an XA employee assisted in the design of the Studio AG website, and respectfully refer the Court to the emails referenced in paragraph 55 for the contents thereof.

56.     Defendants deny the allegations in paragraph 56, respectfully refer the Court to the emails referenced in paragraph 56 for the contents thereof, and admit that Katie Hall, a former XA employee and then independent contractor retained to promote events held at Gallery 1028, which was managed by XA under the name XA Scenes, some of which events included work by Studio AG for which XA received revenues, and respectfully refer all questions of law to the Court.

57.     Defendants deny the allegations in paragraph 57, and respectfully refer the Court to the emails referenced in paragraph 57 for the contents thereof, some of which have been

misquoted by Plaintiff. Defendants assert that Studio AG did not exist at that time, such that it could not have, and did not, have any debts.

58.     Defendants deny the allegations in paragraph 58, respectfully refer the Court to the email referenced in paragraph 58 for the contents thereof, deny knowledge or information sufficient to form a belief as to the truth of the allegation that "CMG had no idea Andereck was running a design service out of Studio AG through which he decorated the homes and offices of businesses and high income individuals" such as the individual referenced in the paragraph, deny that Andereck ran a design service out of Studio AG, and admit that NBCUniversal is a client of HudsonGray. Defendants further assert that the logo design for Queens Endoscopy was an XA project, not a Studio AG project.

59.     Defendants deny the allegations in paragraph 59, respectfully refer the Court to the emails referenced in paragraph 59 for the contents thereof, and admit that XA employees promoted events held at Gallery 1028, which was managed by XA under the name XA Scenes, some of which events included work by Studio AG. Defendants assert that the advertisement was for XA and revenue derived from it, if any, went to XA.

60.     Defendants deny the allegations in paragraph 60, and assert that XA's failure to achieve higher profitability resulted from CMG's failure to provide XA with the necessary capital to scale XA's work.

61.     Defendants deny the allegations in paragraph 61, respectfully refer the Court to the documents referenced in paragraph 61 for the contents thereof, and assert that Studio AG was a vendor, and not a customer, of XA.

62.     Defendants deny the allegations in paragraph 62, respectfully refer the Court to the documents referenced in paragraph 62 for the contents thereof, and assert that Studio AG

invoiced XA for equipment purchased by Studio AG for use on XA projects – again, as would any vendor.

63.    Defendants deny the allegations in paragraph 63, and assert that one of Studio AG's lines of business was furniture rental.

64.    Defendants deny the allegations in paragraph 64, except deny knowledge or information sufficient to form a belief as to the truth of the allegation that "the Javits Center exclusively handles such breaking down through union labor contracts, not companies that employ non-union personnel," and assert that XA used non-union labor in conformance with the requirements of events operated at the Javits Center.

65.    Defendants deny the allegations in paragraph 65, except admit that Studio AG featured some of the work it provided for XA clients, as a vendor to XA, on its website, and respectfully refer the Court to the websites referenced in paragraph 65 for the contents thereof.

66.    Defendants deny the allegations in paragraph 66, and respectfully refer the Court to the documents referenced in paragraph 66 for the contents thereof, assert that XA did produce the Grand Opening Event for the W Hotel of Chicago and assert that, with the exception of an occasional courtesy for long-term clients, XA was not in the business of planning weddings.

67.    Defendants deny the allegations in paragraph 67, and respectfully refer the Court to the documents referenced in paragraph 67 for the contents thereof, and assert that, with the exception of an occasional courtesy for long-term clients, XA was not in the business of planning weddings.

68.    Defendants deny the allegations in paragraph 68, respectfully refer the Court to the documents referenced in paragraph 68 for the contents thereof, and assert that, with the

exception of an occasional courtesy for long-term clients, XA was not in the business of planning weddings.

69.       Defendants deny the allegations in paragraph 69, except admit that Studio AG orders flowers and vases for specified booked event from wholesale florists and vase suppliers, as do most florists, and assert that Studio AG charged XA for various expenses incurred and services performed for XA projects, which XA ultimately billed to the client.

70.       Defendants deny the allegations in paragraph 70, admit that Studio AG did not pay XA for providing support services to XA, and assert that Studio AG supported XA by providing services for XA projects that XA could not efficiently provide itself, for which services XA charged to its clients and paid monies to Studio AG – like it did for any other vendor.

71.       Defendants deny the allegations in paragraph 71, and assert that Studio AG was never "enriched."

72.       Defendants deny the allegations in paragraph 72, except admit that CMG Board members occasionally contacted Wagner concerning XA's level of profit, admit that Wagner asserted that XA could not be more profitable due to CMG's lack of financial support to XA, deny knowledge or information sufficient to form a belief as to the truth of the allegation that Board members relied upon auditor's reports concerning XA's finances, except admit that such financial statements were audited, and admit that Wagner stated that XA could only be profitable if revenues exceeded costs.  Defendants assert that CMG and its Board members received audited financial reports from XA on a quarterly basis and had access to all financial documents maintained by XA, which disclosed all of XA's dealings with Studio AG and other entities, which dealings were legitimate and were not secret.

73.     Defendants deny knowledge or information sufficient to form a belief as to whether "XA was a valuable asset to CMG's company profile, as a high earning, if unprofitable subsidiary", and admit that CMG did not provide the additional capital necessary for XA to become profitable, admit that Wagner advised CMG of the needed capital, and assert that CMG failed to provide the needed capital.

74.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74, except admit that Ronald Burkhardt ("Burkhardt") was hired as the Executive Chairman of XA in 2014.

75.     Defendants deny the allegations in paragraph 75, and assert that Glenn Laken ("Laken"), who had been running CMG without disclosing his status as an insider, stated to Wagner at the time that Laken hired Burkhardt, "I came here to fire you tonight."

76.     Defendants deny the allegations in paragraph 76, except admit that HudsonGray was formed in March 2014.

77.     Defendants deny the allegations in paragraph 77, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning XA's knowledge of the formation of HudsonGray.

78.     Defendants deny the allegations in paragraph 78.

79.     Defendants deny the allegations in paragraph 79, and assert that XA employees used personal cell phone numbers on which to conduct XA business, XA purchased cell phones for certain employees, and XA purchased new cell phones in 2014 for certain employees due to service issues.  Defendants further assert that after receiving a new cell phone, it is customary and necessary to port information, such as contact numbers, to the new cell phone.  Defendants further assert that XA did not have corporate credit cards.

80.     Defendants deny the allegations in paragraph 80, respectfully refer the Court to the emails referenced in paragraph 80 for the contents thereof, and respectfully refer all questions of law to the Court.

81.     Defendants deny the allegations in paragraph 81, except admit that David Tuma worked as an IT specialist for XA, admit that Tuma advised employees on porting information from old cell phones to new cell phones for use at XA, and assert that XA did not possess any proprietary or intellectual information.

82.     Defendants deny the allegations in paragraph 82.

83.     Defendants deny the allegations in paragraph 83, respectfully refer the Court to the alleged text messages, security records, and photos referenced in paragraph 83 for the contents thereof, deny knowledge or information sufficient to form a belief as to the truth of the allegation that Gudin left his phone at XA with voicemail and email service intact, assert that the duratrans referenced in paragraph 83 were used for an XA project, billed to an XA client, and discarded, assert that the furniture removed from XA offices by any Defendant was the property of such Defendant and not XA, and assert that the chandeliers referenced in paragraph 83 were used for an XA project and were not installed in HudsonGray's offices.

84.     Defendants deny the allegations in paragraph 84, and respectfully refer all questions of law to the Court.

85.     Defendants deny the allegations in paragraph 85, and respectfully refer the Court to the documents referenced in paragraph 85 for the contents thereof.

86.     Defendants deny the allegations in paragraph 86, except admit that Gudin is a citizen of Spain and that XA sponsored Gudin's visa application.

87.   Defendants deny the allegations in paragraph 87, except deny knowledge or information sufficient to form a belief as to the truth of the allegation that XA reviewed the contents of Gudin's phone.

88.   Defendants deny the allegations in paragraph 88, except admit that Gudin was an employee of XA and that he received payment from XA for his work as an employee and, prior to that, as an independent contractor.

89.   Defendants deny the allegations in paragraph 89, except admit that Wagner negotiated two releases with XA as a result of XA's repeated failure to pay agreed upon wages to Wagner.

90.   Defendants deny the allegations in paragraph 90, except admit that Wagner entered into an employment contract with XA on or about April 1, 2009, and respectfully refer the Court to the Employment Contract referenced in paragraph 90 for the terms thereof.

91.   Defendants admit the allegations in paragraph 91.

92.   Defendants deny the allegations in paragraph 92, and respectfully refer the Court to the release referenced in paragraph 92 for the terms thereof.

93.   Defendants deny the allegations in paragraph 93, and respectfully refer all questions of law to the Court.

94.   Defendants deny the allegations in paragraph 94, respectfully refer the Court to the release agreement referenced in paragraph 94 for the terms thereof, and admit that Wagner and XA entered into a second release agreement on or about April 22, 2014. Defendants assert that no section of the first release agreement is quoted in the Second Amended Complaint and that no section of the first release agreement contemplates the execution of a second release agreement.

95.    Defendants deny the allegations in paragraph 95, except admit that HudsonGray was formed in March 2014.

96.    Defendants deny the allegations in paragraph 96, respectfully refer the Court to the release agreement referenced in paragraph 96 for the terms thereof, and respectfully refer all questions of law to the Court.

97.    Defendants deny the allegations in paragraph 97, respectfully refer the Court to the release agreement referenced in paragraph 97 for the terms thereof, and respectfully refer all questions of law to the Court.

98.    Defendants deny the allegations in paragraph 98, respectfully refer the Court to the documents referenced in paragraph 98 for the terms thereof, and respectfully refer all questions of law to the Court.

99.    Defendants deny the allegations in paragraph 99, except admit that HudsonGray has handled projects for NBCUniversal, as is permitted by law.

100.    Defendants deny the allegations in paragraph 100, except deny knowledge or information sufficient to form a belief as to the truth of allegations concerning whether money was paid to XA after the HudsonGray Defendants ceased employment with XA.

101.    Defendants deny the allegations in paragraph 101.

102.    Defendants deny the allegations in paragraph 102.

103.    Defendants deny the allegations in paragraph 103, and assert that no XA clients were solicited by any of the Defendants while employed by XA.

104.    Defendants deny the allegations in paragraph 104.

105.    Defendants deny the allegations in paragraph 105, except deny knowledge or information sufficient to form a belief as to the truth of allegations concerning the basis of XA's mistaken belief that Defendants stole office furniture.

106.    Defendants deny the allegations in paragraph 106, and assert that XA's business model required the purchase of numerous physical items for use at a specific event or for a specific campaign, many of which items were discarded after the event or campaign as it would be highly unlikely that the items would be useful for any subsequent event or campaign. Defendants further assert that such items were billed to the client, and were not paid for by XA.

107.    Defendants deny the allegations in paragraph 107, except admit that Lomma, Day, and Gudin are employees of HudsonGray.

108.    Defendants deny the allegations in paragraph 108, except admit that NBCUniversal unveils its fall lineup to advertisers at their "upfront" event to sell advertising, and admit that NBCUniversal's "upfront" event in 2015 took place at the Javits Center in May 2015.

109.    Defendants deny the allegations in paragraph 109, except deny knowledge or information sufficient to form a belief as to the truth of allegations concerning what documents, if any, XA recovered from its servers, and refer to the alleged documents referenced in paragraph 109 for the contents thereof.

110.    Defendants deny the allegations in paragraph 110, except admit that XA helped manage NBCUniversal's "upfront" event in 2014, and deny knowledge or information sufficient to form a belief as to the truth of allegations concerning the basis of XA's mistaken belief that Defendants diverted XA business to another entity.

111.    Defendants deny the allegations in paragraph 111.

112.    Defendants deny the allegations in paragraph 112, except deny knowledge or information sufficient to form a belief as to the truth of allegations concerning what NBCUniversal executives knew about the DIG project, and refer to the emails referenced in paragraph 112 for the contents thereof.

113.    Defendants deny the allegations in paragraph 113.

114.    Defendants deny the allegations in paragraph 114, and deny knowledge or information sufficient to form a belief as to the truth of allegations concerning what monies XA received after the Defendants resigned or what documents XA currently possesses.

115.    Defendants deny knowledge or information sufficient to form a belief as to the truth of allegations in paragraph 115, and refer to the emails referenced in paragraph 115 for the contents thereof.

116.    Defendants deny knowledge or information sufficient to form a belief as to the truth of allegations in paragraph 116, except admit that HudsonGray was handling NBCUniversal projects in September 2014.

117.    Defendants deny the allegations in paragraph 117, respectfully refer the Court to the Release Agreement signed on or about April 22, 2014 for the terms thereof, and respectfully refer all questions of law to the Court.

118.    Defendants deny the allegations in paragraph 118, and respectfully refer the Court to the alleged Handbook provisions referenced in paragraph 118 for the contents thereof.

119.    Defendants deny the allegations in paragraph 119.

120.    Defendants deny knowledge or information sufficient to form a belief as to the truth of allegations in paragraph 120.

121.    Defendants deny the allegations in paragraph 121, except deny knowledge or information sufficient to form a belief as to the truth of allegations concerning what documents are in XA's offices, and respectfully refer the Court to the alleged Handbook provisions referenced in paragraph 121 for the contents thereof.

122.    Defendants deny the allegations in paragraph 122, except deny knowledge or information sufficient to form a belief as to the truth of allegations concerning what documents are in XA's offices, and respectfully refer the Court to the documents referenced in paragraph 122 for the contents thereof.

123.    Defendants deny knowledge or information sufficient to form a belief as to the truth of allegations in paragraph 123.

124.    Defendants deny the allegations in paragraph 124, except admit that XA had a policy of issuing a handbook to "new employees", i.e., primarily those who worked in the public relations department, and requesting that they return the signature page.

125.    Defendants deny the allegations in paragraph 125, except deny knowledge or information sufficient to form a belief as to the truth of allegations concerning the basis for XA's mistaken belief that the Individual HudsonGray Defendants each signed an XA Handbook, and respectfully refer the Court to the documents referenced in paragraph 125 for the contents thereof, and admit that various non-disclosure agreements were requested from vendors and subcontractors as well as potential business acquisition targets.

126.    Defendants deny the allegations in paragraph 126, except admit that Wilson was the COO of XA, and respectfully refer the Court to the Handbook page referenced in paragraph 126 for the contents thereof.

127.    Defendants deny the allegations in paragraph 127.

128.    Defendants deny the allegations in paragraph 128, and respectfully refer the Court to the Handbook provisions referenced in paragraph 128 for the contents thereof.

129.    Defendants deny the allegations in paragraph 129, and respectfully refer the Court to the Handbook provisions referenced in paragraph 129 for the contents thereof.

130.    Defendants deny the allegations in paragraph 130, and respectfully refer the Court to the Handbook provisions referenced in paragraph 130 for the contents thereof.

131.    Defendants deny the allegations in paragraph 131.

132.    Defendants deny the allegations in paragraph 132, and respectfully refer the Court to the Handbook provisions referenced in paragraph 132 for the contents thereof.

133.    Defendants deny the allegations in paragraph 133, and respectfully refer the Court to the Handbook provisions referenced in paragraph 133 for the contents thereof.

134.    Defendants deny the allegations in paragraph 134, and respectfully refer the Court to the Handbook provisions referenced in paragraph 134 for the contents thereof.

135.    Defendants deny the allegations in paragraph 135.

136.    Defendants deny the allegations in paragraph 136, except admit that Wilson knew the importance of accurate timekeeping records, and respectfully refer the Court to the Handbook provisions referenced in paragraph 136 for the contents thereof.

137.    Defendants deny the allegations in paragraph 137, and respectfully refer all questions of law to the Court.

138.    Defendants deny the allegations in paragraph 138, and respectfully refer the Court to the Handbook provisions referenced in paragraph 138 for the contents thereof.

139.    Defendants deny the allegations in paragraph 139.

140.    Defendants the allegations in paragraph 140, and assert that Defendants did not delete all emails from XA computers.

141.    Defendants deny the allegations in paragraph 141, except deny knowledge or information sufficient to form a belief as to the truth of allegations concerning which documents are possessed by XA and the basis for XA's mistaken belief that the Defendants emails and computer files, and assert that Defendants did not delete emails or computer files upon their departure from XA.

142.    Defendants deny the allegations in paragraph 142, respectfully refer the Court to the email referenced in paragraph 142 for the contents thereof, and assert that following up on matters handled by a recently departed employee is a standard and necessary practice for businesses.

143.    Defendants deny the allegations in paragraph 143, respectfully refer the Court to the email referenced in paragraph 143 for the contents thereof, admit that Lomma resigned from XA in June 2014, and assert that changing the email password for a recently departed employee is a standard and necessary practice for businesses.

144.    Defendants deny the allegations in paragraph 144.

145.    Defendants deny the allegations in paragraph 145.

146.    Defendants deny the allegations in paragraph 146, respectfully refer the Court to the documents referenced in paragraph 146 for the contents thereof, and assert that NBCUniversal paid XA, not HudsonGray, for the work that XA performed for NBCUniversal's 2014 Upfront.

147.    Defendants deny the allegations in paragraph 147.

148.    Defendants deny the allegations in paragraph 148, and assert that NBCUniversal did not retain XA for the referenced project.

### FIRST CLAIM FOR RELIEF
#### (Violations of 18 U.S.C. § 1962(c))
#### Against All RICO Defendants

149.    In response to paragraph 149, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 148 with the same force and effect as though fully set forth herein.

150.    Defendants deny the allegations in paragraph 150, respectfully refer the Court to the statute referenced in paragraph 150 for the contents thereof, and respectfully refer all questions of law to the Court.

151.    Defendants deny the allegations in paragraph 151, respectfully refer the Court to the statute referenced in paragraph 151 for the contents thereof, and respectfully refer all questions of law to the Court.

152.    Defendants deny the allegations in paragraph 152, respectfully refer the Court to the statute referenced in paragraph 152 for the contents thereof, and respectfully refer all questions of law to the Court.

153.    Defendants state that no response is necessary to paragraph 153.  To the extent a response is necessary, Defendants deny the allegations in paragraph 153.

154.    Defendants state that no response is necessary to paragraph 154.  To the extent a response is necessary, Defendants deny the allegations in paragraph 154.

155.    Defendants deny the allegations in paragraph 155, admit there were email and telephone communications between employees of XA between the New York and Chicago offices, and respectfully refer all questions of law to the Court.

156.   Defendants deny the allegations in paragraph 156.

157.   Defendants deny the allegations in paragraph 157, and respectfully refer all questions of law to the Court.

158.   Defendants deny the allegations in paragraph 158.

159.   Defendants deny the allegations in paragraph 159.

160.   Defendants deny the allegations in paragraph 160, respectfully refer the Court to the statute referenced in paragraph 160 for the contents thereof, and respectfully refer all questions of law to the Court.

161.   Defendants deny the allegations in paragraph 161.

162.   Defendants deny the allegations in paragraph 162.

163.   Defendants deny the allegations in paragraph 163, and respectfully refer all questions of law to the Court.

164.   Defendants deny the allegations in paragraph 164.

165.   Defendants deny the allegations in paragraph 165.

166.   Defendants deny the allegations in paragraph 166, respectfully refer the Court to the statute referenced in paragraph 166 for the contents thereof, and respectfully refer all questions of law to the Court.

167.   Defendants deny the allegations in paragraph 167, respectfully refer the Court to the statute referenced in paragraph 167 for the contents thereof, and respectfully refer all questions of law to the Court.

168.   Defendants deny the allegations in paragraph 168, respectfully refer the Court to the statute referenced in paragraph 168 for the contents thereof, and respectfully refer all questions of law to the Court.

169.    Defendants deny the allegations in paragraph 169.

170.    Defendants deny the allegations in paragraph 170.

171.    Defendants deny the allegations in paragraph 171.

172.    Defendants deny the allegations in paragraph 172.

173.    Defendants deny the allegations in paragraph 173, and respectfully refer all questions of law to the Court.

174.    Defendants deny the allegations in paragraph 174, and respectfully refer all questions of law to the Court.

175.    Defendants deny the allegations in paragraph 175, and respectfully refer all questions of law to the Court.

176.    Defendants deny the allegations in paragraph 176, and respectfully refer all questions of law to the Court.

177.    Defendants deny the allegations in paragraph 177, and respectfully refer all questions of law to the Court.

178.    Defendants deny the allegations in paragraph 178, and respectfully refer the Court to the emails referenced in paragraph 178 for the contents thereof.

179.    Defendants deny the allegations in paragraph 179, admit that Wagner received certain money owed to him pursuant to a settlement agreement with XA, and admit that Wagner arranged for the formation of HudsonGray on or about March 14, 2014.

180.    Defendants deny the allegations in paragraph 180, and respectfully refer the Court to the emails referenced in paragraph 180 for the contents thereof.

181.    Defendants deny the allegations in paragraph 181, and respectfully refer the Court to the emails referenced in paragraph 181 for the contents thereof.

182.   Defendants deny the allegations in paragraph 182, and respectfully refer the Court to the emails referenced in paragraph 182 for the contents thereof.

183.   Defendants deny the allegations in paragraph 183, and respectfully refer the Court to the emails and text messages referenced in paragraph 183 for the contents thereof.

184.   Defendants deny the allegations in paragraph 184, and assert that the existence, ownership, and purpose of Studio AG was disclosed in written memoranda to XA and CMG.

185.   Defendants deny the allegations in paragraph 185, and assert that Defendants did not engage in any criminal misconduct.

186.   Defendants deny the allegations in paragraph 186.

187.   Defendants deny the allegations in paragraph 187, and respectfully refer all questions of law to the Court.

188.   Defendants deny the allegations in paragraph 188, and respectfully refer all questions of law to the Court.

189.   Defendants deny the allegations in paragraph 189, and respectfully refer all questions of law to the Court.

190.   Defendants deny the allegations in paragraph 190.

191.   Defendants deny the allegations in paragraph 191.

192.   Defendants deny the allegations in paragraph 192.

193.   Defendants deny the allegations in paragraph 193.

194.   Defendants deny the allegations in paragraph 194.

195.   Defendants deny the allegations in paragraph 195, and respectfully refer all questions of law to the Court.

196.   Defendants deny the allegations in paragraph 196.

197.    Defendants deny the allegations in paragraph 197.

198.    Defendants deny the allegations in paragraph 198, and respectfully refer all questions of law to the Court.

199.    Defendants deny the allegations in paragraph 199, and respectfully refer all questions of law to the Court.

200.    Defendants deny the allegations in paragraph 200, and respectfully refer all questions of law to the Court.

201.    Defendants deny the allegations in paragraph 201, and respectfully refer all questions of law to the Court.

202.    Defendants deny the allegations in paragraph 202, and respectfully refer all questions of law to the Court.

203.    Defendants deny the allegations in paragraph 203.

204.    Defendants deny the allegations in paragraph 204, and respectfully refer all questions of law to the Court.

205.    Defendants deny the allegations in paragraph 205.

206.    Defendants deny the allegations in paragraph 206.

207.    Defendants deny the allegations in paragraph 207.

208.    Defendants deny the allegations in paragraph 208, respectfully refer the Court to the statute referenced in paragraph 208 for the contents thereof, and respectfully refer all questions of law to the Court.

209.    Defendants deny the allegations in paragraph 209, and respectfully refer all questions of law to the Court.

## SECOND CLAIM FOR RELIEF
### (Violations of 18 U.S.C. § 1962(d))
### Against Wilson, Wagner, Andereck, Lomma, Mixed Company, Day and Gudin

210.   In response to paragraph 210, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 209 with the same force and effect as though fully set forth herein.

211.   Defendants deny the allegations in paragraph 211, respectfully refer the Court to the statute referenced in paragraph 211 for the contents thereof, and respectfully refer all questions of law to the Court.

212.   Defendants deny the allegations in paragraph 212.

213.   Defendants deny the allegations in paragraph 213, and respectfully refer all questions of law to the Court.

214.   Defendants deny the allegations in paragraph 214, and respectfully refer the Court to the documents referenced in paragraph 214 for the contents thereof.

215.   Defendants deny the allegations in paragraph 215, and respectfully refer the Court to the documents referenced in paragraph 215 for the contents thereof.

216.   Defendants deny the allegations in paragraph 216.

217.   Defendants deny the allegations in paragraph 217.

218.   Defendants deny the allegations in paragraph 218, and respectfully refer all questions of law to the Court.

219.   Defendants deny the allegations in paragraph 219, and respectfully refer all questions of law to the Court.

220.   Defendants deny the allegations in paragraph 220, and respectfully refer all questions of law to the Court.

### THIRD CLAIM FOR RELIEF
### (Breach of Contract)
### Against the Individual HudsonGray Defendants

221.     In response to paragraph 221, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 220 with the same force and effect as though fully set forth herein.

222.     Defendants state that no responsive pleading is necessary as to the allegations in paragraphs 222-226, as the Court dismissed XA's Third Claim for Relief in its Opinion and Order dated September 7, 2016.   To the extent a response is required, Defendants deny the allegations made in paragraphs 222-226.

### FOURTH CLAIM FOR RELIEF
### (For Injunctive Relief and Constructive Trust)
### Against HudsonGray and the HudsonGray Defendants

223.     In response to paragraph 227, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 226 with the same force and effect as though fully set forth herein.

224.     Defendants state that no responsive pleading is necessary as to the allegations in paragraphs 228-233, as the Court dismissed XA's Fourth Claim for Relief in its Opinion and Order dated September 7, 2016.   To the extent a response is required, Defendants deny the allegations made in paragraphs 228-233.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty)**
**Against the HudsonGray Defendants[1]**

225.    In response to paragraph 234, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 233 with the same force and effect as though fully set forth herein.

226.    Defendants deny the allegations in paragraph 235, and respectfully refer all questions of law to the Court.

227.    Defendants deny the allegations in paragraph 236.

228.    Defendants deny the allegations in paragraph 237, and respectfully refer all questions of law to the Court.

**SIXTH CLAIM FOR RELIEF**
**(Breach of the Faithless Servant Doctrine)**
**Against the Individual HudsonGray Defendants**

229.    In response to paragraph 238, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 237 with the same force and effect as though fully set forth herein.

230.    Defendants deny the allegations in paragraph 239, and respectfully refer all questions of law to the Court.

231.    Defendants deny the allegations in paragraph 240, and respectfully refer all questions of law to the Court.

232.    Defendants deny the allegations in paragraph 241, and respectfully refer all questions of law to the Court.

---

[1] The Court dismissed this claim as against Gudin.   Therefore, no response is necessary from Gudin as to the fifth claim for relief.

### SEVENTH CLAIM FOR RELIEF
### (Tortious Interference with Contractual Relations)
### Against Wilson, Wagner, Andereck, Studio AG, and HudsonGray

233.    In response to paragraph 242, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 241 with the same force and effect as though fully set forth herein.

234.    Defendants deny the allegations in paragraph 243.

235.    Defendants deny the allegations in paragraph 244.

236.    Defendants deny the allegations in paragraph 245, and respectfully refer all questions of law to the Court.

237.    Defendants deny the allegations in paragraph 246, and respectfully refer all questions of law to the Court.

### EIGHTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty)
### Against the HudsonGray Defendants and the Studio AG Defendants[2]

238.    In response to paragraph 247, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 246 with the same force and effect as though fully set forth herein.

239.    Defendants deny the allegations in paragraph 248, and respectfully refer all questions of law to the Court.

240.    Defendants deny the allegations in paragraph 249, and respectfully refer all questions of law to the Court.

241.    Defendants deny the allegations in paragraph 250.

---

[2] The Court dismissed this claim as against Gudin. Therefore, no response is necessary from Gudin as to the eighth claim for relief.

242.   Defendants deny the allegations in paragraph 251, and respectfully refer all questions of law to the Court.

### NINTH CLAIM FOR RELIEF
#### (Misappropriation and Unfair Competition)
#### Against the HudsonGray Defendants and the Studio AG Defendants

243.   In response to paragraph 252, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 251 with the same force and effect as though fully set forth herein.

244.   Defendants deny the allegations in paragraph 253.

245.   Defendants deny the allegations in paragraph 254.

246.   Defendants deny the allegations in paragraph 255, and assert that XA's clients were listed on its website and were public information.

247.   Defendants deny the allegations in paragraph 256, and respectfully refer all questions of law to the Court.

248.   Defendants deny the allegations in paragraph 257.

249.   Defendants deny the allegations in paragraph 258, and respectfully refer all questions of law to the Court.

### TENTH CLAIM FOR RELIEF
#### (Theft of Corporate Opportunities and
#### Aiding and Abetting the Theft of Corporate Opportunities)
#### Against the HudsonGray Defendants and the Studio AG Defendants[3]

250.   In response to paragraph 259, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 258 with the same force and effect as though fully set forth herein.

251.   Defendants deny the allegations in paragraph 260.

---

[3] This claim was dismissed by the Court as against HudsonGray, Studio AG, Mixed Company, and Pizzo. Thus, no response is necessary from those defendants to the tenth claim for relief.

252.   Defendants deny the allegations in paragraph 261.

253.   Defendants deny the allegations in paragraph 262.

254.   Defendants deny the allegations in paragraph 263, and respectfully refer all questions of law to the Court.

255.   Defendants deny the allegations in paragraph 264, and respectfully refer all questions of law to the Court.

**ELEVENTH CLAIM FOR RELIEF**
**(Tortious Interference with Business Relationships)**
**Against the HudsonGray Defendants and the Studio AG Defendants**

256.   In response to paragraph 265, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 264 with the same force and effect as though fully set forth herein.

257.   Defendants deny the allegations in paragraph 266, except admit that XA formerly performed work for NBCUniversal and other companies.

258.   Defendants deny the allegations in paragraph 267.

259.   Defendants deny the allegations in paragraph 268, and respectfully refer all questions of law to the Court.

260.   Defendants deny the allegations in paragraph 269.

261.   Defendants deny the allegations in paragraph 270, and respectfully refer all questions of law to the Court.

### TWELFTH CLAIM FOR RELIEF
### (Tortious Interference with Prospective Advantage)
### Against the HudsonGray Defendants and the Studio AG Defendants

262.    In response to paragraph 271, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 270 with the same force and effect as though fully set forth herein.

263.    Defendants deny the allegations in paragraph 272.

264.    Defendants deny the allegations in paragraph 273.

265.    Defendants deny the allegations in paragraph 274, and respectfully refer all questions of law to the Court.

266.    Defendants deny the allegations in paragraph 275, and respectfully refer all questions of law to the Court.

267.    Defendants deny the allegations in paragraph 276.

268.    Defendants deny the allegations in paragraph 277, and respectfully refer all questions of law to the Court.

### THIRTEENTH CLAIM FOR RELIEF
### (Conversion of XA Property)
### Against HudsonGray and the HudsonGray Defendants

269.    In response to paragraph 278, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 277 with the same force and effect as though fully set forth herein.

270.    Defendants deny the allegations in paragraph 279, and respectfully refer all questions of law to the Court.

271.    Defendants deny the allegations in paragraph 280.

272.    Defendants deny the allegations in paragraph 281.

273.    Defendants deny the allegations in paragraph 282, and respectfully refer all questions of law to the Court.

274.    Defendants deny the allegations in paragraph 283, and respectfully refer all questions of law to the Court.

## FOURTEENTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### Against HudsonGray Defendants and the Studio AG Defendants

275.    In response to paragraph 284, Defendants repeat and reiterate each and every response to the allegations contained in paragraphs 1 through 283 with the same force and effect as though fully set forth herein.

276.    Defendants deny the allegations in paragraph 285, and respectfully refer all questions of law to the Court.

277.    Defendants deny the allegations in paragraph 286, and respectfully refer all questions of law to the Court.

278.    Defendants deny the allegations in paragraph 287, and respectfully refer all questions of law to the Court.

279.    Defendants deny the allegations in paragraph 288.

280.    Defendants deny the allegations in paragraph 289.

281.    Defendants deny the allegations in paragraph 290, and respectfully refer all questions of law to the Court.

## PUNITIVE DAMAGES

282.    Defendants deny the allegations in paragraph 291, and respectfully refer all questions of law to the Court.

283.    Defendants deny the allegations in paragraph 292, and respectfully refer all questions of law to the Court.

284.    Defendants deny the allegations in paragraph 293, and respectfully refer all questions of law to the Court.

285.    Defendants deny the allegations in paragraph 294, and respectfully refer all questions of law to the Court.

286.    Defendants deny the allegations in paragraph 295, and respectfully refer all questions of law to the Court.

### AFFIRMATIVE AND OTHER DEFENSES

### AS AND FOR A FIRST DEFENSE

287.    The Second Amended Complaint fails to state a claim for relief against Defendants.

### AS AND FOR A SECOND DEFENSE

288.    Plaintiff's equitable claims are barred by the doctrine of unclean hands.

289.    CMG / XA, under the control of Glenn Laken ("Laken") and Alexis Laken, has committed numerous unlawful acts with respect to the subject matter of this dispute that preclude its ability to obtain equitable relief.

290.    Upon Laken taking formal control over CMG / XA in 2014, after operating the company under the guise of being a consultant, the Individual HudsonGray Defendants became concerned about affiliating with Laken due to the fact that he was previously convicted for racketeering conspiracy, wire fraud, illegal kickbacks, theft of honest services, conspiracy to commit the above substantive offenses and to commit union pension fund fraud, securities fraud,

fraud by an investment advisor, conspiracy to commit securities fraud, wire fraud, and commercial bribery. *See, generally, United States v. Reifler*, 446 F.3d 65, 70 (2d Cir. 2006).

291.   In 2014, moreover, Laken directed Wagner and Ronald Burkhardt, then XA's Executive Chairman, to arrange for an Internet consulting firm to "scrub" Laken's "Google listing" so that Internet searches of Laken's name would not display information related to Laken's prior arrest, indictment and conviction.

292.   Following the initiation of this litigation in September 2014 and as a result of the investigation conducted by Wagner and counsel, it has become clear that this litigation against Wagner and the other Defendants is in part a scheme by Laken to conceal his illegal and unethical actions relating to CMG including:

- acting as a control person for CMG without proper disclosure
- violating insider trading laws through illegal trading of CMGO stock

293.   According to an affidavit executed by Sol Mlot attached as Exhibit 1 hereto, in April 2012 Laken began directing Sol Mlot to trade Mlot's CMGO stock, and Laken also directly traded Mlot's CMGO stock using Mlot's trading account credentials.  Laken did not disclose his control of Mlot's stock in any public filing.  This unlawful trading activity of 14 million shares of CMGO stock by Laken based on material non-public information, a clear violation of the securities laws, is memorialized in a June 29, 2013 agreement between Laken and Mlot. *See* June 29, 2013 Agreement between Glenn Laken and Sol Mlot attached as Exhibit 2 hereto.

294.   This Agreement was acknowledged by letter dated June 18, 2014 attached as Exhibit 3 hereto issued by CMG's attorney, Darren Ofsink, who was indicted in 2015 on charges of securities fraud, conspiracy to commit securities fraud, and conspiracy to commit mail fraud and wire fraud. *See* Superseding Indictment dated November 2, 2015 attached as Exhibit 4 hereto.

295.    At the same time, Laken was acting as a "control person" for CMG by directing corporate management and policies, and also having full access to insider information regarding CMG and its subsidiaries through his direct communication with CMG's corporate officers, auditor and accountant.  For example, Laken signed the Release Agreement entered into with Wagner on February 26, 2014 as "Chairman / CEO", and then, on February 27, 2014, directed Wilson to transfer CMG funds, again signing as the "Chairman / CEO", several weeks prior to his supposed appointment by the Board. *See* Agreement and Wire Transfer Authorization attached as Exhibit 5 hereto.

296.    CMG did not disclose Laken's role as a control person within CMG until the April 7, 2014 public filing in which Laken was named as Chairman and CEO.  *See* Form 8-K attached as Exhibit 6 hereto.

297.    CMG / XA, under Laken's control, also manipulated the stock of CMGO by making false and defamatory statements concerning this lawsuit, including the July 16, 2015 press release advertising to sell a "new class of series A preferred shares that will have first priority payout from any litigation settlement" to attract "capital to support CMG's ongoing civil RICO (Racketeer Influenced and Corrupt Organizations) lawsuit against former employees seeking total damages of $20 million.") *See* Press Release attached as Exhibit 6 hereto.

298.    As a result of this, and other, wrongful conduct, Plaintiff's claims for equitable relief must be denied and Plaintiff's claim for punitive damages considered in light of Plaintiff's own wrongful conduct.

## AS AND FOR A THIRD DEFENSE

299.    Defendants acted at all times fairly towards Plaintiff, in good faith and in a commercially reasonable manner.

### AS AND FOR A FOURTH DEFENSE

300.    The Second Amended Complaint is barred, in whole or in part, by the applicable statute of limitations.

### AS AND FOR A FIFTH DEFENSE

301.    Plaintiff had notice of XA's business transactions.  Plaintiff periodically received audited financial reports concerning XA, which included, *inter alia*, XA's business transactions with Studio AG and Mixed Company.  Plaintiff also had access to all underlying financial records maintained by XA.

### AS AND FOR A SIXTH DEFENSE

302.    Plaintiff did not possess any trade secrets or proprietary information that could have been misappropriated by Defendants.

### AS AND FOR A SEVENTH DEFENSE

303.    Defendants did not misappropriate any trade secrets, as the subject information is generally known in the industry or could be easily acquired or duplicated by competitors.

### AS AND FOR AN EIGHTH DEFENSE

304.    Plaintiff's claims are barred, in whole or in part, by the doctrines of laches.

### AS AND FOR A NINTH DEFENSE

305.    Plaintiff's damages, if any, are due to its own comparative fault, contributory negligence, and/or acts or omissions.

### AS AND FOR AN TENTH DEFENSE

306.    Plaintiff cannot demonstrate any illegal acts or malice by Defendants.

### AS AND FOR A ELEVENTH DEFENSE

307.    Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver.

### AS AND FOR A TWELFTH DEFENSE

308.    Plaintiff's claims are barred, in whole or in part, by the doctrines of estoppel.

### AS AND FOR AN THIRTEENTH DEFENSE

309.    Defendants have not committed any predicate acts under the RICO statute.

### AS AND FOR A FOURTEENTH DEFENSE

310.    Defendants have not engaged in a racketeering enterprise under the RICO statute.

### AS AND FOR A FIFTEENTH DEFENSE

311.    Defendants have not engaged in a pattern of racketeering.

### AS AND FOR A SIXTEENTH DEFENSE

312.    The claims asserted in the Second Amended Complaint are not the proximate cause of XA's failure as a business.  The Individual Defendants resigned their employment with XA, as is their right.  After their departure, XA no longer employed anyone capable of managing an experiential marketing agency or successfully bidding on and managing an experiential marketing campaign.

### AS AND FOR A SEVENTEENTH DEFENSE

313.    Defendants reserve the right to assert additional defenses up to and including the time of trial.

**WHEREFORE**, Defendants, by their undersigned counsel, respectfully request that this Court enter judgment as follows:

A.   Dismissing the Second Amended Complaint in its entirety; and

B.   Awarding to Defendants such other and further relief this Court deems just and proper.

C.   Awarding to Defendants attorneys' fees for filing a lawsuit based upon allegations known by Plaintiff to have no basis in fact.

Dated: September 30, 2016
New York, New York

**WINDELS MARX LANE & MITTENDORF, LLP**

By:_____s/ Scott R. Matthews_____
        Scott R. Matthews
        James Tracy
        156 West 56th Street
        New York, New York 10019
        Tel.: (212) 237-1025
        Fax: (212) 262-1215
        smatthews@windelsmarx.com
        jtracy@windelsmarx.com
        *Attorneys for Defendants*

# EXHIBIT 1

**SOL MLOT**, being duly sworn, deposes and says under the penalty of perjury:

1.      I am the owner of certain shares of stock of CMG Holdings Group, Inc. ("CMGO"). I have personal knowledge of the facts set forth herein.

2.      On June 29, 2013, I entered into a handwritten agreement with Glenn Laken. A true and accurate copy of that handwritten agreement is annexed hereto as **Exhibit 1**.

3.      I have stated the facts of how this agreement came to be in a type-written statement that is annexed hereto as **Exhibit 2**. The information set forth in this statement is true and accurate.

4.      My son, Barry Mlot, has been trying to retrieve monies that are due to me from Glenn Laken. I am not aware of Barry making any inaccurate statement concerning these issues.

_____
SOL MLOT

FL DL # M430 78023 4460

Sworn to before me this
24 day of September , 2015

_____
Notary Public

HOUTAN FARHANGI
Notary Public - State of Florida
My Comm. Expires Mar 11, 2016
Commission # EE 166847
Bonded Through National Notary A...

On a Sunday afternoon, April 2012, I met Glenn Laken in his mother's Chicago apartment.  Soon the conversation turned to the stock market.  Glenn asked if I would be interested in some good stock tips.  I said yes, and shortly after that Glenn and I shook hands and said " partners" .

Over the next couple of months Glenn would call me on the phone and tell me what stocks I should  buy or sell.  During this period we made approximately 30-40 trades.  That summer Glenn called and said very often he could not always contact me, and time lost meant money lost.  He suggested that I give him the TD Ameritrade account # and password.  I had  known Glenn and his family for almost 60 years,  I trusted him and foolishly gave him the information.   A short time after that I gave him my Wells Fargo information as well.  Over the next year or so Glenn made close to 400 trades ( over 150 on CMGO)

One of the more interesting trades came in February 2013.  Glenn said he had a tip on RGIN ( Regenicin).  Through a series of emails( I'll send you a copy) I was asked to wire $100,000 (plus a $750 fee) for approximately 2,000,080 shares of stock.  A few months after this transaction I learned that in June 2012 the CEO of RGIN had lied about an FDA approval of their skin graft product PermaDerm.  The stock rose 80% on the news, but dropped sharply a few days later when it was learned that no such FDA approval existed.  I found this news very disturbing.  Why would Glenn have me invest in this kind of stock.

By the summer of 2013 Glenn was still averaging several trades a day.  The portfolio was losing about $250,000, and I was becoming more and more concerned.  Glenn had just received a $1,000,000 annuity following the death of his mother-in-law,  so I talked to him and asked for some money to cover at least part of his share of the losses.   It was then that I learned that Glenn's idea of a partnership was only the investments in CMGO and he was not responsible for the losses in the other 5 stocks ( MDNT, SIBE,RGIN,AEYE,and TNIB) despite the hundreds of trades that he had made.  Glenn had me sign a sheet of paper to this effect,  saying that if I didn't sign I would get nothing.  I was so upset that it began to affect my health and my relationship with Glenn's mother.

A week or so later my son Barry noticed some questionable trades on my Wells Fargo account. At this point I had my sons change the passwords to all the accounts. A few days after changing the passwords Barry and I met with Glenn outside his mother's apartment( August 10,2013).   Glenn still insisted we were only partners in CMGO, but he agreed to be responsible for half the losses in TNIB, and he signed the attatched document. The catch was that Glenn would be solely responsible for all trades in these two stocks. So if the stocks are never sold Glenn will never be responsible for their losses.

In April 2014 I learned that Glenn had been named CEO of CMGO. This explained the 200+ trades ( over 14,000,000 shares) in the stock since April 2012. Glenn took advantage of a nearly 60 year family friendship to advance his career and his finances .

Although Glenn called occasionally from August 2013- March 2014 and told me when to try to sell off shares of stock, he had yet to give me any money ( losses still about $250.000). After being named CEO, Glenn started calling more often using me to help him pump up the stock. At one point CMGO nearly doubled going from about .017 to .034 for a few brief moments around May 15th.

In the past year or so the stock has dropped some 90%, and my losses in Glenn's "partnership" is now about $300,000.   I don't know what can be done legally to get my money back, but I just wanted to tell my story in hopes of preventing Glenn from doing this to others.

6/29/13

This is an agreement between Glenn Laken and Sol Mot dated June 29, 2013 where as Sol Mot has a position of approximately 14,000,000+ shares of CMGO and wishes to hire Glenn Laken to share in both the risk and reward of said position. Glenn Laken agrees to such a proposal, Mr. Laken will take on the responsibility of managing said position until its sale, Mr. Laken agrees to share equally both the profit and loss for the said position, from its inception Mr. Laken will have exclusive rights as to when the said position gets liquidated. Upon liquidation an accounting of said position shall be made and the profits or losses shall be divided within 30 days and a settlement shall be made, Mr. Laken agrees that he shall not take any profits from said position, until Mr. Mot is even on the investing Mr. Laken did for Mr. Mot in his other accounts including TD Ameritrade and Wells Fargo. Should the profits in Mr. Laken trades over ride the loss in the CMGO trade Mr. Laken shall not

be responsible for his 1/2 of the losses
(if incurred) in CM60.

Signed this day
June 25, 2013

Glenn Laken

In the event that Sol Myer becomes
incapacitated, or deceased Mr. Laken
shall deal with Barry and Stuart Myer
in his stead.
Profits shall be construed to mean
net of all commissions.

6/29/13

The identical terms and conditions
shall pertain to the stock of TNIB,
as CM60. The conditions and terms
shall exist from the first purchase of
TNIB through the entirety of the
trade.

August 4 2013

# EXHIBIT 2

This is an agreement between Glenn Laken and Sol Mlot dated June 29, 2013. Where as Sol Mlot has a position of approximately 14,000,000 shares of CM60 and wishes to have Glenn Laken to share in both the risk and reward of said position. Glenn Laken agrees to such a proposal, Mr. Laken will take on the responsibility of managing said position until its sale, Mr. Laken agrees to share equally both the profit and loss for the said position, from its inception Mr. Laken will have exclusive right as to when the said position gets liquidated. Upon liquidation an accounting of said position shall be made and the profits or loss shall be divided within 30 days and a settlement shall be made, Mr. Laken agrees that he shall not take any profits from said position, until Mr. Mlot is even on the investing Mr. Laken did for Mr. Mlot in his other accounts including TD Ameritrade and Wells Fargo. Should the profits in Mr. Laken's trades over ride the loss in the CMCo trade Mr. Laken shall not

be responsible for his 1/2 of the losses (if incurred) in CM60.

Signed this day
June 29, 2013

Glenn Laken

In the event that Sol Mlot becomes incapacitated, or deceased Mr. Laken shall deal with Perry and Stuart Mlot in his stead.
Profits shall be construed to mean net of all commissions.

6/29/13

The identical terms and conditions shall pertain to the stock of TNIB, as CM60. The conditions and terms shall exist from the first purchase of TNIB through the entirety of the trade.

August 4 2013

# EXHIBIT 3



**OFSINK, LLC**

ATTORNEYS AT LAW
230 PARK AVENUE, SUITE 851
NEW YORK, NEW YORK 10169
T: 646-627-7326 F: 646.224.9844
WWW.OFSINKLLC.COM

June 18, 2014

**BY E-Mail to islesny1@aol.com**
Mr. Barry Mlot

      Re: Glenn Laken

Dear Mr. Mlot:

We are counsel to Glenn Laken and write in response to your June 8, 2014 letter to Mr. Laken.

We believe that there is a threshold issue here, before getting to the exact amount of losses and or gains, and potentially settling up with some amount. While you are asking that Mr. Laken pay for losses in your father's account for six different stocks, the parties entered into a written agreement related to only two of those stocks – CMGO and TNIB. Pursuant to that agreement, the parties provided that Mr. Laken would pay for half of the losses in those stocks, and share in half of the gains. The payment of a portion of the losses was specifically contingent upon Mr. Laken being able to direct the trades in those stocks, which, as set forth in your e-mail, you prevented him from doing.

In view of the foregoing, we request that you provide us with a copy of the agreement(s) which you have so that we can have a complete picture of the parties' dealings.

We are available to discuss the foregoing with you or your counsel at your convenience.

Very truly yours,

OFSINK, LLC

By:_____
    Darren L. Ofsink

# EXHIBIT 4

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 54 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 1 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 1 of 30 PageID #: 806

WMP:WMN/SCJ/PH/CK
F. #2013R01203

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ABRAXAS J. DISCALA,
        also known as "AJ Discala,"
IRA SHAPIRO,
CRAIG JOSEPHBERG,
        also known as "Jobo,"
KYLEEN CANE,
DARREN GOODRICH,
DARREN OFSINK and
MICHAEL MORRIS,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ NOV 0 2 2015 ★

BROOKLYN OFFICE

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 14-399 (S-1) (ENV)
(T. 15, U.S.C., §§ 78j(b) and 78ff;
T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1343, 1349, 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

### INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.     The Defendants and Relevant Entities

        1.     The defendant ABRAXAS J. DISCALA, also known as "AJ Discala," a

resident of Rowayton, Connecticut, was the Chief Executive Officer of OmniView Capital

Advisors LLC ("OmniView").  DISCALA formed OmniView on or about February 3, 2011.

DISCALA also controlled The Broadsmoore Group LLC ("Broadsmoore") and Fidelis Holdings,

LLC ("Fidelis").

1

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 55 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 2 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 2 of 30 PageID #: 807

      2.     OmniView was a Delaware limited liability company with its principal place of business in Rowayton, Connecticut, and an office in New York, New York. OmniView marketed itself as a merchant bank that sought to create partnerships with companies that were fundamentally sound in order to provide required capital and strategic advice. OmniView claimed to possess a team of seasoned professionals who had extensive knowledge of the capital markets, including having: (i) experience in raising capital through private placements, alternative public offerings and reverse takeovers of companies whose shares were traded on the Over-the-Counter ("OTC") exchanges; (ii) substantial contacts to bolster management boards; and (iii) a model that prevented any conflicts of interest between OmniView, investors and the target companies.

      3.     The defendant IRA SHAPIRO, a resident of Congers, New York, was the Chief Executive Officer and Chairman of the Board of CodeSmart Holdings, Inc. ("CodeSmart") and First Independence Corp. ("First Independence").

      4.     The defendant CRAIG JOSEPHBERG, also known as "Jobo," a resident of New York, New York, was registered as a broker. In or about and between November 2010 and October 2013, JOSEPHBERG was employed as a broker by Halcyon Cabot Partners, Ltd. ("Halcyon"), a broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority, Inc. ("FINRA"), at its office in New York, New York. In or about and between October 2013 and June 2014, JOSEPHBERG was employed as a broker by BD Firm 1, a broker-dealer registered with the SEC and FINRA, the identity of which is known to the Grand Jury, at its office in New York, New York. JOSEPHBERG also controlled Garper LLC ("Garper"), a Delaware limited liability company with its principal place of business in New York, New York.

2

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 56 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 3 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 3 of 30 PageID #: 808

5.      The defendant KYLEEN CANE, an attorney and resident of Las Vegas,

Nevada, was the managing partner of Cane Clark LLP, a law firm that purportedly specialized in

providing corporate and securities legal services to public companies with small capitalization.

6.      The defendant DARREN GOODRICH, a resident of Manhattan Beach,

California, was registered as a broker. GOODRICH was a Managing Director and the Head

Trader at BD Firm 2, a broker-dealer registered with the SEC and FINRA, the identity of which

is known to the Grand Jury, with its principal place of business in El Segundo, California.

7.      The defendant DARREN OFSINK, an attorney and resident of Merrick,

New York, was the principal of Ofsink LLC, a law firm that purportedly serviced small and mid-

size companies by functioning as an off-site general counsel and professional advisor.

8.      The defendant MICHAEL MORRIS, a resident of Merrick, New York,

was registered as a broker. MORRIS was a Managing Director of Halcyon, a broker-dealer

registered with the SEC and FINRA, with its principal place of business in New York, New

York. MORRIS also served for a period of time as the Chief Compliance Officer of Halcyon.

II.     The Relevant Publicly Traded Companies

9.      CodeSmart, formerly First Independence, was a Florida corporation with

its principal place of business in New York, New York. CodeSmart traded under the ticker

symbol ITEN. CodeSmart's purported business plan consisted of furnishing the healthcare

industry with educated, trained and qualified "ICD-10" certified coders. ICD-10, the tenth

revision of the International Statistical Classification of Diseases and Related Health Problems, a

medical classification list created by the World Health Organization, was the medical coding

system mandated by the Centers for Medicare and Medicaid Services as part of the Patient

Protection and Affordable Care Act of 2010. CodeSmart offered "CodeSmart University" as "an

3

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 57 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 4 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 4 of 30 PageID #: 809

online program of study for existing coders, new coders, clinicians and healthcare roles of all types."

10.     Cubed, Inc. ("Cubed"), formerly a mining exploration company known as Northwest Resources, Inc. ("Northwest"), was a Nevada corporation with its principal place of business in Las Vegas, Nevada.  Cubed traded under the ticker symbol CRPT.  Cubed's purported business plan involved the "Get CUBED" mobile-first platform, which Cubed claimed was "a cloud-based, three-dimensional functional cube that appears on the screens of mobile device owners, allowing developers and users to present complex and contextual concepts in a clear and simple manner."

11.     StarStream Entertainment Inc. ("StarStream"), formerly Gelia Group, Corp., was a Nevada corporation with its principal place of business in Monterey, California.  StarStream traded under the ticker symbol SSET.  StarStream's purported business plan consisted of producing, promoting, supporting and developing motion pictures and funding motion picture entities.

12.     The Staffing Group, Ltd. ("Staffing Group"), formerly Aviana, Corp., was a Nevada corporation with its principal place of business in New Orleans, Louisiana.  Staffing Group traded under the ticker symbol TSGL.  Staffing Group's purported business plan consisted of recruiting, hiring, employing and managing skilled workers for its clients.

III.    Relevant Regulatory Principles and Definitions

13.     The term "beneficial owner" was defined under the rules of the SEC.  It included any person who directly or indirectly shared voting power or investment power (the power to sell a security).  When a person or group of persons acquired beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of

4

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 58 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 5 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 5 of 30 PageID #: 810

the Securities Exchange Act of 1934, they were required to file a Schedule 13D with the SEC.

Schedule 13D reported the acquisition and other information within ten days after the purchase.

The schedule was filed with the SEC and was provided to the company that issued the securities

and each exchange on which the security was traded. Any material changes in the facts

contained in the schedule required a prompt amendment.

14.     The term "nominee" in the securities fraud context referred to a person or

firm into whose name securities or other properties were transferred in order to facilitate

transactions, while concealing the customer as the actual owner. A "nominee account" was a

type of account in which a stockbroker held shares belonging to clients in the name of a sham

entity or another individual. The use of nominees and nominee accounts was designed to

conceal the true ownership interest of the customer.

15.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S.

companies which have a low market capitalization. Microcap stocks were often subject to price

manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks

that traded on notable exchanges. Additionally, large blocks of microcap stock were often

controlled by a small group of individuals, which enabled those in the group to control or

orchestrate manipulative trading in those stocks.

16.     A "pump and dump" scheme was a scheme where a group of individuals

who control the free trading or allegedly unrestricted shares, also referred to as the "float," of a

microcap company fraudulently inflated the share price and trading volume of the targeted public

company through, inter alia, wash and matched trades, false and misleading press releases and

paid stock promotions. When the target company's share price reached desirable levels, the

individuals sold their free trading shares for substantial financial gain.

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 59 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 6 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 6 of 30 PageID #: 811

17.    Wash trades were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership. For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of Company A through Broker B.  Matched trades were similar to wash trades but involved a related third person or party who placed one side of the trade.  For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker.  Both wash trades and matched trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

IV.    The Fraudulent Market Manipulation Schemes

18.    In or about and between October 2012 and July 2014, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS, together with others, agreed to defraud investors and potential investors in CodeSmart, Cubed, StarStream and Staffing Group (collectively, the "Manipulated Public Companies") by artificially controlling the price and volume of traded shares in the Manipulated Public Companies through, inter alia: (a) false and misleading press releases; (b) false and misleading SEC filings; (c) fraudulent concealment of the defendants' and their co-conspirators' beneficial ownership; (d) engineering price movements and trading volume in the stocks; and (e) unauthorized purchases of stock in accounts of unwitting investors.

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 60 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 7 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 7 of 30 PageID #: 812

A.   The CodeSmart Manipulation Scheme

(i)   Control of the Purportedly Unrestricted Stock

19.   In April 2012, First Independence filed a Form S-1 with the SEC to register an offering of 3,000,000 shares of its stock, which was made effective on August 7, 2012. In or about January 2013, despite projecting an extremely pessimistic outlook in prior SEC filings, First Independence sold its entire lot of 3,000,000 shares to twenty-four shareholders, based primarily in Florida, for $0.0115 per share, raising $34,500 for the company. The 3,000,000 shares were registered with First Independence's transfer agent on February 7, 2013. The Form S-1 did not authorize any subsequent distribution of those shares to others or to the general public.

20.   From February 2013 through April 2013, there was no public trading of First Independence's stock. On or about May 3, 2013, CodeSmart, a private company, was acquired by First Independence, a shell public company, in a reverse merger. Following the reverse merger, the new company operated under the CodeSmart name.

21.   In or about May 2013, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and MICHAEL MORRIS, together with others, purchased the 3,000,000 purportedly unrestricted shares at $0.023 per share from the aforementioned twenty-four shareholders. The defendant DARREN OFSINK, who received 125,000 shares, received the new stock certificates and enabled DISCALA, JOSEPHBERG, MORRIS and their co-conspirators to conceal their beneficial ownership interest in the 3,000,000 shares by distributing the shares across a number of co-conspirators and by placing them in nominee accounts designed to conceal the true beneficial owners of the shares. On June 14, 2013, CodeSmart implemented a 2-for-1 forward stock split

7

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 61 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 8 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 8 of 30 PageID #: 813

of its common stock which caused the 3,000,000 shares controlled by DISCALA and his co-conspirators to double to 6,000,000 shares.

(ii)    The Pump and Dump Schemes

22.    After gaining control of CodeSmart's purportedly unrestricted shares, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," DARREN OFSINK and MICHAEL MORRIS, together with others (collectively, the "CodeSmart Co-Conspirators"), engaged in two separate pumps and dumps. The first pump and dump occurred between approximately May 13, 2013 and August 21, 2013. During this first period, the CodeSmart Co-Conspirators manipulated CodeSmart's stock price by raising it from $1.77 to a high of $6.94, before causing it to drop to $2.19. The second pump and dump occurred between approximately August 21, 2013 and September 20, 2013. During this second period, the CodeSmart Co-Conspirators manipulated CodeSmart's stock price by raising it from $2.19 to a high of $4.60, before causing it drop to $2.13.

23.    CodeSmart's market capitalization at its highest closing price of $6.94 per share on July 12, 2013 was $86,347,800. However, that same day, CodeSmart filed with the SEC an amended Form 10-K, signed by the defendant IRA SHAPIRO, in which CodeSmart listed only $6,000 in total assets, $7,600 in revenue and a net loss of $103,141. By December 30, 2013, CodeSmart's stock was trading at $0.66 per share, and on July 9, 2014, CodeSmart's stock closed at $0.01 per share.

24.    In furtherance of the CodeSmart stock manipulation scheme, the CodeSmart Co-Conspirators coordinated their trading activity with the issuance of company press releases, a number of which contained false and misleading information. These press

8

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 62 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 9 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 9 of 30 PageID #: 814

releases, which touted agreements between CodeSmart and various universities and learning institutions, were issued at an accelerated rate in an effort to generate market interest in the stock. For example, on or about May 28, 2013, CodeSmart issued a press release which stated, in part, that "its CodeSmart University product is the exclusive strategic partner for ICD-10 education and consulting services to Binghamton University, part of the State University of New York ('SUNY') system, which will exclusively market and provide CodeSmart University products to their students in the School for Continuing Education." Contrary to this representation, CodeSmart was not the "exclusive strategic partner" for ICD-10 education courses at Binghamton University because Binghamton University also offered courses through other providers and had no plans to exclusively market CodeSmart University to its students. Upon issuance of this press release, the trading volume of CodeSmart's shares surged to 316,000 compared to 122,400 the trading day before the press release.

25.     During the first pump and dump period, the CodeSmart Co-Conspirators filed and caused to be filed with the SEC forms that contained material misrepresentations and omissions. For example, on July 12, 2013, the day CodeSmart's stock closed at its highest share price of $6.94, CodeSmart filed with the SEC an amended Form 8-K, signed by the defendant IRA SHAPIRO, in which CodeSmart estimated "about $10 million in revenues over the following 12 months from the date of this Report." On August 19, 2013, approximately one month later and the day CodeSmart's stock price had dropped dramatically to $2.50 per share, CodeSmart filed with the SEC a Form 10-Q, signed by SHAPIRO, which stated that the company did "not have sufficient funds to fully implement [its] business plan," and that, if they did not obtain the funds, CodeSmart "may need to curtail or cease [its] operations until such time as [it has] sufficient funds."

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 63 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 10 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 10 of 30 PageID #: 815

26.     During the second pump and dump period, the CodeSmart Co-Conspirators filed and caused to be filed with the SEC forms that contained material misrepresentations and omissions.  For example, on August 26, 2013, at a time when CodeSmart's stock was rising and closed at $3.10 per share, CodeSmart filed with the SEC a Form 8-K, signed by the defendant IRA SHAPIRO, in which SHAPIRO stated, "If we continue on the track we are on, I believe we will achieve our revenue and profit goals that were previously disclosed for 2013 and beyond." The next day, on August 27, 2013, CodeSmart filed with the SEC a Form 8-K, signed by SHAPIRO, in which CodeSmart announced that CodeSmart's Chief Executive Officer, SHAPIRO, had purchased 25,000 shares of the company's stock from the public market at the market value of $3.21 per share for a cost of $80,250.  In this SEC filing, SHAPIRO extolled his purchase of CodeSmart stock and stated that his "stock purchase [was] symbolic of [his] confidence in the Company and its mission." In reality, SHAPIRO did not pay for the 25,000 CodeSmart shares purchased in his brokerage account.  On September 4, 2013, the same day that SHAPIRO paid $81,278 from his personal bank account to his brokerage firm for the 25,000 shares of CodeSmart, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," directed the transfer of $81,278 from Fidelis' bank account, which DISCALA controlled, to SHAPIRO's personal bank account.

27.     Additionally, during the second pump and dump period, the CodeSmart Co-Conspirators fraudulently engineered price movements and trading volume in the stocks through, inter alia, wash trades and matched trades.  For example, on August 21, 2013, in order to reap profits from CodeSmart stock during the second pump, the CodeSmart Co-Conspirators sold approximately 140,000 shares from a trading account at Halcyon that was controlled by defendant ABRAXAS J. DISCALA, also known as "AJ Discala," but held in the name of Jane

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 64 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 11 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 11 of 30 PageID #: 816

Doe, DISCALA's administrative assistant whose identity is known to the Grand Jury.  Because

there was no genuine market demand to purchase 140,000 CodeSmart shares at this time,

DISCALA directed the defendants CRAIG JOSEPHBERG, also known as "Jobo," MICHAEL

MORRIS and other co-conspirators to purchase the CodeSmart shares.  Approximately half of

the 140,000 CodeSmart shares sold that day were purchased by JOSEPHBERG, using the Garper

account, by MORRIS, using his Halcyon account, and by other co-conspirators and individuals

affiliated with the co-conspirators.

          (iii)   Profits at Investors' Expense

28.      The CodeSmart Co-Conspirators profited by selling CodeSmart stock,

issued to them at pennies, to Halcyon customers of the defendant CRAIG JOSEPHBERG, also

known as "Jobo," and clients of Co-Conspirator 1, an investment adviser representative and

registered broker whose identity is known to the Grand Jury.  On some occasions, the CodeSmart

Co-Conspirators sold CodeSmart shares to JOSEPHBERG's customers at Halcyon and Co-

Conspirator 1's clients without the customers' and clients' knowledge and consent and without

providing them with required disclosures.

29.      At the same time that the defendant CRAIG JOSEPHBERG, also known

as "Jobo," together with others, was purchasing CodeSmart stock in Halcyon's customers'

accounts, JOSEPHBERG was selling CodeSmart stock in Garper's brokerage accounts and the

defendant MICHAEL MORRIS was selling CodeSmart stock in his son's brokerage accounts

and sharing in the profit from those sales.  Specifically, in or about and between May 2013 and

October 2013, Halcyon's customers purchased approximately 130,000 shares of CodeSmart.

During this same period, JOSEPHBERG sold approximately 86,000 shares of CodeSmart stock

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 65 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 12 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 12 of 30 PageID #: 817

in Garper's brokerage accounts and MORRIS sold approximately 62,500 shares of CodeSmart

stock in his son's brokerage accounts.

30.     On or about and between May 13, 2013 and August 7, 2013 alone, the

defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also

known as "Jobo," MICHAEL MORRIS, and their co-conspirators sold approximately 859,226

shares of CodeSmart in their personal and family accounts while JOSEPHBERG and Co-

Conspirator 1 purchased 813,577 shares of CodeSmart in their customers' and clients' accounts.

31.     When Co-Conspirator 1's clients complained about losses they suffered as

the price of CodeSmart shares dropped, the defendants ABRAXAS J. DISCALA, also known as

"AJ Discala," IRA SHAPIRO and DARREN OFSINK, together with others, devised a plan to

provide the complainants with additional shares of CodeSmart stock at a price below the publicly

traded market price.  To accomplish and justify this fraudulent transfer of 750,000 shares to Co-

Conspirator 1's clients, DISCALA, SHAPIRO, OFSINK and others caused CodeSmart to enter

into a sham consulting agreement with a shell company controlled by Co-Conspirator 1 and

transferred 750,000 shares of CodeSmart to the shell company under the guise of consulting fees.

32.     The defendants ABRAXAS J. DISCALA, also known as "AJ Discala,"

IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," DARREN OFSINK and

MICHAEL MORRIS profited through their fraudulent manipulation of CodeSmart's stock.  The

defendants profited as follows: (a) DISCALA profited at least $3 million from trading

CodeSmart's stock, which included $600,000 in profit from an account held in the name of Jane

Doe; (b) JOSEPHBERG profited at least $750,000; (c) SHAPIRO was paid an annual salary of

approximately $225,000; (d) OFSINK profited at least $300,000; and (e) MORRIS profited at

least $160,000, including $135,000 in profit from an account held in his son's name.

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 66 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 13 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 13 of 30 PageID #: 818

B.     The Cubed Manipulation Scheme

      (i)     The Formation of Cubed

      33.     On March 6, 2014, Northwest, a shell public company with only nominal assets and no revenues, appointed John Doe 1, an individual whose identity is known to the Grand Jury, the President and Chief Operating Officer of Crackpot, Inc. ("Crackpot"), a private company, as its sole officer and director.  Crackpot marketed itself as a "developer of a mobile-first information communications technology that offers users a digital platform for the creation of content that combines text, images, audio, and video."  A week later, on March 14, 2014, Northwest filed with the SEC a Form 8-K explaining that Northwest had changed its name to Cubed.

      34.     On March 24, 2014, Cubed filed with the SEC a Form 8-K stating that it had entered into an intellectual property purchase agreement (the "Asset Purchase Agreement") with Crackpot pursuant to which it acquired intellectual property, specifically a "mobile-first platform," from Crackpot.  In exchange for this intellectual property, Cubed agreed to pay Crackpot $350,000 and 2,537,455 restricted shares of Cubed.  Cubed had no assets and was a penny stock at the time of the Asset Purchase Agreement.  Through this Asset Purchase Agreement, Crackpot, a private company, effectively became Cubed, a public company.  On March 26, 2014, Cubed's board of directors appointed John Doe 2, an individual whose identity is known to the Grand Jury, the original founder of Crackpot, as the new Chief Executive Officer and President, replacing John Doe 1.

      (ii)     The Fraudulent Stock Manipulation

      35.     On March 28, 2014, 200 shares of Cubed were sold at $5.00 per share. Based on the $5.00 share price and its outstanding common stock, Cubed had a market

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 67 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 14 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 14 of 30 PageID #: 819

capitalization of approximately $150 million. On April 22, 2014, after 15 days of no trading

activity, Cubed's stock began trading in earnest at a price of $5.25; the stock closed that day at

$5.20.

36.     On or about and between April 22, 2014 and April 30, 2014, the

defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also

known as "Jobo," KYLEEN CANE and DARREN GOODRICH, together with others

(collectively, the "Cubed Co-Conspirators"), were responsible for manipulating the vast majority

of the trading activity in Cubed through, inter alia, wash trades and matched trades. Specifically,

the Cubed Co-Conspirators purchased more than 50% of the total number of Cubed shares

purchased during this period. The Cubed Co-Conspirators used BD Firm 1, where

JOSEPHBERG was employed, and BD Firm 2, where GOODRICH was employed, among other

firms, to execute these fraudulent trades.

37.     On or about and between May 2, 2014 and June 29, 2014, law

enforcement authorities conducted a judicially-authorized wiretap of the defendant ABRAXAS

J. DISCALA's, also known as "AJ Discala," cellular telephone (the "Discala Wiretap"). The

Discala Wiretap revealed that the Cubed Co-Conspirators used wash trades and matched trades

to manipulate Cubed's stock price and volume. Rather than generating significant market

interest and causing a quick pump and dump that would elicit regulators' scrutiny, the Cubed Co-

Conspirators engaged in a scheme that gradually increased the price of Cubed's stock to give it

the appearance of a legitimate company with genuine and steady market demand for the security.

38.     For example, in or about and between April 22, 2014 and May 22, 2014,

the Cubed Co-Conspirators successfully manipulated Cubed's stock, causing its share price to

gradually increase from a closing price of $5.20 on April 22, 2014 to a closing price of $5.42 on

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 68 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 15 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 15 of 30 PageID #: 820

May 22, 2014. During this period, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," controlled the fraudulent manipulation of Cubed's stock by directing the price and volume of Cubed's shares traded on the market. For example, on May 5, 2014, DISCALA called the defendant DARREN GOODRICH and stated, "Can you buy a 100 and see if [the other market maker] moves?" GOODRICH complied and then responded, "Yeah, they're going." In another example, on May 6, 2014, DISCALA sent a text message to the defendant CRAIG JOSEPHBERG, also known as "Jobo," stating, "Go 531. Please." That day, Cubed's stock closed at $5.32 per share.

        (iii)     The Escrow Account

      39.    To successfully execute their fraudulent scheme of causing a controlled rise of Cubed's stock, the Cubed Co-Conspirators used one or more escrow accounts that were maintained by the defendant KYLEEN CANE to manipulate the price and volume of Cubed's stock. For example, on May 9, 2014, during a telephone call between the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," and DARREN GOODRICH, GOODRICH stated, "Run me through the escrow thing that [CANE] is doing again," and DISCALA responded, "Yeah, don't, she doesn't even like to talk about it . . . there is no stock in the 267 [267,000 purportedly free trading shares], and once you get face to face with her, she'll explain it to you[.]" In a follow-up conversation between GOODRICH and DISCALA on May 20, 2014, DISCALA asked, "What did Kyleen [CANE] tell you about the Cube?" and GOODRICH responded, "She explained the escrows, everything." On that same day, during a telephone call between DISCALA and Co-Conspirator 2, a corrupt investor whose identity is known to the Grand Jury, after discussing a conversation between the defendant CRAIG JOSEPHBERG, also known as "Jobo," and CANE about the escrow account, DISCALA

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 69 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 16 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 16 of 30 PageID #: 821

explained his control over Cubed's share price, and stated, in part, "I'm the [expletive] brake and the gas, [expletive]. If I take my foot off the brake it's 55 [dollars] tomorrow (Laughter)."

40.     On May 23, 2014, due to poor coordination with a co-conspirator, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," briefly lost control of his manipulation of Cubed's share price, which caused it to surge from the previous day's closing price of $5.42 to an intraday high of $7.05 per share. However, DISCALA regained control that same day and brought the share price back down to have it close at $6.30 per share.

41.     During four telephone calls that day, May 23, 2014, the defendant ABRAXAS J. DISCALA's, also known as "AJ Discala," control of the price of Cubed's stock is apparent. During a telephone call that morning, DISCALA and the defendant KYLEEN CANE discussed the jump in Cubed's price to $7 per share, and CANE stated, in part, "We need to keep it back down now. We need to keep it back down." Later that day, during a telephone call between DISCALA and Co-Conspirator 2, DISCALA stated, in part, "I talked to Kyleen [CANE], and we, we don't want this. We would want 6.35 today, 6.30, something like that, and then let, let news rip it next week." DISCALA also called Co-Conspirator 3, a corrupt investor whose identity is known to the Grand Jury, to explain the trading in Cubed's share price, and stated, in part, "Yeah like...it just looks stupid! It went up, and up, and then it came back, you know – it's like, look, if we ended at 6.30, we're good. I wanna bring it back up to 6.55; 6.55 on Tuesday, which I can, with some news, right? And just keep stepping it." Finally, during a telephone call with the defendant DARREN GOODRICH, DISCALA stated, "So Kyleen's [CANE] re-tweaking this thing to 6.35, I just wanted to let you know."

42.     Over the next month, the Cubed Co-Conspirators continued to fraudulently manipulate Cubed's stock using the escrow account. On June 23, 2014, Cubed

16

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 70 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 17 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 17 of 30 PageID #: 822

reached its highest closing price of $6.75 per share. At $6.75 per share, Cubed's market

capitalization was approximately $200 million. On April 21, 2014, however, Cubed filed with

the SEC a Form 10-Q and reported less than $1,500 in cash, zero revenue, negative stockholders'

equity, a net loss of $15,000 and accrued professional fees of $131,824. On July 9, 2014,

Cubed's stock price closed at $6.60 per share and was, thus, still in the controlled pump phase of

the fraudulent manipulation scheme orchestrated by the Cubed Co-Conspirators when trading

was halted by the SEC.

C.  The StarStream and Staffing Group Manipulation Schemes

43.  In or about and between October 2013 and July 2014, the defendants

ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as

"Jobo," and KYLEEN CANE, together with others, agreed to fraudulently manipulate

StarStream's and Staffing Group's stocks by artificially controlling the price and volume of

StarStream's and Staffing Group's stocks through, inter alia, wash trades and match trades.

(i)  The StarStream Manipulation

44.  In furtherance of the scheme to manipulate StarStream's stock, the

defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also

known as "Jobo," and KYLEEN CANE, together with others, coordinated the fraudulent buying

and selling of StarStream's stock through the use of, inter alia, text messages and telephone calls.

45.  On May 7, 2014, Co-Conspirator 3 sent a text message to the defendant

ABRAXAS J. DISCALA, also known as "AJ Discala," stating, "We may need to buy SSET at

close. I think EJA has some $. Got get it to 15 cents. LOL what a joke." That day, StarStream's

stock price closed at $0.30 on 41,100 trading volume, a significant decrease from the previous

day's closing price of $0.48 on 16,200 trading volume. The following day, on May 8, 2014,

17

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 71 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 18 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 18 of 30 PageID #: 823

StarStream's stock price closed at $0.15 per share, exactly the price proposed by Co-Conspirator 3.

46.     On May 13, 2014, before trading commenced, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," sent a text message to Co-Conspirator 1, stating, "We got good stuff going. Sset. Should be over a buck today." That day, StarStream's stock price, which opened at $0.35 per share, reached an intraday high of $1.05 per share, before closing at $0.80 per share.

(ii)     <u>The Staffing Group Manipulation</u>

47.     In furtherance of the scheme to manipulate Staffing Group's stock, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and KYLEEN CANE, together with others, coordinated the fraudulent buying and selling of Staffing Group's stock through the use of, <u>inter alia</u>, text messages and telephone calls.

48.     On May 7, 2014, Co-Conspirator 1 sent a text message to the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," stating, "TSGL is tanking. We still good?" In response, DISCALA stated, "Yes. Buy all u can at 20 or better. We're cleaning it up." On May 7, 2014, Staffing Group's stock price closed at $0.25 on 178,300 trading volume, a significant decrease from the previous day's closing price of $0.36 on no trading volume.

49.     On May 16, 2014, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," sent a text message to the defendant CRAIG JOSEPHBERG, also known as "Jobo," stating, "Call in victors tsgl. Supposed to be good til cancel. This shot affects us." On May 16, 2014, the trading volume in the Staffing Group was 13,500 compared to 1,700 on the previous trading day and 2,500 on the following trading day.

18

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 72 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 19 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 19 of 30 PageID #: 824

50.      On May 30, 2014, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," sent a text message to Co-Conspirator 3, stating, "Buy 5k more ts [TSGL] market im gonna get this thing flying." On May 30, 2014, Staffing Group's stock price closed at $0.42 per share on 187,300 trading volume, which was almost double the closing price of $0.23 on 6,000 trading volume on the previous day.

<u>COUNT ONE</u>
(Conspiracy to Commit Securities Fraud –
the Manipulated Public Companies)

51.      The allegations contained in paragraphs one through fifty are realleged and incorporated as though fully set forth in this paragraph.

52.      In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in the Manipulated Public Companies, in connection with the purchase and sale of investments in the Manipulated Public Companies, directly and indirectly, by use of means and instrumentalities of

19

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 73 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 20 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 20 of 30 PageID #: 825

interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and

78ff.

53.     In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also

known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo,"

KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS,

together with others, committed and caused to be committed, among others, the following:

### OVERT ACTS

a.      On or about June 4, 2013, SHAPIRO sent an email to John Doe 3,

a representative of Ramapo College of New Jersey whose identity is known to the Grand Jury,

copying two of SHAPIRO's colleagues, whose identities are known to the Grand Jury, and

stated, in part, "My apologies on behalf of CODESMART. We did not know about that

language you [sic] were allowed to use and certainly will consult with you next time we do a

promotion. This is all done in a spirit of promoting business opportunities for you as a partner."

b.      On or about August 15, 2013, DISCALA signed a purchase

agreement on behalf of Fidelis whereby he sold 25,000 shares of CodeSmart common stock to

Victim 1, an individual whose identity is known to the Grand Jury, for $3,500 at a purchase price

of $0.14 per share.

c.      On or about August 27, 2013, SHAPIRO filed with the SEC a

Form 8-K on behalf of CodeSmart and stated that he had purchased 25,000 shares of the

company's stock from the public market at the market value of $3.21 per share for a cost of

$80,250.

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 74 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 21 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 21 of 30 PageID #: 826

     d.     On or about October 17, 2013, OFSINK caused an email to be sent to SHAPIRO, which email attached a sham consulting agreement, a CodeSmart board consent form approving the consulting agreement in exchange for 750,000 shares, and an instruction letter to transfer 750,000 shares of CodeSmart to a shell company.

     e.     On or about May 6, 2014, during a telephone call between DISCALA and GOODRICH discussing the trading of Cubed shares, DISCALA inquired, in part, "Can you get [your trader] off that 451? He's killing the box," adding, "It's 526, he's in the middle of the 5's at 451[.]" and GOODRICH responded, in part, "Where do you want him? I'll call him right now."

     f.     On or about May 12, 2014, during a telephone call between DISCALA and Co-Conspirator 2, Co-Conspirator 2 stated, in part, "We should start sending [JOSEPHBERG] morons, by the way. We could trade for free, you know, send him a moron, you know, a guy you don't know and then we'll just buy stocks and if they don't go up by the end, we'll buy, like, options – Twitter options – that expire in, like, a day. Either we'll make like twenty times or we'll just give him the stock."

     g.     On or about May 17, 2014, during a telephone call between DISCALA and Co-Conspirator 3, DISCALA stated, in part, "So our deal is going to pay the Cube two-fifty, cause these guys can't generate revenue, so I'm going to generate it myself."

     h.     On or about May 20, 2014, during a telephone call between DISCALA and GOODRICH about the escrow account and Cubed trading, GOODRICH stated, in part, "[Y]ou did a perfect job. Hearing it out of [CANE's] mouth, that makes sense."

     i.     On or about May 20, 2014, during a telephone call between DISCALA and Co-Conspirator 2, DISCALA stated, in part, "Right, because I'm the [expletive]

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 75 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 22 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 22 of 30 PageID #: 827

brake and the gas, [expletive].  If I take my foot off the brake it's 55 [dollars] tomorrow (Laughter)."

        j.    On or about May 21, 2014, during a telephone call between DISCALA and CANE, CANE stated, in part, "You know [the Investor Relations/Public Relations guys are] going to be doing it and I also just talked to two people that are gonna probably going to put in another half a million into Cubed for some interim, interim money."

        k.    On or about May 22, 2014, during a telephone call between DISCALA and JOSEPHBERG, JOSEPHBERG stated, in part, "I don't want to be the only one buying today.  I heard it looks very bad for a broker to be the only one buying, that's what I heard."

        l.    On or about May 27, 2014, during a telephone call between DISCALA and CANE, CANE stated, in part, "Well it's um, it's gonna start happening . . . I don't know if the press has even come out yet.  There's gonna be a release today . . . on the . . . acquisition . . . we're having a conference call in about 30 minutes with the first PR that's gonna go out – the PR group."

        m.    On or about May 29, 2014, during a telephone call between DISCALA and GOODRICH, DISCALA stated, in part, "No, just buy 100 and stay under 43.  I'll have the other guys move up."

        n.    On or about June 6, 2014, during a telephone call between DISCALA and Co-Conspirator 3, Co-Conspirator 3 stated, in part, "We don't need to go up every [expletive] day, but the bottom line is, you know, we're [expletive] supporting the stock[.]"

        (Title 18, United States Code, Sections 371 and 3551 <u>et seq.</u>)

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 76 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 23 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 23 of 30 PageID #: 828

<u>COUNT TWO</u>
(Conspiracy to Commit Mail Fraud and Wire Fraud –
the Manipulated Public Companies)

52.     The allegations contained in paragraphs one through fifty are realleged and incorporated as though fully set forth in this paragraph.

53.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS, together with others, did knowingly and intentionally conspire:

        a.     to devise a scheme and artifice to defraud investors and potential investors in the Manipulated Public Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to cause to be delivered matter and things by FedEx Corp. ("FedEx") and other private and commercial interstate carriers according to the direction thereon, contrary to Title 18, United States Code, Section 1341; and

        b.     to devise a scheme and artifice to defraud investors and potential investors in the Manipulated Public Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

        (Title 18, United States Code, Sections 1349 and 3551 <u>et seq.</u>)

Case 1:15-cv-05814-JPO Document 133-2 Filed 11/16/18 Page 77 of 92
Case 1:15-cv-05814-JPO Document 43-4 Filed 09/30/16 Page 24 of 30
Case 1:14-cr-00399-ENV Document 166 Filed 11/02/15 Page 24 of 30 PageID #: 829

### COUNT THREE
(Securities Fraud – CodeSmart)

54. The allegations contained in paragraphs one through thirty-two are realleged and incorporated as though fully set forth in this paragraph.

55. In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," DARREN OFSINK and MICHAEL MORRIS, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in CodeSmart, in connection with the purchases and sales of investments in CodeSmart, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

24

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 78 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 25 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 25 of 30 PageID #: 830

## COUNT FOUR
(Securities Fraud – Cubed)

56.    The allegations contained in paragraphs one through eighteen and thirty-three through forty-two are realleged and incorporated as though fully set forth in this paragraph.

57.    In or about and between March 2014 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and DARREN GOODRICH, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in Cubed, in connection with the purchases and sales of investments in Cubed, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNTS FIVE THROUGH ELEVEN
(Wire Fraud)

58.    The allegations contained in paragraphs one through fifty are realleged and incorporated as though fully set forth in this paragraph.

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 79 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 26 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 26 of 30 PageID #: 831

59.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and DARREN GOODRICH, together with others, did knowingly and intentionally devise a scheme and artifice to defraud investors and potential investors in the Manipulated Public Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises.

60.     On or about the dates set forth below, for the purpose of executing such scheme and artifice, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," CRAIG JOSEPHBERG, also known as "Jobo," and DARREN GOODRICH, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as set forth below:

| Count | Defendant(s) | Date | Description |
|---|---|---|---|
| FIVE | DISCALA | 05/09/2014 | Telephone call from DISCALA to Co-Conspirator 3 discussing, inter alia, the manipulation of Cubed's stock. |
| SIX | DISCALA and GOODRICH | 05/09/2014 | Telephone call from DISCALA to GOODRICH discussing, inter alia, the manipulation of Cubed's stock. |
| SEVEN | DISCALA | 05/09/2014 | Telephone call from DISCALA to Broker 1, an individual whose identity is known to the Grand Jury, discussing, inter alia, the manipulation of Cubed's stock. |
| EIGHT | DISCALA | 05/09/2014 | Telephone call from DISCALA to Co-Conspirator 2 discussing, inter alia, the manipulation of Cubed's and StarStream's stocks. |

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 80 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 27 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 27 of 30 PageID #: 832

| Count | Defendant(s) | Date | Description |
|---|---|---|---|
| NINE | DISCALA | 06/12/2014 | Telephone call from DISCALA to Trader 1, an individual whose identity is known to the Grand Jury, discussing, inter alia, the manipulation of StarStream's stock. |
| TEN | DISCALA and JOSEPHBERG | 06/12/2014 | Telephone call from DISCALA to JOSEPHBERG discussing, inter alia, the manipulation of StarStream's stock. |
| ELEVEN | DISCALA | 06/12/2014 | Telephone call from DISCALA to Co-Conspirator 3 discussing, inter alia, the manipulation of CodeSmart's, Cubed's and StarStream's stock. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

61.    The United States hereby gives notice to the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS that, upon conviction of any of the above-charged offenses, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any property, real or personal, which constitutes or is derived from proceeds traceable to any of the above-charged offenses, including but not limited to the following:

a.    a sum of money in United States currency, in an amount to be determined at trial, for which the defendants will be jointly and severally liable;

b.    real property and premises known as 10 Vincent Place, Norwalk, Connecticut, and all proceeds traceable thereto;

27

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 81 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 28 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 28 of 30 PageID #: 833

      c.      approximately $73,500.00 formerly on deposit in Bank of America Account No. 385015350211 held in the name of OmniView, and seized pursuant to a court-authorized seizure warrant on or about July 15, 2014, and all proceeds traceable thereto;

      d.      approximately $49,486.99 formerly on deposit in Bank of America Account No. 385019351669 held in the name of DISCALA,  and seized pursuant to a court-authorized seizure warrant on July 15, 2014, and all proceeds traceable thereto;

      e.      approximately $35,946.65 formerly on deposit in Bank of America Account No. 385019351834 held in the name of a nominee of DISCALA, and seized pursuant to a court-authorized seizure warrant on July 15, 2014, and all proceeds traceable thereto;

      f.      approximately $27,186.35 formerly on deposit in Bank of America Account No. 38019351847 held in the name of a nominee of DISCALA, and seized pursuant to a court-authorized seizure warrant on July 15, 2014, and all proceeds traceable therto.

62.      If any of the above-described forfeitable property, as a result of any act or omission of the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," IRA SHAPIRO, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE, DARREN GOODRICH, DARREN OFSINK and MICHAEL MORRIS:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty;

28

Case 1:15-cv-05814-JPO   Document 133-2   Filed 11/16/18   Page 82 of 92
Case 1:15-cv-05814-JPO   Document 43-4   Filed 09/30/16   Page 29 of 30
Case 1:14-cr-00399-ENV   Document 166   Filed 11/02/15   Page 29 of 30 PageID #: 834

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. #2013R01203
FORM DBD-34
JUN. 85

No. 14 CR 399 (S-1) (ENV)

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

ABRAXAS J. DISCALA, *et al.,*

Defendants.

# SUPERSEDING INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff;  T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1343, 1349, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c).)

*A true bill.*

_____
_____   *Foreperson*

*Filed in open court this* _____ _____ *day,*

*of* _____ *A.D. 20* _____

_____
_____   *Clerk*

*Bail, $* _____

_____

*Shannon C. Jones, Assistant U.S. Attorney (718) 254-6379*

# EXHIBIT 5

## <u>RELEASE AGREEMENT AND NON-SOLICITATION</u>

THIS RELEASE AGREEMENT AND NON-SOLICITATION (this "Release"), dated as of February 26, 2014 (the "Effective Date"), is made and entered into by and among Joseph Wagner ("Wagner"), XA, The Experiential Agency, Inc. ("XA") and CMG Holdings, Inc. ("CMG") (collectively, the "Parties").

### RECITALS

A.   WHEREAS, Wagner and XA, a wholly owned subsidiary of CMG, entered into an Amended and Restated Executive Employment Agreement with an effective date of April 1, 2009 (the "Employment Agreement")

B.   WHEREAS, Section 3(i) of the Employment Agreement referenced Incentive Compensation to be paid under a "Performance Based Incentive Plan" maintained by XA (the "Plan");

C.   WHEREAS, Wagner claims that, as of July 1, 2013, he is owed $212,784 in cash and $212,784 in stock under the Plan (the "Incentive Compensation");

D.   WHEREAS, XA claims that the Plan was never adopted;

E.   WHEREAS, a dispute exists between Wagner and XA concerning whether the Plan was adopted and whether Wagner is entitled to be paid the Incentive Compensation (the "Dispute"); and

F.   WHEREAS, the Parties desire to resolve the Dispute without any admission of liability by any Party and without the expense of litigation by entering into this Release.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, intending to be legally bound, the Parties hereby agree as follows:

1.   <u>Incorporation of Recitals</u>.   The Recitals set forth above are hereby incorporated into and made a part of this Release by this reference.

2.   <u>Payment to Wagner</u>.   As of the Effective Date, XA and CMG hereby agree to pay to Wagner or his designee $150,000 in cash upon execution of this Release (the "<u>Funds</u>").

3.   <u>Release</u>.   Subject to full performance of the express condition contained in <u>Section 2</u> herein, Wagner hereby forever releases and discharges XA and CMG and their managers, members, officers, partners, shareholders, directors, employees and other agents (each, a "Released Party"), from and against any and all debts, causes of action, suits, proceedings, judgments, damages, obligations and liabilities whatsoever of every kind and nature that Wagner has or could have had as of the Effective Date with respect to the Incentive Compensation (collectively, the "<u>Released Matters</u>").

4.  Non-Solicitation. Wagner hereby covenants and agrees that, subject to the condition set forth herein, during his employment with XA and for a period of six (6) months following the separation of his employment (for any reason), he shall not solicit or attempt to solicit any client of XA who is doing business with XA at the time of such termination, or who did business with XA at any time within six (6) months prior to such termination. This non-solicitation provision shall be of no force or effect if Wagner, at the time of Wagner's separation from employment from XA, is not paid (i) in full all amounts due to Wagner under the Employment Agreement (other than the Incentive Compensation which is being settled by this Release) including, but not limited to, $418,750.00 of salary due to Wagner and deferred by XA through February 1, 2014 (the "Deferred Compensation"), or (ii) in accordance with the terms any agreement which may be reached between Wagner and XA on or before Wagner's separation from employment with XA for the payment of Deferred Compensation (and any other amounts that may be due under the Employment Agreement).

5.  The Employment Agreement. The Parties hereby agree and acknowledge that, other than the obligations set forth in Section 3(i) of the Employment Agreement which are addressed by this Release, the Employment Agreement remains in full force and effect and Wagner is not waiving any other rights or claims he may have thereunder (including all salary due to Wagner and deferred by XA through February 1, 2014).

6.  Miscellaneous.

   a.  Amendments. This Release may be amended, modified, superseded or canceled only by an instrument in writing signed by each of the Parties.

   b.  Headings. The titles and subtitles herein are inserted for convenience of reference only, are not a part of this Release and are to be ignored in any construction of the provisions hereof.

   c.  Further Assurances. Each Party shall hereafter execute and deliver such further instruments and do such further acts and things as may be reasonably required or reasonably useful to carry out the intent and purposes of this Release and as are not inconsistent with the terms hereof.

   d.  Successors and Assigns. This Release shall inure to the benefit of and be binding upon the successors and assigns of the Parties.

   e.  Governing Law. This Release and the legal relations between the Parties arising thereunder shall be governed by and construed in accordance with the internal laws of the State of Illinois, without regard to the principles regarding the choice of law.

   f.  Counterparts. This Release may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become



effective when such counterparts have been signed by each Party and delivered to the other Party.

g. Severability. If at any time subsequent to the date hereof, any provision of this Release shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Release.

h. Entire Agreement. This Release constitutes the entire understanding and agreement of the Parties with respect to the matters referred to herein. Any representation, promise or condition, whether written or oral, between or among the Parties with respect to the matters referred to herein which is not expressly so incorporated shall not be binding on the Parties. The Parties acknowledge that they have not relied, in entering into this Release, on any representations, promises or conditions not expressly set forth in this Release.

i. No Waiver. No waiver of any provision of this Release shall be deemed, or shall constitute, a waiver of any other provision.

j. Authority. The Parties warrant that all corporate or other necessary organizational acts have been taken to approve the terms of this Release and the signatories hereto are duly authorized to execute this Release as a binding and enforceable contract. Each Party has received independent legal advice from its or his attorneys with respect to the negotiation of this Release and the advisability of executing this Release and any related documents.

IN WITNESS WHEREOF, the Parties hereto have caused this Release to be executed by their respective duly authorized officers as of the day and year first written above.

CMG HOLDINGS, INC.                    XA, THE EXPERIENTIAL AGENCY, INC.

By:_____           By:_____
Name:_____           Name:_____
Its:_____           Its:_____

JOE WAGNER

1280114_3

effective when such counterparts have been signed by each Party and delivered to the other Party.

g. <u>Severability</u>. If at any time subsequent to the date hereof, any provision of this Release shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Release.

h. <u>Entire Agreement</u>. This Release constitutes the entire understanding and agreement of the Parties with respect to the matters referred to herein. Any representation, promise or condition, whether written or oral, between or among the Parties with respect to the matters referred to herein which is not expressly so incorporated shall not be binding on the Parties. The Parties acknowledge that they have not relied, in entering into this Release, on any representations, promises or conditions not expressly set forth in this Release.

i. <u>No Waiver</u>. No waiver of any provision of this Release shall be deemed, or shall constitute, a waiver of any other provision.

j. <u>Authority</u>. The Parties warrant that all corporate or other necessary organizational acts have been taken to approve the terms of this Release and the signatories hereto are duly authorized to execute this Release as a binding and enforceable contract. Each Party has received independent legal advice from its or his attorneys with respect to the negotiation of this Release and the advisability of executing this Release and any related documents.

IN WITNESS WHEREOF, the Parties hereto have caused this Release to be executed by their respective duly authorized officers as of the day and year first written above.

CMG HOLDINGS, INC.

By: _____
Name: _Glenn Laken_____
Its: _Chairman / CEO_____

XA, THE EXPERIENTIAL AGENCY, INC.

By: _____
Name: _Ron Burkhardt_____
Its: _CEC CHAIRMAN_____

**JOE WAGNER**

_____

1280114_3

Thursday, February 27, 2014

Jean Wilson, COO
XA, The Experiential Agency, Inc.

Dear Ms. Wilson,

Pursuant to the RELEASE AGREEMENT AND NON-SOLICITATION, you are hereby authorized to wire transfer funds in the amount of $150,000 payable to Joseph Wagner or his designee.

Per the unaminous approval of the Board of Directors of CMG Holdings Group, Inc.

CMG HOLDINGS, INC.

By: _____
Name: _____
Its: _____

# EXHIBIT 6

f8k040714_cmgholdings.htm

8-K 1 f8k040714_cmgholdings.htm CURRENT REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K**

**CURRENT REPORT**
Pursuant to Section 13 or 15(d)
of The Securities Exchange Act of 1934

Date of Report: April 7, 2014
(Date of earliest event reported)



# CMG HOLDINGS GROUP, INC.

(Exact name of registrant as specified in its charter)

| Nevada | 000-51770 | 87-0733770 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

333 Hudson Street, Suite 303
New York, New York 10013

(Address of principal executive offices) (Zip Code)

(646) 688-6381

(Registrant's telephone no., including area code)

(Former name, former address and former fiscal year, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

o  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
o  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
o  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
o  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

9/28/2016

Case 1:15-cv-05814-JPO  Document 133-2  Filed 11/16/18  Page 92 of 92
Case 1:15-cv-05814-JPO  Document 43-6  Filed 09/30/16  Page 2 of 2
f8k040714_cmgholdings.htm

## SECTION 5 - CORPORATE GOVERNANCE AND MANAGEMENT

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On April 7, 2014 the Board of Directors (the "Board") of CMG Holdings Group, Inc. ("CMG Holdings" or the "the Company"), appointed Glenn Laken, 60, as a member of the Board, Chairman of the Board and Chief Executive Officer ("CEO"). Acting CEO Jeffrey Devlin will remain with the company as its Vice-Chairman of the Board.

Over the past 30 years, Mr. Laken has held multiple senior executive positions and created successful growth strategies in the financial services sector. His expansive professional experience includes working as an advisor to the 22 billion dollar Ameritech Pension fund, partnership in a Wall Street specialist firm, ownership of a Chicago clearing house with offices nationwide, and the purchase and restructuring of the Cigarette Racing Team Company. He has also enjoyed success in the area of mergers and acquisitions as an accomplished business leader.

In 2000 Mr. Laken was accused of conspiring to bribe union officials while raising money for a hedge fund and participating in an Internet stock promotion where the exact amount paid for that promotion wasn't clearly stated. These allegations, made by a government informant, resulted in conviction after a 15-week trial, despite the fact that Mr. Laken never met any union officials, received any union monies for his fund or directly contracted for the Internet promotion.

A Company shareholder since 2010, Mr. Laken organized a shareholder group that forced changes in Company management in 2012, after careful analysis revealed that the Company was failing to reach its potential due to mismanagement by the original management team. Since orchestrating this change, Mr. Laken has worked as Company consultant, introducing Jeffrey Devlin and David Kovacs to the Board, and bringing Ron Burkhardt on as a board member and executive chairman of XA, The Experiential Agency, Inc. ("XA"). He also introduced a new subsidiary partially owned by his wife, Good Gaming Inc., to the Companies portfolio and arranged the sale of Audio Eye, Inc. stock to fund the elimination of the Company's toxic debt.

In connection with his appointment as the Company's CEO and Chairman, Mr. Laken was granted forty million stock options with an exercise price of $0.0155 and a five-year term. The Company anticipates entering into an employment agreement with Mr. Laken by April 30, 2014.

Mr. Laken will continue to seek new opportunities to add shareholder value through organic growth of existing assets of CMG and acquisition of undervalued private and public companies. Mr. Laken has always believed in the strength of the underlying assets of CMG, and upon his appointment as Chairman and CEO, stated, "I'm looking forward to growing CMG into a world class company."

There are no arrangements or understandings between Mr. Laken and any other persons pursuant to which he was selected as Chairman and Chief Executive Officer. There are also no family relationships between Mr. Laken and any director or executive officer of the Company.

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

**CMG HOLDINGS, INC.**

Date: April 7, 2014

/s/ GLENN LAKEN
Name: Glenn Laken
Its: Chief Executive Officer