# EXHIBIT C

FILED: NEW YORK COUNTY CLERK 02/19/2015   INDEX NO. 652894/2014
NYSCEF DOC. NO. 22                         RECEIVED NYSCEF: 02/19/2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

XA EXPERIENTIAL AGENCY, INC.,                    Index No. 652894/2014

                              Plaintiff,         **THIRD-PARTY SUMMONS**

                    v.

JOSEPH WAGNER, HUDSON GRAY LLC,
JEFFREY SMITH, DARREN ANDERECK and
JESSIE LOMA,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH WAGNER, JEFFREY SMITH, DARREN
ANDERECK, and JESSIE LOMMA,

                    Third-Party Plaintiffs,

                    v.

GLENN LAKEN and ALEXIS LAKEN,

                    Third-Party Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**TO THE ABOVE-NAMED THIRD-PARTY DEFENDANTS:**

   **YOU ARE HEREBY SUMMONED** and required to serve upon Third-Party Plaintiffs' attorney an Answer to the Third-Party Complaint in this action within twenty (20) days after the service of this Summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Third-Party Complaint.

{11051495;5}

Dated: New York, New York
      February 19, 2015

                              Respectfully submitted,

                              WINDELS MARX LANE & MITTENDORF, LLP

                              By: _____
                                    Scott R. Matthews
                                    Daniel J. Shim
                              156 West 56th Street
                              New York, NY 10019
                              (212) 237-1000
                              *Attorneys for Third-Party Plaintiffs*

To:   Glenn Laken
      2130 North Lincoln Park West
      Apartment 8N
      Chicago, Illinois 60614

      Alexis M. Laken
      25 Ludlow Street
      Apartment #2
      New York, New York 10002

{11051495.5}                           2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| XA EXPERIENTIAL AGENCY, INC., | Index No. 652894/2014 |
| Plaintiff, | **THIRD-PARTY COMPLAINT** |
| v. | |
| JOSEPH WAGNER, HUDSON GRAY LLC, JEFFREY SMITH, DARREN ANDERECK and JESSIE LOMA, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH WAGNER, JEFFREY SMITH, DARREN
ANDERECK, and JESSIE LOMMA,

                        Third-Party Plaintiffs,

       v.

GLENN LAKEN and ALEXIS LAKEN,

                        Third-Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendants and Third-Party Plaintiffs Joseph Wagner ("Wagner"), Jeffrey Smith

("Smith"), Darren Andereck ("Andereck"), and Jessie Lomma ("Lomma"), erroneously named

Jessie Loma in the Complaint (Smith, Andereck, Lomma, and Wagner are referred to as the

"Third-Party Plaintiffs"), by their attorneys, Windels Marx Lane & Mittendorf, LLP, for their

Third-Party Complaint against Third-Party Defendants, Glenn Laken and Alexis Laken

(collectively, the "Third-Party Defendants" or the "Lakens"), respectfully allege:

## NATURE OF THIS ACTION

1.      The Third-Party Plaintiffs bring this Third-Party Complaint for libel as a result of defamatory statements made by the Lakens in public securities filings, communications made to the Third-Party Plaintiffs' business colleagues, and statements made to a major media company for the sole purpose of publication.  All of these defamatory statements were false, made while the Lakens knew or should have known that the statements were false, widely published to third-parties without privilege or authorization, made in a grossly irresponsible manner without due consideration to applicable standards, constituted defamation *per se*, and caused all Third-Party Plaintiffs damages in an amount to be determined at trial.

## THE PARTIES

2.      XA, The Experiential Agency, Inc., erroneously named as XA Experiential Agency, Inc. in the Complaint ("XA"), the plaintiff in this matter, is a marketing company that is a wholly owned subsidiary of CMG Holdings Group, Inc. ("CMG").

3.      Joseph Wagner ("Wagner") is an individual residing in the state of Illinois, and is the former CEO of XA.

4.      Wagner, Andereck, Smith, and Lomma are all employees of HudsonGray, Inc. ("HudsonGray"), a marketing and branding agency located in New York, New York.

5.      On information and belief, Glenn Laken is an individual residing in the state of Illinois, and is the CEO of CMG.

6.      On information and belief, Alexis Laken is an individual residing in the state of New York, and is the current President of XA.

7.      Smith is an individual residing in the state of New York, county of New York.

8.      Lomma is an individual residing in the state of New York, county of Kings.

{11051495:5}                                    2

9.      Andereck is an individual residing in the state of Illinois.

## JURISDICTION AND VENUE

10.      This Court properly has jurisdiction over the Lakens under CPLR 302(a)(1).

11.      The defamatory statements made by the Lakens are false allegations exclusively concerning the prior employment of Wagner as CEO of XA, and the prior employment of the Smith, Andereck, and Lomma at XA.

12.      XA has closed its Chicago office in favor of operations in its New York office, located at 333 Hudson Street, Suite 203, New York, New York 10013. Alexis Laken, President of XA, has publicly stated that XA has "decided to focus [XA's] operations out of [XA's] New York office." *See* **Exhibit A.**

13.      Glenn Laken is the CEO and Chairman of the Board of Directors of CMG, the parent company of XA, and all of his defamatory comments regarding Third-Party Plaintiffs concerned Third-Party Plaintiffs' association with XA.

14.      CMG maintains offices in New York at 333 Hudson Street, Suite 203, New York, New York 10013.

15.      Jurisdiction over the Lakens in this Court is proper because: (a) all of the defamatory statements made by the Lakens relate to Third-Party Plaintiffs' prior employment with XA; (b) CMG and XA are and were present and conducting business in New York; and (c) the operation of XA's main headquarters is in New York.

16.      Additionally, upon information and belief, Alexis Laken is subject to the jurisdiction of this Court under CPLR 301 as a resident of the state of New York, county of New York.

17. Venue is appropriate in this matter because the parties Smith and Alexis Laken are residents of the state of New York, county of New York.

18. Furthermore, XA, as plaintiff, initiated the underlying lawsuit in this Court and the claims asserted herein directly relate to the claims asserted by XA therein.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

19. XA employed Wagner as CEO pursuant to an executed employment agreement.

20. After prior disputes regarding compensation, and XA's failure to make payments in accordance with an earlier agreement to settle, those disputes were resolved through the Settlement Agreement and Release, effective as of April 30, 2014, entered into between Wagner and XA (the "April Settlement Agreement and Release"). A copy of the April Settlement Agreement and Release is attached hereto as **Exhibit B**.

21. The April Settlement Agreement and Release:

    a. contains an integration clause that states that it constitutes the entire agreement between the parties and supersedes any prior agreements with respect to the matters set forth therein and supersedes all prior agreements between XA and Wagner;

    b. contains a general release by XA of any claims against Wagner, known or unknown, that arose on or before April 30, 2014; and

    c. finalized all matters regarding the employment and termination of Wagner as CEO of XA.

22. Smith, Andereck, and Lomma did not enter into employment or separation agreements with XA.

23. Following the departure of Wagner, Smith, Andereck, and Lomma from XA, the Lakens began a concerted campaign to publicize defamatory statements regarding the Third-Party Plaintiffs, which statements the Lakens knew, or should have known, to be false. These statements were purposefully disseminated by Glenn and Alexis Laken through: 1)

4

statements made to CMG shareholders by Glenn Laken in SEC Form 8-K and Form 10-Q/A filings in November 2014; 2) statements made by Alexis Laken to Wagner's business partner and vendor; and 3) statements made, upon information and belief, to the news publication *Crain's Chicago Business* ("*Crain's*") for the specific purpose of publication, intimidation, and damage to Third-Party Plaintiffs' reputations.

A.     **Defamatory Statements by Glenn Laken Contained in SEC Filings**

24.     In a letter dated November 19, 2014 signed by Glenn Laken attached to the Form 8-K filed by CMG on November 20, 2014, Glenn Laken publishes a litany of defamatory comments.

25.     He falsely states that a "pattern of fraud uncovered was instituted and overseen by former CEO Joe Wagner, who ran XA with little or no oversight from former CMG board members."

26.     Glenn Laken implies that Wagner resigned from his position as CEO because "board members and consultants, from CMG began to question why XA . . . never made a significant profit."

27.     Glenn Laken states that Wagner and Andereck, along with another non-party, "all owned privately held competing companies designed to siphon business opportunity away from XA. These private affiliations were not disclosed to the board of CMG" and these companies "defrauded" CMG "by becoming vendors to XA -- charging XA nearly $650,000.00 in questionable receipts over [sic] last two years alone."

28.     Glenn Laken then states that all Third-Party Plaintiffs, along with other non-parties, "conspired . . . to strip XA's business of all corporate clients, newly purchased computers, lockers filled with staging equipment around the country and ongoing projects worth

over $1,000,000.00 in revenue," and repeats allegations of "transactions between XA and parties owned by these former employees who did not disclose their interests in them."

29.     Laken's letter also asserts "numerous instances of conversion of XA assets and funds, such as personal charges on company credit cards, payments for cell phones for family members, reimbursement for personal travel and other expenses which did not relate to XA in any way," and that emails were deleted by the Third-Party Plaintiffs.

30.     The Form 10-Q/A of CMG, filed November 20, 2014 and signed by Glenn Laken, substantively repeats all of these false and defamatory statements. In addition, in it, Glenn Laken states that the Third-Party Plaintiffs formed HudsonGray, "which was soliciting XA's clients using confidential information gained from their employment with XA." Further, Glenn Laken states that CMG and XA plan to recover "emails deleted by the former employees."

31.     At the time Glenn Laken published these statements, he knew, or should have known, all of these statements to be absolutely false.

32.     Both the November 19, 2014 letter and the relevant pages of the Form 10-Q/A are attached hereto as **Exhibit C.**

**B.     Defamatory Statements by Alexis Laken to Wagner's Business Partner**

33.     To further the Lakens' efforts to spread defamatory statements against Wagner, Alexis Laken, President of XA, wrote at least one email to Wagner's business partner and vendor falsely accusing Wagner of theft.

34.     Alexis Laken stated that XA had "documentary proof that Joseph Wagner, the former CEO of XA, stole millions of dollars in business opportunity and cash receipts from the parent company that owns XA over the course of his tenure." In fact, Alexis Laken went so far

as to state that Wagner was susceptible to "criminal" charges.   An email containing these statements is attached hereto as **Exhibit D.**

35.     Alexis Laken used this email to intimidate and threaten Wagner's business partner, thereby harming Wagner.

36.     Furthermore, Alexis Laken threatened this business partner, stating that she has "an ongoing relationship with a number of media outlets – Craig's [sic] Chicago in particular has been asking for interesting and salacious details." Upon information and belief, Alexis Laken is referring to the news publication *Crain's Chicago Business* ("*Crain's*").   This email is attached hereto as **Exhibit E.**

**C.     Defamatory Statements Made to *Crain's* for Purposes of Publication**

37.     Upon information and belief, Alexis Laken and Glenn Laken used their relationships with *Crain's* to further spread their defamatory statements concerning all Third-Party Plaintiffs.

38.     On December 16, 2014, *Crain's* published an article entitled, "Marketing and PR agency XA shutters Chicago office amid theft allegations." *See* **Exhibit A.**

39.     Both the Lakens are quoted in the article.

40.     Upon information and belief, the Lakens made defamatory statements about Third-Party Plaintiffs for the purpose of publication in a widely-read news source.

41.     Upon information and belief, the Lakens repeated many of the defamatory statements identified above to *Crain's* for publication in the article.

42.     Upon information and belief, the Lakens also provided *Crain's* with additional documents or information that contained defamatory statements not published elsewhere. Indeed, although the article reports that these statements are alleged in XA's lawsuit against

Third-Party Plaintiffs and HudsonGray, they are, in fact, not contained in XA's Complaint. On information and belief, the Lakens falsely informed *Crain's* that these statements were alleged in the Complaint so that *Crain's* would publish them, when, in fact, these statements are not included in the Complaint.[1]

43.    For example, the article states that XA alleges in its lawsuit that Wagner and Andereck operated a company called XA Scenes and Studio AG "without the knowledge of CMG executives and siphoned millions of dollars in revenue from XA." The article states that XA alleges that Andereck owns Studio AG.

44.    The article further states that XA alleges that Mixed Company, an entity owned by former XA COO Jean Wilson, was an "unauthorized vendor" to XA and received $130,000 in payments.

45.    Upon information and belief, these statements were provided by the Lakens to *Crain's* for publication for the express purpose of causing reputational and economic harm to the Third-Party Plaintiffs.

46.    At the time the Lakens provided this information, they knew or should have known that the information was false.

**D.    The Lakens Knew that the Defamatory Statements were False**

47.    All of the defamatory statements that Glenn Laken made in the SEC filings, that Alexis Laken made to Wagner's business partner, and that the Lakens, upon information and belief, made to *Crain's* for the purposes of publication are demonstrably false, and both either knew their statements were false, or should have known their falsity, at the time that they made the statements.

---

[1] XA withdrew its Complaint against Wagner following service of Wagner's Motion to Dismiss the Complaint on the basis of documentary evidence. XA then missed the January 23, 2015 deadline to serve an amended complaint. Accordingly, there is now no Complaint pending against Wagner.

a.   XA Scenes and Studio AG Did Not Siphon Business from XA

48.   Glenn Laken's shareholder letter and Form 10-Q/A and the *Crain's* article planted by the Lakens contain statements that XA Scenes and Studio AG were competitors of XA in which Wagner and Andereck had an ownership interest that was not disclosed to CMG, and that the Third-Party Plaintiffs siphoned business from XA to these entities without the knowledge of CMG board members.

49.   This is patently false.

50.   XA Scenes was a subsidiary of XA, Inc., the predecessor entity of XA.

51.   At the time that CMG acquired the assets of XA, it also obtained all the trademarks, customer lists, and goodwill of XA Scenes.

52.   CMG board members were not only fully aware of the actions of XA Scenes, but were actively involved in XA Scenes' operations.

53.   For example, at the time that Wagner was employed by XA, XA Scenes was the leaseholder for the New York office of both XA and CMG.

54.   James Ennis ("Ennis"), the former CFO, COO, and Treasurer of CMG, was also the President, Secretary, and Treasurer of XA.

55.   In October 2009, Ennis signed a guarantee as President of CMG for rent payments to be made by XA Scenes.  This agreement is attached hereto as **Exhibit F**.

56.   In fact, to assist paying corporate office lease expenses, CMG paid $10,000.00 directly to XA Scenes.

57.   Furthermore, in January 2010, Ennis executed a Certificate of Business: Fictitious Firm Name for XA to conduct business under the name of XA Scenes.  A true and correct copy of this certificate is attached hereto as **Exhibit G**.

{11051495.5}

9

58.    Glenn Laken, as the CMG Chief Executive Officer and Chairman of the CMG board of directors, and Alexis Laken, as President of XA, knew, or should have known, any statements that XA Scenes was operating without the knowledge of CMG were false.

59.    Furthermore, even ignoring the corporate affiliation between XA Scenes and XA, the allegation that XA Scenes siphoned business away from XA is false, as the two entities were not competitors.

60.    XA is an event marketing company.

61.    XA Scenes was the venue management division of XA.

62.    Therefore, the Lakens knew or should have known that any statement that XA Scenes siphoned business away from XA was false when they made the defamatory statements.

63.    Similarly, the Lakens knew or should have known that all of their defamatory statements regarding Studio AG were false.

64.    Studio AG was formed by Wagner, Andereck, and another former XA employee because XA required floral décor and fabrication services. Previously, Fiori XA, a subsidiary of XA, Inc., provided this service. In 2009, however, CMG management decided to abandon Fiori XA's line of business.

65.    When it became clear that such services were required again, Wagner, Andereck, and another XA manager formed Studio AG to better serve XA's clients.

66.    The requirement of these types of services, and the consequential formation of Studio AG, was specifically discussed in a memorandum dated December 4, 2009 from Wagner (and a colleague) to Ennis, COO and CFO of CMG. This memorandum is attached hereto as **Exhibit H**.

67.     As an illustration of how openly this was done, Wagner also wrote a memorandum dated January 27, 2014 to Ron Burkhardt ("Burkhardt") soon after Burkhardt became Executive Chairman at XA, disclosing Wagner's ownership interest in Studio AG "to support XA." This memorandum is attached as **Exhibit I.** Burkhardt was also a board member of CMG.

68.     Further, as with XA Scenes, it is impossible for Studio AG to have siphoned business away from XA because the two entities are not competitors, and rather, Studio AG was formed specifically to support XA operations.

69.     Any statement that the CMG board was unaware of the ownership or operation of Studio AG or that Studio AG siphoned any business away from XA is false. And the Lakens knew or should have known that any statements to that effect were false.

### b.     Third-Party Plaintiffs Used Personal Monies to Fund XA

70.     The Lakens also published the defamatory statement that all Third-Party Plaintiffs converted XA funds by charging "personal charges on company credit cards," making payments for cell phones for family members, obtaining reimbursement for personal travel, and other expenses not related to XA.

71.     At the time the Lakens made these statements, they knew that they were false.

72.     Due to the shrinking of the credit markets, Wagner, Andereck and another member of XA management used their personal credit cards to fund XA's expenses.

73.     Therefore, for the benefit of the company, Wagner and Andereck incurred significant expenses on their personal credit card accounts.

74.     For example, Wagner used his own credit card for a venue payment on December 9, 2013 in the amount of $32,076.00 on behalf of XA.  A credit card statement showing that payment is attached hereto as **Exhibit J.**

75.     Because this was Wagner's personal credit card, Wagner exposed himself to significant personal financial liability given that in the event XA was unable or unwilling to pay, Wagner would be personally responsible for these charges.

76.     Andereck similarly exposed himself to personal financial liability by using his own personal credit card for the benefit of XA.

77.     It was then XA's standard practice to reimburse Wagner and Andereck for any of these expenses related to XA's business.  From these reimbursements, XA would specifically exclude any payments Wagner and Andereck made that were personal.  For example, Wagner, for a period of a handful of months, used his personal credit card for family cell phone plans, which amounted to approximately $20 per month, and used his personal credit card for miscellaneous purchases, such as concert tickets.

78.     As a matter of course, Wagner and Andereck reimbursed XA for any credit card charges made for personal usage, even prior to any demand from XA.

79.     Furthermore, Wagner and Andereck submitted to Burkhardt five years of their personal credit card statements for review.  Burkhardt, on behalf of XA, determined that no expenses charged to XA were outside the normal and ordinary course of XA's business.

80.     The defamatory statements that Smith and Lomma in any way converted funds of XA for their own personal use have absolutely no truthful basis.

81.     Thus, all of the statements that any of the Third-Party Plaintiffs in any way used XA funds for their own personal use are completely false.

{11051495;5}                                         12

82.    Over a period of years, Third-Party Plaintiffs attempted to stop XA's reliance on their personal credit cards.

83.    In a memorandum dated December 4, 2009 to Ennis, Wagner stated that XA's management, including Wagner and Andereck, were supporting XA by use of their personal credit cards. Wagner suggests that this had been a burden because those managers had their "personal credit compromised" due to the necessity of using their own personal credit cards for XA's needs. *See* **Exh. H**.

84.    By memorandum dated January 27, 2014, over four years later, Wagner wrote another memorandum to Burkhardt, XA's Executive Chairman and CMG's board member. In it, Wagner states that there is "still no credit line" for XA, and that Wagner and Andereck are "using personal credit cards to support XA's need for credit." *See* **Exh. I**.

85.    Simply put, there were no XA company credit cards for anyone to even abuse. And the use of Wagner and Andereck's own personal credit cards for XA's expenses was not only something of which CMG board members were aware, it was something that Third-Party Plaintiffs were actively attempting to end.

86.    Additionally, with regard to Wagner, throughout this time period, XA failed to pay Wagner compensation according to his employment agreement, which necessitated a settlement agreement executed in February 2014 that required XA to pay Wagner over $500,000 (the "February Agreement"). When XA failed to comply with these terms, Wagner and XA signed April Settlement Agreement and Release. *See* ¶¶ 16-17, *supra*.

87.    Therefore, during the time that the Lakens claim that Wagner was converting funds, XA actually owed Wagner hundreds of thousands of dollars.

88.     Finally, as stated above, the April Settlement Agreement and Release contained a general release of all claims XA may have had against Wagner as of April 30, 2014. Thus, even if the defamatory statements of conversion were true, XA had waived any such claims when the defamatory statements were made such that the statement in Glenn Laken's letter that XA "will use every legal avenue available to claw-back the stolen profits of the past" is false and misleading. There is a pattern and practice of such duplicitous conduct.

c.      **Third-Party Plaintiffs Are Permitted to Solicit XA's Clients**

89.     The Lakens also made defamatory statements that HudsonGray and Third-Party Plaintiffs improperly poached corporate clients or business opportunities from XA.

90.     The April Settlement Agreement and Release entered into between XA and Wagner does not contain a non-solicitation provision restricting Wagner's ability to solicit XA clients. *See* **Exh. B.** It does, however, contain an integration clause, stating that it constitutes the entire agreement between the parties and supersedes any prior agreements with respect to the matters set forth therein and supersedes all prior agreements between XA and Wagner. *See id.* at ¶ 11. Thus, Wagner was permitted to seek the business of any of XA's clients.

91.     In fact, when Glenn Laken was confronted with the effect of the lack of a non-solicitation provision in the April Settlement Agreement and Release, he stated that it was not a concern because of his view that Wagner no longer had any interest in the business of XA and that Wagner was going to focus on his consulting business.

92.     Alexis Laken, as President of XA, has or has access to the April Settlement Agreement and Release, thereby demonstrating that she knew or should have known that the allegations concerning improper solicitation were false.

93.     In addition, prior to XA initiating the underlying lawsuit against Wagner and others, Wagner's counsel sent XA a letter on September 18, 2014, which specifically directs XA's attention to the release provisions and integration clause of the April Settlement Agreement and Release. This letter is attached hereto as **Exhibit K.** Further, in response to the lawsuit, on November 7, 2014, Wagner, along with HudsonGray, filed a motion to dismiss which specifically articulated why Wagner was not subject to a non-solicitation provision, the effect of the integration clause in the April Settlement Agreement and Release, and the effect of the general waiver contained therein.

94.     Smith, Andereck, and Lomma never signed any employment manual, handbook, contract, or agreement that contained any restriction against solicitation. The statements made by the Lakens that they had any such duty are completely false.

95.     Accordingly, at the time the Lakens made these statements, they knew them to be false.

96.     These statements were particularly egregious considering that Alexis Laken made statements to business entities implying that Wagner had engaged in criminal activity. *See* **Exh. D.**

97.     Such statements were deliberately meant to harm the business reputation of Third-Party Plaintiffs.

d.     **Third-Party Plaintiffs Did Not Delete Email Accounts**

98.     In a transparent attempt to saddle Third-Party Plaintiffs with as many nefarious actions as possible, Glenn Laken states in the SEC filings that XA's investigations have discovered "e-mails deleted by former employees."

99.   Glenn Laken is well aware that XA's own email policy is to delete former employee email accounts 60 days after separation.

100.   At the latest, Glenn Laken was made aware of this policy on September 12, 2014, when Jean Wilson, former COO of XA, provided an email to Glenn Laken that explicitly stated this policy.

101.   Glenn Laken's defamatory statements that suggest improper deleting of emails by XA's former employees demonstrates the desperate attempts that both he and Alexis Laken went in their efforts to impugn Third-Party Plaintiffs' reputations and harm their business.

e.   **Implication of Wagner's Resignation Due to XA's Performance**

102.   Glenn Laken's letter to shareholders implies that Wagner resigned his position as CEO because XA "never made a significant profit."

103.   Laken, however, is well aware that a dispute arose between XA and Wagner regarding payments owed to Wagner as a result of a certain incentive package, and in February 2014, XA and Wagner executed a contract entitling Wagner to certain payments (the "February Release").

104.   XA, however, failed to make the payments required by the February Release.

105.   To resolve Wagner's claims against XA, the parties entered into the April Settlement Agreement and Release, which also terminated Wagner's employment with XA.

106.   Thus, the implication that Glenn Laken made in his letter that Wagner resigned due to an investigation into XA's poor performance is false and is meant to disparage Wagner's business reputation.

####    f.      Mixed Company Was Known to XA

107.    The *Crain's* article states that a company called Mixed Company, owned by former COO Jean Wilson, was an "unauthorized vendor" to XA and received improper payments.

108.    The Third-Party Plaintiffs comprised senior management of XA, such that they had full authority to hire vendors without first seeking or receiving any authorization from CMG, XA's corporate parent.

109.    In addition, Mixed Company had stellar qualifications in the floral design industry, including design credentials and experience, and provided myriad other benefits to XA as determined in the business judgment of Third-Party Plaintiffs.

110.    For example, because of the relationship that XA had with Mixed Company, Mixed Company was willing and able to provide services at the last minute that other entities would not have been able to provide.

111.    Furthermore, upon information and belief, the information that the Lakens provided to *Crain's* overstates the amount that was paid to Mixed Company.

112.    Thus, the statements concerning an improper relationship between XA and Mixed Company when Third-Party Plaintiffs were employed by XA are false, and the Lakens knew it to be so when they provided *Crain's* with that information.

####    g.      The Lakens' Blatantly False Claims Concerning Computers and Staging Equipment

113.    The Lakens also made defamatory statements that Third-Party Plaintiffs stole newly purchased computers and lockers filled with staging equipment around the country.

114.    These statements are completely false. There is absolutely no basis for these statements.

{11051495;5}                                    17

## COUNT I (LIBEL PER SE)

115.   Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

116.   The defamatory statements made by Glenn Laken in the November 19, 2014 letter to CMG shareholders attached to XA SEC Form 8-K and in the Form 10-Q/A filings constitute libel *per se*.

117.   Glenn Laken knew, or should have known, that his defamatory statements, including statements of Third-Party Plaintiffs siphoning business to entities in which they had an interest without the knowledge of CMG, converting funds for personal use, improperly soliciting the business of XA's clients, improperly deleting emails, and all the other defamatory assertions, were false.

118.   The defamatory statements made by Glenn Laken were: 1) false statements; 2) published to countless third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) constitute libel *per se*.

119.   Glenn Laken knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner.

120.   The defamatory statements were published in publicly available SEC filings, were made available to all shareholders of CMG, are currently accessible on the internet, and have been publicized in countless investment internet discussion boards. *See, e.g.,* February 12, 2015 printout from *Investors Hub*, attached hereto as **Exhibit L**.

121.   By making these publications, Glenn Laken has published his defamatory statements to countless numbers of people, and has done so with the intention of injuring Third-Party Plaintiffs' business reputation and to discredit and harm them.

{11051495.5}                                                    18

122.   The defamatory statements have damaged the personal and business reputation of Third-Party Plaintiffs, resulting in monetary damages in an amount to be determined at trial.

123.   The defamatory statements suggest improper performance of Third-Party Plaintiffs' duties or unprofessional conduct by Third-Party Plaintiffs.

124.   Business clients and associates of Third-Party Plaintiffs have already contacted them, raising their concerns about the defamatory statements published by Glenn Laken, resulting in monetary damages in an amount to be determined at trial.

125.   Potential clients of Third-Party Plaintiffs may have been deterred by the defamatory statements made by Glenn Laken, resulting in monetary damages in an amount to be determined at trial.

126.   The actions of Glenn Laken in making the defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT II (LIBEL PER SE)

127.   Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

128.   The defamatory statements made by Alexis Laken to Wagner's business partner and vendor constitute libel *per se*.

129.   Alexis Laken knew, or should have known, that her defamatory statements that XA was in possession of documentary proof that Wagner stole millions of dollars in business opportunity and cash receipts from CMG, and the implication that Wagner had engaged in criminal conduct were false.

{11051495:5}

19

130.   The defamatory statements made by Alexis Laken were: 1) false statements; 2) published to third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) constitute libel *per se*.

131.   Alexis Laken knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner by spreading these statements through emails in Wagner's business community.

132.   Alexis Laken further sought to intimidate these business entities, threatening embarrassing media coverage through use of her media connections.

133.   By sending these emails, Alexis Laken has published her defamatory statements to business associates of Wagner, and has done so with the intention of injuring Wagner's business reputation and to discredit and harm him.

134.   The defamatory statements have damaged the personal and business reputation of Wagner, resulting in monetary damages in an amount to be determined at trial.

135.   The defamatory statements not only suggest improper performance of Wagner's duties or unprofessional conduct by Wagner, but further suggest that Wagner conducted himself in a criminal fashion.

136.   The actions of Alexis Laken in making her defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT III (LIBEL PER SE)

137.   Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

138.   Upon information and belief, the defamatory statements made by the Lakens to the news publication *Crain's* constitute libel *per se*.

{11051495:5}                                             20

139.    The Lakens knew, or should have known, that their defamatory statements, including statements of Third-Party Plaintiffs siphoning business to entities in which they had an interest without the knowledge of CMG, converting funds for personal use, improperly soliciting the business of XA's clients, improperly deleting emails, and all the other defamatory assertions, were false.

140.    The defamatory statements made by the Lakens were: 1) false statements; 2) published to countless third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) constitute libel *per se*.

141.    Upon information and belief, by providing their statements to *Crain's*, the Lakens knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner.

142.    The defamatory statements were published in a widely circulated news periodical, with an internet-based website that boasts monthly readership of over 400,000 people. *See* http://crainschicagoadvertising.com/stats/print/ (last accessed February 12, 2015). Furthermore, *Crain's* is specifically targeted towards business professionals, precisely the audience with whom Third-Party Plaintiffs' good reputations are most valuable.

143.    By making these statements for the purpose of mass publication, the Lakens published their defamatory statements to countless numbers of people, and did so with the intention of injuring Third-Party Plaintiffs' business reputation and to discredit and harm them.

144.    The defamatory statements have damaged the personal and business reputations of Third-Party Plaintiffs, resulting in monetary damages in an amount to be determined at trial.

145.    The defamatory statements suggest improper performance of Third-Party Plaintiffs' duties or unprofessional conduct by Third-Party Plaintiffs.

146.   Business clients and associates of Third-Party Plaintiffs have already contacted them, raising their concerns about the defamatory statements published by the Lakens, resulting in monetary damages in an amount to be determined at trial.

147.   Potential clients of Third-Party Plaintiffs may have been deterred by the defamatory statements made by the Lakens, resulting in monetary damages in an amount to be determined at trial.

148.   The actions of the Lakens in making their defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT IV (LIBEL)

149.   Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

150.   The defamatory statements made by Glenn Laken in the November 19, 2014 letter to CMG shareholders attached to XA SEC Form 8-K and in the Form 10-Q/A filings constitute libel.

151.   Glenn Laken knew, or should have known, that his defamatory statements, including statements of Third-Party Plaintiffs siphoning business to entities in which they had an interest without the knowledge of CMG, converting funds for personal use, improperly soliciting the business of XA's clients, improperly deleting emails, and all the other defamatory assertions, were false.

152.   The defamatory statements made by Glenn Laken were: 1) false statements; 2) published to countless third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) caused specific damages.

{11051495;5}                                          22

153.   Glenn Laken knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner.

154.   The defamatory statements were published in publicly available SEC filings, were made available to all shareholders of CMG, are currently accessible on the internet, and have been publicized in countless investment internet discussion boards.   *See, e.g.,* printout from *Investors Hub*, attached hereto as **Exhibit L**.

155.   By making these publications, Glenn Laken has published his defamatory statements to countless numbers of people, and has done so with the intention of injuring Third-Party Plaintiffs' business reputation and to discredit and harm them.

156.   The defamatory statements have damaged the personal and business reputation of Third-Party Plaintiffs, resulting in monetary damages in an amount to be determined at trial.

157.   The defamatory statements suggest improper performance of Third-Party Plaintiffs' duties or unprofessional conduct by Third-Party Plaintiffs.

158.   Business clients and associates of Third-Party Plaintiffs have already contacted them, raising their concerns about the defamatory statements published by Glenn Laken, resulting in monetary damages in an amount to be determined at trial.

159.   Potential clients of Third-Party Plaintiffs may have been deterred by the defamatory statements made by Glenn Laken, resulting in monetary damages in an amount to be determined at trial.

160.   The actions of Glenn Laken in making the defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT V (LIBEL)

161.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

162.    The defamatory statements made by Alexis Laken to Wagner's business partner and vendor constitute libel.

163.    Alexis Laken knew, or should have known, that her defamatory statements that XA was in possession of documentary proof that Wagner stole millions of dollars in business opportunity and cash receipts from CMG, and the implication that Wagner had engaged in criminal conduct were false.

164.    The defamatory statements made by Alexis Laken were: 1) false statements; 2) published to third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) caused specific damages.

165.    Alexis Laken knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner by spreading these statements through emails in Wagner's business community.

166.    Alexis Laken further sought to intimidate these business entities, threatening embarrassing media coverage through use of her media connections.

167.    By sending these emails, Alexis Laken has published her defamatory statements to business associates of Wagner, and has done so with the intention of injuring Wagner's business reputation and to discredit and harm him.

168.    The defamatory statements have damaged the personal and business reputation of Wagner, resulting in monetary damages in an amount to be determined at trial.

169.   The defamatory statements not only suggest improper performance of Wagner's duties or unprofessional conduct by Wagner, but further suggest that Wagner conducted himself in a criminal fashion.

170.   Business clients and associates of Wagner have already contacted Wagner, raising their concerns about the defamatory statements published by the Lakens, resulting in monetary damages in an amount to be determined at trial.

171.   The actions of Alexis Laken in making their defamatory statements were motivated by ill-will, malice or other nefarious motive.

## COUNT VI (LIBEL)

172.   Third-Party Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114, as if fully set forth herein.

173.   Upon information and belief, the defamatory statements made by the Lakens to the news publication *Crain's* constitute libel.

174.   The Lakens knew, or should have known, that their defamatory statements, including statements of Third-Party Plaintiffs siphoning business to entities in which they had an interest without the knowledge of CMG, converting funds for personal use, improperly soliciting the business of XA's clients, improperly deleting emails, and all the other defamatory assertions, were false.

175.   The defamatory statements made by the Lakens were: 1) false statements; 2) published to countless third parties without privilege or authorization; 3) were made with the requisite degree of fault; and 5) caused specific damages.

176.   Upon information and belief, by providing their statements to *Crain's*, the Lakens knowingly and maliciously made, dispersed, and publicized the defamatory statements in a grossly irresponsible manner.

177.   The defamatory statements were published in a widely circulated news periodical, with an internet-based website that boasts monthly readership of over 400,000 people. *See* http://crainschicagoadvertising.com/stats/print/ (last accessed February 12, 2015). Furthermore, *Crain's* is specifically targeted towards business professionals, precisely the audience with whom Third-Party Plaintiffs' good reputations are most valuable.

178.   By making these statements for the purpose of mass publication, the Lakens published their defamatory statements to countless numbers of people, and did so with the intention of injuring Third-Party Plaintiffs' business reputation and to discredit and harm them.

179.   The defamatory statements have damaged the personal and business reputation of Third-Party Plaintiffs, resulting in monetary damages in an amount to be determined at trial.

180.   The defamatory statements suggest improper performance of Third-Party Plaintiffs' duties or unprofessional conduct by Third-Party Plaintiffs.

181.   Business clients and associates of Third-Party Plaintiffs have already contacted them, raising their concerns about the defamatory statements published by the Lakens, resulting in monetary damages in an amount to be determined at trial.

182.   Potential clients of Third-Party Plaintiffs may have been deterred by the defamatory statements made by the Lakens, resulting in monetary damages in an amount to be determined at trial.

183.   The actions of the Lakens in making their defamatory statements were motived by ill-will, malice or other nefarious motive.

## PRAYER FOR RELIEF

WHEREFORE, Third-Party Plaintiffs demand judgment against Glenn Laken and Alexis

Laken for:

1.      monetary damages in an amount to be determined at trial, plus interest and costs,

and reimbursement of Third-Party Plaintiffs' attorneys' fees and expenses;

2.      punitive damages for the knowing publication of the defamatory statements;

3.      a mandatory and permanent injunction directing the Lakens and all employees

and agents of CMG and its subsidiaries, including XA, to cease making defamatory statements

concerning the Third-Party Plaintiffs; and

4.      such other relief as the Court deems to be fair and equitable.

Dated: New York, New York
       February 19, 2015

                              Respectfully submitted,

                              WINDELS MARX LANE & MITTENDORF, LLP

                              By: _____
                                  Scott R. Matthews
                                  Daniel J. Shim
                              156 West 56th Street
                              New York, NY 10019
                              (212) 237-1000
                              *Attorneys for Third-Party Plaintiffs*

Index No. 652894/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

XA EXPERIENTIAL AGENCY, INC.,

                                        Plaintiff,

            v.

JOSEPH WAGNER, HUDSON GRAY LLC, JEFFREY SMITH, DARREN ANDERECK and
JESSIE LOMA,

                                        Defendants.

JOSEPH WAGNER, JEFFREY SMITH, DARREN ANDERECK, and JESSIE LOMMA,

                                        Third-Party Plaintiffs,

            v

GLENN LAKEN and ALEXIS LAKEN,

                                        Third-Party Defendants.

## THIRD-PARTY SUMMONS AND COMPLAINT

**WINDELS MARX LANE & MITTENDORF, LLP**
*Attorneys for Third-Party Plaintiffs*

156 WEST 56TH STREET
NEW YORK, NEW YORK 10019
212.237.1000

TO:                                    Signature (Rule 130-1.1-a)

                                       Printed name beneath
                                       Daniel Shim

Attorney(s) for
Service of a copy of the within                              is hereby admitted.

Dated,

                              Attorney(s) for

Please take notice
☐ NOTICE OF ENTRY
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within court on
☐ NOTICE OF SETTLEMENT
that an order                          of which the within is a true copy will be presented for
settlement to the HON.                                         one of the judges
of the within court, at
on                         at            M

Dated,                                 Yours, etc.

                              **WINDELS MARX LANE & MITTENDORF, LLP**
                              *Attorneys for Third-Party Plaintiffs*

To

Attorney(s) for                        156 WEST 56TH STREET

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM

NYSCEF DOC. NO. 23

INDEX NO. 652894/2014

RECEIVED NYSCEF: 02/19/2015

# Exhibit A



<u>Print Story</u>                    Printed from ChicagoBusiness.com

## Marketing and PR agency XA shutters Chicago office amid theft allegations

By Brigid Sweeney December 16, 2014

**XA, the Experiential Agency,** a marketing and public relations company that represented high-profile restaurants, bars and lifestyle brands in Chicago, is closing its office here, effective immediately.

The shutdown comes amid allegations of client theft and misuse of funds.

According to **documents filed with the Securities and Exchange Commission,** XA filed a lawsuit in New York in September against former employees in Chicago and New York.

"We don't have a lot of information," said Kate Gleason, an XA account director who estimates that there are four or five full-time employees in Chicago. Several staff members have left in recent months. "We just found out yesterday and the team is still figuring out what's next."

"We decided to focus our operations out of our New York office," said XA President Alexis Laken. "XA will certainly remain open."

XA, a subsidiary of Wilmington, Del.-based holding company CMG Holdings, opened its Chicago office in the John Hancock Center about a decade ago. The company also has offices in Los Angeles and Atlanta, according to its website.

"Our new organizational structure will simply strengthen and leverage the company to rebalance its workforce to meet the changing requirements of its clients and align its staffing levels to meet current market conditions," according to an email from CMG Holdings CEO Glenn Laken.

The suit alleges that XA's New York employees and its Chicago-based COO, **Jean Wilson,** who resigned during the first half of this year, created a new company called **HudsonGray** and solicited XA clients in violation of their non-compete agreements.

Wilson is no longer affiliated with HudsonGray.

According to the suit, the former employees also put personal charges on company credit cards and used XA funds to pay for family members' cellphones, personal travel and other expenses unrelated to business.

According to documents obtained by Crain's, XA alleges that Wilson conspired with former CEO Joe Wagner, also based in Chicago, and former President **Darren Anderek,** based in New York, to solicit XA employees and business.

XA also alleges that a west suburban Elmhurst florist owned by Wilson, Mixed Company, was an unauthorized vendor to XA and received $130,000 in payments in the last year.

Anderek, reached briefly at HudsonGray's New York office, did not return subsequent calls. Wagner, reached at HudsonGray's Chicago office, declined to comment. Attempts to reach Wilson were unsuccessful.

## XA SCENES

XA goes on to allege that Wilson, Wagner and Anderek also operated a company called XA Scenes that functioned as the rental agent for **Gallery 1028,** a Near North Side loft event space, and as an agent for Alice's Garden, a now-defunct Lakeview florist owned by Anderek, and **Studio AG,** a North Side event-production company he also owns. The suit alleges that these companies supplied the same services to the same clients

as XA, operated without the knowledge of CMG executives and siphoned millions of dollars in revenue from XA.

CMG's gross revenue decreased to $120,058 for the quarter ended Sept. 30 from just over $1 million in the year-earlier period. According to a filing with the SEC, "The decrease in revenues was mainly due to the departure of certain personnel and clients of our subsidiary XA." Net loss increased to $450,890 from $115,799.

For the nine months ended Sept. 30, CMG booked revenue of $7.6 million—all of it generated by XA. CMG posted a $1.6 million net loss for the same period. XA posted a $205,341 loss during that time.

For years, XA's Chicago office was affiliated with **Amanda Puck,** a former executive vice president at the company who is well-connected in social and business circles. She is not named in the suit.

Puck hosted the first two seasons of "Check, Please!" on WTTW-TV/Channel 11 in the early 2000s. She joined XA in 2004 to increase its event planning business, nabbing clients including the 900 Shops on Michigan Avenue, Bravo TV and USA Network, along with plenty of restaurants in town.

Puck departed in May to become the **director of strategic brand development at Mariano's,** the fast-growing grocery chain owned by Milwaukee-based Roundy's.

XA clients in Chicago have included the Ritz-Carlton, Le Colonial, Coco Pazzo, Freshii and Hubbard Inn. Other clients include HBO, Google Wallet, Michael Kors and Moet & Chandon, according to XA's website.

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM

NYSCEF DOC. NO. 24

INDEX NO. 652894/2014

RECEIVED NYSCEF: 02/19/2015

# Exhibit B

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is entered into by and between Joseph Wagner ("Wagner"); XA, the Experiential Agency, Inc. ("XA"); CMG Holdings, Inc. ("CMG"); Glenn Laken ("Laken"); Jeffrey Devlin ("Devlin"); and Ron Burkhardt ("Burkhardt"); (collectively, the "Parties"), this 22nd day of April, 2014.

**WHEREAS,** Wagner and XA, a wholly owned subsidiary of CMG, entered into an Amended and Restated Executive Employment Agreement with an effective date of April 1, 2009 (the "Employment Agreement");

**WHEREAS,** Wagner alleges he terminated the Employment Agreement for "Good Reason" pursuant to Section 11(d) of the Employment Agreement effective March 18, 2014, and XA disputes the termination was for "Good Reason";

**WHEREAS,** a dispute exists between Wagner and XA concerning compensation Wagner claims XA owes him pursuant to the terms of the Employment Agreement, (collectively, the "Dispute"); and

**WHEREAS,** the Parties wish to fully and finally resolve the Dispute without the burden, expense, and distraction of litigation and have negotiated the terms of this Agreement in good faith and at arm's length;

**NOW, THEREFORE,** in consideration of the mutual covenants, understandings, obligations and provisions of this Agreement, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.     **Recitals.**  The foregoing recitals are incorporated into this Agreement in their entirety.

1

17123642v.3

2.     **$210,000 Payment to Wagner.**  Provided Wagner executes this Settlement

Agreement and does not later revoke it, XA shall wire to Wagner on April 30, 2014 (the

"Effective Date"), the lump sum payment of $210,000 (the "$210,000 Payment").  The $210,000

Payment shall be subject to all applicable withholdings, including federal, state and other taxes

associated with wages paid to W-2 employees.  Under no circumstances, shall Laken, Devlin

and/or Burkhardt be responsible or liable for payment under this Section 2.

3.     **PTO Payment to Wagner**.  Provided Wagner executes and does not later revoke

this Agreement, XA shall wire to Wagner, on or before April 30, 2014, payment for all earned

and unused PTO for year 2014 in the amount of $10,000 (the "PTO Payment").  The PTO

Payment shall be subject to all applicable withholdings, including federal, state and other taxes

associated with wages paid to W-2 employees.  Under no circumstances, shall Laken, Devlin

and/or Burkhardt be responsible or liable for payment under this Section 3.

4.     **Wire Instructions**.  The $210,000 Payment and the PTO Payment shall be wired

to Wagner at the following address:

          LSC Capital Advisers, Inc.
          Chase Bank N.A., Chicago, IL
          ABA # 071000013
          Acct # 0792569618

5.     **CMG Guarantee**.  By its authorized signature below and by signing the

Guaranty attached as Exhibit A which is incorporated herein, CMG guarantees both the

$210,000 Payment and the PTO Payment to Wagner and agrees that in the event XA fails to

make either the $210,000 Payment or the PTO Payment or both on the date due, CMG will wire

transfer said payment or payments to Wagner within three (3) business days of the respective due

date.  In the event XA files a bankruptcy petition and either the $210,000 Payment or the PTO

Payment or both are avoided and recovered by the bankruptcy trustee, CMG will wire transfer

2

said payment or payments to Wagner within three (3) business days of the avoidance and recovery.

6.     **Employment Agreement.** As of the Effective Date, the Employment Agreement is terminated and all rights and obligations of Wagner and XA thereunder are extinguished. This Agreement constitutes, and may be pleaded as, a bar to any claim, action, cause of action, or proceeding brought by Wagner and/or XA to enforce the Employment Agreement or any of its terms.

7.     <u>General Release of Claims by Wagner.</u>

(a)     In consideration for the payments and covenants, as set forth herein, and except with respect to any action to enforce the terms of this Agreement, Wagner, for himself and all of his agents, heirs, executors, administrators, attorneys and assigns, past, present and future, hereby waives, releases and forever discharges XA and CMG, and all of their subsidiaries and affiliates, whether direct or indirect, their joint ventures and joint venturers (including their respective directors, officers, employees, shareholders, partners and agents, past, present and future), and each of their respective successors and assigns, past, present and future, and Laken, Devlin, Burkhardt, and each of their agents, heirs, executors, administrators, attorneys and assigns, past, present and future (hereinafter collectively referred to as the "Releasees"), from any and all known or unknown actions, causes of action, claims or liabilities of any kind which have or could be asserted against the Releasees arising out of or related to the Dispute, Wagner's relationship with and/or termination from XA and/or any of the other Releasees and/or arising out of or related to any other occurrence up to and including the Effective Date, including but not limited to:

(i)     All claims under the Age Discrimination In Employment Act (ADEA), Title VII of the Civil Rights Act of 1964, Civil Rights Acts of 1866, 1870, and 1871,

3

17123642v.3

Americans With Disabilities Act, Family and Medical Leave Act, Executive Order 11246, Rehabilitation Act of 1973, Employee Retirement Income Security Act, Fair Labor Standards Act, Illinois Human Rights Act, state wage payment laws, and under any other federal, state and local statute, ordinance, regulation, and order, and all claims for breach of contract, bonuses, commissions, stock options, negligence, wrongful discharge, and under any other common law theory; provided, however, that Wagner does not waive any right he may have to unemployment insurance benefits or vested benefits under the Company's 401(k) or pension plan; and/or

             (ii)     Claims, actions, causes of action or liabilities arising under any other federal, state, municipal, or local statute, law, ordinance or regulation; and/or

             (iii)    Any other claim whatsoever including, but not limited to, claims for pay/wages/commissions, bonuses, severance pay, claims based upon breach of contract, wrongful or retaliatory termination, defamation, intentional infliction of emotional distress, tort, personal injury, invasion of privacy, violation of public policy, negligence and/or any other common law, statutory or other claim whatsoever arising out of or relating to Wagner's employment with and/or termination from employment with XA and/or any of the other Releasees,

        (b)     Excluded from this release are claims arising after Wagner executes this Agreement, claims for breach of this Agreement, and claims that, by law, cannot be waived, such as for unemployment or worker's compensation. Neither the release section(s) above nor anything else in this Agreement shall limit Wagner's rights to file a charge with any administrative agency or to participate in an agency investigation or other administrative proceeding. However, Wagner gives up all rights to any money or other personal benefit from any administrative charge, investigation or proceeding.

        (c)     Wagner also agrees not to sue any of the Releasees or become a party to a lawsuit on the basis of any claim of any type whatsoever arising out of or related to his relationship with and/or termination from employment with XA and/or any of the other Releasees, which claim, known or unknown, arises or could have been asserted on or before the Effective Date, other than a lawsuit by Wagner to challenge this Agreement under the ADEA.

4

(d)     To the extent permitted by law, Wagner also waives his right, if any, to any monetary recovery should any federal, state, or local administrative agency pursue any claims on Wagner's behalf arising out of or related to his employment with and/or separation from employment with XA and/or any of the other Releasees. Wagner also hereby acknowledges that he has not suffered any on-the-job injury for which he has not already filed a claim.

(e)     To the extent permitted by law, Wagner further waives, releases, and discharges Releasees from any reinstatement rights which Wagner has or could have under any applicable law.

(f)     Wagner acknowledges that he has been given at least twenty-one (21) days to consider this release provision, and that he has consulted with his personal attorney before signing this Agreement. Wagner may waive this twenty-one (21) day consideration period.

(g)     Wagner understand that he may revoke this Agreement within seven (7) days after its signing and that any revocation must be made in writing and submitted within such seven day period to XA with a copy to Daniel F. Lanciloti of Seyfarth Shaw LLP., 131 S. Dearborn Street, Chicago, Illinois 60603. Wagner further understands that if he revokes this Agreement, he shall not receive any payments or other benefits as set forth herein.

(h)     Wagner also understands and agrees that the payments and benefits which he will receive in exchange for signing and not later revoking this Agreement are in addition to anything of value to which he is already entitled.

5

17123642v.3

(i)     WAGNER FURTHER UNDERSTANDS THAT THIS AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS THAT HAVE ARISEN ON OR PRIOR TO THE EFFECTIVE DATE.

8.    **General Release of Claims by XA, CMG, Laken, Devlin and Burkhardt.**

(a)    In consideration of the mutual covenants contained herein, except with respect any action to enforce the terms of this Agreement, XA and CMG and all of their subsidiaries and affiliates, whether direct or indirect, their joint ventures and joint venturers (including their respective directors, officers, employees, shareholders, partners and agents, past, present and future), and each of their respective successors and assigns, past, present and future, and Laken, Devlin, Burkhardt, and each of their agents, heirs, executors, administrators, attorneys and assigns, past, present and future (hereinafter collectively referred to as the "Releasors") hereby waive, release and forever discharge Wagner, and all of his agents, heirs, executors, administrators, attorneys and assigns, past, present and future, from any and all known or unknown actions, causes of action, claims or liabilities of any kind, whether based upon any federal, state, municipal, or local statute, law, ordinance or regulation, which have or could be asserted by the Releasors against Wagner arising out of or related to this Dispute, Wagner's relationship with and/or termination from XA and/or arising out of or related to any other occurrence up to and including the Effective Date.

(b)    XA, CMG, Laken, Devlin and Burkhardt also agree not to sue Wagner, or his agents, heirs, executors, administrators, attorneys and assigns, past, present and future, or become a party to a lawsuit on the basis of any claim of any type whatsoever arising out of or related to his relationship with and/or termination from employment with XA, which claims, known or unknown, arises or could have been asserted on or before the Effective Date.

6

17123642v.3

(c)   XA, CMG, LAKEN, DEVLIN AND BURKHARDT FURTHER UNDERSTAND THAT THIS AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS THAT HAVE ARISEN ON OR PRIOR TO THE EFFECTIVE DATE.

9.     **No Admission of Liability.**  The Parties agree that this Agreement is a compromise and settlement and that neither its execution nor their performance under it shall constitute an admission of any breach of contract or violation of any law, and it is made solely to avoid the burden, inconvenience and expense of further litigation.

10.     **No Assignment of Claims.**  The Parties represent and warrant that they have not made or caused to be made any assignment or transfer of any right, claim, demand, or cause of action covered by this Agreement.

11.     **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties and supersedes any prior negotiations, agreements, arrangements and undertakings with respect to the matters set forth in this Agreement.  No representations, warranties, or inducements have been made to any of the Parties concerning this Agreement or its exhibits other than the representations, warranties, and covenants contained in this Agreement.

12.     **Voluntary Agreement.**  The Parties individually represent, warrant and agree that: (i) they have been represented by legal counsel of their choice in connection with the entering into this Agreement; (ii) they are fully aware, clearly understand and freely assent to all of the terms and provisions contained in this Agreement; (iii) they have voluntarily, with full knowledge and without coercion or duress of any kind, entered into this Agreement; (iv) they are not relying on any representation, either written or oral, express or implied, made to them by the other Party other than as set forth in this Agreement; and (v) the consideration received by them

7

to enter into this Agreement and the settlement contemplated by this Agreement has been actual and adequate.

13.    **No Waiver.**  The Parties shall not at any time be deemed, by any act or omission, to have waived any of their rights, defenses or remedies under this Agreement, unless such waiver is in writing and signed by the Party against whom waiver is sought to be enforced.  A waiver of one event shall not be construed as a continuing waiver or as a bar to or waiver of any right or remedy in connection with any subsequent event.

14.    **Amendments.**  This Agreement may be amended or modified only by a written instrument signed by all Parties, their authorized agents, or their respective successors-in-interest.

15.    **Successors Bound.**  This Agreement is binding on and inures to the benefit of the Parties and their respective heirs, successors, assigns, affiliates, officers, directors, agents, servants, employees and attorneys.

16.    **Severability.**  In the event that any term, covenant or provision of this Agreement shall be held by a court of competent jurisdiction to be invalid or against public policy, the remaining provisions of this Agreement shall remain in full force and effect.

17.    **Agreement Not to be Construed Against the Drafter.**  This Agreement shall be construed as if drafted by all Parties.  All Parties have contributed substantially and materially to the preparation of this Agreement, and it shall not be construed more strictly against one Party than the other.

18.    **Captions.**  The captions and headings used in this Agreement are inserted for reference purposes only and shall not be deemed to define, limit, extend, describe, or affect in any way the meaning, scope or interpretation of any of the terms of this Agreement or its intent.

8

17123642v.3

19. **Authority to Execute Agreement.** The undersigned represent that they are fully authorized to execute and enter into this Agreement on behalf of the respective persons or entities for whom they have signed it.

20. **Choice of Law.** The terms and conditions of this Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of Illinois, without regard to any applicable choice of law or conflicts rules.

21. **Jurisdiction.** The Parties agree that any action to interpret or enforce this Agreement will be filed exclusively in a federal or state court of competent jurisdiction located in Cook County, Illinois.

22. **Counterparts.** This Agreement may be executed in one or more counterparts, which may be transmitted by regular mail, electronic mail or facsimile. All executed counterparts shall be deemed to be one and the same instrument provided that Counsel for the Parties to this Agreement exchange all signed counterparts.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first set forth above.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

17123642v.3

SIGNATORIES:

JOSEPH WAGNER

GLENN LAKEN

JEFF DEVLIN

RON BURKHARDT

XA, THE EXPERIENTIAL AGENCY, INC.

By its authorized agent

Name: _____

Title: _____

CMG HOLDINGS, INC.,

By its authorized agent

Name: _____

Title: _____

1286988_1

10

17123642v.3

SIGNATORIES:

JOSEPH WAGNER

GLENN LAKEN

JEFF DEVLIN

RON BURKHARDT

XA, THE EXPERIENTIAL AGENCY, INC.

By its authorized agent

Name: _____

Title: _____

CMG HOLDINGS, INC.,

By its authorized agent

Name: _____

Title: _____ Chairman + Ceo _____

12860088 1

10

17123642v.3

SIGNATORIES:

JOSEPH WAGNER

_____

GLENN LAKEN

_____

JEFF DEVLIN

_____

RON BURKHARDT

_____

XA, THE EXPERIENTIAL AGENCY, INC.

By its authorized agent

Name: _____

Title: _____

CMG HOLDINGS, INC.,

By its authorized agent

Name: _____

Title: _____

1286988_1

10

17123642v.3

SIGNATORIES:

JOSEPH WAGNER

_____

GLENN LAKEN

_____

JEFF DEVLIN

_____

RON BURKHARDT

*Ron Burkhardt* [signature]

XA, THE EXPERIENTIAL AGENCY, INC.

By its authorized agent

Name: _Ron Burkhardt_ [signature]

Title: _EXECUTIVE CHAIRMAN_

CMC HOLDINGS, INC.,

By its authorized agent

Name: _____

Title: _____

{2869}88_1

10

17125643v.J

GUARANTY

The undersigned hereby unconditionally guarantees timely payment of the $210,000 Payment and the PTO Payment by XA, The Experiential Agency, Inc. as required by this Settlement Agreement and Release. The undersigned guarantor waives diligence, demand for payment, extension of time for payment, notice of acceptance of this guaranty, and indulgences and notice of every kind. Joseph Wagner may enforce this guaranty without first resorting to or exhausting other remedies provided by the Agreement or the law. Guarantor signs this Guaranty in consideration of Joseph Wagner's willingness to enter into this Agreement with XA, The Experiential Agency, Inc.

GUARANTOR:

CMG HOLDINGS, INC.,

By its authorized agent

Name: _____

Title: _____

1286988_1

11

17123642v.3

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM
NYSCEF DOC. NO. 25

INDEX NO. 652894/2014
RECEIVED NYSCEF: 02/19/2015

Exhibit C

EDGAR Online

# CMG HOLDINGS GROUP, INC.

## FORM 8-K
(Current report filing)

## Filed 11/20/14 for the Period Ending 11/19/14

| | |
|---|---|
| Address | 875 NORTH MICHIGAN AVENUE |
| | CHICAGO, IL 33137 |
| Telephone | (646) 688-6381 |
| CIK | 0001346655 |
| Symbol | CMGO |
| SIC Code | 7310 - Advertising |
| Fiscal Year | 12/31 |

Powered By EDGAR Online
http://www.edgar-online.com
© Copyright 2015, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d)
of The Securities Exchange Act of 1934

Date of Report:  November 19, 2014
(Date of earliest event reported)



# CMG HOLDINGS GROUP, INC.

(Exact name of registrant as specified in its charter)

| Nevada | 000-51770 | 87-0733770 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

875 North Michigan Avenue, Suite 2929
Chicago, IL 60611

(Address of principal executive offices) (Zip Code)

(732) 536-3800

(Registrant's telephone no., including area code)

(Former name, former address and former fiscal year, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01 Other Events.**

The Chief Executive Officer of the Company, Mr. Glenn Laken, provided a letter for the shareholders of the Company as an update of the operations of the Company's subsidiaries. The letter is annexed hereto as Exhibit 17.1.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

CMG HOLDINGS GROUP, INC.

Date: November 19, 2014

/s/ GLENN LAKEN
Name: Glenn Laken
Its: Chief Executive Officer

3

Exhibit 17.1

November 19, 2014

To Shareholders of CMG Holdings Group, Inc:

## XA, The Experiential Agency, Inc.

A forensic investigation conducted by current executives of XA and CMG has revealed an ongoing pattern of fraud at XA's New York and Chicago offices that predated and extended through the tenure of former chairman, Ron Burkhardt.

The pattern of fraud uncovered was instituted and overseen by former CEO Joe Wagner, who ran XA with little or no oversight from former CMG board members from 2009 – 2012. Mr. Wagner resigned as CEO in early 2014, months after board members and consultants from CMG began to question why XA, a company with 7-8 million dollars in annual revenue, never made a significant profit. CMG board chairman Glenn Laken launched his own investigation in an attempt to answer that question and uncovered the following:

From the time CMG first acquired ownership of XA in 2009, and until their departure from the firm a few months ago, Darren Andereck, XA's president, Joe Wagner, XA's CEO and Jean Wilson XA's COO all owned privately held competing companies designed to siphon business opportunity away from XA. These private affiliations were not disclosed to the board of CMG. These undisclosed entities also defrauded the parent company by becoming vendors to XA – charging XA nearly $650,000.00 in questionable receipts over last two years alone.

While still working for XA, Darren Andereck, Jean Wilson and Jeff Smith, XA's Creative Director along with employees Jesse Loma and Mike Day conspired with Joe Wagner to strip XA's business of all corporate clients, newly purchased computers, lockers filled with staging equipment around the country and ongoing projects worth over $1,000,000.00 in revenue. While the investigation is not complete, we have discovered that there are numerous instances of conversion of XA assets and funds, such as personal charges on company credit cards, payments for cell phones for family members, reimbursement for personal travel and other expenses which did not relate to XA in any way, in addition transactions between XA and parties owned by these former employees who did not disclose their interests in them. The Company and XA plan to complete the investigation, including recovering e-mails deleted by the former employees, and to vigorously pursue any and all amounts wrongfully taken from XA. On September 23, 2014, XA filed a lawsuit in the Supreme Court of the State of New York, County of New York against Hudson Gray, Joe Wagner's new competing enterprise, along with its principals and former XA employees now working for Hudson Gray, alleging wrongdoing by the defendants in connection with soliciting XA's clients and seeking against further contact with XA clients.

While XA has suffered client losses due to the wrongful acts by its former management and employees, XA's new executive staff has worked diligently to develop a vibrant and transparent business model for the future by focusing on smaller jobs with higher profit margins. The new XA staff organized and managed public relations for the October 24th Lang-Lang Foundation Concert and Gala at the United Nations, and arranged for Sting's surprise guest appearance there. New XA staffers have also booked the Legacy Awards and Influencer dinner at Chicago's Art Institute in March. They're currently negotiating with a well known charitable foundation to organize a star-studded movie premiere and A-list gala dinner scheduled to take place in Manhattan in early March, in addition to a number of other corporate and charitable projects and events. They're also fielding RFP's for up-fronts for this upcoming television season. XA employees in the Chicago office continue to represent some of the regions most high profile restaurants and hotel chains, including the popular Coco Pazzo Group, The Four Seasons Hotel Group and The Ritz Carlton.

The future is bright for the newly re-organized XA, which is now being run by a younger, hipper, experienced and professional staff. Without the fraudulent practices of the past gobbling up profits, XA will finally generate a meaningful financial benefit to CMG's shareholders, and have the ability to grow into the thriving profit center it always had the potential to be. We look forward to sharing the continued successes of the new XA, and will use every legal avenue available to claw-back the stolen profits of the past.

### Good Gaming, Inc.

Good Gaming Inc. successfully completed its first test tournament in October 2014. We identified several key areas for development as a result, and believe over 90% of all areas targeted for improvement will be addressed prior to when the next tournament takes place. We are currently in the final stages of negotiation with a major gaming publisher to create a mutually beneficial alliance for our tournament in December. This alliance will significantly speed up our global adoption cycle. While details are still forthcoming, Good Gaming is extremely excited about this potential alliance and its impact on the overall business going forward.

In the short period of time since its official launch, Good Gaming has further refined the infrastructure involved in keeping the content production branch of the business as efficient as possible. We've begun releasing new videos every Tuesday to assure our user base that content is up to date and to keep them excited from week to week. We are also preparing to institute a content calendar so users can preview future videos. By offering promotional giveaways on our Twitch channel, we gained further exposure and credibility with the gaming community and expanded our user base. The most recent Twitch promotion – a 12 hour live stream for Halloween with Good Gaming streamers playing survival, horror, and survival/horror games while giving away copies of the most recent horror game, "The Evil Within," was a huge success. We have over 20 veteran gamers with thousands of hours of experience working as content contributors and streamers for the most popular and commonly played games, such as Battlefield, Call of Duty, World of Warcraft, and League of Legends.

From a technological standpoint Good Gaming is evolving at a rapid pace. As is the case with any new and innovative site, a big part of our job is to identify technical hurdles and nimbly overcome them as soon as they present themselves. As a result of constant testing and stringent attention to quality control, every system Good Gaming has built is constantly evaluated, and where necessary, improved. One obstacle that we are addressing is our ability to gain global traction and credibility while not sacrificing the overall vision of the site. A technology we discovered after our tournament testing cycle, which will be ready for implementation in early 2015, will give us a significant advantage over competitors, improve our timeline, and add a significant value proposition for any alliance members.

Good Gaming expects significant strides of improvement in platform functionality prior to the December tournament, as our feedback loop kicks in full force and new users join and supply data. While using community feedback has a slower adoptive cycle, we firmly believe that an involved community of users who feel invested in the site is the best way to form a dedicated and ever expanding client group, and using them as a knowledgeable and constructive feedback source will pay dividends now and in the future. Feedback from our community of users has led us to improve on the boarding of new members by reducing the steps required to sign up for tournaments. We expect this and other continuing innovations will be well received, and increase our customer base and revenue flow when our next tournament takes place a few weeks from now.

Sincerely,

/s/ Glenn Laken
Glenn Laken
Chief Executive Officer

EDGAR Online

# CMG HOLDINGS GROUP, INC.

## FORM 10-Q/A
(Amended Quarterly Report)

## Filed 11/20/14 for the Period Ending 09/30/14

| | |
|---|---|
| Address | 875 NORTH MICHIGAN AVENUE |
| | CHICAGO, IL 33137 |
| Telephone | (646) 688-6381 |
| CIK | 0001346655 |
| Symbol | CMGO |
| SIC Code | 7310 - Advertising |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com

© Copyright 2015, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-Q/A

AMENDMENT NO. 1 TO FORM 10-Q

QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the quarter ended September 30, 2014

Commission file number 000-51770

CMG HOLDINGS GROUP, INC.

(Exact name of registrant as specified in its charter)

| Nevada | 87-0733770 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 875 North Michigan Avenue, Suite 2929 Chicago, IL | 60611 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number including area code (732) 536-3800

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or small reporting company. See the definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☐

As of November 14, 2014, there were 289,329,190 shares of common stock of the registrant issued and outstanding.

EXPLANATION NOTE

This Amendment No. 1 to the Quarterly Report on Form 10-Q/A of CMG Holdings Group, Inc. (the "Company") for the three months ended September 30, 2014 is being filed to properly indicate by check mark whether the Company has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months, which was checked as "No" in the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2014 which was filed with the Securities and Exchange Commission ("SEC") on November 19, 2014 (the "Form 10-Q"). Accordingly, the Company has checked "Yes" on this Amendment No. 1 to Form 10-Q.

Except as described above, no other parts of the Form 10-Q are being amended.

CMG HOLDINGS GROUP, INC.
FORM 10-Q

TABLE OF CONTENTS

| Item # | Description | Page Numbers |
|--------|-------------|:------------:|
| | **PART 1  FINANCIAL INFORMATION** | |
| ITEM 1 | CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) | 4 |
| ITEM 2 | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 19 |
| ITEM 3 | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK FACTORS | |
| ITEM 4 | CONTROLS AND PROCEDURES | 22 |
| | **PART II  OTHER INFORMATION** | |
| ITEM 1 | LEGAL PROCEEDINGS | 23 |
| ITEM 1A | RISK FACTORS | 23 |
| ITEM 2 | UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS | 23 |
| ITEM 3 | DEFAULTS UPON SENIOR SECURITIES | 23 |
| ITEM 4 | MINE SAFETY DISCLOSURES | 23 |
| ITEM 5 | OTHER INFORMATION | 23 |
| ITEM 6 | EXHIBITS | 24 |

PART I FINANCIAL INFORMATION

ITEM 1- CONSOLIDATED FINANCIAL STATEMENTS

CMG HOLDINGS GROUP, INC.
UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS

FOR THE NINE MONTHS ENDED AND THREE MONTHS ENDED SEPTEMBER 30, 2014 AND 2013

CONTENTS

Consolidated Balance Sheets as of September 30, 2014 and December 31, 2013 (Unaudited)                                    5

Consolidated Statements of Operations for the three months ended and nine months ended September 30, 2014 and 2013
(Unaudited)                                                                                                              6

Consolidated Statements of Cash Flows for the nine months ended September 30, 2014 and 2013 (Unaudited)                  7

Notes to Consolidated Financial Statements (Unaudited)                                                                   8

CMG HOLDINGS GROUP, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
September 30, 2014
(Unaudited)

## NOTE 5 - LEGAL PROCEEDINGS

We are subject to certain claims and litigation in the ordinary course of business. It is the opinion of management that the outcome of such matters will not have a material adverse effect on our consolidated financial position, results of operations or cash flows.

On April 21, 2011, the Company was served with a lawsuit that was filed in Clark County, Nevada against the Company by A to Z Holdings, LLC and seven other individuals or entities. The complaint alleges, among other things, that the Company's Board of Directors did not have the power to designate series A and B preferred stock without amending the articles of incorporation. The complaint also alleges any such amendment would require shareholder approval and filing of a proxy statement. On April 20, 2012, the Company settled with A to Z Holdings, LLC and seven other individuals or entities for $10,000.

On July 6, 2011, the Company was served with a lawsuit filed in the Circuit Court for the County of Multnomah, Oregon. The complaint alleges breach of contract and entitlement to consulting fees from the Company. The Company disagrees with the allegations contained in the Complaint and intends to vigorously defend the matter and otherwise enforce its rights with respect to the matter. The Company has retained counsel and is prepared to defend this lawsuit. The Company believes that the claims are frivolous pursuant to the terms of the contract. The case was settled on September 28, 2012 for $30,000. The Company has accrued for this liability as of September 30, 2014 and December 31, 2013.

On September 23, 2014, XA filed a lawsuit in the Supreme Court of the State of New York, County of New York against HG and its principals alleging wrongdoing by the defendants in connection with soliciting XA's clients and seeking against further contact with XA clients. The Company conducted an internal investigation of actions taken by XA's former employees during the quarter ended September 30, 2014. While the investigation is not complete, we have discovered that there are numerous instances of conversion of XA assets and funds, such as personal charges on company credit cards, payments for cell phones for family members, reimbursement for personal travel and other expenses which did not relate to XA in any way, and transactions between XA and parties owned by these former employees who did not disclose their interests in them. The Company and XA plan to complete the investigation, including recovering e-mails deleted by the former employees, and to vigorously pursue any and all amounts wrongfully taken from XA.

In October, 2014, Ronald Burkhardt, XA,s former Executive Chairman and a current member of the Company's Board of Directors filed a lawsuit in the Supreme Court of the State of New York, County of New York, alleging breach of his employment contract and seeking approximately $695,000 in damages. The Company believes that Mr. Burkhardt's claim is without merit and plans to vigorously defend the lawsuit.

## NOTE 6 - ACQUISITION OF GOOD GAMING, INC.

On March 28, 2014, CMG Holdings, Inc. (the "Company" or "CMG"), completed its acquisition of 100% of the shares of Good Gaming, Inc. ("GGI") by entering into a Share Exchange Agreement (the "SEA") with BMB Financial, Inc. and Jackie Beckford, the then shareholders of GGI. The sole owner of BMB Financial, Inc. is also the sole owner of Infinite Alpha, Inc. which provides consulting services to CMG. The transaction was completed under the purchase method of accounting. Pursuant to the SEA, the Company received 100% of the shares of GGI in exchange for 5,000,000 shares of the Company's common stock, $33,000 in equipment and consultant compensation and a commitment to pay $200,000 in development costs, of which $50,000 of the development costs had been advanced by the Company. In addition, pursuant to the SEA, CMG shall adopt an incentive plan for GGI which shall entitle the GGI officers, directors and employees to receive up to 30% of the net profits of GGI and up to 30% of the proceeds, in the event of a sale of GGI or its assets. In accordance with the purchase method of accounting, the Company recorded a charge of $87,500.

## NOTE 7 - RELATED PARTY TRANSACTIONS

The Company had outstanding accounts payable to a former officer and director who was a related party at December 31, 2012 of $19,625. The payables represent legal and administrative fees paid on behalf of the Company. These payables were settled during the year ended December 31, 2013.

XA has made business reimbursements to a consulting firm which is controlled by its former CEO. The accounts payable in the amount of $47,912 and $47,912 is included in account payable as of September 30, 2014 and December 31, 2013, respectively. Total amount submitted to the Company for reimbursement from the consulting firm is $0 and $142,060 for the nine months ended September 30, 2014 and the year ended 2013, respectively.

ITEM 2 - MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

FORWARD LOOKING STATEMENTS

*The following discussion of our financial condition and results of operations should be read in conjunction with our unaudited condensed consolidated financial statements and the notes to those financial statements appearing elsewhere in this Report.*

*Certain statements in this Report constitute forward-looking statements. These forward-looking statements include statements, which involve risks and uncertainties, regarding, among other things, (a) our projected sales, profitability, and cash flows, (b) our growth strategy, (c) anticipated trends in our industry, (d) our future financing plans, and (e) our anticipated needs for, and use of, working capital. They are generally identifiable by use of the words "may," "will," "should," "anticipate," "estimate," "plan," "potential," "project," "continuing," "ongoing," "expects," "management believes," "we believe," "we intend," or the negative of these words or other variations on these words or comparable terminology. In light of these risks and uncertainties, there can be no assurance that the forward-looking statements contained in this filing will in fact occur. You should not place undue reliance on these forward-looking statements.*

*The forward-looking statements speak only as of the date on which they are made, and, except to the extent required by federal securities laws, we undertake no obligation to update any forward-looking statements to reflect events or circumstances after the date on which the statements are made or to reflect the occurrence of unanticipated events.*

*Unless the context indicates otherwise, the terms "Company", "Corporate", "CMGO", "our", and "we" refer to CMG Holdings Group, Inc. and its subsidiaries, including XA, The Experiential Agency, Inc. ("XA") and Good Gaming, Inc. ("Good Gaming").*

RECENT DEVELOPMENTS

Good Gaming has launched its website platform on October 17, 2014, with most features of the platform being functional or fully completed. Based on feedback of Good Gaming gamers, the Company anticipates that the site will be a success and expects to generate a significant amount of subscribers over the next 12 months. Good Gaming held its inaugural tournament on October 24, 2014 and has planned additional tournaments beginning on December 12, 2014.

During the quarters ended June 30, 2014 and September 30, 2014, each of the employees in XA's New York office, as well as its COO in Chicago resigned. The Company later learned that each of these employees had, along with XA's former CEO, formed a new company, called Hudson Gray, LLC ("HG") which was soliciting XA's clients using confidential and proprietary information gained from their employment with XA.

On September 23, 2014, XA filed a lawsuit in the Supreme Court of the State of New York, County of New York against HG and its principals alleging wrongdoing by the defendants in connection with soliciting XA's clients and seeking against further contact with XA clients. The Company conducted an internal investigation of actions taken by XA's former employees during the quarter ended September 30, 2014. While the investigation is not complete, we have discovered that there are numerous instances of conversion of XA assets and funds, such as personal charges on company credit cards, payments for cell phones for family members, reimbursement for personal travel and other expenses which did not relate to XA in any way, and transactions between XA and parties owned by these former employees who did not disclose their interests in them. The Company and XA plan to complete the investigation, including recovering e-mails deleted by the former employees, and to vigorously pursue any and all amounts wrongfully taken from XA.

19

Exhibit 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Each of the undersigned hereby certifies, in his capacity as an officer of CMG Holdings Group, Inc. (the "Company"), for the purposes of 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

(1)   The Company's Quarterly Report on Amendment No. 1 to Form 10-Q for the period ended September 30, 2014 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 20, 2014

/s/ Glenn Laken
Glenn Laken
Chief Executive Officer
(principal executive officer)

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM

INDEX NO. 652894/2014

NYSCEF DOC. NO. 26

RECEIVED NYSCEF: 02/19/2015

# Exhibit D

**Shim, Daniel**

| | |
|---|---|
| **From:** | Joe Wagner <joe@grantparkglobal.com> |
| **Sent:** | Thursday, February 05, 2015 5:19 PM |
| **To:** | Matthews, Scott |
| **Subject:** | FW: Axelrod invoice dispute |
| **Attachments:** | XA - Axelrod finder_s fee agreement.pdf; ATT00001.htm |

**From:** Mike Axelrod [mailto:mike@grantparkglobal.com]
**Sent:** Wednesday, December 17, 2014 2:37 PM
**To:** Joe Wagner
**Subject:** Fwd: Axelrod invoice dispute

Begin forwarded message:

> **From:** "Chiquoine, Alexander D." <AChiquoine@winthrop.com>
> **To:** "Mike Axelrod" <mike@grantparkglobal.com>
> **Subject: FW: Axelrod invoice dispute**
>
>
> Alexander D. Chiquoine
> (612) 604-6762
> achiquoine@winthrop.com<mailto:achiquoine@winthrop.com>
>
> Notice: Important disclaimers & limitations apply to this email.
> Please click here for our disclaimers and
> limitations.<http://www.winthrop.com/our_firm/email_disclaimer.aspx>
>
> From: Chiquoine, Alexander D.
> Sent: Wednesday, December 17, 2014 2:23 PM
> To: 'Alexis Laken'
> Subject: RE: Axelrod invoice dispute
>
> Ms. Laken,
>
> Attached is the signed agreement between XA and Mr. Axelrod.  Although I am aware of your allegations against Mr. Wagner, they have nothing to do with my client and whether or not he has settled any debt owed to XA.  Nor is Mr. Axelrod required to explain why Ms. Wilson was unaware of the attached agreement and his performance under it.  XA is certainly welcome to pursue any legal claim it believes it has against Mr. Axelrod, that is its right.  However, part of that right does not include slandering my client in the media or engaging in any other unlawful or improper behavior.  If I am made aware you or any other party connected with XA has pursed such a course, the legal consequences of my previous letter will follow.

1

Very truly yours,

Alec Chiquoine

Alexander D. Chiquoine
(612) 604-6762
achiquoine@winthrop.com<mailto:achiquoine@winthrop.com>

Notice: Important disclaimers & limitations apply to this email.
Please click here for our disclaimers and
limitations.<http://www.winthrop.com/our_firm/email_disclaimer.aspx>

From: Alexis Laken [mailto:alexis@expagency.com]
Sent: Wednesday, December 17, 2014 12:55 PM
To: Chiquoine, Alexander D.
Cc: Mike Axelrod
Subject: Re: Axelrod invoice dispute

Dear Mr. Chiquoine,

If Mr. Axlerod has proof his debt to XA was paid in full we invite him to provide it. We do not
have the signed contract you refer to, but would be most interested to see it. What we do have is
documentary proof that Joseph Wagner, the former CEO of XA, stole millions of dollars in
business opportunity and cash receipts from the parent company that owns XA over the course of
his tenure. Using him as a witness will be of dubious benefit considering the existing and future
legal issues - some of which may be criminal -  he is likely to face.

As for former COO Jean Wilson, I am attaching an e-mail she sent to your client just a few
months ago, which was his last notice from XA that we are aware of.  As COO for years under
Wagner, surely she should have been privy to the contract you refer to and the "commissions"
and "payments" credited toward Mr. Axelrod's wedding. Yet as this e-mail clearly shows, she
was of the opinion this money was owed. Any documentation you can provide to demonstrate
otherwise will be appreciated. In absence of any reliable evidence to the contrary, we will
continue to pursue this debt as we see fit.

Very Truly Yours,

Alexis Laken
President

XA, THE EXPERIENTIAL AGENCY
333 Hudson Street | Suite 203 | New York, NY 10013
C 917 971 1677
Alexis@expagency.com<mailto:Alexis@expagency.com>
www.expagency.com<http://www.expagency.com> | follow XA on Facebook

The information contained in this message may be privileged and confidential and protected
from
disclosure. If the reader of this message is not the intended recipient, or an employee or agent
responsible for delivering this message to the intended recipient, you are hereby notified that
any dissemination, distribution or copying of this communication inclusive of attachments is

prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.
Thank you. XA


On Dec 17, 2014, at 12:05 PM, Chiquoine, Alexander D.
<AChiquoine@winthrop.com<mailto:AChiquoine@winthrop.com>> wrote:

Ms. Laken,

 Attached please find a letter to your attention regarding the above referenced matter.  A copy of the letter was also sent to XA's New York address via U.S. mail.  I look forward to receiving your timely response.


[www.winthrop.com]<http://www.winthrop.com/>

Alexander D. Chiquoine
Winthrop & Weinstine, P.A.
Attorney
(612) 604-6762
achiquoine@winthrop.com<mailto:achiquoine@winthrop.com>


Capella Tower | Suite 3500 | 225 S 6th Street | Minneapolis, MN 55402

Notice: Important disclaimers & limitations apply to this email.
Please click here for our disclaimers and
limitations.<http://www.winthrop.com/our_firm/email_disclaimer.aspx>


<20141217 Letter to Alexis Laken of XA re invoice dispute.pdf>

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM
INDEX NO. 652894/2014

NYSCEF DOC. NO. 27
RECEIVED NYSCEF: 02/19/2015

# Exhibit E

## Shim, Daniel

| | |
|---|---|
| **From:** | Joe Wagner <joe@grantparkglobal.com> |
| **Sent:** | Thursday, February 05, 2015 5:32 PM |
| **To:** | Matthews, Scott |
| **Subject:** | FW: Outstanding Balance Due |
| **Attachments:** | 1209015AX_Axelrod%20Bal%20Due%20on%20InvXA627240%20120927-2.pdf |

**From:** Mike Axelrod [mailto:mike@grantparkglobal.com]
**Sent:** Tuesday, December 16, 2014 4:26 PM
**To:** Joe Wagner
**Subject:** FW: Outstanding Balance Due

**From:** Alexis Laken <alexis@expagency.com>
**Date:** Tuesday, December 16, 2014 4:19 PM
**To:** Michael Axelrod <mike@grantparkglobal.com>
**Cc:** "lizbalwin37@gmail.com" <lizbalwin37@gmail.com>
**Subject:** Outstanding Balance Due

Mike,

It has been brought to my attention that you have an outstanding balance of $14,195.21 due to XA (invoice attached) from your wedding that occurred on September 15, 2012. We have an ongoing relationship with a number of media outlets - Craig's Chicago in particular has been asking for interesting and salacious details as you'll see from the link below. If payment is not made in full by Friday December 19th via wire or check to the below address I will have no choice but to contact both the Chicago and New York press with regards to your lack of payment for a wedding that occurred 15 months ago. Although I would prefer not to publicly embarrass you and your family, I have no problem doing so if this balance is not paid in full.

http://www.chicagobusiness.com/article/20141216/NEWS07/141219870/marketing-and-pr-agency-xa-shutters-chicago-office-amid-theft

Alexis Laken
President

XA, THE EXPERIENTIAL AGENCY
333 Hudson Street  |  Suite 203  |  New York, NY 10013
C 917 971 1677
Alexis@expagency.com
www.expagency.com  | follow XA on Facebook

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication inclusive of attachments is prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

1

Thank you. XA

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM

NYSCEF DOC. NO. 28

INDEX NO. 652894/2014

RECEIVED NYSCEF: 02/19/2015

# Exhibit F

October **15**, 2009

First Amendment Agreement to the Lease

By and between

WATERFRONT NEW YORK REALTY CORP.
As Agent for Waterfront NY,
Landlord

and

XA Scenes, Inc.
Tenant

Dated December 23, 2005 (the "Prime Lease")

**WHEREAS,** Landlord owns the Terminal Stores Buildings (the "Building") and has leased to Tenant, pursuant to the Lease a certain property as described therein as the Demised Premises known as approximately 10,000 square feet on the 9th Floor of Building #18 and Building #20 and 1,930 square feet on the roof of Building #20 at 636-642 West 28th Street, New York. NY 10001;

**WHEREAS,** the term of the Lease is from April 1, 2006 and shall terminate on March 31, 2016;

**WHEREAS,** Tenant currently owes Landlord $84,182.52 in rent and additional rent.

**WHEREAS,** Tenant desires to defer certain rent payments and late fees totaling $63,363.03 of the $84,182.52 past due amount and Landlord desires to accommodate such request;

**WHEREAS,** Tenant shall pay Landlord $20,819.49 upon execution of this Amendment.

**WHEREAS,** the parties desire to amend the Lease on the following terms as follows as of _Oct. 15, 2009;_

**NOW THEREFORE,** for in consideration of the Demised Premises and the mutual covenants therein contained and Ten and 00/100 Dollars ($10.00) and other good and valuable considerations the receipt in sufficiency of which is hereby acknowledged the parties hereto agree that the Lease shall be amended pursuant to this ("First Lease Amendment") as follows:

1. The annual net base rent for the demised premises for the period from October 1, 2009 to March 31, 2016 shall be as follows and shall be due and payable in monthly installments due on the first day of each and every month as follows as fully as if state in Exhibit 1 to the Prime Lease:

Total (Building #18, Building #20, 9th Floor  approximately 10,000 square feet of space)  and Roof Space Building #20 –approximately 1,930 square feet of space.

| Commencing | Annual Rent | Monthly Base Rent |
|---|---|---|
| 10/1/09-10/31/09 | | $25,702.31 |
| 11/1/09-11/30/09 | | $25,702.31 |
| 12/1/09-12/31/09 | | $25,702.31 |
| 01/1/10-01/31/10 | | $32,434.63 |
| 02/1/10-02/28/10 | | $32,434.63 |
| 03/1/10-03/31/10 | | $32,434.63 |
| 04/1/10-03/31/11 | $364,806.80 | See below |
| 04/1/10-04/30/10 | | $33,205.70 |
| 05/1/10-05/31/10 | | $33,205.70 |
| 06/1/10-06/30/10 | | $33,205.70 |
| 07/1/10-07/31/10 | | $33,205.70 |
| 08/1/10-08/31/10 | | $33,205.70 |
| 09/1/10-09/30/10 | | $33,205.70 |
| 10/1/10-10/31/10 | | $33,205.70 |
| 11/1/10-11/30/10 | | $26,473.38 |
| 12/1/10-12/31/10 | | $26,473.38 |
| 01/1/11-01/31/11 | | $26,473.38 |
| 02/1/11-02/28/11 | | $26,473.38 |
| 03/1/11-03/31/11 | | $26,473.38 |
| 04/1/11-03/31/12 | $327,210.96 | $27,267.58 |
| 04/1/12-03/31/13 | $340,136.52 | $28,344.71 |
| 04/1/13-03/31/14 | $350,340.60 | $29,195.05 |
| 04/1/14-03/31/15 | $360,850.80 | $30,070.90 |
| 04/1/15-03/31/16 | $372,003.72 | $31,000.31 |

**Approximately 10,000 square feet Building #18 and Building #20, 9th Floor.**

| Commencing | Annual Rent | Monthly Base Rent |
|---|---|---|
| 10/1/09-10/31/09 | | $24,166.66 |
| 11/1/09-11/30/09 | | $24,166.66 |
| 12/1/09-12/31/09 | | $24,166.66 |
| 01/1/10-01/31/10 | | $30,898.98 |
| 02/1/10-02/28/10 | | $30,898.98 |
| 03/1/10-03/31/10 | | $30,898.98 |
| 04/1/10-03/31/11 | $345,826.16 | See below |
| 04/1/10-04/30/10 | | $31,623.98 |
| 05/1/10-05/31/10 | | $31,623.98 |
| 06/1/10-06/30/10 | | $31,623.98 |
| 07/1/10-07/31/10 | | $31,623.98 |
| 08/1/10-08/31/10 | | $31,623.98 |
| 09/1/10-09/30/10 | | $31,623.98 |
| 10/1/10-10/31/10 | | $31,623.98 |
| 11/1/10-11/30/10 | | $24,891.66 |
| 12/1/10-12/31/10 | | $24,891.66 |
| 01/1/11-01/31/11 | | $24,891.66 |
| 02/1/11-02/28/11 | | $24,891.66 |
| 03/1/11-03/31/11 | | $24,891.66 |
| 04/1/11-03/31/12 | $307,660.92 | $25,638.41 |
| 04/1/12-03/31/13 | $319,999.92 | $26,666.66 |
| 04/1/13-03/31/14 | $329,599.92 | $27,466.66 |
| 04/1/14-03/31/15 | $339,487.66 | $28,290.66 |
| 04/1/15-03/31/16 | $349,999.92 | $29,166.66 |

**Approximately 1,930 square feet Roof Space of Building #20.**

| Commencing | Annual Rent | Monthly Base Rent |
|---|---|---|
| 10/1/09-10/31/09 | | $1,535.65 |
| 11/1/09-11/30/09 | | $1,535.65 |
| 12/1/09-12/31/09 | | $1,535.65 |
| 01/1/10-01/31/10 | | $1,535.65 |
| 02/1/10-02/28/10 | | $1,535.65 |
| 03/1/10-03/31/10 | | $1,535.65 |
| 04/1/10-03/31/11 | $18,980.64 | See below |
| 04/1/10-04/30/10 | | $1,581.72 |
| 05/1/10-05/31/10 | | $1,581.72 |
| 06/1/10-06/30/10 | | $1,581.72 |
| 07/1/10-07/31/10 | | $1,581.72 |
| 08/1/10-08/31/10 | | $1,581.72 |
| 09/1/10-09/30/10 | | $1,581.72 |
| 10/1/10-10/31/10 | | $1,581.72 |
| 11/1/10-11/30/10 | | $1,581.72 |
| 12/1/10-12/31/10 | | $1,581.72 |
| 01/1/11-01/31/11 | | $1,581.72 |
| 02/1/11-02/28/11 | | $1,581.72 |
| 03/1/11-03/31/11 | | $1,581.72 |
| 04/1/11-03/31/12 | $19,550.04 | $1,629.17 |
| 04/1/12-03/31/13 | $20,136.60 | $1,678.05 |
| 04/1/13-03/31/14 | $20,740.68 | $1,728.39 |
| 04/1/14-03/31/15 | $21,362.88 | $1,780.24 |
| 04/1/15-03/31/16 | $22,003.80 | $1,833.65 |

2.  Exhibit C is amended to substitute the following for the 1,930 square feet of Roof Space on Building #20 for the existing exhibit of 10,000 square feet.

3.  Tenant represents and warrants to Landlord that it has not dealt with any real estate agent or broker in connection with this Lease, this First Lease Amendment and/or the Demised Premises and/or the Building Tenant agrees to indemnify and defend Landlord in connection with any claim for brokerage commission resulting from its breach of this representation and warranty.

4.  There shall be no rent abatement for the Demised Premises aside from that stated herein.

5.  Paragraph 92 of the Prime Lease is amended to reflect that Tenant leased 1,930 square feet of Roof Space on Building #20 and constructed a roof platform. Tenant as of 6/1/07 commenced paying $1,447.50 per month as rent for the Roof Space as additional rent such amount shall increase 3% per annum on the anniversary of April 1, 2006 for the term as stated in Paragraph 1 herein which is substituted for Exhibit 1 in the Prime Lease.

6.  Tenant agrees that Landlord shall not return the security deposit until the termination of the Lease scheduled to be March 31, 2016. The Security Deposit shall increase as the base rent increases so that at all times it shall equal one (1) month base rent. Such deposit shall be payable by Tenant on demand by Landlord.

7.  Tenant shall provide operating statements monthly and quarterly which shall show gross revenue for the demised premises by month and list of clients by month. Tenant shall provide such financial statements for the duration of this Lease.

8.  **LANDMARKS DESIGNATION.**
**THERE IS CURRENTLY A PROPOSAL FOR A HISTORIC DISTRICT DESIGNATION WHICH WOULD INCLUDE THE BUILDING. SUCH HISTORIC DISTRICT DESIGNATION WAS DESIGNATED ON JULY 15, 2008 AND INCLUDES THE BUILDING, THREFORE THE FOLLOWING NOTIFICATION IS APPLICABLE:**

**THE TENANT IS HEREBY NOTIFIED THAT THE LEASED PREMISES ARE SUBJECT TO THE JURISDICTION OF THE LANDMARKS PRESERVATION COMMISSION. IN ACCORDANCE WITH SECTIONS 25-305, 25-306, 25-309 and 25-310 OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK AND THE RULES SET FORTH IN TITLE 63 OF THE RULES OF THE CITY OF NEW YORK, ANY DEMOLITION, CONSTRUCTION, RECONSTRUCTION, ALTERATION OR MINOR WORK AS DESCRIBED IN SUCH SECTIONS AND SUCH RULES MAY NOT BE COMMENCED WITHIN OR AT THE LEASED PREMISES WITHOUT THE PRIOR WRITTEN APPROVAL OF THE LANDMARKS PRESERVATION COMMISSION. TENANT IS NOTIFIED THAT SUCH DEMOLITION, CONSTRUCTION, RECONSTRUCTION, ALTERATIONS OR MINOR WORK INCLUDES, BUT IS NOT LIMITED TO, (a)WORK TO THE EXTERIOR OF THE LEASED PREMISES INVOLVING WINDOWS, SIGNS, AWNINGS, FLAGPOLES, BANNERS AND STOREFRONT ALTERATIONS AND (b) INTERIOR WORK TO THE LEASED PREMISES THAT (i) REQUIRES A PERMIT FROM THE DEPARTMENT OF BUILDINGS OR (ii) CHANGES, DESTROYS OR AFFECTS AN INTERIOR ARCHITECTURAL FEATURE OF AN INTERIOR LANDMARK OR AN EXTERIOR ARCHITECTURAL FEATURE OF AN IMPROVEMENT THAT IS A LANDMARK OR LOCATED ON A LANDMARK SITE OR IN A HISTORIC DISTRICT.**

9.  In all other respects the provisions of the Lease shall remain in full force and effect.

WATERFRONT NY REALTY CORP.,
As Agent for Waterfront NY,
Landlord

Date: 10|15|09

By: _Christopher S. Figg_
Name: CHRISTOPER S. FLAGG
Title: V.P.

XA SCENES, INC.
Tenant

Date: 10|15|09

By: _____
Name: JOSEPH WAGNER
Title: PRESIDENT

I, The Experiential Agency, Inc., an Illinois Corporation, do hereby personally guarantee all of the terms and conditions to be performed by XA Scenes, Inc. under this Lease Agreement as amended.

Dated: New York, New York
       10/15/0 , 2009

Experiential Agency, Inc.
By: _____
Name: JOSEPH WAGNER
Title: CEO

I, XA, Inc., a Nevada Corporation, do hereby personally guarantee all of the terms and conditions to be performed by XA Scenes, Inc. under this Lease Agreement as amended.

Dated: New York, New York
       10/15 , 2009

XA, Inc
By: _____
Name: JOSEPH WAGNER
Title: CEO

I, Fiorio XA, Inc., a Nevada Corporation, do hereby personally guarantee all of the terms and conditions to be performed by X, Scenes, Inc. under this Lease Agreement as amended.

Dated: New York, New York

_ll  15_, 2009

Fiorio XA, Inc.

By: _____

Name: DARREN ANDEREEN

Title: PRESIDENT

I, CMG Holdings, Inc., a Nevada Corporation, do hereby personally guarantee all of the terms and conditions to be performed by XA Scenes, Inc. under this Lease Agreement as amended.

Dated: New York, New York

_10  /15_, 2009

CMG Holdings Inc.

By: _____

Name: _____

Title: President

I, CMGO Capital Inc., a Nevada Corporation, do hereby personally guarantee all of the terms and conditions to be performed by XA Scenes, Inc. under this Lease Agreement as amended.

Dated: New York, New York

_10  /15_, 2009

CMGO Capital Inc.

By: _____

Name: _____

Title: _____

LEASE BETWEEN WATERFRONT NY REALTY CORP. AS
AGENT FOR WATERFRONT NY L.P., OWNER
AND XA SCENES, INC., TENANT.
DATED 23 DAY OF ~~OCTOBER~~ 2009 5
Amended __ Day of December
October 2009

EXHIBIT C

APPROXIMATELY 1,930 SQUARE FEET ON THE ROOF
BUILDING 20
636–642 WEST 28TH STREET NEW YORK, NY 10001

NORTH



WEST                                        EAST

SOUTH

BUILDING NO. 20 – ROOF PLATFORM

APPROXIMATEY 1,930SF OF ROOF PLATFORM

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM

NYSCEF DOC. NO. 29

INDEX NO. 652894/2014

RECEIVED NYSCEF: 02/19/2015

# Exhibit G

Feb 26 10 10:17a                                                                                    p.1

Clark County Clerk's Office
200 Lewis Avenue, 5th Floor
P. O. Box 551601
Las Vegas, NV 89155-1601
702-671-0500

Diana Alba

**COUNTY CLERK**                              Receipt for Services

| Cashier | LEONRO | | | | | Batch # | 517324 |
|---------|--------|--|--|--|--|---------|--------|
| | | | | Date: | 01/29/2010 | Time: | 02:46:55PM |

Customer Name  XA, EXPERIENTIAL AGENCY, INC

| Date | Document Number | Document Type | | Pg/Amt |
|------|-----------------|---------------|--|--------|
| | | | | I |
| 1/29/2010  2:46:55PM | 2010012910001561-0 FFN | | | |
| Party 1:   XA, SCENES | | | Party 2:  XA, EXPERIENTIAL AGENCY, INC | |
| | | FFN | Total: | 20.00 |
| | | Fee Total: | | 20.00 |
| CHECK | 17436484675 | Money Order | | 20.00 |
| | | | Payment Total: | 20.00 |

Transactions of $100.00 or less will incur a $5.00 service fee.  Transactions greater than $100.00 will incur a 5% service fee.

# Certificate of Business: Fictitious Firm Name

Please Select One:
☐ New Application
☐ Renewal of existing name

**Please Print or Type**

The expiration date for such certificates shall be the last day of the sixtieth month from the date of filing.

The undersigned do/does hereby certify that **XA, Experiential Agency, Inc.**

(Name of individual, corporation, partnership or trust)

with mailing address of **5601 Biscayne Blvd**, **Miami**, **FL**, **33137**

( Mailing Address for notification of renewal) (Street)          (City)          (State)          (Zip)

is/are conducting business in Clark County, Nevada, under the fictitious name of

**XA, Scenes.**

(Fictitious Firm Name) or (Doing Business As)

and that said firm is composed of the following person(s) whose name(s) and address(es) are as follows:

By signing below I do solemnly swear (or affirm), under penalty of perjury, that all statements made in this document are true.

(1) James Ennis        *President*

Full Name and title (Type or Print)            Signature                          Date

5601 Biscayne. Blvd                          Miami  FL 33137

Street Address of Business or Residence      City, State, Zip

_____                             _____

Mailing Address, if different from above     City, State, Zip

(2) _____                         _____

Full Name and title (Type or Print)          Signature                          Date

_____                             _____

Street Address of Business or Residence      City, State, Zip

_____                             _____

Mailing Address, if different from above     City, State, Zip

(3) _____                         _____

Full Name and title (Type or Print)          Signature                          Date

_____                             _____

Street Address of Business or Residence      City, State, Zip

_____                             _____

Mailing Address, if different from above     City, State, Zip

(4) _____                         _____

Full Name and title (Type or Print)          Signature                          Date

_____                             _____

Street Address of Business or Residence      City, State, Zip

_____                             _____

Mailing Address, if different from above     City, State, Zip

Mail to: Diana Alba, County Clerk, Attn. FFN, P.O. Box 551604, Las Ve...
Include: Filing Fee of $20.00 with the certificate plus 2 copies and a self-addr...

Diana Alba, County Clerk
01/29/2010 02:46:55 PM

2010012910001651-0

# Certificate of Business: Fictitious Firm Name

Please Select One:
☐ New Application
☐ Renewal of existing name

**Please Print or Type**

**The expiration date for such certificates shall be the last day of the sixtieth month from the date of filing.**

The undersigned do/does hereby certify that  XA, Experiential Agency, Inc.
_____
(Name of individual, corporation, partnership or trust)

with mailing address of 5601 Biscayne Blvd _____, Miami _____, FL , 33137
( Mailing Address for notification of renewal) (Street)         (City)          (State)    (Zip)

is/are conducting business in Clark County, Nevada, under the fictitious name of
  XA, Scenes.
_____
(Fictitious Firm Name) or (Doing Business As)

and that said firm is composed of the following person(s) whose name(s) and address(es) are as follows:

By signing below I do solemnly swear (or affirm), under penalty of perjury, that all statements made in this document are true.

(1) James Ennis    *President*                    Signature              Date  1/25/10
Full Name and title (Type or Print)
5601 Biscayne. Blvd                              Miami  FL 33137
Street Address of Business or Residence          City, State, Zip

Mailing Address, if different from above          City, State, Zip


(2) _____          _____      _____
Full Name and title (Type or Print)             Signature                 Date

Street Address of Business or Residence          City, State, Zip

Mailing Address, if different from above          City, State, Zip


(3) _____          _____      _____
Full Name and title (Type or Print)             Signature                 Date

Street Address of Business or Residence          City, State, Zip

Mailing Address, if different from above          City, State, Zip


(4) _____          _____      _____
Full Name and title (Type or Print)             Signature                 Date

Street Address of Business or Residence          City, State, Zip

Mailing Address, if different from above          City, State, Zip


Mail to: Diana Alba, County Clerk, Attn. FFN, P.O. Box 551604, L   Diana Alba, County Clerk
Include: Filing Fee of $20.00 with the certificate plus 2 copies and a self-  01/29/2010 02:46:55 PM

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM
INDEX NO. 652894/2014
NYSCEF DOC. NO. 30
RECEIVED NYSCEF: 02/19/2015

# Exhibit H

THE E PERIENTIAL AGENCY

MEMO

Friday, December 04, 2009

TO:     Jim Ennis, COO, CMG Holdings, Inc.

FR:     Joe Wagner, Jean Wilson

RE:     Capital Requirements and Operating Issues

---

Management Team

- ✓ Supporting business with personal credit cards – AMEX billing
- ✓ Operating in crisis mode since April
- ✓ Expenses outstanding
- ✓ Personal credit compromised

## Payroll Tax Liability – Exposure and business shut down issue

Lack of Holding Company support for critical legal issues

- ✓ Requirement for S-K Partners to engage with CMG / XA
- ✓ Former Corporate entities – Fiori XA, XA Scenes, XA Interactive
    - o Fiori XA issue / Jean, Darren, Joe to form Studio AG
- ✓ Tax filings
- ✓ Legal issues
- ✓ Personal Liability

Holding Company Structure

- ✓ Accrued salary liability – impact on the financials
- ✓ Holding Company overhead supported by XA

Loss of Business – No pay reputation in the industry

- ✓ Modern Wing Art Institute          $600K
- ✓ Navy Pier PR Retainer              $288K

THE EXPERIENTIAL AGENCY

- ✓ Discovery Ball                    $200K

Expenses

- ✓ Paying a premium for services as result of late and slow payments
- ✓ Loss of long term vendor relationships
- ✓ Loss of preferred pricing and discounts
- ✓ Result – Cash margins for production work are as much as 10% lower, direct connect to bottom line

Need new projects for references and awards to garner new projects

XA Team – Potential loss of key team members

- ✓ Hard job made harder
- ✓ Not possible to keep staff from exposure to the cash deficit
- ✓ No benefits

Office Leases – Unresolved since April

- ✓ Loss of NY office and venue is possible
- ✓ Loss of opportunity to capitalize on a down market and get more favorable lease for Chicago

Bandwidth – XA team is over extended to service CMG relationships; no contracted business has resulted to date for PR or Production

Opportunity Costs

- ✓ Inordinate amount of Mgt team time is spent dealing with the fact there is no cash, capital or credit facility
- ✓ Business Development and Creativity is sacrificed
- ✓ Damage Control – Reactive as opposed to proactive
- ✓ Lack of Counsel – XA team has been left to internal means
- ✓ Risk Management – Holding company with no insurance
- ✓ UCC transaction comprised – No counsel to support
- ✓ XA CEO – Supporting Holding Company at XA expense

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM

NYSCEF DOC. NO. 31

INDEX NO. 652894/2014

RECEIVED NYSCEF: 02/19/2015

# Exhibit I



# MEMO

Monday, January 27, 2014

TO:   Ron Burkhardt

FR:   Joe Wagner

RE:   XA operations and corporate overview

## XA Credentials and Capabilities

- ✓ Experiential Marketing
- ✓ Event Design
- ✓ Production & Promotion
- ✓ Sponsorship Evaluation
- ✓ Negotiation & Activation
- ✓ Talent Buying & Management
- ✓ Theatrical Stage & Set Design
- ✓ Show Production
- ✓ Guest Management
- ✓ Data Capture & Management

Creative Development

- ✓ Brand Identity
- ✓ Creative Concepts
- ✓ Graphic Design
- ✓ Video Design & Production
- ✓ Industrial Design

Non-Traditional Marketing

- ✓ Sponsorship & Co-Branding
- ✓ Event Promotion



- ✓ Activation Strategies
- ✓ Lifestyle Marketing

Public Relations
- ✓ Media Outreach
- ✓ Press Events & Tours
- ✓ Celebrity Wrangling

### Ongoing lack of support from CMG for XA business operations

No Operating Credit Line for XA
- ✓ First issue that Glenn promised to address – still no credit line
- ✓ Management team (Joe and Darren) using personal credit cards to support XA's need for credit – personal liability with no ownership in XA
- ✓ Unable to grow the company's revenue – financial inability to produce multiple large events at the same time
- ✓ History of CMG's acquisition of XA
- ✓ Assets purchased in 2009
- ✓ No financial support or integration with CMG post acquisition

Management Team Issues
- ✓ No ownership in XA or CMG
- ✓ Personal credit compromised
- ✓ Jean, Darren, Joe ownership in Studio AG post CMG acquisition to support XA (Fiori XA legacy)
- ✓ Deferred salary on my part to support XA's need for credit
- ✓ Glenn's statements to staff that are not team oriented – convicted felon background – damages morale

INDEX NO. 652894/2014

NYSCEF DOC. NO. 32

RECEIVED NYSCEF: 02/19/2015

# Exhibit J



Transaction Details
Prepared for
JOSEPH WAGNER
Account Number
XXXX-XXXXXX-35006

**Business Platinum Card® / November 25, 2013 to December 25, 2013**

| Date | Receipt | Description | Cardmember | Account # | Amount |
|---|---|---|---|---|---|
| 12/20/2013 | | GIBSON'S BAR & STE SCHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 38.15 |
| 12/20/2013 | | GIBSON'S BAR & STE SCHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 1,585.67 |
| 12/20/2013 | | HYATT HOTELS GR NEW NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 37.92 |
| 12/19/2013 | | AA ADMIRAL LGA017958FLUSHING NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 15.07 |
| 12/19/2013 | | COC O'HARE --A,B,C LCHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 110.00 |
| 12/19/2013 | | LAGUARDIA/FIGS CAFE FLUSHING NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 26.78 |
| 12/19/2013 | | NYC TAXI 2G63 090024NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 42.33 |
| 12/18/2013 | | CAMPBELL APARTMENTS NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 133.77 |
| 12/18/2013 | | CHANGING TIMES AMERIBAY SHORE NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 60.05 |
| 12/18/2013 | | CVS 3099 03099 BAY SHORE NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 35.15 |
| 12/18/2013 | | Efrain Altamirano New York NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 345.00 |
| 12/18/2013 | | HYATT HOTELS GR NEW NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 343.99 |
| 12/18/2013 | | ISLAND CREEK OYSTER BOSTON MA | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 428.00 |
| 12/18/2013 | | MAGNOLIA BAKERY NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 8.00 |
| 12/18/2013 | | MICHAEL JORDAN'S THENEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 126.95 |
| 12/17/2013 | | AA INFLIGHT MC 2 AA TULSA OK | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 14.00 |
| 12/17/2013 | | PENINSULA FIVES RESTNEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 166.54 |
| 12/17/2013 | | S & R MEDALIION CORPNEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 35.70 |
| 12/16/2013 | | AA AIR TICKET SALE 4DALLAS TX | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 303.90 |
| 12/16/2013 | | AA AIR TICKET SALE 4DALLAS TX | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 303.90 |
| 12/16/2013 | | GREAT AMER BAG251320CHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 19.44 |
| 12/16/2013 | | T3M-H1 BAR ORD250080CHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 12.60 |
| 12/13/2013 | | CTCORPORATION 800-624-0909 NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 238.50 |
| 12/12/2013 | | AMEX GIFT CARDS 877-297-4438 | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 3,127.45 |
| 12/12/2013 | | LENOVO LENOVO US INC800-426-9735 | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 1,071.43 |
| 12/12/2013 | | REGUS 972-340-2021 TX | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 129.00 |
| 12/11/2013 | | L APPETITO L APPETITCHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 23.48 |
| 12/10/2013 | | DYN*DYN.COM/CHARGE 603-668-4998 NH | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 95.00 |
| 12/09/2013 | | AA AIR TICKET SALE 4DALLAS TX | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 624.90 |
| 12/09/2013 | | BELLA SERA 120000128SCHILLER PARK IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 30.18 |
| 12/09/2013 | | ISLAND CREEK OYSTER BOSTON MA | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 32,076.10 |
| 12/09/2013 | | THE JAMES CHICAGO 22CHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 473.76 |
| 12/09/2013 | | UNITED AIRLINES HOUSTON TX | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 303.90 |
| 12/08/2013 | | ADOBE SYSTEMS, INC.800-833-6687 WA | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 21.24 |
| 12/07/2013 | | INT*COOKING FOOLS 773-276-5565 | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 14.18 |
| 12/06/2013 | | ENTERPRISE RENTACAR TRENTON NJ | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 250.71 |
| 12/06/2013 | | HYATT HOTELS GR NEW NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 647.30 |
| 12/05/2013 | | AA AIR TICKET SALE 4DALLAS TX | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 269.80 |
| 12/05/2013 | | AA AIR TICKET SALE 4DALLAS TX | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 269.80 |
| 12/04/2013 | | DITKA'S CHICAGO 0000CHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 29.53 |
| 12/04/2013 | | PANERA CARES #609003CHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 12.68 |
| 12/03/2013 | | ENTERPRISE RENTACAR LISLE IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 945.09 |
| 12/03/2013 | | GRILL CONCEPTS - C 5CHICAGO IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 56.14 |
| 12/02/2013 | | SPROUT SOCIAL 8668783231 IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 99.00 |
| 11/26/2013 | | REGUS OFFICE SERVI | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 110.19 |
| 11/26/2013 | | WHARTON GAS WHARTON NJ | JOSEPH WAGNER | XXXX-XXXXXX-35008 | 73.84 |
| 11/25/2013 | | GOTHAMGARAGEMGMT261QNEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 110.00 |
| 11/25/2013 | | HYATT PLACE MIDTOWN NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 1,185.03 |
| 11/25/2013 | | LGAAIRPORTRESTAURANTJAMAICA NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 48.63 |
| 11/25/2013 | | PARK AVENUE TAVERN 0NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 242.95 |
| 11/25/2013 | | SPROUT SOCIAL 8668783231 IL | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 59.00 |
| 11/24/2013 | | HYATT PLACE MIDTOWN NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 1,261.00 |

| Date | Description | Name | Card | Amount |
|---|---|---|---|---|
| 11/24/2013 | KEENS STEAKHOUSE NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 56.14 |
| 11/24/2013 | MPULSE INDUSTRIES 718-565-1510 | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 16.32 |
| 11/24/2013 | TAXI CREDIT CARD CORWOODSIDE NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 36.90 |
| 11/23/2013 | KEENS STEAKHOUSE NEW YORK NY | JOSEPH WAGNER | XXXX-XXXXXX-35006 | 215.63 |
| 12/12/2013 | RUBBER STAMP AND BUTSAN MARCOS CA | GINA STEFANI | XXXX-XXXXXX-32037 | 222.48 |
| 12/08/2013 | BLUE RIBBON TAX 0902CHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 11.45 |
| 12/08/2013 | CHI TAXI 3465 090110CHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 9.45 |
| 12/08/2013 | CRUMBS WATERTOWERPLACHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 5.30 |
| 12/08/2013 | CRUMBS WATERTOWERPLACHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 6.19 |
| 12/08/2013 | FOODLIFE CHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 10.48 |
| 12/08/2013 | FOODLIFE CHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 15.75 |
| 12/08/2013 | FOODLIFE CHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 35.13 |
| 12/07/2013 | CRUMBS WATERTOWERPLACHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 8.28 |
| 12/07/2013 | CRUMBS WATERTOWERPLACHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 30.94 |
| 12/07/2013 | FOODLIFE CHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 14.24 |
| 12/07/2013 | JOHN HANCOCK GARAGE CHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 32.00 |
| 12/07/2013 | JOHN HANCOCK GARAGE CHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 43.00 |
| 12/07/2013 | WATER TOWER NEWSSTANCHICAGO IL | GINA STEFANI | XXXX-XXXXXX-32037 | 4.25 |
| 12/19/2013 | PERSHING SQUARE NEW YORK NY | MIA BLAGSVEDT | XXXX-XXXXXX-32045 | 64.44 |
| 12/16/2013 | L APPETITO L APPETITCHICAGO IL | MIA BLAGSVEDT | XXXX-XXXXXX-32045 | 16.48 |
| 12/11/2013 | CHI TAXI 3465 090110CHICAGO IL | MIA BLAGSVEDT | XXXX-XXXXXX-32045 | 62.38 |
| 12/09/2013 | ROSEMONT ELITE TAXI ROSEMONT IL | MIA BLAGSVEDT | XXXX-XXXXXX-32045 | 42.70 |
| 12/02/2013 | POTASH GOURMET 44 54CHICAGO IL | MIA BLAGSVEDT | XXXX-XXXXXX-32045 | 33.11 |
| 11/25/2013 | AFFILIATED PARKING LNEW YORK NY | MIA BLAGSVEDT | XXXX-XXXXXX-32045 | 66.00 |
| 11/25/2013 | CLARITY 47 PARKING 0NEW YORK NY | MIA BLAGSVEDT | XXXX-XXXXXX-32045 | 63.00 |
| 11/25/2013 | Simon Sips Simon SipNew York NY | MIA BLAGSVEDT | XXXX-XXXXXX-32045 | 27.95 |
| | | | TOTAL | 49,242.69 |
| | Previous Statement | CREDIT - Cell Phone | | -180.00 |
| | Previous Statement | CREDIT - Stub Hub | | -1,150.45 |
| | | | TOTAL | 47,912.24 |

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM

NYSCEF DOC. NO. 33

INDEX NO. 652894/2014

RECEIVED NYSCEF: 02/19/2015

# Exhibit K

John F. Kennedy

Telephone (312) 836-4122
Facsimile (312) 527-4011
jkennedy@taftlaw.com

In Reference to:  F32361-1

Shefsky has joined
& Froelich  Taft/
Attorneys at Law

111 East Wacker, Suite 2800
Chicago, Illinois 60601

Tel 312.527.4000 / Fax 312.527.4011
www.taftlaw.com

September 18, 2014

*VIA E-MAIL (glennbrlaken@gmail.com) and U.S. MAIL*
Glenn Laken
XA, The Experiential Agency, Inc.
875 N Michigan Ave, Ste 2929
Chicago, IL  60611

RE:    *Notice to Cease and Desist:  Joseph Wagner/Hudson-Gray*

Dear Mr. Laken:

This Firm represents Joseph Wagner and Hudson-Gray.  It has come to our attention that you intend to inform clients of Hudson-Gray that Mr. Wagner is bound by some sort of non-solicitation clause arising from his employment with your company and his former employer, XA, the Experiential Agency, Inc. ("XA").  This would be ill-advised and illegal because it is not accurate.  Consequently, this is to demand that you refrain from doing so.

As you know, on April 22, 2014, you, XA and Mr. Wagner, among others, signed a Settlement Agreement and Release which included a mutual and general release to all claims.  It also nullified any and all prior agreements that Mr. Wagner may have had with XA or you.  This includes a Release Agreement and Non-Solicitation Agreement dated February 26, 2014.

Mr. Wagner and Hudson-Gray reserve all rights with respect to this matter.  In the event you have no such intention, please disregard this Notice.  Please contact me immediately if you have any questions or, if you are represented by counsel, please have your counsel contact me.

Very truly yours,

John F. Kennedy

JFK/bsn/1305376_1
cc:    Kim Walberg

Taft Stettinius & Hollister LLP       Chicago / Cincinnati / Cleveland / Columbus / Dayton / Indianapolis / Northern Kentucky / Phoenix

FILED: NEW YORK COUNTY CLERK 02/19/2015 01:04 PM

NYSCEF DOC. NO. 34

INDEX NO. 652894/2014

RECEIVED NYSCEF: 02/19/2015

# Exhibit L

2/18/2015                          CMG Holdings Group, Inc. (CMGO) Stock Message Board - InvestorsHub



Investors Hub Newswire | Home | Log in

# investorshub

Join iHub today - FREE!

**Click Here**

TRADE FREE FOR 60 DAYS

| Boards | Hot! | Tools | Funds | Streamer | Level 2 | Travel |

Get Quote

TRADE FREE FOR 60 DAYS

Search iHub

First-class Technology, More Value and 24/7 Support, Apply at E*TRADE.

E*TRADE    $150 Amazon.com Gift Card*    SaveTrader    Open an Account with $5000    E*TRADE    TAKE A NEW LINE WITH YOUR EQUITY INVESTMENTS

Home > Boards > US OTC > Miscellaneous > **CMG Holdings Group, Inc. (CMGO)** RSS        Add CMGO Price Alert    Hide Sticky    Hide Intro

Moderator: No Moderator FergusVI, Orangeman3, Pickle, DeeDog, PlayMoneyBS, Powercat23
Search This Board:                    2014 ▾  Go
Created: *10/4/2008 12:25:44 AM* - Followers: *254* - Board type: *Free* - Posts Today: *7*

## Current Report Filing (8-k)

November 19, 2014

To Shareholders of CMG Holdings Group, Inc:

**XA, The Experiential Agency, Inc.**

A forensic investigation conducted by current executives of XA and CMG has revealed an ongoing pattern of fraud at XA's New York and Chicago offices that predated and extended through the tenure of former chairman, Ron Burkhardt.

The pattern of fraud uncovered was instituted and overseen by former CEO Joe Wagner, who ran XA with little or no oversight from former CMG board members from 2009 – 2012. Mr. Wagner resigned as CEO in early 2014, months after board members and consultants from CMG began to question why XA, a company with 7-8 million dollars in annual revenue, never made a significant profit. CMG board chairman Glenn Laken launched his own investigation in an attempt to answer that question and uncovered the following:

From the time CMG first acquired ownership of XA in 2009, and until their departure from the firm a few months ago, Darren Andereck, XA's president, Joe Wagner, XA's CEO and Jean Wilson XA's COO all owned privately held competing companies designed to siphon business opportunity away from XA. These private affiliations were not disclosed to the board of CMG. These undisclosed entities also defrauded the parent company by becoming vendors to XA – charging XA nearly $650,000.00 in questionable receipts over last two years alone.

While still working for XA, Darren Andereck, Jean Wilson and Jeff Smith, XA's Creative Director along with employees Jesse Loma and Mike Day conspired with Joe Wagner to strip XA's business of all corporate clients, newly purchased computers, lockers filled with staging equipment around the country and ongoing projects worth over $1,000,000.00 in revenue. While the investigation is not complete, we have discovered that there are numerous instances of conversion of XA assets and funds, such as personal charges on company credit cards, payments for cell phones for family members, reimbursement for personal travel and other expenses which did not relate to XA in any way, in addition transactions

between XA and parties owned by these former employees who did not disclose their interests in them. The Company and XA plan to complete the investigation, including recovering e-mails deleted by the former employees, and to vigorously pursue any and all amounts wrongfully taken from XA. On September 23, 2014, XA filed a lawsuit in the Supreme Court of the State of New York, County of New York against Hudson Gray, Joe Wagner's new competing enterprise, along with its principals and former XA employees now working for Hudson Gray, alleging wrongdoing by the defendants in connection with soliciting XA's clients and seeking against further contact with XA clients.

While XA has suffered client losses due to the wrongful acts by its former management and employees, XA's new executive staff has worked diligently to develop a vibrant and transparent business model for the future by focusing on smaller jobs with higher profit margins. The new XA staff organized and managed public relations for the October 24th Lang-Lang Foundation Concert and Gala at the United Nations, and arranged for Sting's surprise guest appearance there. New XA staffers have also booked the Legacy Awards and Influencer dinner at Chicago's Art Institute in March. They're currently negotiating with a well known charitable foundation to organize a star-studded movie premiere and A-list gala dinner scheduled to take place in Manhattan in early March, in addition to a number of other corporate and charitable projects and events. They're also fielding RFP's for up-fronts for this upcoming television season. XA employees in the Chicago office continue to represent some of the regions most high profile restaurants and hotel chains, including the popular Coco Pazzo Group, The Four Seasons Hotel Group and The Ritz Carlton.

The future is bright for the newly re-organized XA, which is now being run by a younger, hipper, experienced and professional staff. Without the fraudulent practices of the past gobbling up profits, XA will finally generate a meaningful financial benefit to CMG's shareholders, and have the ability to grow into the thriving profit center it always had the potential to be. We look forward to sharing the continued successes of the new XA, and will use every legal avenue available to claw-back the stolen profits of the past.

**Good Gaming, Inc.**

Good Gaming Inc. successfully completed its first test tournament in October 2014. We identified several key areas for development as a result, and believe over 90% of all areas targeted for improvement will be addressed prior to when the next tournament takes place. We are currently in the final stages of negotiation with a major gaming publisher to create a mutually beneficial alliance for our tournament in December. This alliance will significantly speed up our global adoption cycle. While details are still forthcoming, Good Gaming is extremely excited about this potential alliance and its impact on the overall business going forward.

In the short period of time since its official launch, Good Gaming has further refined the infrastructure involved in keeping the content production branch of the business as efficient as possible. We've begun releasing new videos every Tuesday to assure our user base that content is up to date and to keep them excited from week to week. We are also preparing to institute a content calendar so users can preview future videos. By offering promotional giveaways on our Twitch channel, we gained further exposure and credibility with the gaming community and expanded our user base. The most recent Twitch promotion – a 12 hour live stream for Halloween with Good Gaming streamers playing survival, horror, and survival/horror games while giving away copies of the most recent horror game, "The Evil Within," was a huge success. We have over 20 veteran gamers with thousands of hours of experience working as content contributors and streamers for the most popular and commonly played games, such as Battlefield, Call of Duty, World of Warcraft, and League of Legends.

On September 23, 2014, XA filed a lawsuit in the Supreme Court of the State of New York, County of New York against HG and its principals alleging wrongdoing by the defendants in connection with soliciting XA's clients and seeking against further contact with XA clients. The Company conducted an internal investigation of actions taken by XA's former employees during the quarter ended September 30, 2014. While the investigation is not complete, we have discovered that there are numerous instances of conversion of XA assets and funds, such as personal charges on company credit cards, payments for cell phones for family members, reimbursement for personal travel and other expenses which did not relate to XA in any way, and transactions between XA and parties owned by these former employees who did not disclose their interests in them. The Company and XA plan to complete the investigation, including recovering e-mails deleted by the former employees, and to vigorously pursue any and all amounts wrongfully taken from XA.

In October, 2014, Ronald Burkhardt, XA,s former Executive Chairman and a current member of the Company's Board of Directors filed a lawsuit in the Supreme Court of the State of New York, County of New York, alleging breach of his employment contract and seeking approximately $695,000 in damages. The Company believes that Mr. Burkhardt's claim is without merit and plans to vigorously defend the lawsuit.

http://ih.advfn.com/p.php?pid=nmona&article=64510744

Wed, 06 Aug 2014 16:30:22 GMT ~ Good Gaming Enters Closed Alpha Testing

[Marketwired] - Good Gaming Inc. , an online destination for gamers who want to become professionals, is a wholly owned subsidiary of CMGO. The state-of-the-art Good Gaming platform will give amateur gamers access to ...

read full: http://finance.yahoo.com/news/good-gaming-enters-closed-alpha-163022604.html
*************************************************************

Mon, 21 Jul 2014 10:01:18 GMT ~ CMG HOLDINGS GROUP, INC. Files SEC form 8-K, Change in Directors or Principal Officers

read full: http://biz.yahoo.com/e/140721/cmgo8-k.html
*************************************************************

Mon, 23 Jun 2014 15:23:00 GMT ~ CMGO's eSports Subsidiary, Good Gaming, Accelerates Original Timeline For New Unrivaled Web Platform

[Accesswire] - CHICAGO, IL / ACCESSWIRE / June 23, 2014 / CMG HOLDINGS, INC, Chairman, Glenn Laken proudly announced the positive progress of its subsidiary, GOOD GAMING's web platform and media/splash page. Mr Laken ...

read full: http://finance.yahoo.com/news/cmgos-esports-subsidiary-good-gaming-152300506.html
*************************************************************

Sat, 24 May 2014 17:04:11 GMT ~ CMG HOLDINGS GROUP, INC. Financials

read full: http://finance.yahoo.com/q/is?s=cmgo
*************************************************************

Thu, 15 May 2014 20:18:56 GMT ~ CMG HOLDINGS GROUP, INC. Files SEC form 10-Q, Quarterly Report

read full: http://biz.yahoo.com/e/140515/cmgo10-q.html
*************************************************************

## Update in Progress 2/11/14



CMG Holdings, Inc.   OTCQB

## Ok, Lets first start with this bit of news released Jan 6th, 2014

"CMG Holdings, Inc. ("CMG" or "the company") proudly announces today that for the first time in the history of the company, it is debt free."

**http://www.sec.gov/Archives/edgar/data/1346655/000117892414000002/f8k1_form-cmgo.htm**

CMG Holdings Group inc. Quick Background Summary (FergusVI):

The company first caught my eye in February 2008.  This is when Creative Management Group inc. was reverse merged into Pebble Beach Enterprises inc.  There was a change in control, a name change to CMG Holdings Inc.  This company was run by the old management, Alan Morell, Mike Vandetty, and Jim Ennis.  The future looked bright and the OS was around 42M.

2/18/2015                                CMG Holdings Group, Inc. (CMGO) Stock Message Board - InvestorsHub

They quickly acquired the assets of Xa, The Experiential Agency in March, 2009. This was exciting because Xa was a proven revenue driver. The company has been around since 1989, through all markets. Xa proved to be their main revenue source, as the talent management and commercial rights segments produced very little income. Old management started issuing convertible notes, most likely to pay their large salaries of $675,000/yr.

In March 2010, they closed on the AudioEye acquisition. They paid $30k cash, 1.5 Million in shares and deferred capital commitments of 2.5 million over a few years. Although the IP and patents AE possesed at the time were valuable, and had good independent valuations, history shows that they were ahead of the curve with this purchase and they had a hard time funding AE, as AE wasn't able to generate much revenue at that time. It was also difficult to finance a subsidiary, under the umbrella of the holding company, so with this, AE was eventually spun off and became an independent public company trading in the OTC under symbol AEYE. CMG at the time of spinoff was able to retire senior secured notes, give shareholders a dividend, and hold around 5M shares of AE on books, and they also had revenue sharing % of future AE sales and revenue.

There is a lot I'm leaving out, but essentially the company continued (Old Management) to issue more and more convertible notes. Along the way, many organized long shareholders were accumulating millions and millions of shares. Many from the toxic convertible sales. The long shareholders had had enough and took matters into their own hands and effected a change in control, and instituted new management and a new direction. Since then, new management has made some very shareholder friendly moves. Mainly, they took the company to debt free status as cited above from the Jan 6, 2014 8K. They also reduced the OS substantially, returned shares to the treasury and nullified other outstanding convertibles. They appointed powerhouse new management additions to the BOD of CMGO and to XA. They acquired Good Gaming llC, and are making an entrance into the ever growing Esports sector. Links to follow.

New management sold a portion of their AEYE shares back to AudioEye. With these proceeds, they paid off all debt and are debt free. No convertible notes. They still retained about 2.36Million shares of AEYE on the books.
http://www.sec.gov/Archives/edgar/data/1346655/000117892413000176/f8k1_form-cmgo.htm


# Shareholders take back control of company!!!

## CMGO's recent change in control summary. This is very rare in the OTC markets.

On November 26th 2012, groups of organized long shareholders sent written correspondence to the then

current management indicating they had 55% majority of the stock and wanted to ammend the corporate bylaws.

http://www.sec.gov/Archives/edgar/data/1346655/000117892412000190/f8k1222_form-cmgo.htm

On December 13th, 2012, The Majority shareholders were successful in taking back control of the company and appointing a new board of directors and giving current management their departure notices.
http://www.sec.gov/Archives/edgar/data/1346655/000117892412000198/f8k1223_form-cmgo.htm

On December 19th, The new Board of Directors added new management (Joseph Wagner COO) with industry experience, finalized on termination of old management, and instituted a lock up provision on old managements CMGO shares and AE shares, and retained 55% of UsaveCT and UsaveNJ subsidiaries.
http://www.sec.gov/Archives/edgar/data/1346655/000117892412000200/f8k1224_form-cmgo.htm

On January 22, 2013, new management informs the shareholders of increased communication and updates, a new line of credit for XA, inc., expectations of dramatic increase in revenues (Revenues were already up in 2012 - 9 months ending Revenue 7.5Million). They also informed shareholdes that AE dividend shares are with TA and ready for distribution around Mid Feb 2013. Also informed us of possible corporate name change and ticker change to better reflect main revenue driver, XA, inc.

http://www.sec.gov/Archives/edgar/data/1346655/000117892413000011/f8k1222_form-cmgo.htm

On August 5, 2013, new management informs the shareholders through an 8K that CMGO has come to an agreement that brings closure to the termination of old management in regards to shares and debt held by the aforementioned resulting in a 11.5% reduction in the company's Outstanding Float and the elimination of an $85,000 note plus two years interest at 20%. There will be a reversal of the $85K note on the company's books.

http://www.otcmarkets.com/edgar/GetFilingHtml?FilingID=9432832

OTCPink

## CMGO Security Details

**Share Structure**

| | | |
|---|---|---|
| Market Value[1] | $5,040,000 | a/o Feb 12, 2014 |
| Shares Outstanding | 280,000,000 | a/o Feb 03, 2014 |
| Float | 215,000,000 | a/o Feb 03, 2014 |
| Authorized Shares | 450,000,000 | a/o Feb 03, 2014 |
| Par Value | 0.001 | |

**Shareholders**

| | | |
|---|---|---|
| Shareholders of Record | 175 | a/o Feb 03, 2014 |

**Corporate Actions**

| | Ex. Date | Record Date | Pay Date |
|---|---|---|---|
| Dividend () | Feb 26, 2013 | Oct 26, 2012 | Feb 19, 2013 |
| Dividend () * | | Feb 11, 2008 | Mar 04, 2008 |

2/18/2015                     CMG Holdings Group, Inc. (CMGO) Stock Message Board - InvestorsHub

| Dividend (0.00) * | Feb 11, 2008 | Mar 04, 2008 |
| --- | --- | --- |

# New Management

## Glenn Laken, 60, member of the Board, Chairman of the Board and Chief Executive Officer ("CEO")



David Kovacs Board of Directors
Jan 14th, 2014 http://www.sec.gov/Archives/edgar/data/1346655/000117892414000006/f8k1_form-cmgo.htm

A veteran of the investment banking and private equity sectors for over 10 years, Mr. Kovacs is currently the head of Investment Banking and Private Equity for Fitch Learning. Mr. Kovacs is also the Managing Director of Private Equity for Strategic Acquisitions, a $2 billion real estate investment firm. Prior to his current roles, Mr. Kovacs focused on private equity as a Managing Director at The Hinduja Group, one of the largest diversified groups in the world with over $50 billion under management. Mr. Kovacs also worked in various capacities at Citigroup and Blackstone Group in their investment banking and private equity divisions.

With the addition of Mr. Kovacs to the Board, CMG has acquired one of the most respected and brilliant minds in the world of investment and private equity. As a student at Columbia University and City University (NY), Mr. Kovacs completed his undergraduate degree at age 18, finishing the required coursework in two years and earning a triple major in Finance, Economics and Biochemistry.

The wealth of experience and breadth of knowledge that Mr. Kovacs brings to the Board will be invaluable as the Board seeks to enhance current strategies as well as devise new ones to help the company move forward with its current and future initiatives.

With his experience in mature and emerging markets as a training specialist in venture capital, investment banking, and private equity, Mr. Kovacs is also a highly coveted speaker. Mr. Kovacs has lectured at over 100 universities, including the majority of Ivy League schools. He was a lead instructor for the Securities & Exchange Commission and has given talks to industry leaders such as Barclays, JP Morgan, RBC, Morgan Stanley, Deutsche Bank and the Abu Dhabi Investment Authority.

## http://www.CMGO.co

## Business Overview:

## Overview

CMG Holdings Group, Inc. is a marketing communications holding company focused on the acquisition and operation of organizations in the alternative advertising, digital media, experiential and interactive marketing, entertainment, Internet content publication and distribution technology sectors. Our Company was formed by a core group of executives who have held senior level positions with several of the largest companies in the entertainment and marketing management industry. Our Company delivers customized marketing solutions at to optimize profitability by concentrating our resources in those segments of the marketing communications and entertainment industry. Our Company operates in the sectors of experiential marketing, event marketing, Internet content publication and distribution software, commercial rights, and talent management.

Experiential marketing includes production and promotion, event designs, sponsorship evaluation, negotiation and activation, talent buying, show production, stage and set designs, data analysis and management. We also offer branding and design including graphic, industrial and package designs across traditional and new media and public relations, social media, media development and relations and interactive marketing platforms to provides our clients with a custom private digital media networks to design and develop individual broadcasting digital media channels for our clients' to sell, promote and enhance their digital media video contents through mobile, online and social mediums.

Event Management includes marquis hospitality, sponsorships and licensing, broadcast production, and implementation of events including hospitality services to the most discriminating of clients in sports sectors including golf, tennis, equine and motor sports pairing corporate sponsors and premier events and leveraging that experience to ensure our clients receive the highest return on their investment and level of brand exposure. Our Company is dedicated to pursuing intellectual property rights of entertainment properties and offering these events through long-term entertainment hospitality packages for corporate sponsors' and manage and implement on-site operations and logistical concerns. Our broadcast and production services secures, and negotiates electronic production, broadcast and syndication opportunities for our clients via network, cable television, radio and digital media.

Internet content publication and distribution software includes the offering of embedded audio navigation and Internet content publication and distribution software that enables conversion of any media into accessible formats and allows for real time distribution to end users on any Internet connected device. Our Company also offers a more comprehensive access to devices, Internet, print, broadcast and other media to all people regardless of their network connection, device, location, or disabilities. Our solutions include comprehensive E-Learning and E-Commerce systems, Internet publishing products and services that enable customers to create and deliver highly scalable web-based applications. We provide technology solutions that facilitate information accessibility via the web, mobile phones, and other devices for all people, with a special emphasis on those that have physical, learning, or visual impairment, as well Internet novices such as seniors, non-English readers, and children. Our subsidiary division, Audioeye Inc. owns the "Method and Apparatus for Website Navigation by the Visually Impaired" and "Method and System for Audible Website Navigation" patent portfolios which protect the rights to its proprietary technology. Our Company believes this technology is an indispensable component of the Internet accessibility industry as it exists today. Our focus is to create more comprehensive access to devices, internet, print, broadcast and other media through our technology solutions including comprehensive E-Learning and E-Commerce systems that enable interaction between brands and consumers.




## XA, The Experiential Agency, Inc. - wholly owned subsidiary

## http://www.xapragency.com/

## http://www.experientialagency.com/

## Xa videos:

## http://vimeo.com/23932918

## http://vimeo.com/user1506707

XA, The Experiential Agency, Inc., a wholly owned subsidiary of CMGO, has offices in New York from which it provides corporations and highly visible brands with comprehensive event marketing, design and production services. The XA brand has a 20 year history and its team has been the creative force behind prestigious, national projects for such

clients as *NBC Universal, Unicef, Harrah's Entertainment, Conde Nast, McDonalds, W Hotels, Emirates Airline and Ritz Carlton.*

At XA, we help our clients build their brands through innovative, authentic social media and PR tactics. We create environments of conversation and engagement to targeted consumers specific to that brand. We realize that each brand is unique and has their own set of consumers and goals. That is why at XA we handcraft a strategy that we then implement tailored towards you and your brand.

Our experience in public relations, as well as social media and digital marketing, helps us create unique and memorable exposure for our clients of all types and sizes.



<div align="center">

**eSports Subsidiary**

## Good Gaming, Inc.

http://good-gaming.com/

</div>

2/18/2015                        CMG Holdings Group, Inc. (CMGO) Stock Message Board - InvestorsHub

## On Twitter:

### https://twitter.com/GoodGamingInc

## On Facebook:

### https://www.facebook.com/goodgaminginc

## *Company Charts*



2/18/2015                        CMG Holdings Group, Inc. (CMGO) Stock Message Board - InvestorsHub



Invest Smart with Free Tools & Research. Apply at E*TRADE!

**Cmg Holdings Group, (CMGO)**

**0.003 ◊ 0.0 (0.00%)**

**Volume: 0 ⊕-ET**

| Bid | Ask | Day's Range |
|---|---|---|
| 0.0032 | 0.007 | - - - |

CMGO Detailed Quote    Wiki

Sponsored Links

**TaxSlayer** Max your refund with TaxSlayer.
https://www.taxslayer.com

**Try Equifax** Take control of your credit with Equifax Complete™ Premier
www.equifax.com

Let E*TRADE Guide You Step by Step. It's Easy! Start Now.

CMGO News: Statement of Changes in Beneficial Ownership (4)          12/03/2014 03:38:34 PM
CMGO News: Amended Quarterly Report (10-q/a)                         11/20/2014 03:47:13 PM
CMGO News: Current Report Filing (8-k)                               11/20/2014 06:01:54 AM
CMGO News: Quarterly Report (10-q)                                   11/19/2014 05:22:42 PM
CMGO News: Notification That Quarterly Report Will Be Submitted Late (nt 10-q)   11/14/2014 02:01:07 PM

| Post New Msg | Follow Board | My Stocks (108) | Hide Intro | View Posters | CMGO Poststream | Bar.s (2) | Hide Quote | Filter Disabled |
|---|---|---|---|---|---|---|---|---|

Post     Subject                                                    Go to Post    < Older

#54107   Thanks DeeDog. I pan through a handful of          SuperPunter    12/24/14 03:45:44 AM
#50562   A little update                                    Boum-Yeah      09/05/14 09:50:52 AM

http://investorshub.advfn.com/CMG-Holdings-Group-Inc-CMGO-13511/                       10/12

2/18/2015                                    CMG Holdings Group, Inc. (CMGO) Stock Message Board - InvestorsHub

| #50493 | CMG's eSports Subsidiary, Good Gaming Strengthens Leadership Team | FergusVI | 09/04/14 09:08:12 AM |
| #50063 | 10-Q is out! http://www.sec.gov/Archives/edgar/data/1346655/000121390014005943/ | Powercat23 | 08/14/14 06:29:04 PM |
| #43259 | Jan 2014 8K~~ CMGO Completely Free of Toxic | FergusVI | 01/06/14 11:14:00 AM |
| #54941 | Good Gaming still showing some action on their | hyrpowr | 02/18/15 01:07:42 PM |
| #54940 | He probably hasn't updated her either as to | Powercat23 | 02/18/15 12:50:53 PM |
| #54939 | It's not a matter of what the offer | makingwaves | 02/18/15 09:16:13 AM |
| #54938 | Do we know what the offer was ? | jcny | 02/18/15 09:14:21 AM |
| #54937 | You are correct in your assumption Lenard, Glenn | makingwaves | 02/18/15 08:59:39 AM |
| #54936 | I strongly suggest you send Glenn an e-mail | makingwaves | 02/18/15 08:43:09 AM |
| #54935 | Given who made the offer and I believe | makingwaves | 02/18/15 08:30:16 AM |
| #54934 | I believe those are his and hers, ones | Lenard | 02/17/15 11:14:46 PM |
| #54933 | OK; I'm going to address the Eight-Thousand-Pound Gorilla | cbrad10480 | 02/17/15 09:15:00 PM |
| #54932 | let's go baby holding long. | jimGMT | 02/17/15 09:02:15 PM |
| #54931 | Parenthetical to "REFUSED OFFERS" does this necessarily | MRDALE | 02/17/15 08:59:17 PM |
| #54930 | Yes they can take their offer and stick | Lenard | 02/17/15 04:43:01 PM |
| #54929 | We have been below 004 in the past | shedhnt | 02/17/15 04:37:02 PM |
| #54928 | Appreciated Aly. | makingwaves | 02/17/15 03:53:48 PM |
| #54927 | Tough times don't last, tough people do. | 3Aly12 | 02/17/15 03:49:22 PM |
| #54926 | Well if my memory serves me right jcny, | makingwaves | 02/17/15 12:59:49 PM |
| #54925 | I want to take a moment to address | makingwaves | 02/17/15 11:50:27 AM |
| #54924 | yes if at ask now | funstock | 02/17/15 11:38:37 AM |
| #54923 | Its $70, get your figures straight. | poincianamike | 02/17/15 11:25:48 AM |
| #54922 | ok as in i don't see the point | funstock | 02/17/15 11:22:28 AM |
| #54921 | saving $20 bucks....? ok | funstock | 02/17/15 11:19:17 AM |
| #54920 | Have an order in to buy 100,000 at | poincianamike | 02/17/15 11:14:09 AM |
| #54919 | patience patience i think | funstock | 02/17/15 11:09:30 AM |
| #54918 | I am surprise we have not see this | just4fun2 | 02/17/15 10:31:40 AM |
| #54917 | This was a very perfect small float 3 | SyTradings | 02/16/15 10:45:26 PM |
| #54916 | You didn't sell any when it was 7,8 | Lenard | 02/16/15 10:02:42 PM |
| #54915 | 1/3 of a penny speaks for itself Mr cbrad10480 | poincianamike | 02/16/15 09:33:16 PM |
| #54913 | The co's CEO has lost his tongue with | poincianamike | 02/16/15 09:22:37 PM |
| #54911 | Any updates? Last filing was November. | matrixassetsmgt | 02/16/15 09:13:42 PM |
| #54910 | 1/3 of a penny says it all. | poincianamike | 02/16/15 09:02:41 PM |
| #54909 | Why are we blaming other shareholders for this | cbrad10480 | 02/16/15 09:02:24 PM |
| #54906 | Is the holding co. in business or not. | poincianamike | 02/16/15 07:01:40 PM |
| #54905 | We should all buy Dee a box of | poincianamike | 02/13/15 04:24:26 PM |
| #54904 | Ok...what ya got? | FergusVI | 02/13/15 09:55:59 AM |
| #54903 | Good job. Tomorrow, we go BIG! | SyTradings | 02/12/15 10:04:19 PM |
| #54900 | Sorry diver66. I never meant to say you | jcny | 02/12/15 05:12:55 PM |
| #54899 | GLENN LAKEN SUCCESS QUOTES: | Pickle | 02/12/15 04:20:48 PM |
| #54898 | i never said he's the problem... I just | Diver66 | 02/12/15 03:55:24 PM |
| #54897 | I can't see how its possible that Glenn | jcny | 02/12/15 03:40:10 PM |
| #54896 | Maybe 3 years is after after beta in | Pickle | 02/12/15 03:16:41 PM |
| #54895 | I think that 3 year timeline was based | Powercat23 | 02/12/15 03:13:16 PM |
| #54894 | GG is still in its infancy. They are | Pickle | 02/12/15 03:09:59 PM |
| #54893 | OK trying to understand how I got punked.. | Diver66 | 02/12/15 03:09:32 PM |
| #54892 | What I am hearing is: | Pickle | 02/12/15 03:07:19 PM |
| #54891 | Im hoping that everything will be in the | Diver66 | 02/12/15 03:06:51 PM |
| #54890 | have you seen the competitions(HG) website or called | Diver66 | 02/12/15 02:56:00 PM |
| #54888 | wait for a free pot of gold | Pickle | 02/12/15 02:43:33 PM |
| #54886 | Perhaps a game of "devils advocate" has been | Pickle | 02/12/15 02:37:43 PM |
| #54885 | Glenn is part of the problem here as | Powercat23 | 02/12/15 02:36:23 PM |
| #54884 | I do so love when people are short | twistedkilt | 02/12/15 02:20:53 PM |
| Post | Subject | | Go to Post   < Older |

Post New Msg      Follow Board      My Stocks (108)      Hide Intro      View Posters      CMGO Poststream      Bans (2)      Hide Quote      Filter Disabled

Fidelity

Crop report: Prices are low, but opportunities could be appearing

Learn More

Top 7 Credit Cards For Those With Excellent Credit

Learn More

Apple has some important news concerning your credit card.

Click Here

What's this?

© 2015 InvestorsHub.Com, Inc.

You are Guest on WEB4

**About**

- Investor Relations (OTC:IHUBY)
- About Us
- Terms of Service
- Privacy Policy
- Advertise With Us
- Investor Relations
- Data Accreditations
- Disclaimer

**Help**

- FAQ
- Site Map
- Handbook
- Q&A Forum
- Contact Us
- Tutorials

**Educational**

- Educational Channel
- Stock Market 101
- Educational Videos
- Investor Help Forum

**More**

- iHub on Facebook
- iHub on Twitter
- iHub iPhone/iPad App
- iHub Android App
- StockWiki
- Auditorium
- iHub NewsWire

# EXHIBIT D