# EXHIBIT E

Case 1:15-cv-05814-JPO   Document 133-5   Filed 11/16/18   Page 1 of 14



# Peckar & Abramson
A Professional Corporation · Attorneys & Counselors at Law

www.pecklaw.com

*Kevin J. O'Connor, Esq.*
*Partner*

70 Grand Avenue
River Edge, NJ 07661
tel. 201.343.3434
fax 201.343.6306

November 2, 2018

**VIA EMAIL AND FEDERAL EXPRESS**

New York, NY
Los Angeles, CA
Oakland, CA
Washington, D.C.
Miami, FL
Chicago, IL
River Edge, NJ
Austin, TX
Dallas, TX
Houston, TX

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019

RE: <u>CMG Holdings Group as successor to XA The Experiential Agency, Inc. v. Joseph Wagner, et al.</u>
**Civil Action No.: 15-CV-05814 (JPO)**
**Our File No.: 11372/398630**

Dear Mr. Matthews:

**International Alliances**

Argentina
Brazil
Canada
Chile
Colombia
Costa Rica
El Salvador
England
Guatemala
India
Mexico
Panama
Peru
Uruguay

As you know, this office represents Plaintiff, CMG Holdings Group ("Plaintiff" or "CMG") as successor to XA the Experiential Agency, Inc. ("XA" and when referring to both CMG and XA, "Plaintiff"), in the above-referenced matter commenced against your clients, Joseph Wagner ("Wagner"), Hudson Gray, Inc. (improperly pleaded as Hudson Gray, LLC)(hereinafter "HG"), Darren Andereck ("Andereck"), Jessie Lomma ("Lomma"), Michael Day ("Day"), Jean Wilson ("Wilson"), Estelle Pizzo ("Pizzo"), Studio AG, LLC ("SAG"), Remigio Gudin ("Gudin"), and Mixed Company, Inc. ("Mixed Co." and, when referred to with Wagner, HG, Andereck, Lomma, Day, Wilson, Pizzo, and SAG, collectively referred to herein as "Defendants").

The purpose of this letter is to address Plaintiff's obligations under the parties' "so ordered" stipulation (ECF #122), Rule 26 and pre-trial obligations under the FRCP and Local Civil Rules, as well as Federal Rule of Evidence 701.

Defendants have claimed that there is no evidence that they misappropriated data and destroyed data belonging to XA. So that the evidence is clear and to explain to you how this evidence fits within the four corners of the Second Amended Complaint ("SAC") and the patchwork of federal and state laws expressly prohibiting the conduct engaged in by Defendants, the first part of this letter is to lay out the highlights of that evidence for you and your clients. In the second part of the letter, we explain our position concerning the remaining computer hardware in Plaintiff's possession, custody and control, and offer full and unfettered access to such hardware to your expert, in accordance with Plaintiff's stipulation with Defendants.



# Peckar & Abramson

A Professional Corporation • Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 2

## BACKGROUND FACTS

As concerns the criminal acts of Defendants and their co-conspirators surrounding the wholesale theft and misappropriation of XA's data, with the fraudulent intent of stealing the entire business and preventing XA from ever being in a position to compete with HG fairly, the following "facts in evidence"[1] are shown by the discovery exchanged to date:

David Tuma ("Tuma") of Creative IT Consulting, LLC ("CIT") was hired by Wagner and Wilson in November 2013 to engage in a wholesale revamping of XA's computer systems in Chicago and New York. His invoices were omitted from Defendants' production set and it is clear that they were deliberately destroyed by Defendants in covering their tracks. Fortunately for Plaintiff, Tuma retained those invoices and they were obtained by Plaintiff's recently through subpoena.

Tuma's highly detailed records from November 2013 show that he was enlisted to purchase new computers for XA, inclusive of a new DELL R420 server that disappeared when there were mass resignations of Defendants in the late spring 2014. (XA0629435; CREATIVE IT-00072). As will be shown at trial, Defendants caused XA to incur $51,675.74[2] in expenses through Tuma's office alone in the period November 2013 through August 2014, all so they could put XA in a position to steal its data.

Tuma's invoices were highly detailed through March 2014 which, as you know, is when Wagner abruptly resigned from XA.

As will be shown at trial, while Tuma furnished Wilson with highly detailed invoices submitted to XA during the period November 2013 through March 2014, she created fabricated invoices that she in turn submitted to XA, omitting all of the detail about the work performed. (Compare Exhibits A and B to the Third Requests for Admissions to Jean Wilson).

The invoices from Tuma for the period of April 2014 through August 2014 provide a summary charge with no information on what services were performed. He stopped invoicing XA right before the orchestrated departure of Wilson, when Defendants' final plan was put into operation.

---

[1] This phrase was included in Mr. Matthews' October 30, 2018 email contending that since there are "no facts in evidence" to support these claims, Defendant HG would not designate a corporate designee to testify on those issues. That email demonstrated a fundamental misunderstanding of the obligations of a defendant to respond to a FRCP 30(b)(6) deposition notice, not to mention a total unfamiliarity with the facts.

[2] This amount will be within the sum sought from Defendants, jointly and severally at trial, including interest at 9%.

# Peckar & Abramson
A Professional Corporation • Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 3

Simultaneous with this shifting in detail, the invoices that Tuma was secretly issuing to his other client, HG, for the period April 2014 through late 2014, are *highly detailed*. Defendants failed to produce these invoices in discovery, again engaging in obstreperous behavior that has been the hallmark of their defense in this case from the inception. It would appear that Tuma's desire was to have plausible deniability: ie., he was just doing what he was ordered to do by one of his client's, HG, to the detriment of *his original client*, XA.

Tuma's invoices show that he was enlisted to do several things. One, he was to create a Windstream account to house XA data "in the cloud." Two, he was to "clean up" old computers and essentially de-link the new server in New York from Chicago so that CMG could not see what was on the New York server. He set up users with new laptops and computers, and deleted old profiles on computers at the New York office, all at XA's expense.

Meanwhile, Wagner, the CEO of XA who himself has a non-compete, was busy sourcing new space for HG and forming HG, which efforts entailed a rather bold effort to put the new office in the same building as XA. The evidence clearly shows that Wagner first approached the landlord, with the active assistance of Andereck and Wilson, in mid February 2014. (See, e.g., GEOMATIC CON 000002). Meanwhile, in further breach of their legal duties to XA, Wilson, Wagner, Andereck and Day began to try to solicit investors in HG such as Brad Powers, by inviting Powers and his wife to a Suits event on March 4, 2014. (Def00067604).

Using his private email address, Wagner communicated with the landlord and sought a CAD drawing for the space on or before March 11, 2014, and obtained one from HG's construction consultant on March 17, 2014. (GEOMATIC CON 000003-5).[3] According to the Secretary of State in Delaware, HG was incorporated on March 14, 2014.

As part of the strategy, after having run up enormous expenses on XA's behalf for this huge information technology upgrade,[4] and the purchasing of computers, phones, etc. for the New York office, Wagner sent his phony "termination notice" dated March 18, 2014 demanding to be paid hundreds of thousands of dollars from XA for alleged "deferred compensation" and the like. (DEF00164752).

---

[3] Defendants either destroyed these communications, or simply failed to produce them. They falsely stated to the Court that all such communications had been produced, leaving Plaintiff to the subpoena power available to it to find these records.

[4] Somewhat comically, while Wagner has testified that he left XA in large part because CMG was not spending enough money to support XA, Andereck pointed to this "reckless spending" as a large part of his reason for leaving. That will be one of many inconsistent arguments made by Defendants before the jury.

# Peckar & Abramson
A Professional Corporation • Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 4

On April 1, 2014, the Internal Revenue Service granted Wagner's request and assigned an Employer Identification Number to HG. (Def00068980-981). Evidence will show that HG's worker's compensation employment coverage began on May 5, 2014, weeks before XA's employees would resign *en masse*. (Def00039337).

On April 15, 2014, Wilson purchased Quickbooks Plus Hosting Service, and then furnished this new account information (including password information) to Tuma, who gave it to Wagner and HG. (CREATIVE IT 01450).

On April 15, 2014, Mia Blagsvedt ("Blagsvedt") wrote an email on her HG account to XA's vendor for copiers and falsely stated that she "was referred to [them] by XA" now that she was at a "new marketing company." (DEF00077864).[5] She would later confirm, on May 12, 2014, HG's agreement to a large lease of copiers from Konica Minolta for a "new marketing company" *that as of that date had no real employees*. (DEF00077861).

Tuma wrote on April 23, 2014 that he was beginning to evaluate the setup for HG's offices, and was recommending hosted services either through a terminal or citrix server. (CREATIVE IT-01389). IT Savvy, a vendor from New York assisting Tuma, provided its first proposal on April 27, 2014. (CREATIVE IT-01390).

On May 1, 2014, at 12:35 p.m. Tuma asked Wagner if they could talk about "the hosted services and/or local server" to be used by HG. (CREATIVE IT-01392). About an hour later, likely after a call between Tuma and Wagner, Tuma sent an email to IT Savvy, Blagsvedt, and Wagner, and blind copied[6] Jean Wilson, in which Tuma stated that his "cost conscious" solution to HG's serve needs would be to "put a 'file server' into the NY office, and then put on a 10 user Global VPN license into the Sonicwall Firewall..."

On May 2, 2014, Dell Financial approved HG for a $50,000 line of credit, which was confirmed in an email to HG, Wagner, *and Wilson* (who obviously was still working for XA as its Chief Operating *Officer*). (CREATIVE IT 01404).

On May 7, 2014, HG ordered $18,286.65 worth of Imacs and a Mac Pro from Apple using Estelle Pizzo's credit card. Tuma arranged for $13,836.35 worth of computer hardware to be ordered from Dell, and signaled his intention of ripping off Microsoft by utilizing "trust" licenses for installation and that he would simply wait until later "if ever" to tell Microsoft how

---

[5] The same "marketing company" that Wagner falsely testified, under oath, was not her employer.

[6] The Tuma production contains the metadata showing that Wilson was copied on multiple emails concerning the setup of HG's server and transition of files from XA to HG. This demonstrates the falsity of testimony by multiple defendants about Wilson's role in setting up HG.

# Peckar & Abramson
A Professional Corporation • Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 5

many licenses they were actually using. (CREATIVE IT 01406). At the tail end of the email, Tuma noted that he was "[s]till working on the 'hosted file server' need."

The May 7, 2014 Dell order contains Andereck's name as the person to receive delivery (at his apartment). (CREATIVE IT 01415). Yet, according to Andereck in sworn deposition testimony, he had not even come close to making up his mind yet. *No server was purchased from Dell.*

In the meantime, HG got its contractor working on renovating the space, and Andereck personally participated in same, well before he left XA. (GEOMATIC CON 000011-13). Two days before Andereck's resignation from XA, the contractor reported to Wagner and to Andereck that it was "95% complete with the job." (GEOMATIC CON 000015). Again, the construction records give the lie to the testimony by Defendants that they were not operational in this time period.

On May 19, 2014, IT Savvy sent Tuma, HG, Wagner and Blagsvedt a hosted server proposal dated May 13, 2014. The server solution would allow 25 users and 2.5TB of storage. Users could access the file server anywhere with an internet connection. (CREATIVE IT 01428-449). Tuma approved it on May 21, 2014, stating that Blagsvedt would sign and return the proposal to IT Savvy.

Later that evening, at 11:01 p.m., Tuma wrote to Wagner in an email titled "recap," as follows, in language making clear their criminal intent to access XA's servers and data for HG's benefit:

> "Joe, just a recap of items discusses.. so that I did not miss anything
> or if you need to adjust:
>
> HG Items:
>
> -Get Public Folder for HG, setup with Calendar for all users
>
> -setup new HG emails: Darren Andereck, Natallia Tsynkevich, Chelsea Tracy, Mike Day
>
> (Working on above items now – note: I had to purchase the mailbox licenses NOW.. and it takes a few hours before I can create the mailboxes… so those should be done tomorrow late afternoon/evening, ALONG with the public folders… it's great that GoDaddy has 24 our support/sales).

# Peckar & Abramson
A Professional Corporation • Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 6

> *XA Email (at Windstream):*
>
> *Delete mailboxes over weekend: Mia, Joe, Mike, Jeff, Darren, Natalia*
>
> *Current NY Server:*
>
> *-Copy/download FROM it: the "projects production" data to my server.*
>
> *-Once copied: DELETE from the server*
>
> *The above will happen over the weekend.*
>
> *Chicago Server:*
>
> *Copy data to NY server: Agency Projects, Resources, Media (Exact copy of data at point in time when done).*
>
> *This will be done over the weekend.*
>
> Chicago Accounting Data:
>
> *On date of jean's exit: jean will make a copy to her raid device. I will make a 2nd copy to my server. Then delete from the Chicago server.*
>
> OK?????
>
> TTYL" (CREATIVE IT-01452).[7]

In sum, Tuma lays out a roadmap for XA's *former CEO* about how to illegally access XA's Chicago and New York existing servers; to copy and misappropriate data; and then to delete the data from the servers. He also acknowledges his role in working closely with Jean Wilson to raid the Chicago server and steal XA's confidential and proprietary "accounting data," all of which is crucial if HG is going to unfairly compete and steal XA's clientele.

The next day, May 22, 2014, Tuma wrote to "update" XA's former CEO, Wagner on his progress in stealing XA's data, and betrayed the fact that he and Wagner were working in tandem with Lomma to copy over those project files to their own laptops before he permanently deleted data:

---

[7] The message was bcc'd to Adam Owens of Creative IT.

# Peckar & Abramson

A Professional Corporation · Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 7

"So… I started some of that work we discussed yesterday..

-HG email: the requested mailboxes are created. Waiting on public folders with GoDaddy support.. I'll probably get to call them later this afternoon and/or tomorrow afternoon

-NY Server: I setup MY office to NY office hardware based VPN connection and started copying the 'Project's production data'… **I have the Past Projects, and Projects 2013 copied, waiting on Projects 2014 to do tonight**.

**Let me know when its OK to delete those from the NY server (I think were waiting on Jessie and/or other users to make copies of some of those projects folders to their local laptop computers).**

**-Chicago server data copied to NY server (Agency Projects, Resources, Media): started that process: its over 250GB and it will take about 5-6 days to complete**. I found a solution that lets the copy process run 'day/night' with minimal user intervention (all I have to do is check up on it and if need be, give it a push).
That's the update." (CREATIVE IT 01455)(emphasis added).

On May 22, 2014, Tuma wrote again to IT Savvy saying how much he loved their "hosted server" solution, and confirmed that this new startup, HG, which again had no operations yet nor any real employees, **"will have data to upload on the hosted server's shared folders already (so I need access from MY home office to upload data)"**. (CREATIVE IT 01456)(emphasis added). Again, Tuma is clearly telling HG's vendor that it has existing data ready to be uploaded to HG's new hosted server. *That's the precise data that Tuma confirmed he had stolen earlier that day, as shown in CREATIVE IT 01455, which data Tuma also confirmed he deleted from XA's server.*

On Saturday, May 24, 2014, Tuma wrote to Wagner again about the XA data that he had stolen, and asked Wagner to confirm that he should "wipe the ny projects production data" since he had "two copies of it in my office already." (CREATIVE IT 01459).

Importantly, according to CIT's own records, HG was not even a client of CIT until June 2, 2014. The only one paying for all of the things done by Tuma on behalf of HG in the period November 2013 through June 2, 2014, was XA. Since it is clear that Wagner, Andereck and Wilson could have no legitimate authority to authorize Tuma to take the actions he did, their actions were illegal.

# Peckar & Abramson
A Professional Corporation • Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 8

On June 18, 2014, IT Savvy informed Tuma, Blagsvedt and Wagner that it was necessary to "upgrade your storage space from the default 100GB to 2.5TB..." (CREATIVE IT 01497). **This for a startup that had just started operating.**

On July 8, 2014, Tuma wrote to Andereck, Wagner, Blagsvedt, and Lomma stating that he a discussion with IT Savvy about "the hudson gray data server" which was interestingly put in quotes, likely as part of their inside joke. (CREATIVE IT 01523). He furnished a document to each of them demonstrating how the "hudson gray data server" was connected to their computers and contained an enormous volume of data occupying all but 934 GB of 2.70 TB. This document alone shows that HG had 1.766 TB of data as of that date, even though HG had not earned a dime from a client from a single project as of that date. (*Compare* CREATIVE IT 01524 *with* HG's General Ledger, Def 00039337).[8]

On July 21, 2014, Tuma wrote to Wilson, Wagner and Pizzo about issues with Quickbooks for "company files." Obviously by this point HG was linked with SAG and Mixed Company through the Quickbooks account that XA paid for earlier in the year, as arranged by Wilson. (CREATIVE IT 01528).

Exactly as laid out in the "recap" email on May 21, 2014 (CREATIVE IT-01452), Tuma sprang into action the week of Wilson's resignation from XA with a flurry of activity that he detailed in his HG invoice of September 30, 2014 (CREATIVE IT 00031), including the following entries corroborating his illegal access to XA's data and how he then deposited that data into HG's exchange server:

- 9/12/14, "Jean PST file download. Opened Jeans (sic) PST file in Outlook"

- 9/24/14, "Jean: Resolved phone email issue, *import outlook pst file into HG Exchange account-David Tuma.*" (CREATIVE IT 00031)(emphasis added).

On September 10, 2014, Tuma sent Defendants an email with a detailed log of events making clear all of the items he had illegally accessed and deleted. (CREATIVE IT 01536).

The misappropriation of data and other illegal actions by Defendants and their agents is clear. Making things even more clear was the fact that, in discovery, Defendants have produced thousands of records that they have no right to possess, and could only possess through unlawful and illegal means. By way of example only and not by way of limitation:

---

[8] His work appears in the July 31, 2014 invoice. (CREATIVE IT 00023).

# Peckar & Abramson
A Professional Corporation • Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 9

- Wilson fraudulently sought both unemployment compensation from the State of Illinois, as well as a claim for back wages. She fraudulently collected unemployment while simultaneously receiving substantial sums from HG during the period of September 2014 through early 2015. Most pertinent for our analysis here was when she showed up at a hearing before the Illinois Department of Labor, where the Administrative Law Judge found that Wilson was "unable to explain or recall how she was able to attach a balance sheet of Respondent's dated September 15, 2014 that was printed out at 1:02 p.m. July 28, 2015, after Claimant's employment separation"? Obviously we all know how she got those confidential and proprietary documents;

- An early December 2014 email exchange between Wagner and Wilson (who had resigned abruptly from XA on September 12, 2014) shows that Wagner knew that Wilson possessed a .pst folder that had all of Jean Wilson's emails from her time at XA. (DEF00150711). Wagner wrote to Wilson and said "I would like to see all the emails that you have to and from Ron B. It may be easier for you to just make a PST that I can go through." This was a reference to Ron Burkhardt whom Defendants were working with to obtain an affidavit to be used in the litigation, as shown by the line right above that in the email;

- In total breach of her legal obligations to XA, Wilson kept an email dated May 11, 2014 between herself and XA's auditor concerning XA's financials, and then later shared it with HG and Wagner on December 15, 2014 (DEF00131691);

- Wilson retained a mid-March 2014 email exchange from XA which contains the entire Quickbooks file for XA as well as the passwords for the file, and forwarded that package (including this highly confidential data and passwords) to Joseph Wagner and HG on December 8, 2014, as shown by your clients' own records (DEF00080305-06);

- Wilson converted a May 7, 2014 email between herself and XA's auditor which also contained two Excel spreadsheets contained highly confidential XA financial data, and shared that email and data with HG and Wagner by way of a December 15, 2014 email produced by Defendants as DEF00095461);

- A mid December 2014 email exchange between Wagner, Andereck, Wilson and Lomma demonstrates that Defendants continue to maintain XA files on their server. (DEF00093919-920). Wilson (who at this time was fraudulently collecting unemployment from the State of Illinois), forwarded a draft of the "Upfront Template" to Lomma and Wagner, which draft clearly came from a prior upfront done at XA. Indeed, Wagner remarked that Wilson had failed to

# Peckar & Abramson
A Professional Corporation • Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 10

> "remove[] a few references to XA" in the document, which he took care of in the next draft. Lomma, who appears to be the only one in the bunch with any common sense, remarked "[a]m I the only one concerned about submitting the same contract as we did last year, with a new company name/logo? Feel free to let me know if I am overthinking it." Wilson responded by assuring Lomma that she had done everything she could to ensure that the XA document was "stripped down to pull out anything that would prompt NBC legal to get involved"; and

- There are numerous other examples of confidential and proprietary documents produced by Defendants (and even marked as such by Defendants), that have no legitimate reason to be in their possession. Take for example DEF00072661-678), which is the "NBC Primetime Preview 2014" contacts list. We could fill a telephone book with all of the examples of items stolen by Defendants from XA's servers, as shown by Defendants' own document production as well as that of Mr. Tuma.

In addition to this clear and convincing documentary evidence of fraud and illegal activity, Plaintiffs will rely upon FRE 602 and, in some instances if required, FRE 701, through the testimony of Pedro Faria, to further establish such misconduct. On March 1, 2018, Faria testified that he was retained in the spring of 2014 by Jean Wilson, purportedly on behalf of XA, to perform IT services at XA's New York office. This was just a few months after Joseph Wagner had resigned from XA while Wagner, in concert with the other defendants, was in the process of setting up a competing firm in violation of his obligations to XA. Faria's testimony entirely corroborates the "recap" email secretly exchanged between Wagner and Tuma, and he is the eyes and ears on the ground when all of that occurred.

The evidence will show that Defendant Jean Wilson stayed behind to run interference and destroy documents, and was fully aware of what Tuma and Wagner/HG had agreed to do. While actively concealing from XA her direct knowledge that Wagner had been planning this strategy for months, and her own active participation in helping HG locating an office, and failing to disclose that Wagner had already set up shop just four floors above in the same building, Wilson arranged for Faria to destroy data on XA's computers in the New York office. Faria's testimony is totally corroborated by the documents obtained from Tuma, demonstrating when this plan was placed into motion, and exactly how it was accomplished.

Faria candidly testified that this raised serious red flags and that he repeatedly asked Wilson if she was sure she wanted to delete all of this data without properly backing it up. (See Faria Dep., at 59-65). Her response to him was to feed him false information as an explanation for such actions, by falsely telling him that there had been a parting of the ways between the Chicago and New York office. She said that the New York office was going to break away and be totally separate (id. at 55-56) which, in retrospect, was technically true only because she was

# Peckar & Abramson
A Professional Corporation • Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 11

working with her co-defendants to secretly destroy XA. Faria also corroborated the allegations in the Second Amended Complaint that someone had improperly accessed XA's system shortly before Wilson's September 12, 2014 resignation; had created a phony administrator account; and deleted additional data to cover the Defendants' tracks and slow down XA. (Id. at 37-38). Again, this is totally corroborated by Tuma's contemporaneous email to Wagner and computer log, which log was found in his own files and was sent to HG and Wagner at the time the illegal acts were committed.

Faria further testified that he engaged in efforts to restore data and that he was ultimately able to restore deleted email accounts, but from a certain date forward. He packaged up all of the hard drives and servers and they were sent to XA's non-testifying consultant, United Lex. As indicated in our prior amendment to Rule 26 disclosures, United Lex will be available to corroborate all of this, and that the chain of custody has remained unbroken for the hardware that was left behind at XA by Defendants.

Where a witness such as Faria is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

>   (a) rationally based on the witness's perception;
>   (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>   (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Faria clearly meets the requirements of FRE 701, and notice is hereby given that Plaintiff intends to introduce his testimony as outlined in his deposition.

The relevant caselaw demonstrates the contours of the rule and the discretion of the court in allowing lay testimony. "This first requirement of Rule 701 is met where the witness derives his opinion from "first-hand knowledge or observation." Accordingly, a proper foundation will be readily established where the witness was a participant in the conversation." United States v. Rubin/Chambers, Dunhill Ins. Servs., 828 F. Supp. 2d 698, 703 (S.D.N.Y. 2011) quoting United States v. Rea, 958 F.2d 1206, 1215 (2d Cir.1992).

"Lay opinion testimony will probably be more helpful when the inference of knowledge is to be drawn not from observed events or communications that can be adequately described to the jury, but from such factors as the defendant's history or job experience." United States v. Rea, 958 F.2d 1206, 1216 (2d Cir. 1992). See also Morin v. State Farm Fire & Cas. Co., 453 F. Supp. 2d 173 (D. Me. 2006) (holding that a certified fire investigator who was originally identified as potential expert witness, but whose expert testimony was agreed to not be proffered after a motion in limine, could offer lay testimony concerning facts he observed during the course of his

# Peckar & Abramson
A Professional Corporation · Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 12

investigation of the fire at home.); Hartzell Mfg., Inc. v. Am. Chem. Techs., Inc., 899 F. Supp. 405, 408 (D. Minn. 1995) ("[T]he mere fact that the witness, by virtue of his education, training or experience, is capable of being qualified as an expert, does not serve as a valid objection to his expression of lay opinion testimony."). In a securities fraud prosecution, the Second Circuit held that district court did not abuse its discretion in permitting a company employee to testify as a lay witness about the effects of the disputed reclassifications based upon his observations during his twenty months as an employee, who was responsible for correcting company's financial statements and was well-acquainted with company records and was not based on specialized knowledge. United States v. Rigas, 490 F.3d 208 (2d Cir. 2007); see also Furmanite Am., Inc. v. T.D. Williamson, Inc., 506 F. Supp. 2d 1126 (M.D. Fla. 2007) (Computer forensics specialist would be allowed to testify as fact witness, rather than as expert, in action brought by pipeline repair company against competitor and former employees, stemming from alleged conspiracy to injure company's business). In Furmanite, the Court held that the computer specialist would be "permitted to testify regarding the data obtained from such computers, the dates of the elimination of material from such computers, if based on fact and not opinion, and the procedures used to extract such information". Id. at 1133.

The operative complaint alleges various statutory and common law violations by Defendants stemming from, among other things, their deliberate efforts to misappropriate XA's data and to use it in their business, and to destroy data resident on XA's computers. Given the admissions made by Wilson to Faria, all testified to by Faria, and given the rather clear, corroborating evidence from Tuma's and Defendants' own files, no computer forensics expert needs to be designated to get these claims before a jury.

To answer the request made in your clients' formal demand, which is the subject of the stipulation, at the present juncture it is the intention of Plaintiff to rely upon the testimony of the Defendants, Mr. Faria and others, as well as the overwhelming records produced in this case, to establish these claims. It is clear that Tuma, at Defendants' instructions, destroyed data not just on XA's computers but also in Windstream. Windsteam is not in Plaintiff's possession, custody or control, so if you wish to try to disprove Tuma's admitted actions, you should take action now to access Windstream's virtual servers. As for the New York server, we all know that your clients stole it, so we are unable to engage an expert to analyze a server that was stolen.

At present, Plaintiff has not designated *an expert* to affirmatively conclude from a forensic analysis that data was specifically deleted from the various devices listed on Exhibit A to the Stipulation. We will use the evidence outlined above to prove that obvious fact. Plaintiff does not waive its right to utilize an expert in this regard in the case and the time for Plaintiff to so designate has not yet expired. Notwithstanding, we wish to make clear our intentions, and we are prepared to provide you with access to the items listed on the inventory for your expert's analysis, should you so desire.

# Peckar & Abramson
A Professional Corporation · Attorneys & Counselors at Law

Scott R. Matthews, Esq.
Windels Marx Lane & Mittendorf, LLP
November 2, 2018
Page 13

I trust this makes my client's position clear. Please let me know at your earliest convenience whether you would like to have the items sent to your expert so we can make that happen.

Very truly yours,

KEVIN J. O'CONNOR
KJO:ci
(4069347)(1)