# EXHIBIT F

Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Civil Action No. 15-CV-05814(JPO)

5   ------------------------------------x

6   CMG HOLDINGS GROUP, INC. as assignee

7   of XA, THE EXPERIENTIAL AGENCY, INC.,

8                        Plaintiff,

9            -against-

10   JOSEPH WAGNER, HUDSON GRAY LLC,

11   DARREN ANDERECK, JESSIE LOMMA,

12   MICHAEL DAY, JEAN WILSON, ESTELLE

13   PIZZO, STUDIO AG, LLC, REMIGIO GUDIN,

14   and MIXED COMPANY, INC.,

15                        Defendants.

16   ------------------------------------x

17

18                        November 2, 2018

19                        10:01 a.m.

20                        Job No. NJ3073935

21            Deposition of JOSEPH WAGNER, held at

22   the offices of Peckar & Abramson, 1325 Avenue of

23   the Americas, New York, New York, pursuant to

24   Notice, before Lynne D. Metz, a Shorthand Reporter

25   and Notary Public of the State of New York.

Page 2

```
 1

 2     A P P E A R A N C E S:

 3

 4          PECKAR & ABRAMSON

 5          Attorneys for Plaintiff

 6               1325 Avenue of the Americas

 7               New York, New York 10019

 8          BY:   KEVIN J. O'CONNOR, ESQ.

 9                SHANNON D. AZZARO, ESQ

10

11

12          WINDELS MARX LANE & MITTENDORF, LLP

13          Attorneys for Defendants

14               156 West 56th Street

15               New York, New York 10019

16          BY:   SCOTT R. MATTHEWS, ESQ.

17

18

19

20          ALSO PRESENT:

21               Barbara Laken

22               Darren Andereck

23

24

25
```

Page 3

1

2

3

4        IT IS HEREBY STIPULATED AND AGREED, by and

5   between the attorneys for the respective parties

6   herein, that filing and sealing be and the same

7   are hereby waived.

8        IT IS FURTHER STIPULATED AND AGREED

9   that all objections, except as to the form of the

10   question, shall be reserved to the time

11   of the trial.

12        IT IS FURTHER STIPULATED AND AGREED that the

13   within deposition may be signed and sworn to

14   before any officer authorized to administer an

15   oath, with the same force and effect as if signed

16   and sworn to before the officer before whom the

17   within deposition was taken.

18

19

20

21

22

23

24

25

1

2    J O S E P H   W A G N E R,

3    called as a witness, having been first duly sworn

4        by the Notary Public (Lynne D. Metz), was

5        examined and testified as follows:

6    EXAMINATION BY

7    MR. O'CONNOR:

8        Q.    Good morning, sir.

9        A.    Good morning.

10       Q.    As you know, I represent the plaintiff

11   in this action and we are here for a corporate

12   designee deposition pursuant to a notice.  I think

13   the best thing to do first is to talk about who is

14   going to talk about what.

15             MR. MATTHEWS:  Okay.

16             MR. O'CONNOR:  Please mark as HG

17       Exhibit 1 notice of deposition.

18             (HG Exhibit 1, notice of deposition,

19       marked for identification, as of this date.)

20       Q.    Have you ever seen HG 1 before, the

21   document in front of you?

22       A.    Yes, I have.

23             MR. O'CONNOR:  So you have a copy

24       there counsel.

25             Do you want to -- I don't know if you

Page 5

1                    J. Wagner

2      want to speak or is this witness going to

3      tell me who is going to speak on each

4      subject?  Which would you prefer to do?

5           MR. MATTHEWS:  I can speak.

6           I sent you an e-mail earlier this week

7      identifying that Mr. Wagner will speak with

8      respect to topic areas 1, 2, 3, 10, 11, 14,

9      15, 16, 17 and 18.

10          And the e-mail also stated that Darren

11     Andereck is prepared to testify as to topic

12     areas 1, 2 --

13          MR. O'CONNOR:  So number one you told

14     me that -- so he is going to explain what he

15     reviewed.  So we will put Darren Andereck

16     for 1.

17          What else again?

18          MR. MATTHEWS:  2, 4, 5, 9, 10, 11, 12,

19     13, 15, 16, 17 and 18.

20          MR. O'CONNOR:  So that leaves.

21          MR. MATTHEWS:  6, 7 and 8.

22          MR. O'CONNOR:  And what is your

23     position on this?

24          MR. MATTHEWS:  The position is that

25     the events, actions or events set forth in

Page 6

1                    J. Wagner
2       6, 7 and 8 did not occur but either witness
3       is prepared to answer questions to the
4       extent they have knowledge of them.
5              MR. O'CONNOR:  So 6, 7 and 8 you said
6       the events did not occur.
7              Are you saying in 8 that they didn't
8       purchase cellular telephones?
9              MR. MATTHEWS:  Your question is
10      whether HudsonGray purchased cellular
11      telephones for HudsonGray employees in 2014?
12      You can ask either witness.  I don't know
13      that that occurred.
14             MR. O'CONNOR:  Okay.  I don't
15      necessarily agree with it but I understand
16      your position so let's move forward and see
17      how far we progress with it.
18             MR. MATTHEWS:  Good.
19  BY MR. O'CONNOR:
20      Q.    Good morning sir.
21      A.    Good morning.
22      Q.    Where do you reside?
23             MR. MATTHEWS:  Objection.  The witness
24      is prepared to give his address as his
25      business address in Chicago, Illinois and I

Page 7

1                    J. Wagner

2       will accept service of any trial subpoena on

3       his behalf.  This is noted in his deposition

4       as a party and I am continuing to stipulate

5       to that in that regard.

6       Q.    So you are refusing to --

7             MR. O'CONNOR:  You are directing him

8       not to tell me where he resides; is that

9       correct?

10            MR. MATTHEWS:  The home address.

11            MR. O'CONNOR:  I am asking where he

12      resides.

13            MR. MATTHEWS:  That's a fair question.

14      A.    It is in Chicago.

15      Q.    Do you commute back and forth to New

16  York?

17      A.    I do occasionally, yes.

18      Q.    What have you done to prepare for

19  today's deposition?

20      A.    Review the complaint.  Went through

21  some of the materials around that and had

22  discussions with counsel.

23      Q.    Just so it is clear, I don't want to

24  know about your discussions with your lawyer,

25  provided you tell me -- did you have a meeting

Page 8

```
1                        J. Wagner
2    with him?
3         A.    Yes, we did.
4         Q.    How long was the meeting?
5         A.    A couple of hours.
6         Q.    Can you tell me who was in the
7    meeting?
8         A.    Myself and Darren and Scott.
9         Q.    Was Mia Blagsvedt -- is that how you
10   pronounce her name?
11        A.    No, Mia was not in the meeting.
12        Q.    Anybody else?
13        A.    No, just the three of us.
14        Q.    When was that meeting?
15        A.    Yesterday.
16        Q.    How long was the meeting?
17        A.    A couple of hours.
18        Q.    Did you review anything at that
19   meeting?
20        A.    We did.
21        Q.    Other than what you just said, you
22   said you looked at the complaint?
23        A.    Correct.
24        Q.    What else did you look at?
25        A.    Some supporting documents.
```

Page 9

1                      J. Wagner

2      Q.    Like what?

3      A.    Went through some e-mails and

4  financial statements.

5      Q.    Did you happen to look at any of the

6  materials that were produced by David Tuma?

7      A.    I did.  We went through some of those

8  materials.

9      Q.    Do you remember what you look at?

10     A.    Went through some e-mails and

11  invoices.

12     Q.    Were some of the invoices you looked

13  at what was sent over to you yesterday?

14     A.    It was contemporaneous with yesterday,

15  yeah.

16     Q.    When was the last time you spoke to

17  David Tuma?

18     A.    I had a conversation with David

19  yesterday.

20     Q.    What did you talk to him about?

21     A.    We went through some clarifications on

22  an e-mail and invoicing.

23     Q.    Can you tell me what was said and who

24  said it?

25     A.    So best of recollection, we discussed

Page 10

1                    J. Wagner

2    an e-mail that I went through with counsel.

3    Talked with David about that.  Clarification on

4    the points that were laid out in the e-mail and

5    also reviewed an invoice that was associated with

6    that.

7         Q.    Do you remember the date of that

8    e-mail?

9         A.    It was May 21st and there was an

10   e-mail from May 22nd.

11        Q.    Two e-mails you looked at; right?

12        A.    Correct.

13        Q.    Prior to yesterday when you spoke to

14   David Tuma, had you spoken with him in recent

15   past?

16        A.    I talked to him a couple of weeks ago

17   when he got a subpoena.

18        Q.    What did you talk about?

19        A.    Basically we caught up on how his

20   business was doing.  Discussed the subpoena and I

21   instructed him to contact Scott Matthews.

22        Q.    So you received notice that a subpoena

23   had been issued to Mr. Tuma; right?

24        A.    Correct.

25        Q.    And then you called Mr. Tuma; right?

Page 11

1                          J. Wagner

2          A.     Correct.

3          Q.     And then you gave Mr. Tuma Mr.

4   Matthews' phone number?

5          A.     Correct.

6          Q.     Did you say anything else to him?

7          A.     Just talked about the context of the

8   case.  How long it was going on.  Nothing in a lot

9   of specifics.  Just basically the subpoena and to

10  speak with Scott Matthews.

11         Q.     Do you remember what you said to him

12  about the case?

13         A.     I said it was going on and on.

14         Q.     That's it?

15         A.     In that kind of context.  Again, I

16  don't have the verbatim of the conversation but

17  that was the context.

18         Q.     How long was the conversation?

19         A.     Not very long.

20         Q.     Can you approximate nor me?

21         A.     Probably ten, 15 minutes.  A lot of it

22  was catch up too.  We talked about his recent

23  travel and getting to different parts of Asia and

24  I don't see David very much.  So there was some

25  catchup as well.

Page 12

1                      J. Wagner

2          Q.    David Tuma is with a company called

3     Creative IT Consulting; is that correct?

4          A.    That's correct.

5          Q.    There's a couple of creatives in this

6     case, so I guess I shouldn't use creative.  I want

7     to come up with a short form.

8                Can we just say David Tuma's company

9     and when we are referring to --

10         A.    That's fine.

11         Q.    When was the last time that you

12    utilized David Tuma's company for HudsonGray

13    affairs?

14         A.    David Tuma has been working with

15    HudsonGray for years.  David Tuma is currently IT

16    working with HudsonGray now.

17         Q.    Do you have some understanding why he

18    hasn't produced any records beyond 2015?

19         A.    Sorry?

20         Q.    Did you speak to him about what he was

21    going to be producing?

22         A.    No.  Just in a general sense but

23    there's a list of requests and you should speak

24    with Scott Matthews about that.

25         Q.    You didn't suggest to him that he

Page 13

1                          J. Wagner

2    shouldn't produce anything, did you?

3          A.    No, I did not.

4          Q.    Did you offer to pay his expenses?

5          A.    No.  We didn't talk about that.

6          Q.    Have you offered to produce, pay his

7    expenses associated with the subpoena?

8          A.    There hasn't been any expenses.   In

9    terms if he does work product for us he would just

10   bill us but he is not traveling or doing anything

11   so we didn't talk about expenses.

12         Q.    As of this moment have you received

13   any invoices for his work in responding to the

14   subpoena?

15         A.    No.

16         Q.    How about any other recipient of the

17   subpoena issued from my firm over the last month,

18   have you received a bill from anyone for their

19   time responding to the subpoena?

20         A.    Not that I am aware of.

21         Q.    Now you have been deposed before;

22   correct?

23         A.    That's correct.

24         Q.    So I am going to ask you questions and

25   I would like to get an answer from you.  If we get

Page 14

1                          J. Wagner

2      an answer from you it is going to be assumed that

3      you understood that question; okay?

4           A.    Understood.

5           Q.    If I've asked you a question you don't

6      understand, just tell me.  I will be more than

7      happy to rephrase it.

8           A.    I understand.

9           Q.    If you need a break from time to time

10     just let me know.  We have a breakout room and you

11     are more than welcome to use it, even when we

12     bring in lunch but I would ask if there is a

13     question pending you answer that question; okay?

14          A.    I understand.

15          Q.    Who are the owners of HudsonGray

16     Incorporated?

17          A.    I am the sole shareholder of

18     HudsonGray.

19          Q.    Have there ever been shareholders of

20     HudsonGray?

21          A.    No.

22          Q.    Is there a predecessor company to

23     HudsonGray that you have ever operated with the

24     same name?

25          A.    Rephrase the question please.

Page 15

```
 1                    J. Wagner
 2       Q.    I am sorry.  That was a poor question.
 3             HudsonGray Incorporated was
 4   incorporated in Delaware?
 5       A.    Correct.
 6       Q.    Did you ever operate a business named
 7   HudsonGray?
 8       A.    Again, in time frame?
 9       Q.    Ever.
10       A.    There is a HudsonGray operating now.
11       Q.    I understand that.
12             Prior to forming the Delaware company,
13   did Joe Wagner ever participate in running a
14   company called HudsonGray?
15       A.    No.
16       Q.    Were you ever an employee of a company
17   called HudsonGray?
18       A.    No.
19       Q.    So would you call that a startup
20   company HudsonGray?
21       A.    That's a fair assessment.
22       Q.    In other words, it had no assets;
23   right?
24       A.    Correct.
25       Q.    Had no clients; right?
```

Page 16

1                      J. Wagner

2        A.    As a newly formed entity.

3        Q.    Had no furniture; right?

4        A.    No, it did not.

5        Q.    Had no bank accounts?

6        A.    No bank accounts.

7        Q.    Had no data; right?

8        A.    Everything was a startup company,

9   correct.

10       Q.    So the answer is no, it had no data?

11       A.    It has no data.

12       Q.    When was the first time that you

13  contemplated forming a company called HudsonGray?

14       A.    So by associating the name there is a

15  time frame around that.  The HudsonGray name came

16  up in the Spring of 2014.

17       Q.    Do you remember when?

18       A.    It was around March.

19       Q.    And that's when you came up with the

20  name; right?

21       A.    That's correct.

22       Q.    But prior to that you had contemplated

23  forming your own company; right?

24       A.    Correct.

25       Q.    When do you think you first started

Page 17

```
1                    J. Wagner
2    thinking about that?
3         A.    Specifically around a new company
4    would have been sometime around the beginning of
5    2014 but the situation that was going on with
6    Glenn Laken.
7         Q.    Would you say that that was within the
8    first few weeks of 2014?
9         A.    I would say within the first month
10   after several of the meetings that I had with
11   Glenn Laken at the time and Jeff Devlin and also
12   Ron Burkhardt.
13        Q.    Is it your testimony that until those
14   meetings occurred you had not had any thoughts
15   going on your own forming that company?
16        A.    That's not correct.  I had some
17   discussions with employment counsel in the Fall of
18   2013 because there was again issues that were
19   challenging around Glenn Laken's activities and
20   purported ownership of the company and things of
21   that nature.
22        Q.    So you had these discussions with a
23   lawyer in the Fall of 2013 and yet you embark in
24   an adventurous plan building out the IT in New
25   York; right?
```

Page 18

1                          J. Wagner

2             MR. MATTHEWS:  Objection.

3        Q.    Do you understand the question?

4        A.    Can you rephrase it?

5        Q.    You just told us that in the Fall of

6   2013 you were thinking about leaving; right?

7        A.    In the Fall of 2013 I was talking with

8   employment counsel about my position with the

9   company based on an aggressive track that was

10  being taken by the purported owner of the company

11  being Glenn Laken.

12        Q.    Who hired David Tuma to upgrade the

13  information technology in the New York office?

14             MR. MATTHEWS:  Objection.

15        Q.    Was it you or Miss Wilson?

16             MR. MATTHEWS:  When you say the New

17        York office, what do you mean by that?

18             MR. O'CONNOR:  I will rephrase it.

19             MR. MATTHEWS:  Thank you.

20  BY MR. O'CONNOR:

21        Q.    In December of 2013 efforts were made

22  to upgrade the information technology system at

23  XA; correct?

24        A.    Correct.

25        Q.    A lot of money was spent; right?

Page 19

1                    J. Wagner

2       A.    You can quantify that but there was

3   money spent on upgrading the IT equipment and the

4   IT infrastructure.

5       Q.    And that started in December of 2013;

6   correct?

7       A.    I don't recall exactly when it started

8   but there was a need to enhance the IT

9   infrastructure, so probably starting in the Fall

10  of 2013.

11      Q.    Who within XA approved those

12  expenditures?

13      A.    Jean Wilson was the one that was most

14  involved in doing the budget and expense around

15  office equipment and IT and was mostly the direct

16  contact with David Tuma.

17      Q.    When you say mostly, were you also in

18  contact with Mr. Tuma about these efforts?

19      A.    Occasionally but more at a high level.

20  Jean was very good at managing the detail.

21      Q.    Did you let Mr. Tuma in on your plans

22  to form your own company --

23            MR. MATTHEWS:  Objection.

24      Q.    -- at some point?  You can answer.

25            MR. MATTHEWS:  Objection.

Page 20

```
 1                      J. Wagner
 2           Go ahead.
 3      A.     There was communication with David at
 4  some point.  I don't recall when.  And he became
 5  someone who was assisting me in setting up
 6  HudsonGray later in 2014.
 7      Q.     It could have been in the Fall of 2013
 8  when you told Mr. Tuma your plans?
 9      A.     No, I don't believe so.
10      Q.     When was it?
11      A.      It would have been after I had left XA
12  or in the process of setting up plans for the
13  company or doing the logistics.  David was the IT
14  person, so that would have been contemporaneous to
15  2014 in the spring.
16      Q.     So your testimony understand oath is
17  that you did not tell David Tuma until you
18  resigned from XA?
19      A.     No.  I don't recall exactly when David
20  became aware of it, but I don't recall having any
21  conversations with David about leaving XA in the
22  Fall of 2013.
23      Q.      My question is:  Are you able to say
24  under oath you did not tell David Tuma before you
25  resigned from XA that you were leaving --
```

Page 21

1                          J. Wagner

2          A.    I don't recall the time.

3          Q.    You have to let me finish.  That's one

4   of my instructions that I forget.  You have to let

5   me get my question out, then pause a little bit

6   because he may have an objection, then answer.

7          A.    I understand.

8          Q.    It will go faster.

9          A.    I understand.

10         Q.    Are you able to say definitively under

11  oath that you did not tell David Tuma that you

12  were leaving to form your own company until you

13  left XA?

14         A.    I don't recall when I told David four

15  and a half years ago.

16         Q.    Who within XA handled the preparation

17  of David Tuma's invoices for submission to

18  accounting at XA?

19         A.    I am sorry.

20               Could you say that again?

21         Q.    David Tuma performed services in

22  December of 2013; right?

23         A.    Correct.

24         Q.    And that was the upgrade of

25  information technology at the New York office;

Page 22

```
1                      J. Wagner
2    right?
3         A.    I am assuming that that happened then.
4    I don't recall specific invoices verbatim but
5    David Tuma was someone who would provide invoices
6    to XA that would be paid.
7         Q.    So we agree that he would provide
8    invoices to XA and they would be paid; right?
9         A.    That's correct.  He was a vendor.
10        Q.    So my question to you is:  Did you
11   have any role in taking the invoices from David
12   Tuma, presenting them to the bookkeeping and
13   having them paid?
14        A.    No.
15        Q.    Is that all Jean Wilson?
16        A.    Jean Wilson yes, correct.
17        Q.    Were you aware that the invoices for
18   David Tuma were altered when they were submitted
19   to XA?
20        A.    No.  I am not aware of that.
21        Q.    You can't think of any reason why XA
22   wouldn't be entitled to the full invoice, can you?
23              MR. MATTHEWS:  Objection.
24              Go ahead.
25        A.    No, I cannot.
```

```
1                    J. Wagner
2         Q.    Do you have a shareholder's agreement
3   for HudsonGray?
4         A.    Not that I recall.  I believe it was
5   just formation documents.
6         Q.    Is it a C-Corp or an S-Corp?
7         A.    It is a C-Corp.
8         Q.    Has it filed tax returns for calendar
9   years 2014 through 2017?
10        A.    Yes, it has.
11        Q.    And you possess those?
12        A.    I can get them through the accountant,
13  yes.
14        Q.    And did you file both State of New
15  York and Federal?
16        A.    Yes.  As far as I know state and
17  federal filings have been done every year.
18        Q.    And also in the State of Illinois or
19  no?
20        A.    I am not sure on that.  I have to
21  check with the accountant.
22        Q.    Are there any written agreements
23  between HudsonGray and any of its employees about
24  their employment?
25        A.    I believe we have a standard
```

1                          J. Wagner

2     non-disclosure agreement that is done with any

3     kind of contractors, perhaps some of the

4     employees.  There is no formal employment

5     agreements.

6          Q.    You said perhaps some of the

7     employees.

8               Is it possible you have NDAs for

9     certain of your employees?

10         A.    There may be.

11         Q.    Do you know who those people would be?

12         A.    Not offhand, no.

13         Q.    Why would you need an NDA with anyone

14    in your business?

15         A.    Sometimes the clients require it.

16         Q.    Is that the only reason?

17         A.    Typically yes.  We were not big on a

18    lot of documentation.

19         Q.    Do you have a handbook?

20         A.    With HudsonGray?

21         Q.    Yes.

22         A.    We do not.

23         Q.    No employee handbook?

24         A.    No, we do not.

25         Q.    Does Mia Blagsvedt -- can I call her

Page 25

```
1                    J. Wagner
2    Mia?
3         A.    That's fine.
4         Q.    Is Mia an employee of HudsonGray?
5         A.    No, she is not.
6         Q.    Has she ever been an employee of
7    HudsonGray?
8         A.    No.
9         Q.    Has she ever had authority to sign
10   contracts on behalf of HudsonGray?
11        A.    No, she has not.
12        Q.    Did you ever see a contract with her
13   name on it?
14        A.    From HudsonGray?
15        Q.    Yes.
16        A.    No.
17        Q.    Did you happen to look at the
18   documents that were produced from IT Savvy?
19        A.    I have may gone through them.  There
20   was quite a number of documents.
21             MR. MATTHEWS:  Objection.
22        Q.    Did you say her name on anything?
23             MR. MATTHEWS:  IT Savvy, were those
24        documents produced?
25             MR. O'CONNOR:  Yes.  Came over to you
```

Page 26

1                        J. Wagner

2         yesterday.

3                   MR. MATTHEWS:  When?

4                   MR. O'CONNOR:  We will deal with it on

5         a break.  It came over yesterday.

6                   MR. MATTHEWS:  I am not aware of those

7         documents being produced.  I am just noting

8         it for the record so the witness could not

9         have produced them.

10                  MR. O'CONNOR:  I understand.  They

11        came in late.

12   BY MR. O'CONNOR:

13        Q.    What does Mia do for HudsonGray?

14        A.    At the very beginning Mia assisted me

15   because I was doing everything on my own, so she

16   helped me with assisting me in doing things that

17   were required to set up the company.

18        Q.    I asked you before about what

19   HudsonGray had at its inception.

20              Do you remember that?

21        A.    Yes.

22        Q.    Did it have any goodwill?

23              MR. MATTHEWS:  Objection.

24              Go ahead.

25        Q.    I will withdraw the question.

Page 27

1                  J. Wagner

2                  What is your background?  Your

3      educational background?

4          A.    I have graduated from Perdue

5      University and I have a Master's degree in

6      industrial relations and labor history from

7      Northern Illinois University.

8          Q.    And have you been a CEO of any

9      companies other than XA over your career?

10         A.    Yes.

11         Q.    What companies?

12         A.    At the time a coatings company by the

13     name of Master's Choice.  Architectural coatings

14     company.

15         Q.    Anyone else?

16         A.    Not that I recall the title.

17         Q.    Did you ever hear of a company called

18     Powermag, P-O-W-E-R-M-A-G?

19         A.    Yes.  My title there is technically

20     the manager.  It is an LLC but I would also be

21     considered the CEO of Powermag.

22         Q.    Do you understand what the concept of

23     goodwill is?

24         A.    It would probably be more helpful if

25     you tell me what your definition is.

1                    J. Wagner

2          Q.     Sir, I am not here to answer

3    questions.   I am asking you if you know.   If you

4    don't know just say I don't know.

5          A.     In that context I don't know exactly

6    what you are looking for.

7          Q.     Did you believe that when you formed

8    HudsonGray, the day you formed it did it have any

9    goodwill in the eyes of the accounting industry,

10   do you know?

11         A.     On the day it was formed, no.

12         Q.     How about the day after?

13         A.     It's an nebulous question.   It depends

14   on what happens over time with the company.

15         Q.     In your view, how does it build up

16   goodwill?

17                MR. MATTHEWS:  Off the record.

18                (Discussion off the record.)

19                MR. MATTHEWS:  I want to note that

20         Mrs. Laken appeared and counsel has

21         represented that she is here as a party

22         representative of the plaintiff.

23                MR. O'CONNOR:  I did.

24   BY MR. O'CONNOR:

25         Q.     Now I asked you a question about

Page 29

1                          J. Wagner

2       goodwill and I wanted to know from you in your

3       view you said HudsonGray had no goodwill when it

4       was formed; right?

5              A.     Correct.

6              Q.     And then you say it builds up after

7       some time; right?

8              A.     Correct.

9              Q.     And then in your view, what causes a

10      company to build up goodwill over time?

11             A.     The history of operations and

12      performance depending on what industry it is

13      operating in.

14                    MR. O'CONNOR:  Please mark this as HG

15             Exhibit 2.

16                    (HG Exhibit 2, a February 24, 2014

17             e-mail from Geomatic Consultants to a

18             recipient, marked for identification, as of

19             this date.)

20             Q.     I would like to show you what has been

21      marked as HG 2.  It is a February 24, 2014 e-mail

22      from Geomatic Consultants to a recipient.

23                    Do you know who that recipient is?

24             A.     No, I don't.

25             Q.     Have you ever heard of that name

Page 30

```
 1                        J. Wagner
 2   that's indicated there?
 3        A.    I have not.
 4        Q.    Have you ever had any dealings with
 5   anyone from Jonathan Adler?
 6        A.    Not to my knowledge, no.
 7        Q.    Geomatic Consultants is the company
 8   that was hired by HudsonGray to perform
 9   construction services at your premises; right?
10        A.    That's correct.
11        Q.    When was the first time that
12   HudsonGray contacted the landlord about taking
13   space in the building that you currently occupy?
14        A.    I don't recall exactly.  At some point
15   in February or March of 2014.
16        Q.    Who was it that made contact with the
17   landlord from -- strike that.
18              Did you personally make contact with
19   the landlord for the first time?
20        A.    To the best of my recollection, yes.
21        Q.    How did you do that?
22        A.    I don't recall if it was a phone call
23   to set a meeting or we just had a meeting.  There
24   was a space that became available and I met with
25   them to discuss leasing the space.
```

1                          J. Wagner

2          Q.     How did you find out about the space?

3          A.     Darren told me there was a space in

4    the building that was available.

5          Q.     And that would have been in February

6    or March; right?

7          A.     Correct.

8          Q.     So you must have known that you were

9    thinking of forming your own company; right?

10         A.     Correct.

11         Q.     And you had spoken to him about that;

12   right?

13         A.     Correct.

14         Q.     And you had met with him and discussed

15   it; right?

16         A.     Correct.

17         Q.     And the space that you ended up

18   leasing on behalf of HudsonGray is approximately

19   how many square feet?

20         A.     Approximately, four thousand.

21         Q.     Four thousand?

22         A.     Thirty-five hundred, four thousand.  I

23   don't recall the exact amount of space.

24         Q.     How many square feet did XA have

25   downstairs?

```
 1                    J. Wagner
 2        A.   Downstairs where?
 3        Q.   In the same building.
 4        A.   I don't know how many square feet.
 5        Q.   You were the CEO of the company and
 6   you don't know how many square feet you had --
 7        A.    Somewhere the same size, thirty-five
 8   hundred, four thousand square feet.  I don't know
 9   the exact number.
10        Q.    How many employees when you resigned
11   from XA, how many employees did XA have in New
12   York?
13        A.   I don't recall exactly.
14        Q.   Can you give me a ballpark number?
15        A.   Eight to ten.
16        Q.    So is it fair to say that you were
17   pretty confident you were going to have a company
18   that had similar number of employees in short
19   order?
20             MR. MATTHEWS:  Objection.
21             Go ahead.
22        A.    I wouldn't put it that way.  I was
23   certainly anticipating having an office location
24   and finding office space in New York is pretty
25   difficult.  So it is a matter of my priority was
```

Page 33

1                     J. Wagner

2       more about making sure I had office space

3       allocated.

4            Q.    What were you paying per square foot?

5            A.    I don't recall.

6            Q.    You have a lease; right?

7            A.    Correct.

8            Q.    Did you produce the lease in this

9       litigation, to your knowledge?

10           A.    Yes, I believe I did.

11           Q.    And how many years is the lease?

12           A.    I don't recall offhand.

13           Q.    Is it more than five?

14           A.    I don't recall.

15           Q.    Did you provide a guarantee for the

16      lease?

17           A.    I believe I did.

18           Q.    Was it a personal guarantee of the

19      payment obligations or was it a good guy?

20           A.    I believe it is a good guy.  I am not

21      sure but I believe that's what it is.

22           Q.    Did anyone else provide a personal

23      guarantee of any kind to the landlord?

24           A.    Not that I recall.

25           Q.    Who is Brad Powers?

Page 34

```
 1                    J. Wagner
 2        A.    Brad Powers is a business person who
 3   has companies in New York that do, I believe
 4   public relations and marketing and digital
 5   marketing.
 6        Q.    When was the last time you spoke to
 7   Brad Powers about HudsonGray?
 8        A.    It's been years.
 9        Q.    Have you spoken to him about his
10   deposition?
11        A.    No.
12        Q.    You didn't reach out to him?
13        A.    No.
14        Q.    Did he reach out to you?
15        A.    No.
16        Q.    Did he text you?
17        A.    No.
18        Q.    Did Brad Powers ever put money into
19   HudsonGray?
20        A.    Yes.   Originally Brad Powers was an
21   investor that was strategic in the sense that he
22   was interested in investing in HudsonGray and also
23   felt that he had some significant client
24   opportunities as well.
25        Q.    How much did he put in?
```

Page 35

1                      J. Wagner

2        A.    A hundred thousand.

3        Q.    Did he put it in personally or was it

4   through a company, do you know?

5        A.    I don't recall.

6        Q.    Was there any written agreement

7   between either you or HudsonGray on the one hand

8   and Brad Powers on the other?

9        A.    I don't recall.  There was a much

10  larger anticipated investment from Brad Powers

11  that never materialized.  At this point I believe

12  Brad Powers has a warrant position in the company.

13       Q.    What are the terms of that warrant?

14       A.    I don't recall exactly.  Something

15  around an ability to exercise warrants if there is

16  a future funding in the company at the same rate

17  that the new investment would be as far as

18  valuation.  It was an accomodation.  There was a

19  much larger investment that was anticipated and

20  when there was only a hundred thousand put in it

21  was discussed among the attorneys and they felt

22  the warrant coverage was the most expedient way to

23  handle the investment.

24       Q.    So is it fair to say that although

25  when he first invested it wasn't intended to give

Page 36

                          J. Wagner

1

2    him a warrant but that's what you gave him?

3         A.    I think it ended up that way because

4    the investment structure was much different and

5    much larger at the beginning of the discussions

6    with him.

7         Q.    And what were you anticipating getting

8    out of Brad Powers in terms of investment?

9         A.    I don't recall exactly.  It was maybe

10   a couple of million dollars.

11        Q.    Is there some reason why Brad Powers

12   decided not to invest anything more than a hundred

13   thousand?

14        A.    I think he was unable to secure the

15   financial commitment.

16        Q.    What do you base that on?

17        A.    Supposition.

18        Q.    So you don't know?

19        A.    I don't know for sure.

20        Q.    Did he ever tell you why?

21        A.    No.

22        Q.    Who is he in the business world?  Does

23   he have a company?

24        A.    I believe he has a company by the name

25   of Cupcake Digital.  I don't know if it is still

Page 37

1                     J. Wagner

2       in operation or not.

3           Q.     Where is that company?

4           A.     It's in New York as far as I know.

5           Q.     Did you ever visit it?

6           A.     Yes.

7           Q.     Do you remember where it is; where it

8       is located?

9           A.     Midtown I believe.

10          Q.     Did you ever arrange for Brad Powers

11      to come to any client events when you were at XA?

12          A.     Not that I recall.

13          Q.     Did you ever ask Jean Wilson to

14      arrange for Brad Powers to attend a suits event?

15          A.     Not that I recall.

16          Q.     Did Brad Powers have any interactions

17      with Jean Wilson, to your knowledge?

18          A.     Again, not that I recall.

19          Q.     Did Brad Powers have interactions with

20      Mr. Andereck, to your knowledge?

21          A.     I believe that Darren met Brad.  We

22      had a dinner at one point in the Spring of 2014.

23      I believe Darren met Brad at that dinner.  I don't

24      recall the date or the location.

25          Q.     Do you remember was it in Manhattan?

```
 1                    J. Wagner
 2        A.    It was yeah, in Manhattan somewhere.
 3        Q.    And did you charge the dinner that you
 4   had to XA by any chance?
 5        A.    I don't recall.
 6        Q.    What was the purpose of the dinner?
 7        A.     It was social and discussions of,
 8   basic discussions around potential client
 9   opportunities and more social than anything else.
10        Q.    Are you telling me under oath that you
11   didn't tell him about your plans to start your own
12   company?
13        A.    No.  He was already involved in that
14   the at that point, yes.  I was talking with Brad
15   about investing in HudsonGray.
16        Q.    Did you ever provide Brad Powers with
17   any forecast of what HudsonGray could earn?
18             MR. MATTHEWS:  Objection.
19             Go ahead.
20        A.    I don't recall.
21        Q.    Did you provide Brad Powers with a
22   single document that would tell him what he was
23   investing in?
24        A.    The documentation for the investment
25   was handled by the attorneys.  At the time they
```

```
 1                      J. Wagner
 2   were working through Taft which was Shefsky and
 3   Froelich at the time.
 4        Q.    In the general ledger I see charges in
 5   HudsonGray for a company called Taft?
 6        A.    Correct.
 7        Q.    That's the law firm you keep referring
 8   to?
 9        A.    Taft is the corporate counsel for
10   HudsonGray, yes.
11        Q.    So your testimony is that you never
12   looked at any forecasts of what HudsonGray may
13   earn in the future in that time frame we are
14   talking about?
15        A.    I am --
16              MR. MATTHEWS:  Go ahead.
17        A.    I am sure that there was discussions
18   and thought around that.  I don't remember exactly
19   what those numbers were and it was a startup
20   company.  So there certainly wasn't anything that
21   would be able to be associated with specific
22   numbers that would be hit over time because it was
23   startup service company.
24        Q.    Brad Powers met with you to talk about
25   possibly investing; correct?
```

Page 40

```
1                    J. Wagner
2       A.   Right.
3       Q.   And you told him what your plans were;
4  right?
5       A.   Correct.  There was a lot of
6  discussion that Brad was focused on in terms of
7  clients that he felt he could bring into -- that
8  would be synergistic with that marketing company.
9       Q.   Did you talk to him about your plan to
10 go after XA's clients?
11      A.   No, I did not.
12      Q.   So Brad Powers as far as your
13 discussions with him, you never mentioned to him
14 that Darren's role would be bringing in XA's
15 clients?
16      A.   Darren's role would be bringing in
17 clients.
18      Q.   Whose clients?
19      A.   Whatever clients we could procure for
20 HudsonGray.
21      Q.   Did you discuss in your discussions
22 with Brad Powers the deep relationships that Mr.
23 Andereck had with these clients?
24      A.   I talked with Brad most likely to the
25 best of my recollection, I talked with Brad about
```

1                    J. Wagner

2    building a very strong team with a lot of industry

3    experience that would be able to attract top tier

4    clients.

5         Q.    Did you happen to mention to him what

6    you thought the profit margin would be for

7    HudsonGray?

8         A.    We talked about it in the sense that

9    Brad was an interactive marketer which is

10   associated with much higher margins than the

11   service business on the event side.  That was one

12   of the reasons he was excited about potentially

13   being part of it because he felt it could be

14   strategic client relationships that would take

15   interactive marketing services and combine them

16   with event marketing.

17        Q.    Did you give him an approximation of

18   what you thought the profit margin could be for

19   HudsonGray?

20        A.    I may have.  I don't recall.

21        Q.    You don't know what it is?

22        A.    Do I know what the profit margin for

23   HudsonGray is?

24        Q.    No.  That was a poor question.

25             Do you remember what you said to him

Page 42

```
 1                      J. Wagner
 2   about what the profit margin could be?
 3         A.    I don't remember the specific numbers
 4   but I remember discussing that the event services
 5   industry is a low margin business with high top
 6   tier clients and interactive marketing as a higher
 7   margin basis traditionally than what event
 8   marketing does.
 9         Q.    Did Brad Powers ever in the past
10   accuse you of not giving him full information with
11   respect to your plans for HudsonGray?
12         A.    Not that I recall.
13         Q.    Has Brad Powers told you he will not
14   give you any more money for HudsonGray?
15         A.    That's out of context.  Brad Powers
16   was looking to invest a larger amount of money.
17   He was only able to come up with a hundred
18   thousand for whatever reason that was and that's
19   the way it was left with Brad Powers.  There
20   wasn't an expectation, from my point of view, that
21   Brad Powers would be investing more money in the
22   future.
23              MR. O'CONNOR:  Could you mark this as
24         HG Exhibit 3.
25              (HG Exhibit 3, an e-mail that's been
```

Page 43

1                        J. Wagner

2        produced by HudsonGray dated March 3, 2014,

3        marked for identification, as of this date.)

4        Q.    I am showing you an e-mail that's been

5    produced by HudsonGray dated March 3, 2014.  It's

6    been marked HG 3 for identification.

7        A.    Okay.

8        Q.    Have you ever seen this e-mail before?

9        A.    I don't recall seeing this e-mail

10   before, no.

11       Q.    Were you involved in the production of

12   records in this case?  A lot of witnesses don't

13   know what production means.  Let me rephrase the

14   question.

15             In litigation parties turn documents

16   over to the other side.

17       A.    Absolutely.

18       Q.    Were you involved in the efforts to

19   gather up records and give them to your counsel so

20   they could be given to my client?

21       A.    Yes.  I was involved in that.

22       Q.    What sources did you go to in order to

23   produce records?

24       A.    Whatever hard copies I could find to

25   go through and electronic data.

Page 44

1                        J. Wagner

2        Q.     What electronic data did you go

3   through?

4        A.     E-mails.

5        Q.     What e-mails did you go through?

6        A.     I went through the e-mails that I had

7   and produced what was available.

8        Q.     Is this an e-mail that you would have

9   produced because it has your Bates stamp number on

10  the bottom; do you see it?

11       A.     Can you define what you mean by Bates

12  stamp number?

13       Q.     On the bottom right-hand corner, and I

14  think your lawyer will agree with me, when it says

15  DEF 00067604 and then 605, that's a designation

16  that it came from your files.

17       A.     From me personally or from HudsonGray?

18       Q.     From HudsonGray.

19       A.     Okay, well there is a difference.

20       Q.     You are here as a corporate designee;

21  right?

22       A.     Correct.

23       Q.     And I am just talking to you about

24  HudsonGray's production; right?

25       A.     Correct.

Page 45

1                    J. Wagner

2        Q.    This came out of HudsonGray's files.

3        A.    Okay.

4        Q.    How did this come out of HudsonGray's

5   files?

6        A.    I am not sure.

7        Q.    Do you see this e-mail is dated March

8   3, 2014?

9        A.    I see that.

10       Q.    And this e-mail pertains to XA's

11   affairs; correct?

12       A.    Correct.

13       Q.    You have no idea how you got it?

14       A.    This e-mail?

15       Q.    Yes.

16       A.    No, I don't.

17       Q.    It says Jean Wilson on March 3rd wrote

18   to Mike Day and Darren Andereck "Mike, would you

19   please added following individuals to the guest

20   list for the suits event tomorrow.  Brad and

21   Jennifer Powers."

22             Do you see that?

23       A.    I do.

24       Q.    So tell me it in your own words why is

25   the owner of a cupcake company being invited to a

Page 46

1                         J. Wagner

2    suits event?

3         A.    I didn't recall this so I am not sure.

4    Again, it is four and a half years ago.

5         Q.    Does this e-mail help refresh your

6    recollection of when you had the dinner with the

7    man from the cupcake company?

8         A.    As I said, it was sometime in the

9    Spring.

10               MR. MATTHEWS:  Objection.

11               It is not a cupcake company.

12               MR. O'CONNOR:  I will withdraw it.

13        Q.    Does this e-mail help you remember

14   when you had the dinner between you and Brad

15   Powers?

16        A.    Again, as a said before, it was

17   sometime in the Spring of 2014.

18        Q.    Certainly before you left XA; right?

19        A.    I can't recall if it was before or

20   after I left XA for a dinner.  It happened at some

21   point in the Spring of 2014.

22        Q.    And it was in Manhattan?

23        A.    As far as I know, yes.

24        Q.    Did you fly in just for the dinner?

25        A.    I don't recall.

Page 47

1                          J. Wagner

2          Q.     Did you charge your flight to XA?

3          A.     I was coming out to New York for XA

4    business consistently during that period of time.

5          Q.     Did you disclose to senior management

6    of XA that you were meeting with an investor to

7    discuss the formation of a new company?

8                 MR. MATTHEWS:  Objection to form.

9                 Go ahead.

10         A.     Not that I recall.

11         Q.     Do you know if Mr. Andereck who was

12   the president of the company, who knew about this,

13   do you know if he advised senior management of XA

14   that he was meeting with investors about a new

15   company?

16                MR. MATTHEWS:  Objection to form.

17                Go ahead.

18         A.     I don't know.

19                MR. O'CONNOR:  Please mark this as HG

20         Exhibit 4.

21                (HG Exhibit 4, an e-mail chain,

22         marked for identification, as of this date.)

23         Q.     I am showing you what's been marked as

24   HG 4 for identification.  It is an e-mail.  It's a

25   chain actually but on the top it is from someone

Page 48

1                      J. Wagner

2     named Tara Chase to JWLSC at Comcast.net.

3              Do you see that?

4         A.    Yes, I do.

5         Q.    The date on that is March 17, 2014;

6     right?

7         A.    Correct.

8         Q.    And is that e-mail address to which

9     this was directed your private e-mail address?

10        A.    It was at the time, yes.

11        Q.    When did you get rid of it?

12        A.    It's actually still an account that

13    operates.  I don't use it anymore.  It is kind of

14    a catch all for spam at this point.

15        Q.    Did you ever delete e-mails from that

16    account?

17        A.    I do not.

18        Q.    You don't, so you leave everything in

19    there; right?

20        A.    I looked at it recently.  It's got a

21    24-month retention on it and it seems that just

22    keeps rolling.

23        Q.    Your testimony is you have it set to

24    delete anything --

25        A.    I don't have it set.

Page 49

J. Wagner

1

2      Q.    I know you want to get your answers

3   out, but if we are going to get out of here today

4   you have to wait until I complete the question.

5              Your testimony is you have it set to

6   delete anything that's older than 24 months?

7      A.    No.   There is an automatic deletion in

8   the Comcast e-mail where it just retains things

9   for two years.

10      Q.    For two years?

11      A.    For two years.

12      Q.    Well, you produced records in this

13   case; right?

14      A.    I did.

15      Q.    When did you preserve your evidence in

16   this case?

17              MR. MATTHEWS:  Objection to form.

18              Go ahead.

19      Q.    When was the lawsuit filed; sir?

20      A.    In September of 2014.

21      Q.    What steps did you take in September

22   of 2014 to secure that e-mail address, the e-mails

23   that were in that account?

24      A.    I didn't do anything with the account

25   at that time.

Page 50

1                         J. Wagner

2          Q.     When do you think you first went back

3     to that account to see if you had e-mails that

4     relate to the case?

5          A.     I don't recall.

6          Q.     So it is true that as of this moment

7     you don't even recall going to look at that

8     account; correct?

9          A.     Correct.

10         Q.     Do you remember being ordered by the

11    court to go and look at all your private e-mails?

12         A.     I did.

13         Q.     You just told me you don't remember

14    looking at this e-mail.

15         A.     I was going back through the e-mail

16    accounts that I had at the time.

17         Q.     But you still have this e-mail

18    account.

19         A.     Right but I don't use this e-mail

20    anymore.

21         Q.     So you think that order from the court

22    only required you to go back and look at accounts

23    that were active at the time of the order; is that

24    what you are telling me?

25         A.     I am sorry.

Page 51

```
 1                      J. Wagner
 2              Say that again.
 3         Q.    You were ordered to go back over all
 4    your personal e-mail accounts and to see if there
 5    was anything relevant for this lawsuit.
 6              Do you remember that?
 7         A.    Yes.
 8              MR. MATTHEWS:  Objection.  That's not
 9         what the court ordered.
10         Q.    Is it your testimony that the reason
11    why you didn't look back at this e-mail account is
12    because you didn't use it anymore?
13         A.    It was an e-mail account I wasn't
14    using anymore, correct.
15         Q.    Did you e-mail people in the Spring of
16    2014 about the work you were doing to set up a new
17    company using this e-mail account?
18         A.    Yes, I did.
19         Q.    And it was more than just Geomatic, it
20    was other people; right?
21         A.    At the time and there was a HudsonGray
22    e-mail that was set up and I began using that.
23         Q.    But according to you because of the
24    settings on your account all those e-mails are
25    gone; right?
```

Page 52

1                          J. Wagner

2        A.    In Comcast they only preserve the

3   e-mails for a couple of years.  I just found that

4   out recently.

5        Q.    Did you e-mail using that account with

6   Mr. Andereck in the Spring of 2014?

7        A.    I don't recall if I used that account

8   or not.

9        Q.    Was your use of that e-mail in the

10  Spring of 2014 intended so that people at XA could

11  not see who you were talking to?

12       A.    No.  It was a personal e-mail at the

13  time.

14       Q.    Is it your testimony that you just

15  chose that e-mail, it had nothing to do with the

16  fact that you didn't want XA to know what you were

17  doing?

18       A.    I wasn't using XA e-mails that would

19  relate to HudsonGray business or the business that

20  I was setting up.

21       Q.    That's really what I am asking you.

22       A.    Yes, that's correct.

23       Q.    When you were setting up HudsonGray

24  and doing all the HudsonGray affairs, you would

25  use your own personal e-mail accounts; right?

Page 53

1                    J. Wagner

2       A.    And eventually HudsonGray e-mail.

3       Q.    When do you think you first got a

4  HudsonGray e-mail?

5       A.    Spring or early summer 2014.  It was a

6  GoDaddy account that was set up.

7       Q.    So on the bottom of HG 4 it says "We

8  have a prospective tenant who needs a CAD drawing

9  of room 601."

10            Do you see that?

11      A.    Yes.

12      Q.    Why did you want a CAD drawing?

13      A.    I assume this was to review the set up

14  of the new office space.

15      Q.    Now Mr. Andereck was helping you out

16  with all of that, wasn't he?

17            MR. MATTHEWS:  Objection to form.

18            Go ahead.

19      A.    Mr. Andereck was engaged doing --

20  coming up to an upfront event, a large event.  I

21  was doing the work with Geomatic.

22      Q.    Is it your testimony under oath that

23  Mr. Andereck had no interactions with Geomatic?

24      A.    No.  That's not my testimony.  I am

25  saying I was doing the majority of the work with

Page 54

1                          J. Wagner

2     Geomatic at the time.

3          Q.     So some of the work was being done by

4     Darren Andereck; correct?

5          A.     I don't recall the exact details but I

6     was the point person doing the setup of the

7     office.

8          Q.     Now if you look at the third page of

9     this page 5 it is Bates stamped page 5, is that

10    the layout of the former space, the space that you

11    took over?

12         A.     As far as I know, yes.

13         Q.     Did you modify this space or is this

14    basically what you have now?

15         A.     There has been modifications.

16         Q.     Can you tell me what they are?

17         A.     Not offhand.  There was a

18    reconfiguration of the office space from the prior

19    configuration that was there from the prior

20    tenant.

21         Q.     As you look at this schematic, you

22    have a large conference room.

23                Is that still there?

24         A.     There is still a conference room in

25    the space, yes.

Page 55

```
 1                    J. Wagner
 2        Q.    Is the space of that generally the
 3   same still?
 4        A.    It's been -- again, there has been
 5   modifications to it but in the general sense
 6   that's it.
 7        Q.    Now if you look on the right side of
 8   the schematic on Charlton Street, you see an
 9   office 601C?
10        A.    Yes.
11        Q.    Is that still there?
12        A.    I don't recall if it is in that format
13   or not.  If the walls had been moved or if it is
14   still in that same format.
15        Q.    There is still an office there; right,
16   today?
17        A.    I don't recall the exact configuration
18   of that.
19        Q.    When was the last time you were there?
20        A.    It's probably been a few months.  Six
21   months maybe.
22        Q.    You haven't been to the office in six
23   months?
24        A.    Something in that range probably,
25   yeah.  I worked work out of Chicago.
```

Page 56

1                         J. Wagner

2          Q.     What I am trying to get at is:  Do you

3    have an office here on this layout?

4          A.     No.

5          Q.     Does Mr. Andereck have an office?

6          A.     Mr. Andereck works out of that office,

7    yes.

8          Q.     Do you know where his office is in

9    relation to this schematic?

10         A.     I do not.

11         Q.     Is it a corner office?

12         A.     I am not sure.

13         Q.     What is Mr. Andereck's title for

14   HudsonGray?

15         A.     He is the president and creative

16   director.

17                Could I take a break for the bathroom?

18                MR. O'CONNOR:  Absolutely, sure.

19                (Recess taken.)

20                MR. MATTHEWS:  I just want to note

21          that during the break counsel graciously

22          sent to me the response to the subpoena sent

23          by IT Savvy.  I did not receive it last

24          night.

25                MR. O'CONNOR:  Okay.  Those documents

Page 57

1                    J. Wagner

2          were received late yesterday so.

3                 Let's mark this as HG Exhibit 5.

4                 (HG Exhibit 5, a document from the

5          Delaware Division of Corporations Secretary

6          of State website, marked for identification,

7          as of this date.)

8          Q.    I have shown you what has been marked

9    HudsonGray 5 which is from the Delaware Division

10   of Corporations Secretary of State website and I

11   wanted to ask you does this tell you the exact

12   incorporation date of HudsonGray?

13         A.    That looks correct.

14         Q.    That would be March 14, 2014; correct?

15         A.    Correct.

16         Q.    Are you aware of an entity called

17   HudsonGray LLC?  Is there any such entity?

18         A.    Not that I am aware of.

19               MR. O'CONNOR:  Off the record.

20               (Discussion off the record.)

21   BY MR. O'CONNOR:

22         Q.    Can we agree that you formed

23   HudsonGray before you resigned from XA?

24         A.    Correct.

25         Q.    Do you remember when you received your

Page 58

1                       J. Wagner

2     tax ID number?

3          A.    I don't recall.

4                MR. O'CONNOR:  Please mark this next

5          document as HG Exhibit 6.

6                (HG Exhibit 6, a document Bates

7          stamped Defendant 68980 from the IRS, marked

8          for identification, as of this date.)

9          Q.    I have shown you what has been marked

10    as HG 6 which is from defendants' production.  By

11    the way, this is marked confidential.  It is

12    Defendant 68980 from the IRS.

13                Do you see that?

14         A.    Yes, I do.

15         Q.    And it has a date on the notice of

16    what?

17         A.    April 1st.

18         Q.    Is that the date that you received --

19    that's April 1, 2014?

20         A.    Sorry.  April 1, 2014.

21         Q.    Is that the date when HudsonGray

22    received an employer identification number?

23         A.    From the document, yes.

24         Q.    Did you have any employees in the

25    month of April?

Page 59

```
 1                    J. Wagner
 2        A.    Not that I recall.  It was basically
 3   just me working at that point and Mia was
 4   assisting.
 5        Q.    Was Mia paid?
 6        A.    I don't recall what was, if anything
 7   was set you up at that point.
 8        Q.    You said before she helps out.
 9              Has Mia ever received any compensation
10   from HudsonGray?
11        A.    She may have at the very beginning but
12   she was not involved.  Over time she was helping
13   me during the formation period.
14        Q.    So she may have received payment as a
15   1099 worker?
16        A.    Perhaps.  I don't recall.  I have to
17   check that.
18        Q.    Is it possible she received wages as a
19   W-2 earner?
20        A.    I don't believe so, but again I would
21   have to check that.
22        Q.    HudsonGray, its Worker's Compensation
23   employment -- I'm sorry.  Its Worker's
24   Compensation insurance was issued from White
25   Mountains Insurance Group.
```

Page 60

1                          J. Wagner
2              Does that sound familiar?
3         A.    It does.
4         Q.    And that was issued in May, of the
5    first week of May 2014; correct?
6         A.    That sounds correct.
7         Q.    Do you still use White Mountains
8    Insurance Group?
9         A.    I am not sure.
10             MR. O'CONNOR:  Please mark this as HG
11         Exhibit 7.
12              (HG Exhibit 7, a document Bates
13         stamped Creative IT 1450 and 1451, marked
14         for identification, as of this date.)
15        Q.    Showing you what has been marked for
16   identification as HG 7 which is Creative IT 1450
17   and 1451.
18             Have you ever seen this e-mail before?
19        A.    I don't recall this e-mail.
20        Q.    The bottom of the e-mail is from QBESS
21   support to Jean Wilson and it is dated April 15,
22   2014.
23             Do you see that?
24        A.    I do.
25        Q.    And it says "QuickBooks Plus Hosting

Page 61

```
1                          J. Wagner
2    Welcome."
3               Right?
4         A.    I do see that.
5         Q.    And it provides the user name of Jean
6    Wilson and it provides a password.
7               Do you see that?
8         A.    I do.
9         Q.    And then this was then forwarded from
10   Jean Wilson to David Tuma.
11              Do you see that?
12        A.    I do.
13        Q.    And then it was forwarded from David
14   Tuma to you at HudsonGray.
15              Do you see that?
16        A.    I do.
17        Q.    Can you give me an explanation in your
18   own words why HudsonGray would be entitled to a
19   user name and password for a QuickBooks plus
20   hosting service that was signed up by Jean Wilson?
21        A.    So to the best of my recollection, the
22   way this is set up is talking about the Right
23   Networks control panel.  Right Networks is a
24   hosted remote desktop service and there is a
25   shared platform among the accountant that we use
```

Page 62

```
 1                        J. Wagner
 2    which is David Rice.  So there is a number of
 3    clients that all use the Right Networks platform
 4    for the QuickBooks hosting.
 5            Q.    For HudsonGray?
 6            A.    For HudsonGray and for a number of
 7    other companies.  They all use Right Networks and
 8    David Rice is the shared accountant.
 9            Q.    Do you know who paid for this, by the
10    way?
11            A.    I don't.
12            Q.    Are you aware whether this was charged
13    to XA?
14            A.    I am not aware of that.
15            Q.    That wouldn't be right, that wouldn't
16    be appropriate in your view, would it?
17                  MR. MATTHEWS:  Objection.
18                  Go ahead.
19            A.    No.  Again, I was not aware of that.
20            Q.    Now HudsonGray uses QuickBooks in its
21    current operations; right?
22            A.    That's correct.
23            Q.    And HudsonGray utilized QuickBooks the
24    day it opened its doors; correct?
25            A.    I don't know about the day it opened
```

Page 63

1                     J. Wagner

2   its doors, but we use QuickBooks, yes.

3        Q.    And Mr. Tuma helped set that up;

4   correct?

5        A.    David Tuma does IT and David Rice is

6   the accountant that a number of companies use on

7   that Right Networks platform.

8        Q.    And you still use the same platform;

9   correct?

10       A.    Yes.  Again, the Right Networks

11   platform is still in existence, yes.

12       Q.    Did you tell anyone at XA that you had

13   come into possession of their user name and

14   password?

15            MR. MATTHEWS:  Objection.

16       A.    I am not sure if that's user name for

17   QuickBooks or Right Networks.  I don't know that.

18       Q.    Who would know?

19       A.    Jean Wilson would.

20       Q.    Did you authorize her to send that to

21   David Tuma?

22       A.    Not that I recall.

23            MR. O'CONNOR:  Please mark this

24       document as HG Exhibit 8.

25            (HG Exhibit 8, a document Bates

Page 64

1                  J. Wagner

2       stamped Creative IT 1389 dated April 23,

3       2014, marked for identification, as of this

4       date.)

5          Q.    I am showing you what has been marked

6    as HG 8 Creative IT 1389 dated April 23, 2014.

7              Have you ever seen this before?

8          A.    Not that I am aware of, but I am

9    familiar with it now.

10         Q.    HudsonGray in April of 2014 was using

11   David Tuma to help it set up its office; right?

12         A.    That's correct.

13         Q.    Did you have a contract with David

14   Tuma?

15         A.    I don't recall a written contract with

16   David Tuma.  He was a paid vendor at the time.

17         Q.    He was?

18         A.    He was performing services for us.

19         Q.    For you.

20              Well, those are two different things;

21   right?

22         A.    Sorry.

23              In terms of?

24         Q.    Well, you said two different things.

25              You said he was performing services

Page 65

1                        J. Wagner
2      for HudsonGray; right?
3           A.    Correct.
4           Q.    And then you said he was a paid vendor
5      at the time; right?
6           A.    For HudsonGray.
7           Q.    Are you aware of any payments made to
8      David Tuma prior to June of 2014?
9           A.    Any payments made to David Tuma?
10          Q.    From HudsonGray.
11          A.    Not that -- I mean I don't have any
12     accounting records.  I know we were paying David
13     Tuma for his services.
14          Q.    When did you start paying?
15          A.    I don't recall.
16          Q.    Can you tell me when was the first
17     invoice you got from David Tuma?
18          A.    I don't remember.  It was four and a
19     half years ago.
20          Q.    We will get to that.
21                He says "Josh will be sending over
22     some quotes and proposals.  Hosted services
23     terminal or citrix server."
24                Do you see that?
25          A.    Yes, I do.

1                    J. Wagner

2        Q.    So at that time Mr. Tuma was talking

3   to you about using hosted services; right?

4        A.    Correct.

5        Q.    And by this time had there been any

6   upgrades to the XA information technology

7   infrastructure in New York?

8        A.    In April of 2014 there had been

9   significant upgrades to the IT in New York.

10       Q.    For XA?

11       A.    For XA, correct.

12       Q.    And you authorized all that; correct?

13       A.    That's right.

14       Q.    And XA paid for it; right?

15       A.    For the equipment that was in the XA

16   office yes, they did.

17            MR. O'CONNOR:  Please mark this

18       document as HG Exhibit 9.

19            (HG Exhibit 9, an April 27, 2014

20       e-mail exchange Bates stamped Creative IT

21       01390-1391, marked for identification, as of

22       this date.)

23       Q.    I am showing you what has been marked

24   as HG 9 which is an April 27, 2014 e-mail exchange

25   marked Creative IT 01390-1391.

Page 67

1                    J. Wagner

2        A.    Okay.

3        Q.    Have you ever seen this before?

4        A.    I don't recall it offhand, but it came

5    to my e-mail.

6        Q.    Are you denying you received this?

7        A.    No, I am not.

8        Q.    Now this is IT Savvy providing a

9    proposal to, it says Mia and Joe.

10             That's you and Miss Blagsvedt?

11       A.    Correct.

12       Q.    And he outlines the proposal; correct?

13       A.    Josh Gill from IT Savvy?

14       Q.    Yes.

15       A.    That's correct.

16       Q.    Is IT Savvy still providing services

17   for you at HudsonGray?

18       A.    I don't believe they are working with

19   us anymore.  They were very involved in the

20   beginning.

21       Q.    When do you think they stopped?

22       A.    I don't recall.

23       Q.    How much was the construction work

24   that you did on the space that you occupy at 601,

25   333 Hudson Street, do you remember?

Page 68

1                         J. Wagner

2          A.    Can you say it again?

3          Q.    How much money did you spend on

4     building out the space?

5          A.    I don't recall the exact number.

6          Q.    Can you give me an approximation?

7          A.    I would estimate something in the

8     range of probably maybe sixty to a hundred

9     thousand dollars.  Again, very rough estimate.  I

10    don't have the numbers in front of me.

11              MR. O'CONNOR:  Please mark this

12         document as HG Exhibit 10.

13              (HG Exhibit 10, a May 8, 2014

14         exchange containing a Dell quotation Bates

15         stamped Creative IT 1414 through 1419,

16         marked for identification, as of this date.)

17         Q.    Sir, have you ever seen HG 10 before?

18         A.    I am just getting it right now.

19         Q.    I am going to speak on the record

20    while you are looking at it.  This is a May 8,

21    2014 exchange and it contains a Dell quotation and

22    it is marked Creative IT 1414 through 1419.

23         A.    Okay.

24         Q.    Does this look familiar to you?

25         A.    Again, it's four and a half years ago.

Page 69

                              J. Wagner
1
2    I am reviewing it right now.
3         Q.    Look at page 2 if you would please.
4         A.    Okay.
5         Q.    Do you see the quote date?  What do
6    you see on the bottom?
7         A.    On page 2?
8         Q.    Yes, sir, second page.
9         A.    Quote date is May 7, 2014.
10        Q.    And who does it say is the delivery
11   contact for the Dell equipment that's going to
12   HudsonGray?
13        A.    Darren.
14        Q.    At his home address; right?
15        A.    That says 33 Hudson Street.
16        Q.    Look at the third page.
17        A.    I don't know if that's Darren's home
18   address.
19        Q.    The delivery address is 360 Furman
20   Street; right?
21        A.    Yes, it is.
22        Q.    You don't know if that's his address?
23        A.    I am not sure if that's his home
24   address.
25        Q.    Have you ever been to his home?

Page 70

1                         J. Wagner

2        A.    I have not.

3        Q.    Do you see anywhere on this order a

4   server?

5        A.    There is a lot of IT items on here

6   that's called Towers, and OptiPlex and things like

7   that.  I don't know what a server is or it isn't.

8        Q.    You are not sure what it is?

9        A.    I am not an IT guy.

10       Q.    Did HudsonGray ever buy a server?

11       A.    I believe that we did buy servers,

12   yes.

13       Q.    Where did you by them from?

14       A.    I don't recall.  I didn't handle that

15   directly.

16       Q.    Who handled that, Darren?

17       A.    No.  That would have been sourced

18   through David Tuma.

19       Q.    Do you know how much you paid for this

20   server that you are not sure you bought?

21       A.    I don't recall offhand.

22            MR. O'CONNOR:  Please mark as HG

23       Exhibit 11 this next document.

24            (HG Exhibit 11, a May 16, 2014

25       e-mail Bates stamped Creative IT 01426

Page 71

1                          J. Wagner

2          through 27, marked for identification, as of

3          this date.)

4               Q.    I am showing you what has been marked

5     as HG 11 and it is a May 16, 2014 e-mail marked

6     Creative IT 01426 through 27.

7                     Have you ever seen this before?

8               A.    I am just reviewing it now.

9                     Okay.

10              Q.    Have you ever seen it before?

11              A.    I don't recall the e-mail, but I am

12    sure it is something that came to my e-mail

13    address.

14              Q.    Mr. Tuma wrote to you on May 16th and

15    said "Looks like Dell messed up.  They shipped it

16    to Darren's apartment instead of Studio AG at the

17    333 address."

18                    Do you see that?

19              A.    I do see that.

20              Q.    Why would the new computer equipment

21    be shipped to a current employee of XA?

22              A.    I don't recall at the time.

23              Q.    And why would it ever have been

24    shipped to Studio AG?

25              A.    I don't know why they are referencing

Page 72

```
 1                        J. Wagner
 2   Studio AG on here or why David was doing that.
 3   You have to ask David.
 4        Q.    The equipment did in fact go to Mr.
 5   Andereck's apartment?
 6        A.    Yeah.  Again, I am assuming this is
 7   the equipment that went to HudsonGray but I don't
 8   know about whether it went to the apartment or
 9   not.  I am assuming it did.
10             MR. O'CONNOR:  Please mark this
11        document as HG Exhibit 12.
12             (HG Exhibit 12, a document Bates
13        stamped Geomatic CON 15, marked for
14        identification, as of this date.)
15        Q.    I am showing you HG 12 which is marked
16   Geomatic CON 15.
17        A.    Okay.
18        Q.    Have you ever seen this before?
19        A.    I don't recall seeing it, but I am
20   reviewing it right now.
21        Q.    This is a May 20, 2014 e-mail from
22   Geomatic to you and to Darren; correct?
23        A.    Correct.
24        Q.    And when it says JDD underscore DA at
25   MSN.com, that's Darren Andereck's home e-mail;
```

Page 73

1                          J. Wagner
2    right, his personal e-mail?
3          A.    Personal e-mail, yes.
4          Q.    And you communicated with him on that
5    e-mail; correct?
6          A.    Yes, that's correct.
7          Q.    And you communicated with him about
8    things that related to HudsonGray; correct?
9          A.    That's correct.
10          Q.    And do you have some explanation as to
11    why we don't have those e-mails?
12          A.    I do not.
13          Q.    Do you know if anyone from HudsonGray
14    insured that its employee, its president Darren
15    Andereck, went and looked at that e-mail account
16    to see where the e-mails are?
17          A.    You have to ask Darren that.
18          Q.    My question was:  Did anyone at
19    HudsonGray instruct its employee and its president
20    Darren Andereck to look at his personal e-mail
21    accounts?
22          A.    I think everybody went through and
23    searched on key words to produce e-mails that were
24    requested.  That was a production exercise that we
25    did on the e-mails.

Page 74

1                          J. Wagner

2        Q.     Your testimony is that Mr. Andereck

3   went to his personal account and searched his

4   personal account; is that right?

5        A.     I am not testifying as to what Darren

6   did.  I am saying the instructions that we had to

7   all the individual defendants were to go through a

8   list of keyword searches that were provided by

9   prior counsel and provide whatever e-mails we

10  could find using those keyword searches.

11       Q.     It says "We thank you for your

12  payments first wire transfer deposit of nine

13  thousand dollars and second wire transfer deposit

14  of nine thousand dollars in which at this point we

15  are 95 percent complete with the job."

16              Do you see that?

17       A.     I see that.

18       Q.     And he says the electrical in your

19  space is 80 percent done; correct?

20       A.     Yes.

21       Q.     Now that's two days before Mr.

22  Andereck resigns; correct?

23       A.     I believe that's correct.

24              MR. O'CONNOR:  Please mark this next

25       document as HG Exhibit 13.

Page 75

1              J. Wagner

2         (HG Exhibit 13, a May 12, 2014

3     exchange but it actually begins on April 15,

4     2014 Bates stamped DEF 77864 and it is also

5     marked confidential, marked for

6     identification, as of this date.)

7         Q.    Have you ever seen this document

8  marked HG 13?

9         A.    Again, I don't recall exactly but I am

10  looking at it now.

11        Q.    For the record, this is a May 12, 2014

12  exchange but it actually throughout, it begins on

13  April 15, 2014 and it is marked DEF 77864 and it

14  is also marked confidential.

15        A.    Okay.

16        Q.    Do you remember our discussion before

17  when I told you that anything with a DEF is a

18  defendant document?

19        A.    Yes, sir.  I recall that.

20        Q.    Do you have any reason to believe this

21  is not from your own files?

22        A.    I do not.

23        Q.    Do you know why it is marked

24  confidential?

25        A.    I do not.

1                        J. Wagner

2        Q.    Do you think it is confidential?  You

3    just looked at it.  Do you think it is

4    confidential?

5        A.    I am not sure if it is confidential

6    due to the contract or company information.  I

7    don't know why it is confidential.

8        Q.    Look looks like it is the fourth page

9    in and I want to direct your attention to a

10   statement by Mia.  On April 15, 2014 to Konica

11   Minolta quote "I am following up a voicemail I

12   left for you at 312 701 9221.  I am with a new

13   marketing company and was referred to you from

14   XA."

15       A.    Okay.

16       Q.    That's a false statement; right?

17       A.    I don't know that that's a false

18   statement.

19       Q.    Do you think that XA referred Mia to

20   Konica Minolta so that they could set up copiers

21   for a competing company?

22       A.    I don't know where that reference is.

23   I don't know if that was a mistake she put when

24   she meant to say HudsonGray.  I don't know what

25   the attributing XA is to this statement.

Page 77

1                           J. Wagner

2          Q.    Are you aware of anyone at XA --

3    strike that.

4                Aside from Jean Wilson, are you aware

5    of anyone at XA who would have given you that kind

6    of a referral?

7          A.    No, I am not.  And again, I am not

8    even sure if that's a mistake or what that

9    reference is that Mia was talking about in April

10   of 2014.

11               MR. O'CONNOR:  Please mark this

12         document as HG Exhibit 14.

13               (HG Exhibit 14, a document Bates

14         stamped Creative IT 01392, marked for

15         identification, as of this date.)

16         Q.    I put in front of you what has been

17   marked as HG 14 Creative IT 01392.

18         A.    Okay.

19         Q.    Have you ever seen this before?

20         A.    Again, I don't recall offhand but I am

21   looking at it now.

22         Q.    It says "Hi Joe, do you have a few min

23   today to listen to my thoughts regarding the

24   hosted services and/or local server et cetera?"

25               Do you see that?

Page 78

1                    J. Wagner

2        A.    I do.

3        Q.    Do you remember the e-mail?

4        A.    I don't remember it four and a half

5   years ago.  I am looking at it now.

6        Q.    So your testimony is you don't

7   remember -- strike that.

8              Did you have a conversation that day

9   about this?

10       A.    I don't recall if I talked to David

11  Tuma four and a half years ago.  I am looking at

12  the e-mail that's produced now.

13       Q.    I am going to give you the next

14  e-mail.

15             MR. O'CONNOR:  Please mark these two

16         documents together as the next exhibit

17         Exhibit 15.

18             (HG Exhibit 15, a document Bates

19         stamped Creative IT 01393 through 95, marked

20         for identification, as of this date.)

21       Q.    I have put in front of you what is

22  marked HG 15.

23       A.    Okay.

24       Q.    And it is Creative IT 01393 through 95

25  and on the back of this document is a printout of

1                    J. Wagner

2    the metadata from this document; okay.  So first I

3    would like you to look at the e-mail.

4         A.    Okay.

5         Q.    Have you ever seen this e-mail before?

6         A.    Again, I don't recall specifically but

7    I am looking at it now.

8         Q.    Was this one of the e-mails you looked

9    at the other day when you were preparing?

10        A.    No, it was not.

11             MR. MATTHEWS:  Is this metadata that's

12             attached here part of the production from

13             Creative IT?

14             MR. O'CONNOR:  No.  All you do is open

15             it up and it is right there.

16             MR. MATTHEWS:  We didn't receive the

17             production in native format.

18             MR. O'CONNOR:  I gave it to you the

19             same way I got it.  So I was able to look at

20             the metadata.

21   BY MR. O'CONNOR:

22        Q.    I am not going to ask you in detail

23   about this.  I am just going to ask you about a

24   couple of lines, but you are welcome to read the

25   whole thing.  I do want to get you out of here for

Page 80

```
 1                    J. Wagner
 2   your flight.
 3         A.    I understand.
 4         Q.    In the second paragraph it says "For
 5   now my 'cost conscious' idea is to put a 'file
 6   server' into the New York office. "
 7         A.    Okay.
 8         Q.    Do you see how he puts the word file
 9   server into air quotes?  Do you know what he means
10   by that?
11         A.    I do not.  I believe he is indicating
12   a file server.
13         Q.    Is it your testimony on May 1, 2014
14   that you did not have access to XA server?
15         A.    I am sorry.  Say that again.
16         Q.    On May 1, 2014 did you still have
17   access to XA server?
18         A.    I don't believe that I did.
19         Q.    No?
20         A.    I don't recall.  I don't believe I
21   did.
22         Q.    You don't recall?
23         A.    I don't recall.
24         Q.    You can see here though he is talking
25   about he still hasn't made up his mind about what
```

Page 81

```
 1                        J. Wagner
 2    to do with the server; correct?
 3         A.    From David Tuma?
 4         Q.    Yes.
 5         A.    Correct.
 6         Q.    And he is the guy that is working for
 7    HudsonGray; correct?
 8         A.    That's correct.
 9         Q.    And he goes on to say he wants them to
10    give him a quote for a good Dell file server.
11               Do you see that?
12         A.    I do.
13         Q.    Now the metadata, do you see on the
14    last page there is a BCC to someone at Jean at
15    freckle farm home.com?
16         A.    Yes.
17         Q.    Who is that?
18         A.    I assume that's Jean Wilson.
19         Q.    Can you explain to me in your own
20    words why Jean Wilson would be copied on the plans
21    for HudsonGray to build out its IT infrastructure?
22         A.    I don't know why David Tuma would copy
23    her.
24         Q.    Are you saying you were unaware that
25    Jean at freckle farm home.com was receiving
```

Page 82

1                        J. Wagner

2    e-mails at that time?

3         A.    I wasn't aware that she received this

4    e-mail, no.

5         Q.    But you were aware she was in the

6    loop; right?

7         A.    I was not aware that she was in the

8    loop.   That's kind of a broad statement.

9                   What do you mean?

10        Q.    Did you communicate with Jean Wilson

11   in the time frame of May and June of 2014 about

12   the work you were doing to set up HudsonGray?

13        A.    We may have had some conversations.   I

14   don't recall specifics.

15        Q.    And you may have had e-mails with her;

16   correct?

17        A.    I may have.

18        Q.    And those e-mails were all through

19   Jean at freckle farm home.com; correct?

20        A.    I don't know that.

21        Q.    Did you ask David Tuma to set up Jean

22   at freckle farm home.com?

23        A.    To set up her e-mail account?

24        Q.    Yes.

25        A.    Not that I am aware of.

Page 83

1                        J. Wagner

2        Q.     Would you agree with me that it would

3   not be appropriate for XA to have paid to set up

4   Jean at freckle farm home.com?

5        A.     I would agree with that.

6               MR. O'CONNOR:  Please mark this

7        document as HG Exhibit 16.

8               (HG Exhibit 16, a May 5, 2014 e-mail

9        Bates stamped Creative IT 01404, marked for

10       identification, as of this date.)

11       Q.     I put in front of you what's been

12   marked HG 16.

13              Have you seen this before, sir?

14       A.     Again, I don't recall seeing it but I

15   am looking at it now.

16       Q.     You are done?

17       A.     I am.

18       Q.     So this is a May 5, 2014 e-mail

19   Creative IT 01404.

20              Did you receive this e-mail, sir?

21       A.     Again, I don't recall offhand but I am

22   looking at it now.  It came to my e-mail address

23   at HudsonGray.

24       Q.     Do you have any reason to doubt you

25   got this e-mail?

```
                                              Page 84
 1                         J. Wagner
 2        A.    I do not.
 3        Q.    And among the recipients of the e-mail
 4   is a cc to Jean at freckle farm home.com; correct?
 5        A.    That's correct.
 6        Q.    And as of that date you knew that that
 7   meant Jean Wilson received that e-mail; correct?
 8        A.    That's correct.
 9        Q.    Do you know if she ever disclosed to
10   XA she was being copied on e-mails between your IT
11   consultant and you about setting up a new company?
12        A.    I don't know if she disclosed that or
13   not.
14        Q.    And this e-mail says that you had
15   gotten approval for fifty thousand dollars in
16   credit from Dell; correct?
17        A.    That's what it says, yes.
18              MR. O'CONNOR:  Mark this document as
19         HG Exhibit 17.
20              (HG Exhibit 17, an e-mail from David
21         Tuma to Joseph Wagner and to Mia Bates
22         stamped Creative IT 01406, marked for
23         identification, as of this date.)
24        Q.    Showing you what has been marked HG 17
25   Bates stamped Creative IT 01406.  It is an e-mail
```

Page 85

```
 1                      J. Wagner
 2    from David Tuma to you and to Mia.
 3         A.    Okay.
 4         Q.    And it is dated May 7, 2014.
 5         A.    Okay
 6         Q.    Did you receive this e-mail?
 7         A.    I assume that I did.
 8         Q.    The e-mail states that three Imacs,
 9    and one Mac Pro have been purchased using
10    Estelle's visa.
11               Do you see that?
12         A.    Yes.
13         Q.    Is that Estelle Pizzo?
14         A.    That's correct.
15         Q.    And does she have any formal
16    employment with HudsonGray?
17         A.    She does not.
18         Q.    Can you explain to me why Estelle
19    Pizzo's visa would be used to buy HudsonGray's
20    equipment?
21         A.    I am not sure why that was happening
22    at the time.
23         Q.    And Estelle Pizzo is in Chicago;
24    right?
25         A.    That's correct.
```

Page 86

1                          J. Wagner

2          Q.     And that's something that you think

3    Jean Wilson had arranged?

4          A.     I don't know that.

5          Q.     It's possible?

6          A.     Again, I don't know that.

7          Q.     But you didn't do it; right?

8          A.     I didn't place an order on Estelle's

9    visa, no.

10         Q.     And you didn't know it was happening

11   at the time?

12         A.     I was copied on the e-mail.

13         Q.     Do you see at the bottom he says

14   "Note, still working on the hosted file server

15   need."?

16         A.     Okay.

17         Q.     You still don't have a hosted file

18   server; right?

19         A.     That's correct.

20         MR. O'CONNOR:  Please mark this next

21      document as HG Exhibit 18.

22         (HG Exhibit 18, an e-mail exchange

23      on May 21, 2014 Bates stamped Creative IT

24      01428-29, marked for identification, as of

25      this date.)

Page 87

1                    J. Wagner

2        Q.    Showing you what has been marked as HG

3    18.  It is an e-mail exchange on May 21, 2014

4    Creative IT 01428-29.

5        A.    Okay.

6        Q.    It is an e-mail thread; right?  One is

7    dated the 21st and one is dated the 19th; correct?

8        A.    Correct.

9        Q.    On the 19th Josh Gill wrote to you,

10   Mia, David and Steve Lupinski.

11             Do you see that?

12       A.    I do.

13       Q.    Who is Steve Lupinski?

14       A.    I don't know who Steve Lupinski is.

15       Q.    It says "David and I spoke about your

16   preferences and needs for a flexible server

17   solution."

18             Do you see that?

19       A.    I do.

20       Q.    And it says hosted server 25 users.

21       A.    Okay.

22       Q.    2.5 terabytes of storage.

23       A.    Okay.

24       Q.    That's a lot of storage, do you agree?

25       A.    That's a general statement.  Graphics

Page 88

1                              J. Wagner

2     and everything that happens in computers just

3     keeps taking more and more storage.  You can get

4     huge amounts of terabytes of storage now.

5          Q.    As of May 21, 2014 what data did

6     HudsonGray have?

7          A.    I think that was more in terms of

8     being able to do the graphic design work and the

9     things the company anticipated.  In other words,

10    you don't buy a storer, a server and anticipate it

11    is going to remain empty.

12         Q.    So from your answer I take it that as

13    of that moment you didn't have the data, you were

14    just anticipating generating the data in the

15    ordinary course of business; correct?

16         A.    Correct.  Video files and graphics and

17    the type of work that we do.

18               MR. O'CONNOR:  Please mark this as HG

19         Exhibit 19.

20               (HG Exhibit 19, a May 13, 2014

21         hosted file server proposal Bates stamped

22         Creative IT 01430 through 1449, marked for

23         identification, as of this date.)

24         Q.    I am showing you what has been marked

25    as HG 19.  It is a May 13, 2014 hosted file server

Page 89

1                    J. Wagner

2    proposal.

3         A.    Okay.

4         Q.    Creative IT 01430 through 1449.

5         A.    Okay.

6         Q.    Is this the proposal you received on

7    or about that date from IT Savvy?

8         A.    I don't recall offhand if this went to

9    us or to David Tuma.  I don't remember this

10   document verbatim looking at it but it is a

11   proposal to HudsonGray.

12        Q.    If you look at the e-mail we just

13   looked at said I am attaching a proposal.

14        A.    Okay.

15        Q.    And then you have this proposal.

16             Do you have any reason to doubt this

17   is the proposal he is referring to in HG 19?  HG

18   18, I am sorry.

19             Do you have any reason to doubt the

20   proposal HG 19 is not what is referenced in HG 18?

21        A.    Well, the date says Monday May 19th

22   and the proposal is dated May 13th.  I assume that

23   it could have come with this e-mail.

24             MR. O'CONNOR:  Please mark this next

25        document as HG Exhibit 20.

Page 90

1                    J. Wagner

2              (HG Exhibit 20, a May 21, 2014

3         e-mail, marked for identification, as of

4         this date.)

5         Q.    I am showing you what has been marked

6    HG 20.

7         A.    Okay.

8         Q.    And it is the May 21, 2014 e-mail I

9    think you told me about before.

10        A.    That's correct.

11        Q.    This is the one you prepared with?

12        A.    This is the one we talked about in the

13   beginning, yeah.

14        Q.    And it is Bates stamped Creative IT

15   01452; correct?

16        A.    Correct.

17        Q.    When you were preparing did you recall

18   that you actually received this e-mail?

19        A.    No, I didn't recall.

20        Q.    As you sit here now, do you remember

21   receiving the e-mail?

22        A.    Again, I don't recall it but I am

23   looking at it now.  I mean I reviewed it, yeah.  I

24   just got this a couple of days ago.

25        Q.    Do you need more time to review?

Page 91

1                    J. Wagner

2         A.    No, no.  This is good.

3         Q.    Attached to this is the metadata for

4    the document; okay.

5         A.    Okay.

6         Q.    As you can see it was blind copied to

7    someone by the name of Adam Owens at Creative IT.

8         A.    Okay.

9         Q.    Do you know who that is?

10        A.    I believe that's David's assistant,

11   David Tuma's assistant.

12        Q.    When was the last time you spoke to

13   him?

14        A.    It's been years.  I don't think I have

15   seen Adam since he was working at XA.

16        Q.    So this is an 11:01 p.m. e-mail from

17   David Tuma to you; correct?

18        A.    Okay.

19        Q.    And he goes on and talks about the

20   things that you talked about; right?

21        A.    Okay.

22        Q.    He says "HG items."

23              That's a reference to HudsonGray;

24   right?

25        A.    That's correct.

1                       J. Wagner

2          Q.    "Get public folder for HG setup with

3    calendar for all users."

4                Right?

5          A.    Okay.

6          Q.    "Set up new HG e-mails" and he goes on

7    and lists four employees; right?

8          A.    Yes.

9          Q.    Including Mr. Andereck; correct?

10               MR. MATTHEWS:   Objection.

11               Go ahead.

12         A.    Correct.

13         Q.    And Mr. Day; right?

14         A.    And Mr. Day, correct.

15         Q.    He says "Working on above items now.

16   Note, I had to purchase the mailbox licenses now

17   and it takes a few hours before I can create the

18   mailboxes."

19               Right?

20         A.    Yes, that's correct.

21         Q.    And then he says "XA e-mail (at

22   Windstream)."

23               Right?

24         A.    That's correct.

25         Q.    So here is Mr. Tuma talking to you

Page 93

1                          J. Wagner
2      about XA's e-mails; right?
3           A.    That's correct.
4           Q.    And then he says "Delete mailboxes
5      over weekend Mia, Joe, Mike, Jeff, Darren and
6      Natalia."
7                 Right?
8           A.    Correct.
9           Q.    And those are all references to XA
10     employees; right?
11          A.    That's correct.
12          Q.    So you knew as of that moment Tuma was
13     telling you he was going to be deleting mailboxes
14     over the weekend; correct?
15          A.    That's correct.
16          Q.    "Current New York server."
17                Do you see that?
18          A.    I do.
19          Q.    That's a reference to XA server;
20     correct?
21          A.    That's reference to XA server New
22     York, correct.
23          Q.    You are not there anymore as of this
24     day; right?
25          A.    That's correct.

Page 94

```
 1                    J. Wagner
 2      Q.     You have been gone for six weeks;
 3  right?
 4      A.     That's correct.
 5      Q.     You don't claim that you had any legal
 6  or proprietary right to anything on XA's servers,
 7  do you?
 8      A.     That's correct.
 9      Q.     "Copy/download from it meaning New
10  York XA server."
11             Right?
12      A.     Correct.
13      Q.     "The projects production data to my
14  server."
15             Right?
16      A.     Correct.
17      Q.     So you knew as of that night he was
18  going to be copying projects production data from
19  XA server to his server; correct?
20      A.     Okay.  That's what the e-mail says,
21  yes.
22      Q.     And then it says "Once copied delete
23  from the server."
24             Right?
25      A.     That's correct.
```

Page 95

1                     J. Wagner

2      Q.    So you knew that his plan was that

3  once he copied the projects production data to his

4  server he would then delete it from the New York

5  server; correct?

6      A.    That's what it says, yes.

7      Q.    It says "The above will happen over

8  the weekend."

9            Right?

10     A.    Correct.

11     Q.    Then it says "Chicago server."

12           That's a reference to XA's Chicago

13  server; right?

14     A.    That's correct.

15     Q.    Again, something you had no right to

16  proprietary wise; is that right?

17     A.    That's right.

18     Q.    "Copy data to New York server.  Agency

19  projects, resources, media, exact copy of data at

20  point in time when done.  This will be done over

21  the weekend."

22           Right?

23     A.    Correct.

24     Q.    And you knew that was his plan;

25  correct?

Page 96

1                        J. Wagner

2          A.    That's what he put forward in the

3    e-mail.

4          Q.    Chicago accounting data.

5                Do you see that?

6          A.    I do.

7          Q.    Mr. Tuma told you quote "On date of

8    Jean's exit Jean will make a copy to her raid

9    device.  I will make a second copy to my server,

10   then delete from the Chicago server."

11               Do you see that?

12         A.    I do.

13         Q.    And that's what Tuma told you he was

14   planning to do; correct?

15         A.    That's what's put forth in the e-mail.

16         Q.    Did you write to Tuma and say are you

17   out of your mind?

18         A.    I had a conversation with David Tuma

19   about this and we went through that.

20         Q.    When was this conversation?

21         A.    Yesterday.

22         Q.    My question is:  When you received

23   this e-mail from David Tuma in May of 2014, did

24   you write to him and say are you out of your mind?

25         A.    I didn't write to David and say are

```
 1                    J. Wagner
 2   you out of your mind.
 3        Q.    What did you say to him?
 4        A.    I don't recall the exact conversation.
 5   I was very focused on HudsonGray at the time.  I
 6   know that I spoke with David and worked with him
 7   for ten years.  He feels like he copied me on this
 8   just out of habit, but there is very specific
 9   items to go down through on each of these.
10        Q.    Sir, I don't have an open question.
11              I just asked you if you called him or
12   e-mailed him.
13        A.    I probably did e-mail him.
14              MR. MATTHEWS:  Wait a second.
15              MR. O'CONNOR:  I don't have an open
16        question.
17              MR. MATTHEWS:  The question is did you
18        write to David Tuma are you out of your
19        mind?
20              THE WITNESS:  No, I didn't.
21   BY MR. O'CONNOR:
22        Q.    So you knew he was going to do these
23   things; correct?
24        A.    It was what was purported in the
25   e-mail.
```

Page 98

1                      J. Wagner

2        Q.    Did you ever discuss with Jean Wilson

3   either directly or indirectly her having a raid

4   device?

5        A.    I did not discuss a raid device with

6   Jean Wilson.

7        Q.    Were you ever present when a raid

8   device was discussed?

9        A.    Not a raid device.  I am not really

10  even sure what that is.

11       Q.    You don't know what it is?

12       A.    A raid device?

13       Q.    Yes.

14             You have no knowledge of what a raid

15  device --

16       A.    I assume it is some sort of hard

17  drive.  I don't know.

18       Q.    Did Darren Andereck have knowledge of

19  this plan?

20             MR. MATTHEWS:  Objection to form.

21             MR. O'CONNOR:  I will withdraw it.

22       Q.    To your knowledge, did Darren Andereck

23  have knowledge of the contents of HG 20 in or

24  about May of 2014?

25       A.    I don't know that he did.

1                    J. Wagner

2        Q.     To your knowledge, did Jean Wilson

3    have knowledge of this plan course of action

4    outlined in HG 20 in or about May of 2014?

5        A.     According to David Tuma her personal

6    QuickBooks files were on that accounting data and

7    that is what he was referring to.  So I assume

8    Jean Wilson was aware of this because she had her

9    personal QuickBooks files on the Chicago server

10   and David was making reference to getting her

11   personal files removed from the accounting drive.

12       Q.     Did you know if Jean Wilson disclosed

13   to XA the plan outlined in HG 20 at any time?

14       A.     I don't know that.

15             MR. MATTHEWS:  Objection.

16             MR. O'CONNOR:  Please mark this as HG

17       Exhibit 21.

18             (HG Exhibit 21, a May 22, 2014

19        e-mail Bates stamped Creative IT 01455,

20        marked for identification, as of this date.)

21       Q.     I show you what has been marked as HG

22   21 which for the record is a May 22, 2014 e-mail

23   Bates stamped Creative IT 01455.

24       A.     Okay.

25       Q.     So this is the morning after the

Page 100

1                      J. Wagner

2    e-mail that we just looked at; right?

3         A.    Correct.

4         Q.    David Tuma reported back to you at

5    9:35 a.m.  So he said "I started some of that work

6    we discussed yesterday."

7               Right?

8         A.    Correct.

9         Q.    So the e-mail HG 20 was a summary of

10   the things you talked about on the phone; correct?

11              MR. MATTHEWS:  Objection.

12        A.    He references a conversation, correct.

13        Q.    And you had a conversation; correct?

14        A.    As far as I know, yes.

15        Q.    He says "HG e-mail the requested

16   mailboxes are created.  Waiting on public folders

17   with GoDaddy support.  I will probably get to call

18   them later this afternoon and/or tomorrow

19   afternoon."

20              "New York server.  I set up my office

21   to New York office hardware based VPN connection

22   and started copying the projects production data."

23   I will stop there for a second.

24              He is talking about XA's data; right?

25        A.    That's correct.

1                          J. Wagner

2          Q.      And you knew as of that date he was

3     copying XA's data; correct?

4          A.      Per the e-mail I assume that's XA's

5     data, yes.

6          Q.      Then it says "I have the past projects

7     and projects 2013 copied.  Waiting on projects

8     2014 to do tonight."

9                  Do you see that?

10         A.      I do.

11         Q.      Quote "Let me know when it is okay to

12    delete those from the New York server.  (I think

13    were waiting on Jesse and or other users to make

14    copies of some of those project folders to their

15    local laptop computers)."

16                 Do you see that?

17         A.      I do.

18         Q.      Let's break that down.

19                 You knew that Jessie Lomma was copying

20    project records to her personal laptop computer;

21    correct?

22         A.      In the context of what was happening

23    in the servers, the synchronization between

24    Chicago and New York.  This was a project that was

25    started because there was significant issues in

```
1                    J. Wagner
2    synchronizing with the data server in New York
3    with the data server in Chicago.
4              So David Tuma was going forward with
5    the process to delete all the data on the New York
6    server and copy the XA data back to the New York
7    XA server so there would be two mirrors instead of
8    trying to synchronize between the servers which
9    was an ongoing problem going back all the way
10   before I had left XA.
11         Q.    So you are not even part of XA
12   anymore, are you?
13         A.    In this time frame, no.
14         Q.    You don't have a position with them?
15         A.    I do not.
16         Q.    You resigned?
17         A.    That's correct.
18         Q.    You've already formed a competitor?
19         A.    That's correct.
20         Q.    You are gathering new employees and
21   you are telling me the reason he copied you is
22   because he wanted you to know all the good things
23   he is doing for XA?
24         A.    No.  I don't know why David copied me.
25   I don't recall why this e-mail was put forward.
```

Page 103

1                        J. Wagner

2        Q.    The next paragraph says quote "Chicago

3   server data copied to New York server."

4        A.    Correct.

5        Q.    "Agency projects, resources, media

6   started that process."

7        A.    Correct.

8        Q.    He says it will take five to six days

9   to complete; right?

10       A.    Okay.

11       Q.    Then he goes on to say "I found a

12   solution that lets the process run day and night."

13             Right?

14       A.    Okay.

15             MR. O'CONNOR:  Please mark this as HG

16       Exhibit 22.

17             (HG Exhibit 22, an e-mail Bates

18       stamped Creative IT 01456 through 01458,

19       marked for identification, as of this date.)

20       Q.    Before we look at HG 22 and I will put

21   on the record what it is, but a few minutes ago

22   you said as of the date of the e-mails HG had no

23   data of its own; correct?  Do you remember that?

24       A.    Starting in April, May time frame it

25   wasn't a company that had a lot of data at that

Page 104

```
1                         J. Wagner
2    point.
3         Q.    You said it didn't have any data.
4               Do you remember saying that?
5         A.    When we were starting the company of
6    course there was no data.  When it was a startup
7    company there was random computers, of course.
8         Q.    When did Darren Andereck start at
9    HudsonGray?
10        A.    I don't recall the exact date.
11        Q.    Wasn't it the day after this e-mail HG
12   22?
13        A.    That sounds about right.
14        Q.    Jessie Lomma hadn't joined you yet;
15   right?
16        A.    That's correct.
17        Q.    And then you told me Mia wasn't an
18   employee; right?
19        A.    Mia was assisting me, yeah.
20        Q.    And assist you.
21              You are not generating data, are you?
22        A.    Not tons of data, no.
23        Q.    So there is no one else there to
24   generate data as of May 22nd; right?
25        A.    That's a fair statement.
```

Page 105

1                      J. Wagner

2       Q.    Now let's look at HG 22 Creative IT

3   01456 through 01458.

4       A.    Okay.

5       Q.    Is this an e-mail you received on or

6   about May 22, 2014?

7       A.    Again, I don't recall the e-mail

8   specifically but yes I am looking at it now.

9       Q.    It says "We have eight new PCs coming

10  in."

11            Right?

12      A.    Correct.

13      Q.    "We have four new Macs coming in."

14      A.    Correct.

15      Q.    It says "Give all computers/users

16  access to the hosted file server solution."

17            Right?

18      A.    Okay.

19      Q.    And he says at the bottom of that,

20  actually it is in the middle, quote "I will have

21  data to upload on the hosted server's shared

22  folders already.  So I need access from my home

23  office to upload the data."

24            Correct?

25      A.    Correct.

1                    J. Wagner

2        Q.     So you knew on May 22, 2014 Mr. Tuma

3    was telling IT Savvy that he already had data from

4    his server that he was going to transfer to

5    HudsonGray's server; correct?

6        A.     Correct.

7               MR. O'CONNOR:  Please mark this as HG

8        Exhibit 23.

9               (HG Exhibit 23, a document Bates

10       stamped Creative IT 01459, marked for

11       identification, as of this date.)

12       Q.     I am showing you HG 23.

13              This is the day after Mr. Andereck had

14   resigned from XA; right?

15       A.     Okay.

16       Q.     Do you know if he gave any notice to

17   XA or did he just up and leave?

18              MR. MATTHEWS:  Objection.

19       A.     I believe he gave notice.

20       Q.     How much time?

21       A.     I am sorry?

22       Q.     How much time, do you remember?

23       A.     I don't recall.

24       Q.     Did he actually show up or did he just

25   --

Page 107

1                    J. Wagner

2        A.    When you say show up you mean?

3        Q.    Did he stay around for two weeks to

4   help transition the files?

5        A.    I don't recall the format.  I just

6   know that I believe Darren did resign.

7        Q.    So the next day Saturday he didn't

8   magically create any new data for you; right, for

9   HudsonGray?

10        A.    That's correct.

11        Q.    It says in HG 23 which is Creative IT

12   01459?

13        A.    Okay.

14        Q.    David Tuma wrote to you seeking input

15   and he wrote "Hi Joe, please let me know if it is

16   okay to wipe the New York projects production

17   data.  I have two copies of it in my office

18   already."

19              Is that what he wrote to you?

20        A.    That's correct.

21        Q.    And you knew he was talking about XA

22   data; correct?

23        A.    I do not.

24        Q.    No?

25              Well, we know HudsonGray didn't have

Page 108

```
 1                    J. Wagner
 2   any data; right?
 3        A.    That's correct.
 4        Q.    So who else's data are we talking
 5   about here?
 6        A.    I am not sure what he is referencing
 7   there.
 8              I need to use the restroom.
 9              MR. O'CONNOR:  Sure.
10              (Recess taken.)
11              (Luncheon recess:  12:10 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 109

```
 1                     J. Wagner
 2           A F T E R N O O N    S E S S I O N.
 3                      (12:40 p.m.)
 4   J O S E P H   W A G N E R,
 5           having been previously sworn, resumed the
 6           stand and testified further as follows:
 7
 8                  MR. O'CONNOR:  Please mark as HG
 9           Exhibit 24 an e-mail dated July 8, 2014
10           HudsonGray server presentation.
11                  (HG Exhibit 24, an e-mail dated July
12           8, 2014 HudsonGray server presentation,
13           marked for identification, as of this date.)
14                  (Record read.)
15   EXAMINATION (Cont'd)
16   BY MR. O'CONNOR:
17           Q.    I am putting in front of you HG 24
18   which is a July 8, 2014 e-mail.
19                  Have you ever seen this e-mail before?
20           A.    I don't recall specifically, but I am
21   reviewing it now.
22           Q.    Okay?
23           A.    Okay.
24           Q.    Is this a HudsonGray data server
25   e-mail and presentation given to you by David
```

```
1                    J. Wagner
2    Tuma?
3         A.    That is what it appears to be, yes.
4         Q.    And the intension is that you would
5    distribute the attached which is Creative IT 1524
6    to your employees; correct?
7         A.    Correct.
8         Q.    And did you in fact distribute this to
9    your employees?
10        A.    I assume it was.
11        Q.    Because it looked in order; correct?
12        A.    Correct.
13        Q.    And if you look on the second page Mr.
14   Tuma is indicating that you have 1.7 terabytes of
15   data on your hard drives; correct?  Second page.
16        A.    Where is this?
17        Q.    Second page.
18              Do you see where it has the network
19   locations?
20              MR. MATTHEWS:  Where?
21        A.    You mean in the graphic?
22        Q.    Yes, sir.
23              It says 934 gigabytes are free of 2.70
24   terabytes; correct?
25        A.    I am not sure if this graphic is
```

Page 111

1                           J. Wagner

2      generic or if it's HudsonGray specific.

3             Q.    Take a look at it.

4             A.    I am tying to read it.

5             Q.    You see it says David Tuma and he has

6      the four network locations; right?

7             A.    Okay.

8             Q.    And the e-mail is telling you he is

9      describing how your network is configured; right?

10            A.    Okay.

11                  MR. O'CONNOR:  Please mark this as HG

12            Exhibit 25.

13                  (HG Exhibit 25, a June 30, 2014

14         Creative IT invoice Bates stamped Creative

15         IT 24, marked for identification, as of this

16         date.)

17            Q.    Showing you what has been marked as HG

18      25 which is Bates stamped Creative IT 24.

19            A.    Okay.

20            Q.    This is a June 30, 2014 Creative IT

21      invoice to your company; correct?

22            A.    Correct.

23            Q.    Was this received by you on or about

24      that date?

25            A.    I assume that it was.

Page 112

1                            J. Wagner

2         Q.     And this is for services performed in

3    June of 2014.

4                Do you see that?

5         A.     That's what it looks to be, yes.

6         Q.     Do you have some explanation for me as

7    to why this was not in your production?

8         A.     I don't know.

9         Q.     Where would this document have been

10   stored at your company?

11        A.     Going back to this point in time kind

12   of the startup nature of the company I don't know

13   whether this would have been hard copies or where

14   we would have kept vendor files at that point.

15        Q.     By the way, was Mia ever physically

16   present in New York to help set up HudsonGray?

17        A.     I don't recall.  I am not sure if she

18   was.

19        Q.     Now this is provided by Creative IT

20   Consulting and it is dated June 30.  I have never

21   seen an invoice from Creative IT for anything they

22   did previously for HudsonGray.

23                Do you have some explanation for why

24   that might be the case?

25        A.     I don't know what the -- I don't

Page 113

```
 1                    J. Wagner
 2   recall what the situation was when David was
 3   setting this up.  I know that some of the things
 4   were done on a cash basis.  I don't know.
 5          Q.    Are you testifying under oath that you
 6   gave cash to this man for IT services?
 7          A.    I am not saying that I gave cash to
 8   David Tuma.  I said checks.  Before we had offices
 9   set up where we had the accounting systems going
10   at the beginning.
11   RQ          MR. O'CONNOR:  Well, I would ask that
12              you provide us with any checks for any
13              services that were rendered before June
14              2014.
15              MR. MATTHEWS:  We will take the
16              request under advisement.
17              MR. O'CONNOR:  They should have been
18              produced a long time ago.
19              MR. MATTHEWS:  What request are they
20              responsive to?
21              MR. O'CONNOR:  I'm not going to drag
22              -- your client wants to get on a flight.
23              You can take it up with --
24              MR. MATTHEWS:  My client was available
25              at 9:30 to start this deposition.
```

1                       J. Wagner

2           MR. O'CONNOR:  You can take it up with

3       the court.

4           MR. MATTHEWS:  You can take it up with

5       the court.

6           MR. O'CONNOR:  Listen, I will stay

7       here till five o'clock if you'd like.  Keep

8       it up.

9           MR. MATTHEWS:  I'm ready.

10  BY MR. O'CONNOR:

11      Q.    Sir, do you know of any invoice from

12  David Tuma to HudsonGray in April of 2014?

13      A.    I don't recall that, no.

14      Q.    And do you know of any invoice in May

15  of 2014 from David Tuma?

16      A.    I don't recall it offhand, no.

17      Q.    So the only one paying for David

18  Tuma's time in May or April is XA; correct, as far

19  as you know?

20      A.    I don't know that.

21      Q.    Well, you don't remember if you made

22  any payments to him prior to this; correct?

23      A.    That's correct.

24          MR. O'CONNOR:  Please mark this as HG

25      Exhibit 26.

Page 115

1                        J. Wagner

2               (HG Exhibit 26, a July 31, 2014

3       invoice from Creative IT Consulting to

4       Joseph Wagner at HudsonGray, marked for

5       identification, as of this date.)

6          Q.    I would like to show you what has been

7       marked as HG 26.

8               Have you seen this before?

9          A.    I don't recall, but I am reviewing it

10      now.

11         Q.    For the record, this is a July 31,

12      2014 invoice from Creative IT Consulting to Joseph

13      Wagner at HudsonGray.

14         A.    Okay.

15         Q.    Does it look familiar?

16         A.    Again, I am reviewing it now.

17              MR. MATTHEWS:  The question is does it

18      look familiar?

19              THE WITNESS:  Yes.  I said I am

20      reviewing it now.

21         Q.    Does it look familiar to you?

22         A.    I assume it is something that was

23      provided to the company.  I don't recall this

24      invoice from memory.

25         Q.    He states that nothing had been paid

Page 116

1                        J. Wagner

2    to him as of that date.

3                 Do you see that?  Look at the box.

4         A.     A balance due of twenty-six hundred

5    dollars and change.

6         Q.     And it says payments and credits

7    between June 30 and July 31 zero?

8         A.     That's correct.

9                 MR. O'CONNOR:  Please mark this as HG

10         Exhibit 27.

11                 (HG Exhibit 27, a September 30, 2014

12          invoice from Creative IT Consulting, marked

13          for identification, as of this date.)

14         Q.     Now before I get to HG 27, what was

15    the date that Jean Wilson resigned from XA?

16         A.     I don't recall exactly.  I think it

17    was sometime in September.

18         Q.     Was it a Friday in mid September?

19         A.     I don't know the exact date but it was

20    sometime in September.

21         Q.     Let's see if this refreshes your

22    recollection.  HG 27 September 30, 2014 invoice

23    from Creative IT Consulting to you; right?

24         A.     Okay.

25         Q.     It is marked Creative IT 31.

```
                                          Page 117

 1                    J. Wagner
 2              Did you receive this invoice?
 3         A.    I am sure that I did.
 4         Q.    In fact, you paid part of that
 5    invoice; correct?
 6         A.    It shows a payment recorded, yes.
 7         Q.    I mean after you received the invoice
 8    you made a future payment, a subsequent payment on
 9    that; correct, do you remember?
10         A.    It shows a payment credit of four
11    hundred.
12         Q.    I understand that.
13              That's reflecting a payment you made
14    before the invoice was issued; right?
15         A.    Correct.
16         Q.    And then after you received this
17    invoice, you paid on the invoice; correct?
18         A.    I assume that I made payment on this
19    invoice.
20         Q.    You didn't see anything wrong with the
21    invoice, did you?
22         A.    No, I did not.
23         Q.    In fact, HudsonGray was billed for
24    work on September 12, 2014 described as Jean PST
25    file download open Jean's PST file and Outlook.
```

Page 118

```
 1                      J. Wagner
 2             Do you see that?
 3        A.    That's correct.
 4        Q.    And HudsonGray was billed for time on
 5   the 17th and time on the 23rd and time on the
 6   24th; correct?
 7        A.    Correct.
 8        Q.    And on September 24th HudsonGray paid
 9   for the following services Jean resolved phone
10   e-mail issue.  Import Outlook PST file into HG
11   exchange account.
12             Do you see that?
13        A.    I do.
14        Q.    So you paid to have her Outlook folder
15   imported into HG's exchange account; correct?
16        A.    That's correct.
17             MR. O'CONNOR:  Please mark this as HG
18        Exhibit 28.
19             (HG Exhibit 28, an October 31, 2014
20        invoice Bates stamped Creative IT 30, marked
21        for identification, as of this date.)
22        Q.    Do you know if Jean Wilson told
23   anybody at XA that she was taking her PST folder
24   with her?
25             MR. MATTHEWS:  Objection.
```

1                    J. Wagner

2        Q.    Do you know?

3        A.    I don't know.

4        Q.    HG 28 Creative IT 30.  October 31,

5    2014 invoice.

6              Do you see that?

7        A.    I do.

8        Q.    Is this an invoice that you received?

9        A.    I assume that it is.

10       Q.    And you can see that you made a five

11   hundred dollar payment on the invoice we just

12   looked at; is that correct?

13       A.    That's correct.

14       Q.    It says "October 8th phone meeting

15   with Jean to review items."

16             Do you see that?

17       A.    I do.

18       Q.    As of October 8th, what was Jean

19   Wilson's role in HudsonGray?

20       A.    I don't believe she had a specific

21   title at the time.  Operations.

22       Q.    She had a title operations?

23       A.    I didn't say she had a title.  I said

24   she was doing operations.  I said I don't believe

25   she had a specific title at the time.

Page 120

1                           J. Wagner

2        Q.     When did she get a title?

3        A.     To the best of my recollection, Jean

4    worked as an independent contractor for a period

5    of time for HudsonGray and then eventually became

6    a full time employee.

7        Q.     Did you recommend to her that she

8    apply for unemployment?

9        A.     I don't recall doing that.

10       Q.     Were you aware that she applied for

11   unemployment telling them she was not working?

12       A.     I know that Jean had an employment

13   hearing or had some issues.  We had talked about

14   that.

15       Q.     You helped her through that?

16       A.     I don't know if I helped her through

17   that.  I know that she made me aware that she was

18   going through an employee, employment hearing.

19       Q.     My question was about unemployment

20   insurance.

21              Were you aware that she made a claim

22   to XA to receive unemployment insurance at the

23   time you were working with her as an independent

24   contractor?

25              MR. MATTHEWS:  Objection.

Page 121

1                        J. Wagner
2              Go ahead.
3         A.    I was aware that she had an employment
4    hearing at some point, yes.
5         Q.    Were you aware that she showed up for
6    a hearing with an administrative law judge and had
7    with her confidential information from XA servers?
8              MR. MATTHEWS:  Objection.
9              Go ahead.
10        A.    No, I wasn't aware of that.
11        Q.    Never saw the decision by the
12   administrative law judge?
13        A.    I did not read a decision from the
14   administrative law judge.
15        Q.    The payments that HudsonGray made to
16   Jean Wilson after she resigned from XA were all
17   made through Mixed Company; correct?
18        A.    To the best of my recollection, there
19   were payments made to Mixed Company.
20        Q.    And you authorized those; right?
21        A.    Correct.
22        Q.    Were there any payments made to Mixed
23   Company in calendar year 2014 that were for any
24   services other than what Jean Wilson was
25   performing in the role that you just described?

Page 122

1                     J. Wagner

2        A.    I am not sure.  I know that there was

3    some creative services work that company did on

4    behalf of HudsonGray.  Darren can probably speak

5    to that more on the operations and the production

6    side.

7        Q.    If you had documentation of that you

8    would have produced it; right?

9        A.    That's correct.

10              MR. MATTHEWS:  Objection, but go

11       ahead.

12              MR. O'CONNOR:  Please mark this as HG

13       Exhibit 29.

14              (HG Exhibit 29, a July 21, 2014

15          e-mail exchange Bates stamped Creative IT

16          1528 through 1532, marked for

17          identification, as of this date.)

18        Q.    Mr. Wagner, I am showing you what has

19    been marked as HG 29 which is a July 21, 2014

20    e-mail exchange and it is Bates stamped Creative

21    IT 1528 through 1532.

22              Have you ever seen this before?

23        A.    Yes, I have.

24        Q.    Is this an e-mail you received on or

25    about that date?

Page 123

1                        J. Wagner

2        A.     I assume that it is.

3        Q.     Again, it is copied to Jean Wilson;

4    correct?

5        A.     This is the Right Network shared

6    platform again.  It has the shared QuickBooks file

7    and the shared accountant which is David Rice.

8              MR. O'CONNOR:  Please mark this as HG

9          Exhibit 30.

10             (HG Exhibit 30, a document Bates

11         stamped Defendant 150711, marked for

12         identification, as of this date.)

13       A.     Okay.

14       Q.     This is Defendant 150711?

15       A.     That's correct.

16       Q.     Have you ever seen this e-mail before?

17       A.     I don't recall it, but I am reviewing

18   it now.

19       Q.     For the record, the e-mail is dated

20   December 7, 2014.

21             Have you looked at it?

22       A.     I have.

23       Q.     Is this an e-mail you received on or

24   about December 7, 2014?

25       A.     It is.

1                        J. Wagner

2        Q.    Now the HG underscore accounting

3   e-mail address, that's an e-mail address assigned

4   to Jean Wilson; correct?

5        A.    No.   That was an e-mail address that

6   was a catchall.   It was entitled accounting and

7   there were a number of individuals that would use

8   that account depending on what needed to happen to

9   send invoices that were past due or to handle

10  accounting.   So it was what's considered a

11  catchall e-mail under accounting.   It wasn't

12  titled to a specific individual.   Jean did use it.

13  I believe Mia used it at the beginning.

14              So there was a number of folks who

15  used that e-mail.

16       Q.    Who else?

17       A.    I don't recall offhand but it was

18  available to be anything that was accounting based

19  because we were still kind of going through that

20  startup mode.

21       Q.    In any event, on December 5, 2014 you

22  wrote an e-mail to that address and you said

23  "Jean, sorry about the phone tag."

24              Is that correct?

25       A.    That's correct.

Page 125

J. Wagner

1

2      Q.      Then you said quote "I would like to

3  see all the e-mails that you have to and from Ron

4  B.  It may be easier for you to just make a PST

5  that I can go through."

6              Do you see that?

7      A.      I do.

8      Q.      You are talking about e-mails from XA;

9  correct?

10      A.      I assume those are XA e-mails

11  referenced there, yes.

12      Q.      So you knew at that date she had XA

13  e-mails; correct?

14      A.      That's correct.

15      Q.      You also said "Please send me the

16  balance sheet and P&L for Studio AG."

17              Correct?

18      A.      Right.

19      Q.      For how many years?

20      A.      It goes 2010 through 2014

21  year-to-date.

22      Q.      So why in the world would Jean Wilson

23  have possession of balance sheets and P&Ls for

24  Studio AG?

25      A.      I assume because she had access to the

Page 126

1                         J. Wagner

2    accounting file for Studio AG.

3         Q.    Where was the accounting file?

4         A.    Again, in the hosted drive, the Right

5    Networks drive.

6         Q.    So you had access, that drive was

7    available through HudsonGray; right?

8         A.    That networks drive was available to

9    the different companies that were using David Rice

10   as an accountant.  So each company stored their

11   QuickBooks file on the Right Networks system.

12        Q.    She says "I have interviewed four tax

13   consultants."

14              Do you see that?

15        A.    I do.

16        Q.    What is she talking about?

17        A.    I assume that goes to the New York

18   sales tax that was being set up for HudsonGray.

19              MR. O'CONNOR:  Please mark this as

20        HudsonGray Exhibit 31.

21              (HG Exhibit 31, a December 15, 2014

22        e-mail entitled General Ledger and Trial

23        Balance, marked for identification, as of

24        this date.)

25        Q.    I would like to show you what has been

1                        J. Wagner

2    marked as HudsonGray 31 which is a December 15,

3    2014 e-mail entitled General Ledger and Trial

4    Balance.

5               Do you see that?

6         A.    I do.

7         Q.    Now on December 15, 2014 Jean Wilson

8    forwarded to you the XA general ledger and trial

9    balance; correct?

10        A.    She sent me an e-mail that referenced

11   that in a title.  I don't believe she sent me the

12   actual document.  It seems to be an e-mail trail

13   that is titled under general ledger and trial

14   balance.

15        Q.    Can we agree that this is from your

16   production?  Do you see that?

17        A.    Correct.

18        Q.    This was in your possession; correct?

19        A.    Correct.

20        Q.    And this is a communication between

21   the COO of XA and its auditor; correct?  Do you

22   see on the bottom?

23        A.    It's Diego Roca.

24        Q.    Who is that?

25        A.    I assume he is somebody working at XA.

Page 128

1                      J. Wagner

2        Q.    Why would you be entitled as of

3    December 15, 2014 to confidential information

4    about XA?

5              MR. MATTHEWS:  Objection.

6        A.    I am not sure what the context was

7    with this.

8        Q.    Can you think of any legitimate reason

9    why the now former COO of XA would be sending you

10   confidential financial information about my client

11   on that date?

12             MR. MATTHEWS:  Objection.

13       Q.    Can you think of any reason?

14       A.    I assume it was related to the lawsuit

15   in some way.

16       Q.    But you had possession of this

17   document; right?

18       A.    When you say you, you mean HG

19   defendants?

20       Q.    Miss Wilson gave it to you; right?

21       A.    I am not sure where the e-mail came

22   from but yes, it is part of our production.

23       Q.    And in fact, you thought it was

24   confidential and you stamped it confidential, do

25   you see that?

Page 129

1                    J. Wagner

2        A.    It is stamped confidential.

3              MR. O'CONNOR:   Please mark this as HG

4        Exhibit 32.

5              (HG Exhibit 32, a document Bates

6        stamped Defendant 95461 and 62, marked for

7        identification, as of this date.)

8        Q.    I am showing you what has been marked

9    as HG 32 which is marked Defendant 95461 and 62.

10       A.    Okay.

11       Q.    Have you ever seen this document

12   before?

13       A.    I don't recall it.  I am reviewing it

14   now.

15             Okay.

16       Q.    So here we have Miss Wilson, a former

17   XA employee, on December 15, 2014 sending to you

18   communication that she had with the auditor of XA

19   when she was employed at XA; correct?

20             MR. MATTHEWS:   Objection.

21       A.    That's correct.

22       Q.    And in fact, she attaches three Excel

23   spreadsheets; right?

24       A.    There are spreadsheets referenced in

25   the attachment, yes.

Page 130

1                              J. Wagner

2          Q.    Sir, tell me what legitimate factual

3    basis would you have to possess any of this?

4                MR. MATTHEWS:   Objection.

5                Go ahead.

6          A.    Again, I am assuming this was around

7    the lawsuit that had been filed.

8          Q.    What does that mean?

9          A.    I assume that she is referencing these

10   for the information needed for the case.

11         Q.    How did she get them?

12         A.    I don't know.

13         Q.    Did you say why are you sending this

14   to me?

15         A.    I did not.

16         Q.    You in fact asked her for that;

17   correct?

18         A.    Again, to the best of my recollection,

19   this revolves around the lawsuit that had been

20   filed.

21         Q.    But I have asked you what right did

22   you have to the information and you keep saying it

23   is because of the lawsuit.  I don't understand

24   what you mean.

25               Are you suggesting that because there

```
 1                    J. Wagner
 2   was a lawsuit that you could get access to XA's
 3   data?
 4        A.    Again, I don't recall what the
 5   specifics were around how the data was generated
 6   but I am assuming that this is tied into the
 7   lawsuit that was filed and the items were being
 8   reviewed for that purpose.
 9        Q.    But you don't have any understanding
10   about why Jean Wilson has this, do you or how she
11   got it?
12        A.    I assume it was part of her PST file.
13        Q.    The one we looked at before that got
14   taken when she was --
15        A.    Obviously, out of her e-mails.
16              MR. O'CONNOR:  Please mark this as HG
17        Exhibit 33.
18              (HG Exhibit 33, a December 16, 2014
19         e-mail chain Bates stamped Defendant 93919
20         through 93920 also marked confidential,
21         marked for identification, as of this date.)
22        Q.    I am showing you what has been marked
23   as HG 33.
24        A.    Okay.
25        Q.    Which is a December 16, 2014 e-mail
```

1                          J. Wagner

2     chain marked Defendant 93919.  It is also marked

3     confidential.

4          A.    Okay.

5          Q.    It goes through 93920.  This was

6     produced by your office, by your attorney; okay?

7          A.    Okay.

8          Q.    It is marked confidential; right?

9          A.    Okay.

10          Q.    And if you look down there is a

11     discussion December 12, 2014 between someone from

12     HG accounting.

13          A.    Okay.

14          Q.    To Jessie Lomma, yourself and Darren

15     Andereck.

16                Do you see that?

17          A.    I do.

18          Q.    If you look on the second page at the

19     first e-mail in the chain it talks about an

20     upfront template.

21          A.    Okay.

22          Q.    Where did the upfront template come

23     from?

24          A.    I don't know.

25          Q.    Do you have some explanation for how

Page 133

1               J. Wagner

2    HudsonGray obtained a upfront template?

3         A.    I assume since it is coming from

4    Jessie it is something she had produced.

5         Q.    Let's look at this.  It says from you

6    to HG accounting and to Jessie Lomma and to

7    Darren.

8         A.    Okay.

9         Q.    "Jean, as discussed I have attached

10   the document with minor edits removing a few

11   references to XA and deleting sections 7B and C."

12             Do you see that?

13        A.    I do.

14        Q.    So you took the draft upfront template

15   and you deleted all the references to XA; correct?

16        A.    It says remove references to XA, yes.

17        Q.    And then what did Jessie Lomma say

18   back to you?  Can you please read that back to me?

19        A.    "Am I the only one concerned about

20   submitting the same contract as we did last year,

21   with a new company name and logo?  Feel free to

22   let me know if I am overthinking it."

23        Q.    And then somebody from HG accounting

24   on December 12, 2014 wrote back "It has been

25   stripped down to pull out anything that would

Page 134

```
 1                    J. Wagner
 2   prompt NBC legal to get involved, raise any
 3   concerns or slow down due to their review."
 4              Do you see that?
 5        A.   I am sorry?
 6        Q.   First page.  The bottom of the first
 7   page.
 8        A.   This is from HG accounting?
 9        Q.   Yes.
10              And that's Jean; right?
11        A.   I assume this is Jean.
12        Q.   Is it HudsonGray's position that it
13   did not take that upfront template from XA's
14   files?
15        A.   I don't know if that's correct or not.
16        Q.   So it might have come from XA's files?
17        A.   That's a possibility.
18        Q.   Did you tell anybody to take things
19   from XA's files?
20        A.   I did not.
21              MR. O'CONNOR:  Please mark this as HG
22         Exhibit 34.
23              (HG Exhibit 34, a document entitled
24         NBC Primetime Preview 2014 Contact List,
25         marked for identification, as of this date.)
```

Page 135

1                          J. Wagner

2          Q.    Have you ever seen HG 34 before?

3          A.    No, I don't believe I have.

4          Q.    It is a document entitled NBC

5    Primetime Preview 2014 Contact List.

6          A.    Okay.

7          Q.    18 pages; right?

8          A.    Correct.

9          Q.    Do you see at the bottom right-hand

10   corner DEF 72661?

11         A.    I do.

12         Q.    And it goes through 72678?

13         A.    Correct.

14         Q.    And it is marked confidential;

15   correct?

16         A.    That's correct.

17         Q.    And do you have some explanation for

18   how this got into your files?

19         A.    I do not.

20         Q.    You agree it is confidential

21   information; right?  Didn't you mark it

22   confidential?

23         A.    I didn't personally mark it

24   confidential.

25         Q.    Do you agree with the designation

Page 136

1                      J. Wagner
2    confidential?
3         A.    It is marked confidential.
4         Q.    Do you agree it is confidential?
5              MR. MATTHEWS:  Objection.
6              MR. O'CONNOR:  He can answer.
7              MR. MATTHEWS:  I will make a
8         statement.
9              MR. O'CONNOR:  Don't make a speaking
10        objection.  That would really be
11        inappropriate.
12             MR. MATTHEWS:  I object to the form of
13        the question.
14             MR. O'CONNOR:  I will withdraw the
15        question.
16   BY MR. O'CONNOR:
17        Q.    Do you agree that what's in this
18   document is confidential?  Take a look at it.
19             MR. MATTHEWS:  Objection.
20             Go ahead.
21        A.    It would seem to be a production list
22   of people associated with doing the context for
23   the NBC universal upfront.
24        Q.    And it contains personal information;
25   correct, phone numbers, e-mails?

1                      J. Wagner

2        A.    That's correct.

3        Q.    It contains a who's who of who worked

4    on the project; correct?

5        A.    I would say yes, it encompasses the

6    folks that were working on the project.

7        Q.    Again, do you have any understanding

8    of how this came into your possession?

9        A.    I do not.

10            MR. O'CONNOR:   Please mark this as HG

11        Exhibit 35.

12            (HG Exhibit 35, a September 10, 2014

13        e-mail from David Tuma to Joe Wagner with an

14        attachment events log, marked for

15        identification, as of this date.)

16        Q.    HG 35 for the record is a September

17    10, 2014 e-mail from David Tuma to Joe Wagner and

18    it has an attachment events log and attached to it

19    is the log and this was produced by Mr. Tuma.

20        A.    Okay.

21        Q.    Why are you receiving a log from Mr.

22    Tuma about activities going on on XA servers?

23        A.    I don't know.

24        Q.    Did you write back to him and say why

25    are you sending me this log?

Page 138

1                          J. Wagner

2        A.    I don't recall if there was

3   communication about this or not.  I did speak with

4   David yesterday about this to ask him if he has

5   any recollection of why this was sent and he said

6   he thought perhaps it was done in error.  He

7   doesn't have a recollection of why it was sent to

8   me.  I don't have any recollection of it seeing

9   this or why it was sent.  It wouldn't really mean

10  anything to me.

11       Q.    Did you happen to notice that the log

12  correlates exactly to HG 27 where he lists all the

13  things he did on XA server?

14       A.    No, I did not corollate that.

15       Q.    It is just a coincidence?

16       A.    I am not saying it is.  I am just

17  saying I didn't notice that.

18              MR. O'CONNOR:  Please mark this as HG

19       Exhibit 36.

20              (HG Exhibit 36, a December 8, 2014

21       e-mail Bates stamped Defendant 80305 through

22       80307, marked for identification, as of this

23       date.)

24       Q.    Showing you what is HG 36, a December

25  8, 2014 e-mail Defendant 80305 through 80307.

Page 139

1                         J. Wagner

2          A.    Okay.

3          Q.    If you look at the end it attaches a

4    bunch of reports.

5                Do you see that?

6          A.    I do.

7          Q.    And it says in the subject line

8    deliverables you ask about and if you look in the

9    middle Jean Wilson had written on March 13, 2014

10   and said "Here is the QB file that was sent to the

11   auditor." And then she gave a password.

12         A.    Okay.

13         Q.    So this e-mail contains a QuickBook

14   file for CMG; correct?

15         A.    I don't know if this specific e-mail

16   trail included the attachments.

17         Q.    Well, I would know that if you guys

18   had actually produced it the way it was given to

19   you but it wasn't. So I am asking you.

20         A.    I don't know if there was attachments

21   to this e-mail or not.

22               MR. MATTHEWS:  Objection.

23         Q.    So you have been in the business for a

24   long time; right?  You have run businesses; right?

25         A.    Okay.

Page 140

1                         J. Wagner

2        Q.    You use e-mail a lot?

3        A.    Yes.

4        Q.    And when you get an e-mail that says

5   attachments and then it has, it signifies that

6   actual attachment; do you see that the first page?

7        A.    Yes.

8        Q.    And it says "XA-CMGO portable dot

9   QBM."

10             That's a QuickBook file; correct?

11       A.    I assume it is a QuickBook file.

12       Q.    Why were you receiving a XA CMG

13  QuickBook file on December 8, 2014?

14       A.    Again, I am assuming it is something

15  that had to do with the case that's filed.

16       Q.    But there is no legitimate reason for

17  you to receive this, is there?

18             MR. MATTHEWS:  Objection.

19       Q.    Can you think of one?

20       A.    I can't answer that.

21             MR. O'CONNOR:  Please mark this as HG

22       Exhibit 37.

23             (HG Exhibit 37, a document Bates

24       stamped Defendant 77850 also marked

25       confidential by the defendant, marked for

Page 141

1                          J. Wagner
2          identification, as of this date.)
3          Q.     Showing you HG 37 Bates stamped
4    Defendant 77850 also marked confidential by the
5    defendant.
6          A.     Okay.
7          Q.     Have you ever seen this before?
8          A.     I don't recall ever seeing this, no.
9          Q.     Do you have some explanation why this
10   was in your files?
11         A.     I am not familiar with the document.
12   I don't know why it is in the file.
13                MR. O'CONNOR:  Please mark this as HG
14         Exhibit 38.
15                (HG Exhibit 38, an e-mail from
16         September 17, 2014 Bates stamped Defendant
17         76978, marked for identification, as of this
18         date.)
19         Q.     I have shown you HG 38 marked
20   Defendant 76978 which is an e-mail from September
21   17, 2014.
22         A.     Okay.
23         Q.     So this is not even a week after Jean
24   Wilson resigned from XA; correct?
25         A.     That's the correct time frame.

Page 142

1                            J. Wagner

2          Q.    So is there some reason why you chose

3     to copy Jean Wilson on an e-mail, but sent it to

4     her home address or her personal address?

5          A.    I don't recall why Jean was copied on

6     here.

7          Q.    But you did; right?

8          A.    That's correct.

9          Q.    And it says and this is Jessie Lomma

10    to Joe Wagner on September 17th, "We have a long

11    standing relationship with Civic as they are USA's

12    outside PR company."

13               Do you see that?

14         A.    I do.

15         Q.    And that's a reference to XA having a

16    long standing relationship; correct?

17               MR. MATTHEWS:   Objection.

18         A.    My interpretation it says the team

19    like Jessie Lomma has a long standing relationship

20    with Civic.

21         Q.    Had you done any work with Civic at

22    that time?

23         A.    I don't know.

24               MR. O'CONNOR:   Please mark this as HG

25         Exhibit 39.

Page 143

```
 1                    J. Wagner
 2           (HG Exhibit 39, a document Bates
 3      stamped DEF 87910 through 87912, marked for
 4      identification, as of this date.)
 5      Q.    HG 39 looks like another version of
 6  this e-mail with you just telling her that you are
 7  going to do something.
 8           Do you see that at the top?
 9      A.    Yes, I do.
10      Q.    Again, you copied it to Jean at
11  freckle farm home.com; right?
12      A.    That's right.
13           MR. O'CONNOR:  Please mark this as HG
14      Exhibit 40.
15           (HG Exhibit 40, a document marked
16      HudsonGray General Ledger as of December 31,
17      2014 Bates stamped Defendant 39337 through
18      39472 and marked confidential 2014, marked
19      for identification, as of this date.)
20      Q.    I am showing you what has been marked
21  HG 40.
22           Is this a true and correct copy of the
23  general ledger for HudsonGray during the first
24  calendar year of its operations?
25      A.    It is marked HudsonGray general ledger
```

Page 144

                         J. Wagner

1

2    as of December 31, 2014.  There is a huge number

3    of pages.  I assume it is a correct version.  I

4    don't know if you want me to go through each page.

5            Q.    I got this from your lawyer.

6            A.    Yes.  I assume it is a correct copy of

7    the general ledger.

8            Q.    So the Bates range is Defendant 39337

9    through 39472 and it is marked confidential.  Let

10   me ask you a few questions.

11           A.    Okay.

12           Q.    Did any other investors put money into

13   HudsonGray at any time other than Brad Powers?

14           A.    Not that I recall.

15           Q.    Is there someone named Nate that you

16   looked to for money?

17           A.    Nate Bradley.

18           Q.    Who is he?

19           A.    He was the CEO of Audio Eye.

20           Q.    Is he still the CEO of Audio Eye?

21           A.    No.  He is no longer with Audio Eye.

22           Q.    Do you know why he is no longer with

23   Audio Eye?

24           A.    No.

25           Q.    Never heard anything about that?

Page 145

1                        J. Wagner

2         A.     No.  I know that there was a gentleman

3    by the name of Carr Betis that took over Audio Eye

4    at one point.  I think he was brought in by Nate

5    and Nate at one point left the company.  Nate was

6    part of CMG at one point.  He was another

7    subsidiary coming out alongside of XA.

8         Q.     Did Audio Eye ever advance any moneys

9    to HudsonGray?

10        A.     I think they did at the end of

11   December.  I think we had a loan from them.  I

12   don't recall exactly the nature of it.

13        Q.     End of December what year?

14        A.     2014.

15        Q.     How much did they lend?

16        A.     I don't recall.  We were very tight on

17   cash flow.  I can't remember if it was a loan or

18   an advance or some kind of fund.

19        Q.     Were they paid back?

20        A.     I don't recall if we paid them back or

21   we did services for them.  I don't recall the

22   nature of how it was done.  I can go back and look

23   at it but I don't recall what happened exactly

24   with the moneys that I believe Nate put in toward

25   the end of December 20124.

Page 146

1                    J. Wagner

2        Q.    Is there some reason why the deposits

3   don't appear in your general ledger?

4        A.    I don't recall.

5        Q.    You said you would have to go back and

6   look.

7              What would you go back and look at?

8        A.    I would go back and talk to the

9   accountant and look at the QuickBooks file and see

10  if there was anything.

11       Q.    Who would that accountant be?

12       A.    David Rice.

13       Q.    Do you remember the amount of money

14  that was lent from Audio Eye?

15       A.    I don't recall much about it.  I

16  recall we were very tight on cash flow at the

17  time.  I know Darren was lending money to the

18  company.  We were very tight on cash flow.  I had

19  conversations with Nate I remember about it.  I am

20  not sure if there was actually any moneys put in

21  or we just talked about.  I don't recall.  It was

22  four and a half years ago.

23       Q.    Your testimony is you don't remember

24  if you got money from Audio Eye?

25       A.    I don't remember if we borrowed money

```
1                          J. Wagner
2    from Nate.
3         Q.    From him personally or from his
4    company?
5         A.    I don't recall.
6         Q.    Now you mentioned Darren Andereck
7    loaned money to the company?
8         A.    Correct.
9         Q.    And that's reflected on the general
10   ledger; right?
11        A.    I am not sure it is.  I assume it is.
12        Q.    I can show you, but --
13        A.    Okay.
14        Q.    I am asking is there any documentation
15   of those loans?
16        A.    I don't believe we ever did notes or
17   anything on them.  Darren just lent the company
18   money.
19        Q.    Was he paid back?
20        A.    As far as I know he was.
21        Q.    Was he paid back with interest?
22        A.    I don't recall.
23        Q.    Is Darren Andereck promised an equity
24   stake in the company?
25        A.    No.
```

Page 148

1                       J. Wagner

2        Q.    Verbal or otherwise?

3        A.    No.

4        Q.    Has Jean Wilson been promised an

5   equity stake or holding in HudsonGray?

6        A.    Not that I recall.

7        Q.    Is any other person on the face of the

8   earth been promised an equity stake in HudsonGray?

9        A.    Brad Powers has warrants in the

10  company.

11       Q.    Other than Brad Powers?

12       A.    Not that I recall.

13       Q.    So on the general ledger it says on

14  June 3rd that you paid out salaries.

15             Do you see that?

16       A.    June 3rd paychecks.

17       Q.    Yes.  Looks like one says

18  professionals, one says salaries and another says

19  salaries.

20             Do you see those in June 2014?

21       A.    There is a number of June 3rd entries.

22       Q.    My question is:  Who was receiving a

23  salary at that time?

24       A.    June 3rd of 2014 most likely in that

25  pay period Jeff Smith.

Page 149

1          J. Wagner

2     Q.    Was Mia receiving any moneys from

3  HudsonGray at any time?

4     A.    I don't recall if we paid her or not

5  at the time.

6     Q.    Was Mia still employed by XA at that

7  time?

8     A.    I don't recall exactly when Mia left

9  XA.

10    Q.    Do you see on the second page you have

11 a large American Express payment $36,060.10?

12    A.    I do see that.

13    Q.    Is that Darren Andereck's American

14 Express?

15    A.    I believe that that is his personal

16 Amex, yes.

17    Q.    And that would have been for the

18 period that would have been June; right?

19    A.    I am not sure what the period was.  I

20 know there was a payment made at that time.

21    Q.    So you paid on Darren Andereck's

22 American Express July 3rd thirty-six thousand

23 dollars?

24    A.    Correct.

25    Q.    Have you produced those statements?

Page 150

1                        J. Wagner

2        A.    Yes.   The statements have been

3    produced numerous times.  As far as I know we have

4    produced our American Express statements.

5        Q.    For all expenses that were incurred in

6    HudsonGray you produced --

7        A.    Not HudsonGray.  We produced our

8    statements.

9        Q.    My question was this:  You look at

10   that line item, you are claiming that your

11   organization incurred an expense of $36,060.10;

12   correct?

13       A.    Off Darren's Amex yes.

14       Q.    And you reimbursed Darren Andereck for

15   that; correct?

16       A.    That's correct.

17       Q.    And have you provided the backup for

18   that item to my client?

19       A.    I don't recall if the Amex statements

20   for HudsonGray have been produced.  I know we

21   produced them for XA.

22       Q.    Would you agree with me as someone in

23   the business world in order for anyone to know

24   what those charges were for you would need to see

25   the statement; right?

1                       J. Wagner

2        A.     Correct.

3        Q.     Then if you look at the August 6th

4   same thing, Darren Andereck one hundred and ninety

5   thousand dollar American Express?

6        A.     Correct.

7        Q.     And again, we don't have those

8   statements, do we?

9        A.     I don't know that you do or you don't.

10       Q.     You never have given them to your

11  lawyer to give to me, have you?

12       A.     I don't know if we produced the Amex

13  statements.  I have not personally produced

14  Darren's Amex statements.  I don't know whether

15  they have been produced or not.

16       Q.     You would agree in order for me to see

17  what was charged for a hundred and ninety thousand

18  dollars I would need to see the actual statement;

19  right?

20       A.     That's reasonable, yes.

21       Q.     Who is Mariusz Lubak?

22       A.     I don't know who that is.

23              What date are you on?

24       Q.     It is on page 3.

25       A.     And the date?

Page 152

```
 1                      J. Wagner
 2        Q.    August 18th.
 3        A.    I don't know who that is.
 4        Q.    Who is Kage Konsulting LLC?
 5        A.    They're a vendor that does venue
 6   rentals, like event venues.  They manage event
 7   venues.
 8        Q.    So again on September 14th Darren
 9   Andereck presented with you an Amex bill for
10   $11,222.71; correct?
11        A.    Yes.
12        Q.    That was paid?
13        A.    I assume that was paid.
14        Q.    If you look on page five again you
15   have Darren Andereck October 17th of 2014.
16        A.    Okay.
17        Q.    $17,803.52 Amex bill; correct?
18        A.    Correct.
19        Q.    Is that paid?
20        A.    I assume it was paid.
21        Q.    If you look at the entry for October
22   20, 2014.
23        A.    Okay.
24        Q.    Mixed Company.
25              Why is Mixed Company receiving four
```

Page 153

1                          J. Wagner

2     thousand dollars?

3          A.    I wouldn't be able to answer that

4     without looking at the accounting files.  I assume

5     they performed services for HudsonGray.

6          Q.    And that's the company owned by in

7     part by Jean Wilson?

8          A.    That's correct.

9                MR. MATTHEWS:  Objection.

10         Q.    Who is Jonathan Matthey?

11         A.    I don't know who that is.

12         Q.    What is Spread House?

13         A.    I don't know who that is.

14         Q.    You are the corporate designee for

15    HudsonGray on its financials; right?

16         A.    With Darren.

17         Q.    So Darren can answer to the degree you

18    can't?

19         A.    If there are vendors and even

20    contractors I wouldn't know them by name.

21         Q.    Corporate Concepts Incorporated?

22         A.    I believe that's the furniture

23    provider.

24         Q.    Now can you show me on the first two

25    pages where the first moneys were received from an

Page 154

1                         J. Wagner

2       actual client?

3              A.      So it appears we started receiving

4       deposits in July, on July 25th.

5              Q.      So is it fair to say that until July

6       25th you had no revenues as a company; right?

7              A.      That appears to be the case off the

8       general ledger.

9              Q.      When you told me before that you met

10      with Brad Powers at a restaurant with Mr.

11      Andereck, do you remember that in the Spring of

12      2014?

13             A.      Yes, I do.

14             Q.      Was that Frankie and Johnny?

15             A.      I don't recall the restaurant.

16                    MR. O'CONNOR:   Please mark this as HG

17             Exhibit 41.

18                    (HG Exhibit 41, a December 18, 2014

19             e-mail exchange Bates stamped Defendant

20             137367, marked for identification, as of

21             this date.)

22             Q.      I am showing you what is marked HG 41

23      which is a December 18, 2014 e-mail exchange and

24      it is marked Defendant 137367.

25             A.      Okay.

1                    J. Wagner

2        Q.    And it is also marked confidential.

3              Do you see that?

4        A.    I do.

5        Q.    I want to ask you about that line at

6    the bottom of the first string where it says "Let

7    me know when there is an update from Nate and/or

8    status of bank package.  Is the door with Brad

9    really closed at this point."

10             Do you see that?

11       A.    I do.

12       Q.    Why was Jean writing that to you; do

13   you know?

14       A.    I assume it was around the very tight

15   cash flow that we had that we previously just

16   discussed where there was a potential where Nate I

17   believe may have put money into the company.  We

18   were very cash flow constrained at the end of

19   December of 2014.

20       Q.    And she said is the door with Brad

21   really closed and that is a reference before to

22   what you said about he couldn't come up with the

23   money?

24       A.    There was a significant, large amount

25   of money.  I don't recall the exact amount but

Page 156

```
 1                         J. Wagner
 2     yes, Brad Powers was going to put in significantly
 3     more money than he ended up doing.  So it created
 4     a cash flow problem.
 5           Q.    Other than Nate Bradley and -- other
 6     than Nate Bradley and Brad Powers, other than
 7     those two investment sources, were there any other
 8     sources of revenue; investors, moneys or equity?
 9           A.    Revenue or investor?
10           Q.    Anything.  Any sources of a cash
11     infusion by anybody.
12           A.    On the general ledger you can track
13     the deposits that came in from clients but in
14     terms of investors best of my recollection Brad
15     Powers and potentially Nate were the only people
16     that supported the company from an investment or
17     loan standpoint.
18           Q.    And I think you told me you are not
19     sure of the status of Brad Powers; right?
20           A.    When you say status, what do you mean?
21           Q.    Whether he has been paid back.
22           A.    No.  I said that Brad Powers is
23     holding warrants in the company.
24           Q.    When do they expire?
25           A.    They are open-ended warrants.
```

Page 157

1                        J. Wagner

2        Q.      Indefinitely?

3        A.      Well, they are tied to another

4    financing line.  So that's gonna trigger for the

5    warrants.

6        Q.      And there is an agreement to that

7    effect; right?

8        A.      There is a warrant document I assume

9    somewhere.

10              MR. O'CONNOR:  Please mark this as HG

11          Exhibit 42.

12              (HG Exhibit 42, e-mail from Darren

13          Andereck Bates stamped Defendant 90864

14          through 65 marked confidential and dated

15          December 12, 2014, marked for

16          identification, as of this date.)

17       Q.      So I have shown you HG 42 marked

18    Defendant 90864 through 65.  It is marked

19    confidential and it is dated December 12, 2014.

20              Do you see that?

21       A.      I do.

22       Q.      This is an e-mail from Darren Andereck

23    and he was asked to give you guys an update on the

24    pipeline; right?

25       A.      Correct.

Page 158

1                        J. Wagner

2         Q.     And if you look on the second page it

3    says "I just finished the last call with Nate for

4    today.  He is trying to close a funding round

5    tomorrow and will allocate one hundred thousand

6    dollars to HG."

7                 Do you see that?

8         A.     I do.

9         Q.     Does that refresh your recollection

10   that --

11        A.     This is what we were talking about,

12   yes.

13        Q.     It helps you recall how much you got?

14        A.     I don't know if we actually received

15   money from Nate.  I know that Nate was looking to

16   do something around Audio Eye's capital campaign

17   and he was offering to assist HudsonGray with

18   that.

19        Q.     Now if you add up the total pipeline

20   that Darren laid out for you, it comes out to 6.36

21   million dollars.

22        A.     Okay.

23        Q.     Does that sound about right?

24        A.     That's correct.  I mean I didn't add

25   it up but I will give you that.

1                    J. Wagner

2       Q.    So can we agree by the end of your

3   first calendar year which is only really six

4   months of operations, you had in the pipeline 6.36

5   million dollars just for quarters one and two

6   alone for 2015; correct?

7            MR. MATTHEWS:  Objection.

8       A.    I would say these are estimates.

9   These certainly aren't contracts of business but

10  they are estimates of what is considered to be

11  upcoming projects with a high probability of

12  activation.

13      Q.    Jean wrote "I understand that is not

14  AR but I would think it would carry weight with

15  Nate based on our past delivery and execution."

16           Right?

17      A.    That's what she said, yes.

18      Q.    That prompts me to ask two questions.

19           What is she referring to when she says

20  past delivery and execution?

21      A.    I assume she is talking about what the

22  team has been able to do working together.

23      Q.    She is not referring to any prior

24  raise that he made for you, is she?

25      A.    No.  I think when she said my

Page 160

1                        J. Wagner

2    interpretation of this is based on our past

3    delivery and execution she is talking about the

4    teams performance not Nate.

5         Q.    How would he know anything about your

6    past performance and execution?

7         A.    Again, Nate was part of CMG for a

8    period of time.

9         Q.    Got it.

10              So you went to Nate because Nate knew

11   XA; right?

12        A.    I went to Nate because Nate was a

13   friend of mine and Nate was working under the CMG

14   world and Nate knew my team.

15        Q.    But you had a pipeline that you felt

16   comfortable giving to Nate and he could rely on it

17   in going to his board; correct?

18        A.    I don't know if Nate went to his board

19   with this and I don't recall whether this was a

20   personal investment in addition to what Nate was

21   offering to do in the capital campaign.  I know in

22   the context of this there was a conversation with

23   Nate about us being very tight cash position and

24   would he be interested in loaning the company

25   money or investing in it.  I don't recall the

1                          J. Wagner

2      specific details.  But I know that was the context

3      of the discussions with Nate.

4                  MR. O'CONNOR:  Please mark this as HG

5            Exhibit 43.

6                  (HG Exhibit 43, a December 12, 2014

7            e-mail Bates stamped Defendant 113447,

8            marked for identification, as of this date.)

9            Q.    This is HG 43.

10                 Have you ever seen it before?  And for

11     the record it is a December 12, 2014 e-mail;

12     right?  It came from your production.

13           A.    Correct.

14           Q.    It is marked Defendant 113447?

15           A.    Yes.

16           Q.    And in it Jean Wilson wrote "I know

17     you are very busy and it was a late night last

18     night.  So thank you very much for doing this.  I

19     appreciate it.  Just going to present it to Nate's

20     board."

21                 Right?

22           A.    Just going to present it to Nate's

23     board.  So hopefully good things.  Okay.

24           Q.    So you knew that the financials you

25     were putting together for Nate had to be solid

```
                                            Page 162

 1                      J. Wagner
 2    enough to go to a board; right?
 3         A.    From the context of the e-mail I read
 4    that Nate -- Jean was putting forward that Nate
 5    was going to present this to the board.  The
 6    financials are characterized here in the pipeline
 7    of projects that would be anticipated in the next
 8    year.
 9         Q.    Has HudsonGray earned a profit in its
10    history?
11         A.    Has HudsonGray earned a profit in its
12    history?
13         Q.    Yes.
14         A.    HudsonGray has earned a profit in its
15    history.
16         Q.    How much?
17         A.    There has been, I think the first year
18    we lost about five hundred thousand and the next
19    period anywhere from a thousand dollars to around
20    maybe three hundred and fifty thousand.
21         Q.    In profit?
22         A.    Well, net income, is that what you
23    mean?
24         Q.    Yes.
25               You file 1040s?
```

```
1                      J. Wagner
2        A.    It is all public available
3   information.
4        Q.    Public available in what way?
5        A.    I mean there are tax returns.
6        Q.    It is not available to the public.  It
7   is certainly not available to me.  I don't have
8   it.
9        A.    I mean they are federally filed tax
10  returns.
11       Q.    And when it comes to your 1040 you
12  indicate that there is profit; right?
13       A.    Some years we have had a profit, yes.
14       Q.    And you don't know what that is?
15       A.    I don't know it off the top of my
16  head, no.
17       Q.    You are here as a designee to tell us
18  what it is; right?
19       A.    I can give you general references.
20             MR. MATTHEWS:  He is not here to
21        give --
22             MR. O'CONNOR:  Financial performance
23        of HudsonGray isn't relevant?  It's not on
24        there.
25             MR. MATTHEWS:  Financial performance
```

Page 164

```
 1                        J. Wagner
 2          he is here to talk about.
 3               MR. O'CONNOR:  But he can't tell me
 4          what his profit is.
 5               MR. MATTHEWS:  In which year?  Name a
 6          year.
 7               MR. O'CONNOR:  Any year.  Give me the
 8          year.  I will take any year.
 9               MR. MATTHEWS:  The first year Mr.
10          Wagner testified --
11               MR. O'CONNOR:  Please don't testify.
12          If you start doing that we will get the
13          judge on the phone.
14               MR. MATTHEWS:  Call the judge.  Don't
15          mischaracterize the witness' testimony.
16     BY MR. O'CONNOR:
17          Q.    Sir, tell me what the was the profit
18     earned in calendar year 2015?
19          A.    We did 1.1 approximately the first
20     year and we lost five hundred thousand.
21                2015 we did around seven million and
22     around fifty-eight thousand in net income.
23          Q.    Was that distributed out to you?
24          A.    In dividend format?
25          Q.    Yes.
```

```
                                            Page 165
 1                    J. Wagner
 2        A.    No.
 3        Q.    Did you pay it back into the company?
 4        A.    Yeah.  The earnings rolled over into
 5   the company yes.
 6        Q.    Tell me about the next year after
 7   that?
 8        A.    I believe it was around nine million.
 9        Q.    2016 now you are talking?
10        A.    I believe so.
11        Q.    What was your profit?
12        A.    I don't recall exactly, but I think it
13   was fifty-eight thousand.
14        Q.    That's the same as the year before?
15        A.    I don't recall offhand.
16        Q.    How much have you been drawing as a
17   salary in each of these years?
18        A.    It varies, but typically around one
19   hundred thirty, one hundred forty thousand.
20        Q.    Has it ever been more than that?
21        A.    I did around 190 in 2016.
22        Q.    What did you do for 2017?
23        A.    Actually, that was 2017.
24        Q.    What was your profit in 2017 as a
25   company?
```

Page 166

J. Wagner

1

2      A.    A profit in 2017 I think we made a

3      thousand dollars.

4      Q.    But again, in order for us to

5      understand that we would need to see your

6      financials, we need to see your expenses; correct?

7      A.    Right.

8      Q.    Have you produced those to us?

9            MR. MATTHEWS:  Do you know?

10     A.    I believe that we provided our P&Ls,

11     our profit and loss statements.

12     Q.    You have had four years now running

13     this company; right?

14     A.    That's correct.

15     Q.    You testified previously that the

16     profit margin in this industry generally runs

17     between 22 and 25 percent.

18           Do you remember saying that?

19     A.    Is a general statement yes, in the

20     industry.

21     Q.    Tell us in your own words sir, then

22     why is it that you can't even make a profit?

23           MR. MATTHEWS:  Objection.

24     A.    I didn't say we couldn't make a

25     profit.

1                         J. Wagner

2          Q.     You made a very small profit; right?

3          A.     We are still making profits.

4          Q.     You call that 22 to 25 percent?

5          A.     There are some years we made more and

6    some years we made less.  There has been a

7    significant drain on the company from a legal

8    expense standpoint.

9          Q.     So the legal expenses are being

10   charged against the company; right?  You are

11   paying them out of HudsonGray; is that correct?

12         A.     That's correct.

13         Q.     Are you paying for the third-party

14   complaint by the way?

15         A.     I am sorry?

16         Q.     Do you understand that there is a

17   third-party complaint being made in this case?

18         A.     I do understand that.

19         Q.     And is HudsonGray paying the legal

20   fees for that third-party complaint?

21                MR. MATTHEWS:  Objection.

22                Go ahead.

23         A.     As far as I know, yes.

24         Q.     And it is being passed through the

25   company; correct?

Page 168

1                          J. Wagner
2          A.    It would be an expense as part of our
3    legal expenses; correct.
4          Q.    Even though it is supposedly for the
5    personal harm to the individuals who made the
6    claim; right?
7          A.    I am not sure what you are asking.
8          Q.    Do you know what your third-party
9    complaint is?
10         A.    Defamation.
11         Q.    You have it against who?
12         A.    The plaintiffs.
13         Q.    And so that's a harm to you
14   personally; correct?
15         A.    Also harms the company.
16         Q.    Well, the company isn't making a
17   defamation claim; right?
18         A.    Okay.
19         Q.    You are making a defamation claim?
20         A.    Okay.
21         Q.    So tell me why is the company paying
22   the legal fees for you to make a defamation claim,
23   if you know?
24         A.    I don't.
25               MR. O'CONNOR:  Let's take a few

Page 169

1                          J. Wagner

2          minutes and then we will come back.  I am

3          almost finished.

4                  (Recess taken.)

5                  MR. O'CONNOR:  Please mark this as HG

6          Exhibit 44.

7                  (HG Exhibit 44, a document titled

8          HudsonGray Income Summary With Project

9          Support, marked for identification, as of

10         this date.)

11         Q.    HudsonGray 44, this is a summary you

12    prepared sir?

13         A.    It is a summary that our team

14    prepared.

15         Q.    And it is titled HudsonGray Income

16    Summary With Project Support?

17         A.    That's correct.

18         Q.    And this is only through January 31,

19    2018; right?

20         A.    That's correct.

21         Q.    Can we agree that HudsonGray's

22    performance since January 31, 2018 has stayed on

23    par with what it was previously?

24         A.    We are about ten million year-to-date.

25         Q.    So your ten million year-to-date and

Page 170

```
1                        J. Wagner
2     it is only November 2nd?
3          A.    That's correct.
4          Q.    So you are ahead of where you were
5     last year?
6          A.    We will see how the year ends up.
7          Q.    Congratulations.
8                MR. O'CONNOR:  Off the record.
9                (Discussion off the record.)
10    BY MR. O'CONNOR:
11         Q.    Mr. Wagner, you gave testimony in the
12    matter styled Burkhardt versus XA, did you not?
13         A.    I did.
14         Q.    And on May 25, 2016 you testified in
15    that action, did you not?
16         A.    I believe I did, yes.
17         Q.    And I just want to read into the
18    record your statement on page 104 and I am reading
19    from line 21.
20               "Question:  Where did you get these
21    documents from?
22               Answer:  I had a back up of e-mails.
23               Question:  Okay.  These are e-mails
24         that you received at your XP agency.com
25         account; is that correct?
```

```
                                        Page 171
 1                    J. Wagner
 2            Answer:  That's correct.
 3            Question:  And you still have a copy
 4       of all those e-mails?
 5            Answer:  I have a PST file yes, a
 6       backup file.
 7            Question:  Does that backup file cover
 8       all of your time at XA?
 9            Answer:  2009 forward."
10            And then you said -- he said "aha" and
11       you said "I am not sure.  I believe it
12       does."
13            Do you see that?
14       A.    I do.
15       Q.    Was that your truthful testimony under
16  oath?
17       A.    Yes, it was.
18       Q.    How did you get your PST folder in
19  your possession?
20       A.    I believe it was on USB drive.
21       Q.    How did you get a USB drive?
22       A.    I purchased one.
23       Q.    So you have enough technical knowledge
24  to go into a computer at XA and download your
25  entire PST folder; correct?
```

Page 172

1                          J. Wagner

2        A.    I was able to copy a PST file, yes.

3        Q.    And when did you do that, sir?

4        A.    I don't recall exactly.

5        Q.    And which office did you do it at?

6        A.    I am sure it was at the XA office in

7   Chicago.

8        Q.    Was it prior to your departure on May

9   15, 2014?

10             MR. MATTHEWS:  Objection.

11             Go ahead.

12       A.    Yeah.  I certainly wanted a record of

13  everything that happened which I am glad I had at

14  this point.

15       Q.    Did you seek permission of anybody at

16  XA or CMG to do so?

17       A.    No, I did not.

18       Q.    Last question is it pertains to the

19  defenses raised by HudsonGray.  If you want to say

20  that he is going to be the one to talk about it

21  that's fine, but there is a defense raised in the

22  case that trading activity by Mr. Laken somehow

23  should disallow the claims in this case.

24             Are you familiar with that?

25             MR. MATTHEWS:  You can testify to your

1                         J. Wagner

2            familiarity.

3            A.    I am familiar with the claims, yes.

4            Q.    Tell me about it.

5                  What's this defense of yours at

6      HudsonGray?

7                  MR. MATTHEWS:  I am going to object in

8            that it is not listed in the topics.

9                  But you can go ahead and testify.

10                 MR. O'CONNOR:  I think it is, but he

11           can go ahead and answer.

12           A.    At a high leveling context it is that

13     what Mr. Laken's attorneys have admitted that he

14     has been posting on the stock board his giant

15     killer promoting the stock.  At the same time that

16     there is trading records showing that Barbara

17     Laken is selling stock acting on inside

18     information and promoting stock on the stock

19     board.

20           Q.    Anything else?

21           A.    I am sure there is more details to it

22     but this is something that Scott is handling.  I

23     am not crafting the unclean hands defense.

24           Q.    Let me go through what you just said.

25     Posting on a stock board as giant killer.

Page 174

```
 1                    J. Wagner
 2          What did he post?
 3     A.     There is numerous posts.  I don't have
 4  them memorized verbatim.
 5     Q.     What were the posts and when?
 6     A.     Again, they were over the past periods
 7  of time while he was involved with inside
 8  information and working in CMG access to the
 9  auditor, running the company.
10     Q.     Is it your claim that for HudsonGray
11  that this occurred prior to the departure of the
12  defendants in this case or before?
13          MR. MATTHEWS:  You know what, I am
14       going to object.  This is not part of the
15       30(b)(6) deposition topics.  You are happy
16       to take a look at them.
17          MR. O'CONNOR:  Sir, it is your
18       client's defense.
19          MR. MATTHEWS:  It is not listed.  We
20       client has already been deposed in this
21       action and it also goes to attorney work
22       product.
23          MR. O'CONNOR:  So your position is you
24       are not going to let him answer questions?
25          MR. MATTHEWS:  I'd answer a few
```

Page 175

1              J. Wagner

2        questions but I mean the giant killer post I

3        know there are hundreds of them.

4              MR. O'CONNOR:  I'd appreciate if you

5        don't talk.

6   DI         MR. MATTHEWS:  Then I prefer not to

7        let him answer the question.

8              MR. O'CONNOR:  You are not going to

9        let your client answer questions you know

10       that you are going to have to bring him

11       back.

12             MR. MATTHEWS:  I don't know how you

13       would do that.  It is not part of the

14       topics.  I want to be collegial about this

15       so that we don't have a dispute.

16             MR. O'CONNOR:  Let me ask this.

17  BY MR. O'CONNOR:

18       Q.    You know there is a claim against your

19  clients, against you and against your company and

20  against Darren, against Jean; right?  For damages;

21  right?

22       A.    Correct.

23       Q.    Do you have any claim that those

24  damages aren't owed to you because of something

25  done with Glenn Laken with his posting board?

Page 176

1                          J. Wagner

2          A.    I can't answer that.  That's a legal

3    question.

4          Q.    You don't know the answer to that?

5          A.    I do not.  That would be Scott who

6    would answer that.

7                MR. O'CONNOR:  We are going to take a

8          minute and then we will be right back.

9                MR. MATTHEWS:  Okay.

10               (Recess taken.)

11               MR. O'CONNOR:  Subject to any

12         questions that your lawyer has, I have no

13         further questions.

14               MR. MATTHEWS:  I have no questions at

15         this time.

16               (Continued on the next page.)

17

18

19

20

21

22

23

24

25

Page 177

```
 1                        J. Wagner
 2      Q.      Thank you, sir.  Have a nice flight.
 3      A.      Thank you very much.
 4              (Time Noted:  2:13 p.m.)
 5
 6
 7              JOSEPH WAGNER
 8
 9   Subscribed and sworn to before me
10   this        day of            , 2018.
11
12
13   (Notary Public)        My Commission Expires:
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 178

```
 1
 2                    C E R T I F I C A T E
 3    STATE OF NEW YORK      )
                             : ss.
 4    COUNTY OF NEW YORK     )
 5              I, LYNNE D. METZ, a Shorthand Reporter
 6    and a Notary Public within and for the State of
 7    New York, do hereby certify that the foregoing
 8    deposition of JOSEPH WAGNER was taken before me on
 9    the 2nd day of November, 2018;
10              That the said witness was duly sworn
11    before the commencement of his testimony; that the
12    said testimony was taken stenographically by me
13    and then transcribed.
14              I further certify that I am not
15    related by blood or marriage to any of the parties
16    to this action or interested directly or
17    indirectly in the matter in controversy; nor am I
18    in the employ of any of the counsel in this
19    action.
20              IN WITNESS WHEREOF, I have hereunto
21    set my hand this 5th day of November, 2018.
22
23
24              LYNNE D. METZ
25
```

1

2     November 2, 2018

3

4                         I N D E X

5     WITNESS                 EXAMINATION BY          PAGE

6     JOSEPH WAGNER           MR. O'CONNOR              4

7

8     ---------- INFORMATION REQUESTS ----------

9     DIRECTIONS (DI):      174

10    INSERT:               None

11    RULINGS (RL):         None

12    REQUESTS (RQ):        113

13    CERTIFIED (CE):       None

14    MOTIONS (MO):         None

15

16                    E X H I B I T S

17    HG Exhibits                         For ID

18    Exhibit 1, notice of deposition        4

19    Exhibit 2, a February 24, 2014 e-mail  29

20    from Geomatic Consultants to a

21    recipient

22    Exhibit 3, an e-mail that's been       42

23    produced by HudsonGray dated March 3,

24    2014

25    Exhibit 4, an e-mail chain             47

Page 180

1

2     Exhibit 5, a document from the Delaware   57

3     Division of Corporations Secretary of

4     State website

5     Exhibit 6, a document Bates stamped       58

6     Defendant 68980 from the IRS

7     Exhibit 7, a document Bates stamped       60

8     Creative IT 1450 and 1451

9     Exhibit 8, a document Bates stamped       63

10    Creative IT 1389 dated April 23, 2014

11    Exhibit 9, an April 27, 2014 e-mail       66

12    exchange Bates stamped Creative IT

13    01390-1391

14    Exhibit 10, a May 8, 2014 exchange        68

15    containing a Dell quotation Bates

16    stamped Creative IT 1414 through 1419

17    Exhibit 11, a May 16, 2014 e-mail Bates   70

18    stamped Creative IT 01426 through 27

19    Exhibit 12, a document Bates stamped      72

20    Geomatic CON 15

21    Exhibit 13, a May 12, 2014 exchange but   75

22    it actually begins on April 15, 2014

23    Bates stamped DEF 77864 and it is also

24    marked confidential

25    Exhibit 14, a document Bates stamped      77

Page 181

1

2      Creative IT 01392

3      Exhibit 15, a document Bates stamped      78

4      Creative IT 01393 through 95

5      Exhibit 16, a May 5, 2014 e-mail Bates     83

6      stamped Creative IT 01404

7      Exhibit 17, an e-mail from David Tuma      84

8      to Joseph Wagner and to Mia Bates

9      stamped Creative IT 01406

10     Exhibit 18, an e-mail exchange on May      86

11     21, 2014 Bates stamped Creative IT

12     01428-29

13     Exhibit 19, a May 13, 2014 hosted file     88

14     server proposal Bates stamped Creative

15     IT 01430 through 1449

16     Exhibit 20, a May 21, 2014 e-mail          90

17     Exhibit 21, a May 22, 2014 e-mail Bates    99

18     stamped Creative IT 01455

19     Exhibit 22, an e-mail Bates stamped        103

20     Creative IT 01456 through 01458

21     Exhibit 23, a document Bates stamped       106

22     Creative IT 01459

23     Exhibit 24, an e-mail dated July 8,        109

24     2014 HudsonGray server presentation

25     Exhibit 25, a June 30, 2014 Creative IT    111

Page 182

```
 1
 2      invoice Bates stamped Creative IT 24
 3      Exhibit 26, a July 31, 2014 invoice      115
 4      from Creative IT Consulting to Joseph
 5      Wagner at HudsonGray
 6      Exhibit 27, a September 30, 2014          116
 7      invoice from Creative IT Consulting
 8      Exhibit 28, an October 31, 2014 invoice  118
 9      Bates stamped Creative IT 30
10      Exhibit 29, a July 21, 2014 e-mail        122
11      exchange Bates stamped Creative IT 1528
12      through 1532
13      Exhibit 30, a document Bates stamped      123
14      Defendant 150711
15      Exhibit 31, a December 15, 2014 e-mail    126
16      entitled General Ledger and Trial
17      Balance
18      Exhibit 32, a document Bates stamped      129
19      Defendant 95461 and 62
20      Exhibit 33, a December 16, 2014 e-mail    131
21      chain Bates stamped Defendant 93919
22      through 93920 also marked confidential
23      Exhibit 34, a document entitled NBC       134
24      Primetime Preview 2014 Contact List
25      Exhibit 35, a September 10, 2014 e-mail   137
```

Page 183

1

2    from David Tuma to Joe Wagner with an

3    attachment events log

4    Exhibit 36, a December 8, 2014 e-mail     138

5    Bates stamped Defendant 80305 through

6    80307

7    Exhibit 37, a document Bates stamped      140

8    Defendant 77850 also marked

9    confidential by the defendant

10   Exhibit 38, an e-mail from September      141

11   17, 2014 Bates stamped Defendant 76978

12   Exhibit 39, a document Bates stamped      143

13   DEF 87910 through 87912

14   Exhibit 40, a document marked            143

15   HudsonGray General Ledger as of

16   December 31, 2014 Bates stamped

17   Defendant 39337 through 39472 and

18   marked confidential 2014

19   Exhibit 41, a December 18, 2014 e-mail    154

20   exchange Bates stamped Defendant 137367

21   Exhibit 42, e-mail from Darren Andereck   157

22   Bates stamped Defendant 90864 through

23   65 marked confidential and dated

24   December 12, 2014

25   Exhibit 43, a December 12, 2014 e-mail    161

Page 184

1

2      Bates stamped Defendant 113447

3      Exhibit 44, a document titled          169

4      HudsonGray Income Summary With Project

5      Support

6   (Exhibits retained by the court reporter.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 185

VERITEXT·COURT REPORTING

NAME OF CASE:

DATE OF DEPOSITION:

WITNESS:

If there are any corrections to your deposition,
indicate them on this sheet of paper, give the
change, page number, and line number.

PAGE          LINE

CHANGE                                TO

PAGE          LINE

CHANGE                                TO

PAGE          LINE

CHANGE                                TO

PAGE          LINE

CHANGE                                TO

PAGE          LINE

CHANGE                                TO

PAGE          LINE

CHANGE                                TO

Subscribed and sworn to before me
this        day of            , 2018.

(Notary Public)      My Commission Expires: