UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CMG HOLDINGS GROUP, INC. as assignee of XA THE EXPERIENTIAL AGENCY, INC.,<br>                              Plaintiffs.<br>                    -against-<br><br>JOSEPH WAGNER, HUDSONGRAY LLC,<br>DARREN ANDERECK, JESSIE LOMMA,<br>MICHAEL DAY, JEAN WILSON, ESTELLE<br>PIZZO, STUDIO AG, LLC, REMIGIO GUDIN,<br>and MIXED COMPANY, INC.,<br>                              Defendants.<br><br>JOSEPH WAGNER, DARREN ANDERECK AND<br>JESSIE LOMMA,<br>                    Third-Party Plaintiffs,<br>                    -against-<br>GLENN LAKEN AND ALEXIS LAKEN,<br>                    Third-Party Defendants. | Civil Action No.:  15-cv-05814-JPO |

---

### BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING DEFENDANTS' SECOND AFFIRMATIVE DEFENSE AND FOR SUMMARY JUDGMENT AS TO THIRD-PARTY COMPLAINT FOR LIBEL AND SLANDER

---

**PECKAR & ABRAMSON, P.C.**
1325 Ave. of the Americas, 10th Fl.
New York, NY 10019
P.: 212-382-0909
F.: 212-382-3456
*Attorneys for Plaintiff and*
*Third-Party Defendants*

On the Brief:
Kevin J. O'Connor, Esq.
Joseph M. Vento, Esq.
Shannon Azzaro, Esq.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................II

FACTUAL BACKGROUND RELEVANT TO THE MOTION.................................. 3

    A.  Defendants' Second Affirmative Defense. ..................................................... 3

    B.  The Third-Party Complaint.......................................................................... 8

LEGAL ARGUMENT........................................................................................... 11

    POINT I.............................................................................................................. 11

    PLAINTIFF SHOULD BE GRANTED SUMMARY JUDGMENT AS TO THE
    SECOND AFFIRMATIVE DEFENSE .......................................................... 11

    POINT II ........................................................................................................... 19

    THE THIRD-PARTY CLAIMS FOR LIBEL AND SLANDER SHOULD BE
    DISMISSED ON SUMMARY JUDGMENT ................................................. 19

CONCLUSION...................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelson v. Harris*,
   973 F.Supp.2d 467 (S.D.N.Y 2013)........................................................................20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...............................................................................................17

*Armstrong v. Simon & Schuster, Inc.*,
   85 N.Y.2d 373 (1995).............................................................................................20

*Balestriere PLLC v. CMA Trading, Inc.*,
   No. 11-civ-9459, 2014 WL 929813 (S.D.N.Y. Mar. 7, 2014)...............................20

*Bilinski v. Keith Haring Foundation, Inc.*,
   632 Fed.Appx. 637 (2d. Cir. 2015)........................................................................20

*Celle v. Filipino Reporter Enterprises Inc.*,
   209 F.3d 163 (2d Cir. 2000)............................................................................19, 20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...............................................................................................18

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014)...................................................................................20

*Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*,
   No. 12-cv-5262, 2014 WL 4652548 (S.D.N.Y. Sept. 18, 2014) ...........................18

*Cohen Lans LLP v. Naseman*,
   No. 14-civ.-4045, 2017 WL 477775 (S.D.N.Y. Feb. 3, 2017) ..............................18

*Drug Research Corp. v. Curtis Publ'g Co.*,
   7 N.Y.2d 435 (1960)...............................................................................................21

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002).....................................................................................21

*Foster v. Churchill*,
   87 N.Y.2d 744, 642 N.Y.S.2d 587 (1996) ..............................................................20

*Gargiulo v. Forster & Garbus Esqs.*,
   651 F.Supp.2d 188 (S.D.N.Y. 2009).......................................................................20

*Karedes v. Ackerley Group, Inc.*,
    423 F.3d 107 (2d Cir. 2005) .................................................................................20

*Kelly v. Albarino*,
    485 F.3d 664 (2d Cir. 2007) .................................................................................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................18

*In re Ofsink*,
    2018 NY Slip Op. 07195 (1st Dep't 2018) .........................................................19

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ............................................................................................18

*Specialty Minerals Inc. v. Pluess-Staufer AG*,
    395 F.Supp.2d 109 (S.D.N.Y. 2005) ..................................................................17

*United States v. Reifler*,
    446 F.3d 65 (2d Cir. 2006) ..........................................................................4, 11, 15

*Wolf Street Supermarkets v. McPartland*,
    108 A.D.2d 25, 487 N.Y.S.2d 442 (2d Dep't 1985) ...........................................22

*Zinman v. Black & Decker (U.S.), Inc.*,
    983 F.2d 431 (2d Cir. 1993) ...............................................................................16

**Statutes**

18 U.S.C. §1961, *et. Seq* ("RICO"). ..........................................................2, 5, 11, 13

**Other Authorities**

Fed. R. Civ. P. 26 ..........................................................................................................21

Fed. R. Civ. P. 56 ..........................................................................................................17

Fed. R. Evid. 403 ...................................................................................................15, 16

Fed. R. Evid. 609 ...................................................................................................15, 16

Fed. R. Evid. 609(b) ....................................................................................................16

Rules of Professional Conduct 3.4(d)(2) ...................................................................16

S.Rep. No. 1277, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. ...................16

## PRELIMINARY STATEMENT

CMG Holdings, Inc. ("CMG"), as assignee of XA The Experiential Agency, Inc. (collectively "XA" or "Plaintiff") submits this brief in advance of a trial in this matter in support of a motion to strike the second affirmative defense raised by Defendants Joseph Wagner ("Wagner"), Darren Andereck ("Andereck"), Jean Wilson ("Wilson"), Jessie Lomma ("Lomma"), Michael Day ("Day") and Remegio Gudin ("Gudin") (the "Individual Hudson Defendants"), and HudsonGray Inc. ("HudsonGray") (collectively with the Individual Hudson Defendants, the "Hudson Defendants"), Studio AG LLC ("Studio AG") and Estelle Pizzo ("Pizzo") (the "Studio AG Defendants"), and Mixed Company, Inc. ("Mixed Company") (collectively the "Defendants").  This brief is also submitted by Third-Party Defendants, Glenn Laken and Alexis Laken (collectively, "Third-Party Defendants"), in support of their motion for summary judgment to dismiss the Third-Party Complaint for libel and slander filed by Third-Party Plaintiffs, Wagner, Andereck and Lomma.  For the reasons stated herein, Plaintiff's/Third-Party Defendants' motion should be granted in its entirety.[1]

This is a case by XA against a group of persons who were mid-level and C-suite level employees of XA, seeking damages for Defendants' illegal and fraudulent acts that occurred over an extended period of time before their mass, planned exodus in 2014. Their wrongful acts continued with their tortious and illegal theft of XA property, hacking of XA's computer systems months after they had departed, and intentional efforts to leave XA without any employees to service its clients, all so that HudsonGray could steal long term clients like Comcast and NBC. The claims which survived the Court's September 7, 2016 decision on Defendants' Motion to

---

[1] References to the Second Amended Complaint are notated "SAC,"; complaint paragraphs are referenced as "SAC ¶ __," Complaint Exhibit A predicate act numbers are referenced "Ex. A # __."  Referenced documents are attached to the annexed Declaration of Kevin J. O'Connor, Esq, dated November 16, 2018 ("O'Connor Decl."), the annexed Declaration of Glenn Laken dated November 16, 2018 ("G. Laken Decl."), and the annexed Declaration of Alexis Laken dated November 15, 2018 ("A. Laken Decl.").

Dismiss (ECF #42) are reflected in the Second Amended Revised Complaint (hereinafter "SAC").

XA has sued under the *Racketeer Influenced and Corrupt Organizations Act*, 18 U.S.C. §1961, *et. seq*. ("RICO"), and for various common law claims stemming from Defendants' wrongful actions in fleecing XA for years and then abruptly leaving together after spending months carefully forming a competing firm just four floors up in the same building, all-the-while concealing their duplicitous efforts. Wagner, XA's former CEO, who was and is subject to a non-compete agreement, departed in early March 2014; Andereck, Day, Gudin and Lomma followed over the next few months; and Wilson stayed at XA until September 12, 2014, but can now be shown to have colluded with her co-conspirators during those three months.

The Second Affirmative Defense is clearly ripe for summary judgment. Defendants have utilized the affirmative defense as a means to try to get inadmissible information in front of the jury, including:

-   Reference to what is now an 18-year-old criminal conviction of Glenn Laken which is presumptively inadmissible under the Federal Rules of Evidence ("FRE");

-   claims that are factually unsupported that Mr. Laken somehow improperly posted information on-line while this litigation has been pending, in a manner which supposedly benefited Mr. Laken (for reasons that no defendant has been able to explain);

-   they have stooped so low that they obtained an affidavit from a 95-year old boyfriend of Mr. Laken's mother, who was declared incompetent, taking pot shots at Glenn Laken on totally irrelevant information; and

-   Defendants seem intent on getting in front of the jury the fact that an attorney who once provided legal services to XA back in 2013 or 2014, was disbarred (four years after he provided such services to CMG/XA) in 2018, which disbarment was for reasons having nothing whatsoever to do with this case.

As for the Third-Party Complaint, it also was improperly filed, and should be dismissed on summary judgment. The evidence shows that Crain's Chicago ran an article following the filing of the September 2014 lawsuit and the shuttering of XA's long-term Chicago office as XA was in financial free fall as a result of Defendants' actions.  There is no evidence to speak of that either Third-Party Defendant published anything other than their own opinion about matters in litigation.  Moreover, no Third-Party Plaintiff has ever been able to articulate any cogent theory of libel or slander, or to demonstrate even a penny of damages.  These claims, like the Second Affirmative Defense, are entirely lawyer-driven, and should be dismissed in advance of trial. This case is ready for trial once the Court adjudicates this motion and the parties conclude expert discovery. The motion should be granted.

## FACTUAL BACKGROUND RELEVANT TO THE MOTION

1.     This action was first commenced in New York County Supreme Court and was removed by Defendants on July 24, 2015.  (ECF #1).

2.     The operative complaint is the Second Amended Complaint ("SAC").  (*See* O'Connor Decl., Ex. A).

3.      The Court issued a comprehensive decision and order dated September 7, 2016, sustaining all but two causes of action in the SAC.  (ECF #42).

4.     The only equitable claim that survived the motion to dismiss is one for unjust enrichment, which claim is duplicative of the other damage claims and therefore is unlikely to be submitted to a jury.  (Id.)

A.     **Defendants' Second Affirmative Defense.**

5.      In their answer, Defendants raise a Second Affirmative Defense, as follows:

283.   Plaintiff's equitable claims are barred by the doctrine of unclean hands.

284. CMG / XA, under the control of Glenn Laken ("Laken") and Alexis Laken, has committed numerous unlawful acts with respect to the subject matter of this dispute that preclude its ability to obtain equitable relief.

285. Upon Laken taking formal control over CMG / XA in 2014, after operating the company under the guise of being a consultant, the Individual HudsonGray Defendants became concerned about affiliating with Laken due to the fact that he was previously convicted for racketeering conspiracy, wire fraud, illegal kickbacks, theft of honest services, conspiracy to commit the above substantive offenses and to commit union pension fund fraud, securities fraud, fraud by an investment advisor, conspiracy to commit securities fraud, wire fraud, and commercial bribery. *See, generally, United States v. Reifler*, 446 F.3d 65, 70 (2d Cir. 2006).

291.   In 2014, moreover, Laken directed Wagner and Ronald Burkhardt, then XA's Executive Chairman, to arrange for an Internet consulting firm to "scrub" Laken's "Google listing" so that Internet searches of Laken's name would not display information related to Laken's prior arrest, indictment and conviction.

292.   Following the initiation of this litigation in September 2014 and as a result of the investigation conducted by Wagner and counsel, it has become clear that this litigation against Wagner and the other Defendants is in part a scheme by Laken to conceal his illegal and unethical actions relating to CMG including:

- acting as a control person for CMG without proper disclosure
- violating insider trading laws through illegal trading of CMGO stock

293. According to an affidavit executed by Sol Mlot attached as Exhibit 1 hereto, in April 2012 Laken began directing Sol Mlot to trade Mlot's CMGO stock, and Laken also directly traded Mlot's CMGO stock using Mlot's trading account credentials. Laken did not disclose his control of Mlot's stock in any public filing. This unlawful trading activity of 14 million shares of CMGO stock by Laken based on material non-public information, a clear violation of the securities laws, is memorialized in a June 29, 2013 agreement between Laken and Mlot. *See* June 29, 2013 Agreement between Glenn Laken and Sol Mlot attached as Exhibit 2 hereto.

295. This Agreement was acknowledged by letter dated June 18, 2014 attached as Exhibit 3 hereto issued by CMG's attorney, Darren Ofsink, who was indicted in 2015 on charges of securities fraud, conspiracy to commit securities fraud, and conspiracy to commit mail fraud and wire fraud. *See* Superseding Indictment dated November 2, 2015 attached as Exhibit 4 hereto.

296. At the same time, Laken was acting as a "control person" for CMG by directing corporate management and policies, and also having full access to

4

insider information regarding CMG and its subsidiaries through his direct communication with CMG's corporate officers, auditor and accountant. For example, Laken signed the Release Agreement entered into with Wagner on February 26, 2014 as "Chairman / CEO", and then, on February 27, 2014, directed Wilson to transfer CMG funds, again signing as the "Chairman / CEO", several weeks prior to his supposed appointment by the Board. *See* Agreement and Wire Transfer Authorization attached as Exhibit 5 hereto.

297.   CMG did not disclose Laken's role as a control person within CMG until the April 7, 2014 public filing in which Laken was named as Chairman and CEO. *See* Form 8-K attached as Exhibit 6 hereto.

298.   CMG / XA, under Laken's control, also manipulated the stock of CMGO by making false and defamatory statements concerning this lawsuit, including the July 16, 2015 press release advertising to sell a "new class of series A preferred shares that will have first priority payout from any litigation settlement" to attract "capital to support CMG's ongoing civil RICO (Racketeer Influenced and Corrupt Organizations) lawsuit against former employees seeking total damages of $20 million.") *See* Press Release attached as Exhibit 6 hereto.

299.   As a result of this, and other, wrongful conduct, Plaintiff's claims for equitable relief must be denied and Plaintiff's claim for punitive damages considered in light of Plaintiff's own wrongful conduct. (Defendants' Answer, Second Affirmative Defense, Ex. B to the O'Connor Decl.).

6.   Upon resolution of the motion to dismiss, the parties engaged in two years of discovery. (ECF Nos. 43 to 131).

7.   Plaintiff made a demand for a corporate designee from Hudson Gray to give testimony about the Second Affirmative Defense and Joseph Wagner was produced. The following constitutes Mr. Wagner's attempt to explain this affirmative defense:

Q.   Last question is it pertains to the defenses raised by HudsonGray. If you want to say that he is going to be the one to talk about it that's fine, but there is a defense raised in the case that trading activity by Mr. Laken somehow should disallow the claims in this case. Are you familiar with that?

MR. MATTHEWS: You can testify to your familiarity.

A.   I am familiar with the claims, yes.

Q.   Tell me about it. What's this defense of yours at HudsonGray?

MR. MATTHEWS:  I am going to object in that it is not listed in the topics.  But you can go ahead and testify.

MR. O'CONNOR:  I think it is, but he can go ahead and answer.

A.   At a high leveling context it is that what Mr. Laken's attorneys have admitted that he has been posting on the stock board his giant killer promoting the stock. At the same time that there is trading records showing that Barbara Laken is selling stock acting on inside information and promoting stock on the stock board.

Q.   Anything else?

A.    I am sure there is more details to it but this is something that Scott [Matthews] is handling.  I am not crafting the unclean hands defense.

Q.    Let me go through what you just said.  Posting on a stock board as giant killer.  What did he post?

A.   There is numerous posts.  I don't have them memorized verbatim.

Q.   What were the posts and when?

A.    Again, they were over the past periods of time while he was involved with inside information and working in CMG access to the auditor, running the company.

Q.   Is it your claim that for HudsonGray that this occurred prior to the departure of the defendants in this case or before?

MR. MATTHEWS:  You know what, I am going to object.  This is not part of the 30(b)(6) deposition topics.  You are happy to take a look at them.

MR. O'CONNOR:  Sir, it is your client's defense.

MR. MATTHEWS:  It is not listed.  We client has already been deposed in this action and it also goes to attorney work product.

MR. O'CONNOR:  So your position is you are not going to let him answer questions?

MR. MATTHEWS:  I'd answer a few questions but I mean the giant killer post I know there are hundreds of them.

MR. O'CONNOR:  I'd appreciate if you don't talk.

MR. MATTHEWS:  Then I prefer not to let him answer the question.

MR. O'CONNOR:  You are not going to let your client answer questions you know that you are going to have to bring him back.

MR. MATTHEWS:  I don't know how you would do that.  It is not part of the topics.  I want to be collegial about this so that we don't have a dispute.

MR. O'CONNOR:  Let me ask this.

BY MR. O'CONNOR:

Q.    You know there is a claim against your clients, against you and against your company and against Darren [Andereck], against Jean [Wilson]; right?   For damages right?

A.    Correct.

Q.    Do you have any claim that those damages aren't owed to you because of something done with Glenn Laken with his posting board?

A.    *I can't answer that.  That's a legal question*.

Q.    You don't know the answer to that?

A.    I do not.  That would be Scott who would answer that.  (Deposition of Hudson Gray Corporate Designee Joseph Wagner, at 173-176, O'Connor Decl. Ex. C) (emphasis added).

8.    Barbara Laken owns approximately 10,000,000 shares of CMG in certificate form, which are presently non-negotiable. (Glenn Laken Declaration ("G. Laken Decl."), ¶ 3). Glenn Laken worked with her to manage her portfolio of CMG stock given his background in the financial industry. (*Id.*)  CMG is traded on the over-the-counter market ("OTC").  (*Id.*, ¶ 2).

9.    During the period of 2011 through April 2018 there were hundreds of buy tickets generated for her account, and only two sell tickets.  (*Id.*)

10.    The first sale on August 23, 2013 was for 120,000 shares that generated $1,029.24, followed by a purchase the same day for 104,000 shares at a total cost of $1,037.08.

11.    All of the statements attributed to Glenn Laken in either the Second Affirmative Defense or Third-Party Complaint, which Defendants claim were made to either defame them or inflate CMG's stock, were all made after this trade, which obviously yielded a loss. (*Id.*, ¶ 5).

12.     The second sale took place a full five years later, in May of 2018, for approximately 3.9M shares. That sale generated approximately $21,000.  (*Id.*, ¶ 6).

13.     The Lakens sold the 3.9M shares at that time because they needed funds and decided to take the loss rather than borrow finds and increase their debt. Based on the accounting principal FIFO, the sale resulted in a significant loss. (*Id.*, ¶ 7).

14.     Over the years, Glenn Laken has posted information on an online forum called investorshub.com with the profile "giantkiller."  (*Id.*, ¶ 10).

15.     Glenn Laken never posted for personal benefit or short term profit, as the stock trading clearly shows.  (*Id.*, ¶ 11).

16.     Defendants include an affidavit by Sol Mlot in their answer and affirmative defenses, claiming that this constitutes "unclean hands".  Sol Mlot is a 95-year old man who has been dating Glenn Laken's 87-year old mother for more than 15 years. He asked Glenn Laken to help him with trading and Glenn did so.  He did not like the results he got, and signed an affidavit at his son's insistence stating that Glenn Laken had no authority to trade on his behalf.  Mlot later signed a second affidavit recanting the first affidavit.  Later, at the insistence of his sons, he signed a third affidavit – ***after they had him declared incompetent*** in a Florida proceeding-contradicting the first and second ones. During this period, Mr. Mlot's sons were litigating against Glenn Laken's mother in an effort to deny her a small inheritance left by their father. This case has since been settled in Illinois.  (*Id.*, ¶ 13).

**B.      The Third-Party Complaint.**

17.     On or about February 29, 2015, Third-Party Plaintiffs, Wagner, Andereck and Lomma (collectively, "Third-Party Plaintiffs"), filed a Third-Party Complaint against Glenn

Laken and Alexis Laken (collectively, "Third-Party Defendants") alleging six counts of Libel and Libel Per Se. (*See* O'Connor Decl., Ex. C).

18.     Alexis Laken took over the duties of President of XA in July 2014, at a tumultuous time when XA had just suffered the mass exodus of its CEO, President and entire production team in the course of just a few weeks.  (A. Laken Decl., ¶ 3).

19.     At the time, she did not know this had all been carefully orchestrated and planned by Wagner, Wilson and their co-defendants for many months. Alexis Laken learned the details of their fraudulent acts slowly. By September 2014, it began to come into full picture, and suit was first filed in September 2014 in New York County Supreme Court. (*Id.* at Decl., ¶ 4).

20.     After suit was filed against Defendants, Alexis Laken received a call from a reporter from Crain's Chicago.  She returned that call and politely referred the reporter to the publicly-available pleadings on file in the action that had been filed. (*Id.* at Decl., ¶ 9).  The Crain's article to which the Third-Party Complaint relies itself attaches this article that recites allegations from the pleading.

21.     At no time did Alexis Laken give the reporter any information beyond the pleadings or express any opinions other than what was alleged by XA in its pleadings in this action. (*Id.* at Decl., ¶ 10).

22.     The Third-Party Complaint (Counts II and V) also refers to a communication between Alexis Laken and Mike Axelrod ("Axelrod") about an unpaid bill for his wedding. Alexis Laken determined that Wagner had caused XA to perform valuable services for Axelrod without seeking full repayment. This was one of many instances that were discovered where

Wagner, Wilson and others had engaged in this conduct to the detriment of XA. (*Id.* at Decl., ¶ 11)

23.     Alexis Laken did communicate to Axelrod that it was not acceptable for him to claim that he had been given services for free, particularly in light of the pending litigation against Defendants accusing them of fraud and diversion of corporate opportunities.  She did so in her capacity as President of XA, to recover a just and legal debt for services that Wagner and Wilson were apparently intending to allow to go unpaid. (*Id.* at Decl., ¶ 12).

24.     In her communications with Axelrod, which were not "published" but rather constituted an attempt to collect a debt, she made reference to the Crain's article and the allegations of the lawsuit.  (*Id.*)

25.     Defendants have claimed that XA made public filings that contained defamatory information, or did so in a way to manipulate its stock.  (G. Laken, ¶ 9).

26.     Everything in CMG's public Securities & Exchange Commission ("SEC") filings was fully vetted after a thorough investigation and included in the pending lawsuit, which commenced in September 2014 following the departure of Jean Wilson and the discovery that Defendants had orchestrated a massive fraud on CMG and its shareholders.  (G. Laken, ¶ 9).

27.     The Second Affirmative Defense and Third-Party Complaint do not allege that a single person traded on such information, nor do they identify a single customer of Third-Party Plaintiffs who refused to do business with them because of anything said or done by XA or CMG or its officers and/or employees.

## LEGAL ARGUMENT

## POINT I

### PLAINTIFF SHOULD BE GRANTED SUMMARY JUDGMENT AS TO THE SECOND AFFIRMATIVE DEFENSE

The sole equitable claim left in the case is one for unjust enrichment. That claim is duplicative of the claims for diversion of corporate opportunities, breach of fiduciary duty and duty of loyalty, RICO and unfair competition, and is unlikely to be given to the jury in the final analysis due to its duplicative nature. This is the "equitable claim" that Defendants have used to make incessant and frivolous demands for trading information from the Lakens, which were fully complied with notwithstanding that Plaintiff knew this defense was frivolous.

Even setting aside the fact that the sole equitable claim surviving is one of unjust enrichment, the Second Affirmative Defense of "unclean hands" is obviously just being used as a vehicle by Defendants to throw mud at Plaintiff and Third-Party Defendants and to provide a vehicle by which to introduce highly prejudicial and presumptively inadmissible material. That defense consists of the following "factual" allegations:

286.   Plaintiff's equitable claims are barred by the doctrine of unclean hands.

287.   CMG / XA, under the control of Glenn Laken ("Laken") and Alexis Laken, has committed numerous unlawful acts with respect to the subject matter of this dispute that preclude its ability to obtain equitable relief.

288.   Upon Laken taking formal control over CMG / XA in 2014, after operating the company under the guise of being a consultant, the Individual HudsonGray Defendants became concerned about affiliating with Laken due to the fact that he was previously convicted for racketeering conspiracy, wire fraud, illegal kickbacks, theft of honest services, conspiracy to commit the above substantive offenses and to commit union pension fund fraud, securities fraud, fraud by an investment advisor, conspiracy to commit securities fraud, wire fraud, and commercial bribery. *See, generally, United States v. Reifler*, 446 F.3d 65, 70 (2d Cir. 2006).

11

293.  In 2014, moreover, Laken directed Wagner and Ronald Burkhardt, then XA's Executive Chairman, to arrange for an Internet consulting firm to "scrub" Laken's "Google listing" so that Internet searches of Laken's name would not display information related to Laken's prior arrest, indictment and conviction.

294.  Following the initiation of this litigation in September 2014 and as a result of the investigation conducted by Wagner and counsel, it has become clear that this litigation against Wagner and the other Defendants is in part a scheme by Laken to conceal his illegal and unethical actions relating to CMG including:

- acting as a control person for CMG without proper disclosure
- violating insider trading laws through illegal trading of CMGO stock

294.  According to an affidavit executed by Sol Mlot attached as Exhibit 1 hereto, in April 2012 Laken began directing Sol Mlot to trade Mlot's CMGO stock, and Laken also directly traded Mlot's CMGO stock using Mlot's trading account credentials. Laken did not disclose his control of Mlot's stock in any public filing. This unlawful trading activity of 14 million shares of CMGO stock by Laken based on material non-public information, a clear violation of the securities laws, is memorialized in a June 29, 2013 agreement between Laken and Mlot. *See* June 29, 2013 Agreement between Glenn Laken and Sol Mlot attached as Exhibit 2 hereto.

300.  This Agreement was acknowledged by letter dated June 18, 2014 attached as Exhibit 3 hereto issued by CMG's attorney, Darren Ofsink, who was indicted in 2015 on charges of securities fraud, conspiracy to commit securities fraud, and conspiracy to commit mail fraud and wire fraud. *See* Superseding Indictment dated November 2, 2015 attached as Exhibit 4 hereto.

301.  At the same time, Laken was acting as a "control person" for CMG by directing corporate management and policies, and also having full access to insider information regarding CMG and its subsidiaries through his direct communication with CMG's corporate officers, auditor and accountant. For example, Laken signed the Release Agreement entered into with Wagner on February 26, 2014 as "Chairman / CEO", and then, on February 27, 2014, directed Wilson to transfer CMG funds, again signing as the "Chairman / CEO", several weeks prior to his supposed appointment by the Board. *See* Agreement and Wire Transfer Authorization attached as Exhibit 5 hereto.

302.  CMG did not disclose Laken's role as a control person within CMG until the April 7, 2014 public filing in which Laken was named as Chairman and CEO. *See* Form 8-K attached as Exhibit 6 hereto.

303.     CMG / XA, under Laken's control, also manipulated the stock of CMGO by making false and defamatory statements concerning this lawsuit, including the July 16, 2015 press release advertising to sell a "new class of series A preferred shares that will have first priority payout from any litigation settlement" to attract "capital to support CMG's ongoing civil RICO (Racketeer Influenced and Corrupt Organizations) lawsuit against former employees seeking total damages of $20 million.") *See* Press Release attached as Exhibit 6 hereto.

304.     As a result of this, and other, wrongful conduct, Plaintiff's claims for equitable relief must be denied and Plaintiff's claim for punitive damages considered in light of Plaintiff's own wrongful conduct. (O'Connor Decl., Ex. B).

First and foremost, Wagner was deposed and was asked squarely to explain the defense to the extent it is alleged by Defendants that Mr. Laken did something wrong with online posting and stock trading.  Wagner's cagey response, and the interference of his counsel who apparently is the sole witness who intends to support this defense, demonstrates the sheer frivolity of this "defense":

Q.     Last question [as] it pertains to the defenses raised by HudsonGray.  If you want to say that he is going to be the one to talk about it that's fine, but there is a defense raised in the case that trading activity by Mr. Laken somehow should disallow the claims in this case.  Are you familiar with that?

MR. MATTHEWS:  You can testify to your familiarity.

A.     I am familiar with the claims, yes.

Q.     Tell me about it.  What's this defense of yours at HudsonGray?

MR. MATTHEWS:  I am going to object in that it is not listed in the topics. But you can go ahead and testify.

MR. O'CONNOR:  I think it is, but he can go ahead and answer.

A.     At a high leveling (sic) context it is that what Mr. Laken's attorneys have admitted that he has been posting on the stock board his giant killer promoting the stock.  At the same time that there is trading records showing that Barbara Laken is selling stock acting on inside information and promoting stock on the stock board.

Q.     Anything else?

A.     *I am sure there is more details to it but this is something that Scott [Matthews] is handling.  I am not crafting the unclean hands defense*.

Q.     Let me go through what you just said.  Posting on a stock board as giant killer.  What did he post?

A.     There is (sic) numerous posts.  I don't have them memorized verbatim.

Q.     What were the posts and when?

A.     Again, they were over the past periods of time while he was involved with inside information and working in CMG access to the auditor, running the company.

Q.     Is it your claim that for HudsonGray that this occurred prior to the departure of the defendants in this case or before?

MR. MATTHEWS:  You know what, I am going to object.  This is not part of the 30(b)(6) deposition topics.  You are happy to take a look at them.

MR. O'CONNOR:  Sir, it is your client's defense.

MR. MATTHEWS:  It is not listed.  We (sic) client has already been deposed in this action and it also goes to attorney work product.

MR. O'CONNOR:  So your position is you are not going to let him answer questions?

MR. MATTHEWS:  I'd answer a few questions but I mean the giant killer post I know there are hundreds of them.

MR. O'CONNOR:  I'd appreciate if you don't talk.

MR. MATTHEWS:  Then I prefer not to let him answer the question.

MR. O'CONNOR:  You are not going to let your client answer questions you know that you are going to have to bring him back[?]

MR. MATTHEWS:  I don't know how you would do that.  It is not part of the topics.  I want to be collegial about this so that we don't have a dispute.

MR. O'CONNOR:  Let me ask this.

BY MR. O'CONNOR:

Q.     You know there is a claim against your clients, against you and against your company and against Darren [Andereck], against Jean [Wilson]; right?  For damages; right?

14

A.   Correct.

Q.    Do you have any claim that those damages aren't owed to you because of something done with Glenn Laken with his posting board?

A.   *I can't answer that.  That's a legal question.*

Q.   *You don't know the answer to that?*

A.    *I do not.  That would be Scott who would answer that.* (Deposition of HudsonGray Corporate Designee Joseph Wagner, at 173-176, O'Connor Decl. Ex. F) (emphasis added).

As shown above, these allegations about stock sales and online posting are nonsensical and completely meritless. In not a single instance did the Lakens trade stock for any gain of any kind, nor could Defendants cogently explain how they alleged this in the first place.

As for the inclusion of reference to Mr. Laken's 2001 criminal conviction, which is summarized in *Reifler*, 446 F.3d at 70, this, too, is an obvious attempt to get inadmissible information to the jury, to poison the well, and to turn a jury against Plaintiff.  Federal Rule of Evidence 609 provides as follows:

> "a) In General. The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:
>
> (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:
>
> (A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and
>
> (B) must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and
>
> (2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving--or the witness's admitting--a dishonest act or false statement.
>
> (b) Limit on Using the Evidence After 10 Years. This subdivision (b) applies if more than 10 years have passed since the witness's

15

conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:

(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and

(2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." (*See* Fed. R. Evid. 609).

As has been repeatedly recognized by the Second Circuit,

"[FRE 609(b)] bars the use of a conviction more than ten years old to attack a witness's credibility unless "the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." We have recognized that Congress intended that convictions over ten years old be admitted "very rarely and only in exceptional circumstances." S.Rep. No. 1277, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. (93 Stat.) 7051, 7062; *Zinman v. Black & Decker (U.S.), Inc*., 983 F.2d 431, 434 (2d Cir. 1993).

Here, Mr. Laken's conviction is 18 years old, nearly ten years beyond the limit allowed in the FRE. Under the clear text of FRE 609 and well-established Second Circuit precedents, as well as FRE 403, it would be inappropriate to allow a jury to even learn of this conviction, let alone allow an affirmative defense to introduce that information. It is entirely inappropriate for Defendants to insert this inflammatory information in an affirmative defense when it bears no logical relation to the claims made against them. When pressed at deposition on the alleged acts of wrongful conduct by Mr. Laken and how they interrelate to this case, Mr. Wagner had nothing to offer, turning instead to Mr. Matthews to provide information. Indeed, it is Defendants' position that Mr. Matthews will be the witness to "craft" this so called "defense." (*See* RPC 3.4(d)(2) (a lawyer shall not assert personal knowledge except when testifying as a witness)). This tells the Court everything it needs to know about the games being played here.

In *Specialty Minerals Inc. v. Pluess-Staufer AG*, 395 F.Supp.2d 109 (S.D.N.Y. 2005), a competitor brought an action against a patentee alleging that the patentee had used a patent to engage in unfair competition. The patentee asserted an affirmative defense of unclean hands that was not related to the claims made in the case, and the defense was stricken. This Court had this to say about how infrequently an unclean hands defense can be interposed in the manner sought by Defendants:

> "The unclean hands defense is an "ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  The unclean hands doctrine applies only where the misconduct alleged as the basis for the defense "has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation."  *The Second Circuit has repeatedly emphasized the narrowness of the doctrine's application*."  *Id.* at 114 (citations omitted)(emphasis added).

Defendants' "unclean hands defense" here is bizarre, to say the least.  While Mr. Wagner was unable to articulate it at all, the best one can glean is that Defendants take issue with online posts that they attribute to Mr. Laken, made while this suit was pending, which discuss CMG's stock.  They make repeated, unfounded assertions that "the securities laws were violated" (of course failing to explain how this is the case), and utterly fail to explain how any of this, even if true, has something to do with the blatant acts of criminality and fraud by Defendants that has been firmly established in discovery.  These are the precise circumstances in which an unclean hands defense should be dismissed.

Summary judgment should be awarded where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute is one for which a

rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14-civ.-4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, i.e., that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12-cv-5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014).

If the Court were to allow this defense to go forward, it is conceivable that as much as a full week will be added to an already complex trial, examining each of the posts, and explaining the securities laws to the jury.  And one must remember that Mr. Matthews seems to think that there are "hundreds" of relevant posts. (Hudson Gray Dep., at 175-76)("MR. MATTHEWS:  I'd answer a few questions but I mean the giant killer post I know there are hundreds of them.").

This, in a case where no Defendant claims that even a *single person, let alone one of them,* traded CMG stock based upon statements made by any Third-Party Defendant online or otherwise. Moreover, the claim that CMG's SEC filings were not accurate is also a ruse designed to complicate the trial so that the jury gets confused, distracted, and deadlocked.

There is simply no plausible argument to be made by Defendants that Plaintiff is somehow "contributorily negligent" for the various frauds and misdeeds by Defendants, nor could Defendants ever be heard to argue to a jury that it is perfectly acceptable to do the various things they did to this publicly traded company because they did not like the way the parent

company of XA was operating, or who owned shares in the operating company.  Their argument

in this regard is legally and factually deficient, and the defense should therefore be stricken.

Lastly, as concerns the references to Mr. Ofsink who at one time provided legal services

to XA but provided services last in 2013 or 2014, we are again left to guess why that is included

in the affirmative defense. Mr. Ofsink was disbarred in 2018 for certain alleged violations that

have nothing to do with this case.[2]  Allowing this defense to stand would be to allow Defendants

to introduce such evidence at trial in order to do exactly what they hope to do—ask the jury to

assign guilt to XA by association for hiring an attorney who would go on in his career to lose his

license.  Again, this has nothing to do with the claims, and the defense should be stricken.

## POINT II

### THE THIRD-PARTY CLAIMS FOR LIBEL AND SLANDER SHOULD BE DISMISSED ON SUMMARY JUDGMENT

Under New York law, a plaintiff must establish five elements to recover in libel:

"1) a written defamatory statement of fact concerning the plaintiff;

2) publication to a third party;

3) fault (either negligence or actual malice depending on the status of the libeled party);

4) falsity of the defamatory statement; and

5) special damages or per se actionability (defamatory on its face)." *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

A defamatory statement of fact is one "which tends to expose the plaintiff to public

contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-

---

[2] Defendants recently produced the First Department's decision in the case *In re Ofsink*, 2018 NY Slip Op. 07195 (1st Dep't 2018), which provides yet another example of how Defendants' temerity knows no bounds. At the precise time they were conclusively shown to have been engaging in the wholesale withholding and destruction of evidence (*see* O'Connor Decl., Ex. E), they are taking the time to send XA a wholly irrelevant decision about Mr. Ofsink as a produced record in the case.

thinking persons, and to deprive him of their friendly intercourse in society." *Balestriere PLLC v. CMA Trading, Inc.,* No. 11-civ-9459, 2014 WL 929813, at \*16 (S.D.N.Y. Mar. 7, 2014) (internal quotations and citations omitted); *see also Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014); *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005); *Foster v. Churchill*, 87 N.Y.2d 744, 751, 642 N.Y.S.2d 587 (1996). ("[O]nly factual statements are actionable as defamation or libel[,]" because "New York law protects derogatory statements which may be categorized as 'opinion' as opposed to 'fact.'")). Further, a defamatory statement is only actionable if made "without authorization or privilege." *Gargiulo v. Forster & Garbus Esqs.*, 651 F.Supp.2d 188, 192 (S.D.N.Y. 2009).

It is well-settled that the "determination of whether a statement constitutes constitutionally protected opinion or unprotected fact is an issue that must be decided by the Court." *Adelson v. Harris*, 973 F.Supp.2d 467, 486 (S.D.N.Y 2013) (citing *Celle*, 209 F.3d at 178). In assessing a claim for defamation, the Court must evaluate the alleged defamatory statement and "'must give the disputed language a fair reading in the context of the ***publication as a whole***'" and construe it as the intended reader(s) would. *Celle*, 209 F.3d at 177 (emphasis in original) (quoting *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380 (1995)).

Here summary judgment dismissing the Third-Party Complaint is appropriate for several reasons. First, the cited story by Crain's Chicago exclusively cites to matters that are of public record in a pleading already filed in court, which is privileged and cannot form the basis for a claim like this. *See Bilinski v. Keith Haring Foundation, Inc.*, 632 Fed.Appx. 637, 639 (2d. Cir. 2015) ("As the district court recognized, pertinent statements made in the course of legal proceedings…are absolutely privileged."); *see also Kelly v. Albarino*, 485 F.3d 664, 666 (2d Cir. 2007). The Crain's article does not cite to any comments by Glenn Laken at all, and only quotes

Alexis Laken for commenting that XA had decided to close its Chicago office. While it is true that Alexis Laken spoke to a reporter about the lawsuit, it is also true that none of what she conveyed to the reporter was different than what was alleged in the lawsuit. The statements are not defamatory as a matter of bedrock law in this Circuit.

The Third-Party Complaint attempts to avoid this case law by alleging that certain statements made by CMG to the Securities & Exchange Commission ("SEC") in its public filings after the filing of the lawsuit, are actionable. (TPC, ¶¶ 24-32). The Third-Party Complaint frivolously suggests that because the parties entered into a stipulation following a pre-answer motion to dismiss whereby Plaintiff agreed to file an amended complaint, Plaintiff somehow exposed itself to a defamation or libel claim in the interim period between the filing of the motion to dismiss and the filing of the amended complaint because there was no operative complaint. (*Id.*, ¶ 42 & n.1). This is simply false, as Defendants had already answered the original September 2014 complaint.

Second, there is not the slightest indication of damage. Indeed, the claim is styled as being filed to compensate for alleged business harm to Hudson Gray, yet discovery has not yielded any information in this regard, and Hudson Gray is not a third-party plaintiff. Even if it were, loss of customers can only represent recoverable damages for such a claim where the claimant identifies the allegedly lost customers and itemizes the damages lost because of same. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) (citing *Drug Research Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435, 441-42 (1960)). Third-Party Plaintiffs have never done so, not in their Rule 26 Disclosures nor in any amendments to same in the last two years or in any deposition, nor have they even come close to identifying any general damages with any competent proof. The Third-Party Complaint is therefore ripe for summary

dismissal. *See Wolf Street Supermarkets v. McPartland*, 108 A.D.2d 25, 487 N.Y.S.2d 442, 448 (2d Dep't 1985) (recognizing that general damages "must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.").[3]

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment dismissing the Second Affirmative Defense, and Third-Party Defendants' motion for summary judgment as to the Third-Party Complaint, should be granted.

Dated: New York, New York        **PECKAR & ABRAMSON, P.C.**
November 16, 2018

By: */s/ Kevin J. O'Connor, Esq.*
KEVIN J. O'CONNOR
1325 Avenue of the Americas, 10th Fl.
New York, New York 10019
Tel.: (212) 382-0909
Fax.: (212) 382-3456
Email: koconnor@pecklaw.com
*Attorneys for Plaintiff and*
*Third-Party Defendants*

---

[3] As will be shown at trial, each and every allegation in the SAC will be established as being true. If anything, XA failed to include vital information that was actively hidden by Defendants both during their tortious actions and actively in discovery, including their submission of patently false (sworn) statements to this Court.  All of that will be shown at trial.  (*See* O'Connor Decl., Ex. E).