UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CMG HOLDINGS GROUP, INC. as assignee of XA THE EXPERIENTIAL AGENCY, INC., <br><br> Plaintiffs. <br><br> -against- <br><br> JOSEPH WAGNER, HUDSONGRAY LLC, DARREN ANDERECK, JESSIE LOMMA, MICHAEL DAY, JEAN WILSON, ESTELLE PIZZO, STUDIO AG, LLC, REMIGIO GUDIN, and MIXED COMPANY, INC., <br><br> Defendants. <br><br> JOSEPH WAGNER, DARREN ANDERECK AND JESSIE LOMMA, <br><br> Third-Party Plaintiffs, <br><br> -against- <br><br> GLENN LAKEN AND ALEXIS LAKEN, <br><br> Third-Party Defendants. | Civil Action No.: 15-cv-05814-JPO <br><br><br> **PLAINTIFF'S AND THIRD-PARTY DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE** |

Plaintiff, CMG Holdings Group, Inc. as assignee of XA The Experiential Agency, Inc. ("Plaintiff" or "XA"), and Third-Party Defendants, Glenn Laken and Alexis Laken (collectively, "Third-Party Defendants"), by and through their attorneys, Peckar & Abramson P.C., respectfully submits the following statement of material facts as to which there is no genuine dispute pursuant to Rule 56.1(a) of this Court's Local Civil Rules in support of their motion for partial summary judgment striking the Second Affirmative Defense (Unclean Hands) raised by Defendants, Joseph Wagner ("Wagner"), Hudson Gray, Inc. ("Hudson Gray"), Darren Andereck ("Andereck"), Jessie Lomma ("Lomma"),

1

Michael Day ("Day"), Jean Wilson ("Wilson"), Estelle Pizzo ("Pizzo"), Studio AG, LLC ("SAG"), Remigio Gudin ("Gudin"), and Mixed Company, Inc. ("Mixed Company"), and for summary judgment dismissing the Third-Party Complaint in its entirety.

The statements herein are supported by citations to the SAC; deposition transcripts; documents produced during discovery; and declarations or pleadings filed by the parties which are included as part of Plaintiff's/Third-Party Defendants' motion.[1]

1. This action was first commenced in New York County Supreme Court and was removed by Defendants on July 24, 2015.  (ECF #1).

2. The operative complaint is the Second Amended Complaint ("SAC"). (*See* O'Connor Decl., Ex. A).

3. The Court issued a comprehensive decision and order dated September 7, 2016, sustaining all but two causes of action in the SAC.  (ECF #42).

4. The only equitable claim that survived the motion to dismiss is one for unjust enrichment, which claim is duplicative of the other damage claims and therefore is unlikely to be submitted to a jury.  (Id.)

I. **Defendants' Second Affirmative Defense.**

5. In their answer, Defendants raise a Second Affirmative Defense, as follows:

> 283. Plaintiff's equitable claims are barred by the doctrine of unclean hands.
>
> 284. CMG / XA, under the control of Glenn Laken ("Laken") and Alexis Laken, has committed numerous unlawful acts with respect to the subject matter of this dispute that preclude its ability to obtain equitable relief.

---

[1] These documents are attached to the annexed Declaration of Kevin J. O'Connor, Esq, dated November 16, 2018 ("O'Connor Decl."), the annexed Declaration of Glenn Laken dated November 15, 2018 ("G. Laken Decl."), and the annexed Declaration of Alexis Laken dated November 15, 2018 ("A. Laken Decl.").

LAW OFFICES
Peckar & Abramson
A Professional Corporation

2

285. Upon Laken taking formal control over CMG / XA in 2014, after operating the company under the guise of being a consultant, the Individual HudsonGray Defendants became concerned about affiliating with Laken due to the fact that he was previously convicted for racketeering conspiracy, wire fraud, illegal kickbacks, theft of honest services, conspiracy to commit the above substantive offenses and to commit union pension fund fraud, securities fraud, fraud by an investment advisor, conspiracy to commit securities fraud, wire fraud, and commercial bribery. See, generally, United States v. Reifler, 446 F.3d 65, 70 (2d Cir. 2006).

291. In 2014, moreover, Laken directed Wagner and Ronald Burkhardt, then XA's Executive Chairman, to arrange for an Internet consulting firm to "scrub" Laken's "Google listing" so that Internet searches of Laken's name would not display information related to Laken's prior arrest, indictment and conviction.

292. Following the initiation of this litigation in September 2014 and as a result of the investigation conducted by Wagner and counsel, it has become clear that this litigation against Wagner and the other Defendants is in part a scheme by Laken to conceal his illegal and unethical actions relating to CMG including:

- acting as a control person for CMG without proper disclosure
- violating insider trading laws through illegal trading of CMGO stock

293. According to an affidavit executed by Sol Mlot attached as Exhibit 1 hereto, in April 2012 Laken began directing Sol Mlot to trade Mlot's CMGO stock, and Laken also directly traded Mlot's CMGO stock using Mlot's trading account credentials. Laken did not disclose his control of Mlot's stock in any public filing. This unlawful trading activity of 14 million shares of CMGO stock by Laken based on material non-public information, a clear violation of the securities laws, is memorialized in a June 29, 2013 agreement between Laken and Mlot. *See* June 29, 2013 Agreement between Glenn Laken and Sol Mlot attached as Exhibit 2 hereto.

295. This Agreement was acknowledged by letter dated June 18, 2014 attached as Exhibit 3 hereto issued by CMG's attorney, Darren Ofsink, who was indicted in 2015 on charges of securities fraud, conspiracy to commit securities fraud, and conspiracy to commit mail fraud and wire fraud. *See* Superseding Indictment dated November 2, 2015 attached as Exhibit 4 hereto.

LAW OFFICES

Peckar & Abramson

A Professional Corporation

3

> 296. At the same time, Laken was acting as a "control person" for CMG by directing corporate management and policies, and also having full access to insider information regarding CMG and its subsidiaries through his direct communication with CMG's corporate officers, auditor and accountant. For example, Laken signed the Release Agreement entered into with Wagner on February 26, 2014 as "Chairman / CEO", and then, on February 27, 2014, directed Wilson to transfer CMG funds, again signing as the "Chairman / CEO", several weeks prior to his supposed appointment by the Board. *See* Agreement and Wire Transfer Authorization attached as Exhibit 5 hereto.
>
> 297. CMG did not disclose Laken's role as a control person within CMG until the April 7, 2014 public filing in which Laken was named as Chairman and CEO. *See* Form 8-K attached as Exhibit 6 hereto.
>
> 298. CMG / XA, under Laken's control, also manipulated the stock of CMGO by making false and defamatory statements concerning this lawsuit, including the July 16, 2015 press release advertising to sell a "new class of series A preferred shares that will have first priority payout from any litigation settlement" to attract "capital to support CMG's ongoing civil RICO (Racketeer Influenced and Corrupt Organizations) lawsuit against former employees seeking total damages of $20 million.") *See* Press Release attached as Exhibit 6 hereto.
>
> 299. As a result of this, and other, wrongful conduct, Plaintiff's claims for equitable relief must be denied and Plaintiff's claim for punitive damages considered in light of Plaintiff's own wrongful conduct. (Defendants' Answer, Second Affirmative Defense, Ex. B to the O'Connor Decl.).

6. Upon resolution of the motion to dismiss, the parties engaged in two years of discovery. (ECF Nos. 43 to 131).

7. Plaintiff made a demand for a corporate designee from Hudson Gray to give testimony about the Second Affirmative Defense and Joseph Wagner was produced. The following constitutes Mr. Wagner's attempt to explain this affirmative defense:

> Q. Last question is it pertains to the defenses raised by HudsonGray. If you want to say that he is going to be the one to talk about it that's fine, but there is a defense raised in the case that trading activity by Mr. Laken somehow should disallow the claims in this case. Are you familiar with that?

LAW OFFICES
Peckar & Abramson
A Professional Corporation

4

MR. MATTHEWS:  You can testify to your familiarity.

A.   I am familiar with the claims, yes.

Q.   Tell me about it.  What's this defense of yours at HudsonGray?

MR. MATTHEWS:  I am going to object in that it is not listed in the topics. But you can go ahead and testify.

MR. O'CONNOR:  I think it is, but he can go ahead and answer.

A.   At a high leveling context it is that what Mr. Laken's attorneys have admitted that he has been posting on the stock board his giant killer promoting the stock.  At the same time that there is trading records showing that Barbara Laken is selling stock acting on inside information and promoting stock on the stock board.

Q.   Anything else?

A.   I am sure there is more details to it but this is something that Scott [Matthews] is handling.  I am not crafting the unclean hands defense.

Q.   Let me go through what you just said.  Posting on a stock board as giant killer.  What did he post?

A.   There is numerous posts.  I don't have them memorized verbatim.

Q.   What were the posts and when?

A.   Again, they were over the past periods of time while he was involved with inside information and working in CMG access to the auditor, running the company.

Q.   Is it your claim that for HudsonGray that this occurred prior to the departure of the defendants in this case or before?

MR. MATTHEWS:  You know what, I am going to object.  This is not part of the 30(b)(6) deposition topics.  You are happy to take a look at them.

MR. O'CONNOR:  Sir, it is your client's defense.

MR. MATTHEWS:  It is not listed.  We client has already been deposed in this action and it also goes to attorney work product.

MR. O'CONNOR:  So your position is you are not going to let him answer questions?

MR. MATTHEWS:  I'd answer a few questions but I mean the giant killer post I know there are hundreds of them.



5

MR. O'CONNOR:  I'd appreciate if you don't talk.

MR. MATTHEWS:  Then I prefer not to let him answer the question.

MR. O'CONNOR:  You are not going to let your client answer questions you know that you are going to have to bring him back.

MR. MATTHEWS:  I don't know how you would do that.  It is not part of the topics.  I want to be collegial about this so that we don't have a dispute.

MR. O'CONNOR: Let me ask this.

BY MR. O'CONNOR:

Q.     You know there is a claim against your clients, against you and against your company and against Darren [Andereck], against Jean [Wilson]; right?  For damages right?

A.    Correct.

Q.   Do you have any claim that those damages aren't owed to you because of something done with Glenn Laken with his posting board?

A.   *I can't answer that.  That's a legal question*.

Q.   You don't know the answer to that?

A.   I do not.  That would be Scott who would answer that.  (Deposition of Hudson Gray Corporate Designee Joseph Wagner, at 173-176, O'Connor Decl. Ex. C) (emphasis added).

8. Barbara Laken owns approximately 10,000,000 shares of CMG in certificate form, which are presently non-negotiable. (Glenn Laken Declaration ("G. Laken Decl."), ¶ 3).  Glenn Laken worked with her to manage her portfolio of CMG stock given his background in the financial industry. (*Id.*)  CMG is traded on the over-the-counter market ("OTC").  (*Id.*, ¶ 2).

9. During the period of 2011 through April 2018 there were hundreds of buy tickets generated for her account, and only two sell tickets.  (*Id.*)



6

10. The first sale on August 23, 2013 was for 120,000 shares that generated $1,029.24, followed by a purchase the same day for 104,000 shares at a total cost of $1,037.08.

11. All of the statements attributed to Glenn Laken in either the Second Affirmative Defense or Third-Party Complaint, which Defendants claim were made to either defame them or inflate CMG's stock, were all made after this trade, which obviously yielded a loss. (*Id.*, ¶ 5).

12. The second sale took place a full five years later, in May of 2018, for approximately 3.9M shares. That sale generated approximately $21,000.  (*Id.*, ¶ 6).

13. The Lakens sold the 3.9M shares at that time because they needed funds and decided to take the loss rather than borrow finds and increase their debt. Based on the accounting principal FIFO, the sale resulted in a significant loss. (*Id.*, ¶ 7).

14. Over the years, Glenn Laken has posted information on an online forum called investorshub.com with the profile "giantkiller."  (*Id.*, ¶ 10).

15. Glenn Laken never posted for personal benefit or short term profit, as the stock trading clearly shows.  (*Id.*, ¶ 11).

16. Defendants include an affidavit by Sol Mlot in their answer and affirmative defenses, claiming that this constitutes "unclean hands".  Sol Mlot is a 95-year old man who has been dating Glenn Laken's 87-year old mother for more than 15 years. He asked Glenn Laken to help him with trading and Glenn did so.  He did not like the results he got, and signed an affidavit at his son's insistence stating that Glenn Laken had no authority to trade on his behalf.  Mlot later signed a second affidavit recanting the first affidavit.  Later, at the insistence of his sons, he signed a third affidavit – ***after they had***

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

***him declared incompetent*** in a Florida proceeding- contradicting the first and second ones. During this period, Mr. Mlot's sons were litigating against Glenn Laken's mother in an effort to deny her a small inheritance left by their father. This case has since been settled in Illinois. (*Id.*, ¶ 13).

## II.     The Third-Party Complaint.

17.    On or about February 29, 2015, Third-Party Plaintiffs, Wagner, Andereck and Lomma (collectively, "Third-Party Plaintiffs"), filed a Third-Party Complaint against Glenn Laken and Alexis Laken (collectively, "Third-Party Defendants") alleging six counts of Libel and Libel Per Se. (*See* O'Connor Decl., Ex. C).

18.    Alexis Laken took over the duties of President of XA in July 2014, at a tumultuous time when XA had just suffered the mass exodus of its CEO, President and entire production team in the course of just a few weeks.  (A. Laken Decl., ¶ 3).

19.    At the time, she did not know this had all been carefully orchestrated and planned by Wagner, Wilson and their co-defendants for many months. Alexis Laken learned the details of their fraudulent acts slowly. By September 2014, it began to come into full picture, and suit was first filed in September 2014 in New York County Supreme Court. (*Id.* at Decl., ¶ 4).

20.    After suit was filed against Defendants, Alexis Laken received a call from a reporter from Crain's Chicago.  She returned that call and politely referred the reporter to the publicly-available pleadings on file in the action that had been filed. (*Id.* at Decl., ¶ 9).  The Crain's article to which the Third-Party Complaint relies itself attaches this article that recites allegations from the pleading.

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

8

21. At no time did Alexis Laken give the reporter any information beyond the pleadings or express any opinions other than what was alleged by XA in its pleadings in this action. (*Id.* at Decl., ¶ 10).

22. The Third-Party Complaint (Counts II and V) also refers to a communication between Alexis Laken and Mike Axelrod ("Axelrod") about an unpaid bill for his wedding. Alexis Laken determined that Wagner had caused XA to perform valuable services for Axelrod without seeking full repayment. This was one of many instances that were discovered where Wagner, Wilson and others had engaged in this conduct to the detriment of XA. (*Id.* at Decl., ¶ 11)

23. Alexis Laken did communicate to Axelrod that it was not acceptable for him to claim that he had been given services for free, particularly in light of the pending litigation against Defendants accusing them of fraud and diversion of corporate opportunities. She did so in her capacity as President of XA, to recover a just and legal debt for services that Wagner and Wilson were apparently intending to allow to go unpaid. (*Id.* at Decl., ¶ 12).

24. In her communications with Axelrod, which were not "published" but rather constituted an attempt to collect a debt, she made reference to the Crain's article and the allegations of the lawsuit. (*Id.*)

25. Defendants have claimed that XA made public filings that contained defamatory information, or did so in a way to manipulate its stock.

26. Everything in CMG's public Securities & Exchange Commission ("SEC") filings was fully vetted after a thorough investigation and included in the pending lawsuit, which commenced in September 2014 following the departure of Jean

Wilson and the discovery that Defendants had orchestrated a massive fraud on CMG and its shareholders.  (G. Laken, ¶ 9).

27. The Second Affirmative Defense and Third-Party Complaint do not allege that a single person traded on such information, nor do they identify a single customer of Third-Party Plaintiffs who refused to do business with them because of anything said or done by XA or CMG or its officers and/or employees.

Dated: New York, New York
November 16, 2018

PECKAR & ABRAMSON, P.C.

By: */s/ Kevin J. O'Connor, Esq.*
KEVIN J. O'CONNOR
1325 Avenue of the Americas, 10th Fl.
New York, New York 10019
Tel.: (212) 382-0909
Fax.: (212) 382-3456
Email: koconnor@pecklaw.com
*Attorneys for Plaintiff and*
*Third-Party Defendants*



LAW OFFICES
Peckar & Abramson
A Professional Corporation