UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
CMG HOLDINGS GROUP, INC., as successor to :
XA THE EXPERIENTIAL AGENCY, INC.,         :   Civil Action No.: 15-cv-05814-JPO
                                          :
                Plaintiff,                :
                                          :
        vs.                               :   **DECLARATION OF**
                                          :   **DAVID TUMA**
JOSEPH WAGNER, HUDSON GRAY LLC,           :
DARREN ANDERECK, JESSIE LOMMA,            :
MICHAEL DAY, JEAN WILSON, ESTELLE         :
PIZZO, STUDIO AG, LLC, REMIGIO GUDIN,     :
and MIXED COMPANY, INC.,                  :
                                          :
                Defendants.               :
---------------------------------x
JOSEPH WAGNER, JEFFREY SMITH, DARREN      :
ANDERECK, and JESSIE LOMMA,               :
                                          :
                Third-Party Plaintiffs,   :
                                          :
        vs.                               :
                                          :
GLENN LAKEN and ALEXIS LAKEN,             :
                                          :
                Third-Party Defendants.   :
---------------------------------x

**DAVID TUMA**, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am the President of Creative IT Consulting, LLC ("Creative IT"). I have provided information technology ("IT") consulting services to XA, The Experiential Agency, Inc. ("XA") from 2004 until September 2014. I have also provided IT consulting services to HudsonGray, Inc. ("HudsonGray") from April 2014 until the present (with billing beginning in June 2014 when services became significant). I have also, on an informal basis, assisted some of the individual Defendants with their home computing needs.

{11636141:1}                              1

2. I understand that Plaintiff CMG Holdings Group, Inc., as successor to XA The Experiential Agency, Inc. ("Plaintiff" or "CMG"), has made a number of allegations that various Defendants: (1) improperly copied proprietary XA data and transferred that data to HudsonGray; (2) improperly deleted data from XA; and (3) used XA funds to purchase a computer server. Plaintiff issued a subpoena to Creative IT for various documents, pursuant to which Creative IT produced responsive documents on or about October 26, 2018.

3. I submit this Declaration to: (1) state clearly and unequivocally that I did not assist in any improper data deletion or theft; (2) state that I know of no "plan" or "scheme" by any of the Defendants to improperly delete any XA data or take any data from the XA server (other than personal information); (3) state that the server that XA paid for was installed in XA's office; and (4) describe the work – all legal and appropriate – that Creative IT performed for XA and HudsonGray.

4. I prepared this Declaration from a review of my files, including emails and invoices, and describing this information to Defendants' counsel.

**My Work With XA**

5. As part of the services that Creative IT provided for XA, I often provided the services myself, by visiting the XA office or working remotely from my home office. If I was not available, I would ask a colleague to service the request. I primarily worked with Joseph Wagner ("Wagner") and Jean Wilson ("Wilson") at XA, each of whom I had worked with for years.

6. My services for XA usually consisted of work that is pretty typical for an office. For instance, if an employee departed from XA, XA would often ask me to change the former employee's computer password so that the individual could no longer access XA systems and

other current employees could retrieve any needed items. Similarly, I was often asked to set up new email accounts, delete old email accounts, change settings on work stations, and set up phone lines for new employees. I also provided XA with "troubleshooting". For instance, if an XA employee had trouble logging on remotely, or there were problems with which emails were being automatically sent to a spam folder, I (or a colleague) would assist. Throughout my involvement with XA, I also provided advice concerning the type of hardware XA should be using, obtained price quotes, and placed orders on XA's behalf. These services are illustrated on a collection of invoices issued by Creative IT to XA in 2013 and which annexed are hereto as **Exhibit "A."**

## I. Email Migration to Windstream's Cloud

### A. Preliminary Efforts

7. In late 2013, as a result of storage constraints on and crashing of XA's physical servers, I began assisting XA in shifting their computer systems from in-office servers to a hosted exchange server, known as the "cloud." A copy of Creative IT's September 2013 invoice to XA, in which I billed time for discussing cloud services on September 25, 2013 with Wilson, is annexed hereto as **Exhibit "B."**

8. At no time did any employee of XA ever state, suggest, or insinuate that there was a nefarious purpose to using cloud services, nor was I ever asked to keep the project secret from CMG. Indeed, during the migration process I emailed reports to all XA users, including to Jeff Devlin and Ron Burkhardt – who I am advised were board members of CMG – explaining the process. I am advised that emails concerning the status of the email migration have produced by XA and marked XA0629438-39.

9. There were several expected advantages to moving XA's email system to the "cloud", including: (1) it was sometimes difficult to access email stored in XA's physical server located in Chicago with employees outside of that office, but the use of cloud-based email by employees anywhere should eliminate that problem; and (2) it would be less expensive to store email in the cloud than to use in-office servers.

10. In November 2013, I began speaking with Windstream, a company that used cloud-based Intermedia email services, regarding how to "migrate" – or transfer – XA email accounts to the cloud. A copy of Creative IT's November 2013 invoice to XA is annexed hereto as **Exhibit "C."** These communications continued into December, as illustrated by the email chain marked CREATIVE IT 00705 – 714 annexed hereto as **Exhibit "D."**

**The New York Server**

11. During December 2013, I started looking for price quotes on the new file server that XA would purchase for the New York office to host media and other files (but not email). A copy of Creative IT's December 2013 invoice to XA is annexed hereto as **Exhibit "E."** In an email dated January 3, 2014, annexed hereto as **Exhibit "F,"** I explained the server installation process to Wilson. Ultimately, on January 6, 2014, I ordered a Dell R420 file server on XA's behalf for the New York office, which was installed in XA's New York office in late January 2014, as reflected in Creative IT's invoice to XA for that month, which is annexed hereto as **Exhibit "G,"** and Dell's Statement of Work, which I signed on XA's behalf, and which is annexed hereto as **Exhibit "H."** To oversee that process, I traveled to New York on January 26-27, 2014, as reflected in the plane ticket submitted with Creative IT's invoice. (Ex. G.)

12. In the meantime, I remained in contact with Dell's subcontractor, IT Savvy and SonicWall, to make arrangements for the installation, as reflected in the emails attached hereto as **Exhibit "I."** The server was installed in January 2014. (Ex. G.)

13. I understand that Plaintiff has accused Defendants of having had XA pay for the Dell R420 New York server, but installing it at HudsonGray's office. I was never asked, nor did I make any efforts to, participate in any scheme to steal the Dell R420 server. Indeed, the Dell R420 server was installed in XA's New York office, and, to my knowledge, remained there.

**Email Migration to the Cloud**

14. In December 2013, in connection with the preparation of the physical email servers as part of the migration process, I instructed XA employees to delete their deleted (trash) email, and I archived and exported the current employees' old email and purged the former employees' email.

15. Throughout December 2013, I also interacted with Windstream to better understand the migration process, filled out the necessary forms for XA, prepared XA's firewall for the migration process, and discussed with Windstream how to set up mailboxes and synchronize them for the migration. (Ex. E.)

16. Although the Windstream migration was initially scheduled for late December 2013, when XA staff would be less likely to need access to their computer systems, Windstream was unable to meet the deadline, and the email migration extended into 2014.

17. Throughout January and February 2014, I was in constant contact with Windstream regarding preparations for the migration, including making sure that Windstream was on schedule, that the work performed was acceptable, and to solve issues that would arise. Emails documenting these efforts are annexed hereto as **Exhibit "J."** During this same period, I

was explaining to XA how the process would work, the status of the project, and how problems were being resolved, as set forth in the emails annexed hereto as **Exhibit "K."** For instance, on February 5, 2014, I emailed XA detailed instructions on how employees could set up Outlook email to the Windstream cloud-based server. A copy of the February 5, 2014 email and attachment is annexed hereto as **Exhibit "L."**

18. On February 10, 2014, I began re-pulling data for the migration. On February 14, 2014, I attended to issues relating to email migration, data downloads, restoring re-directed mail during an unsuccessful attempt at migration, and worked with Windstream to cut over and implement the migration. The migration occurred on February 17-18, 2014. The next few days, I continued to troubleshoot any problems resulting from the migration. A copy of Creative IT's February 2014 invoice is annexed hereto as **Exhibit "M."**

19. As part of any migration process, whether email or data, copies of all data were made to ensure that no information was lost. I then compared the copied data to the original, and transferred the data to the new system. Only after the data was transferred, confirmed to be identical to the original and functioning properly in the new system, would I delete the copies.

20. Although the process took longer than expected, and there were some minor issues after the migration was completed (which are unavoidable in a project of this scale), ***no unique data was lost, stolen, or destroyed***. The new system functioned as intended (after certain glitches were fixed), and email was available to and used by XA employees after the migration was finished.

II. **Periodic Deletion of XA's Redundant Mailboxes**

21. To ensure backup of email, I directed the Windstream cloud service to automatically made back-up PST files of each mailbox each week. If left unaddressed, XA's

storage needs would increase substantially as each mailbox is copied and stored along with all of the previous copies made. Periodically, XA would receive a notice that the data limits had been exceeded, and the Windstream system would provide XA with additional storage capacity – at a price, of course. Accordingly, when XA received a notice that the data limits would soon be breached, I suggested to Wilson and she agreed to delete some of the redundant mailboxes that had been copied over and over again in order to avoid incurring unnecessary expense.

22. This deletion process would be rather time consuming, so I would set it in motion and then check in later by reviewing the event logs generated by Windstream. An example of such an event log is annexed hereto as **Exhibit "N,"** and shows that I deleted *__redundant__* mailboxes on September 9, 2014. Importantly, *__no unique data was destroyed as part of this process; rather, only redundant copies of mailboxes were deleted.__* The original mailboxes were not affected by this procedure.

23. I understand that Plaintiff contends that this event log is evidence that Defendants improperly deleted data. Actually, the event log shows the opposite. The log is definitive proof that all users' mailboxes, with email, on the Windstream hosted email server remain intact.

24. The back-up PST files created by the Windstream system are only created when there are mailboxes to copy and convert to a PST file. If the underlying mailboxes had been deleted, as Plaintiff apparently believes, there would have been no PST mailboxes to delete, redundant or otherwise.

25. The deletions recorded in the event log are (1) often performed by companies to reduce storage costs; (2) do not result in the destruction of original or unique data; and (3) were done to reduce costs to XA, not out of any unlawful scheme. The event logs, moreover,

undermine Plaintiff's deletion accusations, as the event log shows the existence, as of September 9, 2014, of the mailboxes that Plaintiff contends had been deleted.

26. On September 10, 2014, I mistakenly sent the XA event log to Wagner, who had already resigned from XA. I do not know why I did this. In retrospect, I should have sent it to Wilson, but I sent it to the wrong person.

### III. Creative IT's Work for HudsonGray

27. Although Creative IT did not issue an invoice to HudsonGray until June 2014, I began considering HudsonGray's IT needs, as shown in my April 23, 2014 email to Wagner, which is annexed hereto as **Exhibit "O."**

28. On May 1, 2014, I was able to discuss HudsonGray's needs with more specificity. My May 1, 2014 email is annexed hereto as **Exhibit "P."** I suggested installing a "file server" in HudsonGray's offices as the most cost conscious solution for a start-up company. I also suggested that HudsonGray purchase various hardware, including an on-site file server.

29. On May 7, 2014, I advised HudsonGray that I purchased various Apple computers and Dell PC's for its use. My May 7, 2014 email is annexed hereto as **Exhibit "Q."** I also notified HudsonGray that I had purchased "open licensing" software, which is a more flexible arrangement that allows the user to manage the licenses purchased between different computers. I understand that Plaintiff contends this email as evidence that HudsonGray was stealing software. This is incorrect.

30. In my May 7, 2014 email, I also notified HudsonGray that I was still working on a cloud-based service referred as a "hosted file server," which was proving more difficult to manage. Indeed, on May 21, 2014, I ordered, on behalf of HudsonGray, a "hosted file server" from IT Savvy. My May 21, 2014 email with the proposal attached is annexed hereto as **Exhibit**

**"R."** IT Savvy's proposal contained an error, stating that the server would have 2.5 TB of storage, which Plaintiff contends is evidence that HudsonGray stole significant amounts of XA data because a start-up company like HudsonGray would not need such expansive storage. IT Savvy's email, however, should have read 250 GB, not 2.5 TB. This is corroborated by the instructions that I created, annexed hereto as **Exhibit "S",** to direct HudsonGray users to remotely access HudsonGray data in the cloud, referred to as the 'DATA SERVER'. To do this, I connected via the internet to the HudsonGray 'DATA SERVER' in the cloud from my own computer and took screenshots to illustrate the process. The screenshots show that "DavWWWRoot" refers to the HudsonGray 'DATA SERVER' and it had total size of 223 GB,[1] and at the time of the screenshot, had 128 GB of free space. (Ex. S, Creative IT 1524.) Users are directed to connect to the "server data folder" which is shown to be DavWWWRoot. (Ex. S, Creative IT 1525, third screen shot.) In the next screen shot, the DavWWWRoot server is highlighted – again, with 128 GB of free space. (Ex. S, Creative IT 1525.) The other serve connections in the screenshot, which contain 2.7 TB of storage, refer to my own personal server, not HudsonGray's. Those servers appear in the screenshots because, as noted above, I was accessing the HudsonGray cloud-based "hosted file server" from my own computer via the internet. The instructions do not show how to connect to those servers.

**Communications with Wagner**

31. On the evening of May 21, 2014, I sent Wagner a recap of the items I was working on for HudsonGray. I also mistakenly advised Wagner about my work for XA. I do not recall why I did this, but it was not because Wagner, or anyone else, directed me to improperly delete XA's data. My May 21, 2014 recap email is annexed hereto as **Exhibit "T."**

---

[1] About ten percent of a server's storage capacity is not available. Thus, a server with 250 GB would start with only 223 GB of memory.

    a. First, I informed HudsonGray that I had created mailboxes for various employees. (Ex. T.)

    b. Second, I notified Wagner of various IT issues at XA. Specifically, I stated that, in regards to "XA Email (at Windstream)", I would delete five mailboxes over the weekend. (Ex. T.) This was a planned deletion as part of the migration / server decommissioning process described above. I never did make these deletions.

32. As I noted earlier, the September event log demonstrates that these migrated mailboxes were not destroyed by the planned deletions I recount in my May 21, 2014 recap email, as they continued to exist in September 2014. Additionally, the migrated mailboxes continued to exist on Windstream, as it was creating backup PST files.

33. Next, due to a failure when we tried to automatically synch data from Chicago to New York, I made a back-up of the partially / failed synchronized data on the XA New York server, and once copied, I was going to delete the data from the server. (Ex. T.) Plaintiff contends that this is proof that I copied XA data for transfer to HudsonGray and deleted it from the XA server. Plaintiff is again incorrect. Actually, I was planning to properly move data from XA's Chicago server to XA's New York server.

34. I then advised that I would be working on XA's Chicago server. (Ex. T.) Specifically, I stated that, over the weekend, I would be copying agency projects (formerly known as "projects production"), resources, and media to XA's New York server. Again, I was copying data from XA's Chicago server to XA's New York server. I did not transfer this data to HudsonGray.

35. Finally, I stated that Wilson could make a copy of "Chicago Accounting Data" onto a "raid" device. A "raid" device is the common name of the external device used to save data externally to a redundant hard drive. This was personal accounting data that Wilson kept on XA's Chicago server, which she wanted to copy onto a portable device.

36. On May 22, 2014, I again gave HudsonGray an update about their new mailboxes. My May 22, 2014 email is annexed hereto as **Exhibit "U."** At that time, I sent Wagner information concerning my work at XA. Again, I cannot remember why I did so four years ago. But it was definitely not part of a plan to steal or destroy XA's computer files. First, I gave an update on the project production data mentioned on my email the previous day. (Ex. U.) There is also a note in my May 22, 2014 email that "(I think were [sic] waiting on Jessie and/or other users to make copies of some of those project folders to their local laptop computers.)" This relates to data that was partially migrated to the New York office. I had to attempt to migrate the data again, but because the migration would take 5-6 days to complete, we first waited for users to save the information that did migrate to their work stations. Those documents were to be used for work at XA, not to be transferred to HudsonGray. To my knowledge, nobody, including Jessie Lomma, was asked to take any proprietary XA data to HudsonGray, nor did they. Second, I gave an update on the XA Chicago data copied to the XA New York server.

37. On May 24, 2014, I emailed Wagner again about XA's computers, a copy of which is annexed hereto as **Exhibit "V".** In the email, I ask if "its ok to wipe the ny projects production data" and I note that, "I have two copies of it in my office already." This is another reference to the failed attempt to synch data from XA's Chicago server to XA's New York server. As the email notes, I already made two copies of the data, so "wiping" it from the New

York server would not have destroyed the data. Wagner did not respond to my email and I never deleted the data from the XA servers.

38. On July 8, 2014, I advised HudsonGray that IT Savvy had discovered a solution to its hosted server issues. My July 8, 2014 email is annexed hereto as **Exhibit "W."** I am informed that Plaintiff interprets this email as code or an "inside joke," and that the parties were actually discussing using XA's server as HudsonGray's server. This is false. My use of capital letters and quotation marks are to show my happiness and surprise at IT Savvy finally figuring out a solution to these issues. If HudsonGray had XA's server this whole time, there would not have been so many communications between me, HudsonGray, and IT Savvy to set up the "hosted file server".

## CONCLUSION

39. In summary, I did not assist any XA or HudsonGray employee to destroy XA data or to copy any XA data (other than personal data). Further, I know of no plan by any XA or HudsonGray employee to improperly delete or destroy XA data. Looking back on my work, I realize that I should not have sent information concerning XA's computer systems to Wagner after his departure from XA. Although I cannot remember why I sent that information to Wagner, I know that it was not to enable or facilitate any wrongdoing. I was simply used to communicating with Wagner, having worked with him for over ten years. I note that my correspondence does not include any request by Wagner for XA information.

40. Finally, I never refused to provide any information to XA. Rather, I recall receiving a call in late Fall 2014 from someone claiming to perform IT work for XA. I explained that I needed to receive authorization from XA before giving out information about XA's servers. Thereafter, no one contacted me to provide that authorization or to seek any additional information.

Executed on November 21, 2018.

_____
DAVID TUMA