IBRJCMGC                        Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CMG HOLDINGS GROUP, et al.,

4                    Plaintiffs,

5              v.                        15 Civ. 5814 JPO

6    JOSEPH WAGNER,

7                    Defendant.

8    ------------------------------x

9

10

11                                      November 27, 2018
                                        3:10 p.m.
12

13

14

15   Before:

16                   HON. J. PAUL OETKEN,

17                                      District Judge

18

19

20

21

22

23

24

25

IBRJCMGC                          Conference

1          (In open court)

2          (Case called)

3          THE COURT:  Good afternoon.

4          I had scheduled this conference I don't know, a month

5    or two ago, and this was intended to be after the close of fact

6    discovery.  I since received some letters from the parties

7    starting with a November 1st joint letter with each side's

8    position on the production and identification of allegedly

9    deleted files from hard drives, servers and USB drives.

10          I gather that's the main dispute.  Let me just before

11   I get into that, depositions were to be completed and all fact

12   discovery other than this hard drive issue were to be completed

13   November 18th.  That is all done, fact discovery is done?

14          MR. O'CONNOR:  Your Honor, yes.  There is another

15   issue.  I filed a letter this morning.  There is the November

16   21 letter and there is my letter from this morning.  Other than

17   that, there are no open issues I am aware of.

18          THE COURT:  Depositions are done?

19          MR. O'CONNOR:  They are of the fact witnesses.

20          THE COURT:  You agree with that?

21          MR. MATTHEWS:  I do, your Honor.

22          THE COURT:  What's the plan for expert discovery?

23          There is a date for plaintiffs' expert disclosure in

24   two days and defendant's expert disclosure in December.  Are

25   you going to hire an expert?

1      MR. O'CONNOR:  I am.  I have a forensic accountant,

2 and I anticipate giving that disclosure on Thursday of this

3 week.  I know counsel has approached me on getting a little bit

4 of time on his end because of holidays, and I expressed to him

5 giving a him a few weeks is perfectly fine with us.

6      THE COURT:  Meanwhile, there is a motion for partial

7 summary judgment which I haven't had a chance to review, and I

8 know that that is filed by plaintiff, and I assume, Mr.

9 Matthews, you're planning to respond to that?

10      MR. MATTHEWS:  We are, your Honor.

11      I have spoken with counsel about asking for a briefing

12 schedule that would contemplate having the defendants put their

13 response in a week from this Friday, which I believe is

14 December 7th, and plaintiff would have two weeks thereafter to

15 put in reply papers, with the court's permission, of course.

16      THE COURT:  Is that right?

17      MR. O'CONNOR:  That is, your Honor, that is

18 acceptable.

19      THE COURT:  That is fine.  Were you going to -- I

20 know, Mr. Matthews, you talked about filing a summary judgment

21 motion.  Is that still your plan?

22      MR. MATTHEWS:  Plan to file a motion for partial

23 summary judgment on some of my claims and some of my client's.

24 Counsel and I had a discussion about when that motion would be

25 filed.  As I read your Honor's individual rules and local

 1   rules, I believe it would be prudent, my deadline would be

 2   within 14 days after the close of all discovery which includes

 3   expert discovery.  I would like confirmation of that because we

 4   haven't had a discussion.

 5            THE COURT:  That is the general rule, although I don't

 6   require premotion conferences.  If you want to file earlier

 7   than that -- some people file a motion for summary judgment

 8   before expert discovery because it doesn't implicate expert

 9   discovery, but if it is going to -- if you want, you can do it

10   later.  The default is two weeks from the close of all

11   discovery including expert discovery.

12            MR. MATTHEWS:  Thank you, your Honor.

13            THE COURT:  You would wait until after experts?

14            MR. MATTHEWS:  I want to wait until at least my expert

15   reviews the hard drives that remain at issue and I hope to

16   discuss with the court today.

17            THE COURT:  So you're not going to move for summary

18   judgment on all claims?

19            MR. MATTHEWS:  Not an all claims, no, but I will be

20   moving on some claims.

21            THE COURT:  There will be a trial --

22            MR. MATTHEWS:  There will be a trial.

23            THE COURT:  -- on some claims and counterclaims or

24   just claims?

25            MR. MATTHEWS:  The plaintiff, the third-party

1    defendants have moved for partial summary judgment on the

2    third-party complaint.

3              THE COURT:  Which is defamation?

4              MR. MATTHEWS:  Defamation, which will be --

5              THE COURT:  But there will be a trial one way or

6    another?

7              MR. O'CONNOR:  Correct.

8              MR. MATTHEWS:  Yes, sir.

9              MR. O'CONNOR:  I should point out to the court we are

10   attempting to get a mediation under way.  There was going to be

11   a trial.  On the partial summary judgment, I should point out

12   to your Honor, we also moved to strike the affirmative defense

13   directed at the unclean hands defense.  Your Honor has written

14   on that subject.  We filed a motion to strike that affirmative

15   defense.  It will be important to have that ruled on.

16             MR. MATTHEWS:  Just so I am clear, counsel, that is

17   the subject of briefing schedule we just discussed?

18             MR. O'CONNOR:  That's correct.

19             THE COURT:  Very good.

20             MR. MATTHEWS:  If I may.  While we were just

21   discussing the expert discovery, counsel alluded to a

22   conversation he and I had about whereas I asked to extend

23   defendant's time to make expert disclosures because it is not

24   on December 30th, which I don't think it was anticipated or

25   intended.  It was just a continuation of prior deadlines, and I

1    was hoping to push that back to January 15th which would, in

2    turn, I would request that we would push back the end date for

3    expert discovery from February 1st to February 15th or 14th,

4    whatever.

5              MR. O'CONNOR:  That is acceptable.  Your Honor, that

6    is perfectly fine.

7              THE COURT:  That is fine.  Defendant's expert

8    disclosures -- let's step back.  Plaintiffs' expert disclosures

9    will still be November 29th.  Is that right?

10             MR. O'CONNOR:  Yes, your Honor.

11             THE COURT:  Plaintiffs' expert disclosures November

12   29th.  Defendant's expert disclosures will now be January 15th,

13   2019, and all expert discovery completed February 15.

14             Did I get that right?

15             MR. MATTHEWS:  I think that is what I have written

16   down.  Yes, your Honor, that is what I propose.

17             THE COURT:  That is fine.  That would make any motion

18   for summary judgment due, the default would be basically March

19   1st.  I could give you a little more than that if you want.

20             MR. MATTHEWS:  I would greatly appreciate a little

21   more than that, your Honor.

22             THE COURT:  Are you going to be moving for summary

23   judgment on the RICO claims?

24             MR. MATTHEWS:  Yes, your Honor, on the RICO claims.

25             THE COURT:  How about 30 days from the end of

1   discovery?

2           MR. MATTHEWS:  That would be excellent.

3           THE COURT:  We'll say March 15th for summary judgment

4   motions.

5           MR. MATTHEWS:  Thank you.

6           THE COURT:  Mr. O'Connor, plaintiff is not going to be

7   moving for any summary judgment on anything other than what

8   they already filed.  Is that right?

9           MR. O'CONNOR:  Currently I don't anticipate doing so,

10  but I would obviously want to see what their motion looks like.

11          THE COURT:  Okay.  Good enough.  That is the easy

12  stuff.  We should start with the issue of the hard drive.  Do

13  you want to start, Mr. Matthews?

14          MR. MATTHEWS:  Yes, your Honor.

15          The issue with the hard drives emanates from a motion

16  for protective order that the plaintiff made in October.

17  Defendants opposed the protective motion for protective order.

18  The court denied the motion for protective order and issued a

19  ruling requiring the production of the hard drives on or before

20  a date at the end of October.

21          Plaintiff and defendants consulted in good faith to

22  work out an arrangement so that we could facilitate compliance

23  with the order and review of the hard drives.  That resulted in

24  an order, Docket No. 122, that required the identification of

25  hard drives that contain evidence of deletion of data by

defendants that plaintiffs intend to submit to the court at
trial by way of fact or expert discovery or that otherwise
contain evidence of deleted data that plaintiff alleges were
improperly deleted by any of the defendants.

That was due to be held on November 9th.  Counsel and
I had numerous communications about that, and the letters have
been submitted to the court for review.  I believe plaintiffs'
position is that all of the drives contain evidence of data
deletion and that they also intend to prove their claims of
data deletion through other evidence, including emails and
invoices from the former information technology consultant used
by XA and also used by my clients Hudson Gray.

My response to that is I am surprised that all of the
data, all of the drives contain evidence of data deletion
because that is why we worked out the stipulation in the first
place so that we could learn from plaintiffs' vendor which
drives, in fact, had evidence of data deletion.

In addition, your Honor, if you recall many moons ago
there was a dispute over the first production of documents from
the plaintiff under prior counsel.  They produced approximately
590,000 pages of documents that they claim were recovered by
their IT specialist.  Recently plaintiff provided me with a
loaded file that identifies approximately 57,000 documents of
files that they claim were "restored," which I assume is the
same thing as "recovered."

1          In any event, I don't see how there could be 590,000

2     pages in one production, 57,000 documents in another

3     production, and that their IT specialist cannot identify which

4     of the 28 different drives that they're holding, one of which

5     is identified as a New York server on the index, and give, so

6     we can give it to our computer expert to say okay, I need

7     Drives 1, 5, 7, however many it is.

8          I am hopeful it is not all 28 because that would be

9     quite expensive for my clients to engage their expert to

10    review, and that's contrary to the intention, I believe, of the

11    parties when we entered into the stipulation that the court so

12    ordered.  So the question of whether or not the plaintiff is

13    obligated to produce the drives, I submit, is not for the

14    court's consideration today.  There is also a court order

15    requiring it.  The question is which drives should plaintiff

16    provide, all or some portion of them?

17         THE COURT:  What is the problem with their providing

18    all of them as long as they meet what they agreed to do in the

19    stipulation, which is to identify with specificity which, if

20    any, of the computer hard drives, et cetera, contain evidence

21    of deleted data?

22         MR. MATTHEWS:  If they will state clearly so that all

23    of them contain evidence of deleted data, I have to take all of

24    them.  That was not my understanding of some of the

25    communications.  That is my understanding now, but I will defer

1   to counsel in that regard.

2              THE COURT:  Mr. O'Connor, would you like to respond?

3              MR. O'CONNOR:  Yes, your Honor.

4         When the stipulation was filed, the universe was far

5   different than it became after we served about five or six

6   subpoenas on non-parties.  We learned things that no one had

7   any idea had occurred here.

8         The stipulation was an effort by me to say to counsel

9   look, if I can identify for you that they only deleted from 4

10  out of 10 hard drives, I'll try to do that for you.  That was

11  the intent of that stipulation.  It says I will identify with

12  specificity which drives have deleted data on them, whether I

13  am going to prove that with fact or expert testimony.

14        We have the deposition of Pedro Faria, F A R I A.  He

15  is an IT professional that they hired.  He has corroborated

16  that they deleted data from all the New York desktops that he

17  saw in that office.  We have now a treasure trove of documents

18  from Mr. Tuma, an IT professional in Chicago that these guys

19  secretly hired to raid all of our computers.

20        We have his file.  We have this entire roadmap.  He

21  laid out in a roadmap email to Mr. Wagner when he left us in

22  early or late February.  Here he is in May, the guy has been

23  gone months, describing how he is going to raid our computers

24  and work with someone in Chicago, still there, Jean Wilson, and

25  use a raid device to get the last bit of data when she resigns.

1         THE COURT:  Is this the same as deleted data,

2    allegedly improperly deleted data?

3         MR. O'CONNOR:  Yes.  Counsel says to your Honor that I

4    gave him a load file.  I gave him a file that shows him 57,000

5    documents that they deleted, precisely the path that they were

6    deleted from, and where he can find them in the current

7    production.

8         I don't know what else they want from me, and we are

9    willing to give them all the drives.  If they want to spend a

10   hundred thousand dollars to go after this, then go right ahead,

11   but the proof and truth is they deleted all our data, and they

12   took it, Mr. Wagner just admitted two weeks ago that he took a

13   USB drive, he stuck it in a computer and he stole his entire

14   Outlook.

15        THE COURT:  When you say, "deleted," copying is

16   different from deleting.  You are saying they got rid of a data

17   and put it on a drive and took it?

18        MR. O'CONNOR:  They did a combination of things.

19        Mr. Wagner decides he is leaving XA in late 2013.  He

20   embarks on this huge IT infrastructure program, spending all

21   this money to have everything upgraded and have everything put

22   in the cloud.  Then he has somebody come into the New York

23   office, they tell this IT guy, who testified under oath, he was

24   told that the New York office is breaking away.  It was true.

25   We didn't know about it, but they told him.  They let him in on

IBRJCMGC                        Conference

1    it.  We are breaking away, wipe the computers.  The guy

2    testified he was brought in to do this.

3              THE COURT:  You're talking about Tuma?

4              MR. O'CONNOR:  Pedro Faria in New York, and Mr. Tuma

5    hasn't testified, but I subpoenaed his records, and in his

6    records -- I have been doing this 23 years -- I have never seen

7    something like this so blatant what they did.  It lays out a

8    roadmap.  He told them this is all the things I'm going to do.

9              So what they did, they moved everything off of the

10   hard drives in New York onto the Winstream Server, cloud-based

11   server, and they wiped the stuff clean in New York.  In Chicago

12   they waited.  When Ms., as you know from the decision,

13   Ms. Wilson stayed behind for four or five months.  So why does

14   she stay behind?  She wanted to make sure all the vendors got

15   paid.

16             THE COURT:  Vendors got what?

17             MR. O'CONNOR:  Got paid for the MBC projects, made

18   sure all the vendors on the past project got paid because they

19   were going after those same clients, they were working with the

20   same clients from day one.

21             Judge, they told the court they looked, got you all

22   the personal emails.  They did no such thing.  We can prove now

23   the whole time Jean Wilson is in Chicago, they're in New York,

24   four floors up with this competitive firm.  He she is talking

25   to them privately.

1           THE COURT:  I realize this is stuff you are going to

2    have a different version.

3           MR. MATTHEWS:  I have an absolutely different version,

4    your Honor.

5           MR. O'CONNOR:  The bottom line is he can have all the

6    drives tomorrow.

7           THE COURT:  Here is my question about the drives.  You

8    have identified, your position is that the 57,000 identified

9    documents, with a path on that thing, that that is the universe

10   of improperly deleted files, or is it something else?

11          MR. O'CONNOR:  That is what we will show a jury

12   someday, that is what they deleted and what Mr. Faria

13   recovered.

14          THE COURT:  But the 57,000, can you connect those

15   57,000 to certain drives?

16          MR. O'CONNOR:  We have a template that tells you which

17   drives are from New York, which are from Chicago.

18          THE COURT:  And identify drives by --

19          MR. O'CONNOR:  Mr. Pedro Faria came up with a list.

20   Item 21 is from New York.  Item 25 is from New York.  I offered

21   to give that to counsel.  At the end of the day, I don't

22   understand what it does for anybody.

23          For them to spend -- it is their money, but at the end

24   of the day you have what you have.  You have witness testimony.

25   He was brought in to wipe these computers clean.  I shouldn't

1    be precluded from having him testify.  On what basis?

2         THE COURT:  Perhaps that will be admissible, who knows

3    when we get to trial, but there is no reason not to produce

4    what I have directed to be produced.  In addition, you need to

5    comply with the part of the stipulation which says you will

6    identify with specificity which, if any, of those drives,

7    storage devices or servers contain evidence of the improperly

8    deleted data.

9         MR. O'CONNOR:  I have done that.  I believe I did that

10   in my November 2nd letter.  I told them they deleted data from

11   all the hard drives.  This was part of an IT upgrade where they

12   took everything off the computers and put it all in the cloud.

13   That is what they did.  Pedro testified to that.  The emails

14   and the invoices from Tuma demonstrate that is exactly what

15   they did.

16        What more specificity can I give?  I don't know.

17        THE COURT:  Mr. Matthews?

18        MR. MATTHEWS:  You hit it on the head.  If this load

19   file that has 57,000 files referenced in it, plaintiffs should

20   be responsible to tell you where those individual files are as

21   opposed to just saying you deleted everything so it is on every

22   drive and we have to spend untold thousands of dollars looking

23   at each drive to determine where it is there is supposed

24   deletion, especially when, your Honor, I submitted a

25   declaration from Mr. Tuma who was accused of participating in

this scheme, laying out in great detail that there was no such

scheme and that there was nothing more than a commonplace

transfer of information from physical servers to services

hosted by the cloud.  Counsel can argue about that.  Plaintiff

can argue that is not incorrect, and we have a jury or the

court decide that at the appropriate time.

          We're allowed to have our computer expert, not Mr.

Tuma, but our expert expert look at the physical drives and say

here is evidence of deletion, and it is just not deletion, your

Honor, there is a difference between deleting redundant backed

up information and deleting information so that it can never be

accessed again.  There is archiving gone on all the time in

companies when they have back up IT.  That is commonplace in

the industry.

          What the plaintiff is alleging is that my clients took

the information to Hudson Gray and then deleted it so that XA

would not have it available to it.  We know that is not true

because Pedro himself testified a year and a half ago he

recovered this information not less than three weeks after Jean

Wilson left.

          THE COURT:  Is that the 57,000?

          MR. MATTHEWS:  I don't know what that is.  That led to

590,000.  Counsel is stating the 57,000 files show exactly from

which servers they came from.  There is no reason for them not

to be able to say here are the servers and here are the files

IBRJCMGC                              Conference

1    on those servers that have been deleted.

2              THE COURT:  It sounds like they have given you that.

3              MR. MATTHEWS:  They have given us a load file that has

4    57,000 entries and on it.  It states the file name and states

5    the production number from which the file name was produced.

6    That is what we have had.  We communicated with counsel and I

7    attempted to have our IT personnel have a conference call and I

8    was rebuffed.

9              So when you look at that, that would require somebody

10   to match up 57,000 different entries amongst 22 different

11   document productions.  That would take months.  I would not be

12   able to do it.  That is not an inspection of the hard drives.

13   We accepted the information in the stipulation that plaintiff

14   would tell us which of the hard drives have evidence of

15   deletion, not just every one.

16             In fact, when we crafted the stipulation at the time,

17   I agree with counsel, it was his opportunity to work in good

18   faith to try to work it out.  United Lex was not prepared at

19   that time to specify which of the hard drives would be required

20   to be reviewed in this situation.  We gave them time, and they

21   came back to us and said every one of them.  I don't think that

22   is compliance with the order.

23             THE COURT:  What do you want me to order them to do?

24             MR. MATTHEWS:  I would like you to identify which of

25   the drives, the 57,000 thousand files are contained.

1            THE COURT:  Can you do that?

2            MR. O'CONNOR:  All of them.  You just heard him, they

3      did it to clean up, right.

4            THE COURT:  Each of the 57,000, can you say this one

5      is this server or this file?

6            MR. O'CONNOR:  He is incorrect.  The load file

7      provides the exact path where it came from.  It shows you whose

8      computer it came from.  I don't know what else I can do for

9      these people, Judge.  At the end of the day, they claim Mr.

10     Tuma is talking to the former CEO in the summer of 2014 -- he

11     has been gone months -- how to wipe clean Chicago.  Really?

12           If you want to argue that to a jury, go right ahead.

13     I don't know what to do for them.  I will give them all the

14     drives.  They can have them tomorrow.  It will take a few days

15     because they're very heavy, but we have explained to them and

16     they admit they deleted data from all the computers.  They were

17     doing, in their view, they were doing us a favor by putting it

18     all in the cloud.  That is what their theory is going to be.

19           THE COURT:  I think you should take the data and see

20     if, in fact, the path identified on the 57,000 spreadsheets

21     will allow your expert to go to a specific place in the

22     servers.

23           MR. MATTHEWS:  What you're proposing is we accept all

24     of the drives?

25           THE COURT:  Yes.

1          MR. MATTHEWS:  And use the load file with 57,000 files

2     on it to determine whether we can identify?  I accept that

3     proposal, your Honor.

4          THE COURT:  And see if it is doable.  If not, you

5     might have to have a meet-and-confer, and I may order you to

6     provide more information on the 57,000.  You should provide it

7     and see if your accountant, your forensic person is able to use

8     it with the path provided by the spreadsheet to get the

9     information.

10         MR. O'CONNOR:  Thank you.

11         THE COURT:  See if that works.

12         MR. MATTHEWS:  Thank you.

13         THE COURT:  What else is disputed?

14         MR. O'CONNOR:  The issue I addressed in my letter is

15    this.  There are two memos the defendants claim they wrote to

16    management at XA.  One is in 2009.  The other is in 2014.  As I

17    told your Honor, we got Mr. Wagner to say he stole this whole

18    Outlook folder, all his Outlook, all his documents.  He took a

19    USB device, stuck it in the computer without any authority and

20    took it with him.

21         The problem is we don't have this Outlook folder.  It

22    is gone.  It is one of the things they deleted.  If you look at

23    the production in this case, there were very few emails from

24    Mr. Wagner to anybody.  There is a memo they claim they gave to

25    XA management and CMG management in '09 that had a line item

1   that says Studio AG, I don't know the exact, but that somehow

2   disclosed these folks had their own company.

3           No one has cooperated.  The only people that are

4   willing to say that under oath are the defendants.  There is no

5   contemporaneous documentation.  I have asked to give me the

6   folder.  They have given me the 2009 memo.  They gave it to me

7   in electronic form so I can check the meta-data and see when it

8   was created.  They won't --

9           THE COURT:  2009 memo?

10          MR. O'CONNOR:  The 2009 memo Mr. Wagner claims he gave

11  to management where he claims he disclosed they formed this

12  other company to support XA's business.  That is the argument

13  for me.

14          I have asked to have the memo in electronic form or

15  some representation you tried to find it and you couldn't.  How

16  is it that there is no proof that this went to management?

17  Where is the email conveying, the email back saying thanks for

18  the memo.  There is nothing like that.

19          I asked for this a while ago.  He waited until after

20  the discovery end date and he says to me it is too late, sorry,

21  I am not going to comply.  The other memo is a 2014 memo

22  Mr. Wagner claims he gave to another gentleman at CMG.  Again

23  the same question, I would like that memo in electronic form.

24  They refused to give it to me.

25          THE COURT:  Is this the subject of your November 27th

1    letter?

2         MR. O'CONNOR:  It is, your Honor.  I was told that I'm

3    too late, even though the request was made prior to the end of

4    the fact discovery period.  I was told I am too late.

5         THE COURT:  Is this why you attached Wagner's

6    deposition?

7         MR. O'CONNOR:  Yes.  He admits he took his Outlook

8    folder with him.  I don't have access.  On my side, I can't

9    possibly find this document in my production.  They deleted it

10   and he took it with him.  I have asked them go to Mr. Wagner's

11   file he says he took and give me the memo or give me an email

12   conveying the memo.

13        THE COURT:  The memo is from when?

14        MR. O'CONNOR:  There are two memos.  There is one in

15   '09 and one in 2014.  He admitted he has his own Outlook

16   folder.  It would take him all of two minutes to look for that

17   memo if it really exists.  We suspect it doesn't exist.  We

18   suspect it was created for the occasion, which explains why

19   they won't give it to us in electronic form.

20        THE COURT:  What do you mean, for the occasion?

21        MR. O'CONNOR:  We don't believe it was created back in

22   '09.  There is no evidence the company had this memo.  They

23   came up with it in the litigation.  They said yeah, we gave

24   this to Mr. Ennis is '09.  Mr. Ennis has no recollection

25   whatsoever of this.

1          THE COURT:  You're saying it is a fabricated document?

2          MR. O'CONNOR:  We do.

3          THE COURT:  Mr. Matthews?

4          MR. MATTHEWS:  We do.  There are a lot of statements

5     what people are saying and people are doing where there is

6     absolutely no basis for.  Starting with Mr. Ennis, he claims he

7     never saw the email.  Mr. Ennis has not been deposed.  There is

8     no evidence of what Mr. Ennis saw, heard or did.  All we know

9     is that Ennis was forced out of the claim when Mr. Lake

10    threatened him with a RICO lawsuit in 2010.

11         My clients are prepared to testify, Joe Wagner and

12    Darryn Andorak, they spoke to Mr. Ennis in 2009 about formation

13    of this company Studio AG.  Studio AG is a defendant in the

14    action.  They wrote a memo, Wagner wrote a memo he had a

15    face-to-face discussion with Mr. Ennis, CMG representative, and

16    he said because CMG was buying certain of the assets and

17    companies of the then constituted XA business, it was not going

18    to buy a company called Fury XA.  Fury XA served as a decor and

19    floral provider to service XA's clients as well as any other

20    clients it could generate on its own.

21         Due to the jettison, the fact they were going to

22    jettison that business, Darryn Andorak, Jean Wilson, Joe Wagner

23    and Estelle Pizzo decided we will form Studio AG, and Joe

24    Wagner discussed that with Jim Ennis, so did Andorak, and

25    they're prepared to testify what they did and there is a

1    contemporaneous memo.  Not only is there a contemporaneous

2    memo, if you look at XA's financial records going forward, you

3    will see payments to Studio AG throughout the course of dealing

4    of the next several years.  In fact, it was not hidden at all

5    what they were doing with Studio AG.

6         Ms. Lake testified just recently in her deposition I

7    believe that she spoke with Jim Ennis, and Mr. Ennis told her

8    he never heard of Studio AG.  That is hearsay that is

9    inadmissible.  My client's testimony is that they provided the

10   memo to Mr. Ennis is not hearsay because they will be in court

11   to testify about it and be cross-examined on it.

12        In addition, your Honor, counsel did not make the

13   request a long time ago.  He made the request two weeks ago

14   after the document discovery period had concluded and asked for

15   the electronic version of the documents.  I have conferred with

16   my clients.  They do not have an electronic version of the 2009

17   memo or the 2014 memo.  They provided it to me from a paper

18   file that my client had in his possession.

19        THE COURT:  So you're saying there is no electronic

20   form?

21        MR. MATTHEWS:  According to my clients, there is no

22   electronic file of this.

23        THE COURT:  There is not a version attached to email?

24        MR. MATTHEWS:  With respect to the 2014 memo, again we

25   don't have an electronic version of it.  I wish we did.  I am

1   surprised it was not in 590,000 pages of documents XA was able

2   to recover, but we'll argue about that another time.

3          There is an affidavit from Ronald Burkhart, who states

4   he received the memo and discussed it with Studio AG, Joe

5   Wagner.  Now, Mr. Burkhart, in his deposition testimony in

6   another case, a companion case, he won against XA which failed

7   to pay him, and on trial also testified that he didn't know

8   Studio AG.

9          His credibility goes to the weight of the evidence.

10  It doesn't go whether or not that memo exists, and I think that

11  is what counsel is arguing prematurely now.  This really should

12  be a motion in limine that we address right before trial rather

13  than a Rule 37 motion to preclude us from referring to a

14  document simply because it wasn't contained in an email or

15  didn't have an electronic version of it.

16         I just received this letter motion this morning, your

17  Honor, so I am sure I will have additional arguments to make,

18  and I would like to reserve my right to do so unless the court

19  wants to hear more.

20         THE COURT:  I don't know what point there is going to

21  be.  Look, if you want to make a motion in limine later on, you

22  can do that.  He has represented there is no electronic

23  version, you have a paper version.  I don't know what more we

24  can do.

25         MR. O'CONNOR:  I want it to be clear when this goes to

IBRJCMGC                    Conference

1   trial and I make a motion for an inference.  I believe there

2   should be an inference.  They have an Outlook folder for

3   Mr. Wagner they failed to produce in discovery.

4           THE COURT:  You can argue what that means in a motion

5   in limine or whatever.

6           MR. O'CONNOR:  Great.  I'll do that.  Thank you.

7           THE COURT:  Great.  We have deadlines for responses.

8   We have extended deadlines for the rest of discovery and for

9   summary judgment motions in March.  Mediation, you mentioned

10  the M word.  You have a privately-retained mediator?

11          MR. O'CONNOR:  Yes, we selected the mediator and we're

12  trying to get that done in January.

13          THE COURT:  You agree with that?

14          MR. MATTHEWS:  I do.  We are going to try to resolve

15  the case.

16          THE COURT:  Great.  Anything else?

17          MR. O'CONNOR:  That is it.

18          THE COURT:  Thanks very much.  We're adjourned.

19          (Court adjourned)

20

21

22

23

24

25