UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| CMG HOLDINGS GROUP, INC. as assignee of XA, THE EXPERIENTIAL AGENCY, INC., :<br><br>Plaintiff, :<br><br>vs. :<br><br>JOSEPH WAGNER, HUDSON GRAY LLC, DARREN ANDERECK, JESSIE LOMMA, MICHAEL DAY, JEAN WILSON, ESTELLE PIZZO, STUDIO AG, LLC, REMIGIO GUDIN, and MIXED COMPANY, INC., :<br><br>Defendants. : | Civil Action No.: 15-cv-05814-JPO<br><br>**DEFENDANTS' AND THIRD-PARTY PLAINTIFFS' RESPONSE TO PLAINTIFF'S AND THIRD-PARTY DEFENDANTS' LOCAL RULE 56.1 STATEMENT, AND DEFENDANTS' AND THIRD-PARTY PLAINTIFFS' LOCAL RULE 56.1 <u>COUNTERSTATEMENT</u>** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOSEPH WAGNER, JEFFREY SMITH, DARREN :
ANDERECK, and JESSIE LOMMA,             :
                                        :
              Third-Party Plaintiffs,   :
                                        :
vs.                                     :
                                        :
GLENN LAKEN and ALEXIS LAKEN,           :
                                        :
              Third-Party Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Pursuant to Local Civil Rule 56.1, Defendants Joseph Wagner ("Wagner"), HudsonGray, Inc., incorrectly sued herein as Hudson Gray LLC ("HudsonGray"), Darren Andereck ("Andereck"), Jessie Lomma ("Lomma"), Michael Day ("Day"), Jean Wilson ("Wilson"), Estelle Pizzo ("Pizzo"), Studio AG, LLC ("Studio AG"), Remigio Gudin ("Gudin"), and Mixed Company, Inc. ("Mixed Company") (collectively, the "Defendants"), and Third-Party Plaintiffs Wagner, Jeffrey Smith, Andereck, and Lomma (collectively, the "Third-Party Plaintiffs"), submit this Response to Plaintiff's and Third-Party Defendants' Local Rule 56.1 Statement of

Material Facts Not in Dispute served by Plaintiff and Third-Party Defendants in support of their Motion For Partial Summary Judgment:

1. This action was first commenced in New York County Supreme Court and was removed by Defendants on July 24, 2015. (ECF #1).

**Response:** Admit.

2. The operative complaint is the Second Amended Complaint ("SAC"). (*See* O'Connor Decl., Ex. A).

**Response:** Deny. The operative complaint is the Second Amended and Revised Complaint. (Doc. No. 19.)

3. The Court issued a comprehensive decision and order dated September 7, 2016, sustaining all but two causes of action in the SAC. (ECF #42).

**Response:** Admit that the Court issued a decision and order, September 7, 2016 (the "Order") that dismissed two causes of action, but deny that it sustained all other causes of action in the Second Amended and Revised Complaint as Defendants had not moved with respect to three causes of action.

4. The only equitable claim that survived the motion to dismiss is one for unjust enrichment, which claim is duplicative of the other damage claims and therefore is unlikely to be submitted to a jury. (*Id.*)

**Response:** Defendants and Third-Party Plaintiffs object to the statement that unjust enrichment claim is duplicative of other damage claims on the grounds that it is a legal

conclusion. Defendants and Third-Party Plaintiffs object to the statement that the unjust enrichment claim is unlikely to be submitted to a jury on the grounds that it premature as no trial date has been set and it is unknown what claims or evidence will be submitted to a jury. Admit that the only equitable claim that survived the motion to dismiss is for unjust enrichment.

**Defendants' Second Affirmative Defense.**

5.     In their answer, Defendants raise a Second Affirmative Defense, as follows:

283.   Plaintiff's equitable claims are barred by the doctrine of unclean hands.

284.   CMG / XA, under the control of Glenn Laken ("Laken") and Alexis Laken, has committed numerous unlawful acts with respect to the subject matter of this dispute that preclude its ability to obtain equitable relief.

285.   Upon Laken taking formal control over CMG / XA in 2014, after operating the company under the guise of being a consultant, the Individual HudsonGray Defendants became concerned about affiliating with Laken due to the fact that he was previously convicted for racketeering conspiracy, wire fraud, illegal kickbacks, theft of honest services, conspiracy to commit the above substantive offenses and to commit union pension fund fraud, securities fraud, fraud by an investment advisor, conspiracy to commit securities fraud, wire fraud, and commercial bribery. See, generally, United States v. Reifler, 446 F.3d 65, 70 (2d Cir. 2006).

291.   In 2014, moreover, Laken directed Wagner and Ronald Burkhardt, then XA's Executive Chairman, to arrange for an Internet consulting firm to "scrub" Laken's "Google listing" so that Internet searches of Laken's name would not display information related to Laken's prior arrest, indictment and conviction.

292.   Following the initiation of this litigation in September 2014 and as a result of the investigation conducted by Wagner and counsel, it has become clear that this litigation against Wagner and the other Defendants is in part a scheme by Laken to conceal his illegal and unethical actions relating to CMG including:

- acting as a control person for CMG without proper disclosure

- violating insider trading laws through illegal trading of CMGO stock

293.   According to an affidavit executed by Sol Mlot attached as Exhibit 1 hereto, in April 2012 Laken began directing Sol Mlot to trade Mlot's CMGO stock, and Laken also directly traded Mlot's CMGO stock using Mlot's trading account credentials. Laken did not disclose his

control of Mlot's stock in any public filing. This unlawful trading activity of 14 million shares of CMGO stock by Laken based on material non-public information, a clear violation of the securities laws, is memorialized in a June 29, 2013 agreement between Laken and Mlot. *See* June 29, 2013 Agreement between Glenn Laken and Sol Mlot attached as Exhibit 2 hereto.

295. This Agreement was acknowledged by letter dated June 18, 2014 attached as Exhibit 3 hereto issued by CMG's attorney, Darren Ofsink, who was indicted in 2015 on charges of securities fraud, conspiracy to commit securities fraud, and conspiracy to commit mail fraud and wire fraud. *See* Superseding Indictment dated November 2, 2015 attached as Exhibit 4 hereto.

296. At the same time, Laken was acting as a "control person" for CMG by directing corporate management and policies, and also having full access to insider information regarding CMG and its subsidiaries through his direct communication with CMG's corporate officers, auditor and accountant. For example, Laken signed the Release Agreement entered into with Wagner on February 26, 2014 as "Chairman / CEO", and then, on February 27, 2014, directed Wilson to transfer CMG funds, again signing as the "Chairman / CEO", several weeks prior to his supposed appointment by the Board. *See* Agreement and Wire Transfer Authorization attached as Exhibit 5 hereto.

297. CMG did not disclose Laken's role as a control person within CMG until the April 7, 2014 public filing in which Laken was named as Chairman and CEO. *See* Form 8-K attached as Exhibit 6 hereto.

298. CMG / XA, under Laken's control, also manipulated the stock of CMGO by making false and defamatory statements concerning this lawsuit, including the July 16, 2015 press release advertising to sell a "new class of series A preferred shares that will have first priority payout from any litigation settlement" to attract "capital to support CMG's ongoing civil RICO (Racketeer Influenced and Corrupt Organizations) lawsuit against former employees seeking total damages of $20 million.") *See* Press Release attached as Exhibit 6 hereto.

299. As a result of this, and other, wrongful conduct, Plaintiff's claims for equitable relief must be denied and Plaintiff's claim for punitive damages considered in light of Plaintiff's own wrongful conduct. (Defendants' Answer, Second Affirmative Defense, Ex. B to the O'Connor Decl.).

**Response:** Admit, except deny that the first three paragraphs of the Second Defense were numbered 283, 284, and 285, and aver that those paragraphs were actually number 288, 289, and 290, respectively.

6. Upon resolution of the motion to dismiss, the parties engaged in two years of discovery. (ECF Nos. 43 to 131).

**Response:**     Admit.

7.     Plaintiff made a demand for a corporate designee from Hudson Gray to give testimony about the Second Affirmative Defense and Joseph Wagner was produced. The following constitutes Mr. Wagner's attempt to explain this affirmative defense:

Q.   Last question is it pertains to the defenses raised by HudsonGray. If you want to say that he is going to be the one to talk about it that's fine, but there is a defense raised in the case that trading activity by Mr. Laken somehow should disallow the claims in this case. Are you familiar with that?

MR. MATTHEWS:  You can testify to your familiarity.

A.   I am familiar with the claims, yes.

Q.   Tell me about it. What's this defense of yours at HudsonGray?

MR. MATTHEWS:  I am going to object in that it is not listed in the topics. But you can go ahead and testify.

MR. O'CONNOR:  I think it is, but he can go ahead and answer.

A.   At a high leveling context it is that what Mr. Laken's attorneys have admitted that he has been posting on the stock board his giant killer promoting the stock. At the same time that there is trading records showing that Barbara Laken is selling stock acting on inside information and promoting stock on the stock board.

Q.   Anything else?

A.    I am sure there is more details to it but this is something that Scott [Matthews] is handling. I am not crafting the unclean hands defense.

Q.   Let me go through what you just said. Posting on a stock board as giant killer. What did he post?

A.   There is numerous posts. I don't have them memorized verbatim.

Q.   What were the posts and when?

A.   Again, they were over the past periods of time while he was involved with inside information and working in CMG access to the auditor, running the company.

Q.   Is it your claim that for HudsonGray that this occurred prior to the departure of the defendants in this case or before?

MR. MATTHEWS:  You know what, I am going to object.  This is not part of the 30(b)(6) deposition topics.  You are happy to take a look at them.

MR. O'CONNOR:  Sir, it is your client's defense.

MR. MATTHEWS:  It is not listed.  We client has already been deposed in this action and it also goes to attorney work product.

MR. O'CONNOR:  So your position is you are not going to let him answer questions?

MR. MATTHEWS:  I'd answer a few questions but I mean the giant killer post I know there are hundreds of them.

MR. O'CONNOR:  I'd appreciate if you don't talk.

MR. MATTHEWS:  Then I prefer not to let him answer the question.

MR. O'CONNOR:  You are not going to let your client answer questions you know that you are going to have to bring him back.

MR. MATTHEWS:  I don't know how you would do that.  It is not part of the topics.  I want to be collegial about this so that we don't have a dispute.

MR. O'CONNOR:  Let me ask this.

BY MR. O'CONNOR:

Q.   You know there is a claim against your clients, against you and against your company and against Darren [Andereck], against Jean [Wilson]; right?  For damages right?

A.   Correct.

Q.   Do you have any claim that those damages aren't owed to you because of something done with Glenn Laken with his posting board?

A.   *I can't answer that.  That's a legal question*.

> Q. You don't know the answer to that?
>
> A. I do not. That would be Scott who would answer that. (Deposition of Hudson Gray Corporate Designee Joseph Wagner, at 173-176, O'Connor Decl. Ex. C) (emphasis added).

**Response:** Deny. Plaintiff did *not* make a demand for a corporate designee from Hudson Gray to give testimony about the Second Affirmative Defense, as demonstrated by the Re-Notice of Deposition of HudsonGray LLC Under Rule 30(b)(6), dated September 13, 2018. (Matthews Dec., Ex. A.) Further, as demonstrated in the excerpt of the deposition of HudsonGray corporate designee Joseph Wagner included above, Defendants' counsel objected during the deposition on the grounds that the Rule 30(b)(6) notice did *not* make a demand for a corporate designee to provide testimony concerning the Second Defense, along with an objection based upon attorney work product.

8. Barbara Laken owns approximately 10,000,000 shares of CMG in certificate form, which are presently non-negotiable. (Glenn Laken Declaration ("G. Laken Decl."), ¶ 3). Glenn Laken worked with her to manage her portfolio of CMG stock given his background in the financial industry. (*Id.*) CMG is traded on the over-the-counter market ("OTC"). (*Id.*, ¶ 2).

**Response:** Admit that CMG is traded on the over-the-counter market. Deny knowledge or information sufficient to form a belief as to the whether Barbara Laken owns approximately 10,000,000 shares of CMG in certificate form or that Glenn Laken worked with her to manage her portfolio of CMG stock.

9. During the period of 2011 through April 2018 there were hundreds of buy tickets generated for her account, and only two sell tickets. (*Id.*)

**Response:** Defendants and Third-Party Plaintiffs object to this statement on the grounds that it is not clear whose account is being referenced. Deny knowledge or information sufficient to form a belief as to the whether during the period of 2011 through April 2018 there were hundreds of buy tickets generated for "her account" and only two sell tickets.

10. The first sale on August 23, 2013 was for 120,000 shares that generated $1,029.24, followed by a purchase the same day for 104,000 shares at a total cost of $1,037.08.

**Response:** Deny. The sale of 120,000 shares of CMG stock on August 23, 2013 for $.008679 generated $1,041.48, and the purchase of 104,000 shares (100,000 shares for $.0098 and 4,000 shares for .0097) that same day cost a total of $1,018.80. (Matthews Dec., Ex. B.)

11. All of the statements attributed to Glenn Laken in either the Second Affirmative Defense or Third-Party Complaint, which Defendants claim were made to either defame them or inflate CMG's stock, were all made after this trade, which obviously yielded a loss. (*Id.*, ¶ 5).

**Response:** Defendants and Third-Party Plaintiffs object to this statement on the grounds that it is vague and ambiguous as to which trade is being referenced. Admit that the defamatory statements by Glenn Laken described in the Third-Party Complaint occurred after August 23, 2013, but deny that all of the message board posts made by Glenn Laken to inflate CMG's stock took place after August 23, 2013. (Matthews Dec., Ex. Q, DEF165361 and DEF165365.) Deny knowledge or information sufficient to form a belief as to whether the trades yielded a loss, as it is not stated at what price the sold shares had been purchased for, or what price the purchased shares were ultimately sold for.

12. The second sale took place a full five years later, in May of 2018, for approximately 3.9M shares. That sale generated approximately $21,000. (*Id.*, ¶ 6).

**Response:** Admit that a sale took place on May 10, 2018 for approximately 3.9 million shares of CMG stock that generated $22,816.98, and deny knowledge or information sufficient to form a belief as to the whether any other sales took place between the May 2018 sale and the August 21, 2013 sale.

13. The Lakens sold the 3.9M shares at that time because they needed funds and decided to take the loss rather than borrow finds and increase their debt. Based on the accounting principal FIFO, the sale resulted in a significant loss. (*Id.*, ¶ 7).

**Response:** Deny knowledge or information sufficient to form a belief as to the why the Lakens sold 3.9 million shares at that time or whether the sale resulted in a significant loss.

14. Over the years, Glenn Laken has posted information on an online forum called investorshub.com with the profile "giantkiller."  (*Id.*, ¶ 10).

**Response:** Admit.

15. Glenn Laken never posted for personal benefit or short term profit, as the stock trading clearly shows. (*Id.*, ¶ 11).

**Response:** Deny. Glenn Laken's posts demonstrate that the purpose of the posts was to boost or maintain the price of CMG stock, of which the Lakens owned millions of shares, and to promote Glenn Laken's management of CMG. (Matthews Dec., Ex. Q.)

16.     Defendants include an affidavit by Sol Mlot in their answer and affirmative defenses, claiming that this constitutes "unclean hands". Sol Mlot is a 95-year old man who has been dating Glenn Laken's 87-year old mother for more than 15 years. He asked Glenn Laken to help him with trading and Glenn did so. He did not like the results he got, and signed an affidavit at his son's insistence stating that Glenn Laken had no authority to trade on his behalf. Mlot later signed a second affidavit recanting the first affidavit. Later, at the insistence of his sons, he signed a third affidavit – ***after they had him declared incompetent*** in a Florida proceeding – contradicting the first and second ones. During this period, Mr. Mlot's sons were litigating against Glenn Laken's mother in an effort to deny her a small inheritance left by their father. This case has since been settled in Illinois. (*Id.*, ¶ 13).

**Response:**     Defendants and Third-Party Plaintiffs object to this paragraph on the grounds that Glenn Laken lacks personal knowledge of the facts sought to be admitted, and so the statement relies on hearsay. Deny that Sol Mlot asked Glenn Laken to help him with trading and that Glenn Laken did so. According to the Affidavit of Sol Mlot, dated September 24, 2015, Glenn Laken asked Sol Mlot if he "would be interested in some good stock tips," and Glenn Laken drafted an agreement under which Glenn Laken would "manage" Sol Mlot's position in CMG stock and determine when to liquidate the shares, and the two would share in the profits and losses. (Matthews Dec., Ex. C.) Deny that Sol Mlot signed an affidavit at his son's insistence stating that Glenn Laken had no authority to trade on his behalf. In an affidavit, dated March 2, 2017, Sol Mlot stated that the statements in his September 2015 affidavit were true. (Matthews Dec., Ex. D.) Deny that Mr. Mlot's sons were litigating against Glenn Laken's mother to deny her a "small inheritance."

**The Third-Party Complaint.**

17.     On or about February 29, 2015, Third-Party Plaintiffs, Wagner, Andereck and Lomma (collectively, "Third-Party Plaintiffs"), filed a Third-Party Complaint against Glenn Laken and Alexis Laken (collectively, "Third-Party Defendants") alleging six counts of Libel and Libel Per Se. (*See* O'Connor Decl., Ex. C).

**Response:**  Deny that Third-Party Plaintiffs consist only of Wagner, Andereck, and Lomma and that the Third-Party Complaint was filed on February 29, 2015. The Third-Party Complaint was filed on February 19, 2015, and Jeffrey Smith is also a Third-Party Plaintiff. (Doc. No. 145-3, Ex. C.)  Admit that the Third-Party Complaint alleges six counts of libel and libel per se against Glenn Laken and Alexis Laken.

18.     Alexis Laken took over the duties of President of XA in July 2014, at a tumultuous time when XA had just suffered the mass exodus of its CEO, President and entire production team in the course of just a few weeks. (A. Laken Decl., ¶ 3).

**Response:**  Defendants and Third-Party Plaintiff object to this statement on the grounds that the phrase "entire production team" is vague and ambiguous.

Admit that Alexis Laken took over the duties of President of XA in July 2014. Deny that "XA had just suffered the mass exodus of its CEO, President and entire production team in the course of just a few weeks."  XA's former CEO, Wagner, gave notice of resignation from XA on March 14, 2014. (Wagner Dec., ¶ 3.)  XA's former President, Andereck, resigned effective May 22, 2014. (Matthews Dec., Ex. E, p. 31, line 21-22.)  Day resigned on May 20, 2014. (*Id.*, Ex. F, p. 77, line 4.)  Lomma, another member of the production team, resigned

effective June 13, 2014. (*Id.*, Ex. G, p. 20, line 13.) Therefore, Defendants' departures took place over the course of months, not "just a few weeks."

19. At the time, she did not know this had all been carefully orchestrated and planned by Wagner, Wilson and their co-defendants for many months. Alexis Laken learned the details of their fraudulent acts slowly. By September 2014, it began to come into full picture, and suit was first filed in September 2014 in New York County Supreme Court. (*Id.* at Decl., ¶ 4).

**Response:**   Defendants object to the allegations in the first two sentences of paragraph 19 as vague and ambiguous. Admit that this lawsuit was commenced in September 2014 in New York County Supreme Court, and deny any fraud. (Wagner Dec., ¶ 4; Wilson Dec., ¶ 3.)

20. After suit was filed against Defendants, Alexis Laken received a call from a reporter from Crain's Chicago. She returned that call and politely referred the reporter to the publicly-available pleadings on file in the action that had been filed. (*Id.* at Decl., ¶ 9). The Crain's article to which the Third-Party Complaint relies itself attaches this article that recites allegations from the pleading.

**Response:**   Deny that Alexis Laken referred the reporter from Crain's Chicago to the publicly-available pleadings on file in the action that had been filed and that the Crain's article recites allegations from the pleadings. Alexis Laken sent an email to the reporter from Crain's Chicago that included defamatory statements that had not been included in the publicly-filed pleadings and which were then included in the Crain's Chicago article. (Matthews Dec., Ex. H.) Deny knowledge or information sufficient to form a belief as to whether the Crain's Chicago

reporter and Alexis Laken also spoke by telephone. Deny that the Crain's article to which the Third-Party Complaint relies itself attaches this article that recites allegations from the pleading.

21. At no time did Alexis Laken give the reporter any information beyond the pleadings or express any opinions other than what was alleged by XA in its pleadings in this action. (*Id.* at Decl., ¶ 10).

**Response:** Deny. Alexis Laken the Crain's Chicago reporter an email dated December 16, 2014 containing statements that were not included in the pleadings in this action at the time and that did not express opinions. (Matthews Dec., Ex. H.)

22. The Third-Party Complaint (Counts II and V) also refers to a communication between Alexis Laken and Mike Axelrod ("Axelrod") about an unpaid bill for his wedding. Alexis Laken determined that Wagner had caused XA to perform valuable services for Axelrod without seeking full repayment. This was one of many instances that were discovered where Wagner, Wilson and others had engaged in this conduct to the detriment of XA. (*Id.* at Decl., ¶ 11)

**Response:** Admit that the Third-Party Complaint refers to a communication between Alexis Laken and Axelrod regarding the bill for his wedding. Deny knowledge or information sufficient to form a belief as to whether Alexis Laken determined that Wagner had caused XA to perform valuable services for Axelrod without seeking full repayment. Deny that Wagner and Wilson caused XA to perform valuable services for clients without seeking full repayment. (Wagner Dec., ¶ 5; Wilson Dec., ¶ 4.)

23.     Alexis Laken did communicate to Axelrod that it was not acceptable for him to claim that he had been given services for free, particularly in light of the pending litigation against Defendants accusing them of fraud and diversion of corporate opportunities. She did so in her capacity as President of XA, to recover a just and legal debt for services that Wagner and Wilson were apparently intending to allow to go unpaid. (*Id.* at Decl., ¶ 12).

**Response:**     Deny. (Doc. No. 145-3, Ex. D and E.) Alexis Laken's email to Axelrod actually stated she has "an ongoing relationship with a number of media outlets" and that "Crain's Chicago in particular has been asking for interesting and salacious details." Alexis Laken threatens Axelrod by stating that if he does not pay the amounts demanded within three days, "I will have no choice but to contact both the Chicago and New York press with regards to your lack of payment for a wedding that occurred 15 months ago" and that "Although I would prefer not to publicly embarrassing you and your family, I have no problem doing so if this balance is not paid in full." The email also provides a link to the defamatory Crain's Chicago article. (*Id.*)

24.     In her communications with Axelrod, which were not "published" but rather constituted an attempt to collect a debt, she made reference to the Crain's article and the allegations of the lawsuit. (*Id.*)

**Response:**     Admit.

25.     Defendants have claimed that XA made public filings that contained defamatory information, or did so in a way to manipulate its stock.

**Response:** Deny. Defendants have claimed that Glenn Laken has made public filings that contained defamatory information, or did so in a way to manipulate CMG stock. (Doc. No. 145-3, ¶¶ 24-32.)

26. Everything in CMG's public Securities & Exchange Commission ("SEC") filings was fully vetted after a thorough investigation and included in the pending lawsuit, which commenced in September 2014 following the departure of Jean Wilson and the discovery that Defendants had orchestrated a massive fraud on CMG and its shareholders. (G. Laken, ¶ 9).

**Response:** Deny that everything in CMG's public SEC filings was included in the pending lawsuit at the time that the filings were made (Matthews Dec., Ex. I; Doc. No. 145-3, Ex. C) and deny information or knowledge sufficient to form a belief as to whether a "thorough investigation" was completed prior to the SEC filings.

27. The Second Affirmative Defense and Third-Party Complaint do not allege that a single person traded on such information, nor do they identify a single customer of Third-Party Plaintiffs who refused to do business with them because of anything said or done by XA or CMG or its officers and/or employees.

**Response:** Admit.

28. Tellingly, Lomma admitted at deposition that: she has not even read the Third-Party Complaint; is not paying to pursue it; cannot explain what was said about her that was false except that she considers the SAC's allegations to be false; and has not suffered even a single penny of damages. (Deposition of Jesse Lomma, at 111-114, O'Connor Decl. Ex. E).

**Response:** Defendants and Third-Party Plaintiff object that it is neither relevant no material whether a party has read the pleadings or personally paid legal fees in the case. Deny, except admit that Lomma stated the following at her deposition that: (a) she had not reviewed the Third-Party Complaint; (b) she has not personally paid money to pursue the third-party claims against the Lakens; (c) she had not reviewed the Crain's Chicago article in some time and so "wouldn't be comfortable answering that," but testified that the allegations in the Complaint against her were false; and (d) her reputation had been damaged as a result of the defamatory statements made by the Lakens, but could not identify, at her deposition, any particular lost wages or business opportunities. (Doc. No. 145-5, p. 111-114.)

### DEFENDANTS' AND THIRD-PARTY PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Civil Rule 56.1, Defendants and Third-Party Plaintiffs respectfully submit this statement of additional material facts, which includes facts that do not present genuine issues to be tried and facts that present genuine issues to be tried. In opposition to the Partial Motion for Summary Judgment submitted by Plaintiff and Third-Party Defendants, Defendants and Third-Party Plaintiffs state:

29. This action was commenced in New York State Supreme Court with the filing of the initial Summons and Complaint, dated September 22, 2014 (the "Initial Complaint"). (Matthews Dec., Ex. I.)

30. The First Amended Complaint was not filed until June 29, 2015. (Doc. No. 1-1.)

31. At the time Alexis Laken communicated with the reporter from Crain's Chicago through her email dated December 16, 2014, and at the time Glenn Laken caused to be filed with the SEC a letter to shareholders of CMG, dated November 19, 2014, the only complaint filed in

this action was the Initial Complaint. (Matthews Dec., Ex. H; Doc. No. 145-3, Ex. C; Matthews Dec., Ex. I.)

32. The Initial Complaint does not include any allegations concerning: (1) Wilson; (2) credit card reimbursement; (3) Studio AG; (4) Mixed Company; or (5) XA Scenes. (Matthews Dec., Ex. I.)

33. The December 16, 2014 email from Alexis Laken to the Crain's Chicago reporter includes the following statements:

- Wilson "[v]iolated an existing non compete [*sic*] by conspiring with Joe Wagner to steal employees and business from XA and set up offices for Hudson Gray [*sic*] in New York";

- Wilson "[a]llowed Darren Andereck to charge all company business on his private AMEX account, then falsify charges on reconstituted spread sheets" and that Andereck "[c]omitted credit card fraud by filing fraudulent 'snapshot' bills for himself and other employees to auditors which they had coded themselves";

- Wilson "[b]ecame an unauthorized vendor to XA through her Elmhurst, Illinois florist shop, Mixed Company, which charged XA $130,000 lat [*sic*] year alone";

- Wilson "[o]perated a competing shadow business through a company called XA Scenes that has been folded into XA by the parent company – that unbeknownst to the board of the parent company continued to function as a the [*sic*] rental agency for Gallery 1028 . . . and as an agent for Alice's Garden/ Studio AG – a competing enterprise owned by XA's president, Darren Andereck";

- Wilson and others, through XA Scenes, Studio AG, Alice's Garden, and Mixed Company, "siphoned millions of dollars in revenue from the parent company. Parent company board members were unaware of Alice's Garden, Studio AG, Mixed Company, and Gallery 1028";

- Andereck, "[u]nknown to the board of the parent company", "owned the competing business Studio AG during the entire term of his employment at XA, in violation of his non compete [*sic*] agreement." According to the email, "Studio AG became an unauthorized vendor to XA as well, charging XA over $600,000.00 in unspecified, unauthorized and possibly fraudulent charges in the last year alone."

(Matthews Dec., Ex. H.)

34. The Crain's Chicago article annexed as Exhibit A to the Third-Party Complaint includes the following statements:

- Wilson "created a company called HudsonGray and solicited XA clients in violation of [her] non-compete agreements";

- "the former employees also put personal charges on company credit cards and used XA funds to pay for family members' cellphones, personal travel, and other expenses unrelated to business";

- "Wilson conspired with former CEO Joe Wagner, also based in Chicago, and former President Darren Andereck, based in New York, to solicit XA employees and business";

- "a west suburban Elmhurst florist owned by Wilson, Mixed Company, was an unauthorized vendor to XA and received $130,000 in payments in the last year";

- "Wilson, Wagner, and Andereck also operated a company called XA Scenes that functioned as the rental agent for Gallery 1028, a Near North Side loft event space, and as an agent for Alice's Garden, a now-defunct Lakeview florist owned by Andereck, and Studio AG, a North Side event-production company he also owns."

- Studio AG and Alice's Garden "supplied the same services to the same clients as XA, operated without the knowledge of CMG executives and siphoned millions of dollars in revenue from XA."

(Doc. No. 145-3, Ex. A.)

35. Glenn Laken's letter to shareholders includes the following statements:

- Andereck, Wagner, and Wilson "all owned privately held competing companies designed to siphon business opportunity away from XA. These private affiliations were not disclosed to the board of CMG. These undisclosed entities also defrauded the parent company be becoming vendors to XA – charging XA nearly $650,000 in questionable receipts over the last two years alone.";

- Andereck, Wilson, Jeff Smith, Lomma, and Day "conspired with Joe Wagner to strip XA's business of all corporate clients, newly purchased computers, lockers filled with staging equipment from around the country . . .";

- CMG discovered "numerous instances of conversion of XA assets and funds, such as personal charges on company credit cards, payments for cell phones for family members,

> reimbursement for personal travel and other expenses which did not relate to XA in any way, in addition [*sic*] transactions between XA and parties owned by these former employees who did not disclose their interests in them."

(Doc. No. 145-3, Ex. C.)

36. The statements identified in the Third-Party Complaint as defamatory concern Third-Party Plaintiffs' profession and/or allege criminality. (Doc. No. 145-3, ¶ 24-46.)

37. Third-Party Defendants filed an Answer to the Third-Party Complaint on June 26, 2015. (Doc. No. 145-4.)

38. The Answer to the Third-Party Complaint does not raise, as an affirmative defense or otherwise, that the Third-Party Complaint does not seek relief derivative of the claims made in the Initial Complaint. (Doc. No. 145-4.)

39. In 2000, Glenn Laken was convicted, following a jury trial, of: RICO conspiracy, in violation of 18 U.S.C. § 1962(d); wire fraud; illegal kickbacks; theft of honest services; and conspiracy to commit those offenses, along with conspiracy to commit union pension fund fraud, securities fraud, and fraud by an investment advisor. *U.S. v. Reifler*, 446 F.3d 65, 70 (2d Cir.2006).

40. Glenn Laken also pleaded guilty to conspiracy to commit securities fraud, wire fraud, and commercial bribery "in connection with stock issued by FinancialWeb.com." *Id.*

41. Glenn Laken was released from prison within the last 10 years. (Matthews Dec., Ex. J.)

42. Wilson, Wagner, and Andereck knew of Glenn Laken's criminal conviction, which contributed to their decisions to depart from XA. (Matthews Dec., Ex. E, p. 32-34, 40; Ex. K, p. 29, 31-32; Ex. L, p. 105.)

43. From its close on April 11, 2018 until its close on May 10, 2018, the share price for CMG stock increased 524% (from .00125 to .0078). (Matthews Dec., Ex. M.)

44. Glenn Laken did not disclose to the SEC or to shareholders his May 10, 2018 sale of 3.9 million shares of CMG stock. (Matthews Dec., ¶ 3.)

Dated: December 20, 2018
      New York, New York

**WINDELS MARX LANE & MITTENDORF, LLP**

By   /s Scott R. Matthews
    Scott R. Matthews
    James Tracy
156 West 56th Street
New York, New York 10019
Tel.: (212) 237-1025
Fax: (212) 262-1215
smatthews@windelsmarx.com
jtracy@windelsmarx.com
*Attorneys for Defendants*